Jessica Blome (Cal. Bar No. 314898)
Jennifer Rae Lovko (Cal. Bar No. 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: jblome@greenfirelaw.com
        rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

BONNIE KOHLERITER, MARY KONCEL, LAURA LEIGH, individually and WILD HORSE EDUCATION, a non-profit corporation,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, Secretary of the United States Department of Agriculture, UNITED STATES FOREST SERVICE, and TOM SCHULTZ, Chief of the United States Forest Service,

      Defendants.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      On August 15, 2025, the UNITED STATES FOREST SERVICE (Forest Service or Service) announced it will begin gathering 350 wild horses from the Devil's Garden Plateau Wild Horse Territory (WHT) on September 2, 2025. Plaintiffs respectfully bring this case to challenge the Forest Service's action as it was made in violation of the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331, *et seq*., National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* The WHA, through its regulations, requires that plans to remove wild horses from public lands must be based

on a determination that an overpopulation exists and is necessary to restore a thriving natural ecological balance to the range. *See* 16 U.S. Code § 1333. The Forest Service violated the WHA by basing the current action on an unlawfully set appropriate management level (AML) for the Devil's Garden Plateau WHT, ignoring the removal of 407 wild horses from the WHT in the Fall of 2024/Winter of 2025, and failing to substantiate that range conditions create a necessity for removal. The Forest Service also failed to take a "hard look" at the environmental consequences of its plan, as required under NEPA and its regulations because it conducted absolutely no NEPA review. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989).

2.      Plaintiffs also bring this case to challenge the Forest Service's decision to conduct a gather on September 2, 2025 because the Forest Service is violating the First Amendment of the U.S. Constitution by improperly limiting the public's right of access to observe the gather operations.

3.      Plaintiffs file this Complaint for Injunctive and Declaratory Relief (Complaint) to prevent the Forest Service from implementing the September 2, 2025 gather or any future gathers until Defendants have complied with the WHA, NEPA, and the APA.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

5.      Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The Forest Service has sufficient contacts to subject it to personal jurisdiction in this district.

## PARTIES

6.      Plaintiff BONNIE KOHLERITER experiences great enjoyment from visiting and observing wild horses on public lands, including the wild horses in the Devil's Garden Plateau WHT. She champions for the long-term survival of the wild, free-roaming horses in public lands by advocating for the government's management to adhere to all applicable state and federal laws related to these animal's survival and humane treatment. Plaintiff KOHLERITER also has worked with the Forest Service to facilitate adoption of wild horses that are removed from public lands.

7.      Plaintiff KOHLERITER has educated the public regarding the wild horses in the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Devil's Garden Plateau WHT through publishing online articles and appearing on radio podcasts.

8. Plaintiff KOHLERITER has been visiting the Devil's Garden Plateau WHT regularly for approximately a decade. Her last visit in the WHT was during the summer of 2025, and she has plans to again visit the WHT in 2026.

9. Plaintiff MARY KONCEL received her Master of Science in Animals and Public Policy from the Cummings School of Veterinary Medicine at Tufts University in 2009. This program focuses on human-animal relationships and their implications for policy and community action.

10. Plaintiff KONCEL has published three peer-reviewed articles on wild horse adoption: Koncel MA, Rutberg AT. Catching the Spirit: A Study of Bureau of Land Management Wild Horse Adopters in New England. J Appl Anim Welf Sci. 2012;15(1):32-52; Koncel MA. Hoofbeats From the Currituck Outer Banks: A Study of the Corolla Wild Horse Fund Adoption Program. J Appl Anim Welf Sci. 2016;19(1):37-48; Koncel MA, Rutberg AT. Knowledge, Tradition, and Community Predict Success for BLM Wild Horse Adoptions in Colorado and Texas. Society and Animals. 2018; 26(2):367-387.

11. Plaintiff KONCEL has been advocating for the protection of wild horses on public lands for more than a decade. From 2017 through 2023, she served as staff to the American Wild Horse Campaign (now re-named the American Wild Horse Conservation). During this time, she became involved in a campaign that focused on the Forest Service's practices for managing wild horses in the Devil's Garden Plateau WHT.

12. Plaintiff KONCEL has submitted Freedom of Information Act requests to the Forest Service regarding the wild horses in the Devil's Garden Plateau WHT. She has educated the public regarding these horses through online blogs.

13. As a private citizen, Plaintiff KONCEL has visited the Devil's Garden Plateau WHT on several occasions over the past 5 years to observe and enjoy the wild horses in their habitat. She also has attended events hosted by the Modoc National Forest in the WHT. She plans on returning to visit the WHT later this year.

14. Plaintiff KONCEL began attending roundups in the Devil's Garden Plateau WHT in

2019, and she attended the last roundup that occurred in 2024.

15. Plaintiff LAURA LEIGH is the Founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals.

16. Plaintiff LEIGH has been documenting and enjoying wild horses in the Devil's Garden Plateau WHT since 2011. In the past, she also has attended and observed gather operations (also known as roundups) of wild horses in the WHT. She has a recreational and aesthetic interest in viewing these horses, as well as a conservation interest in protecting these horses and their habitat.

17. This year, Plaintiff LEIGH has visited the Devil's Garden Plateau WHT twice. She has plans to visit the WHT again in mid-October of 2025.

18. Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information.

19. The mission of Wild Horse Education is to protect and preserve wild horses and burros on range, during and after capture. Wild Horse Education has an interest in ensuring that wild free-roaming horses are treated as an integral part of public lands and management activities are conducted at the minimal level feasible.

20. Advocating for the wild horses in the Devil's Garden Plateau WHT is a past, present, and future important issue for Wild Horse Education.

21. In the past, Wild Horse Education has sent member volunteers to attend and observe gather operations in the Devil's Garden Plateau WHT. At times, when they have appeared for these roundups, they have been turned away because the Forest Service limits the number of observers. Wild Horse Education intends to continue sending member volunteers to roundups in the Devil's Garden Plateau WHT in the future.

22.     Wild Horse Education and its members visit the Devil's Garden Plateau WHT for photography, observing wildlife, and other recreational pursuits. They gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses. The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant interest and value to Wild Horse Education and its members and increases their use and enjoyment of California's public lands. Wild Horse Education and its members have engaged in these activities in the past and have specific plans to do so again in the future.

23.     The Plaintiffs' aesthetic, recreational, and conservation interests in the wild horses of the Devil's Garden Plateau WHT have been, and will continue to be, injured by Defendants' failure to comply with their mandatory obligations under the WHA, NEPA, and the APA since this failure will lead to the permanent removal of these beloved wild horses from the WHT.

24.     The injunctive relief requested provides the only remedy that can redress the injuries of Plaintiffs. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the WHA, NEPA, and the APA before gathering and removing wild, free-roaming horses from the Devil's Garden Plateau WHT. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses needlessly injured, killed, or removed by Defendants.

25.     Defendant UNITED STATES DEPARTMENT OF AGRICULTURE and Defendant BROOKE ROLLINS, Secretary of the United States Department of Agriculture are charged by federal statute with managing, administering, and protecting the wild horses on Forest Service lands, including the Devil's Garden Plateau WHT, pursuant to the WHA.

26.     Defendant UNITED STATES FOREST SERVICE is an agency of the UNITED STATES DEPARTMENT OF AGRICULTURE. Defendant UNITED STATES FOREST SERVICE and Defendant TOM SCHULZ, Chief of the United States Forest Service, have been delegated responsibility to manage, administer, and protect the wild horses on Forest Service lands, including the Devil's Garden Plateau WHT, pursuant to the WHA.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

27.     The Forest Service has adopted no gather plan nor conducted any NEPA review for

the upcoming gather. Plaintiffs wrote to the Forest Service on August 18, 2025 and addressed the basis for Plaintiffs' contention that the upcoming gather violates the WHA, NEPA, and the First Amendment of the U.S. Constitution. Plaintiffs asked that the Service suspend any gather operations for the Devil's Garden Plateau WHT until such time as the agency issues a Record of Decision for the Devil's Garden Plateau Wild Horse Territory Management Plan (a proposed plan that the Forest Service has begun reviewing pursuant to NEPA but which has yet to be adopted). The Forest Service responded on August 22, 2025 and said it refused to suspend the upcoming gather scheduled for September 2, 2025.

**LEGAL FRAMEWORK**

**A.    Wild Free-Roaming Horses and Burros Act**

28.    The WHA is our basic national charter to protect wild free-roaming horses and burros as "living symbols of the historic and pioneer spirit of the West," recognizing that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. Congress enacted the WHA to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." *Id.*

29.    The WHA directs the Secretary to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* at § 1333(a).

30.    As used in the WHA, "Secretary" "means the Secretary of Agriculture in connection with public lands administered by him/her through the Forest Service. *See Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87, 93 n.12 (D.D.C. 2009).

31.    Among the management activities that the Secretary may engage are activities related to the removal of "excess" wild free-roaming horses and burros from the public range. *Id.* at §§ 1332(f), 1333(b). In making determinations regarding such removal, the Secretary must compare the current population to appropriate management levels (AMLs). *See id.* at § 1333(b)(2). AMLs must be established on the basis of "evidence, analysis or studies." *Dahl v. Clark*, 600 F. Supp. 585, 592 (D. Nev. 1984). Where the Forest Service relies upon improper AMLs, any excess

determination will necessarily violate the WHE. *See* Friends of Animals v. Sparks, 200 F.Supp. 3d 1114, 1126 (D. Mont. 2016) ("By operating with an outdated AML when it [adopted a removal plan], [the government's] excess animal determination was based, at least in part, on pure guesswork. Without an accurate AML, [the government's] duty to remove could not be triggered because [the government] could not properly determine that an overpopulation existed, which is the prerequisite for removal"); *Animal Protection Institute of America*, 109 IBLA 112, 118 (1989) (decision to remove horses cannot be based on AMLs established "only for administrative convenience").

32.     Before gathering and removing horses, the Forest Service also must do more than simply rely upon population counts. The agency must make a determination that removal is necessary, too. *See* U.S.C. § 1333(b)(2); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1281 (D. Utah 2017); *Wyoming v. United States DOI*, 839 F.3d 938, 944 (10th Cir. 2016). A determination that removal of horses is necessary' indicates that the Service cannot achieve and maintain a thriving natural ecological balance without the removal. *See* U.S.C. § 1333(b)(2); *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1282.

## B.     National Environmental Policy Act

33.     The centerpiece of environmental regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. *See* 42 U.S.C. § 4331(b).

34.     Prior to the gathering and removal of wild horses from public lands, the Forest Service must adhere to the provisions of NEPA. *See* 42 U.S.C. § 4321 *et seq.*; *Am. Wild Horse Pres. Campaign v. Zinke*, 2017 U.S. Dist. LEXIS 224842, No. 17-cv-170-F,, at *7 (D. Wyo. Oct. 13, 2017); *Friends of Animals v. United States BLM* 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC, 2015 U.S. Dist. LEXIS 17575, at *7 (D. Nev. Feb. 11, 2015); *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 890 F. Supp. 2d 99, 103 (D.D.C. 2012).

35.     As a threshold matter, NEPA requires agencies to consider whether a proposed action might conflict with the requirements or purpose of another statute. *See* 40 CFR § 1501.1(a).

36.    In assessing the appropriate level of NEPA review, agencies must determine whether to rely upon an Environmental Impact Statement (EIS) or an Environmental Assessment (EA). An EIS is appropriate for major actions that are likely to significantly affect the quality of the human environment.  *See* 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.3(a). An EA is appropriate where there is not likely to be a significant effect or the significance of the effects is unknown. 40 C.F.R. § 1501.3(a).

37.    Where an agency adopts a proposed action following development of an EIS, it may adopt a Record of Decision (ROD) to implement its decision. Through this ROD, the agency is legally bound to act as promised pursuant to the decision. *See* 43 C.F.R. § 1505.3; *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123-25 (D. Mont. 2016).

38.    If an agency relies upon an EA and finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an EIS. *See* 40 C.F.R. § 1508.1(l); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

39.    A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(l).

40.    Regardless of whether review involves an EIS or EA, NEPA requires federal agencies to take a "hard look" at environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989); *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4[th] 1016, 1027 (10th Cir. 2023).

41.    NEPA review requires that "every significant aspect" of the environmental effects of a proposed major federal action be made available to inform agency decisionmakers and the public so that both may "play a role in both the decision-making process and the implementation of" the action. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

42.    Such review requires consideration of direct, indirect, cumulative, and ecological impacts associated with a proposed action. *See* 40 C.F.R. § 1508.1(g); *Neighbors of Cuddy*

*Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1379 (9th Cir. 1998); *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 991 (8th Cir. 2011).

43.     NEPA review does not allow an agency to break down an action into small component parts to avoid a significance determination. *See Kern v. U.S. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).

**C.     Administrative Procedure Act**

44.     Sections 706(2)(A) through (D), which apply to all cases involving agency action, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), provide:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall …
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > (B) contrary to constitutional right, power, privilege, or immunity;
> > C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > (D) without observance of procedure required by law …
> > In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2).

45.     In addressing these provisions of the APA, the reviewing court must engage in "substantial inquiry" of an agency decision. *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 415.

**D.     First Amendment to the U.S. Constitution**

46.     The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. Amend. I.

47.     Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986).

48.     A qualified right of access applies to gather operations of wild horses on public

lands. *See Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013).

## STATEMENT OF FACTS

49.     Wild horses have lived in the area now known as the Devil's Garden Plateau WHT since the late 1800s. According to the Forest Service, an estimated 500 wild horses lived in the WHT in 1974.

50.     This land became officially designated as a WHT in 1975, initially being managed for 300 or 305 wild horses over two non-contiguous units covering approximately 236,000 acres. In the early 1980s, the WHT was expanded to approximately 258,000 acres and managed as one contiguous unit.

51.     A management plan issued in 1985 identified a wild horse population objective of 275-335 for the Devil's Garden Plateau WHT, which was reaffirmed by the 1991 Modoc National Forest Land and Resource Management Plan (1991 Modoc LRMP). Currently, this plan remains the operative management plan.

52.     In 2011, the Forest Service issued a scoping letter for the purpose of addressing a new management plan for the Devil's Garden Plateau WHT. The Service subcontracted the development of the new plan to the Modoc County Farm Bureau in August of 2012.

53.     Farm bureaus are nonprofits whose mission is to represent the interests of farmers and ranchers, and not surprisingly, the board for the Modoc County Farm Bureau was comprised of farmers and ranchers. In keeping with the Farm Bureau's mission, the organization's work for the Devil's Garden Plateau WHT almost exclusively focused on the impact of wild horses on livestock allotments.

54.     In October of 2012, the Modoc County Farm Bureau requested that the Forest Service change the WHT boundaries. In 2013, following preparation of an Environmental Assessment (EA), the Forest Service adopted the Devil's Garden Plateau Wild Horse Territory Management Plan and Forest Plan Amendments (2013 Plan) with a Decision Notice and FONSI. Through this plan, the Service eliminated 23,631 acres from the Middle Section of the WHT, thereby separating the territory into two isolated units.

55.     The proffered justification for removing this acreage from the WHT was the Forest

Service's assertion that inclusion of this land in the WHT in the 1980s had been the result of "administrative error." With the 2013 Plan, the Forest Service also re-calculated the appropriate management level (AML) to 206-402 wild horses based upon the new constricted boundaries of the WHT.

56.    In March of 2014, American Wild Horse Preservation Campaign, Carla Bowers, and Return to Freedom began litigation before the U.S. District Court for the District of Columbia to challenge the 2013 Plan. Through summary judgment, Plaintiffs asked the Court to set aside the Service's Decision Notice, EA, and FONSI. In this motion, the Plaintiffs argued that the Forest Service had acted in an arbitrary and capricious manner by removing the Middle Section from the WHT in violation of provisions in the WHA, the National Forest Management Act, and NEPA. Plaintiffs noted that if the Court were to find that the Service's elimination of the Middle Section was unlawful, then the re-calculated AML also should be found defective because it is based on only those portions of the WHT that lie outside of the Middle Section.

57.    On September 30, 2015, the District Court denied Plaintiffs' summary judgment motion and granted the Forest Service's cross-motion. Plaintiffs appealed the decision, and the U.S. Court of Appeals for the D.C. Circuit reversed the lower court's order. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923, 932 (D.C. Cir. 2017). This conclusion was based on the Court's finding that the decision was arbitrary and capricious in two respects. *See id.* at 923.

58.    "First, the Service failed to acknowledge and adequately explain its change in policy regarding the management of wild horses in the Middle Section as part of a single, contiguous protected Wild Horse Territory. Second, the Service failed to consider adequately whether an Environmental Impact Statement was required under NEPA." *Id.*

59.    As regards the second point, the Court explained: "Here, the relevant environmental concern was the effect of the boundary modification on the wild horse population in the Devil's Garden area. The Service not only failed to address that concern, it denied its very existence. The Service insisted that the redrawn boundary lines would have 'no effect' on the ground because it was only 'correct[ing]' a boundary established for administrative convenience.' That is, the only sense in which the Service 'identified' the effect of the boundary modification on wild horses was by

insisting that there was 'no effect' and that nothing had ever really changed. That head-in-the-sand approach to past agency practice is the antithesis of NEPA's requirement that an agency's environmental analysis candidly confront the relevant environmental concerns. More to the point, because the Service actually managed wild horses within portions of the Middle Section for two decades as though they were within the Wild Horse Territory, the 2013 boundary change entailed far more than scratching out a few lines in the 1991 Forest Plan. Yet the Service refused to even consider the possibility of that broader, real-world impact. Thus, while the Service 'identifie[d]' some effects on wild horses as an environmental concern, the Service did not forthrightly and 'accurately identif[y] the relevant environmental concern'—the actual effects of the boundary modification on wild horses in the Devil's Garden area." *Id.* at 931.

60.    The Court "vacate[d] the Service's exclusion of the Middle Section territory and the related Finding of No Significant Impact, and direct[ed] the district court to remand to the Service for further consideration consistent with this decision." *Id.* at 932.

61.    In October of 2017, a collective of ranchers filed suit against the Forest Service (Devils Garden Preservation Group et al. v. U.S. Forest Service et. al., U.S. District Court for the Eastern District of California, 2:17-cv-02185 ) to compel the immediate removal of excess horses in the Carr Allotment, Emigrant Springs Allotment, Pine Springs Allotment, Surveyors Valley Allotment, and Timbered Mountain Allotment.

62.    All or a portion of each of these allotments is located within the Devil's Garden Plateau WHT; a portion of the Carr Allotment also falls within the Middle Section of the WHT.

63.    In their motion for summary judgment, the ranchers contended that the population of wild horses exceeded both the AML contained in the 1991 Modoc LRMP and the AML as set in the 2013 Plan. In response to this motion, intervenors in the case noted that the 2013 Plan's re-calculation of AML had been based on the assumption that more than 23,000 acres in the Middle Section of the WHT would no longer be available to wild horses, "an assumption which the U.S. Court of Appeals overturned." *Devil's Garden Preservation Group et al.*, Intervenors' Response to Plaintiffs' Statement of Facts.

64.    Before any ruling on the merits of the case, the Forest Service and ranchers entered

into a settlement agreement (Settlement Agreement). By its terms, the Forest Service agreed to the following:

> • Subject to available funding, the Forest Service will undertake an annual wild horse census before each gather of the Devil's Garden Plateau Wild Horse population. This census will utilize simultaneous, double-counting. In the event that a census does not occur, a gather will be informed by the most recent census.

> • The Forest Service will develop an AML Implementation Strategy (a staggered, multi-year strategy to achieve AML by using gathers and other appropriate management strategies). In developing this Strategy, the Service will consult with the plaintiff ranchers and seek input from other interested parties. The AML Implementation Strategy will identify the number of horses that need to be gathered each year to reach low- to mid-range AML as specified in the 2013 Plan or any subsequent revision or amendment(s).

> • Subject to available funding, the Forest Service will use best efforts to gather the number necessary to ensure the Devil's Garden wild horse population does not increase. Annual gather numbers, starting with the 2021 gather, will be no less than a minimum of 500 horses or the number necessary to ensure that the Devil's Garden wild horse population does not increase, whichever is necessary to reach low to mid-range AML, at which time other management options become available, as outlined in the Territory Management Plan.

65.    No AML Implementation Strategy, as addressed in the Settlement Agreement, has ever been issued by the Forest Service.

66.    In 2022, the Forest Service began scoping for a new management plan – the Devil's Garden Plateau Wild Horse Territory Management Plan (Proposed Plan). The Forest Service asserts that this Proposed Plan "will supersede" the 2013 Plan; however, as the 2013 Plan was vacated by the U.S. Court of Appeals, the Proposed Plan actually will supersede the 1991 Modoc LRMP.

67.    In 2024, the Service published a Final Environmental Assessment, as well as a draft Decision Notice and draft FONSI. However, to date, no signed decision or FONSI have been issued.

68.    In the Spring of 2024, the Forest Service conducted a census of wild horses in the Devil's Garden Plateau WHT using an aerial survey with simultaneous, double-counting. This survey identified 723 wild horses in or around the WHT, and in the Fall/Winter of 2024/2025, the Forest Service gathered and removed 407 wild horses.

69.    In 2025, the Forest Service conducted a ground count showing 500-600 horses in the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Devil's Garden Plateau WHT. Ostensibly, an aerial survey was not conducted due to a lack of funding.

70. The Forest Service signed a contract for $617,508.00 with C.D. Warner Livestock on July 21, 2025, to conduct the gather operations in the WHT. The contract description is for the removal of 375 wild horses. At that time, the Forest Service did not divulge to the public that it had decided to gather horses in the WHT.

71. On August 15, 2025, the Forest Service publicly announced that the agency plans to begin gathering 350 wild horses from the Devil's Garden Plateau WHT on September 2, 2025. In this announcement, the Service references the 2024 census survey of "more than 700 horses." The announcement does not reference the removal of 407 wild horses in 2024/2025.

72. On August 18, 2025, Plaintiffs wrote to the Forest Service and addressed the basis for Plaintiffs' contention that the upcoming gather violates the WHA, NEPA, and the First Amendment of the U.S. Constitution. Plaintiffs asked that Service suspend any gather operations for the Devil's Garden Plateau WHT until such time as the agency issues a Record of Decision for the Proposed Plan.

73. On August 22, 2025, the Forest Service wrote to the Plaintiffs and said it would not suspend the upcoming gather. In this correspondence, the Service stated the 2013 Plan designates the AML in the Devil's Garden Plateau as 206-402 wild horses, and the agency does not believe the D.C. Circuit reversed this component of the 2013 Plan.

74. The Forest Service informed Plaintiffs that its excess determination is based on a comparison of the 2013 Plan's AML with data from the 2024 aerial survey and 2025 ground count.

75. In this correspondence, the Service also stated that the decision to conduct a gather is based "on factors including rangeland conditions, ecosystem health, excess horse placement capability, workforce capacity, operational capacity, current and future year budget priorities, and other on-range management options. Impacts of wild horse overpopulation include removal of vegetation from riparian areas, increased degradation of spring sites, and increased competition for resources with wildlife." To date, the Forest Service has not provided Plaintiffs or the public with any information in support of these factors.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

76.     The Forest Service also informed Plaintiffs that not only would helicopter gather operations begin on September 2, 2025, but also, "[a] contractor is anticipated to set bait traps this coming week in advance of the helicopter gather." In its announcement on August 15, 2025, the Forest Service did not inform the public that bait traps would be set prior to September 2, 2025.

77.     The Forest Service's response to Plaintiffs' August 18, 2025 letter did not directly address Plaintiffs' statements regarding the Service's need to comply with NEPA before gathering and removing horses. And, the Forest Service has conducted no environmental review for the upcoming gather.

78.     The Forest Service is relying upon the EA for 2013 Plan despite the U.S. Court of Appeals specifically holding that the Plan's "environmental analysis" was "arbitrary and capricious," and the Court vacated the 2013 Plan and its related FONSI. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 931-932. Once agency action has been vacated, it is invalidated. *See id.* at 928 (citing *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687, 690 (9th Cir. 2007.

79.     The Forest Service (and the Bureau of Land Management) generally use aerial surveys such as simultaneous, double-counting to accurately assess wild horse populations. The Forest Service has consistently utilized simultaneous, double-counting prior to undertaking its last seven roundups. Ground counts are unreliable and typically only used for very small geographic locations.

80.     Despite this, the Forest Service is relying upon a ground count to support its gather decision.

81.     The Forest Service's own internal guidance recognizes that more than population numbers need to be considered, noting that the current inventory of horses also should include information on "herd composition, reproduction rates, seasonal feeding habits, herd unit area, seasonal distribution or movement, external influences, and the effects of other animal species on behavior of wild horses and burros." FSM 2200, Section 2262.1.

82.     After the 2024 gather, approximately 316 wild horses were left in the WHT. Even assuming all of the remaining horses were adults and applying a 15% growth rate, the wild horse

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

population would not be reaching 500 wild horses – let alone 700 wild horses.

83.    The removal of 350 wild horses will reduce the population to below the lower range of AML.

84.    In announcing the upcoming gather, the Forest Service is limiting observation of gather operations to Mondays, Tuesdays, and Saturdays during the gather. This limitation is arbitrary, and no overriding interest has been identified that would deem this limitation essential or narrowly tailored to any overriding interest, as required by the First Amendment. Plaintiffs' experience at past gathers in the Devil's Garden Plateau WHT show that observation can occur daily without interference to operations.

85.    In announcing the upcoming gather, the Forest Service also is limiting corral tours only to Saturday. There is absolutely no reason why observers cannot be present during offloading and sorting on a daily basis. There is a fence line where observation could be provided throughout each day without interference to operations. No overriding interest has been identified that would deem this limitation essential or narrowly tailored to any overriding interest, as required by the First Amendment.

**CAUSES OF ACTION**

**COUNT ONE**
**NEPA and Administrative Procedure Act, 5 U.S.C. § 706(2)**

86.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

87.    The Forest Service violated NEPA when it failed to analyze any aspect of the environmental impacts of removing wild horses from the Devil's Garden Plateau WHT.

88.    The Forest Service's decision to implement a gather on September 2, 2025 violates the APA as the decision is arbitrary and capricious, not in accordance with law, in excess of its statutory jurisdiction and authority, and without observance of procedure required by law. *See* 5 U.S.C. § 706(2).

89.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

90.     Plaintiffs ask this Court to vacate and set aside the Defendants' decision to gather and remove horses from the WHT as announced on August 15, 2025.

**COUNT TWO**
**Wild Horse Act and Administrative Procedure Act, 5 U.S.C. § 706(2)**

91.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

92.     Defendants have a duty to gather and remove horses only after (1) making an excess determination that is based on a comparison of current population with appropriately-set AMLs,  *see* 16 U.S.C § 1332; *Dahl*, 600 F. Supp. at 592,  (D. Nev. 1984), and (2) a determination that removal of horses is necessary as indicated by range data showing that a thriving natural ecological balance cannot be maintained without removal. *See* U.S.C. § 1333(b)(2); W. *Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1282.

93.     Defendants have failed in this duty because they are relying on AMLs that were set aside and vacated and/or AMLs that were set based upon the assumption that the acreage in the WHT is less than it currently is.

94.     Defendants have failed in this duty because they are relying on ground count estimates that are unreliable and contradicted by evidence.

95.     Defendants have failed in this duty because they intend to remove horses to a level below AML.

96.     Defendants have failed in this duty because they have not shown that the range is being impacted by the current population of wild horses.

97.     The Forest Service's decision to implement a gather on September 2, 2025 violated the APA as the decision was arbitrary and capricious, not in accordance with law, in excess of its statutory jurisdiction and authority, and without observance of procedure required by law. 5 U.S.C. § 706(2).

98.      Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

99.     Plaintiffs ask this Court to vacate and set aside the Defendants' decision to gather and

remove horses from the WHT as announced on August 15, 2025.

## COUNT THREE
### First Amendment Violation, U.S. Constitution, 28 U.S.C. § 2201

100.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

101.    Plaintiffs have a right, under the First Amendment to the United States Constitution, to observe and document the BLM's gather of the wild horses in the Devil's Garden Plateau WHT, including during gather operations, in capture pens, sorting pens, temporary holding corrals, and off-range holding corrals where horses and burros are held for veterinary treatment and prepared for potential adoption or sale or to live at long-term holding facilities.

102.    These rights under the First Amendment to the United States Constitution have been made enforceable against the states through the Fourteenth Amendment.

103.    Defendants are interfering with Plaintiffs' protected right under the First Amendment by preventing them from observing and documenting the gather of wild horses in the Devil's Garden Plateau WHT.

104.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

105.    Plaintiffs are also entitled to a declaration under 28 U.S.C. § 2201(a) that Defendants' above-described actions violate Plaintiffs' First Amendment rights.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Issue an order and injunction compelling Defendants to immediately stop any implementation of the gather until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, and the Administrative Procedure Act;

B.    Vacate and set aside the decision by Defendants to begin gathering horses on September 2, 2025;

C.    Maintain jurisdiction over this action until Defendants are in compliance with the Wild

Free-Roaming Horses and Burros Act, the Administrative Procedure Act, the National

Environmental Policy Act, and every order of this Court;

D.    Issue a declaration that the Forest Service's limitation of Plaintiffs' right to access has

been violated by the Defendants' decision to begin gathering horses on September 2, 2025;

E.    Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

F.    Grant such additional and further relief to which plaintiffs may be entitled.

Dated: August 26, 2025                              Respectfully Submitted,


                                                    */s/ Jessica L. Blome*
                                                    Jessica L. Blome
                                                    (Cal. Bar No. 314898)
                                                    Jennifer Rae Lovko
                                                    (Cal. Bar No. 208855)
                                                    GREENFIRE LAW, PC
                                                    2748 Adeline Street, Suite A
                                                    Berkeley, CA 94703
                                                    (510) 900-9502
                                                    jblome@greenfirelaw.com
                                                    rlovko@greenfirelaw.com

VERIFICATION OF COMPLAINT BY PLAINTIFF BONNIE KOHLERITER

I, BONNIE KOHLERITER, declare:

      1.      I am a Plaintiff in this matter.

      2.      I have read the foregoing Verified Complaint and know the contents thereof.

      3.      The statements of fact made within this complaint are true of my own personal knowledge. If called upon, I could competently so testify.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26th day of August, 2025,



BONNIE KOHLERITER

VERIFICATION OF COMPLAINT BY MARY KONCEL

I, MARY KONCEL, declare:

      1.     I am a Plaintiff in this matter.

      2.     I have read the foregoing Verified Complaint and know the contents thereof.

      3.     The statements of fact made within this complaint are true of my own personal knowledge. If called upon, I could competently so testify.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26th day of August, 2025,



                                           MARY KONCEL

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

2

VERIFICATION OF COMPLAINT BY LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION, a non-profit corporation

3

I, LAURA LEIGH, declare:

4

     1.      I am a Plaintiff in this matter, and I am the Founder and President of WILD HORSE

5

EDUCATION, which also is a Plaintiff in this matter.

6

     2.      I have read the foregoing Verified Complaint and know the contents thereof.

7

     3.      The statements of fact made within this complaint are true of my own personal

8

knowledge. If called upon, I could competently so testify.

9

     I declare under penalty of perjury under the laws of the United States of America that the

10

foregoing is true and correct.

11

12

Dated this 26th day of August, 2025,

LAURA LEIGH

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

VERIFICATION OF COMPLAINT BY JESSICA L. BLOME

I, JESSICA L. BLOME, declare:

    1.    I am an attorney with Greenfire Law PC, which represent the Plaintiffs in this case.

    2.    I have read the foregoing Verified Complaint and know the contents thereof.

    3.    Based on publicly available documents and information received from the Plaintiffs, I am informed and believe the matters asserted in the foregoing action to be true, and on that basis I allege the matters stated to be true.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26th day of August, 2025,        */s/ Jessica L. Blome*
                                        JESSICA L. BLOME

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF