Jessica Blome (Cal. Bar No. 314898)
Jennifer Rae Lovko (Cal. Bar No. 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: jblome@greenfirelaw.com
         rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

BONNIE KOHLERITER, MARY KONCEL, LAURA LEIGH, individually and WILD HORSE EDUCATION, a non-profit corporation,

       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, Secretary of the United States Department of Agriculture, UNITED STATES FOREST SERVICE, and TOM SCHULTZ, Chief of the United States Forest Service,

       Defendants.

Case No. 2:25-cv-02446-DJC-JDP

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that Plaintiffs BONNIE KOHLERITER, MARY KONCEL, LAURA LEIGH, individually and WILD HORSE EDUCATION, a non-profit corporation, hereby move this court for a temporary restraining order and preliminary injunction against Defendants UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, Secretary of the United States Department of Agriculture, UNITED STATES FOREST SERVICE, and TOM SCHULTZ, Chief of the United States Forest Service. This request is submitted pursuant to Rule 65(a) and (b) of the Federal Rules of Civil Procedure (FRCP).

Plaintiffs are requesting a temporary restraining order and preliminary injunction to stop the Defendants' gather of wild horses at the Devil's Garden Plateau Wild Horse Territory (WHT) due to Defendants' violations of the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331, *et seq.*, National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, as well as violation of Plaintiffs' First Amendment rights in viewing the gather under the United States Constitution. Plaintiffs' motion is supported by the following Memorandum of Points and Authorities, the accompanying declaration of Jennifer Rae Lovko and attached exhibits, Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief, and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: August 27, 2025                         Respectfully Submitted,

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
Jennifer Rae Lovko
(Cal. Bar No. 208855, pro hac vice
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 7

II.   STATEMENT OF MATERIAL FACTS ............................................................... 7

    A.  Plaintiff Bonnie Kohleriter .......................................................................... 7

    B.  Plaintiff Mary Koncel .................................................................................. 8

    C.  Plaintiff Laura Leigh and Wild Horse Education ......................................... 9

    D.  History of the Devil's Garden Plateau WHT .............................................. 10

    E.  Forest Service Gather Decision .................................................................. 15

III.  LEGAL ARGUMENT .......................................................................................... 17

    A.  Likelihood of Success on the Merits .......................................................... 18

        1.   First Cause of Action – NEPA Challenge ......................................... 18

        2.   Second Cause of Action – Wild Horse Act Challenge ...................... 20

            a)   Excess Wild Horse Determination ........................................ 21

            b)   Necessity Determination ....................................................... 23

        3.   Third Cause of Action – First Amendment Challenge ...................... 25

    B.  Irreparable Harm ........................................................................................ 26

    C.  Balance of Equities and Public Interest ...................................................... 27

IV.   CONCLUSION ..................................................................................................... 28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## Cases

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
713 F.2d 795 (D.C. Cir. 1983) ............................................................................. 20, 23

*Alliance for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir.2011) ...................................................................................... 26

*Am. Wild Horse Campaign v. Bernhardt*,
442 F. Supp. 3d 127 (D.D.C. 2020) ............................................................................ 24

*Am. Wild Horse Pres. Campaign v. Perdue* (*Perdue*),
873 F.3d 914 (2017) ............................................................................................. passim

*Am. Wild Horse Pres. Campaign v. Zinke*,
2017 U.S. Dist. LEXIS 224842, No. 17-cv-170-F, (D. Wyo. Oct. 13, 2017) ........ 19, 20

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ...................................................................................................... 27

*Anacostia Watershed Soc'y v. Babbitt*,
871 F. Supp. 475 (1994) .......................................................................................... 18, 19

*Animal Protection Institute of America*,
109 IBLA 112 (1989) .................................................................................................... 21

*Babaria v. Jaddou*,
87 F.4th 963 (9th Cir. 2023) ......................................................................................... 18

*Bernhardt v. L.A. Cnty.*,
339 F.3d 920 (9th Cir. 2003) ........................................................................................ 27

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ................................................................................... 18, 19

*Colo. Wild Horse & Burro Coal., Inc. v. Salazar*,
639 F. Supp. 2d 87 (D.D.C. 2009) ............................................................................... 21

*Colo. Wild Horse & Burro Coal., Inc. v. Salazar*,
890 F. Supp. 2d 99 (D.D.C. 2012) .......................................................................... 19, 20

*Dahl v. Clark*,
600 F. Supp. 585 (D. Nev. 1984) .................................................................................. 21

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ...................................................................................... 27

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ................................................................................... 20, 23

*Friends of Animals v. Culver* (*Culver*),
610 F. Supp. 3d 157 (D.D.C. 2022) ....................................................................... 18, 19

*Friends of Animals v. Sparks*,
200 F. Supp. 3d 1114 (D. Mont. 2016) ........................................................................ 21

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

*Friends of Animals v. United States BLM,*
  2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC
  (D. Nev. Feb. 11, 2015) ........................................................................ 18, 19, 20, 27

*In re Sealed Case,*
  462 U.S. App. D.C. 149, 77 F.4th 815 (2023) ............................................ 25

*Leigh v. Salazar,*
  954 F. Supp. 2d 1090 (D. Nev. 2013) ...................................................... 25, 26

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ....................................................................................... 27

*Medina v. Anzar,*
  No. 2:25-cv-0475 DC AC P, 2025 U.S. Dist. LEXIS 111168, at *3 (E.D. Cal. June 11, 2025) ... 18

*Metcalf v. Daley,*
  214 F.3d 1135 (9th Cir. 2000) .................................................................... 20

*Nat'l Audubon Soc'y v. Butler,*
  160 F. Supp. 2d 1180 (W.D. Wash. 2001) ............................................ 20, 23

*Press-Enterprise Co. v. Superior Court,*
  478 U.S. 1 (1986) ........................................................................................... 25

*Ritidian v. United States Dep't of the Airforce,*
  128 F.4th 1089 (9th Cir. 2025) ................................................................ 18, 19

*Save the Yaak Committee v. Block,*
  840 F.2d 714 (9th Cir. 1988) ...................................................................... 20

*Sports Form, Inc. v. United Press International, Inc.,*
  686 F.2d 750 (9th Cir.1982) ...................................................... 18, 20, 25, 26

*The Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ...................................................................... 27

*Vitkus v. Blinken,*
  79 F.4th 352 (4th Cir. 2023) ........................................................................ 28

*W. Rangeland Conservation Ass'n v. Zinke,*
  265 F. Supp. 3d 1267 (D. Utah 2017) ........................................................ 24

*Winter v. Natl Res. Def. Council, Inc.,*
  555 U.S. 7, 20, 129 S. Ct. 365 (2008) ................................................... 18, 27

*Wyoming v. United States DOI,*
  839 F.3d 938  (10th Cir. 2016) ................................................................... 24


**Statutes**

16 U.S.C. § 1331, *et seq*........................................................................... 7, 21, 28

16 U.S.C. § 1332(b)(2) ............................................................................ 21, 24

16 U.S.C. § 1332(f) ......................................................................................... 21

16 U.S.C. § 1333(a) ........................................................................................ 21

16 U.S.C. § 1333(b) ........................................................................................ 21

16 U.S.C. § 1333(b)(2) .............................................................................. 24, 25

42 U.S.C. § 4321 *et seq.* ..................................................................... 7, 19, 20

42 U.S.C. § 4331 ............................................................................................ 18

42 U.S.C. § 4336 ............................................................................................ 18

U.S. Const. amend. I ........................................................................................ 7

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On August 15, 2025, the UNITED STATES FOREST SERVICE (Forest Service or Service) announced it will begin gathering 350 wild horses from the Devil's Garden Plateau Wild Horse Territory (WHT) on September 2, 2025. Plaintiffs respectfully request a temporary restraining order and preliminary injunction to halt this gather until such time as the Forest Service complies with the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331, *et seq*., National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., and the First Amendment of the U.S. Constitution.

The decision to conduct a gather beginning on September 2, 2025 was issued without any NEPA review – the Service did not issue an environmental assessment (EA), environmental impact statement (EIS), or conclude that the gather action is categorically exempt from NEPA review. The public was never allowed to comment on the Forest Service's decision or participate in any NEPA review.

Upon receiving notice of the Forest Service's announcement, Plaintiffs immediately sent a letter to the Service in an attempt to have the upcoming gather suspended and avoid the need for litigation; however, the Forest Service's response was that the agency would not halt the upcoming gather.

## II.    STATEMENT OF MATERIAL FACTS

### A.    Plaintiff Bonnie Kohleriter

Plaintiff Bonnie Kohleriter experiences great enjoyment from visiting and observing wild horses on public lands, including the wild horses in the Devil's Garden Plateau WHT. *See* Verified Complaint at ¶ 6. She champions for the long-term survival of the wild, free-roaming horses in public lands by advocating for the government's management to adhere to all applicable state and federal laws related to these animal's survival and humane treatment. *See id.* She also has worked with the Forest Service to facilitate adoption of wild horses that are removed from public lands. *See id.*

1    Ms. Kohleriter has educated the public regarding the wild horses in the Devil's Garden

2 Plateau WHT through publishing online articles and appearing on radio podcasts. *See id.* at ¶ 7. She

3 has been visiting the Devil's Garden Plateau WHT regularly for approximately a decade. *See id.* at ¶

4 8. Her last visit in the WHT was during the summer of 2025, and she has plans to again visit the

5 WHT in 2026.

6    Ms. Kohleriter's aesthetic, recreational, and conservation interests in the wild horses of the

7 Devil's Garden Plateau WHT have been, and will continue to be, injured by Defendants' failure to

8 comply with their mandatory obligations under the WHA, NEPA, and the APA since this failure

9 will lead to the permanent removal of these beloved wild horses from the WHT. *See id.* at ¶ 23.

10    **B.    Plaintiff Mary Koncel**

11    Plaintiff Mary Koncel received her Master of Science in Animals and Public Policy from the

12 Cummings School of Veterinary Medicine at Tufts University in 2009. *See id.* at ¶ 9. This program

13 focuses on human-animal relationships and their implications for policy and community action. *See*

14 *id.* Ms. Koncel has published three peer-reviewed articles on wild horse adoption: Koncel MA,

15 Rutberg AT. Catching the Spirit: A Study of Bureau of Land Management Wild Horse Adopters in

16 New England. J Appl Anim Welf Sci. 2012;15(1):32-52; Koncel MA. Hoofbeats From the

17 Currituck Outer Banks: A Study of the Corolla Wild Horse Fund Adoption Program. J Appl Anim

18 Welf Sci. 2016;19(1):37-48; Koncel MA, Rutberg AT. Knowledge, Tradition, and Community

19 Predict Success for BLM Wild Horse Adoptions in Colorado and Texas. Society and Animals.

20 2018; 26(2):367-387. *See id.* at ¶ 10.

21    Ms. Koncel has been advocating for the protection of wild horses on public lands for more

22 than a decade. *See id.* at ¶ 11. From 2017 through 2023, she served as staff to the American Wild

23 Horse Campaign (now re-named the American Wild Horse Conservation). *See id.* During this time,

24 she became involved in a campaign that focused on the Forest Service's practices for managing

25 wild horses in the Devil's Garden Plateau WHT. *See id.*

26    Ms. Koncel has submitted Freedom of Information Act requests to the Forest Service

27 regarding the wild horses in the Devil's Garden Plateau WHT. *See id.* at ¶ 12. She has educated the

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

1    public regarding these horses through online blogs. *See id.* She began attending roundups in the

2    Devil's Garden Plateau WHT in 2019, and she attended the last roundup that occurred in 2024. *See*

3    *id.* at ¶ 14.

4         As a private citizen, Ms. Koncel has visited the Devil's Garden Plateau WHT on several

5    occasions over the past 5 years to observe and enjoy the wild horses in their habitat. *See id.* at ¶ 13.

6    She also has attended events hosted by the Modoc National Forest in the WHT. *See id.* She plans on

7    returning to visit the WHT later this year. *See id.*

8         Ms. Koncel's aesthetic, recreational, and conservation interests in the wild horses of the

9    Devil's Garden Plateau WHT have been, and will continue to be, injured by Defendants' failure to

10   comply with their mandatory obligations under the WHA, NEPA, and the APA since this failure

11   will lead to the permanent removal of these beloved wild horses from the WHT. *See id.* at ¶ 23.

12                    **C.    Plaintiff Laura Leigh and Wild Horse Education**

13        Plaintiff Laura Leigh is the Founder and President of Wild Horse Education. *See id.* at ¶ 15.

14   In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues

15   and provides in-field documentation and commentary on public land issues such as wild horse and

16   burro gathers and removals. *See id.*

17        Ms. Leigh has been documenting and enjoying wild horses in the Devil's Garden Plateau

18   WHT since 2011. *See id.* at ¶ 16. In the past, she also has attended and observed gather operations

19   (also known as roundups) of wild horses in the WHT. *See id*. This year, Ms. Leigh has visited the

20   Devil's Garden Plateau WHT twice. *See id.* at ¶ 17. She has plans to visit the WHT again in mid-

21   October of 2025. *See id.* Ms. Leigh has a recreational and aesthetic interest in viewing these horses,

22   as well as a conservation interest in protecting these horses and their habitat. *See id.* at ¶ 16..

23        Plaintiff Wild Horse Education is a national non-profit corporation dedicated to research,

24   journalism, and public education concerning the activities and operations of federal and state

25   management of the free roaming horse and wild burro populations. *See id.* at ¶ 18. Wild Horse

26   Education has more than 150,000 members and educates and informs the public about wild horses

27   and burros through articles, photographs, videos, and sharing data and other information. *See id.*

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

The mission of Wild Horse Education is to protect and preserve wild horses and burros on range, during and after capture. *See id.* at ¶ 19. Wild Horse Education has an interest in ensuring that wild free-roaming horses are treated as an integral part of public lands and management activities are conducted at the minimal level feasible. *See id.*

Advocating for the wild horses in the Devil's Garden Plateau WHT is a past, present, and future important issue for Wild Horse Education. *See id.* at ¶ 20. In the past, Wild Horse Education has sent member volunteers to attend and observe gather operations in the Devil's Garden Plateau WHT. *See id.* at ¶ 21. At times, when they have appeared for these roundups, they have been turned away because the Forest Service limits the number of observers. *See id.* Wild Horse Education intends to continue sending member volunteers to roundups in the Devil's Garden Plateau WHT in the future. *See id.*

Wild Horse Education and its members visit the Devil's Garden Plateau WHT for photography, observing wildlife, and other recreational pursuits. *See id.* at ¶ 22. They gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses. *See id.* The opportunity to possibly view wild horses, or signs of horses, in these areas is of significant interest and value to Wild Horse Education and its members and increases their use and enjoyment of California's public lands. *See id.* Wild Horse Education and its members have engaged in these activities in the past and have specific plans to do so again in the future. *See id.*

Laura Leigh's and Wild Horse Education's aesthetic, recreational, and conservation interests in the wild horses of the Devil's Garden Plateau WHT have been, and will continue to be, injured by Defendants' failure to comply with their mandatory obligations under the WHA, NEPA, and the APA since this failure will lead to the permanent removal of these beloved wild horses from the WHT. *See id.* at ¶ 23.

### D.    History of the Devil's Garden Plateau WHT

The Devil's Garden Plateau WHT is located in the Modoc National Forest near Alturas, California and consists of 258,000 acres – the majority of which is managed by the Forest Service. *See* Forest Service Website, attached as Exh. A to Lovko Decl. Wild horses have lived on this land

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1   since the 1800s, and the Forest Service officially designated it as a WHT in 1975. *See id.*; Verified

2   Complaint at ¶ 49-50; *Am. Wild Horse Pres. Campaign v. Perdue* (*Perdue*), 873 F.3d 914, 918

3   (2017).

4        Initially, the WHT was managed for 300 or 305 wild horses over two non-contiguous units

5   covering approximately 236,000 acres. *See Perdue*, 873 F.3d at 918; Appellants' Opening Brief,

6   *Am. Wild Horse Pres. Campaign v. Vilsack* (*Vilsack II*), Case No. 15-5332, U.S. Court of Appeals

7   for the District of Columbia (2016) p. 9, attached as <u>Exh. B</u> to Lovko Decl. In the 1980s, the WHT

8   was expanded to approximately 258,000 acres and managed as one contiguous unit. *See id.* at p. 10.

9   A management plan issued in 1985 identified a wild horse population objective of 275-335 for the

10  258,000 acres, which was reaffirmed by the 1991 Modoc National Forest Land and Resource

11  Management Plan (1991 Modoc LRMP). *See* 1991 Modoc LRMP, pp. 3-18, 3-19, 4-3, attached as

12  <u>Exh. C</u> to Lovko Decl.

13       In 2011, the Forest Service issued a scoping letter for the purpose of addressing a new

14  management plan for the Devil's Garden Plateau WHT. *See Perdue* , 873 F.3d at 921. In 2013,

15  following preparation of an Environmental Assessment (EA), the Forest Service adopted the Devil's

16  Garden Plateau Wild Horse Territory Management Plan and Forest Plan Amendments (2013 Plan)

17  with a Decision Notice and FONSI. *See id.* at 922. Through the 2013 Plan, the Service eliminated

18  23,631 acres from the Middle Section of the WHT, thereby separating the territory into two isolated

19  units. *See id.* at 920-22. The proffered justification for removing this acreage from the WHT was the

20  Forest Service's assertion that inclusion of this land in the WHT in the 1980s had been the result of

21  "administrative error." *Id.*

22       With the 2013 Plan, the Forest Service also re-calculated the appropriate management level

23  (AML) to 206-402 wild horses based upon the new constricted boundaries of the WHT. *See*

24  Plaintiffs' Motion for Summary Judgment, *Am. Wild Horse Pres. Campaign v. Vilsack* (*Vilsack I*),

25  Case No. 1:14-cv-00485-ABJ, U.S. District Court for the District of Columbia (2014), pp. 15-22,

26  attached as <u>Exh. D</u> to Lovko Decl.; Appellants' Opening Brief, *Vilsack II* at pp. 24-29, attached as

27  <u>Exh. B</u> to Lovko Decl.

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

1      In March of 2014, American Wild Horse Preservation Campaign, Carla Bowers, and Return

2    to Freedom began litigation before the U.S. District Court for the District of Columbia to challenge

3    the 2013 Plan. *See* Verified Complaint at ¶ 56. Through summary judgment, Plaintiffs asked the

4    Court to set aside the Service's Decision Notice, EA, and FONSI. *See* Plaintiffs' Motion for

5    Summary Judgment, *Vilsack I*, attached as <u>Exh. D</u> to Lovko Decl. In this motion, the Plaintiffs

6    argued that the Forest Service had acted in an arbitrary and capricious manner by removing the

7    Middle Section from the WHT in violation of provisions in the WHA, the National Forest

8    Management Act, and NEPA. *See id.* at pp. 2-3. Plaintiffs noted that if the Court were to find that

9    the Service's elimination of the Middle Section was unlawful, then the new reduced AML also

10   should be found defective because it is based on only those portions of the WHT that lie outside of

11   the Middle Section. *See id.* at pp. 39-45.

12     On September 30, 2015, the District Court denied Plaintiffs' summary judgment motion and

13   granted the Forest Service's cross-motion. *See* Order and Memorandum Opinion, *Vilsack I*, (2015),

14   p. 50, attached as <u>Exh. E</u> to Lovko Decl. Specifically, the Court found the Forest Service had not

15   acted in an arbitrary and capricious manner in removing the Middle Section from the Devil's

16   Garden Plateau WHT, and because of this, "the agency had no duty to consider the [Middle

17   Section] in conducting its AML analysis." *Id.* at p. 34.

18     Plaintiffs appealed the decision. *See* Appellants' Opening Brief, *Vilsack II*, attached as <u>Exh.</u>

19   <u>B</u> to Lovko Decl. In this appeal, the plaintiffs noted that the Forest Service had improperly adjusted

20   AML by "zeroing out" the Middle Section acreage, assuming this lost acreage was to be ignored

21   rather than analyzed. *See id.* at pp. 1, 15-22, 26. They further asserted the agency's NEPA analysis

22   had been insufficient because the Forest Service failed to examine the significant impact the

23   elimination of the Middle Section will have on the WHT's wild horses, who would now be

24   prohibited from accessing public lands previously available to them. *See id.* at p. 56. Simply, the EA

25   for the 2013 Plan did not "even purport to assess the environmental impacts caused by the removal

26   of the Middle Section." *Id.* at 60. Instead, the Forest Service admitted that wild horse populations

27   outside the new boundaries "were not considered as it is assumed they will be removed." *Id.* To

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

rectify the Service's violation of NEPA, the plaintiffs argued that the Court should order an Environmental Impact Statement to be conducted, or, at minimum, an EA that actually takes a "hard look" at relevant impacts and appropriately considers alternatives. *See id.* at 62.

The U.S. District Court of Appeals reversed the lower court's order, stating:

> We hold that the Service's decision to eliminate the Middle
> Section … was arbitrary and capricious in two respects. First, the
> Service failed to acknowledge and adequately explain its change in
> policy regarding the management of wild horses in the Middle
> Section as part of a single, contiguous protected Wild Horse Territory.
> Second, the Service failed to consider adequately whether an
> Environmental Impact Statement was required under NEPA.

*See Perdue*, 873 F.3d at 923.

As regards NEPA, the Court stated the agency had failed to accurately identify the relevant environmental concern. *See id.* at 931. "Here, the relevant environmental concern was the effect of the boundary modification on the wild horse population in the Devil's Garden area. The Service not only failed to address that concern, it denied its very existence." *Id.* By improperly insisting that removal of the Middle Section was insignificant and need not be considered, the Court found the agency had acted with "blinders." *Id.* at 924.

> The Service's decision thus failed to 'make a convincing case for its
> finding of no significant impact.' For those reasons, the Service's
> environmental analysis and Finding of No Significant Impact were
> arbitrary and capricious. The Service not only failed to address that
> concern, it denied its very existence. The Service insisted that the
> redrawn boundary lines would have 'no effect' on the ground because
> it was only 'correct[ing] a boundary established for administrative
> convenience.' That is, the only sense in which the Service 'identified'
> the effect of the boundary modification on wild horses was by
> insisting that there was 'no effect' and that nothing had ever really
> changed. That head-in-the-sand approach to past agency practice is
> the antithesis of NEPA's requirement that an agency's environmental
> analysis candidly confront the relevant environmental concerns.
>
> More to the point, because the Service actually managed wild horses
> within portions of the Middle Section for two decades as though they
> were within the Wild Horse Territory, the 2013 boundary change
> entailed far more than scratching out a few lines in the [1991 Modoc
> LRMP]. Yet the Service refused to even consider the possibility of
> that broader, real-world impact. Thus, while the Service 'identifie[d]'
> some effects on wild horses as an environmental concern, the Service

did not forthrightly and '*accurately* identif[y] the *relevant environmental concern*'—the actual effects of the boundary modification on wild horses in the Devil's Garden area.

*Id.* at 931 (citations omitted) (emphasis in the original).

In October of 2017, a collective of ranchers filed suit against the Forest Service to compel the immediate removal of excess horses in the Carr Allotment, Emigrant Springs Allotment, Pine Springs Allotment, Surveyors Valley Allotment, and Timbered Mountain Allotment. *See* Verified Complaint at ¶ 61. All or a portion of each of these allotments is located within the Devil's Garden Plateau WHT; a portion of the Carr Allotment also falls within the Middle Section of the WHT. *See id.* at ¶ 62. Before any ruling on the merits of the case, the Forest Service and the ranchers entered into a settlement agreement.[1] By its terms, the Forest Service agreed to the following:

• Subject to available funding, the Forest Service will undertake an annual wild horse census before each gather of the Devil's Garden Plateau Wild Horse population. This census will utilize simultaneous, double-counting.

• The Forest Service will develop an AML Implementation Strategy (a staggered, multi-year strategy to achieve AML by using gathers and other appropriate management strategies). In developing this Strategy, the Service will consult with the plaintiff ranchers and seek input from other interested parties. The AML Implementation Strategy[2] will identify the number of horses that need to be gathered each year to reach low- to mid-range AML as specified in the 2013 Plan or any subsequent revision or amendment(s).

• Subject to available funding, the Forest Service will use best efforts to gather the number necessary to ensure the Devil's Garden wild horse population does not increase. Annual gather numbers, starting with the 2021 gather, will be no less than a minimum of 500 horses or the number necessary to ensure that the Devil's Garden wild horse population does not increase, whichever is necessary to reach low to midrange AML, at which time other management options become available, as outlined in the Territory Management Plan.

---

[1] This was a private settlement agreement and not a consent decree.
[2] No AML Implementation Strategy, as addressed in the Settlement Agreement, has ever been issued to the public by the Forest Service. *See* Verified Complaint at ¶ 65.

*See* Settlement Agreement, *Devils Garden Preservation Group et al. v. U.S. Forest Service et. al.*, Case No. 2:17-cv-02185, U.S. District Court for the Eastern District of California (2021), pp. 2-5, attached as <u>Exh. F</u> to Lovko Decl.

In 2022, the Forest Service began scoping for a new management plan – the Devil's Garden Plateau Wild Horse Territory Management Plan (Proposed Plan). *See* Verified Complaint at ¶ 66. The Forest Service asserts that this Proposed Plan "will supersede" the 2013 Plan; however, as the 2013 Plan was vacated by the U.S. Court of Appeals, the Proposed Plan actually will supersede the 1991 Modoc LRMP. *See id.* In 2024, the Service published a Final Environmental Assessment, as well as a draft Decision Notice and draft FONSI. *See id.* at ¶ 67. However, to date, no signed decision or FONSI have been issued. *See id.*

**E.    Forest Service Gather Decision**

The Forest Service signed a contract for $617,508.00 with C.D. Warner Livestock on July 21, 2025, to conduct gather operations in the Devil's Garden Plateau WHT. *See* Contracting Information, attached as <u>Exh. G</u> to Lovko Decl. The contract description is for the removal of 375 wild horses from the WHT. *See id.* At that time, the Forest Service did not divulge to the public that it had decided to gather horses in the WHT. *See* Verified Complaint at ¶ 70.

On August 15, 2025, the Forest Service publicly announced that the agency plans to begin gathering 350 wild horses from the Devil's Garden Plateau WHT on September 2, 2025. *See* Announcement, attached as <u>Exh. H</u> to Lovko Decl. In this announcement, the Service references a 2024 census survey of "more than 700 horses."[3] *Id.* Regarding access to observe the gather operation, the Forest Service stated "[v]iewing of gather operations will be offered for up to 6 viewers on Mondays, Tuesdays, and Saturdays during the gather. Corral tours will also be offered on Saturdays. Some trap sites may not allow for viewing and/or multiple viewers." *Id.*

The announcement fails to mention that after the 2024 census survey was conducted, the Forest Service gathered and removed 407 wild horses in the Fall 2024/Winter 2025. *See* Verified

---

[3] The Forest Service has specified that this survey found "723 wild horses in and around" the WHT. Memorandum, p. 1, attached as <u>Exh. L</u> to Lovko Decl.

1  Complaint at ¶ 68; E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025),

2  attached as Exh. I to Lovko Decl.

3  On August 18, 2025, Plaintiffs wrote to the Forest Service and addressed the basis for

4  Plaintiffs' contention that the upcoming gather violates applicable law. *See* 8/18/25 Letter, attached

5  as Exh. J to Lovko Decl. Plaintiffs asked that the Forest Service suspend any gather operations for

6  the Devil's Garden Plateau WHT until such time as the agency complies with the Wild Horse Act,

7  NEPA, and the First Amendment. *See id.* at p. 1. On August 22, 2025, the Forest Service responded

8  with a letter and memorandum. *See* 8/22/25 Letter, attached as Exh. K to Lovko Decl.;

9  Memorandum, attached as Exh. L to Lovko Decl. In this correspondence, the Service refused to

10  suspend the upcoming gather. *See id.*

11  The Forest Service noted that its decision to gather horses relied upon the AML range

12  established under 2013 Plan, alleging that the U.S. District Court of Appeals' decision in *Perdue*

13  did not vacate this AML. *See* 8/22/25 Letter, pp. 1-2, attached as Exh. K to Lovko Decl. In addition,

14  the Service stated its goal of removing 350 horses was based on the 2024 census survey as well as a

15  ground count survey conducted in 2025.[4] *See id.* at p. 1.

16  The Forest Service also informed Plaintiffs that not only would helicopter gather operations

17  begin on September 2, 2025, but also, "[a] contractor is anticipated to set bait traps this coming

18  week in advance of the helicopter gather." *See id.* at p. 1. In its announcement on August 15, 2025,

19  the Forest Service did not inform the public that bait traps would be set prior to September 2, 2025.

20  *See* Announcement, attached as Exh. H to Lovko Decl.

21  In its correspondence, the Service also stated that the decision to conduct a gather is based

22

23  _____

24  [4] The 2025 ground count survey was an unofficial survey of wild horses showing 500-600 horses
are currently in or around the Devil's Garden Plateau WHT. *See* E-mail Exchange Between Bonnie

25  Kohleriter and Forest Service (August 2025), attached as Exh. I to Lovko Decl. The Forest Service
(and the Bureau of Land Management) generally use aerial surveys such as simultaneous, double-

26  counting to accurately assess wild horse populations. *See* Verified Complaint at ¶ 79. The Forest
Service has consistently utilized simultaneous, double-counting prior to undertaking its last seven

27  roundups. *See id.* Ground counts are unreliable and typically used for very small geographic
locations. *See id.* Despite this, the Forest Service is relying upon a ground count to support its

28  gather decision. *See id.* at ¶ 80.

"on factors including rangeland conditions, ecosystem health, excess horse placement capability, workforce capacity, operational capacity, current and future year budget priorities, and other on-range management options. Impacts of wild horse overpopulation include removal of vegetation from riparian areas, increased degradation of spring sites, and increased competition for resources with wildlife." *See* 8/22/25 Letter, pp. 1-2, attached as <u>Exh. K</u> to Lovko Decl. To date, the Forest Service has not provided Plaintiffs or the public with any information in support of these factors. *See* Verified Complaint at ¶ 75.

The Forest Service did not directly address the Plaintiffs' position that a gather could not be conducted unless NEPA review was first completed, instead asserting the Service will gather wild horses "in accordance with" the vacated 2013 Plan. *See* 8/22/25 Letter, p. 1, attached as <u>Exh. K</u> to Lovko Decl.

Assuming the 2024 census survey accurately reported 723 wild horses in the WHT, after the 2024/2025 gather removed 407 horses, only 316 horses remained in the WHT. *See* Memorandum, p. 1, attached as Exh. L to Lovko Decl.;E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl. The growth rate for wild horses in the Devil's Garden Plateau WHT is estimated at 15%. *See* E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as Exh. I to Lovko Decl. If all of the remaining 316 horses reproduced (an impossibility since not all horses are female or adults), another 47 horses would now exist in the WHT – for a total of 363 wild horses. If the Forest Service removes 350 horses in the upcoming gather, the population will dip significantly below the AML in the 1991 Modoc LRMP, and the horses will be essentially eradicated.

## LEGAL FOUNDATION

### III.    LEGAL ARGUMENT

The standard that a moving party must meet to obtain injunctive relief in the form of a temporary restraining order (TRO) or a preliminary injunction is the same, requiring the party to demonstrate 1) a likelihood of success on the merits; 2) irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and 4) an injunction is in the public

interest. *See Winter v. Natl Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); *Babaria v. Jaddou*, 87 F.4th 963, 976 (9th Cir. 2023); *Medina v. Anzar*, No. 2:25-cv-0475 DC ACP, 2025 U.S. Dist. LEXIS 111168, at *3 (E.D. Cal. June 11, 2025).

### A.    Likelihood of Success on the Merits

Under this factor, Plaintiffs must show a "fair chance of success on the merits" of their claims or "questions . . . serious enough to require litigation." *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 754 (9th Cir.1982) (internal citation omitted). Plaintiffs aver three causes of action, each of which challenges Defendant's decision to gather and remove horses from the Devil's Garden Plateau WHT beginning on September 2, 2025.  *See* Verified Complaint, ¶¶ 86-105.

### 1.    First Cause of Action – NEPA Challenge

NEPA requires federal agencies to assess the environmental impacts of their actions *before* making a final decision. *See* 42 U.S.C. §§ 4331, 4336. Where an agency completely foregoes conducting any environmental analysis, NEPA is violated. *See Ritidian v. United States Dep't of the Airforce*, 128 F.4th 1089, 1104 (9th Cir. 2025); *Friends of Animals v. United States BLM*, 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC, at *7-8 (D. Nev. Feb. 11, 2015); *Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 482 (1994). "NEPA … unambiguously requires the preparation of either an environmental impact statement or an environmental assessment, followed by either a FONSI or an environmental impact statement, for all major federal actions that have not been categorically excluded." *See Anacostia Watershed Soc'y*, 871 F. Supp. at 482. Similarly, where an agency provides no provision for public comment on a proposed action's environmental impacts or on reasonable alternatives to the proposed action before its adoption, NEPA is violated. *See Ritidian*, 128 F.4th at 1104; *California v. Block*, 690 F.2d 753, 771 (9th Cir. 1982).

Prior to the gathering and removal of wild horses from public lands, the Forest Service must adhere to the provisions of NEPA by preparing an EA or EIS. *See* 42 U.S.C. § 4321 *et seq.*; *Friends of Animals v. Culver* (*Culver*), 610 F. Supp. 3d 157, 164 (D.D.C. 2022); *Am. Wild Horse Pres.*

1  *Campaign v. Zinke*, 2017 U.S. Dist. LEXIS 224842, No. 17-cv-170-F,, at *7 (D. Wyo. Oct. 13,

2  2017); *Friends of Animals v. United States BLM*, 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-

3  0057-LRH-WGC, at *7 (D. Nev. Feb. 11, 2015); *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*,

4  890 F. Supp. 2d 99, 103 (D.D.C. 2012).

5        The case of *Friends of Animals v. United States BLM* is particularly instructive. There, BLM

6  announced its plan to begin gathering wild horses in the Pine Nut Herd Management Area; this

7  announcement was not accompanied by any environmental analysis. *See Friends of Animals*, 2015

8  U.S. Dist. LEXIS at *3-4. Instead, the agency relied upon an earlier environmental assessment that

9  addressed a previous gather, concluding that the proposed gather was the same as the previous one

10  because it involved the same Herd Management Area, "and thus, no new or supplemental NEPA

11  analysis … was required." *Id.* at *4. The plaintiffs moved for and were granted a preliminary

12  injunction, with the Court finding no legal basis upon which BLM could evade NEPA review by

13  relying on the previous EA and FONSI. *See id.* at *7-8.

14        Here, the Forest Service has conducted absolutely no NEPA analysis nor provided for public

15  comment on the upcoming gather's environmental impacts or on reasonable alternatives to the

16  upcoming gather prior to its adoption and implementation. The Forest Service has offered no

17  justification for concluding that the upcoming gather will have no impact on wild horses.

18  Accordingly, the decision to implement the upcoming gather violates NEPA and must be set aside.

19  *See Ritidian*, 128 F.4th at 1104 (9th Cir. 2025); *Culver*, 610 F. Supp. 3d at 164; *Friends of*

20  *Animals*, 2015 U.S. Dist. LEXIS at *7-8; *Anacostia Watershed Soc'y,* 871 F. Supp. at 482;

21  *California*, 690 F.2d at 771 (9th Cir. 1982).

22        To the extent the Forest Service believes it can implement the upcoming gather by relying

23  on the 2013 Plan, such a belief is incorrect. The Decision Notice and FONSI for the 2013 Plan were

24  vacated because the Forest Service did not adequately explain why it was removing the Middle

25  Section of the Devil's Garden Plateau WHT, and the Service failed to analyze the actual effects of

26  the boundary modification on wild horses in the Devil's Garden area. *See Perdue*, 873 F.3d at 923,

27  931. "'To vacate …  means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

defeat; to deprive of force; to make of no authority or validity; to set aside.'" *Action on Smoking & Health v. Civil Aeronautics Bd*., 713 F.2d 795, 797 (D.C. Cir. 1983) (citations omitted). Accordingly, before issuing any decision for an upcoming gather, the Forest Service must prepare an EA or EIS. *See* 42 U.S.C. § 4321 *et seq*.; *Am. Wild Horse Pres. Campaign*, 2017 U.S. Dist. LEXIS at *7; *Friends of Animals*, 2015 U.S. Dist. LEXIS at *7; *Colo. Wild Horse & Burro Coal., Inc.*, 890 F. Supp. 2d at 103.

Even had the Decision Notice and FONSI not been vacated (and they were), the 2013 Plan was *not* a gather plan that analyzed impacts associated with the gather and removal of horses from the Devil's Garden Plateau WHT. Instead, the 2013 Plan was limited to changing AML and removing the Middle Section acreage from the WHT. *See* Appellants' Opening Brief, *Vilsack II*, pp. 28-33, attached as Exh. B to Lovko Decl. An agency may not rely on a previous EA and FONSI that is itself inadequate or incomplete. *See Nat'l Audubon Soc'y v. Butler*, 160 F. Supp. 2d 1180, 1190 (W.D. Wash. 2001). An agency may not rely on a prior NEPA analysis that "does not actually discuss the impacts of the project at issue." *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022).

"[A]gency action taken without observance of the procedure required by [NEPA] will be set aside." *Metcalf v. Daley*, 214 F.3d 1135, 1141-42 (9th Cir. 2000) (quoting *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)). As the Defendants' failed to conduct any NEPA review associated with the upcoming gather's removal of 350 wild horses from the Devil's Garden Plateau WHT, the Forest Service's decision clearly violates NEPA. Therefore, Plaintiffs have suitably demonstrated a "fair chance of success on the merits" of their claim or "questions . . . serious enough to require litigation." *Sports Form, Inc.*, 686 F.2d at 754.

**2.      Second Cause of Action – Wild Horse Act Challenge**

Congress enacted the Wild Horse Act to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. The Act directs the Secretary to manage wild horses "in a manner that is designed to

1    achieve and maintain a thriving natural ecological balance on the public lands." *Id.* at § 1333(a).

2    Here, "Secretary" "means the Secretary of Agriculture in connection with public lands administered

3    by him/her through the Forest Service. *See Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F.

4    Supp. 2d 87, 93 n.12 (D.D.C. 2009).

5         Among the management activities that the Forest Service may engage are activities related

6    to the gather and removal of "excess" wild horses from the public range. *See* 16 U.S.C. §§ 1332(f),

7    1333(b). In making determinations regarding such removal, the Secretary must both (a) make a

8    determination that excess wild horses exist, and (b) make a determination that removal of excess

9    wild horses is necessary. *See id.* at § 1333(b).

10         **a)**    **Excess Wild Horse Determination**

11         To determine that excess wild horses exist, the Wild Horse Act requires the Forest Service

12    to compare the current population of wild horses with the appropriate management level (AML) of

13    wild horses for the WHT. *See id.* at § 1332(b)(2). AMLs must be established on the basis of

14    "evidence, analysis or studies." *Dahl v. Clark*, 600 F. Supp. 585, 592 (D. Nev. 1984). Where the

15    Forest Service relies upon improper AMLs, any excess determination will necessarily violate the

16    Wild Horse Act. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1126 (D. Mont. 2016)

17    ("By operating with an outdated AML when it [adopted a removal plan], [the government's] excess

18    animal determination was based, at least in part, on pure guesswork. Without an accurate AML, [the

19    government's] duty to remove could not be triggered because [the government] could not properly

20    determine that an overpopulation existed, which is the prerequisite for removal"); *Animal*

21    *Protection Institute of America*, 109 IBLA 112, 118 (1989) (decision to remove horses cannot be

22    based on AMLs established "only for administrative convenience").

23         In the Spring of 2024, the Forest Service conducted an aerial survey with simultaneous,

24    double-counting that reported 723 wild horses in and around the WHT. *See* E-mail Exchange

25    Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl.;

26    8/22/25 Letter, p. 1, attached as <u>Exh. K</u> to Lovko Decl.; Memorandum, p. 1, attached as <u>Exh. L</u> to

27    Lovko Decl. As a result, in the Fall/Winter of 2024, the Forest Service gathered and removed 407

28

wild horses from the WHT. *See* Verified Complaint at ¶ 68; E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl. That would have left 316 wild horses remaining in the WHT.

In 2025, the Forest Service did not conduct another aerial survey, but instead, the agency performed an unofficial ground count to conclude that 500-600 wild horses are currently in or around the Devil's Garden Plateau WHT. *See* E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl.; 8/22/25 Letter, p. 1, attached as <u>Exh. K</u> to Lovko Decl. This unofficial count is highly suspect for two reasons. First, ground counts are normally not used by the Forest Service as they are unreliable and typically only used for very small geographic locations. *See* Verified Complaint at ¶ 79. And ground counts do not comply with the Forest Service's own internal guidance, which states that "[i]n addition to population numbers, the census of wild free-roaming horses and burros shall include herd composition, reproduction rates, seasonal feeding habits, herd unit area, seasonal distribution or movement, external influences, and the effects of other animal species on behavior of wild horses and burros." FSM 2200, p. 7 (Section 2262.1), attached as <u>Exh. M</u> to Lovko Decl.

Second, it is impossible for the horse population to have grown so significantly since the 2024 gather. The Forest Service estimates a 15% growth rate for the Devil's Garden Plateau WHT. *See* E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl. Even if all of the 316 horses left in the WHT after the 2024 gather had reproduced (an impossibility since not all horses are female), a 15% growth rate would only result in an additional 47 horses in the WHT – for a total of 363 wild horses. It is inconceivable that the population grew to the 500-600 horses estimated by the 2025 ground count. For this reason, the Forest Service's excess determination is without foundation.[5] Moreover, if the Forest Service removes 350 horse in the upcoming gather, the population will dip significantly below AML, and

---

[5] Had the Forest Service prepared an EA or EIS for the upcoming gather, it would have disclosed all of the data it relied upon in making the decision to gather horses, allowing the public an opportunity to comment on and question the data. As this was not done, Plaintiffs are left to conclude that the Forest Service's excess determination is without foundation.

the horses will essentially be eradicated.[6]

The Forest Service's excess determination also is relying upon a vacated AML. The 1991 Modoc LRMP identifies the current AML for the Devil's Garden Plateau WHT as 275-335. *See* 1991 Modoc LRMP, pp. 3-18, 3-19, 4-3, attached as <u>Exh. C</u> to Lovko Decl. The 2013 Plan, which was vacated, attempted to change the AML to 206-402 wild horses based upon the that Plan's proposal to eliminate 23,631 acres from the Middle Section of the WHT. *See Perdue*, 873 F.3d at 920; Plaintiffs' Motion for Summary Judgment, *Vilsack I*, pp. 15-22, attached as <u>Exh. D</u> to Lovko Decl.; Appellants' Opening Brief, *Vilsack II*, pp. 24-29, attached as <u>Exh. B</u> to Lovko Decl. Defendants' continued reliance on the 2013 Plan – including its re-calculation of AML – is unreasonable because the U.S. District Court vacated the Decision Notice and FONSI, making the 2013 Plan void and without authority. *See Perdue*, 873 F.3d at 923, 931; *Action on Smoking & Health*, 713 F.2d at 797.Furthermore, even had the Decision Notice and FONSI not been vacated (and they were), the 2013 Plan's recalculation of AML does not apply to the current WHT. The AML of 206-402 set in the 2013 Plan assumed the WHT was comprised of 236,000 acres contained in two non-contiguous units. *See Perdue*, 873 F.3d at 920. After the U.S. Court of Appeals decision in *Perdue*, the Forest Service returned to managing the WHT as a contiguous unit comprised of 258,000 acres. *See id.*; 8/22/25 Letter, p. 1, attached as Exh. K to Lovko Decl. An agency may not rely on a previous EA and FONSI that is itself inadequate or incomplete. *See Nat'l Audubon Soc'y*, 160 F. Supp. 2d at 1190. An agency may not rely on a prior NEPA analysis that "does not actually discuss the impacts of the project at issue." *Envtl. Def. Ctr.*, 36 F.4th at 874.

### b)    Necessity Determination

Before gathering and removing horses, the Forest Service must do more than simply rely upon population counts. The agency must make a determination that removal is necessary, too. *See*

---

[6] Assuming 363 horses currently reside in the WHT, the upcoming gather will result in approximately a dozen horses remaining in the territory. If the population currently in the WHT is 600 (the high estimate for the 2025 ground count) – which Plaintiffs contend is dubious, the remaining population will be approximately 250 wild horses. The AML identified in the 1991 Modoc LRMP is 275-335. *See* 1991 Modoc LRMP, pp. 3-18, 3-19, 4-3, attached as <u>Exh. C</u> to Lovko Decl.

U.S.C. § 1333(b)(2); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1281 (D. Utah 2017); *Wyoming v. United States DOI*, 839 F.3d 938, 944 (10th Cir. 2016). A necessity determination indicates that the Forest Service cannot achieve and maintain a thriving natural ecological balance without the removal. *See* U.S.C. § 1333(b)(2); *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1282. In making this determination, agencies may look at current information and data to assess whether the excess horses are threatening range conditions. *See* U.S.C. § 1333(b)(2); *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 155 (D.D.C. 2020).

Here, the Forest Service's public announcement of its decision to gather 350 horses from the Devil's Garden Plateau WHT did not reveal why the gather is necessary. *See* Announcement, attached as <u>Exh. H</u> to Lovko Decl. In its letter to Plaintiffs on August 22, 2025, the Service stated its determination considered:

> rangeland conditions, ecosystem health, excess horse placement capability, workforce capacity, operational capacity, current and future year budget priorities, and other on-range management options. Impacts of wild horse overpopulation include removal of vegetation from riparian areas, increased degradation of spring sites, and increased competition for resources with wildlife. Thus, in order to maintain a thriving natural ecological balance on the land, I decided to remove excess wild horses and their foals …

*See* 8/22/25 Letter, p. 1, attached as <u>Exh. K</u> to Lovko Decl. Neither Plaintiffs nor the public have been provided any evidence or information to substantiate the agency's consideration of "a thriving natural ecological balance" based on range conditions or otherwise.[7]

In summary, Defendants have failed to properly determine any overpopulation necessitates a gather to achieve and maintain a thriving natural ecological balance. *See* U.S.C. § 1333(b)(2). This is because the Defendants are relying on AMLs that were set aside and vacated and/or AMLs that were set based upon the assumption that the acreage in the WHT is less than currently managed, the

---

[7] Had the Forest Service prepared an EA or EIS for the upcoming gather, it would have disclosed all of the data and information it relied upon, allowing the public an opportunity to comment on and question the necessity determination. As this was not done, Plaintiffs are left to conclude that the Forest Service's necessity determination is without foundation.

1   Defendants are relying on ground count estimates that are unreliable and contradicted by evidence,

2   the Defendants intend to remove horses to a level below AML, and the Defendants have failed to

3   show the range is being impacted by the current population of wild horses. Therefore, Plaintiffs

4   have suitably demonstrated a "fair chance of success on the merits" of their claim or "questions . . .

5   serious enough to require litigation." *Sports Form, Inc.*, 686 F.2d at 754.

6   ### 3.      Third Cause of Action – First Amendment Challenge

7       The First Amendment prohibits any law "abridging the freedom of speech, or of the press."

8   U.S. Const. Amend. I. Finding that "many governmental processes operate best under public

9   scrutiny," the Supreme Court has held that there is a qualified right of access for the press and

10  public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9

11  (1986). Access may only be limited where the government shows an overriding interest that is

12  essential and narrowly tailored. *See id.* at 9.  A restriction is narrowly tailored if "'less restrictive

13  alternatives' . . . would not 'accomplish the government's goals equally or almost equally

14  effectively.'" *In re Sealed Case*, 462 U.S. App. D.C. 149, 164, 77 F.4th 815, 830 (2023) (citation

15  omitted).

16      A qualified right of access applies to gather operations of wild horses on public lands. *See*

17  *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013). The Court in *Leigh v. Salazar*

18  recognized "that public access to gather activities plays an important role in the function of the

19  gather, namely protecting the interests of the overpopulated horses and news gathering for the

20  benefit of the public." *Id.*

21      The Forest Service's decision to being gathering horses from the Devil's Garden Plateau

22  WHT provides that "[v]iewing of gather operations will be offered for up to 6 viewers on Mondays,

23  Tuesdays, and Saturdays during the gather. Corral tours will also be offered on Saturdays. Some

24  trap sites may not allow for viewing and/or multiple viewers." *See* Announcement, attached as <u>Exh.

25  H</u> to Lovko Decl.

26      Plaintiffs' experience at past gathers in the Devil's Garden Plateau WHT show that

27  observation can occur daily without interference to gather operations. *See* Verified Complaint at ¶

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

84. And, there is no reason why observers cannot be present at corrals during offloading and sorting on a daily basis. *See id.* at ¶ 85. There is a fence line where observation could be provided throughout each day without causing any interference. *See id.*

In their letter to the Forest Service, dated August 18, 2025, the Plaintiffs noted that the Service's decision violated their First Amendment, and no overriding interest has been identified that would deem these limitations essential or narrowly tailored to any overriding interest. *See* 8/18/25 Letter, p. 8, attached as <u>Exh. J</u> to Lovko Decl. They also noted that the Forest Service has not articulated any reason to explain why some trap sites may not allow for viewing. *See id.* In response, the Service generally asserted the limitations were related to safety concerns. *See* 8/22/25 Letter, p. 2, attached as <u>Exh. K</u> to Lovko Decl.

The Service's general assertion is insufficient. Under the narrowly tailored framework, the Court must conduct a thorough and searching review of any restrictions, and the government's justification is not rubber-stamped "simply because the government says it is necessary." *Leigh*, 954 F. Supp. 2d at 1101 (citation omitted). While safety concerns conceivably can be an important interest, the Forest Service has not clarified to the public or the Plaintiffs what safety concerns implicate observation nor has the Service explained how the limitations regarding the number of observers and days of observation address these safety concerns. Based on Plaintiffs' experience, the limitations are unnecessary and providing access during the entirety of the gather and at corrals would cause no interference implicating safety. *See* Verified Complaint at ¶¶ 84-85. Therefore, Plaintiffs have suitably demonstrated a "fair chance of success on the merits" of their claim or "questions . . . serious enough to require litigation." *Sports Form, Inc.*, 686 F.2d at 754.

## B.    Irreparable Harm

"[P]laintiffs must establish that irreparable harm is likely, not just possible," in order to obtain an injunction. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011). "Turning first to the significance of environmental injury, the Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely,

1  therefore, the balance of harms will usually favor the issuance of an injunction to protect the

2  environment.'" *The Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (quoting *Amoco*

3  *Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

4      Plaintiffs have been visiting and advocating for the wild horses in the Devil's Garden

5  Plateau Territory for decades and experience great enjoyment from viewing these horses. *See*

6  Verified Complaint at ¶¶ 6-22. Their aesthetic, recreational, and conservation interests in these

7  horses are directly injured as a result of the Forest Service's failure to abide by the Wild Horse

8  Act's and NEPA's requirements because this failure will lead to the permanent removal of these

9  beloved wild horses from the WHT. *See* Verified Complaint at ¶ 23; *see also Friends of Animals v.*

10  *United States BLM* 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV-0057-LRH-WGC at *10-11 (D.

11  Nev. Feb. 11, 2015) (finding irreparable harm where gather would remove 200 horses from Herd

12  Management Area visited by the moving party); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567

13  (1992) (finding that a person who observes or works with animals of a particular species that are

14  threatened by an agency decision suffers injury "since some animals that might have been the

15  subject of his interest will not longer exist"). Indeed, the removal of 350 horses from the WHT is

16  likely to lower the horse population to below AML – essentially eradicating them. *See* Section

17  III.A.2.a), above.

18          **C.    Balance of Equities and Public Interest**

19      Consideration of the balance of equities and public interest merge into one inquiry where the

20  government opposes a request for preliminary relief. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

21  1073, 1092 (9th Cir. 2014). The balance of equities addresses the burdens or hardships to Plaintiffs

22  compared with the burden on Defendants if a TRO or injunction is ordered. *See Winter*, 555 U.S. at

23  24-31. Consideration of the public interest relates to the impact of a TRO or injunction on non-

24  parties. *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).

25      The balance of equities in this case strongly favors making the Forest Service wait to

26  conduct a gather operation until they have conducted the legally required NEPA review and

27  complied with the Wild Horse Act's requirements. If the gather is allowed to go forward and be

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

implemented as announced, Plaintiffs' injury is likely and significant. On the other hand, the impact of a TRO or preliminary injunction on Defendants is minimal. Not only is it improbable that an overpopulation of horses currently reside in the Devil's Garden Plateau WHT, as addressed above in Section III.A.2.a), but the Forest Service already removed over 400 horses from the WHT less than a year ago. *See* Verified Complaint at ¶ 68; E-mail Exchange Between Bonnie Kohleriter and Forest Service (August 2025), attached as <u>Exh. I</u> to Lovko Decl. Moreover, the Forest Service has begun preparing a new territory plan, which could address an action to gather horses, should the Service so choose. *See* Verified Complaint at ¶¶ 66-67.

The public interest also weighs in favor of granting a TRO and preliminary injunction as the Forest Service's management of the wild horses in the WHT is intended to ensure they are properly protected and managed as an integral part of the WHT. *See* 16 U.S.C. § 1331. The removal of 350 horses in violation of NEPA and the Wild Horse Act is not only tragic for Plaintiffs but for everyone who cherishes these iconic and symbolic creatures. The public interest strongly favors a TRO and preliminary injunction to ensure that the Forest Service abides by the law. *See Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (finding that the public "undeniably" has an interest in seeing "its governmental institutions follow the law").

## IV.    CONCLUSION

In *Perdue*, the U.S. Court of Appeals reproached the Forest Service for its arbitrary and capricious NEPA review of the 2013 Plan, which addressed wild horses in the Devil's Garden Plateau WHT, by stating "[b]linders may work for horses, but they are no good for administrative agencies." *Perdue*, 873 F.3d at 924. And, the Court recognized that the Service's FONSI was issued only by taking a "head-in-the-sand approach" to its analysis of environmental impacts on horses. *Id.* at 931. Yet, even though more than a decade has passed, the Service persists in trudging forward blindly in its management of these wild horses, removing hundreds upon hundreds of these animals without ever conducting any NEPA review of the impact of such gathers upon the horses. It continues to rely upon an AML that does not apply to the current boundaries of the WHT. It continues to flout NEPA's requirement that the public be allowed to comment on and participate in

gather decisions before gathers occur. It continues to limit the public's access to observe the agency's treatment of these horses when such unlawful gathers occur. For this reason, Plaintiffs respectfully request that this Court issue a TRO and preliminary injunction until such time as the Forest Service complies with the law.

Dated: August 27, 2025                                Respectfully Submitted,


                                          By:    /s/ Jessica L. Blome
                                                 Jessica L. Blome
                                                 Jennifer Rae Lovko
                                                 GREENFIRE LAW, PC
                                                 2748 Adeline Street, Suite A
                                                 Berkeley, CA 94703
                                                 Telephone: (510) 900-9502
                                                 Email: jblome@greenfirelaw.com
                                                        rlovko@greenfirelaw.com


                                                 *Attorneys for Plaintiffs*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION