Jessica Blome (Cal. Bar No. 314898)
Jennifer Rae Lovko (Cal. Bar No. 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: jblome@greenfirelaw.com
        rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BONNIE KOHLERITER, MARY KONCEL, LAURA LEIGH, individually and WILD HORSE EDUCATION, a non-profit corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>TOM SCHULTZ, Chief, U.S. FOREST SERVICE, JASON KUIKEN, Acting Regional Forester, Pacific Southwest Region, CHRISTOPHER BIELECKI, Forest Supervisor, Modoc National Forest, MADELEINE LEVY, Wild Horse and Burro Specialist, Modoc National Forest, and BROOKE ROLLINS, Secretary, U.S. DEPARTMENT OF AGRICULTURE,<br><br>        Defendants. | Case No. 2:25-cv-02446-DJC-JDP<br><br>**DECLARATION OF JENNIFER RAE LOVKO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, J. RAE LOVKO, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.      I am an attorney with Greenfire Law, PC, counsel for Plaintiffs in the above-titled action.

2.      Attached hereto as Exhibit A is a true and correct copy of "Devil's Garden Plateau Wild Horse Territory" which is a page on the U.S. Forest Service's website.

3.      Attached hereto as Exhibit B is a true and correct copy of Appellants' Opening Brief in the case of *Am. Wild Horse Pres. Campaign v. Vilsack*, Case No. 15-5332, U.S. Court of Appeals for the District of Columbia (2016).

4.      Attached hereto as Exhibit C is a true and correct copy of the 1991 Modoc National Forest Land and Resource Management Plan.

5.      Attached hereto as Exhibit D is a true and correct copy of Plaintiffs' Motion for Summary Judgment in the case of *Am. Wild Horse Pres. Campaign v. Vilsack*, Case No. 1:14-cv-00485-ABJ, U.S. District Court for the District of Columbia (2014).

6.      Attached hereto as Exhibit E is a true and correct copy of the Order and Memorandum Opinion issued by the District Court on the parties' motions for summary judgment in the case of *Am. Wild Horse Pres. Campaign v. Vilsack*, Case No. 1:14-cv-00485-ABJ, U.S. District Court for the District of Columbia (2015).

7.      Attached hereto as Exhibit F is a true and correct copy of the settlement agreement entered into by the parties in *Devils Garden Preservation Group et al. v. U.S. Forest Service et. al.*, Case No. 2:17-cv-02185, U.S. District Court for the Eastern District of California (2021).

8.      Attached hereto as Exhibit G is a true and correct copy of contract information downloaded from the U.S. Department of the Treasury's USAspending.gov website.

9.      Attached hereto as Exhibit H is a true and correct copy of the Forest Service's announcement that it had decided to implement a gather of wild horses in the Devil's Garden Plateau WHT beginning on September 2, 2025. This announcement was downloaded from the Forest Service's website.

10.      Attached hereto as Exhibit I is a true and correct copy of an e-mail exchange between Bonnie Kohleriter and Forest Service in August of 2025.

11.      Attached hereto as Exhibit J is a true and correct copy of a letter that was sent to the Forest Service on behalf of Plaintiffs on August 18, 2025. Through this letter, Plaintiffs reached out to Defendants to determine whether the Forest Service consider cancelling the gather of horses from the Devil's Garden Plateau WHT. Defendants declined to cancel the gather.

DECLARATION OF JENNIFER RAE LOVKO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

12.     Attached hereto as Exhibit K is a true and correct copy of a letter sent by the Forest Service to Plaintiffs on August 22, 2025.

13.     Attached hereto as Exhibit L is a memorandum that the Forest Service sent to the Plaintiffs on August 22, 2025.

14.     Attached hereto as Exhibit M is a true and correct copy of the Forest Service's manual, FSM 2200.

15.     Because the Forest Service intends to gather and remove horses in the Devil's Garden Plateau WHT beginning September 2, 2025 (and is setting bait traps this week), Plaintiffs are hereby requesting a temporary restraining order and preliminary injunction to stop the ongoing gather at least until the merits of Plaintiffs' claims can be heard.

16.     As established by Plaintiffs' Verified Complaint, Plaintiffs have been visiting and advocating for the wild horses in the Devil's Garden Plateau WHT for decades and experience great enjoyment from viewing these horses. They will suffer irreparable injury if Defendants are allowed to implement the upcoming gather. Plaintiffs' aesthetic, recreational, and conservation interests in these horses will be directly injured as a result of the Forest Service's failure to abide by the Wild Horse Act's and NEPA's requirements because this failure will lead to the permanent removal of beloved wild horses from the WHT.

17.     The first date upon which the Forest Service announced its decision of the upcoming gather was Friday, August 15, 2025. On Monday, August 18, 2025, Greenfire Law PC sent a letter to the Forest Service on behalf of Plaintiffs to ask that the Forest Service consider halting the upcoming gather in the Devil's Garden Plateau WHT. On that date, the letter was sent by overnight mail to Secretary Brooke Rollins, U.S. Department of Agriculture, and it also was e-mailed to Secretary Brooke Rollins, U.S. Department of Agriculture; Chief Tom Schultz, U.S. Forest Service; Acting Regional Forester (Pacific Southwest Region) Jason Kuiken, U.S. Forest Service; Modoc National Forest Supervisor Christopher Bielecki, U.S. Forest Service; and Wild Horse and Burro Specialist Madeleine Levy, U.S. Forest Service. Through this letter, Plaintiffs requested a response no later than August 22, 2025, so that they could proceed with any necessary legal action.

DECLARATION OF JENNIFER RAE LOVKO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  Christopher Bielecki e-mailed the Forest Service's response at 5:04 p.m. on Friday, August 22,
2  2025.

3       18.    Plaintiffs prepared the verified complaint in this action and the instant motion for a
4  temporary restraining order and preliminary injunction on Monday, August 25, 2025 and Tuesday,
5  August 26, 2025.

6       19.    The verified complaint was filed in the evening on Tuesday, August 26, 2025.
7  Plaintiffs will actuate legal service of the complaint on all Defendants; Plaintiffs also sent a courtesy
8  copy of the complaint by e-mail to Secretary Brooke Rollins, U.S. Department of Agriculture; Chief
9  Tom Schultz, U.S. Forest Service; Acting Regional Forester (Pacific Southwest Region) Jason
10 Kuiken, U.S. Forest Service; Modoc National Forest Supervisor Christopher Bielecki, U.S. Forest
11 Service; and Wild Horse and Burro Specialist Madeleine Levy, U.S. Forest Service on August 26,
12 2025.

13      20.    The instant motion for a temporary restraining order and preliminary injunction was
14 filed on Wednesday, August 27, 2025. On this same day, Plaintiffs forwarded a courtesy copy of the
15 motion and this declaration by e-mail to Secretary Brooke Rollins, U.S. Department of Agriculture;
16 Chief Tom Schultz, U.S. Forest Service; Acting Regional Forester (Pacific Southwest Region)
17 Jason Kuiken, U.S. Forest Service; Modoc National Forest Supervisor Christopher Bielecki, U.S.
18 Forest Service; and Wild Horse and Burro Specialist Madeleine Levy, U.S. Forest Service.

19      I declare under penalty of perjury under the laws of the United States of America that the
20 foregoing is true and correct.

21

22 Dated this 27th day of August, 2025,                    _____
23                                                          Jennifer Rae Lovko

24

25

26

27

28

- 4 -
DECLARATION OF JENNIFER RAE LOVKO IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# EXHIBIT A



(https://www.usda.gov/) (https://www.fs.usda.gov/)

**U.S. FOREST SERVICE**
**Caring for the land and serving people**

United States Department of Agriculture

FOREST SERVICE HOME (../../../) » S.USDA.GOV (../../) » WILD-HORSE-BURRO (../) » TERRITORIES (./) » DEVIL'S GARDEN PLATEAU WILD HORSE TERRITORY

# Devil's Garden Plateau Wild Horse Territory

The Devil's Garden Plateau Wild Horse Territory (WHT) is administered by
the Modoc National Forest.



## Location/Habitat

The Devil's Garden Plateau WHT is located in California approximately
seven miles north of Alturas. The territory consists of 258,000 acres;
248,428 acres of Forest Service land, 7,632 acres of public lands
administered by the Bureau of Land Management's Applegate Field Office
(BLM) is included in the territory. Approximately 800 acres of Tribal Lands,
640 acres of California State Lands and 500 acres of private lands fall within the territorial boundaries; however,
these lands are excluded from the territory.

The topography is a relatively flat continuous lava plateau. Average elevation is 5,000 feet. Precipitation is primarily
from winter snow between November and March. Average annual precipitation is 12.6 inches. Temperatures during
winter can be severe for short periods of time, and summer temperatures frequently exceed 90° Fahrenheit.

Vegetation is typical of high desert plateau sagebrush-steppe ecosystems. It is fairly uniform and consists primarily of
western juniper, big sagebrush, perennial grasses, and increasing invasive annual grasses.

Wildlife present within the territory includes deer, antelope, cougar, rabbits, rodents, migratory birds and aquatic
species dependent on delicate high-desert riparian areas.

The entire territory is within permitted livestock allotments.

## History

Wild horses have been present on the Devil's Garden Plateau since shortly after the first pioneers arrived. Many of
the early horses escaped from settlers or were released when their usefulness as domestic animals ended. The first
roundup occurred as early as 1889. In later years, local ranchers and native tribal members turned horses out to
graze and then gathered them as needed. Devil's Garden Horses contributed to the liberation of Europe in WWI. Not
all were ever captured. With the passage of the 1971 Wild Horse and Burro Act (PL 92-195)
(http://www4.law.cornell.edu/uscode/16/ch30.html), private horse roundups ended. In 1974, as an initial step toward
management, the Forest Service inventoried the Devil's Garden Wild Horse population for the first time. The new
Devil's Garden Plateau Wild Horse Territory Management Plan (https://www.fs.usda.gov/project/?project=32426),
completed in 2013, set an Appropriate Management Level (AML) of a maximum of 402 adult total horses.

## Herd Description

Horses can be seen in many colors and sizes. The dominant colors are roan, black and bay; however, gray,
buckskin, palomino, and sorrel are also found with some frequency.

Case 2:25-cv-02446-DJC-JDP     Document 4-1     Filed 08/27/25     Page 7 of 638

# For More Information

Visit the Modoc National Forest website for the <u>Devil's Garden Plateau Wild Horse Territory</u>



<u>(https://www.fs.usda.gov/detail/modoc/landmanagement/resourcemanagement/?cid=FSEPRD512471)</u>.

[ Top of Page ]  [ Home ]

Accessibility Statement (https://www.usda.gov/accessibility-statement)     Privacy Policy (https://www.usda.gov/privacy-policy)

Non-Discrimination Statement (https://www.usda.gov/non-discrimination-statement)

Information Quality (https://www.ocio.usda.gov/policy-directives-records-forms/information-quality-activities)

Site Map (https://www.fs.fed.us/sitemap)

**EXHIBIT B**

**CASE NO. 15-5332**
**ORAL ARGUMENT NOT YET SCHEDULED**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN WILD HORSE PRESERVATION CAMPAIGN;
CARLA BOWERS; RETURN TO FREEDOM,

*Plaintiffs-Appellants,*

v.

THOMAS J. VILSACK, Secretary, U.S. Department of Agriculture; THOMAS L. TIDWELL, Chief, U.S. Forest Service; AMANDA McADAMS, Forest Supervisor, Modoc National Forest, U.S. Forest Service,

*Defendants-Appellees,*

v.

CALIFORNIA CATTLEMEN'S ASSOCIATION; CALIFORNIA FARM BUREAU FEDERATION; PUBLIC LANDS COUNCIL; NATIONAL CATTLEMEN'S BEEF ASSOCIATION; MODOC COUNTY; WILLIAM FLOURNOY; CAROLYN CAREY; JAMES PETER CAREY; MIKE BYRNE,

*Intervenors for Defendants-Appellees.*

---

On Appeal from The United States District Court for the District of Columbia,
Case No. 14-cv-485, Hon. Amy Berman Jackson

---

**APPELLANTS' OPENING BRIEF**

---

*William S. Eubanks II*
*MEYER GLITZENSTEIN & EUBANKS LLP*
*245 Cajetan Street*
*Fort Collins, CO 80524*
*(970) 703-6060*
*beubanks@meyerglitz.com*

*David Zaft*
*CALDWELL LESLIE & PROCTOR, PC*
*725 South Figueroa Street, 31st Floor*
*Los Angeles, CA 90017*
*(213) 629-9040*
*zaft@caldwell-leslie.com*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

**A.      *Parties***

The parties who appeared in the district court, and also are parties in this Court, are:

1.      Plaintiffs-Appellants: American Wild Horse Preservation Campaign; Carla Bowers; Return To Freedom.

2.      Defendants-Appellees: Thomas J. Vilsack; Thomas L. Tidwell; Amanda McAdams.

3.      Intervenors-Appellees: California Cattlemen's Association; California Farm Bureau Federation; Public Lands Council; National Cattlemen's Beef Association; Modoc County; William Flournoy; Carolyn Carey; James Peter Carey; Mike Byrne.

**B.      *Rulings Under Review***

The rulings under review are the final Order (Docket Entry ("D.E.") 31) and Memorandum Opinion (D.E. 32) entered by the district court on September 30, 2015 denying Plaintiffs' motion for summary judgment and granting Federal Defendants' cross-motion for summary judgment.

**C.      *Related Cases***

Counsel are unaware of any related cases pending in this or any other court.

i

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants American Wild Horse Preservation Campaign and Return To Freedom—501(c)(3) non-profit organizations—and Carla Bowers, an individual, state that they have no parent corporations or any publicly held corporations that own 10% or more of their stock.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENT............................................................ ii

TABLE OF AUTHORITIES .............................................................................v

GLOSSARY..................................................................................................ix

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF ISSUES ............................................................................2

ADDENDUM ...............................................................................................3

STATEMENT OF THE CASE.......................................................................3

STATEMENT OF THE FACTS ....................................................................5

    A.    Statutory Framework .........................................................................5

        1.    Wild Horse Act ......................................................................5

        2.    National Forest Management Act ...........................................6

        3.    National Environmental Policy Act ........................................8

    B.    Facts Underlying Plaintiffs' Claims....................................................9

        1.    The Establishment of the Devil's Garden WHT and the Mid-1980s Modifications...............................................................9

        2.    The 1991 Forest Plan Formally Incorporates the Mid-1980s Management Changes ....................................................11

        3.    The Five Grazing Allotments Comprising the Middle Section...................................................................................13

        4.    Wild Horses' Use of the Middle Section .................................18

    C.    Procedural History...........................................................................19

        1.    The Forest Service's 2011 Scoping Letter...............................19

        2.    The Modoc County Farm Bureau Takes Charge of Developing the Revised Management Plan ............................20

        3.    The December 2012 Scoping Letter ......................................22

        4.    The December 2012 Resource Monitoring Report...................24

5. The January 2013 AML Evaluation ..........................................25

6. The February 2013 Wild Horse Specialist Report ...................27

7. The Draft EA ................................................................................28

8. The Final EA .................................................................................29

9. The FONSI and the 2013 WHT Management Plan .................32

10. Plaintiffs' Administrative Appeal ............................................33

D. Proceedings in the District Court .......................................................34

SUMMARY OF ARGUMENT .............................................................................35

ARGUMENT .........................................................................................................38

I. STANDARD OF REVIEW ........................................................................38

II. THE DISTRICT COURT ERRED BY FINDING THAT THE
FOREST SERVICE PROPERLY REMOVED THE MIDDLE
SECTION FROM THE WHT .....................................................................39

A. The District Court's Conclusion that the Middle Section Was
Never Formally Incorporated Into the WHT Disregards the
1991 Forest Plan.....................................................................................39

B. The District Court Was Mistaken In Concluding that the Middle
Section Could Not Have Been Incorporated Into the WHT ..............43

III. THE FOREST SERVICE FAILED TO COMPLY WITH NFMA
AND NEPA WHEN IT ELIMINATED THE MIDDLE SECTION ...........48

A. The Elimination of the Middle Section Was a Significant
Change to the 1991 Forest Plan Requiring a Formal
Amendment ............................................................................................48

B. The Forest Service Also Violated NEPA In Two Distinct Ways .......53

1. Because the Elimination of the Middle Section
Constitutes a Fundamental Change in the Status Quo and
Will Result in Significant Environmental Impacts, an EIS
Was Required ......................................................................................53

2. Even if an EA Were Appropriate, It Failed to Take a
Hard Look at the Loss of the Middle Section............................59

CONCLUSION ......................................................................................................63

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Wildlands v. U.S. Forest Serv.*,
  No. 97-CV-160-M-DWM, 1999 U.S. Dist. Lexis 22243 (D. Mont.
  Apr. 14, 1999) ................................................................................................52, 55

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
  297 F.3d 1012 (10th Cir. 2002) ..............................................................8, 51, 54

*Citizens for Envtl. Quality v. United States*,
  731 F. Supp. 970 (D. Colo. 1989)................................................................40, 41

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)............................................................................................38

*Delaware Dep't of Nat. Res. v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015)................................................................................47

*Encino Motorcars, LLC v. Navarro*,
  No. 15-415, 579 U.S. __, 2016 WL 3369424 (June 20, 2016)..........................43

*Ethyl Corp. v. EPA*,
  541 F.2d 1 (D.C. Cir. 1976)................................................................................38

*Fund for Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003)....................................................................59

*Grand Canyon Trust v. F.A.A.*,
  290 F.3d 339 (D.C. Cir. 2002)................................................................56, 57, 58

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) ................................................................................7

*Lands Council v. Martin*,
  529 F.3d 1219 (9th Cir. 2008) ............................................................................51

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) ............................................................................61

v

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
   463 U.S. 29 (1983) ........................................................................... 39, 47

Native Ecosystems Council v. U.S. Forest Serv.,
   418 F.3d 953 (9th Cir. 2005) .............................................................. 7, 50

Neighbors of Cuddy Mountain v. U.S. Forest Serv.,
   137 F.3d 1372 (9th Cir. 1998) ............................................................ 6, 38

Prairie Wood Prods. v. Glickman,
   971 F. Supp. 457 (D. Or. 1997) ............................................................. 51

*Pub. Emps. for Envtl. Responsibility v. Hopper,
   __ F.3d ___, 2016 WL 3606363 (D.C. Cir. July 5, 2016) ................................ 62

Sierra Club v. Martin,
   168 F.3d 1 (11th Cir. 1999) .................................................................... 7

Sierra Club v. Watkins,
   808 F. Supp. 852 (D.D.C. 1991) ........................................................ 59, 60

## Statutes

5 U.S.C. § 706(2) ............................................................................... 38

*16 U.S.C. § 1331 ................................................................................ 5

*16 U.S.C. § 1333(a) ............................................................................. 5

16 U.S.C. § 1604(a) ........................................................................... 6, 49

*16 U.S.C. § 1604(d) .......................................................................... 6, 37

*16 U.S.C § 1604(e)(1) ........................................................................... 6

*16 U.S.C. § 1604(f) ............................................................................ 37

*16 U.S.C. § 1604(f)(4) ........................................................... 7, 8, 50, 53, 54

*16 U.S.C. § 1604(i) ................................................................... 7, 41, 49

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 1331 ...................................................................................................1

42 U.S.C. § 4321 ...................................................................................................8

*42 U.S.C. § 4332(C) ............................................................................................8

## Rules and Regulations

36 C.F.R. § 219.2(b)(1) .......................................................................................41

*36 C.F.R. § 219.7(c)(1) ......................................................................................54

36 C.F.R. § 219.10(e) ..........................................................................................49

*36 C.F.R. § 219.13(b)(3) ....................................................................................54

*36 C.F.R. § 219.15(e) .........................................................................................41

36 C.F.R. § 222.60 ...............................................................................................44

36 C.F.R. § 222.60(b)(13) ....................................................................................44

36 C.F.R. § 222.60(b)(14) ....................................................................................44

36 C.F.R. § 222.60(b)(15) ....................................................................................45

*36 C.F.R. § 222.61(a)(1) ......................................................................................6

36 C.F.R. § 222.61(a)(3) ...................................................................................6, 44

40 C.F.R. § 1501.4(b) ............................................................................................8

40 C.F.R. § 1501.4(c) ............................................................................................8

*40 C.F.R. § 1502.2(g) .........................................................................................61

40 C.F.R. § 1502.5 ...............................................................................................61

*40 C.F.R. § 1502.14 ...........................................................................................61

*40 C.F.R. § 1508.9 ................................................................................8

*40 C.F.R. § 1508.9(b) ..........................................................................61

40 C.F.R. § 1508.13 ...............................................................................59

40 C.F.R. § 1508.27 ................................................................................8

40 C.F.R. § 1508.27(b) ..........................................................................58

43 C.F.R. § 4710.1 ..................................................................................7

## Other Authorities

*Forest Service Manual § 1926.51 (Jan. 2015) .....................................51

*Forest Service Manual § 2260.3(5) (Jan. 2003) ..................................49

*Forest Service Manual § 2260.41 (Jan. 2003) ...............................45, 49

*Forest Service Manual § 2261.31 (Jan. 2003) .....................................45

*Forest Service Manual § 2263.1 (Jan. 2003) .......................................49

*Forest Service Manual § 2263.11 (Jan. 2003) ............................7, 41, 49

# <u>GLOSSARY</u>

APA          Administrative Procedure Act

EA           Environmental Assessment

EIS          Environmental Impact Statement

FONSI        Finding Of No Significant Impact

LRMP         Land and Resource Management Plan

NEPA         National Environmental Policy Act

NFMA         National Forest Management Act

WHT          Devil's Garden Wild Horse Territory

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action against the U.S. Forest Service ("Forest Service" or "Service") pursuant to 28 U.S.C. § 1331. The district court denied Plaintiffs' motion for summary judgment, granted Defendants' cross-motion for summary judgment, and denied Intervenor-Defendants' cross-motion for summary judgment as moot on September 30, 2015. Plaintiffs filed a notice of appeal on November 25, 2015. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

Plaintiffs are two non-profit organizations—American Wild Horse Preservation Campaign and Return to Freedom—and one individual, Carla Bowers. As attested to in several declarations, *see* D.E. 20-1 & 20-2, Plaintiffs and their members have aesthetic, recreational, and other cognizable interests in observing wild horses that have historically roamed on public lands at issue in this case, and the organizational Plaintiffs also suffer resource injury as a result of having to monitor, educate their members and supporters about, and advocate against and counteract the Service's decision that forms the subject of this appeal. Accordingly, Plaintiffs have established standing to bring this case, which Defendants have not contested.

## **STATEMENT OF ISSUES**

For more than twenty-five years, the Devil's Garden Wild Horse Territory ("WHT") has consisted of a single, contiguous territory totaling approximately 258,000 acres, as expressly prescribed by the Forest Service's 1991 Land and Resource Management Plan for the Modoc National Forest (the "1991 Forest Plan"). In 2013, the Service, at the behest of the Modoc County Farm Bureau, eliminated 23,631 acres (the "Middle Section") from the WHT, thereby "zeroing out" the wild horses from the Middle Section and separating the WHT into two isolated units. The issues raised in this appeal are:

1.     Whether the Forest Service's decision to eliminate the Middle Section from the WHT violated the Wild and Free Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (the "Wild Horse Act"), and was arbitrary and capricious, when the agency's sole justification for the boundary change was its announcement in 2012 that it had been managing the Middle Section as part of the WHT for more than two decades due to an undocumented "administrative error" arising from the Service's erroneous—and since disavowed—claim that the majority of these lands had been privately owned in 1971 when Congress passed the Wild Horse Act.

2.     Whether the Service violated the National Forest Management Act, 16 U.S.C. §§ 1600-1687 ("NFMA"), by forgoing the formal forest plan revision

2

process and instead labeling the elimination of the Middle Section as a "non-significant" amendment to the 1991 Forest Plan, when the governing 1991 Forest Plan expressly directed the inclusion of the Middle Section in the WHT.

3.     Whether the agency failed to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m ("NEPA"), by failing to prepare an Environmental Impact Statement or otherwise taking a "hard look" at the environmental impacts arising from the loss of the Middle Section, and instead made the conclusory determination that removal of the Middle Section will have no effect on federally protected wild horses or their habitat.

## ADDENDUM

Pertinent statutory and regulatory provisions are set forth in the Addendum.

## STATEMENT OF THE CASE

This action has important implications for how the Forest Service manages the nearly two hundred million acres of national forests.  In 2013, the Service decided to eliminate wild horses from public lands running through the center of the Devil's Garden WHT, which both eliminated a significant part of the WHT containing important meadows and water sources for wild horses and completely foreclosed one of the primary uses of these public lands.  More than two decades

earlier, the Service formally incorporated these lands into the WHT as part of the management prescriptions it adopted in the 1991 Forest Plan.

The sole reason given by the Forest Service for its abrupt reversal in the management approach for Devil's Garden is that the Middle Section had been added in 1991 solely for "administrative convenience" and that this had been improper because the majority of the Middle Section was privately held in 1971 when Congress passed the Wild Horse Act. However, the Service proffered no record evidence supporting its assertion of "administrative convenience," and in fact, as the Service has since conceded, the evidence conclusively demonstrates that the majority of the Middle Section was comprised of lands that were publicly held as part of the Modoc National Forest in 1971.

The loss of the Middle Section is a fundamental and significant change in the management approach to the WHT. The Middle Section contains important meadows and water sources that were previously available to wild horses, and it also provided an important conduit for genetic interchange of wild horses. The Forest Service informally added the Middle Section to the WHT in the mid-1980s, and then formally adopted this management approach in the 1991 Forest Plan. By summarily reversing this long-held practice and formal decision, the agency is permitting special interests to re-shape the management prescriptions in Modoc

4

National Forest through an abbreviated process based on a demonstrably false premise.  At minimum, given that the governing 1991 Forest Plan mandated a single, contiguous WHT, the Service was obligated to satisfy all procedural safeguards imposed by NFMA and NEPA before modifying this prescription.  For myriad reasons, the agency's decision to eliminate the Middle Section is arbitrary and capricious and cannot be upheld on this record.

<div align="center">

**STATEMENT OF THE FACTS**

</div>

A.    **Statutory Framework**

1.    ***Wild Horse Act***

Underlying this dispute are the protections afforded to wild horses on our nation's public lands.  In 1971, Congress unanimously passed the Wild Horse Act.  This law provides that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they must be "considered in the area where presently found, as an integral part of the natural system of the public lands."  16 U.S.C. § 1331.  The Act directs the Forest Service to "protect and manage wild free-roaming horses and burros as components of the public lands."  *Id.* § 1333(a).  On public lands that are home to wild horses, "[a]ll management activities shall be at the minimal feasible level."  *Id.*

In 1980, the Service adopted regulations requiring it to "[a]dminister wild free-roaming horses and burros and their progeny on the National Forest System in the areas where they now occur (wild horse and burro territory) to maintain a thriving ecological balance considering them an integral component of the multiple use resources." 36 C.F.R. § 222.61(a)(1). The agency must "[e]stablish wild horse and burro territories in accordance with the Act and continue recognition of such territories where it is determined that horses and/or burros will be recognized as part of the natural system." *Id.* § 222.61(a)(3).

### 2. *National Forest Management Act*

Enacted in 1976, NFMA established a formal two-step process for forest planning. *See generally Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). First, the Service must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Each land and resource management plan ("LRMP") must "provide for multiple use and sustained yield of the products and services obtained therefrom . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id.* § 1604(e)(1). This statutory process requires meaningful "public participation in the development, review, and revision of land management plans." *Id.* § 1604(d).

Second, once an LRMP is developed, NFMA mandates that all subsequent agency action in that forest comply with it. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002); *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999). Thus, "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Like other site-specific plans, "Wild Horse and Burro Territory plans are to conform with the Forest land and resource management plans." Forest Service Manual § 2263.11 (Jan. 2003); *see also* 43 C.F.R. § 4710.1 (analogous requirement for Bureau of Land Management, providing that "[m]anagement activities affecting wild horses and burros . . . shall be in accordance with approved land use plans").

If the Service determines that part of an LRMP is no longer valid and must be modified, the agency must amend the plan subject to NFMA's formal procedures. 16 U.S.C. § 1604(f)(4); *see Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). While non-significant amendments require fewer procedural safeguards, "[i]f an amendment to a[n] Forest Plan would be 'significant,' . . . then NFMA mandates substantial public involvement, planning, and input, requiring, in essence, the Forest Service to conduct the same complex planning process applicable to promulgation of the original plan."

7

*Citizens' Committee to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1032 (10th Cir. 2002) (quotation marks and citation omitted); *see also* 16 U.S.C. § 1604(f)(4) (amendments to LRMP resulting in a "significant" change must follow the procedures applicable to the development and revision of LRMPs).

### 3.    *National Environmental Policy Act*

Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To achieve NEPA's substantive goals, Congress mandated that agencies evaluate the environmental impacts of federal actions and consider reasonable alternatives that might avoid or minimize impacts. *Id.* § 4332(C). An agency must prepare an Environmental Impact Statement ("EIS") for every "major Federal action [ ] significantly affecting the quality of the human environment." *Id.* Only if an agency determines that an action will not result in significant environmental impacts may it avoid preparing an EIS, in which case the agency still must prepare a less-detailed Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") setting forth the specific grounds for why an EIS is not necessary. *See* 40 C.F.R. §§ 1501.4(b), (c), 1508.9, 1508.27.

B.    **Facts Underlying Plaintiffs' Claims**

1.    ***The Establishment of the Devil's Garden WHT and the Mid-1980s Modifications***

Wild horses have lived in the area now known as the Devil's Garden WHT since the late 1800s.  *See* AR00120; AR02969.[1]  While there were sporadic efforts to extirpate the wild horse population at Devil's Garden in the early- to mid-1900s, and periodic roundups severely reduced the population through the early 1950s, sufficient numbers of wild horses remained to ensure their survival once the Wild Horse Act was enacted.  *See* AR00120; AR02969-70.

In 1975, the Service created the Devil's Garden WHT and issued its first Wild Horse Territory Management Plan.  AR02965-2997.  The 1975 Management Plan identified two non-contiguous units covering approximately 236,000 acres and a population objective of 300 or 305 horses.  *See* AR02970-71, AR02978-80, AR02986-87.  The Service revised the Wild Horse Management Plan in 1980, 1981, and 1982.  AR02839-AR02959.  Throughout this period, the Forest Service maintained the two-unit WHT and a population objective of 300 or 305 horses. AR02953-61 (1980 Management Plan stating that WHT consisted of "two large units" encompassing "236,000 acres" and that population objective was either "305 horses" or "300"); AR02947 (partial copy of 1981 Management Plan stating that

_____

[1] Administrative record citations are notated with "AR____."

"management level" was "305 head"); AR02843-49 (1982 Management Plan stating that WHT was "two large units" of "236,000 acres" and that "proposed level" was 305 horses).

In the mid-1980s, the Service made two modifications to the management approach for the Devil's Garden WHT. First, "[d]uring the mid-1980's," the Service "incorporated about another 23,631 acres"—approximately 36 square miles—into the WHT to create a single, contiguous WHT comprising approximately 258,000 acres. AR00156; *see also* AR00157-58 (maps showing the WHT expansion). The lands that were added to the WHT—referred to as the "Middle Section" because they joined the two pre-existing wild horse units—include portions of five grazing allotments: Triangle, Avanzino, Carr, Big Sage, and Timbered Mountain. *See* D.E. 9, ¶¶ 39, 61.[2]

Second, the Service changed from a single population target of 300 or 305 horses to utilizing a population *range* of 275 to 335 horses. *See* AR02838 at 3-18 to 3-19. This was a change from the approach provided in the 1975, 1980, 1981

---

[2] The WHT overlaps with several livestock grazing "allotments," which are Forest Service administrative boundaries and are conceptually distinct from the WHT boundaries. *See* AR03927 (showing allotment boundaries in red and the two-unit WHT boundary in yellow); AR00627 (showing color-coded allotments, but excluding the Middle Section).

10

and 1982 Wild Horse Management Plans, all of which used a single target number

instead of a population range.

### 2. The 1991 Forest Plan Formally Incorporates the Mid-1980s Management Changes

On November 27, 1991, the Forest Service completed the formal planning

process for the Modoc National Forest and issued its final LRMP (the "1991 Forest

Plan"). *See* AR02838. This was the culmination of an extensive planning process

involving twelve years of work, over 45 public meetings and workshops, multiple

open houses and extensive outreach to, and input from, members of the public and

various agencies, organizations, and other stakeholders. *Id.*, Record of Decision at

7. Hundreds of people participated in public meetings and provided testimony on a

variety of topics. *Id.* In 1989, the Service convened working groups composed of

local government representatives, industry (including ranchers), environmental

organizations, and the California Department of Fish and Game, to evaluate

various issues and propose consensus solutions. *Id.* The 1991 Forest Plan

"reflect[ed] the recommendations of these groups." *Id.*

As part of this planning process, "[a]ll existing resource management plans

were re-examined by the Forest's interdisciplinary planning team." *Id.* at 1-1. The

planning team specifically determined that the existing Wild Horse Management

Plan for the Devil's Garden WHT was "consistent with, and . . . appropriate for,

11

the Forest Plan . . . ." *Id.*  Concerning the two management changes that the Forest

Service had adopted in the mid-1980s, the 1991 Forest Plan stated:

> The Forest has one wild horse territory of about 258,000
> acres located on portions of the Doublehead and Devil's
> Garden Ranger Districts.  Fulfilling requirements of the
> Act, the Forest prepared the Wild Horse Management Plan
> in 1985, which identifies a population objective of 275-335
> animals to manage.

*Id.* at 3-18 to 3-19.[3]

It is undisputed that, after this extensive public process, the 1991 Forest Plan

formally and deliberately incorporated the two changes in management approach

that the agency had adopted in the mid-1980s:  the use of a population objective of

275-335 horses rather than a single, fixed number, and the addition of the Middle

Section to form a single, contiguous WHT.  The 1991 Forest Plan further stated

that, to the extent the existing Wild Horse Territory Management Plan (whether the

1982 or the 1985 revision) was inconsistent with the Forest Plan, it was deemed

updated to be consistent with the formal 1991 Forest Plan.  *Id.* at 1-1 and A-1.

---

[3] While the Service now postulates that this reference to the 1985 Management
Plan was a mistake and was intended to reference either the 1975 or the 1982
Management Plans, *neither* of those earlier management plans "identifies a
population objective of 275-335 animals to manage."  That objective is *only*
mentioned in the 1991 Forest Plan and, based on the reference therein, the 1985
Management Plan.  However, the Service did not include a copy of the 1985
Management Plan in the administrative record, and only included a partial copy of
the 1981 Management Plan.  Dkt. No. 32 at 6; AR02941-48.

Thus, as the Service now concedes, "the Forest Service made the decision to manage wild horses on about 258,000 acres, which represents the number designated for wild horse management in the mid-1980s." AR00159.

The Service has not formally revised the 1991 Forest Plan; it remains the operative management plan today.

### 3. *The Five Grazing Allotments Comprising the Middle Section*

The Middle Section that was included in the WHT in the mid-1980s and then formally incorporated in the 1991 Forest Plan is comprised of portions of five grazing allotments: the northern portion of the "Triangle Exchange Lands," which the Service acquired as public lands in 1976; Avanzino, the majority of which has always consisted of public lands; and portions of the Carr, Big Sage and Timbered Mountain allotments, all of which have been public lands since before the WHT was created in 1975.

### a. *The Triangle Exchange Lands*

In August 1976, the Service acquired most of what it called the "Triangle Exchange Lands" (or the "Triangle Allotment"). AR03968. As of the 1976 acquisition, almost all of the Triangle Exchange Lands—which include Boles Meadows, Round Valley, Fairchild Swamp and Antelope Plains—were publicly held as part of the Modoc National Forest. *Id*., AR03969. A 1979 map confirms

13

that only two small parcels in the Triangle Exchange Lands—Point Ranch in the Round Valley unit, and Carey Ranch in the Boles Meadows unit—were privately held at that time. AR03970. Because the Forest Service's acquisition of these lands postdated the 1975 WHT Management Plan, they were not part of that plan. AR03997 (1979 EA noting that "[n]one of the Triangle Lands Management Unit are included within" the five wild horse management units from the 1975 plan).

While the Triangle Exchange Lands were not initially included in the WHT, the northern part of the Triangle Exchange Lands, including all of Boles Meadows and most of Round Valley, was incorporated into the WHT in the mid-1980s. *Compare* AR03969 (showing the Triangle Exchange Lands), *with* AR04351 (2003 map showing the single, contiguous WHT incorporating the northern portion of the Triangle Exchange Lands); *and* AR00158 (agency map dating the inclusion of the Middle Section in the WHT in 1980). Following the inclusion of these public lands into the WHT, the Service established a population objective for Boles Meadows, as evidenced by "Wildhorse Inventory" forms from 2002 and 2004 showing a herd management goal for Boles of 40 horses. AR04324-25. By contrast, the 1980 Management Plan did not include a population goal for Boles. AR02963.

14

Wild horses have used the Triangle Exchange Lands continuously since the early 1970s and likely before that time. *See* AR04339 (1972 flight notes observing "bunches of 5 to 9 head [of wild horses] along Boles Creek, and the *west side of Boles Meadows*") (emphasis added); AR04033 (1979 report noting summer use of Boles Meadows); AR3941 (1988 helicopter survey showing 19 horses in Boles); AR03927-28 (wild horses identified around Boles Meadows during censuses in 1979–1990); AR3932 (1990 survey showing 67 horses in Boles); AR04325 (2002 helicopter survey showing 64 horses at Boles); AR00496 (removing four wild horses from Triangle in 2003); AR4324 (2004 survey showing 113 horses at Boles); AR00633 (identifying ten wild horses in Triangle in 2012); AR04301 (2012 document estimating five to ten wild horses inhabiting Triangle).

### b.    *Avanzino*

The Avanzino Allotment ("Avanzino") is a relatively small strip of land between the Timbered Mountain Allotment (to the east), the Carr and Triangle Allotments (to the west), and the Big Sage Allotment (to the south). *See* AR03927. As with the adjacent Triangle area, Avanzino contains important water sources. *Id.*; AR04133, ¶ 9.  At all relevant times, roughly 59% has been publicly held as part of the Modoc National Forest, and 41% of Avanzino has been privately owned. *See* AR00156.  Wild horses have been found in Avanzino. *See* AR04325

15

(2002 inventory showing two bands of wild horses (totaling 11 individuals) in Avanzino); AR04301 (noting six wild horses in Avanzino during a 2010 inventory and estimating that 20-80 wild horses inhabited Avanzino); AR00633 (observing 80 wild horses in Avanzino in 2012); AR00610 (wild horses moved from the Timbered Mountain Allotment into Avanzino in 2012); AR03927 (identifying wild horses in Avanzino from 1979–1990).  Plaintiffs have never taken the position that the *private* lands in Avanzino must be included in the WHT.

### c.    *Carr, Big Sage, and Timbered Mountain*

The majority of the Middle Section consists not of the Triangle Exchange and Avanzino lands, but of portions of three other allotments on public lands:  (1) the southeast section of the Carr Allotment (the northwest portion of the Middle Section); (2) the northwest section of the Big Sage Allotment (the southeast portion of the Middle Section); and (3) the central-western portion of the Timbered Mountain Allotment (the northeast portion of the Middle Section).  *See* D.E. 9, ¶ 39 ("Federal Defendants admit that the 1991 Forest Plan included portions of the Big Sage, Timbered Mountain, Carr, and Pine Springs Allotments in the Devil's Garden WHT for administrative convenience."); *id.*, ¶ 61 ("Federal Defendants admit that the majority of the middle area was never part of the Triangle or Avanzino Ranches, and consist [sic] of portions of the Big Sage, Timbered

Mountain, Carr and Pine Spring Allotments"); AR04351 (showing single WHT and grazing allotments); AR03929 (showing (in orange shaded areas) portions of the Carr, Timbered Mountain, and Big Sage Allotments adjacent to the two-part WHT adopted in 2013 (outlined in yellow)); AR00549 (showing, in light green, the portion of the Timbered Mountain Allotment in the Middle Section (to the west of the purple line) and showing, in purple, the portion of the Carr Allotment in the Middle Section (to the east of the purple line)).

As with Boles Meadows in the Triangle allotment, after these areas were incorporated into the WHT in the mid-1980s, the Service set population targets for them, as demonstrated by its "Wildhorse Inventory" forms from 2002 and 2004 identifying designated herd management goals for Big Sage (20 horses) and Timbered Mountain (40 horses). AR04324-25. By contrast, the 1980 Management Plan did not include these areas in the unit-specific population targets. AR02963. Importantly, the Big Sage allotment is not part of the smaller two-unit WHT. *See* AR00627.

The portions of the Carr, Big Sage, and Timbered Mountain Allotments that are part of the Middle Section have been utilized by wild horses for decades. *See, e.g.*, AR03927 (map with census results from 1979-1990 showing six wild horse identifications in the southeast corner of the Carr Allotment, two in the northwest

17

corner of the Big Sage Allotment, and two in the central-western portion of the Timbered Mountain Allotment); AR04133-34, ¶ 9.

### 4.     *Wild Horses' Use of the Middle Section*

Extensive evidence in the census data showing the presence of wild horses in the Middle Section is not surprising. With numerous meadows and water sources, the Middle Section is "prime territory that would historically have been used by wild horses." *See* AR04133, ¶ 7. Indeed, there are "no geographical boundaries that would naturally prohibit wild horses from using the middle section" for forage and water and to travel between the eastern and western portions of the WHT. *Id.* The Middle Section is home to several high-quality habitats for wild horses, including Boles Meadow and Round Valley in the Triangle Allotment, and Dutch Flat, Williams Valley, and Graves Valley in the Big Sage Allotment. *Id.*, ¶ 9. In addition to their historical use of the Middle Section, wild horses were recently documented throughout the Middle Section in February 2013. AR00498-99.

Based on available evidence, Marla Bennett—a federal government biologist with extensive experience studying wild horses in the western United States, including at Devil's Garden, *see* AR04131-32, ¶¶ 2-4—observed that it "is highly likely that the middle section of the WHT . . . is actually currently part of the home

18

ranges of several horse bands and certainly part of a migratory corridor" for wild horses. AR04136, ¶ 15. Ms. Bennett stated, "in my professional opinion, there is every reason why wild horses would have historically used the middle section . . . due to the availability of water and forage in the area." *Id.*, ¶ 16.

### C.    **Procedural History**

#### 1.    *The Forest Service's 2011 Scoping Letter*

After twenty years of managing horses in accordance with the 1991 Forest Plan, the Service issued a scoping letter in July 2011 in which it "propos[ed] to update the Devils Garden Plateau Wild Horse Territory Plan which will guide management of wild horses on Modoc National Forest for the next 15-20 years." AR03911-20; *see also* AR03072-73 (June 2011 initiating letter). The proposed actions were limited to reviewing the population level within the WHT, including analyzing whether "the current appropriate management level (AML) of [275 to] 335 head, as established in the Modoc National Forest LRMP, 1991 continues to be valid, and if not determine the optimum number of animals the Territory will support on a yearlong basis." AR03912. Plaintiffs submitted comments on the initial scoping letter expressing concerns about, *inter alia*, reductions to the wild horse AML that would effectively prioritize livestock use of the WHT. *See* AR03831-72, AR03882-85.

19

Nowhere in the scoping letter did the Service even raise the possibility that it was considering eliminating the Middle Section from the WHT. Rather, the letter expressly referred to the single, larger WHT that was adopted in the mid-1980s and formally incorporated into the 1991 Forest Plan. *See* AR03911 ("[t]he Devils [sic] Garden Plateau Wild Horse Territory is approximately 268,750 acres in size"); AR03919-20 (map showing the single, contiguous WHT including the Middle Section).

### 2.    *The Modoc County Farm Bureau Takes Charge of Developing the Revised Management Plan*

The Forest Service subcontracted the development of the revised WHT plan to an entity representing local grazing interests. In August 2012—over one year after the Service issued the scoping letter—the Modoc County Farm Bureau ("Farm Bureau") entered into an agreement with the Service to develop the new management plan for the WHT. *See* AR04700-23; AR04699 ("The entire plan development, not just the data collection, will now be funded through a new challenge cost share agreement between the Forest and the Modoc County Farm Bureau."). Under this agreement, the Farm Bureau agreed to collect all of the data on wild horses, draft a monitoring report, prepare the draft EA and final EA, and oppose any appeal of the agency's decision. AR04713. In return, the Service paid the Farm Bureau $203,000. AR04715.

20

The Farm Bureau was not a disinterested party. Its purpose "is to protect and promote agricultural interests in Modoc County," including the grazing allotments that overlap with the WHT that are used to feed the cattle that compete with horses. AR04700-01. The Farm Bureau "has many members whose livelihoods depend on grazing operations affected by the ever-expanding wild horse herd within or adjacent to" the WHT. AR04701.

Almost immediately after signing this agreement, the scope of the WHT plan revision was dramatically revised. On October 31, 2012, Susan Stokke, Field Manager for the Farm Bureau's project, *see* AR04760, informed the Forest Service that *the Farm Bureau* wanted to change the WHT boundaries. *See* AR04698 ("Based on all the advice I have received, I have decided to re-scope this project. I spoke with Suzie [Stokke] today and it seems that not only are we adding a Plan Amendment (in the form of a new plan) but *we may find a need to change boundaries*.") (emphasis added).[4]

---

[4] Ms. Stokke is the wife of Sean Curtis, the Director of the Farm Bureau. *See* AR03878-79. Mr. Curtis also is the Modoc County employee centrally involved in the development of the new WHT management plan, as confirmed by the declaration he submitted in support of the ranching intervenors in this case. *See* Dkt. No. 15-5.

Ms. Stokke then prepared a job description for the specialist who would develop the new WHT management plan. *See* AR04760-61. The responsibilities included monitoring "wild horse use *outside* the WHT" in areas with "Horses Present," *including* the Avanzino and Triangle areas in the Middle Section. *Id.* (emphasis added). Hence, although the WHT still formally included the Middle Section, the Farm Bureau—in developing the new Wild Horse Territory Management Plan—had begun treating the Middle Section as no longer part of the WHT.[5]

### 3.    The December 2012 Scoping Letter

Based on the Farm Bureau's push to change the WHT boundaries, the Forest Service quickly issued a new scoping letter on December 14, 2012 in which it publicly proposed—for the first time—to eliminate the Middle Section of the WHT.[6] *See* AR03809-24. Revising the description of the WHT from the July 2011 scoping letter, the new letter stated that the WHT comprised only "232,520 acres of federal land," AR03810, and that the Service proposed to "return to the

---

[5] Notably, the job description listed Big Sage as an allotment "within the WHT" although the Service would later eliminate it from the WHT entirely. AR04761.

[6] Although it appears that, from December 2012 forward, the Farm Bureau carried out most of the work discussed herein on behalf of the Forest Service, to avoid confusion Plaintiffs will attribute all such efforts to the Service.

management of wild horses within the WHT boundary established in 1975."

AR03812. The Service justified its proposal as follows:

> During the mid-1980's, the MDF [Modoc National Forest] appears to have adjusted the WHT boundary for administrative convenience. . . . An administrative error was made in expanding the WHT beyond the herd's known territorial limits.

AR03811-12. Citing no evidence, the new scoping letter asserted that only the 1975 map—and not the map included with the initial scoping letter or the formal 1991 Forest Plan—reflects the "territorial limits" of wild horses in the area as of 1971 when the Wild Horse Act was enacted. *See* AR03812.

According to the new scoping letter, the WHT boundary needed to be redrawn because the "Avanzino and Triangle private ranch lands which lay in between the West and East home ranges were not included in the [1975] WHT" and were incorporated into the WHT in the 1980s "for administrative convenience." AR03811. The scoping letter did not address the fact that—as Federal Defendants have now conceded in their Answer—"the majority of the middle area was *never* part of the Triangle and Avanzino Ranches and were [sic] part of the Modoc National Forest *at all relevant times*." D.E. 9, ¶ 3 (emphases added). These areas include portions of the Timbered Mountain, Carr, and Big Sage allotments. *Id.*, ¶ 61.

Plaintiffs submitted comments to the scoping letter, *see* AR03713-25, AR03688-92, in which they specifically objected to the new proposal to eliminate the Middle Section. AR03714, AR03689. They noted that the Service had "offer[ed] no data regarding this acreage" (*i.e.*, the Middle Section) and inquired about the results of the 1971 wild horse census. AR03714.

### 4.    *The December 2012 Resource Monitoring Report*

The same month that the Service issued its new scoping letter in which it first proposed eliminating the Middle Section, it issued the "Resource Monitoring Report" for the WHT. *See* AR00622-95. Notably, this report *already assumed* that the Middle Section had been eliminated from the WHT. Directly contradicting the statement in the governing programmatic document—the 1991 Forest Plan— that the WHT was a single unit comprising 258,000 acres that the Forest Service "is legally obligated to manage [for] horses," AR02838 at 3-17, the Resource Monitoring Report proclaimed that the WHT comprised only 232,521 acres and was split into two separate sections. *See* AR00627.

The report's treatment of different parts of the Middle Section is inconsistent. For example, in one map, the Service excluded from the WHT the southeastern section of the Carr Allotment and the center-western section of the Timbered Mountain Allotment that are part of the Middle Section. *See* AR00627,

24

Map 1.  On the very next page, however, the Service presented a map which

*includes* the southeastern section of the Carr Allotment and the center-western

section of the Timbered Mountain Allotment in the WHT but excludes the rest of

the Middle Section.  *See* AR00628, Map 2.  The same two maps also present

conflicting information about areas entirely outside the Middle Section that the

Report assumed were eliminated, including the northeastern corner of the Pine

Springs Allotment and the northwestern portions of the WHT that fall within the

Carr Allotment.  *Compare* AR00627, Map 1, *with* AR00628, Map 2.  The Report

offers no explanation for these discrepancies.

### 5.    *The January 2013 AML Evaluation*

In January 2013, the Forest Service released the Evaluation of Monitoring

Data for the Purpose of Determining an Appropriate Management Level ("AML

Evaluation"), which borrowed heavily from (and in many cases directly copied

from) the Resource Monitoring Report.  *See* AR00542-621.  As with the Resource

Monitoring Report, the AML Evaluation treated the Middle Section as already

having been eliminated from the WHT.  *See* AR00548-49.  The Service asserted

without any citation that "[a]lthough the Triangle and Avanzino Ranch lands were

included in the WHT boundary in the [1991] Forest Plan as a result of an

administrative error, the AML was established as 0 wild horses for the two areas."

25

AR00547.  The rationale for why "the AML was established as 0 wild horses" for

the Triangle or Avanzino Allotments was:

> This is because the Triangle Ranch lands were acquired in 2006
> [sic] (nearly five years after the passage of the 1971 WFRHBA)
> and the high percentage of unfenced private land in the Avanzino
> Ranch.

*Id.*[7]

The AML Evaluation did not mention that the Middle Section includes not

just lands from the Triangle and Avanzino Allotments, but also portions of the

Carr, Timbered Mountain, and Big Sage Allotments, which have been owned by

the Service at all relevant times, and parts of which were assigned wild horse

population objectives since the mid-1980s.  *See* AR00548, Map 1 (showing public

lands in green, and private lands in white); D.E. 9, ¶¶ 48, 61; AR04324-25.  Nor

does the AML Evaluation mention that 59% of Avanzino is *not* unfenced private

land but rather is part of the publicly held Modoc National Forest.  AR00156.

Indeed, while the AML Evaluation sought to "zero out" the wild horse AML

in these areas, it also demonstrated that wild horses were using the Middle Section.

For example, several of the Forest Service's maps confirm that the eliminated

section of the Timbered Mountain Allotment is wild horse habitat.  *See* AR00620

---

[7] Plaintiffs assume the reference to 2006 as the year "the Triangle Ranch lands
were acquired" was an error and should read "1976."

(showing three "key areas" in the carved-out portion of the Timbered Mountain

Allotment, west of the grey, concave boundary in the center of the map); AR00617

(showing areas of "moderate," "light," and "slight" use by wild horses in the same

eliminated section, and including a smaller map in the lower right-hand corner

showing the eliminated sections of the Timbered Mountain Allotment).  Likewise,

the eliminated portion of the Carr Allotment is subject to "heavy" use by wild

horses.  AR00566 (the orange-shaded section in the southeast corner adjacent to

Avanzino , which is also depicted, in the smaller map in the lower-right hand

corner, as the orange-shaded section east of the grey boundary).

### 6.    *The February 2013 Wild Horse Specialist Report*

In February 2013, the Service produced a "Wild Horse Specialist Report."

AR00489-541.  Like the Resource Monitoring Report and the AML Evaluation,

the Specialist Report assumed the elimination of the Middle Section from the

WHT.  It claimed that the WHT "consists of approximately 232,521 acres,"

AR00489, and depicts the WHT as comprising two, separate units.  *See* AR00490.

Like the Resource Monitoring Report, the maps in the Specialist Report show

inconsistent approaches regarding which parts of the Middle Section would be

eliminated from the WHT.  *Compare* AR00490, Map 1, *with id.*, Map 2.

The Specialist Report addresses, in general terms, the elimination of the Middle Section. It states that "the long-term needs of the Devils Garden wild horse herd" would be met by "future management of two distinct home ranges: West and East," rather than by the larger, contiguous WHT that had been in place since the mid-1980s. AR00509. Without any analysis or explanation, the Wild Horse Specialist concluded that removing the Middle Section and splitting the WHT into two smaller units "has no effect on wild horses or their habitat and is consistent with Forest Plan goals." *Id.* It provided no data concerning wild horses' natural migratory and movement patterns to support this assumption. It also did not explain how eliminating the Middle Section and dividing the WHT into two separate parts was "consistent" with the 1991 Forest Plan, which formally adopted the larger, single WHT.

### 7.    *The Draft EA*

In May 2013, the Forest Service released its Draft EA for the revised Devil's Garden WHT Management Plan. AR03453-3658. The Draft EA "*proposes* to return to the management of wild horses within the WHT boundary established in 1971," even though it was clear from the Resource Monitoring Report, AML Evaluation, and the Wild Horse Specialist Report that the agency had already

28

effectively eliminated the Middle Section from the WHT.[8]  *See* AR03465 (emphasis added).  The Draft EA *itself* also assumed that the Middle Section had already been eliminated by repeatedly asserting that the WHT comprised only "232,520 acres of federal land."  AR03459, AR03461.

In their comments to the Draft EA, Plaintiffs opposed the elimination of the Middle Section.  They specifically noted that wild horses always had been present in the Middle Section, and that the Service had offered no evidence to the contrary nor any evidence supporting any "administrative error."  AR03334, AR03349-50. Plaintiffs again inquired about the 1971 wild horse census—documentation of which the Service had not (and still has not) disclosed.  *See* AR03335.

### 8.    *The Final EA*

On August 26, 2013, the Forest Service issued the Final EA, in which the agency adopted the proposed action from the Draft EA with minor modifications. *See* AR00146-386. As in the Draft EA, the Final EA "*proposes* to return to the management of wild horses within the WHT boundary established in 1971," AR00159 (emphasis added), even though the Service had assumed for almost a

---

[8] In fact, the boundaries for the WHT were not established in 1971; instead, as explained above, the first time that the Service established boundaries for the WHT was in 1975.  *See* § B.1, *supra*.

year that the WHT boundary *already* had been changed.  Each of the three action

alternatives in the EA proposed to eliminate the Middle Section:

> Establish a boundary for the WHT *based on the long-term needs of the Devil's Garden wild horse herd* and within the herds' known territorial limits (1971 WFRHBA) rather than for administrative convenience.  This boundary will provide for future management of two distinct home ranges:  West and East.

AR00177 (Guideline 5C) (emphasis added); AR00271 (same).  The EA does not

explain how a smaller, bisected WHT is "based on the long-term needs of the

Devil's Garden wild horse herd" or what was meant by "administrative

convenience."  AR00271.

The Final EA concedes that the Service, in its 1991 Forest Plan, deliberately

"made the decision to manage wild horses on about 258,000 acres" in the WHT,

but it asserted without any explanation or citation that "an AML was not

established for the added lands" and that "zero AML allocations were assigned to

the acquired land," *i.e.*, the Middle Section.  AR00156-59.  In fact, as noted above,

population targets *had* been established for, and applied to, portions of the Middle

Section, including Big Sage (20 horses), Boles (40 horses), and Timbered

Mountain (40 horses).  AR04324-25.

As with the Draft EA, *see* AR03460, the Final EA asserts that the inclusion

of the Middle Section was "[a]n administrative error," but offers no evidence in

support of this explanation.  AR00159.  Nor does the Final EA provide any

historical or scientific support for the Service's claim that "few, if any, wild horses

were found" in the Middle Section.  AR00156.  To the contrary, the Final EA

includes evidence of the continuing presence of wild horses in the Middle Section.

*See* AR00255 (four wild horses in the Triangle lands in 2003); AR00256 (five wild

horses observed in Avanzino in 2010, eighty wild horses identified in Avanzino in

2012, and ten wild horses identified in Triangle in 2012); AR00257 (59 wild

horses counted in Avanzino and Triangle in 2013); AR00258 (map showing wild

horse observations in 2013, including in the Big Sage Allotment).

The only justification offered by the Forest Service for the decision to

eliminate the Middle Section is its assertion that, as of 1975, there was "[l]ittle or

no use by wild horses" of the Middle Section "due to the number of fences and the

ongoing livestock operationson [sic] this *privately owned land*."  AR00373

(emphasis added.)  However, as noted above, the Service has admitted that this

explanation is erroneous:  "the majority of the middle area was never part of the

Triangle and Avanzino Ranches and were part of the Modoc National Forest at all

relevant times."  D.E. 9, ¶¶ 3, 39, 48, 61.

In response to twelve comments that wild horses used the Middle Section in

1971, the Final EA does *not* claim that no wild horses inhabited the Middle Section

31

in 1971. *See* AR00373-374 (Response to Comment 2-5). Rather, the Forest

Service asserts that:

> As the Triangle Lands were under private ownership at the time the act was passed, and Avanzino remains 41% private property, they did not meet the criteria for being included into the Territory. . . . As the lands were private, there *may have been some incidental use* of the areas by wild horses, however *it is likely* wild horse use was excluded *for the most part* as the forage was needed for the livestock operations.

*Id.* (emphases added). The EA does not identify any evidence supporting its

speculation that wild horses "likely" did not inhabit the Middle Section "for the

most part" in 1971, but rather *confirms* that there is was at least "incidental use" of

horses on these lands at this time. And because the majority of the Middle Section

consisted of lands from *other* allotments that were *always public*—portions of

Timbered Mountain, Carr and Big Sage—the Service's explanation was

nonresponsive.

### 9.    *The FONSI and the 2013 WHT Management Plan*

On August 27, 2013, the Service issued a Decision Notice & Finding of No

Significant Impact ("FONSI"), *see* AR00100-13, which incorporates by reference

the EA and the supporting specialist reports. *See* AR00100. The Service formally

selected "Alternative 2," which it concluded "would not pose significant short or

long term adverse effects" on the "quality of the human environment considering

the context and intensity of impacts," and "[t]hus, an environmental impact statement will not be prepared."  AR00100, AR00106-07.

The FONSI states that the "boundary of the territory would be returned to the one established at the passage of the WFRHBA of 1971 . . . bringing it into compliance with the Act."  AR00104.  The FONSI does not explain this assertion, or how it is reconcilable with the fact that the WHT was not established until 1975.  The FONSI instead states that "[p]roposed activities are consistent objectives [sic] in the Modoc National Forest Land and Resource Management Plan, as amended . . . and applicable law and regulations."  AR00107.

On August 27, 2013, the Service also issued the new Devil's Garden Plateau Wild Horse Territory Management Plan, *see* AR00114-45, which was attached to the FONSI and adopted by the agency's decision.  *See* AR00100-01.  The Plan incorporates the boundary modifications.  *See* AR00119-20, AR00124.

### 10.    *Plaintiffs' Administrative Appeal*

Plaintiffs timely appealed the agency's decision on November 18, 2013.  *See* AR04088-4289.  The Forest Service denied that appeal on January 2, 2014.  *See* AR00001-65.

D.    **Proceedings in the District Court**

Plaintiffs sought judicial review of both the elimination of the Middle

Section and changes to the AML range.  *See* D.E. 1.  Upon review of the parties'

cross-motions for summary judgment, the district court framed its analysis of the

WHT boundary change as follows:

> [T]he Court is limited to reviewing the Forest Service's
> conclusion that the references to a single, contiguous wild
> horse territory were the result of "[a]n administrative
> error," . . . and determining whether that 2013 conclusion
> was consistent with the evidence before the agency at the
> time the decision was made.

D.E. 32 at 14.

The district court ruled for Defendants, finding that the Service did not act

arbitrarily and capriciously in eliminating the Middle Section from the WHT more

than twenty years after it was formally incorporated in the 1991 Forest Plan.

Despite the fact that the Service's addition of the Middle Section in the mid-1980s

was expressly incorporated into the 1991 Forest Plan after extensive public

involvement, the court concluded that "plaintiffs cannot point to any formal plan

implementing a territorial change."  *Id.* at 16.  The district court also concluded

that the Middle Section "could not have been properly incorporated into the

Devil's Garden WHT," *id.* at 21, because "significant portions of the disputed

territory were privately held and would not have qualified for inclusion in the

34

WHT." *Id.* at 22.  Thus, the court adopted the agency's rationale that the incorporation of the Middle Section was both an "administrative convenience" and an "error" that the Forest Service was free to reverse without a formal Forest Plan amendment or an EIS, and found that this change did not violate the Wild Horse Act, NFMA, or NEPA.  The court also rejected Plaintiffs' challenge to the AML modifications in the new WHT Management Plan.

## SUMMARY OF ARGUMENT

1.    The district court's ruling that the Forest Service did not act arbitrarily or capriciously in eliminating the Middle Section is in error for multiple reasons.

First, the Service's claim that it never formally incorporated the Middle Section into the WHT—and, instead, that its incorporation was a mere oversight—is undermined by the irrefutable fact that the agency *did* incorporate the Middle Section as part of the most formal process that the Service has undertaken (or could undertake) with respect to the Modoc National Forest, i.e., the adoption of the 1991 Forest Plan.  This document—the result of twelve years of public planning by the Service—sets forth the agency's binding management prescriptions for the forest.  With respect to wild horse management, the 1991 Forest Plan clearly adopted the management direction taken by the Forest Service in the mid-1980s: "The Forest has one wild horse territory of about 258,000 acres

35

located on portions of the Doublehead and Devil's Garden Ranger Districts."
AR02838 at 3-18 to 3-19. Thus, as the 1991 Forest Plan directed, "[u]nder the
Wild Horses and Burros Act, the Forest is *legally obligated* to manage horses
within a [single] 258,000-acre wild horse territory." AR02838 at 3-17 (emphasis
added). Given the express conditions of the 1991 Forest Plan, it was arbitrary and
capricious for the Service, twenty years after formally incorporating the Middle
Section into the WHT, to abruptly reverse this decision based on a *post hoc* and
completely unsubstantiated assertion that the previous boundary modification had
been an administrative oversight.

Second, contrary to the district court's conclusion, there was nothing
preventing the Service from incorporating the Middle Section into the WHT in the
1991 Forest Plan, notwithstanding the Service's erroneous claim—since disavowed
in the trial court—that the majority of Middle Section had previously been
privately owned. As noted above, the majority of the Middle Section was *not*
privately owned at the time the Wild Horse Act was passed, but instead consisted
of portions of the Carr, Timbered Mountain, and Big Sage allotments, all of which
were *publicly* owned. Moreover, 59% of Avanzino was also publicly owned at all
relevant times. And once the Forest Service acquired the Triangle Exchange Lands

in 1976, there was nothing stopping it from including those public lands in the WHT based on the known and historical presence of wild horses.

In short, the district court erred in accepting the Forest Service's assertions without addressing their obvious inconsistencies in the record.

2.    The district court also erred by finding the Forest Service complied with NFMA's requirements for amending the 1991 Forest Plan.  Contrary to the Service's conclusory assertions, the elimination of over 23,000 acres from the WHT, including important meadows and water sources, is not the type of "non-significant" modification to the 1991 Forest Plan that the Service may make without complying with NFMA's procedural safeguards.  Thus, because the elimination of the Middle Section constituted a fundamental change in the management prescription for this WHT—regardless of the rationale underlying the shift—the Service violated NFMA's mandate requiring a formal Forest Plan amendment process and "public involvement comparable" to the preparation of a Forest Plan in the first instance, 16 U.S.C. § 1604(d), (f).

3.    The district court erred in finding that the Service complied with NEPA's safeguards.  To the contrary, the Forest Service failed to prepare an EIS despite the inevitable significant environmental impacts that will result from eliminating the Middle Section from the WHT and separating the wild horses into

37

two isolated territories, nor did the Service even purport to take a "hard look" in the EA or FONSI at these issues or at whether the agency should maintain the status quo—i.e., continuing management of the single, larger WHT—as a reasonable alternative to the adopted action.  Instead, every alternative that the Service reviewed assumed that the Middle Section had already been eliminated from the WHT, thus demonstrating that the EA and FONSI were merely intended to paper over a predetermined decision that the agency had already made.

## ARGUMENT

### I.    STANDARD OF REVIEW

A district court's grant of summary judgment receives de novo review. *Cuddy Mountain*, 137 F.3d at 1376.  Under the Administrative Procedure Act ("APA"), this Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).  In making this determination, the Court must "immers[e]" itself in the record, *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976), and conduct a "thorough, probing, in-depth review" of the facts to determine whether the agency's decisions were based on the "relevant factors." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).

The court must assess whether the agency "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence" before it. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While an agency may deviate from its prior policy or practice, it "is obligated to supply a reasoned analysis for the change," lest its action be deemed arbitrary and capricious. *Id.* at 42.

## II.    THE DISTRICT COURT ERRED BY FINDING THAT THE FOREST SERVICE PROPERLY REMOVED THE MIDDLE SECTION FROM THE WHT

### A.    The District Court's Conclusion that the Middle Section Was Never Formally Incorporated Into the WHT Disregards the 1991 Forest Plan

The district court's erroneous conclusion that the elimination of the Middle Section from the WHT did not violate the APA is predicated on a flawed interpretation of the record. The court found that "plaintiffs can point to nothing in the Administrative Record showing that an actual incorporation [of the Middle Section] ever took place. No formal process was invoked, and there is no record of any official decision." D.E. 32 at 13. In fact, the record contains a crucial document that demonstrates actual incorporation of the Middle Section into the WHT, one which was repeatedly cited by all parties in their briefing and represents

the *embodiment* of a formal process and an official decision:  the 1991 Forest Plan

for the Modoc National Forest, which is still in effect today.

As the Service conceded in its August 2013 EA, "[d]uring the mid-1980's,

the [Modoc National Forest] appears to have adjusted the WHT boundary for

administrative convenience."  AR00156; *see also* AR00158 (map from undated

"Devil's Garden Plateau Wild Horse Territory Plan" showing the single,

contiguous WHT).  The agency also concedes that the new boundaries for the

WHT were thereafter formally adopted in the 1991 Forest Plan:  "In 1991, the

MDF issued its Forest Plan.  In this Plan, the Forest Service *made the decision* to

manage wild horses on about 258,000 acres, *which represents the number*

*designated for wild horse management in the mid-1980s*."  AR00159 (emphases

added).

Contrary to the district court's conclusion, the adoption of the larger WHT in

the 1991 Forest Plan constituted both a "formal process" and a "record of an

official decision."  Under NFMA, planning involves "the formal identification of

purpose and need . . . , the establishment of planning criteria . . . , and the

collection of data."  *Citizens for Envtl. Quality v. United States*, 731 F. Supp. 970,

977 (D. Colo. 1989).  The result of this deliberative process is an LRMP for a

particular national forest.  The LRMP "provides a framework for integrated

40

resource management and for guiding project and activity decisionmaking on a

national forest, grassland, prairie, or other administrative unit." 36 C.F.R. §

219.2(b)(1).

> The development of the Plan is based on a set of
> management prescriptions, each of which sets forth a
> strategy for managing all of the major resources of the
> forest. Each management prescription provides for various
> levels of goods and services and addresses issues and
> concerns raised in the public participation process.

*Citizens for Envtl. Quality*, 731 F. Supp. at 977.

Once an LRMP is approved, it "*defines* the 'management direction' for the

forest" and "constitutes a program for all natural resource management activities

and *establishes management requirements* to be employed in implementing the

plan." *Id.* (emphases added). "Implementation of the LRMP is achieved through

individual site-specific projects, *and all projects must be consistent with the*

*LRMP*." *Id.* (emphasis added); *see also* 16 U.S.C. § 1604(i); 36 C.F.R. §

219.15(e) ("Any resource plans . . . developed by the Forest Service that apply to

the resources or land areas within the planning area must be consistent with the

plan components"). This includes wild horse territory management plans. *See*

Forest Service Manual § 2263.11 (Jan. 2003).

It is unassailable that the formal 1991 Forest Plan for the Modoc National

Forest was, as NFMA requires, the result of an extensive planning effort, one that

41

involved more than twelve years of work and 45 public meetings and workshops, and multiple open houses. AR02838, Record of Decision at 7. Hundreds of members of the public actively participated. *Id.* As part of this planning process, "[a]ll existing resource management plans were re-examined by the Forest's interdisciplinary planning team." *Id.* at 1-1. One result of this extensive planning was that, when the 1991 Forest Plan was approved, the Forest Service formally adopted the two management changes concerning the WHT that it had taken in the mid-1980s, namely that "[t]he Forest has one wild horse territory of about 258,000 acres" and "a population objective of 275-335 animals to manage." *Id.* at 3-18 to 3-19. Both the larger WHT and the use of a population range represented changes from the 1975, 1980, 1981 and 1982 WHT Territory Management Plans. *See* Statement of Facts, § B.2., *supra*. To the extent the existing Wild Horse Territory Management Plan deviated from the Forest Plan, it was deemed expressly updated to be consistent with the 1991 Forest Plan. *Id.* at 1-1 and A-1.

Thus, contrary to the district court's groundless finding that "[n]o formal process was invoked" and "there is no record of any official decision," D.E. 32 at 13, the inclusion of the Middle Section in the WHT was the result of the *most formal process* the Service has undertaken (or could undertake) with respect to the Modoc National Forest, *viz.* the development of its first and (to date) only LRMP

42

in conformance with NFMA. Similarly, the Service's formal approval of the 1991 Forest Plan constituted the only "record" of an "official decision" required for adoption of the agency's formal decision to add the Middle Section to the Devil's Garden WHT, as is the case with any LRMP adopted under NFMA.

Accordingly, because the Forest Service *did*, in fact, formally incorporate the public lands of the Middle Section into the WHT in 1991 after an extensive and deliberative public process, the Service's primary rationale in its 2013 decision for removing the Middle Section—*i.e.*, that the agency was merely correcting an administrative error—is entirely unsubstantiated and therefore constitutes a paradigmatic arbitrary and capricious change in agency position lacking any coherent explanation in the record. *See Encino Motorcars, LLC v. Navarro*, No. 15-415, 579 U.S. __, 2016 WL 3369424, at *5 (June 20, 2016) (rejecting regulation in which an agency "gave little explanation for its decision to abandon its decades-old practice" of applying a particular statute). For that reason alone, the ruling below must be reversed.

## B. The District Court Was Mistaken In Concluding that the Middle Section Could Not Have Been Incorporated Into the WHT

The district court also concluded that the Service lacked the authority to incorporate the Middle Section into the WHT. Dkt No. 32 at 21. Here, too, the district court erred.

43

In reaching this conclusion, the court relied on three subsections of 36 C.F.R. § 222.60.  *Id.*  Subsection (b)(13) of that regulation merely defines wild free-roaming horses and burros as "all unbranded and unclaimed horses and burros and their progeny that have used lands of the National Forest System on or after December 15, 1971, or do hereafter use these lands as all or part of their habitat." 36 C.F.R. § 222.60(b)(13).  Because all of the horses in the Devil's Garden WHT fall within this definition, this subsection is irrelevant.  Neither Plaintiffs nor Defendants contend that the wild horses at issue were "introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership."  *Id.*

The district court also cited subsection (b)(14) in its decision, but as with subsection (b)(13), this subsection is inapplicable.  Subsection (b)(14) defines a wild horse and burro *range*, which is a special designation that the Service may apply to all or part of a wild horse territory.  36 C.F.R. § 222.60(b)(14); *see also* 36 C.F.R. § 222.61(a)(3) (authorizing the agency to "designate areas within [wild horse] territories as a specific wild horse and burro range" in some situations). Because the Service has never designated a wild horse range in the Devil's Garden WHT, this subsection is also irrelevant.

Finally, the district court cited subsection (b)(15), which defines a wild horse territory as "lands of the National Forest System which are identified by the Chief, Forest Service, as lands which were territorial habitat of wild free-roaming horses . . . at the time of the passage of the Act." 36 C.F.R. § 222.60(b)(15). However, nothing in this regulation prevents the Service from adjusting the boundaries of a wild horse territory, as it did in the mid-1980s, in order to reflect a better understanding of the horses' territorial range or changed circumstances such as the acquisition of formerly private land. To the contrary, the Forest Service Manual on wild horse management specifically states that "Regional Foresters are authorized to abolish territories *or adjust territorial boundaries* if justified in the Forest Land and Resource Management Plan." Forest Service Manual § 2260.41 (Jan. 2003) (emphasis added); *see also id.*, § 2261.31 (providing that the Service should consult with state wildlife agencies on "[p]roposals to modify boundaries of established wild horse and burro territories").

Here, the Service did *not* designate "the territorial habitat" of wild horses at Devil's Garden in 1971. Instead, it first proposed the boundaries of the WHT in 1975, and it then revised that designation in the mid-1980s after acquiring the Triangle Exchange Lands, and the revised WHT incorporated the northern part of the Triangle Exchange Lands as well as portions of the already-public lands in the

45

Timbered Mountain, Carr, and Big Sage allotments.  It was this revised territory, not the original two-part territory, which the Forest Service formally incorporated into the 1991 Forest Plan.  To the extent any member of the public disagreed with the single, contiguous WHT, they had the opportunity to comment on, and ultimately challenge, the 1991 Forest Plan, but no such challenge was ever lodged.

Finally, the district court credited the Forest Service's *post hoc* rationale for removing the Middle Section, *i.e.*, "[a]t the time of the passage of the Wild Horses Act, significant portions of the disputed territory were privately held and would not have qualified for inclusion in the WHT."  D.E. 32 at 22.  The court never came to grips with the fundamental flaw in the Service's purported justification, namely that, as the Forest Service has admitted, *the majority of the Middle Section was never private land.*  Indeed, while the agency wholly disregarded this critical fact throughout the development of the 2013 WHT Management Plan, Defendants have since admitted that "the majority of the middle area was never part of the Triangle or Avanzino Ranches, and consist [sic] of portions of the Big Sage, Timbered Mountain, Carr and Pine Spring Allotments."  D.E. 9, ¶ 61; *see also id.*, ¶ 39.  On that basis alone, the district court should have found that the Service failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and held that the elimination of the

46

Middle Section was arbitrary and capricious. *State Farm*, 463 U.S. at 43 (citation omitted).

Moreover, 59% of the Avanzino Allotment was *always* publicly held. AR00156. And Defendants have not cited any authority or legislative history that would have prevented the Service from including the northern section of the acquired Triangle lands (including Boles Meadows) when it made this boundary change, especially given the evidence of historical wild horse use there. AR04339. Thus, contrary to the district court's conclusion, there was no legal obstacle preventing the Service from including the public lands of the Middle Section in the WHT in the mid-1980s based on current and historical use of these areas, and then formalizing that change in the 1991 Forest Plan.[9]

_____

[9] The Service unlawfully eliminated more than just the Middle Section from the WHT. For example, the northeastern portion of the Pine Springs Allotment, the northern edge of the WHT in the Carr Allotment, and the northeastern corner of WHT in the Carr Allotment also were eliminated from the WHT in August 2013. The Forest Service has never provided any explanation for eliminating these areas from the WHT. Plaintiffs specifically objected to these modifications. *See* AR04138, ¶ 20. The district court only focused on the Triangle Exchange and Avanzino lands, and never addressed the Service's failure to justify the removal of the remaining portions of the Middle Section, or these other areas that the agency eliminated from the WHT. As this Court has explained, that cannot pass muster under the APA. *See Delaware Dep't of Nat. Res. v. EPA*, 785 F.3d 1, 14-15 (D.C. Cir. 2015) ("refus[ing] to engage with the commenters'" arguments renders an action "arbitrary and capricious on that ground alone").

In sum, because there had been no prior administrative oversight in formally incorporating the Middle Section into the WHT and there were no legal obstacles to including these public lands in the WHT to reflect current conditions and changed circumstances, there is no basis in the record upon which this Court may uphold the Service's elimination of the Middle Section.

## III. THE FOREST SERVICE FAILED TO COMPLY WITH NFMA AND NEPA WHEN IT ELIMINATED THE MIDDLE SECTION

Even assuming the Forest Service were merely correcting an administrative oversight in eliminating the Middle Section—which is *not* borne out by the record—the loss of more than 23,000 acres of public lands that for more than two decades had been legally authorized for wild horse use through the binding 1991 Forest Plan required the agency, at minimum, to comply with mandatory procedural safeguards under NFMA and NEPA due to a substantial change in the status quo. The district court erred in upholding the Service's minimal approaches under both statutes, which cannot withstand close scrutiny.

### A. The Elimination of the Middle Section Was a Significant Change to the 1991 Forest Plan Requiring a Formal Amendment

As discussed, the Service's decision to abolish the Middle Section from the WHT contravenes the management decision formally incorporated into the 1991 Forest Plan, which mandated that the agency must manage a single, contiguous

258,000 acre WHT.  *See* AR02838 at 3-17 ("Under the Wild Horses and Burros Act, the Forest is *legally obligated* to manage horses within a [single] 258,000-acre wild horse territory.") (emphasis added).  Despite making drastic changes to the WHT boundary and eliminating a significant amount of acreage, the agency ignored NFMA's requirement for formally amending the 1991 Forest Plan.

NFMA requires the Service to "develop, maintain, and, as appropriate, revise" LRMPs.  16 U.S.C. § 1604(a).  All site-specific "[r]esource plans … and other instruments for the use and occupancy of National Forest System lands *shall be consistent* with the land management plans."  *Id.* § 1604(i) (emphasis added); *see also* 36 C.F.R. § 219.10(e).  The Forest Service Manual provides further guidance, stating that the agency may only "adjust territorial boundaries if justified in the Forest [LRMP]."  Forest Service Manual § 2260.41 (Jan. 2003).  The Manual also instructs that: (1) "Wild Horse and Burro Territory plans are to conform with the Forest [LRMPs]," *id.* § 2263.11; (2) territory plans must be in "compliance with the management direction identified in … Forest [LRMPs]," *id.* § 2263.1; and (3) the agency's policies include "[r]ecogniz[ing] wild horse-burro territory boundaries in Forest [LRMPs]," *id.* § 2260.3(5).

The Service's elimination of the Middle Section violates each of these mandates.  The 1991 Forest Plan provides that "[t]he Forest has one wild horse

49

territory of about 258,000 acres" that the Service "is legally obligated to manage."

AR02838 at 3-17 & 3-18.  Because the removal of the Middle Section reduces the

WHT to a two-unit 232,500-acre area, it directly contravenes the management

direction established in the still-operative 1991 Forest Plan.  Faced with this major

inconsistency, the Service was obligated, at bare minimum, to formally amend the

1991 Forest Plan.  *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d

953, 961 (9th Cir. 2005) ("If the Forest Service thinks any provision of the

[LRMP] is no longer relevant, the agency should propose amendments . . . in a

process complying with NEPA and NFMA, rather than discount its importance in

environmental compliance documents").

Instead of formally amending the 1991 Forest Plan in conformance with

NFMA, however, the Service merely asserted that it did not have to do so because

of its self-serving and conclusory statement that the action only consists of "non-

significant Forest Plan amendments."  AR00101, AR00110.  Although, in certain

circumstances, an LRMP may be modified absent the formal NFMA amendment

process, that is the case only where the Service analyzes the proposed action and

sets forth evidence establishing that "such amendment would [not] result in a

significant change in such plan."  16 U.S.C. § 1604(f)(4).  As the Ninth Circuit has

explained, "[u]nder the relevant statute and regulation, the correct procedure

50

depends on the scope of the amendment. 'Significant' amendments require *a lengthy and detailed amendment process*." *Lands Council v. Martin*, 529 F.3d 1219, 1227 (9th Cir. 2008) (emphasis added); *see also Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1032 (significant amendments require "the same complex planning process applicable to promulgation of the original plan").

To determine whether a particular amendment is significant, the deciding official must refer to the guidelines in the Forest Service Manual. *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1033; *Prairie Wood Prods. v. Glickman*, 971 F. Supp. 457, 463 (D. Or. 1997). Examples of non-significant changes include:

> 1. Actions that do not significantly alter the multiple-use goals and objectives for long-term land and resource management.
>
> 2. Adjustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management.
>
> 3. Minor changes in standards and guidelines.
>
> 4. Opportunities for additional projects or activities that will contribute to achievement of the management prescription.

Forest Service Manual § 1926.51 (Jan. 2015).

51

While the Service concluded that the elimination of 23,631 acres–*i.e.*, 36 square miles or nearly 10% of the WHT—was a non-significant amendment to the 1991 Forest Plan, AR00161, AR00177; D.E. 32 at 26, the decision to eliminate the Middle Section does not fit readily into any of the above examples. Far from not significantly altering the multiple-use goals and objectives in the 1991 Forest Plan, the decision to "zero out" horses from the 23,631 acres that form the Middle Section completely eliminates one of those multiple-use goals—*i.e.*, use by federally protected wild horses—from the affected areas.

Nor is this decision merely an "adjustment" to the boundaries or management prescriptions for the WHT resulting from "on-site analysis" of conditions there. The Service's removal of the Middle Section completely eliminates one of the multiple uses from 10 percent of the WHT and splits a contiguous territory into two isolated territories. Whereas prior to the change, the Middle Section was managed for use by horses, livestock, and wildlife, the Forest Service's decision changes the goal, objectives, and output for the affected area by *completely removing* one of these multiple uses. As courts have found, such a change in management prescriptions constitutes a "significant amendment" under NFMA. *See Am. Wildlands v. U.S. Forest Serv.*, No. 97-CV-160-M-DWM, 1999 U.S. Dist. Lexis 22243, at *9-20 (D. Mont. Apr. 14, 1999) (rejecting Service's

52

finding of non-significance under NFMA where "the amendment significantly changes the 'goals, objectives and outputs' for the Elkhorns by placing other activities such as mining, timber, and grazing on par with wildlife conservation").

In short, while the agency may make minor modifications to an LRMP to reflect on-site conditions without engaging in a formal amendment process, the elimination of 23,631 acres from the WHT at issue here instead reflects a significant and fundamentally different approach to managing horses at Devil's Garden. As such, this highly consequential change in the status quo—which will indisputably affect wild horses, livestock, wildlife, and other resources located in the Middle Section—obligated the Service to follow the formal NFMA procedures that apply to significant amendments to LRMPs, 16 U.S.C. § 1604(f)(4). The agency's failure to adhere to this statutory process renders the decision arbitrary and capricious.

**B.    The Forest Service Also Violated NEPA In Two Distinct Ways**

**1.    *Because the Elimination of the Middle Section Constitutes a Fundamental Change in the Status Quo and Will Result in Significant Environmental Impacts, an EIS Was Required***

Here, the Forest Service prepared an EA and FONSI—rather than a more rigorous EIS—despite the fact that this action eliminates more than 23,000 acres of public lands from the Devil's Garden WHT that wild horses have been able to

53

access for more than three decades.  For two independent reasons, the Service's

failure to prepare an EIS under the circumstances is arbitrary and capricious.

First, because the elimination from the WHT of this large area of public

lands—which served as a key corridor connecting the two isolated units that now

comprise the WHT and therefore facilitated genetic interchange and provided

access to meadows and water sources for the past three decades—is undoubtedly a

"significant amendment" to the 1991 Forest Plan for purposes of NFMA, *see supra*

at 48-53, that alone requires an EIS because "NFMA mandates substantial public

involvement, planning, and input, requiring, in essence, the Forest Service to

conduct the same complex planning process applicable to promulgation of the

original plan."  *Citizens' Committee to Save Our Canyons*, 297 F.3d at 1032

(quotation marks and citations omitted); *see also* 16 U.S.C. § 1604(f)(4).

Thus, because the 1991 Forest Plan was itself developed pursuant to an

extensive public process—and the Service *prepared an EIS* in approving the Forest

Plan, AR2838—in amending the 1991 Forest Plan in this manner, the agency had

no choice but to follow the same procedures that applied to adopting the 1991

Forest Plan in the first instance, *i.e.*, preparing an EIS.  *See* 36 C.F.R. § 219.7(c)(1)

("A new plan or *plan revision requires preparation of an environmental impact

statement*") (emphasis added); *id.* § 219.13(b)(3) ("A proposed amendment that

54

may create a significant environmental effect and thus require preparation of an

environmental impact statement is considered a significant change in the plan for

the purposes of the NFMA"). Therefore, the Forest Service's failure to prepare an

EIS here—when undertaking a significant amendment to the governing 1991

Forest Plan—is in flagrant violation of NEPA, as well as NFMA. *See Am.*

*Wildlands*, 1999 U.S. Dist. Lexis 22243, at *17-20 (finding that "the amendment

significantly changes the 'goals, objectives and outputs'" and thus holding that

"the amendments to the forest plans should have been accompanied by an

Environmental Impact Statement").

Second, even if this were a situation not involving a significant amendment

under NFMA, the Service's failure to prepare an EIS would nevertheless constitute

arbitrary and capricious decisionmaking under NEPA. This Court's "long-

established standard" for reviewing an agency's decision not to prepare an EIS is:

> First, the agency [has] accurately identified the relevant
> environmental concern. Second, once the agency has
> identified the problem it must have taken a "hard look" at
> the problem in preparing the EA. Third, if a finding of no
> significant impact is made, the agency must be able to
> make a convincing case for its finding. Last, if the agency
> does find an impact of true significance, preparation of an
> EIS can be avoided only if the agency finds that the
> changes or safeguards in the project sufficiently reduce the
> impact to a minimum.

*Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (citation omitted).  With respect to the crucial issue of the Service's elimination of the Middle Section, the EA and FONSI fail to satisfy *any* of these requirements.

At the outset, the EA does *not* "identif[y] the relevant environmental concern" because it fails to examine *in any way whatsoever* the impact of the elimination of the Middle Section on the wild horse population at Devil's Garden or on members of the public who have long observed federally protected horses in those locations, due to the agency's erroneous insistence that it was merely correcting a boundary error.  Even if the Service were simply correcting an administrative oversight—which it was not—there are nevertheless significant environmental impacts that will result as a consequence of that action now that wild horses are prohibited from accessing these public lands after more than three decades of those lands being available for their use, and after a longer period of use that likely predated the Wild Horse Act.  Hence, the agency's failure in its EA and FONSI to analyze *at all* the impact that the elimination of access to the meadows and water sources in the Middle Section will have on wild horses, or the impact that separating the population into two non-interacting herds will have on the genetic viability of the population, provides the Court with no basis to determine either that the Service "accurately identified the relevant environmental concern"

56

or took "a 'hard look' at the problem in preparing the EA." *Grand Canyon Trust*, 290 F.3d at 340-41.[10]

Moreover, the Service failed "to make a convincing case" for its FONSI in lieu of an EIS. *Id.* at 341. Like the EA, the FONSI simply does not address the impact of the removal of the Middle Section on wild horses or other natural resources located on these public lands. Rather, the FONSI incorporates the EA by reference and hence suffers from the same defects. The Service's central premise—that because the elimination of the Middle Section "corrects a boundary established for administrative convenience, this amendment has no effect on wild horses or their habitat," AR00271—strains credulity. In fact, as discussed, pertinent record evidence suggests just the opposite: the elimination of the Middle Section will substantially alter the environmental status quo in the WHT by limiting wild horses' access to forage, water, and other resources in the Middle Section, and by severing connectivity and natural genetic interchange that has

_____

[10] It is evident from the record that the NEPA process as it relates to the Middle Section was nothing more than a *post hoc* attempt to justify the removal of the Middle Section at the behest of the Farm Bureau, an interested party that was heavily involved in—and received significant federal funding for—developing the wild horse strategy adopted by the Forest Service in its EA. *See supra* at 20-33. Given the Farm Bureau's close involvement in the EA preparation process— including by successfully urging the Service to eliminate the Middle Section and treating the Middle Section in all pre-decisional documents as *already* eliminated from the WHT—it is not surprising that the Service never conducted *any* analysis as to the environmental impacts of eliminating the Middle Section from the WHT.

existed between wild horse bands throughout the contiguous WHT for at least 30 years. *See* AR04133-38, ¶¶ 9-11, 15, 19.

By the same token, not only did the Forest Service fail to analyze the significant environmental impacts of eliminating the Middle Section but the agency did not even consider any "changes or safeguards in the project [that could] sufficiently reduce the impact to a minimum." *Grand Canyon Trust*, 290 F.3d at 341. For example, had the Service prepared an EIS evaluating the environmental impacts of eliminating more than 23,000 acres of public lands from the middle of this WHT and analyzing reasonable alternatives to that action, the agency may have adopted a final decision in which *some* of the Middle Section is removed from the WHT without entirely foreclosing wild horses from crucial meadows and water sources and without severing genetic interchange between isolated populations. Absent this analysis, however, the agency's failure to prepare an EIS for this action that will result in significant environmental impacts cannot pass muster under this Court's NEPA precedents.[11]

---

[11] In addition to failing this Court's test espoused in *Grand Canyon Trust*, the Service's failure to prepare an EIS is arbitrary and capricious for an additional reason. The elimination of the Middle Section (and access to its meadows and water sources), in combination with the loss of genetic interchange, triggers several NEPA "significance" factors identified at 40 C.F.R. § 1508.27(b)—e.g., this action is highly controversial, will result in uncertain effects to now-isolated wild horse bands and their genetic viability, and sets a precedent for future management

58

## 2.    Even if an EA Were Appropriate, It Failed to Take a Hard Look at the Loss of the Middle Section

As explained, rather than analyzing what effect the elimination of the Middle Section would have on wild horses, the EA simply writes off the 33-year-old Middle Section as an "administrative error." *Supra* at 39-43. By sweeping this crucial issue under the rug, the Service flouted NEPA and its regulations.

NEPA mandates that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Sierra Club v. Watkins*, 808 F. Supp. 852, 858 (D.D.C. 1991) (quotation marks and citation omitted). Where an action will "*not* have a significant effect on the environment," agencies may issue a less rigorous EA so long as it "explains how the agency reached that conclusion." *Id.* at 859 (citing 40 C.F.R. § 1508.13).

Here, other than a few fleeting references to "administrative error" and "administrative convenience," *see* AR00156, AR00159, and the erroneous explanation—since disavowed—that the Middle Section was comprised mostly of "private lands" in the 1970s, *see* AR00373, the EA contains no analysis concerning

---

actions in the WHT—and the existence of even *one* such factor triggers the need to prepare an EIS. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 218-19 (D.D.C. 2003) ("[T]he presence of one or more of these factors should result in an agency decision to prepare an EIS.").

the elimination of the Middle Section.  Likewise, the EA does not even purport to assess the environmental impacts caused by the removal of the Middle Section. The EA lacks *any* scientific data supporting its bald claim that the elimination of more than 23,000 acres of public lands, including important meadows and water sources, somehow is "based on the long-term needs of the Devil's Garden wild horse herd."  AR00177; *see also* AR00271 (same).  Rather, the EA asserts, without explanation, that "[a]s [the elimination of the Middle Section] corrects a boundary established for administrative convenience, this amendment has no effect on wild horses or their habitat."  AR00271.  This conclusory statement defies logic and relevant scientific principles.  *See* AR04136-38, ¶¶ 17, 19.

This is not a case of an EA "assessing difficult questions regarding scientific and technical disputes," necessitating deference to the agency's expertise. *Watkins*, 808 F. Supp. at 859 (citing cases).  Here, the Service conducted *no analysis whatsoever* as to the impact that permanently eliminating the central portion of a wild horse territory would have on wild horses (or other natural resources) located there.  *See* AR00252-83.  The EA admits as much:  "[w]ild horse populations outside the [new, two-unit] territory *were not considered* as it is assumed they will be removed."  AR00264 (emphasis added).  Notably absent is any analysis as to how this action would impact the ability of the WHT's

60

remaining wild horses (i.e., in the East and West units) to access essential

resources such as forage and water in the Middle Section, which they have used for

decades, and to migrate seasonally and reproduce in a manner that supports genetic

interchange and the overall health of the population. *Cf.* AR04133-38, ¶¶ 9-11, 15-

17, 19. These critical failures render the EA patently inadequate under NEPA.

Moreover, the Service's underlying motivation for abolishing the Middle

Section and for failing to conduct even a cursory review of its environmental

effects—*i.e.*, to accede to the desires of the Farm Bureau, *see supra* note 10—

makes crystal clear that the agency did not seriously consider reasonable

alternatives to eliminating the Middle Section as required by NEPA, *see* 40 C.F.R.

§§ 1502.14, 1508.9(b), but instead utilized the EA to paper over and justify a

decision concerning the Middle Section that had already been made well before the

final decision was issued. *See* 40 C.F.R. § 1502.2(g) (requiring that NEPA review

"shall serve as the means of assessing the environmental impact of proposed

agency actions, rather than justifying decisions already made"); *id.* § 1502.5

(NEPA review "will not be used to rationalize or justify decisions already made").

These violations, too, require vacatur and remand. *See Metcalf v. Daley*, 214 F.3d

1135, 1142-45 (9th Cir. 2000) (NEPA review "must be taken objectively and in

good faith, not as an exercise in form over substance, and not as a subterfuge

61

designed to rationalize a decision already made," and rejecting an EA because "[i]t is highly likely that because of the Federal Defendants' prior written commitment to the Makah and concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling proposal would not significantly affect the environment").

In light of the Service's utter failure even to analyze the environmental impacts of—or consider reasonable alternatives to—the agency's elimination of more than 23,000 acres of public lands in the Middle Section from wild horse use, the agency has failed to take the "hard look" required by this Court's NEPA precedents. *See Pub. Emps. for Envtl. Responsibility v. Hopper*, __ F.3d ___, 2016 WL 3606363, at *3 (D.C. Cir. July 5, 2016) (rejecting NEPA review that failed to "consider every significant aspect of the environmental impact" because "[a]gencies must take a 'hard look' at the environmental effects of a major federal action *and consequences* of that action") (quotation marks and citation omitted).

In sum, the eradication of the Middle Section requires an EIS, or, at minimum, an EA that actually takes a "hard look" at the relevant issue by analyzing its impacts and evaluating reasonable alternatives. By violating NEPA and its regulations with respect to the Middle Section, the Service's actions were arbitrary, capricious, and not in accordance with law.

62

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that the Court declare the Forest Service's elimination of the Middle Section arbitrary and capricious, and vacate and remand that decision to the Service for further consideration.


Respectfully submitted,


DATED: July 18, 2016          /s/ William S. Eubanks II
                              _____
                              William S. Eubanks II
                              MEYER GLITZENSTEIN & EUBANKS LLP
                              245 Cajetan Street
                              Fort Collins, Colorado 80524
                              (970) 703-6060


DATED: July 18, 2016          /s/ David Zaft
                              _____
                              David Zaft
                              CALDWELL LESLIE & PROCTOR, PC
                              725 S. Figueroa Street, 31st Floor
                              Los Angeles, California 90017
                              (213) 629-9040

                              Attorneys for Plaintiffs-Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that this brief complies with the type and volume limitations of Fed. R. App. P. 32(a)(7).  The brief contains 13,966 words.

DATED: July 18, 2016         /s/ William S. Eubanks II
                                    William S. Eubanks II
                                    MEYER GLITZENSTEIN & EUBANKS LLP
                                    245 Cajetan Street
                                    Fort Collins, Colorado 80524
                                    (970) 703-6060
                                    *beubanks@meyerglitz.com*

## CERTIFICATE OF SERVICE

I, William S. Eubanks II, hereby certify that on July 18, 2016, I served

copies of Plaintiffs-Appellants' Initial Opening Brief on the following parties by

way of electronic mail (ECF filing):

Party: Defendants-Appellees United States Forest Service, *et al.*
      Counsel: Mark Haag

Party: Defendants-Appellees California Cattleman's Association, *et al.*
      Counsel: Caroline Lobdell



DATED: July 18, 2016          /s/ William S. Eubanks II
                    William S. Eubanks II
                    **MEYER GLITZENSTEIN & EUBANKS LLP**
                    245 Cajetan Street
                    Fort Collins, Colorado 80524
                    (970) 703-6060
                    *beubanks@meyerglitz.com*

65

# EXHIBIT C

**Pacific Southwest Region**
**USDA Forest Service**



# Land and Resource Management Plan

## Modoc National Forest

### 1991

**DOUGLAS G. SMITH**

*Forest Supervisor*

**RONALD E. STEWART**

*Regional Forester*

**This is a Plan for managing the Modoc National Forest
for the next ten to fifteen years, after which it must be revised.
If the need arises, it will be revised or amended earlier.**

# Preface

This proposed Land and Resource Management Plan was developed for the Modoc National Forest. Detailed information regarding the Plan is available from:

<div align="center">

**Forest Supervisor**

**441 N. Main St.**

**Alturas, CA 96101**

</div>

## Organization of the Plan

The Forest Plan is composed of five chapters:

| | |
|---|---|
| **Chapter 1** | **Introduction** - is an introduction to the planning process; describes the purpose and need; relates the Forest Plan to other plans; and describes the location of the Modoc National Forest. |
| **Chapter 2** | **Public Issues and Management Concerns** - states the issues and concerns established at the outset of the planning process, and explains how they were resolved. |
| **Chapter 3** | **Summary of the Analysis of the Management Situation** - summarizes the Analysis of the Management Situation (AMS) and the EIS *Affected Environment* section (Chapter 3); and addresses each resource in terms of demand, supply potential, uses, and the need and opportunity for management change. The full text of the AMS is part of the planning records, and is available for review in the Supervisor's Office in Alturas, CA. |
| **Chapter 4** | **Management Direction** - introduces the concept of management direction; defines Forest goals and objectives; outlines Forest-wide standards and guidelines; describes the desired future condition for the Forest; gives commodity outputs and costs for the planning period; and presents management prescriptions, standards and guidelines, and target outputs for each management area. A description and map of each management area accompany the text. |
| **Chapter 5** | **Monitoring and Evaluation Requirements** - describes the monitoring system, and sets requirements for monitoring and evaluating both the implementation and the results of the Plan. |

# Land and Resource Management Plan

## Modoc National Forest

---

# Table of Contents

Preface . . . . . . . . . . . . . . . **ii**

**Chapter 1 — Introduction**

    Purpose and Need . . . . . . . . . . . . . 1 - 1

    Relationship of the Forest Plan to Other Plans . . . . . . . . 1 - 1

    Plan Implementation Process . . . . . . . . . . . 1 - 2

    Forest Plan Amendments, and Revisions . . . . . . . . . 1 - 3

**Chapter 2 — Public Issues and Management Concerns**

**Chapter 3 — Summary of the Analysis of the Management Situation**

    Introduction . . . . . . . . . . . . . 3 - 1

    The Economic Environment . . . . . . . . . . . 3 - 1

    The Social Environment . . . . . . . . . . . 3 - 2

    The Resource Environment . . . . . . . . . . . 3 - 5

        Air Quality . . . . . . . . . . . . 3 - 5

        Cultural Resources . . . . . . . . . . 3 - 5

        Diversity . . . . . . . . . . . 3 - 6

        Energy . . . . . . . . . . . . 3 - 7

        Facilities . . . . . . . . . . . 3 - 9

        Fire and Fuels . . . . . . . . . . 3 - 10

        Firewood . . . . . . . . . . . 3 - 12

        Geology . . . . . . . . . . . 3 - 12

        Lands . . . . . . . . . . . . 3 - 13

        Law Enforcement . . . . . . . . . . 3 - 14

        Minerals . . . . . . . . . . . 3 - 14

        Pests . . . . . . . . . . . . 3 - 17

        Range . . . . . . . . . . . . 3 - 17

        Recreation . . . . . . . . . . . 3 - 20

        Research Natural Areas . . . . . . . . . 3 - 23

        Riparian Areas . . . . . . . . . . 3 - 24

Sensitive Plants . . . . . . . . . . . . . . . . 3 - 25
Soils . . . . . . . . . . . . . . . . . . . 3 - 26
Special Interest Areas . . . . . . . . . . . . . . 3 - 27
Timber . . . . . . . . . . . . . . . . . . . 3 - 28
Visual Resources . . . . . . . . . . . . . . . 3 - 32
Water . . . . . . . . . . . . . . . . . . . 3 - 33
Wilderness and Roadless Areas . . . . . . . . . . . 3 - 35
Wildlife and Fish . . . . . . . . . . . . . . . 3 - 37
Wild and Scenic Rivers . . . . . . . . . . . . . 3 - 38
Woodlands . . . . . . . . . . . . . . . . . 3 - 38

## Chapter 4—Management Direction

**A. Introduction** . . . . . . . . . . . . . . . . **4 - 1**
**B. Forest Mission and Goals** . . . . . . . . . . . . **4 - 1**
**C. Forest Objectives** . . . . . . . . . . . . . . **4 - 6**
**D. Forest Standards and Guidelines** . . . . . . . . . . **4 - 13**
   Air Quality . . . . . . . . . . . . . . . . 4-13
   Cultural Resources . . . . . . . . . . . . . . 4-14
   Energy . . . . . . . . . . . . . . . . . . 4-14
   Facilities . . . . . . . . . . . . . . . . . 4-14
   Fire and Fuels . . . . . . . . . . . . . . . 4-15
   Firewood . . . . . . . . . . . . . . . . . 4-16
   Geology . . . . . . . . . . . . . . . . . 4-16
   Lands . . . . . . . . . . . . . . . . . . 4-16
   Law Enforcement . . . . . . . . . . . . . . 4-17
   Minerals . . . . . . . . . . . . . . . . . 4-18
   Pests . . . . . . . . . . . . . . . . . . 4-18
   Range . . . . . . . . . . . . . . . . . . 4-18
   Recreation . . . . . . . . . . . . . . . . 4-19
   Research Natural Areas . . . . . . . . . . . . . 4-21
   Riparian Areas . . . . . . . . . . . . . . . 4-21
   Sensitive Plants . . . . . . . . . . . . . . . 4-21
   Soils . . . . . . . . . . . . . . . . . . 4-21
   Special Interest Areas . . . . . . . . . . . . . 4-23
   Timber . . . . . . . . . . . . . . . . . . 4-23
   Visual Resources . . . . . . . . . . . . . . . 4-24
   Water . . . . . . . . . . . . . . . . . . 4-25
   Wilderness . . . . . . . . . . . . . . . . 4-25
   Wildlife and Fish . . . . . . . . . . . . . . 4-25
   General . . . . . . . . . . . . . . . . . 4-33

## Appendices

A.  Implementation Plans . . . . . . . . . . . . A - 1
B.  Research and Technical Planning Needs . . . . . . . . . . B - 1
C.  Tentative Ten-Year Timber Sale Program . . . . . . . . . C - 1
D.  Timber Data . . . . . . . . . . . . . D - 1
E.  Fish and Wildlife Monitoring Techniques . . . . . . . . E - 1
F.  Management Practices . . . . . . . . . . . . F - 1
G.  Facilities Management . . . . . . . . . . . . G - 1
H.  Fire Management . . . . . . . . . . . . H - 1
I.  Special Stipulations for Geothermal, Oil and Gas Leasing . . . . I - 1
J.  Guidelines for Range Vegetative Manipulation . . . . . . . J - 1
K.  Recreation Opportunity Spectrum . . . . . . . . . K - 1
L.  Trail Program . . . . . . . . . . . . . L-1
M.  Streamside Management Zones . . . . . . . . . . M - 1
N.  Water Quality Best Management Practices . . . . . . . . N - 1
O.  Livestock Management Strategies . . . . . . . . . . O - 1
P.  Acreage Allocations by Management Prescriptions and Management Areas . P - 1
Q.  Visual Quality Objectives . . . . . . . . . . . Q - 1
R.  Big Valley Federal Sustained-Yield Unit Policy Statement . . . . R - 1
S.  Range Allotment and Riparian Improvement Priorities . . . . . S - 1
T.  Stream Classification . . . . . . . . . . . . T - 1
U.  Electronic Site Designation and Recommendations . . . . . U - 1

## Tables

4-1  Land allocation to management prescriptions . . . . . . . 4 - 6
4-2  Average annual outputs by decade . . . . . . . . . 4 - 7
4-3  Timber management outputs and activities . . . . . . . 4 - 10
5-1  Monitoring plan by resource . . . . . . . . . . 5 - 5

## Figures

4-1  Management areas by ranger district . . . . . . . . . 4 - 146
5-1  Monitoring and evaluation decision trend . . . . . . . 5 - 4

E. Management Prescriptions . . . . . . . . . . . . . 4 - 34

F. Management Area Direction . . . . . . . . . . . . . 4 - 146

   Warner Mountain Ranger District

      31 - Highgrade . . . . . . . . . . . . . 4 - 149

      32 - Fandango . . . . . . . . . . . . . 4 - 153

      33 - Lake City . . . . . . . . . . . . . 4 - 157

      34 - Fitzhugh . . . . . . . . . . . . . 4 - 161

      35 - South Warner Wilderness . . . . . . . . . . . 4 - 165

      36 - Patterson . . . . . . . . . . . . . 4 - 169

   Big Valley Ranger District

      41 - Long Bell . . . . . . . . . . . . . 4 - 173

      42 - Stone Coal . . . . . . . . . . . . . 4 - 177

      43 - Portuguese Ridge . . . . . . . . . . . . 4 - 181

      44 - North Adin . . . . . . . . . . . . . 4 - 185

      45 - South Adin . . . . . . . . . . . . . 4 - 189

   Devil's Garden Ranger District

      51 - Devil's Garden . . . . . . . . . . . . 4 - 194

      52 - Crowder . . . . . . . . . . . . . 4 - 199

      53 - Hackamore . . . . . . . . . . . . . 4 - 203

      54 - Happy Camp . . . . . . . . . . . . . 4 - 207

   Doublehead Ranger District

      61 - Medicine Lake . . . . . . . . . . . . . 4 - 211

      62 - Black Mountain . . . . . . . . . . . . 4 - 215

      63 - Tionesta . . . . . . . . . . . . . 4 - 219

      64 - Mears . . . . . . . . . . . . . 4 - 223

      65 - Steele Swamp . . . . . . . . . . . . . 4 - 227

      66 - Clear Lake . . . . . . . . . . . . . 4 - 231

      67 - Mount Dome . . . . . . . . . . . . . 4 - 235

## Chapter 5 — Monitoring and Evaluation Requirements

Introduction . . . . . . . . . . . . . . 5 - 1

Monitoring and Evaluation Requirements . . . . . . . . . . 5 - 1

Monitoring Levels . . . . . . . . . . . . . 5 - 2

Monitoring Plan . . . . . . . . . . . . . 5 - 2

Evaluation . . . . . . . . . . . . . . 5 - 3

# Chapter 1
## Introduction

## Purpose and Need

The Forest Plan guides all natural resource management activities and establishes management standards and guidelines for the Modoc National Forest. These activities and standards allow for the use and protection of Forest resources. In addition, they fulfill legislative requirements, respond to public issues and Forest Service concerns, and provide opportunities for the use of the Forest. Specifically, the Forest Plan:

- guides the management of the Forest for the next 10-15 years, and includes long-range goals and objectives for the Forest;

- describes resource management practices and levels of resource production and management;

- allocates land for the combination of management activities to which it is best suited by maximizing long-term net public benefits in an environmentally sound manner;

- establishes monitoring and evaluation requirements needed to ensure that management direction is implemented and its objectives met; and to trigger changes in that direction, if needed;

- yields resource inventory data necessary for Forest and Rangeland Renewable Resource Planning Act (RPA) assessments;

- provides information for the development of program and budget proposals;

- will be revised at least every 15 years, and will be reviewed every 5 years to determine need for more frequent revision.

## Relationship of the Forest Plan to Other Plans

Preparation of the Forest Plan is required by the RPA of 1974, as amended by the National Forest Management Act of 1976 (NFMA). RPA requires the Forest Service to conduct an assessment of the nation's renewable resources and to develop a program of use. The assessment determines the capability of all National Forest System lands to provide goods and services, as well as a forecast of demands for them.

NFMA requires the Forest Service to develop an integrated Land Management Plan for each National Forest. Each Forest Service Region distributes its share of national production targets to each of its Forests. The share each Forest receives is based on detailed information gathered at the Forest level.

Assessment of the Plan's environmental impacts is required by the National Environmental Policy Act (NEPA) and is contained in an accompanying Environmental Impact Statement (EIS). The EIS describes in detail the existing Forest environment and management, supply and demand factors, and the environmental effects of implementing the proposed Forest Plan or other reasonable alternatives that are presented therein. It also includes the data gathering, issue identification, and alternative formulation that constituted this planning process. The Plan summarizes demand and supply potential, amplifies the preferred alternative, and applies its management direction to each management area of the Forest. Both the EIS and Plan state the public issues and management concerns that guided formulation of the plan.

When approved, the Forest Plan will supersede most previous Forest resource management plans. All existing resource management plans were re-examined by the Forest's interdisciplinary planning team. Plans deemed consistent with, and still appropriate for, the Forest Plan are incorporated by reference. These include:

- Wild Horse Management Plan

- Modoc Sucker Recovery Action Plan

- Transportation Plan

- Deer Herd Plans - Warner Mountain, McCloud Flat (Glass Mountain), Interstate, Adin

- Three Sisters Bald Eagle Winter Roost Management Plan

- Mt. Dome Bald Eagle Winter Roost Management Plan

- Pronghorn Management Plan

Other plans are incorporated by reference and will be amended to be consistent with the Forest Plan after it is approved:

- Range Allotment Plans
- Triangle Lands Development & Management

After adoption of the Forest Plan, all other existing resource management plans will be superseded:

- Ranger District Multiple Use Plans:
    Big Valley Ranger District
    Devil's Garden Ranger District
    Doublehead Ranger District
    Warner Mountain Ranger District
- Medicine Lake Unit Land Management Plan
- Timber Management Plan & Five-Year Action Plan
- Land Adjustment Plan
- South Warner Wilderness Interim Management Plan
- Off-Highway Vehicle Plan
- Wetlands Development Plan 1979-84
- Geologic Special Interest Areas Interim Plan
- Fire Pre-Attack Plans
- Fisheries Habitat Management Plan
- Deer Herd Habitat Management Plan

The Big Valley Federal Sustained-Yield Unit (BVFSYU) policy statement (Appendix R) and allowable sale quantity is also incorporated by reference and amended. The BVFSYU was established under the authority of the Sustained Yield Forest Management Act of 1944, by a Declaration of the Chief of the Forest Service on January 27, 1950. The most recent policy statement concerning the BVFSYU prior to this Plan was approved by the Chief on August 24, 1979. The periodic review of the BVFSYU, required by the Forest Service Manual, was included as part of the current planning effort. The review includes examining the level of harvest within the Unit, operating policies, and the need for the Unit.

The Plan also requires preparation of various resource implementation plans to more specifically define management direction. These implementation plans are listed in Appendix A.

Forest managers can use all the information in the Plan and EIS as a basis for local project environmental analyses. This process of tiering to the broader documents and incorporating the Plan and EIS by reference permits concentration on issues specific to subsequent smaller projects. Similarly, the Forest Plan is tiered to the Pacific Southwest Regional guide, which is tiered to the national RPA program.

## Plan Implementation Process

The Forest Plan and resource implementation plans will be carried out by the District Rangers and their staffs. The Modoc's four districts cover 22 Management Areas. The Plan is comprised of a set of goals and objectives for each Management Area, reflecting the capability and suitability of the land to support various activities. District Rangers' staffs will plan and conduct projects that conform with these goals and objectives. Projects will continue to be planned and evaluated through the interdisciplinary process. District and Forest staffs will conduct environmental analyses, and document them in appropriate environmental documents (such as Environmental Assessments), which will be tiered to the Forest Plan EIS.

Numerous existing contracts for timber sales, special uses, and grazing may not immediately comply with the Forest Plan. Duration of these contracts may be several months, such as salvage sales, or several years. Most operation and maintenance activities, new projects, projects in the first year of development, new special use proposals, and transfers of existing permits can be brought into compliance with the Forest Plan within the first year of implementation. Contractual obligations will continue as originally planned.

The Plan will be implemented at all levels of Forest management. Environmental Assessments for all Forest projects will be tiered to the EIS for this Plan.

## Forest Plan Amendments, and Revisions

If the Forest Plan requires amending, the Forest Supervisor determines whether a proposed amendment would result in a significant change to the Plan. If the change is significant, the Forest Supervisor shall follow the same procedure required to develop and approve a Forest Plan. The Regional Forester approves significant amendments. If the change is not significant for the purposes of the planning process, the Forest Supervisor may approve and implement an amendment after the public is notified and NEPA procedures are completed.

Every five years the Forest Supervisor will determine whether conditions of the land or demands of the public have changed significantly. The Forest Plan will normally be revised every 10 years, or at least every 15 years. However, it may be revised whenever the Forest Supervisor determines that changing conditions or demands, including RPA policies, would have a significant effect on the Forest, or whenever monitoring results so require. Approval by the Chief is required to revise the Plan.

# Chapter 2
## Public Issues and Management Concerns

The scoping process identified the following public issues, management concerns, and resource opportunities, collectively called issues. The issues represent important reasons for considering change in current management direction, and are the basis for this Plan and the alternatives considered in the Environmental Impact Statement (EIS).

Chapter 1 and Appendix A of the EIS discuss the scoping process and facets of the issues. The resolution of issues by the Plan (the Preferred Alternative from the EIS) is summarized below.

## Cultural Resources

**What direction will be provided for the inventory, management, and interpretation of cultural resources?**

Forest Standards and Guidelines provide minimum direction for the inventory, management, and interpretation of cultural resources. Significant and unevaluated sites are protected through project redesign and avoidance. Inventories are conducted on a project basis, and the Forest inventory is completed by 2050.

Interpretation consists of signing one site annually for two decades. Two sites per year are nominated to the National Register of Historic Places (NRHP). Fifty backlog sites are evaluated each year to determine NRHP significance.

Native American consultation continues on a project basis.

## Diversity

**How will management provide for diversity of plant and animal communities so that diversity is at least as great as that which presently exists?**

Standards and Guidelines and management prescriptions ensure that diversity of plant and animal communities will achieved by providing a threshold level of vegetations types and seral stages found within the Forest. These measures also ensure that viable populations of all fish, wildlife, and plant species will be maintained.

## Energy

**How will Forest management contribute to the federal policy of achieving national energy self-sufficiency?**

Forest-wide Standards and Guidelines encourage development of new energy sources while stressing energy efficiency in all alternatives for facilities, vehicles, and equipment.

## Facilities

**How and where will the transportation and communication system be managed and maintained?**

Forest-wide Standards and Guidelines require developing and managing transportation and communication systems to help meet other resource direction and objectives, and to protect against resource damage. The Plan specifies average road miles (36.5 miles) and trail mileage (9.7 miles) to be constructed and reconstructed annually. It also requires maintaining 3,167 miles of Forest roads.

## Fire Management

**How will fire be managed to protect and improve Forest resources?**

Forest Standards and Guidelines give general direction on cost-effective fire suppression, prevention, detection, and fuel management, including prescribed burning. Direction for each management area includes fire suppression strategy, acceptable acres burned, and guidance on fuel loading and required fuel treatment.

Cost-effective fire suppression requires use of the closest forces which includes detection and suppression forces, incident management teams, and dispatch centers.

## Firewood

### How and where will firewood be managed?

Forest Standards and Guidelines provides direction for firewood management. The Plan anticipates a harvest of approximately 26,500 cords of firewood per year. Preference is given to personal use over commercial and industrial use.

Juniper is the preferred firewood species. Estimates of 10-year growth rates show that 18,760 cords of western juniper could be removed annually if all areas were accessible for harvest and cutters selected trees with diameters of six inches or greater.

Firewood supply also depends on the limbs and cull logs associated with timber harvesting. Approximately 26,500 cords of firewood is available due to timber harvest activity.

## Lands

### What will be the priorities for adjustments in land ownership to meet public demand and to support resource management goals and administrative needs?

Forest Standards and Guidelines give direction for landowner coordination: land adjustment, rights-of-way, withdrawals, special use permits (including small hydroelectric projects), utility developments for power-related activities, and unauthorized occupancies. A land adjustment plan lists specific opportunities for ownership adjustment. The intent of the land adjustment program is to consolidate ownerships, facilitate management, and minimize conflicts with adjacent land users.

## Minerals

### How will mineral areas be managed?

About 85% of the Forest is open to mineral exploration and development, except for the South Warner Wilderness, Devil's Garden Research Natural Area, Geologic Special Interest Areas, and certain administrative sites. Approximately 89,000 acres are closed to mineral exploration and development. Forest-wide Standards and Guidelines and management prescriptions restrict mineral exploration and development on an additional 158,000 acres to protect land and resources from unacceptable environmental effects.

## Pests

### How will damage from forest pests be controlled?

Forest pests are identified in EIS Chapter 3. Forest Standards and Guidelines direct use of integrated pest management to reduce unacceptable pest impacts.

### Under what conditions will pesticides be used?

Selection of specific methods are made at the project level, based on site-specific analysis of relative effectiveness, environmental effects, and costs.

## Range

### What will be the level of range use and development?

The Forest Plan estimates that the level of livestock grazing will be 118,800 AUMs annually for the 1st decade. A low level of nonstructural improvements (on about 150 acres per year) and a moderate level of structural improvements are made. Forest Standards and Guidelines and management prescriptions specify livestock management measures and protect other resources. Management area direction outlines management strategies for each allotment.

## Recreation

### What recreation opportunities will be provided?

Forest Standards and Guidelines and management prescriptions provide a variety of recreation opportunities. Management area direction outlines recreation instructions for specific units of land.

*Developed Recreation* – Existing opportunities are maintained and new opportunities are provided where demand is especially high. Interpretive services are expanded.

*Dispersed Recreation* – Existing OHV opportunities are maintained. Over 60% of the Forest is open to OHVs. The OHV Plan is updated after the Forest Plan is approved.

The trail system is improved and expanded. Approximately 9.7 miles of new trails are con-

structed or reconstructed annually in the 1st decade to provide a variety of opportunities. About 317,000 acres are managed for semi-primitive non-motorized (SPNM) recreation experience, and 219,800 acres for semi-primitive motorized recreation experience.

*Wilderness* — No Wilderness additions are made; but many SPNM areas are managed to maintain those environments in semi-primitive condition for future generations. A portion of the South Warner Wilderness has a primitive emphasis. Management efforts disperse campers from popular sites to maintain uncrowded conditions. Trails are maintained, and challenging opportunities for hiking complement the area.

## Socio-Economic

**How will the effects of management be considered in relation to community stability?**

The primary factors used to assess effects on community stability are changes in Forest policy that affect social groups' value systems or change local income and employment. Any significant change is considered an adverse impact on stability if major conflicts occur and local residents are unable to mutually resolve them. The Forest Plan strives to maintain community stability. Chapter 4 of the EIS gives the economic and social effects of each alternative, including the Preferred Alternative.

## Timber

**What amounts, methods, and locations of timber harvest and other silvicultural activities will be practiced?**

Timber management objectives, management area direction, and the Ten-Year Timber Sale Plan (Appendix C) describe the amount, method, location, and timing of timber harvests. A total of 519,000 acres are suitable for timber production. Annual harvest averages 45.5 million board feet (MMBF), which includes 4.5 MMBF from the Visual Retention, Riparian, and <20 Cu. Ft. Lands Prescriptions. Even-aged management is the dominant silvicultural system, while uneven-aged management is emphasized on 17,000 acres. Reforestation averages 3,400 acres per year and timber stand improvement (precommercial thinning and re-

lease) is applied to an average of 5,400 acres per year. Lands allocated to even-aged management have rotation lengths from 70 to 150 years with an average of 100 years.

Of the total suitable land base, 27% is capable of producing less than 20 cubic feet of wood per year. Timber production from this land is nominal. Highway scenic areas represent 6% of the suitable land base and are managed on an equivalent of a 250-year rotation.

Forest Standards and Guidelines and management prescriptions provide direction for protecting soil and water, visual, wildlife, and other resources. Management prescriptions also describe the conditions for applying timber harvesting to specific areas.

## Visual Resource

**How will the visual resource be managed to protect the scenic quality of the Forest?**

The Plan assigns visual quality objectives (VQOs) to the Forest, as mapped on the accompanying Adopted Visual Quality Objective Map, and requires that management activities meet them. Management prescriptions give guidelines for achieving each VQO. Specific acreage allocation of visual prescriptions are found in management area direction.

Major travel corridors, riparian areas, recreation sites, special scenic areas, and areas with wilderness characteristics are managed to meet the VQO of retention or partial retention. This means that management activities result in a natural-appearing landscape or remain visually subordinate. Opportunities to enhance visual quality are identified during project planning. During these activities, Standards and Guidelines apply.

Long-term effects of various activities are considered during the planning phase of those projects. Areas assigned to the Timber-Visuals prescription are planned for the entire rotation cycle so that timber and visual resource values can be considered.

In most cases, the visual quality of areas adversely impacted in the past recover naturally if they are undisturbed. Other areas (abandoned roads, borrow pits, etc.) require rehabilitation.

A Forest Visual Rehabilitation Plan is prepared after approval of the Forest Plan.

## Water and Soil

**How will watersheds be managed to maintain or enhance water quantity, water quality, and soil productivity?**

Water quality improves by applying Forest-wide Standards and Guidelines and completing 260 acres per year of watershed improvements in the 1st decade. Improvements continue past the 1st decade to eventually restore degraded watersheds and riparian areas in 40 years. By then, 100% of the water runoff will meet State water quality objectives.

No significant changes in water quantity occur as the potential for increases through vegetative manipulation is minor. Available increases are assessed and optimized where appropriate use can be made, and environmental damage will not result.

Forest Standards and Guidelines prohibit irreversible loss of soil productivity and require restoration of degraded soil areas. Management area direction (Chapter 4) requires protective measures in specific problem areas. Forest Standards and Guidelines and management area direction also call for opportunities to enhance soil productivity and assess new opportunities.

## Wetlands and Riparian Areas

**What will be the management direction for wetland and riparian habitats?**

The goal of this Plan is to develop all suitable wetlands as waterfowl nesting habitat by the end of the 2nd decade. This goal is dependent on funding levels. Livestock grazing continues in seasonal flooded wetlands, with nesting islands or areas protected by fencing. In permanent wetlands, livestock may be excluded when values can be gained for waterfowl or nongame wildlife.

All riparian areas are protected through Forest-wide Standards and Guidelines and the Riparian Prescription.

## Wildlife and Fish

**Where, what kind, and how much habitat will be provided for fish and wildlife species?**

Population goals for fish and wildlife include meeting recovery targets for endangered species; increasing or maintaining deer and pronghorn populations at State Plan levels; improving waterfowl production on 4,400 acres of wetlands; increasing trout and bass production by 3,000 pounds; and, providing for viable populations of all species.

Deer and pronghorn forage needs are met by making forage available to meet Deer Herd and Pronghorn Plan goals. Browse and other forage requirements are maintained at acceptable levels during reforestation on 50% of the clearcut acres in the 1st decade. Habitat needs for all species are provided at the project and program levels through Standards and Guidelines and prescriptions.

A monitoring program is initiated which combines current Forest and CDFG surveys with new monitoring programs to better assess the status of fish and wildlife populations and habitat. Existing wildlife policy has been augmented during development of this Plan and is incorporated throughout these documents to insure compliance.

Direct fish habitat improvement occurs at the rate of 15 miles of streams and 100 acres of reservoirs and lakes per decade. Stream improvements are tied, where possible, to watershed improvement projects to achieve maximum benefits. Improvements are based on priority needs and cost effectiveness.

Snags are managed to meet a minimum of 1.5 snags per acre on all commercial forest lands. In eastside pine, where snag densities levels are lowest, snags are created as acres are treated to achieve minimum snag densities by the 7th decade.

# Chapter 3 — Summary of the Analysis of the Management Situation

## Table of Contents

Introduction . . . . . . . . . . . . . . . 3 - 1
The Economic Environment . . . . . . . . . . . . 3 - 1
The Social Environment . . . . . . . . . . . . . 3 - 2
The Resource Environment . . . . . . . . . . . . 3 - 5
    Air Quality . . . . . . . . . . . . . . 3 - 5
    Cultural Resources . . . . . . . . . . . . . 3 - 5
    Diversity . . . . . . . . . . . . . . 3 - 6
    Energy . . . . . . . . . . . . . . . 3 - 7
    Facilities . . . . . . . . . . . . . . 3 - 9
    Fire and Fuels . . . . . . . . . . . . . 3 - 10
    Firewood . . . . . . . . . . . . . . 3 - 12
    Geology . . . . . . . . . . . . . . 3 - 12
    Lands . . . . . . . . . . . . . . . 3 - 13
    Law Enforcement . . . . . . . . . . . . . 3 - 14
    Minerals . . . . . . . . . . . . . . 3 - 14
    Pests . . . . . . . . . . . . . . . 3 - 17
    Range . . . . . . . . . . . . . . . 3 - 17
    Recreation . . . . . . . . . . . . . . 3 - 20
    Research Natural Areas . . . . . . . . . . . 3 - 23
    Riparian Areas . . . . . . . . . . . . . 3 - 24
    Sensitive Plants . . . . . . . . . . . . . 3 - 25
    Soils . . . . . . . . . . . . . . . 3 - 26
    Special Interest Areas . . . . . . . . . . . 3 - 27
    Timber . . . . . . . . . . . . . . . 3 - 28
    Visual Resources . . . . . . . . . . . . . 3 - 32
    Water . . . . . . . . . . . . . . . 3 - 33
    Wilderness and Roadless Areas . . . . . . . . . 3 - 35
    Wildlife and Fish . . . . . . . . . . . . . 3 - 37
    Wild and Scenic Rivers . . . . . . . . . . . 3 - 38
    Woodlands . . . . . . . . . . . . . . 3 - 38

# Chapter 3
## Summary of the Analysis of the Management Situation

## Introduction

This chapter summarizes the Analysis of the Management Situation (AMS), a set of documents which examines the existing situation for each resource of the Forest. The AMS is part of the Planning records.

Chapter 3 —*Affected Environment* — of the accompanying Environmental Impact Statement describes each resource in detail.

## The Economic Environment

### Introduction

National Forest land management and activities affect the social and economic well-being of communities close to and dependent on the Forest. The Forest's impact areas are Modoc, Lassen and portions of Siskiyou Counties. These impact areas are characterized by a rural setting, low population density, and limited job diversity centered around agriculture, the timber industry, and recreation. The impact counties are most affected by Forest Service employment, timber, range, wildlife, and recreation. The Forest's extended zone of influence includes urban centers throughout California, southern Oregon, and western Nevada. Users from this zone primarily include hunters, recreationists, and commercial firewood cutters.

The proportion of land area administered by the Forest in each county determines the extent to which the Forest affects those counties. The Forest administers 53% of the land in Modoc County, 5% of Lassen County, and 3% of Siskiyou County.

### Population

The current population of Modoc, Lassen, and Siskiyou Counties is 82,275 people. From 1980 to 1990, the population increased 17%, higher than California's increase of 6%. In-migration accounts for 75-80% of the increase. This pattern is consistent with national trends showing movements from urban areas to more rural settings. Population growth rates varied among counties in the last decade, with Modoc County growing the least

(12%) and Lassen County the most (27%). Siskiyou County's population increased 13%.

### Employment and Income

The principal economic resources of the affected counties are government employment, timber, agriculture, and recreation. Modoc County employment from these resources is dominated by the following sectors: government (36%), agriculture and forestry (12%), wholesale and retail trade (16%), services (23%), and manufacturing (6%). Federal, State, and local government employment, in concert with educational jobs, provide two times more employment than the Statewide average of 16%.

In rural areas, per capita income is usually lower than Statewide averages due to the lifestyles of the residents. People tend to grow more of their own food, cut their own firewood, barter, and work for nonreported cash such as family farm labor. These factors account for some of the differences between the counties and the State. Seasonal employment is another contributor to the difference. Construction, logging, and agriculture all have cyclical employment patterns.

### Local Economic Impacts

The Forest contributes to the local economy by providing timber for wood products, forage for livestock operations, recreation and hunting opportunities, and revenue from the Receipts Act Payment Program and through the influx of the annual operating budget. The Forest employs approximately 154 permanent people (full- and part-time) as well as 76 temporary workers.

The Twenty-Five Percent Fund, an act created in 1908, requires the return to affected counties of 25% of monies received by the Forest from the sale of forest products. Receipts from timber sales and grazing fees are the primary source of monies. The percent of forest land area in each county is the basis for the distribution of 25% funds returned to each county: Modoc County receives 83% of the Fund, Lassen County 9%, and Siskiyou 8%. The money must be used to improve public schools and roads.

Annual receipts can fluctuate widely because of the variation in volumes of timber harvested which dominate the economic base from which the 25% returns are calculated. Although the Forest regulates the volume of timber offered for sale, the price paid and timing of the actual harvest is influenced by the market demand for wood products.

Another source of income to the counties is the possessory interest tax levied on individuals holding various permits in national forest lands. The primary source of possessory income tax from the Forest is livestock grazing. For example, Modoc County receives approximately $29,000 in taxes annually from ranchers who graze their livestock on the Forest.

The State of California levies a timber yield tax, currently set at 2.9% of the timber harvest value, which is returned to the county of origin where the volume is harvested.

Rents from geothermal, oil and gas leasing are recent additional sources of income to Modoc and Siskiyou Counties.

# The Social Environment

## Introduction

In order to determine the effects of Forest management on the quality of peoples' lives and their well-being, the population of the assessment area was grouped into several social categories: ranching-farming, timber operators-wood products manufacturing, retail trade-services, retirees, government employees, non-local recreationists and Native American Indians. The categories are simplified, stereotypic groups, but individuals may belong to several groups because the categories are not mutually exclusive.

### Social Groups

Forest management activities can influence individuals and groups on a local, regional, and national basis. People living within and adjacent to the Forest are most influenced; they are described in detail below. Various groups may overlap at the local, regional, or national level. For example, recreationists visiting the Forest come from the local area as well as from areas outside the zone of influence. Similarly, national and regional groups interested in commodity outputs, such as timber or grazing, share many beliefs held by local commodity-oriented groups.

Descriptions of the various groups and their value systems which follow are in general categories developed for analytical purposes; individuals may not perfectly fit a unique group. Many cross ties exist between the social groups because of such factors as religious affiliations, family relations, social organizations, recreational preferences, and the desire for open space, rural environmental equality and a slower pace of life.

### Ranching-Farming Group (Ranchers, Farmers)

This group is comprised of individuals involved in livestock production and the growing of grain crops, hay and pasture, and vegetable crops. Many of the members of this group are long-time residents of the assessment area with ranches and farms having been passed to successive generations. This group is also made up of ethnic minorities, usually Hispanics, who provide manual labor to the ranchers and farmers. The group's lifestyles and job dependencies are based on using the land to sustain their livelihoods. Currently, economic instabilities in ranching and farming create uncertainty in the ability to sustain these lifestyles.

Grazing on public lands is an integral part of many ranch operations. Currently, local ranchers depend on approximately 15% of their cattle forage requirement from Forest land. While livestock graze on public lands during the summer months, those private lands not used for summer grazing are devoted to alfalfa and grass hay production for winter feeding. Reductions in public land grazing could increase the use of private lands for grazing livestock during the summer months. To compensate for the loss of acreage in production, ranchers would have to decrease the number of livestock their ranches could support.

The Ranch-Farming Group is generally opposed to changes that would rapidly alter their lives and communities. As a group they benefit from Forest commodities, especially forage and water for agricultural use. They have a strong feeling of ownership in public lands and believe that their historical uses of the Forest should not be altered. In fact, the Forest was established largely because of the work and recommendations of local ranchers in the last century.

Important population variables for the group are land ownership and use patterns. Believing that agricultural land should be used for agricultural purposes and not broken up for other uses under a variety of ownerships, this group is concerned about the effects of subdivison, including the effects of carving up the agricultural land base, and the limited supply of water. Because water is scarce in high desert country, its availability for agricul-

tural uses has been and will continue to be a major source of concern.

## Timber Operators-Wood Product Manufacturing Group (Timber Industry Workers)

This group includes individuals involved in logging, the manufacturing of wood products, and commercial firewood cutting. Members are generally long-time residents of the assessment area with some minorities employed primarily in wood products manufacturing. The group's employment opportunities are totally dependent on the availability of wood fiber, a major source of which is located on federal lands.

Like those in the ranching-farming group, these peoples' lifestyles are dependent on the land for basic subsistence. For those involved with commercial timber, maintaining their way of life is a major concern due to the economic uncertainties of the wood products market and the policies of the Forest concerning availability and quality of wood fiber.

The values of the group are similar to the ranching-farming group. They have a traditionally strong community orientation. This group believes that the Forest should be managed to provide wood fiber and has strong feelings of ownership regarding Forest lands. Timber operators and wood products manufacturers within the Big Valley Federal Sustained-Yield Unit feel that the Unit is an important part of their community and that it should be managed for the benefit of the Big Valley area. In general, the group values the Forest for its ability to supply their sustenance. Of all the groups considered, this one is most affected by land use patterns on the federal lands.

## Retail Trade-Service Group (Retail and Service Personnel)

This group sells merchandise, provides lodging, amusement and professional services, and works in finance, insurance, and real estate. They include long-time residents and newcomers. Although the employment opportunities for this group are not directly dependent on commodity outputs from the Forest, they are dependent on the economic stability and growth of the area. The group uses the Forest primarily for leisure activities. The certainty of this group to maintain its lifestyle is directly related to the certainty or uncertainty of the other groups. For example, members of this group from the Big Valley area generally feel that their lifestyles and jobs are dependent on the maintenance of the Big Valley Federal Sustained-Yield Unit because timber industry is a major employer in Big Valley. A loss of jobs in the wood prod-

ucts sector would reduce local income, resulting in loss of trade and services.

Although the beliefs, values and attitudes of this group are varied, they generally believe that the Forest should be managed for a mixture of commodity and non-commodity outputs. While the commodity outputs provide much of the existing economic stability of the area, the non-commodity outputs provide for their personal recreational activities, as well as some economic benefits to certain segments of the group from the attraction of tourists to the area for hunting, fishing, and other recreational activities. Similar to all of the local groups, there is a strong community spirit which is generally found in rural areas.

This group would be affected by a change in land use and ownership patterns if there were a general loss of open space. As a whole the group favors subdivisions which usually result in increased economic activity. Business people recognize that population growth and resulting expansion in business depend largely on increasing commodity production or visitors to the area. Therefore, those alternatives which promote production and use of forage, timber, big game, and recreation opportunities would benefit the business community.

## Retirees and Second Homeowners Group

For the most part, members of this small but growing group have come to the area to escape large population centers, to retire, or to purchase second homes or parcels of land for vacations or investment. They are attracted to the area by its rural character, and their use of the Forest is recreational. Their source of income is primarily from retirement funds or from employment outside the area.

This group believes the Forest should be managed for amenities and that convenient access should be provided. Primary concerns of the retirees on fixed income are taxes and the ability of the local communities to provide adequate social services.

The group favors a land use pattern which allows ownership of rural property. A major concern is loss of open space and the natural setting, an amenity that attracted many individuals into moving to the area. Ironically, their arrival generally has resulted in subdivisions of open spaces and new development.

## Government Employees Group (Federal, State, and Local Employees)

This group is composed of individuals employed by State agencies (such as the Department of Fish and Game), county agencies (such as the schools and county

road maintenance), and federal agencies (such as the Forest Service). This group, like the retail trade-services group, is a mixture of long-time residents and newcomers. Individuals in this group have jobs that are more directly affected by Forest management.

Forest employees are especially dependent on the scale of programs that the Forest undertakes. In the last five years, the Forest Service has been operating under reduced budgets which has required reductions in the work force and the number of non-commodity programs undertaken, such as wildlife habitat and recreation development improvements. Decreased habitat improvement funds could reduce timber and range activities if damage to certain fish and wildlife habitats cannot be mitigated. Curtailed activities could then result in diminishing county receipts received from the sale of timber and forage. In other words, Forest programs directly affect some members of this group (Forest Service employees) and indirectly affect other (county programs).

In general, this group believes in a mixture of outputs, uses and services to provide for commodities and amenities. The group's values are varied because government agencies tend to employ people from many areas. Many members of this group tend to favor community improvement.

**Recreationist Group (Recreationists)**

This group primarily includes local residents and individuals from California to the south and west of the assessment area, and from southern Oregon. They use the Forest seasonally for recreation such as mule deer and pronghorn hunting, fishing, camping and rockhounding.

With more interest in amenity values on the Forest than in resource developments, recreationists benefit from alternatives which enhance the natural environment and recreation opportunities. They benefit from conservation and development of wildlife populations, maintenance of access roads and trails, preservation of traditional hunting camps, and maintenance of developed recreation sites.

**Native American Groups (Traditionalists and Non-traditionalists)**

The members of this group primarily include Upper Pit River, Paiute, and Modoc/Klamath Indians. Most of the Upper Pit River Indians are located in the Alturas area, while the Paiute are generally found in the Ft. Bidwell area. Modoc/Klamath Indians are primarily non-residents. The group experiences high unemployment

(approximately 75%), and those who are employed work seasonally in ranching and construction off the reservation.

Native Americans have traditional and non-traditional (economic) ties to the land. That is, religious/heritage sites are located on the Forest; and many individuals are employed by the timber products industry (logging, thinning, planting, mill work, etc.). Traditional Native Americans hold nature in high regard and believe that all land, plants, animals, and water are sacred.

The major influence of Forest management on this group is the disturbance of Native American cultural and religious resources. Traditionalists believe in retaining a natural landscape and using resources necessary to sustain their lifestyle. They consider major land alterations (clearcuts, road building, etc.) disrespectful to nature. Thus, protection and preservation of hunting, gathering and spiritual places is only part of their concerns in the way the Forest is managed. Major prehistoric sites, such as villages, seasonal base camps, cemeteries, rock art, and prayer seats, are also of concern and should similarly be preserved out of respect for ancestors and to preserve examples of past lifestyles.

The certainty and uncertainty of maintaining the group's way of life and their traditional uses of the land is directly related to the amount of environmental disturbance caused by Forest activities: the greater the disturbance, the more likely an area of religious or cultural significance will be changed. Consequently, traditional Native Americans prefer alternatives which stress maintaining the Forest in a natural setting.

Traditionalists may include tribal elders who are not involved in the current job market. They may also include younger individuals interested in reviving some aspects of past lifestyles, beliefs, and traditions. These revivalists may be involved in the current local job market.

Non-traditional Native Americans are generally younger to middle-aged individuals involved in the current job market. While they may lean toward the traditionalist point of view, they are also concerned with the economic necessity of employment. Because of their need to work, non-traditionalists accept more intensive management of the Forest, including disturbance of some cultural heritage sites. Generally, increased opportunities for local employment, especially in the timber products industry, is a benefit to this group.

# The Resource Environment

## 1. Air Quality

Crisp, clean mountain air is a hallmark of the Forest, which is geographically within the Northeast Plateau Air Basin under the jurisdiction of County Air Pollution Control (CAPC) officers in Lassen, Siskiyou and Modoc counties. Air quality over all the Forest is excellent, as acknowledged under standards set by the Federal Clean Air Act. The South Warner Wilderness within the Forest, and the Lava Beds Wilderness in the Lava Beds National Monument in the northwest corner of the Forest, are rated as Class I areas. The rest of the Forest is designated Class II. In Class I areas, even a minimal change in air quality is considered significant, while Class II areas can have changes in air quality if they are the result of moderate, well-controlled growth.

### Current Management

State of California regulations[1] for pollution control and air quality standards affect this Forest. Authority to regulate and monitor state air quality requirements are delegated through the State Air Resources Board to local Air Pollution Control Districts. The Forest follows agricultural burning guidelines and reporting requirements together with Forest Service Manual guidelines when using prescribed fire. To meet these regulations, the Forest maintains records for the amount of forest fuels burned and submits records to the CAPC quarterly.

Burning vegetation, the principal source of air pollution on the Forest, is the traditional method for disposal of logging slash, site preparation for reforestation, and range improvement projects. Suspended particulate matter is the only pollutant of concern when burning on the Forest. Disposing of slash by prescribed burning degrades the air quality less than if the slash were to burn by wildfire. During prescribed burns, fuel volume and fire area are managed under weather conditions which dissipate smoke.

### Opportunities

The Forest is working toward better utilization of logging debris in ways that will solve disposal problems as well as reduce air pollution. Through the personal use firewood program, the Forest encourages firewood users to gather dead and down logging slash by offering it free of charge. Other alternatives to slash burning include chipping small material, pulverizing by heavy equipment, and burying road slash.

## 2. Cultural Resources

Cultural resources provide information on the Forest's unique prehistoric and historic ethnic heritage, including evidence of several Native American groups (Achumawi, Atsugewi, Modoc-Klamath, and Northern Paiute) and their predecessors. In addition to providing archaeological evidence of past lifeways and adaptation to the environment, cultural resources also lend a historic perspective on today's technological and sociological change.

### Current Management

The Forest Service inventories, describes, and evaluates the prehistoric and historic cultural resources on the Forest. Direction for these activities is outlined in the National Historic Preservation Act (NHPA) of 1966 and Executive Order 11593. The Forest consults with the State Historic Preservation Officer (SHPO) and the Advisory Council on Historic Preservation, and reviews State and federal registers when applicable.

Cultural resource sites are managed in several ways. The level or intensity of management has the following range:

– **Preservation** — sites are protected by excluding incompatible land activities.

– **Conservation** — when preservation is not feasible, scientific information is recovered from sites so that other land use activities can occur.

---

[1]
California Health and Safety Code Part 4; and California Administrative Code Title 17.

– **Interpretation** – sites are developed for public enjoyment and education through signs, trails, and public information kiosks.

– **No Management** – sites are not preserved in any way. (These sites are not of the quality suitable for nomination to the National Register. They contain little scientific information or Native American cultural heritage value.)

As part of the Forest's normal compliance procedures, and in accordance with the American Indian Religions Freedom Act (AIRFA), the Native American Heritage Council and local Native American groups are consulted on most large-scale projects, such as timber sales. If Native American groups determine that a project area has cultural or heritage valne when the area is surveyed, particular attention is given to identifying these culturally sensitive areas on the ground. Heritage values are considered when designing project alternatives and site protection measures.

Groups routinely contacted are the California Native American Heritage Commission, the Klamath Tribal Council, the Ft. Bidwell Indian Community Council, the Pit River Tribal Council, the Pit River Home and Agricultural Cooperative Association, the Alturas Rancheria, and the Lookout Rancheria.

## Opportunities

Because most cultural resource inventories are conducted on a project-by- project basis, several areas are underrepresented or not represented in the cultural resource data base. The Forest could conduct non-project inventories to correct deficiencies in the data base and improve the overall cultural resource picture on the Forest.

Better coordination with interpretive services and recreation is needed to fulfill the goal of interpreting cultural heritage for the public. The Forest could encourage local groups, such as the Modoc County Historical Society or the Modoc County Chamber of Commerce, in cooperative ventures such as interpretive locations on the Forest and oral history programs. Cultural resources appropriate for interpretation include rock art (petroglyphs and pictographs), the Glass Mountain obsidian quarry, Modoc War fortifications, remnants of emigrant trails or roads, homesteads, and sites associated with historic mining activities.

# 3. Diversity

## Introduction

The regulations written to implement NFMA define diversity as "the distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan" (36 CFR 219.3). Results come from managing other resources such as vegetation and animals, which are elements of diversity. We can evaluate or project diversity by measuring or quantifying vegetation types, seral stages, and animal species inhabiting a particular area. By maintaining vegetative diversity in a natural dispersion pattern and in sufficient amounts, the Forest can meet another regulatory obligation: to maintain viable populations of the Forest's animal species by providing suitable habitat conditions. The relationship between plants and animals is the basis for the California Wildlife Habitat Relationships (WHR) Program (Laudenslayer 1982).

Diversity is evaluated by richness, evenness, and pattern. Richness is the number of species, communities, or special habitat elements found in the planning area. Evenness is the relative abundance of auimals, habitat types, successional stages, and cover classes within the planning area. Evenness describes the extent to which these elements are uniform. Pattern reflects the sizes and structural complexity of vegetation stands and the spatial distribution of plants aud animals within the planning area.

The presence of 17 major vegetation types indicates that the Modoc NF is a diverse forest spanning a wide range of environmental couditious. Vegetative richness is also reflected in the richness of animal species. The Forest supports more than 354 vertebrate species (EIS Appendix K). They include 25 species of amphibians and reptiles, 218 species of birds, 81 species of mammals, and 30 species of fish. Species richness has remained stable over the last 100 years, as a few species have been locally extirpated and a few others have been introduced.

All successional stages of trees are found on the Forest. On > 20 timberlands, over half the land has small- to medinm-sized timber (successional stages 2 and 3). Only one-third of the forested lands has old, large-diameter trees (successional stage 4a, 4b/c, and 4b/c-older). Animals that favor young, small-diameter timber stands, therefore, are more abundant than species that prefer older stands. Similarly, animals that favor open-canopied stands are more abundant overall than animals favoring

closed-canopied stands. On < 20 timberlands, open-canopied timber stands provide additional habitat in successional stages 3A and 4A.

## Current Management

NFMA states that national forests will "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives...." Furthermore, Forests should provide, where appropriate, "...for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan" (Section 6(g)(3)(B)).

In response to NFMA and subsequent regulations, diversity requirements were issued as Regional policy in 1980 to "...maintain a minimum of 5% of the land area occupied in each forest type in older mature stands exclusive of wilderness...."

Managing forest successional stages complements managing for a regulated forest under even-aged timber management. Maintaining 5% of the area in the old-growth stage, however, is difficult and controversial. Particularly in the eastside pine type, remaining old-growth stands supply the only significant harvestable volume.

Since 1980, addressing diversity in timber sale environmental assessments has become more common. But the decision to fully provide for vegetative diversity is still difficult. In some cases, existing old-growth habitat is retained, while in other cases, recruitment acres in the next lower successional stage is used as a substitute. Efforts are improving.

Providing old-growth habitat in eastside pine is the Forest's most serious problem. Of the suitable timberlands producing > 20 cubic feet per acre growth, only 6% of eastside pine remains in old growth. The amount of old growth is low in the eastside pine for several reasons. In the mid-to-late 1970's pine sold at high prices; $400 per MBF was common. In combination with easy access to pine stands, harvest was heavily concentrated in this type. Inappropriate use of overstory removal and sanitation/salvage treatments understocked many stands to where old-growth habitat was no longer present. Large fires also destroyed many eastside pine acres.

Mixed conifer and red fir still contain sufficient old growth, although distribution is inadequate in some parts of the Forest.

## 4. Energy

### Firewood

#### Introduction

This resource includes logging slash, sawmill and thinning residue, and non-industrial species of timber. Firewood is used primarily for home heating. It is typically harvested by commercial or private woodcutters, or removed from logging slash and cull decks, and is regulated through the issue of woodcutting permits.

#### Current Management

The Forest sells woodcutting permits to the highest bidders on sales of more than 25 cords. For sales of 10-25 cords, the Forest average for commercial sales of similar species is charged. Personal woodcutting permits are available for $5/cord, and are sold in 2-10 cord lots. Free-use permits are offered to encourage woodcutters to use downed culls and limbs from logging and thinning operations. All permits specify the species of wood to be cut and permissible cutting areas. Permits require woodcutters to check weather conditions (available on 24-hr recorded telephone messages) and to prevent fires and road damage. The Forest also uses permits to monitor firewood use. (See Firewood AMS.)

#### Supply

In total, 56,000 cords of firewood are available per year. Western juniper is the preferred species for firewood, easily accessible, and produces the most firewood in the area. Juniper reproduction is estimated at 18,000 cords per year. People who burn firewood also use ponderosa pine, red fir, white fir, lodgepole, and incense cedar. About 38,000 cords are available annually from logging slash and commercial thinning operations. This material will decay on the ground, however, and is worthless if not harvested within three years.

#### Demand

As the population increases, demand for firewood is also expected to increase. In 1980, the population of Modoc County was 8,600 people, and woodcutting permits were issued for 23,000 cords of firewood. By 2020, the population is expected to reach 13,000, and the demand for firewood could increase to 34,700 cords.

### Biomass

#### Introduction

Biomass is residue from logging and thinning operations. When biomass use is more economically attractive

than purchasing an outside power source, the timber purchaser will usually chip it at the site and transport it to the sawmill. There it is burned with sawmill residue for power generation.

**Current Management**

The use of biomass has been left to the discretion of timber purchasers or thinning contractors. Where economically advantageous, biomass has been processed on the site and transported to cogeneration plants, presently located in Beiber, Burney, Wendell and Westwood. Biomass haul trucks are subject to the same restrictions as log or water trucks during timber sales.

**Supply**

While the future demand of biomass is not known, the present supply will meet anticipated demand through the planning period.

**Demand**

The cogeneration plants have a combined capacity to burn 435,000 tons of biomass per year. While this is roughly equivalent to 400,000 cords, it also includes material not suitable for firewood.

# Geothermal

**Introduction**

Geothermal energy is harnessed by tapping superheated ground water. This water provides steam which drives turbines, thus generating electrical power for transmission. This resource is found in some areas where volcanic activity exists. Two potential geothermal areas have been identified on the Modoc: Glass Mountain in the Medicine Lake Highlands, and Lake City on the east side of the north Warner Mountains. (See Minerals AMS and Minerals discussion below for detail.)

**Current Management**

The Glass Mountain and Surprise Valley Lake City known geothermal resource areas (KGRAs) cover 151,000 acres. Surface effects of geothermal development are presently the responsibility of the Forest Service. Subsurface management falls under the jurisdiction of the Bureau of Land Management (BLM). As with hydroelectric projects, the Forest Service cooperates in mitigating surface disturbance of site development.

**Supply**

The Glass Mountain site has had extensive exploration performed. As a result of this exploration, the Glass Mountain KGRA has been declared suitable for geothermal development. Duration and volume of production is

currently being determined. Little exploratory work has been done on Forest lands in the Lake City KGRA. (See Minerals AMS and Minerals discussion below for detail.).

**Demand**

With the recent drop in oil prices, the search for alternative energy sources has slowed. However, as future energy demands and environmental concerns rise, geothermal energy undoubtedly will become a very attractive alternative.

# Oil and Gas

Oil and gas development means extracting hydrocarbons (liquid or gas form) beneath the earth's surface. This energy source is developed in a manner similar to geothermal energy.

**Current Management**

Currently, one 7,700-acre oil and gas lease exists on the Forest. The Forest is currently supplementing the existing environmental assessment for oil and gas leasing to include cumulative effects of commodity production. Five oil and gas leases totally approximately 28,000 acres are pending.

**Supply**

Information estimating the volume of hydrocarbon reserves within Forest boundaries is not currently available.

**Demand**

The Forest anticipates little or no demand for oil and gas.

# Hydroelectric

**Introduction**

Hydroelectricity is produced by falling water. Typically, water is stored in a reservoir or transmitted in a canal to a location where the water drives a turbine generator.

**Current Management**

No hydroelectric plants are currently in operation on the Forest. Applications for hydroelectric development are processed by the Federal Energy Regulatory Commission (FERC). The Forest Service provides FERC with measures to alleviate potential negative effects, issues use permits and rights-of-way for transmission lines, and conducts environmental analyses.

**Supply**

Feasibility studies indicate potential for future development on Pine Creek, Parsnip Creek, and South Fork Pit River (West Valley Reservoir). Powerhouses could be developed at these locations which could produce energy totalling 31.1 million kw per year. Energy consulting firms suggested two powerhouses for the Pine Creek location: a 1,000 kw plant capable of 8.6 million kw per year, and a 900 kw plant for 7.7 million kw per year. A 2,100 kw powerhouse at Parsnip Creek would yield 8.3 million kw per year. Powerhouses of 360 kw and 620 kw each at South Fork Pit River (West Valley Reservoir) together would produce 6.5 million kw per year.

**Demand**

With the recent drop in oil prices, the search for alternative energy sources has decreased. However, demand for small hydroelectric projects are expected to increase as the State's population increases and the price of energy rises.

---

# 5.  Facilities

Facilities support Forest management activities such as timber production and harvest, wildlife and range management, fire protection, recreation, and administration. Forest facilities include roads, trails, major stream crossings, utility transmission lines, buildings, dams, electronic sites, and a military defense installation. Each type is discussed separately.

## Roads

Access to the Modoc National Forest is provided by a system of federal, state and county highways. Forest Development Roads (FDR) are extensions of these highways, and provide access to and mobility within the Forest. Roads allow protection, management, use, and development of Forest resources on which local communities are dependent.

The FDR System consists of 3,178.4 miles. Integrated with the system are 270.8 miles of private roads.

The Forest maintains roads at the minimum level necessary for recreation, timber, administration, and adjacent area protection. Roads are assigned a management objective so they can be maintained at levels commensurate with these goals.

In the past, the Forest attempted to seasonally close some roads by signing, but with marginal success. By using seasonal road closures and traffic control, road maintenance has improved. While the Forest recognizes the importance of keeping areas open to firewood gatherers and dispersed recreation users, it is also concerned about road and resource damage, as well as wildlife issues. A road closure and off-highway vehicle plan will be initiated.

## Trails

The 118 miles of developed inventoried trails include 7 miles of National Recreation Trails, 79 miles of South Warner Wilderness Area trails, and 32 miles of other trails. In general, trails are maintained, but not all meet desired standards. Trails are discussed in the Recreation section of this chapter.

## Major Stream Crossings

The Forest has 14 road bridges, 5 trail bridges, and 63 other major structures consisting of culverts (>35 sq. ft. end area), and low water crossings. All of the structures require maintenance to protect the investment, provide safe crossings, and protect fisheries.

Additionally, Modoc County has 9 bridges, 3 culverts, and 1 low-water crossing. The Forest has cooperative agreements with the County to upgrade or maintain these structures as needed for timber hauling. Two bridges under the jurisdiction of the Bureau of Reclamation are closed and beyond repair.

Most structures crossing major streams are in place and are maintained or replaced for traffic safety and protection of the stream environment. Construction of additional stream crossings depends primarily on locations of future resource activities and their access needs.

## Utility Corridors

A north-south utility corridor on the Big Valley and Doublehead Ranger Districts contains 500-kv overhead power transmission lines and a buried natural gas transmission line. In November 1984, the Bonneville Power Administration constructed an additional 230-kv transmission line from Malin, Oregon, to Alturas, California. Designed to meet increased electrical demands from agricultural pumping, the transmission line is approximately 68 miles long, 50 miles of which are within the Forest boundary. In 1990, an additional 500-kv transmission line will be constructed on the Big Valley and Doublehead Ranger Districts parallel to the existing corridor.

## Buildings

On the Forest's 16 administrative sites are 156 structures. The government leases four administrative sites from private parties: Supervisor's Office, Warner Mountain District Office, Doublehead District Office, and Highway 299 Compound (2 buildings). Leasing requires less initial capital investment, but significantly increases annual costs. Constructing Forest-owned buildings or purchasing leased buildings would offer long-term savings. To minimize costs, the Forest will move from leased to government-owned buildings by the end of the 1st decade.

## Dams

One hundred forty-nine dams on the Forest were constructed for livestock, irrigation, and wildlife habitat reservoirs. One hundred twenty of these dams are owned by the Forest — 11 are covered by special use permits, and 18 are considered USDI easements. The Forest inspects and maintains 127 dams; the State inspects 19; and the U.S. Dept. of Interior inspects the remaining 3.

Dam maintenance prevents damage to streams and downstream structures such as culverts and other dams. The risk to life is very low, but moderate environmental damage could result if a dam failed. However, existing dams must be routinely inspected and maintained to protect investments and the stream environment.

## Electronic Sites

Electronic sites serve the Forest's telecommunications needs and those of commercial users in the area. Of the 35 existing electronic sites on or adjacent to the Forest, 31 are service-type low power sites (150 watts or less), and 4 are future electronic sites (AM, FM, microwave, TV, or radar stations). The Forest currently uses 28 sites for its telecommunication system while sharing 9 sites with commercial users under special-use permits.

Demand for service-type and broadcast station sites (AM, FM, TV, and radar stations) will increase. Because telecommunications companies, such as AT&T, MCI and SPRINT, are expanding their services, the Forest anticipates an increased demand for microwave electronic sites.

## Military Defense Installation

Under a special use permit, the U.S. Air Force constructed an Over-the-Horizon-Backscatter (OTHB/S)

defense radar site on the Doublehead Ranger District near Rimrock Lake which is south of Clear Lake. The radar system detects missiles and aircraft 1,500 miles from the site.

# 6. Fire and Fuels

## Fire History

The average number of annual recorded fires on the Forest has not changed significantly. From 1910 to 1979, more than 6,094 fires burned 705,334 acres of Forest. Twenty-three percent of these fires were caused by people, and 77% were started by lightning. In the last 25 years, the number of human-caused fires has decreased dramatically as a result of intensive public education programs, especially the Smokey Bear prevention effort.

Acreage burned has varied widely. From 1910 through 1969, an average of 9,607 acres burned annually. From 1970 through 1979, the average number of acres burned rose to 12,890, while the average annual acres burned decreased to 1,393 from 1980 to 1985. Cooler, moister weather than normal, as well as fewer lightning-caused fires, account for the dramatic drop in burned acres.

In 1977, a severe drought in the western United States set the stage for many holocausts which raged out of control in several areas of California. At this time, dry lightning bombarded the Modoc National Forest, starting numerous small fires which burned together causing large fires, notably the Gerig and Scarface Fires. Over 100,000 acres burned that year. Unusually large fires in 1973 and 1978 added many acres to the Forest's annual average number of acres burned.

The value of resources lost to fire during the 1970's averaged $2.1 million per year. Since 1975, timber volumes requiring salvage because of fire totalled 159 MMBF. Of this total, approximately 128 MMBF resulted from the Gerig and Scarface fires. Fire salvage volume from those fires represent about 25% of the programmed allowable harvest for the past decade.

## Current Management

The objective of fire management is to administer a program that is cost efficient commensurate with the values at risk.

The elements of fire management are prevention, detection, suppression, and fuels management.

**Prevention** — Prevention includes public contacts, law enforcement, building inspection, and patrols. Prevention has a low priority because the Forest averages 100 lightning fires and 15 person-caused fires annually.

**Detection** — Lookouts from the Forest Service and other agencies provide detection coverage. After lightning storms, Forest personnel conduct reconnaissance flights over areas which lookouts are unable to see.

**Suppression** — Suppression includes the customary firefighting activities with hand crews, engines, helitack, and retardant aircraft. With its own suppression forces, the Forest cooperates with the California Department of Forestry (CDF), Bureau of Land Management (BLM), Lava Beds National Monument (LBNM), and the Fish and Wildlife Service (FWS) to protect mutual boundaries for cost efficient fire suppression. In addition, local rural fire departments protect structures on some federal and State lands. Altogether, the Forest is responsible for protecting 1,805,069 acres.

**Big Sage Fire Management Unit (BSFMU)** — In 1980, the Forest developed the BSFMU. This 430,000-acre area on the Devil's Garden and Doublehead Ranger Districts is designed to save suppression costs and personnel for fires which threaten higher resource values.

Vegetation in the BSFMU is so sparse and the ground so rocky that fire does not easily spread, even under dry, windy conditions. Most fires in the BSFMU involve single juniper trees. The fire plan for the Unit allows lightning-caused fires to burn under a *confine, contain or control* strategy.

**Wilderness Fire Suppression** — Terrain, elevation, open vegetation patterns, and natural barriers are generally favorable to fire control. Currently, Forest policy requires immediate and aggressive suppression of all fires, regardless of location or cause. Where used, firelines are constructed without the use of mechanized equipment, unless the fire crosses firelines. At that time the Forest Supervisor may authorize the use of helicopters, chainsaws, and air tankers (retardant). The Regional Forester can approve the use of tractors. A recent amendment to fire management permits lightning-caused fires to play, as nearly as possible, their natural ecological role in wilderness. This direction may be included in the Wilderness Fire Management Plan which will be prepared after the Forest Plan is approved.

**Fuels Management** — Because of an aggressive suppression policy to extinguish all fires, much fuel has accumulated on the Forest floor. Activity fuels are created primarily from timber harvest or precommercial thinning. Natural fuels include grass, brush, downed dead limbs, needles, and leaves. Prescribed fire is an important fuels management tool for reducing hazards from fuel accumulations, improving wildlife habitat and range conditions, controlling undesirable vegetation, and improving seedbeds for natural regeneration.

## Future Fire Conditions and Opportunities

Only a slight increase in human-caused fires is expected because of increased public awareness and an historically low incidence of person-caused fires on the Forest. The historical trend of lightning-caused fires will probably continue with implications for future management problems if the current fire program is not maintained. Plantations established after large fires in the late 1970's represent a significant investment in dollars and future supply of timber. Fires in plantations burn through the crowns of young trees, producing fast-moving, high-intensity fires which are difficult to control. Even low-intensity fire causes significant damage to young trees. Combined with greater emphasis on even-aged timber management in the future, more acres of fire-susceptible plantations will pose serious protection problems for the Forest.

As stands on steeper terrain are harvested and more short-span cable loggings is undertaken, block burning will be a common fuel treatment. Block burning is technically and logistically demanding, and suitable burning days are limited. Yarding small fuels is an alternative to burning. As industry's demand for forest fuels as an energy source increases, use of timber slash for energy production would offer a significant cost savings for fuel treatment.

To better use fire as a resource tool, fire suppression strategies could be based on the objectives of each management area. Permitting unplanned ignitions to burn in the South Warner Wilderness above 8,000 feet could allow fire to fulfill its role in perpetuating natural ecosystems. Other management areas can also be evaluated for use of unplanned ignitions.

Forest managers could encourage firewood users to remove logging slash which would reduce the fire hazard from accumulated fuels. Prescribed burning could also be used more often to reduce fuels as well as to remove encroaching species from rangelands and limit competition for grasses and forbs. In this way, range ecologic condition would improve.

## 7. Firewood

Firewood is discussed in the *Energy* section of this chapter.

## 8. Geology

### Seismic Hazards

Although the Modoc National Forest is not situated in an area of high seismicity, numerous active and inactive faults lie within the boundaries of the Forest. Surprise Valley Fault, a normal fault, is one of two major faults which have affected the geomorphology of the Forest. There has been an estimated 5,000 feet of vertical displacement along this fault which is located on the eastern slopes of the Warner Mountain Range. The Likely Fault, the second major fault, is also a dip-slip movement fault from Howard's Gulch southeastward toward the Madeline Plains (Potter, 1988).

To minimize hazards associated with seismic activity, the Forest constructs permanent facilities away from active fault traces. During the planning phase of a project, the Forest can use the following opportunities summarized from Guidelines to Geologic/Seismic Reports No. 37 by the California Division of Mines and Geology:

– Establish the proximity of the site to known faults and epicenters.

– Review geologic conditions at or near the site that might indicate recent fault or seismic activity.

– After accumulating all data, determine potential hazards relative to the intended land use or development.

### Volcanic Hazards

Geologically, the Forest is composed predominantly of volcanic and associated sedimentary formations. Some volcanic material is less than 500 years old. In particular, the Medicine Lake Highlands in the northwest portion of the Forest has had at least three eruptive cycles in the last 1,500 years. The Highlands is a very broad shield cone in which the main vent has collapsed to form the present caldera. On the flanks of the volcano there are numerous parasitic cones and recent lava flows. The United States Geological Survey (USGS) has identified the Highlands as one of the four most probable sites in California where a volcanic eruption may occur.

The USGS indicates that an eruption of the Highlands would be similar to previous eruptions—comparatively non-catastrophic. Based on that assumption, some general hazards associated with such an eruption can be predicted. From a geologic perspective, the eruption would not be violent, but accompanied by gases and deposits of ash, pumice and cinders. Because of prevailing southwest winds, the deposits would probably fall near the Lava Beds National Monument. The amount of deposit could be 20-50 feet deep, depending on the distance from the source. Surface flows of hot molten lava and mud would not be extensive. As mud flows are ejected from a volcano, they pick up more water as they melt snow, slide through lakes, and eventually flow down existing drainages. Mud flows occurring as a result of an eruption in the Highlands would not be extensive because few drainages exist in the area.

### Landslide Hazards

Eighty-five percent of the Forest has a low-risk of slope movement, because of gentle slopes (less than 30%), stable parent material (volcanic bedrock), and a preponderance of cohesive soils. The remaining 15% has high risk slope movement. Areas of high risk are located on the eastern slopes of the Warner Mountain Range. The Forest Geologic Resource Inventory (GRI), scheduled for completion in FY 1992, will precisely identify these high-risk areas.

Because the risk of a landslide is low for most of the land, little monitoring is done. When slope failures do occur, prudent ground operations can virtually eliminate all adverse effects of slope movement.

If mass land movement occurred, associated resource damage would be expected. A landslide would degrade the water quality of adjacent streams, and timberland would be lost. The most costly effect would be loss of roads, which would temporarily prevent access to the slide area.

### Special Interest Areas

Modoc National Forest has set aside Burnt Lava Flow, Medicine Lake Glass Flow, and Glass Mountain Glass Flow as three Geological Special Interest Areas to preserve their undisturbed condition while providing educational, scientific, and recreational opportunities.

*Summary of the Analysis of the Management Situation*

## Groundwater

The Forest includes or directly affects at least 20 groundwater basins or recharge areas, or both, most of which are areas composed primarily of flat volcanic rocks. Aquifers (underground areas saturated with water) are generally more than 300 feet deep. Each groundwatershed has its own recharge area and basin. The Forest has 53 groundwater withdrawal sites comprised of 36 deep-water vertical wells and 17 horizontal, gravity wells. Water from these wells supports logging activities, road construction, and livestock. The Forest is developing a management scheme for well sites which will address user cost, unit responsibilities and future needs.

The Forest currently uses about 30 acre-feet of water per year for human needs, fire suppression, livestock, and road construction. As interest in geothermal development increases, so does the use of groundwater for exploratory activities.

Forest Service activities that could effect groundwater quality and quantity include removing large volumes of timber, withdrawing groundwater in the recharge areas, and using chemical pollutants.

If geothermal exploratory work continues at its present pace, current water sources within these areas will not adequately supply the needs for exploration. The Forest will require monitoring new sources of groundwater.

## Rock and Earth Construction Materials

The Forest's road aggregate program locates and develops new quarries within its boundaries, and monitors and re-evaluates existing quarries. Seventeen active rock quarries totalling over three million tons exist on the Forest. In addition to these sites, the Forest uses pit run materials such as gravel and cinders. While they do not have the durability of crushed aggregate, there is generally no crushing cost. Twelve cinder sites and one gravel site, totalling an additional one million tons of rock material, are available to the Forest. Tonnage available at each site varies because of quality and resource mitigating measures, such as visual and wildlife considerations.

Each year the Forest extracts an average of 15,000 tons of fill for road construction, and another 200-500 tons of rip-rap material for erosion protection on waterfowl nesting islands. Total annual use is less than 0.4% of the current supply of rock and pit run materials. Because of budget restrictions on road surface aggregate, and because the arterial-collector road system is near comple-

tion, the Forest will not require as much aggregate in the future. However, the Forest continues to surface and maintain roads, and protect resources in unstable land areas with aggregate materials.

As additional needs for rock and earth construction materials arise, the Forest has the opportunity to examine the economic benefits of using materials found in one source over another and to develop various methods of road surface replacement. The Forest can also analyze the effects of developing new sources of construction materials.

---

## 9. Lands

### Land Ownership

The Modoc National Forest is situated in the extreme northeastern portion of California. It encompasses 1,979,407 acres (Land Status 6/89) — 1,654,392 acres National Forest System lands and 325,015 acres private lands. Of the Forest lands, 2,762 acres are administered by other public agencies. The Lava Beds National Monument (administered by the National Park Service (NPS) but on national forest land) totals an additional 46,238 acres. The Forest lies within three counties: Siskiyou (8%), Lassen (9%), and Modoc (83%).

Land ownership adjustments on the Forest are guided by a Land Ownership Adjustment Plan which gives broad direction on the types of land acquired and the areas in which land should be acquired. The emphasis is on acquisition, with only general direction on disposal. The 1988 Plan assumes that exchange will be the method of adjustment. Future land adjustments will be guided by direction in the Forest Plan.

### Special Uses

The Forest has issued approximately 218 special use permits (affecting 26,082 acres) primarily for utilities, communications, water, transportation, and agriculture.

### Withdrawals

Various acts of Congress and Executive Orders authorize the Forest Service to withdraw land from mineral entry. Currently, 22,211 acres of Forest land are withdrawn for administrative or recreation sites, scenic road-

---

*Summary of the Analysis of the Management Situation*                    *3-13*

ways, special interest areas, research natural areas, and water development (Bureau of Reclamation projects).

The California Wilderness Act of 1984 increased the total South Warner Wilderness to approximately 70,385 acres. These areas are also withdrawn from mineral entry.

Forest lands could be withdrawn in the future to protect five electronic sites, nine recreation sites, and three special interest areas (EIS Appendix H).

## Landline Surveys

As of 1983, 122 miles of Forest property lines have been surveyed and marked; 1,755 miles still must be located. Of these, 658 miles of lines are not cost effective to survey; or lie adjacent to lands administered by other government agencies, along wilderness boundaries, or in areas where trespass is unlikely. This leaves 1,097 miles of line to survey.

## Rights-of-Way

The transportation system for the Forest is essentially complete. No major new routes are known or planned. Right-of-way acquisitions will be programmed for individual timber sales or other projects as needed. As of 1989, the Forest needed an additional 100 miles of rights-of-way so that the existing transportation system would fall under Forest Service jurisdiction. No public concerns have been identified, and none are anticipated.

# 10. Law Enforcement

## Introduction

The Forest is a land management agency with law enforcement responsibility authorized by the United State Code (USC) Title 16. The emphasis of law enforcement is preventing violations and protecting Forest users, employees, resources, and facilities. If employees or the general public do not comply with laws and regulations, lives may be threatened, resources damaged, or Forest work targets not completed. For example, human-caused or arson fires threaten all these values.

The Forest's major law enforcement problems are theft of timber, primarily firewood; cultural resource depredation; clandestine drug manufacturing; wildlife violations; vandalism to and theft of property; and

human-caused and arson fires.] located after 1955 (except block pumice) is considered a common variety and administered as a saleable mineral material.

# 11. Minerals

## Introduction

The geology of a forest contributes significantly to the amount of mineral activity that will occur within its boundaries. The Modoc National Forest is primarily composed of volcanic material which has low potential for most mineral occurrences except for geothermal and mineral materials used in construction trades.

## Current Management

Generally, mineral management depends on the types of mineral commodities present on the Forest. Minerals are classified into three categories:

- **Mineral Materials** — common minerals such as stone, gravel, cinders, and decorative rock.

- **Leasable** — oil, gas, geothermal, and other minerals on acquired lands without public domain status.

- **Locatable** — all metallic and non-metallic minerals, except common mineral material and leasable minerals.

Originally, the authority to manage the federal minerals estate belonged to the Secretary of the Interior. However, following various memoranda of understanding between the Secretaries of the Interior and Agriculture, and recent legislative acts; the Forest Service was given responsibility to manage minerals commodities and to regulate mineral prospecting and development on, and removal from, national forest lands.

Managing each category of mineral varies slightly. The Forest authorizes removing *mineral material* by issuing mineral material permits. However, mining activities associated with *locatable minerals* are authorized through an approved plan of operation which is originally submitted by a mining operator. Regarding *leasable minerals*, the Forest Service must identify lands which are available for leasing and prescribe resource protection measures for each lease. The Bureau of Land Management is responsible for issuing leases.

## Supply

### Minerals Materials

Cinders, aggregate, and decorative rock are the principal common variety minerals on the Forest. Seventeen active aggregate sources and twelve cinder pits are currently available for saleable minerals.

Most of the Forest is covered by basaltic lava flows. Some basalt is used as decorative stone. The most popular decorative stone is a thin-layered basalt, lightly covered with moss, which occurs nearly everywhere. The Forest does not have an accurate estimate of the volume of mineral material within the Forest boundaries. However, we anticipate that it is sufficient to meet project demands for both short- and long-term needs.

Regarding the geologic nature of volcanic rocks, the Forest provides opportunities for novices and experienced rock collecting enthusiasts. Items collected include obsidian needles, quartz crystals, petrified wood, and assorted gemstones. The Forest does not have an adequate inventory of the quantity of material available for rock collecting. However, we anticipate developing a management plan for rock hounding which may include estimates of available material.

The northern and eastern flanks of the Medicine Lake Highlands have deposits of pumice material that range from a few feet to more than 60 feet deep. Pumice is a common variety material, so classified as a result of the Common Varieties of Mineral Materials Act of 1947. Prior to the Act, pumice was considered a locatable mineral. The Act also provided a "grandfather clause" which allowed all valid existing pumice claims to be subject to the Mining Law of 1872, and would not become authorized under the Mineral Materials Act. Currently, all pumice activities operate under the 1872 General Mining Law.

### Leasable Minerals

#### Geothermal

The United States Geologic Survey (USGS) has identified most of the Forest as prospectively valuable for geothermal resources. Within the Forest boundary, two known geothermal resource areas exist. The Lake City-Surprise Valley KGRA is located on the eastern edge and includes approximately 1,880 acres on the Forest. No data of the total geothermal development within the KGRA has been published. In 1981, the Regional Forester signed a Decision Notice which allowed geothermal exploration activities within the KGRA. That Notice authorized the issuance of federal leases with certain lease stipulations. Those stipulations are less restrictive than the lease stipulations proposed in Appendix I of the Forest Plan. In addition to recommending leasing in the Lake City-Surprise Valley KGRA, the Decision Notice authorized similar geothermal activities within the Carey Reservoir area of the Big Valley Ranger District.

The Glass Mountain KGRA is located on the western edge of the Forest and covers approximately 161,000 acres, of which 69,300 are within the jurisdictional boundary of this Forest. The remaining acres are located on the Shasta-Trinity and Klamath National Forests. In 1981, the three forests recommended that the BLM issue competitive geothermal leases in the KGRA. The recommendation was based on an environmental assessment which analyzed impacts associated with geothermal exploration. In 1984, the three forests recommended issuing additional leases within an expanded KGRA. That recommendation was based on a supplementary environmental analysis of the original EA. The supplement analyzed impacts within the total KGRA for exploration and development. Mitigation measures and lease stipulations identified in the supplementary EA have been incorporated into the more comprehensive Forest Plan. Appendix I of the Forest Plan lists special stipulations for geothermal, oil and gas leasing.

After preliminary drillings, the potential for geothermal development at the Glass Mountain KGRA was estimated at more than 500 megawatts. However, subsequent drilling exploration reduced the estimate; but the exact potential has not yet been determined.

#### Oil and Gas

In 1982, the Regional Forester signed a Decision Notice recommending oil and gas leasing on approximately 876,000 acres within the Forest boundary. The recommendation was based on an environmental analysis which analyzed the impacts of only oil and gas exploration. The EA identified certain resource protection measures (i.e., stipulations) which should be included in any leases. Any future oil and gas leases will require additional analysis of impacts associated with oil and gas development.

### Locatable Minerals

The primary locatable mineral activity on the Forest is mining for lode gold, silver, copper, mercury, perlite, block pumice and gemstones. Prospecting for these commodities is based on past mining activities and the geologic setting of the Forest. We do not anticipate that any new minerals will be found in large quantities within the Forest boundary.

The known deposits of gold on the Forest are epithermal (shallow) (Cox, et al., 1986). Most mining activity has been confined to the Hayden Hill, Winters and High

Grade mining districts. Periodic drilling has been done in other areas of the Forest. However, as a result of these activities, the areas have generally been classified as having low potential for mineralization. No estimates of the quantity of available ore deposits within any of the three mining districts have been made. Currently, an open pit mine is proposed in the Hayden Hill area. The project, which includes removing approximately 43 million tons of ore, is located on BLM land adjacent to Forest Service land. At this time, no one has proposed expanding the project onto Forest Service lands.

Pumice and block pumice are mined on the northern flanks of the Medicine Lake Highlands. The pumice operation has been active for many years. The block pumice operation is currently under a mineral patent application to the BLM. No known estimates of reserves of either block pumice or pumice in the Medicine Lake Highlands are available.

## Demand

### Mineral Materials

The greatest increase in demand for mineral materials will be for road surfacing cinders and decorative rock. Federal, State, and county agencies are the primary users of these minerals. From 1981 to 1985, about 67,000 tons of cinders were removed annually. Demand for road surfacing material will probably increase 10-20% over the next five years, because (1) other mineral development will require access; (2) new road surfacing will be required to accommodate a growing population in the rural areas of Modoc, Lassen and Siskiyou Counties; (3) existing roads will continually require maintenance; and (4) in-service access needs will continue.

Demand for decorative rock will also increase as the population grows. Because the Forest has large amounts of basaltic material, it should easily meet the increased demand for this commodity. As demand for this commodity warrants, locations will be analyzed on a case-by-case basis.

### Leasable Minerals

Of the leasable minerals, geothermal energy will command the greatest interest in the next ten years. Currently, 31 geothermal leases encompass 49,410 acres. During the last few years, exploration activities (both in type and amount) have significantly increased in the Glass Mountain KGRA. As a result, one of the exploration wells has been declared a production well. We anticipate that development will occur within the next five years. Further exploration drilling and testing will establish the extent and intensity of the development.

In addition to the leases at the Glass Mountain KGRA, there is a lease at the Lake City-Surprise Valley KGRA. No exploration activity has been associated with this lease within the last five years.

Besides geothermal interest, the Forest has one oil and gas lease encompassing approximately 7,700 acres. Five oil and gas lease applications have been filed with the BLM. Applicants are requesting oil and gas leases on approximately 28,000 acres of Modoc National Forest lands.

### Locatable Minerals

As of March 1990, approximately 530 active mining claims had been filed. Demand for gold, the primary locatable mineral, will probably increase over the next five years, depending on national and local demand.

In 1989, Lassen Gold Mining, Incorporated, a subsidiary of Amax Corporation, Incorporated, submitted a plan of operation for an open pit gold/silver mine in the Hayden Hill area. The site is located primarily on BLM lands which are adjacent to Forest Service lands. At this time, we have no indication that expansion of the pit will adversely impact Forest Service lands.

Pumice has been mined periodically from the Medicine Lake area. In conjunction with the pumice mine, block pumice has been mined for the last six years. In addition to pumice mining, operators have removed perlite from the area. While the volume of perlite being mined is currently small, if perlite is used as a substitute for asbestos, the volume of material removed may significantly increase.

### Critical Minerals

Critical minerals are those needed to supply military, industrial, and essential civilian needs of the United States during a national emergency. Copper is the only critical mineral on the Forest in this category; demand for it from this Forest is insignificant.

### Potential for Development

Forest managers are dependent on the private sector for information regarding locatable and leasable minerals. Most conclusions are based on environmental or geologic setting, and input from industry. Areas were rated from high to low according to their potential for mineral development. If no information was available, the area's potential was rated as unknown.

The Medicine Lake Highlands have a high potential for geothermal development. Withdrawal of the South Warner Wilderness has little effect on the mineral industry. In a recent USGS inventory of potential mineral

development in the Wilderness, the agency found few occurrences of mineral resources (Duffield and Weldin 1984).

---

# 12. Pests

## Introduction

Pests are diseases, insects, animals, and noxious weeds which adversely affect vegetation, land productivity, structures, and occasionally human health. Diseases, insects, and animal damage can cause tree mortality, or reduced growth, wood quality, and seed production. Rodent populations in developed recreational areas can cause significant structural damage. They also endanger human health if they carry diseases such as bubonic plague or rabies. Predation by animals, such as coyotes, result in livestock losses, while noxious weeds can reduce productivity of rangelands and pastures. By defoliating large acreages of bitterbrush, tent caterpillers can reduce available forage and eliminate bitterbrush from the area.

The effects of pests and diseases in an ecosystem are usually the result of a pest complex rather than the action of a single organism. As an example, common complexes in forests include dwarf mistletoe/bark beetles and root disease/bark beetles. Complexes also involve the host and stand conditions, environmental influences, pest population, and effects of management activities.

## Integrated Pest Management (IPM)

While no forest or rangeland pest can be fully controlled, their effects can be prevented or reduced. The overall approach is called Integrated Pest Management (IPM), which recognizes interrelationships of the pest-host system. IPM also recognizes that insects, diseases, and destructive animals are important elements of forest and rangeland ecosystems, and are considered pests only when they interfere with the attainment of management goals and objectives.

The IPM approach emphasizes the integration of pest management activities (prevention, surveillance, detection, evaluation, suppression and monitoring) with resource management planning and decision making. Pest information is considered, for example, in developing and implementing silvicultural prescriptions.

The goal of IPM is to prevent or reduce pest-related damage considered unacceptable because of its negative impact on resource management objectives. In selecting pest management methods, all techniques, including chemical, biological, mechanical, manual and cultural, are considered on a case-by-case, project level basis. Methods are selected according to site-specific analyses of biological effectiveness, cost, and effects on human health and the environment.

## Noxious Weeds

Noxious weeds include species which have been inadvertently introduced and grow out of their natural habitat. Since they have little or no food value for wild or domestic animals they can reduce site productivity of rangelands, farmland, and pastures. Many are allelopathic, that is, they can inhibit growth of other plants in their area of influence through a build-up of toxins in the soil. In the past the Forest and counties have cooperated in treating noxious weeds, generally herbicide applications. Noxious weeds which occur on the Forest are puncture vines, Mediterranean sage, dyer's woad, dalmation toadflax, Scotch thistle, sweet clover, Klamath weed, squarerose knapweed, plumeless thistle, poison hemlock, yellow star thistle, and Russian knapweed.

---

# 13. Range

## Introduction

The range management program on the Forest is important to local and adjacent livestock industries because of forage provided for their animals. This Forest provides 122,500 animal unit months (AUMs) for livestock, which is 23% of the permitted livestock forage produced in the Region, and ranks first among 18 national forests in California.

Wild horses depend on rangelands for forage and habitat. Under the Wild Horses and Burros Act, the Forest is legally obligated to manage horses within a 258,000-acre wild horse territory. The Forest's rangelands also provide forage for wildlife, primarily deer and pronghorn. Eight deer herds and five pronghorn herds use part or all of the Forest for habitat.

Approximately 1.0 million acres (63%) of the Forest's 1.6 million acres is rangeland, of which 90% is suitable for grazing. Ten percent is unsuitable for grazing because of steep slopes, inaccessible dense timber, and lack of forage. An additional 200,000 acres of timberland growing less than 20 cubic feet per acre per year (less than 20

*Summary of the Analysis of the Management Situation*

timberlands) is also discussed as part of the permanent rangeland. Less than 20 timberlands provide long-term forage production because the timber stands have open canopies.

The Forest is broadly divided into permanent rangeland and transitory rangeland. Under proper livestock management, permanent rangeland can perpetually produce forage. Transitory rangeland produces palatable forage for a limited time following timber harvests and fires.

## Current Management

### Livestock Management

To manage rangeland vegetation, the Forest is divided into 84 grazing allotments. Allotment boundaries are determined by natural features, land ownership, and historic use. Sixty-six allotments are permitted for cattle, 15 for sheep, and three for dual use by cattle and sheep. Over 119 term permittees depend on using the allotments to graze their livestock primarily from late spring to early fall. Consequently, permittees can grow and cut hay on their home ranches for winter feeding.

To achieve vegetation management objectives through livestock grazing, allotments are managed at various levels of intensity (Appendix O).

### Rangeland Condition

Rangelands in satisfactory ecological condition provide a diversity of herbaceous, shrub, and forest vegetation; and produce forage for livestock, wildlife, and wild horse herds. The vegetation management objective is to produce desired expressions of these vegetative components according to site potential and resource needs.

Ecological condition is satisfactory if current range condition is good to excellent with static trend, or fair with static or upward trend. Ranges are in unsatisfactory ecological condition if current range conditions are poor or very poor with static or downward trend. Most of the Forest's permanent rangelands are in satisfactory ecological condition: 120,000 acres are in good to excellent range condition, while 462,000 acres are in fair range condition. About 342,000 acres are in unsatisfactory eco-

logical condition. The amount of forage available on these areas is limited. Generally, less forage is produced from rangelands in unsatisfactory range condition. However, trend is generally static to upward.

Unsatisfactory ecological conditions have resulted from improper grazing practices, including overstocking livestock, wildlife, and wild horses; lack of uniform livestock distribution and forage utilization; and extensive encroachment by juniper stands due to historic grazing practices and suppression of natural fires[1]. All factors combined to reduce forage production on these sites.

To achieve vegetation management objectives through livestock grazing, the Forest develops and implements allotment management plans (AMPs). The AMP planning process identifies resource concerns, establishes vegetation management objectives, and designs strategies to correct concerns and accomplish objectives. Management tools include:

– implementing improved grazing strategies;

– fencing to prevent livestock drifting from adjacent allotments or to create pasture systems;

– developing stock watering areas to disperse livestock more evenly and provide better forage utilization.

– rejuvenating decadent brush, or removing juniper with prescribed fire or herbicides;

– cutting firewood to remove juniper; and

– adjusting permitted livestock numbers and grazing seasons as appropriate.

### Wild and Free-Roaming Horses

Wild horses have freely roamed the Forest since settlement days. For many people, they are living symbols of the Old West. With the passage of the Wild Horses and Burros Act, forests are directed to ensure the animals' well-being. More specifically, the Forest is charged with maintaining ecologically balanced habitat in areas on national forest land which wild and free-roaming horses inhabit.

The Forest has one wild horse territory of about 258,000 acres located on portions of the Doublehead and Devil's Garden Ranger Districts. Fulfilling requirements of the Act, the Forest prepared the Wild Horse Manage-

---

[1] In the young stage of growth, juniper is not fire tolerant and thins out during natural fires. However, when fires are suppressed and juniper is allowed to grow, fire has little chance of destroying it. Juniper spreads over an area, closes the canopy, and eventually prevents forage growth. The greatest loss of forage production occurs where juniper has encroached on better sites.

ment Plan in 1985, which identifies a population objective of 275-335 animals to manage. To determine population objectives, the Forest considered the animals' forage and habitat requirements, wildlife and other multiple-use needs, and range conditions. Many areas within the wild horse territory are in unsatisfactory ecological condition (poor range condition). These areas are being analyzed for improvement opportunities through the allotment management planning process.

**Cooperative Approaches to Grazing Management**

The Forest uses several cooperative approaches to grazing management:

- cooperative management agreements with the Bureau of Land Management;

- coordinated resource management planning process (CRMP); and

- the Modoc/Washoe Experimental Stewardship Program.

A cooperative management agreement with BLM provides administration authority for specific allotments whose logical geographic boundaries are not reflected in administrative boundary lines. The agreement facilitates allotment management where minor portions of BLM or national forest land are included within either agencies' allotment boundaries.

The coordinated resource management planning process (CRMP) involves all parties interested in a particular allotment's management. Recent examples of allotment management planning using the CRMP process involved the Ash Valley and Oxendine Allotments on the Big Valley Ranger District. Parties who were interested in resource management or potentially affected by a change in grazing management came together to identify resource issues, develop alternatives, and recommend management strategy to resolve their concerns.

Another cooperative approach to grazing management is the Modoc/Washoe Experimental Stewardship Program (ESP). Established on the Forest in April 1980, the ESP is administered jointly by the Susanville District of BLM and the Modoc NF. The objectives of the program, as mandated in Section 12 of the Public Rangelands Improvement Act of October 25, 1978, are to *"...develop and implement, on an experimental basis..., a program which provides incentives to, or rewards for, the holders of grazing permits whose Stewardship results in an improved range condition...cooperation and coordination between Federal and State agencies and with local private range users."* The ESP area totals 2.25 million acres of private and federal lands in California and Nevada, including all 350,000 acres of the Warner Mountain Ranger

District. Like CRMP, ESP is a cooperative process for resolving on-the-ground resource problems.

## Supply

Forage available within allotments is about 149,000 AUMs. An AUM is 1,000 pounds of air-dried forage needed to support one cow for one month. Of this estimate, 122,500 AUMs are available to livestock, 4,400 AUMs to wild horses, and the remaining 22,100 AUMs to wildlife. Forage needs for wildlife (primarily deer and pronghorn) were not considered in the original stocking assessments and the 22,100 AUMs remaining for wildlife represent only 67% of the current forage needs.

The Forest issues permits allowing livestock to graze on allotments. Numbers of livestock permitted on each allotment is determined in allotment management plans. In 1984, 26,632 cattle, 20 domestic horses, 305 wild horses, and 24,913 sheep were permitted to graze the Forest, for a total of 122,500 AUMs. This figure differs from the permitted value of 153,975 AUMs reported by the Forest in 1984, because term and temporary permitted numbers were counted twice.

Actual use differs from permitted use on an annual basis depending on economics, weather conditions, marketing conditions, etc. In 1984, actual use was 115,204 AUMs.

## Demand

Although President Theodore Roosevelt created the Warner Mountain and Modoc Forest Reserves in 1904, demand for livestock forage began in the early 1860's and continues today. Demand for forage comes from the local livestock industry in communities surrounding the Forest.

Livestock grazing has been a primary use of the Forest since its inception. Forest grazing records show an increase in permitted numbers from 1910 to the early 1920's. The numbers then remained relatively constant into the mid-1930's when they began to drop. Even as late as 1939, the Forest permitted 270,000 AUMs, more than double the current permitted use. Grazing remained heavy throughout the Depression and World War II with a 5-year average high of 168,000 permitted AUMs in 1945. After the war, livestock numbers were reduced, and reduced further in the 1960's when cheatgrass invasion on rangelands became extensive.

Actual use has been less than permitted use over the past decade largely because the demand for beef has

decreased. Normally, one would expect demand to increase as the population increases. However, demand for beef has decreased since the mid-1970's, because of consumer preferences, substitutes, etc. Lower real (inflation-adjusted) beef prices are the result of increased beef supplies and decreased demand. Lower beef prices have forced many ranchers to scale down their operations or go out of business altogether. Consequently, demand for forage on the Forest has declined.

The demand analysis for livestock grazing on the Forest involves three important factors: forage consumption, forage value, and the dependency of livestock growers on national forest lands. The historical livestock forage consumption pattern provides a way to estimate upper limits for future forage consumption. The price of forage helps reveal the economic value of forage to the local livestock growers and establishes a range investment level that is economically justifiable for the Forest. Dependency shows the importance of the forage to the local livestock growers by estimating how much of the total livestock feed is obtained on the Forest.

## Opportunities

Opportunities exist to improve rangeland vegetation and its management. This will depend primarily on four factors: 1) cost-effectiveness of implementing allotment management practices; 2) coordination with other resources such as timber, wildlife, watershed, and fire management; 3) coordination with the livestock permittees; and 4) stability of the livestock industry.

Opportunities exist for increasing forage production on the Forest, primarily on permanent rangelands. Although shallow soils and low precipitation produce low forage yields, better livestock distribution combined with improved grazing strategies, and structural and non-structural improvements could increase forage production available for use.

To achieve vegetation management objectives through livestock grazing, the Forest encourages developing and implementing allotment management plans. In addition to applying appropriate grazing strategies, developing water sources to disperse livestock, and fencing to protect sensitive areas will improve forage production over time.

Non-structural improvements can rapidly increase forage production. Prescribed fires and herbicides remove competing juniper, rejuvenate some species of decadent brush, and stimulate growth of herbaceous material. Firewood cutting projects also reduce juniper competition and boost forage production. Type conver-

sions or seeding projects on more productive sites can yield abundant forage.

Transitory range contributes 18% (or 38% when < 20 timberlands are included) of the forage base. In the future, poorly stocked stands now providing 100-200 pounds per acre will be clearcut and planted to well-stocked stands. In addition, site preparation prior to tree planting and release treatments will reduce the amount of palatable shrubs, forbs and grasses. In those allotments heavily dependent on transitory range, modified site preparation methods could be tested. Those methods include single-pass disking, masticating and broadcast burning, light brushraking and burning, windrow piling and burning, and light herbicide applications. Using intermediate harvests to maintain an open stand condition would also maintain production of palatable forage although timber volumes could be reduced over time.

# 14. Recreation

## Introduction

The Modoc National Forest is best known for its remote location and uncrowded recreation opportunities. Most visitors enjoy hunting, fishing, and camping, while others delight in touring, hiking, horseback riding, swimming, picnicking, and gathering firewood. These activities are enhanced by the abundance of wildlife, variety of landscape settings, and uncrowded conditions. National Forest recreation is divided into three categories: developed, dispersed, and wilderness. This section discusses developed and dispersed recreation. The Wilderness section of this chapter discusses wilderness recreation.

In 1981, total recreation use on the Forest was 377,400 recreation visitor days (RVDs) and wildlife and fish user days (WFUDs).

## Developed Recreation

Developed recreation sites are managed by the Forest Service or the private sector, and amounts to less than 20% of the total recreation use. The average for other forests in the region is 42%. Use on the Modoc is lower because of less private development, and the popularity of dispersed activities such as hunting and fishing.

**Public:** The Forest has 20 developed campgrounds, two picnic sites, two boat ramps, and a swimming beach.

Camping is the major activity, representing more than 80% of the developed use. Most of the use is concentrated at Blue Lake, Mill Creek, and Medicine Lake, which are large camping areas on the Forest. Blue Lake Campground and the 3 campgrounds at Medicine Lake are fee sites, all others have no charge. A total of 198 acres are developed.

Since 1983, all sites have been managed at the low standard level. At the low standard level, Forest personnel maintain campgrounds and provide signing, but generally do not collect trash, and may not furnish potable drinking water. While some campgrounds are well kept, most could be improved by increased maintenance, or reconstruction. Most structures, such as toilets, are in good condition due to little vandalism, compared to other forests in the Region. However, few are accessible to the handicapped.

Recreation supply is affected by the number of people developed sites can accommodate. The Forest provides a practical capacity of 165,000 RVDs. Practical capacity is 40% of theoretical capacity (all sites occupied for 100% of the time, all season long). Use levels between 50% and 100% of practical capacity are considered ideal (83,000-165,000 RVDs). Use at less than 50% is inefficient, while use of 100% will not maintain a quality recreation experience, prevent resource damage, and allow for peak use periods. Although use on the Forest as a whole is within this optimum range, sites at Lily Lake, Cave Lake, and Plum Valley receive well over 100% use.

The demand factors of population growth, past recreation use trends, disposable income, leisure time, and available energy supplies were considered in predicting future recreation use. Overall developed recreation use is projected to rise from the current 50% of practical capacity (86,000 RVDs) to 80% (131,000 RVDs) by the year 2010. At this level, use at many popular campgrounds will exceed capacity. Expansion of these sites prior to overuse is desirable. Use at Medicine Lake is expected to increase faster because of recent road improvements, unique opportunities, and displaced use from the Shasta-Trinity National Forest. If less popular, small campgrounds are closed to improve overall efficiency, demand at remaining sites will increase proportionately, while overall capacity is reduced. This will hasten the need for expansion. Additional recreational opportunities are available at reservoir sites on the Devil's Garden District as the need and demand arise.

Private: Recreation use at privately managed sites accounted for about 5% of the developed recreation use in 1981. The private sector manages three developments for public use: a youth camp at Blue Lake, a pack station at Pepperdine, and a ski hill at Cedar Pass. Three recreation residences are located at Medicine Lake and four at Blue Lake. All privately managed sites are managed by special use permit. Cedar Pass Ski Hill is currently being upgraded from a single rope tow to a T-bar.

The practical capacity of all private facilities is 11,800 RVDs. Blue Lake Youth Camp receives the most use of the private facilities, at 72% of its capacity (2500 RVDs). Cedar Pass Ski Hill has the largest seasonal capacity at 4,240 RVDs, but has only used about 25% of it in the past. At 42 acres, it can accommodate 100 skiers at one time.

During the next few decades, use at these private facilities is not expected to increase significantly. Current improvements at Cedar Pass Ski Area should adequately accommodate local demand into the next century.

## Dispersed Recreation

More than 80% of the recreation use on the Forest occurs in dispersed areas (areas that are not developed for intensive recreation use). Big game hunting and driving for pleasure are the major dispersed recreation activities. From 1977 to 1981, an average of 17,000 deer hunters per year visited the Forest. Visitors who enjoy "getting away from it all" have ample opportunity to do so. Primitive roads access vast areas where it is possible to experience nature for days without seeing other humans. However, one may see wild horses, bald eagles, osprey, antelope (pronghorn), redband trout, and other more common varieties of wildlife. The Forest has no designated wild and scenic rivers (Appendix T).

Dispersed area management has always been at or below the low standard level, except during deer hunting season. At that time, visitor contacts increase and trash is collected. The Forest often gives popular dispersed recreation sites special consideration to retain their values during other resource management activities such as timber sales.

Trails: The current trail inventory for the Forest includes 118 miles of trails, 79 miles of which are in the South Warner Wilderness.

The Forest has two National Recreation Trails (NRT). The Highgrade Trail traverses an historical gold mining area in the North Warner Mountains. Use is light, but plans to interpret its historical values may increase use. The Blue Lake Trail circles Blue Lake in the South Warners. It receives moderate use which is generated by the nearby developed sites.

Off-highway Vehicles (OHVs): This Forest has more land available to OHVs than any forest in the Region.

Ninety-four percent of the land is open to OHV use, and flat to gently sloped topography allows easy access. In addition to cross-country travel, more than 1,000 miles of primitive roads provide challenging routes. Gathering firewood and hunting are the primary activities associated with OHV use. People are creating additional trails to access firewood areas. Although past use has not been significant, some resource damage is occurring. Even if large areas of the Forest are closed to OHV use in the future, outstanding OHV opportunities will still be available. In developing its OHV plan, the Forest will coordinate with the State OHV plan.

**Demand:** Consumptive recreation activities such as big game hunting, fishing, and firewood gathering are affected by availability of the resource. Availability is dependent on how the resources are managed. Competition among users for a limited resource will probably increase as use increases in the future. Some opportunities that are taken for granted now, will not be readily available in the future. Demand for most dispersed recreation activities can easily be met for the next fifty years, although some popular locations will experience overuse. To prevent resource damage, the Forest can develop the sites or apply restrictions for use. New opportunities can be made available by constructing trails or roads. Information services can inform the public of opportunities and distribute use, thereby preventing overuse at specific places.

## Recreation Opportunity Spectrum

In 1980, the Forest conducted a Recreation Opportunity Spectrum (ROS) inventory to identify recreation opportunities on the Forest. The ROS inventory evaluated all land and water areas by their physical, social, and managerial settings. The six main ROS classes are: primitive, semi-primitive non-motorized, semi-primitive motorized, roaded natural, rural, and urban (Appendix K of the Forest Plan).

Sixty-one percent of the Forest land base is classified as roaded natural (RN), and 27% is classified as semiprimitive non-motorized (SPNM). SPNM land is characterized by a predominantly natural environment and no roaded access. Many of these areas have primitive roads or vehicle trails. They were included in the SPNM category because the roads are not Forest system roads and were not actually constructed. They are wheel tracks worn by repeated use. Eleven percent of the Forest is classified as semi-primitive motorized (SPM). These areas are accessible by more permanent primitive roads. Several isolated areas (1%) meet the small size criterion for rural ROS class. No areas, including the South

Warner Wilderness, are categorized as primitive (P), because such areas must be at least three miles from roads and a minimum of 5,000 acres.

Roaded natural areas receive 79% and semi-primitive motorized areas receive 12% of the recreation use because the most popular activities are associated with vehicles (camping, hunting, fishing, driving for pleasure, picnicking and gathering forest products). The main activities in semi-primitive non-motorized areas are hunting, fishing and picnicking, which account for 9% of the total dispersed recreation use.

**Demand:** Each of the three main ROS classes currently receives less than 12% of its recreation capacity. If acres within each of these ROS classes remain the same throughout the planning period, by 2030 use will not exceed 18% of capacity (568,000 RVDs). If the acreage is significantly reduced, then projected use could exceed capacity. This is more likely to occur in SPNM areas outside the Wilderness than in any other ROS class. Activities that will cause a shift from SPNM toward SPM and RN include timber harvest, road building, utility developments, mining, etc.

Since no primitive class exists on the Forest, future demand for this setting must be met elsewhere. However, the South Warner Wilderness (which is SPNM) can be managed to provide primitive opportunities satisfying some of the demand. Future demand for rural and urban recreation settings can be met by opportunities outside the National Forest.

## Opportunities

The Forest has opportunities to improve many areas of recreation, including management, interpretive programs, developed sites, winter sports, trail networks, and off-highway vehicle use. The unique resources, low use, and relatively undeveloped state of the Forest create an opportunity to avoid many of the problems that exist elsewhere.

**Management:** The Forest can develop a cooperative program for northeastern California which would provide the public outstanding recreation experiences. This corner of the State is dominated by the Modoc National Forest, but has lands managed by many federal and State agencies. The Bureau of Land Management (BLM), Lava Beds National Monument, Lower Klamath/Tule Lake/Modoc National Wildlife Refuges, the State of California, Bureau of Reclamation, and other agencies are all involved in recreation management. A cooperative effort could improve efficiency, increase the quality and

quantity of recreation opportunities, and provide for scenic byway development.

Maintaining semi-primitive environments will insure that many existing unique opportunities are available in the future. Future overuse of the Wilderness can be reduced by sustaining the semi-primitive character of other lands, and encouraging visitors to use them.

**Interpretive Services:** Maps, publications, signs, and programs could be used more extensively. These services are important tools for the management of dispersed recreation, and they increase visitor satisfaction. Self-guided tours and opportunity guides are very cost effective.

**Developed Sites:** Many campgrounds could be rehabilitated to accommodate new types of recreation vehicles, correct or prevent resource damage, and replace worn out facilities. Operation and maintenance costs would decrease as visitor satisfaction would increase. Heavily used sites could be expanded and new sites could be developed where increased capacity is needed. To reduce expenses, less popular sites could be maintained by volunteers or closed. Larger campgrounds could be run by private concession operators.

**Winter Sports:** The Medicine Lake Highlands and Cedar Pass area could be developed to increase opportunities for winter sports. Parking areas, signed snowmobile and cross-country ski trails, and sanitation facilities would be needed.

**Trail Network:** Unique geologic features of the Medicine Lake area and the difficulty of cross-country travel offer opportunities for interpretation and trail development. The Highgrade area offers similar potential for a trail system which interprets the historic mining activities that occurred in the North Warners. Linking the Highgrade NRT with the South Warner Wilderness trail system would increase opportunities on the Forest for long-distance trail users, and would provide an extension and destination point for the Oregon trail network.

**Off-highway Vehicle Use:** The existing primitive road system provides an opportunity to identify and sign special routes. Self-guided tours with interpretation of resources along these routes will attract users who might otherwise cause resource damage by driving cross-country.

# 15. Research Natural Areas

## Introduction

Research Natural Areas (RNAs) are typical and distinctive natural ecosystems and habitats that are generally retained in an unmodified condition. They provide unique opportunities for scientific research on plant and animal communities and associations in environments free of human intervention. RNAs provide a baseline for comparison with ecosystems that have been disturbed. They also serve as gene pools and preserve endangered natural components of our environment.

To contribute to the national network of RNAs, the Pacific Southwest Region developed a system to preserve representative botanical types in California. The Devil's Garden RNA meets the requirements for a representative western juniper stand in the Modoc Plateau Physiographic Province.

The Forest nominated a potential RNA in the Warner Mountains which is within the North Basin Range Province. The Regional RNA Committee studies the nomination and subsequently approves the RNA as either a candidate or recommended area, or drops the RNA from further consideration. Before a candidate area is recommended, it is evaluated with other candidates to determine the best RNA. After the Regional Forester's concurrence, an ecological survey report and an establishment report/environmental assessment is completed before classification as an RNA can be recommended to and approved by the Chief.

## Devil's Garden Research Natural Area

### Description

The Devil's Garden RNA consists of open stands of western juniper in association with sagebrush, bitterbrush, rabbitbrush, bunchgrasses, and annuals on an expansive plateau littered with volcanic rock. This dry, rocky woodland provides forage for pronghorn, deer and wild horses. Because the RNA is not fenced, cattle are not excluded; but grazing by wildlife and livestock is limited by water shortage.

*Polygonum polygaloides* spp. *esotericum*, a Regional Forest designated sensitive plant, is known to grow in the Devil's Garden RNA (Keeler-Wolf 1983; Wheeler 1936).

### Opportunities

The Devil's Garden RNA could be fenced to exclude livestock and wild horses, and signed to warn firewood

users not to damage the natural ecosystem set aside for study. The RNA has been proposed as a National Natural Landmark by the NPS. More information is needed to determine NNL status.

### Raider Basin

Raider Basin, nominated by the Forest as a potential RNA, lies within the North Basin Range Ecological Province. Approximately 25% of this 6,481-acre basin in the South Warner Wilderness is composed of pristine white fir forest. Ranging from 5,000 to 8,800 feet, the area is largely undisturbed by fire, grazing, or logging. California bighorn sheep were reintroduced into the Basin in 1980. Wilderness campsites and trails are used by backpackers and hunters in the summer and fall. Sensitive plant populations have been observed in adjacent areas, but not in the Basin itself. Opportunities exist for research studies of old-growth white fir, forest succession, forest structure, and wildlife habitat.

---

## 16. Riparian Areas

### Current Conditions

Riparian areas are found on almost 19,000 acres (1.2%) of the Forest, adjacent to streams (13,473 acres), springs and seeps (2,803 acres), lakes (122 acres), and in wet meadows (2,583 acres). There are 552 miles of streams containing riparian habitat.

In the past, logging practices, road construction, and improper grazing practices contributed to riparian area degradation. Forest riparian areas generally lack desired vegetation expressions to achieve overall management objectives.

### Current Management

Riparian area policy directs forests:

– to recognize the value of riparian areas during planning and when implementing management activities;

– to give preferential consideration to riparian area dependent resources over other resources in cases of unresolvable conflict; and

– to manage riparian areas under the principles of multiple use and sustained yield while emphasizing protection of soil, water, vegetation, and fish and wildlife resources.

The Forest riparian inventory was based on a 100-foot zone, but is actually managed by variable width Streamside Management Zones (SMZs). The widths of SMZs, which include an upslope distance of 50-250 feet plus channel width, depend on stream class and slide slope gradient. The variable width SMZ is always increased by several feet to exceed the actual width of riparian vegetation to protect it with additional filtering. When the table SMZ width does not encompass the riparian vegetation, the width is increased during project planning (Appendix M of the Forest Plan).

Adverse affects to riparian areas from recreation use and fire suppression on the Forest are few. Management of riparian areas relative to these activities is minimal. Past logging practices and improper grazing strategies have had the most impact on riparian areas. Managing riparian areas to prevent or decrease degradation by these activities is more extensive now than in the past.

**Wetlands:** Currently, 233 wetlands cover 35,000 acres of the Forest. They provide important nesting, resting and holding areas for migrating waterfowl and shorebirds; habitat for fish; and forage for wildlife and domestic livestock.

**Timber:** On-the-ground implementation of Best Management Practices (BMPs) and Forest-wide Standards and Guidelines (S&Gs) is ensured by timber sale administrators with the assistance of a watershed specialist when necessary. Timber sale contracts are the instruments through which sale administrators implement BMPs and S&Gs. Past timber harvesting within streamside management zones removed shade vegetation which increased thermal radiation and, in turn, raised water temperatures. As funding becomes available, these problems are corrected. Efforts are also made to correct careless road maintenance and blading which causes sedimentation in adjacent streams.

**Grazing:** With improper management, livestock often graze riparian areas heavily, especially in late summer and fall when little green forage exists elsewhere. Consequently, some uplands are underutilized. Two methods are used extensively on the Forest to improve riparian condition by controlling grazing: creating riparian pastures to which specific management systems have been applied; and excluding cattle through fencing. To properly manage these areas, additional opportunities include: implementing improved grazing strategies, installing fences to create pasture systems, and adjusting timing and duration of livestock use. While excluding cattle from riparian areas may result in the most rapid riparian improvement, it is the most costly. Riparian areas generally respond quickly to improved manage-

ment, particularly if timing and duration of use are carefully controlled.

## Concerns

Riparian areas and associated vegetation are essential for dependent resources and water quality. Healthy vegetation along stream banks helps maintain low water temperatures, reduces suspended sediment levels and buffers the effects of animal wastes. If vegetation is removed, the ecological balance of riparian areas is threatened. When streambanks fail because protective riparian vegetation is removed, sediment levels in the streams can increase. As riparian vegetation is removed, water quality and fisheries have suffered, water tables have dropped, and hardwoods have completely disappeared.

Poor livestock distribution and overgrazing in riparian areas is a greater problem than general overstocking of rangelands. Riparian conditions have not improved in areas where livestock graze season-long and few or no structural improvements have been made.

## Opportunities

Grazing strategies and structural improvements offer opportunities to improve riparian condition. Grazing strategies which would relieve livestock pressure on riparian areas include (1) grazing livestock in spring or early summer when upland grasses are green and palatable (Ruyle 1977; Salwasser and Shimamoto 1981); (2) rest-rotation or deferred-rotation grazing, which moves livestock from one pasture to another; (3) double-rest rotation, which rests a pasture for two years; (4) substituting sheep for cattle (Platts 1981); (5) short-duration, high-intensity grazing; and (6) exclusion (Ames 1977). Generally, strategies which sustain grazing are more cost effective in the long term. However, the Forest will use exclusion where necessary.

Structural improvements include (1) fencing to control grazing; (2) streambank stabilization (Sheeter and Claire 1981); (3) log weir and boulder placement (Claire 1980, Alvarado 1978); (4) constructing check dams; and (5) planting hardwoods. Any structural improvements should be implemented in concert with a suitable grazing strategy. The effects of grazing strategies and structural improvements should be monitored.

# 17. Sensitive Plants

## Introduction

No known federally listed threatened or endangered plants are found on the Forest. As of August 1990, ten sensitive plant species are known or suspected to occur on the Modoc National Forest. The habitat of each sensitive plant species is unique, both geographically and ecologically. Detailed descriptions, population densities and distribution maps for each species are located in the planning records.

## Current Management

Where known populations or sensitive plant habitats exist on the Forest, a botanical survey is conducted prior to any land disturbing or land exchange activity. Survey procedures and findings are documented in project environmental analysis records. Projects are modified to maintain the integrity of the habitat.

Many Forest activities modify the land or vegetation: recreation site development, land exchanges, timber sales, reforestation, mineral exploration, water impoundments, road and trail construction, livestock grazing, and utility line construction. All potentially disturbing activities are subject to current management policy protecting sensitive plants.

## Opportunities

The Forest will conserve sensitive plant populations by identifying and protecting their specific habitats. The first step is to complete a comprehensive survey of all suitable and potential habitats. Care can then be taken not to adversely affect their habitats and thereby ensure species viability.

The Forest can maintain or increase sensitive plant populations by assessing all planned timber sales and other projects for sensitive plants. The Forest may also need to modify existing grazing uses, change proposed road locations, alter planned timber harvest units, relocate burning unit boundaries, or modify other habitat disturbances. The need for such action is likely only in occasional, isolated situations.

# 18. Soils

## Introduction

Soil directly or indirectly supports all other resources. It serves as a growth medium for plants, filters biological and chemical substances and regulates water transmission. Long-term productivity of most Forest resources is dependent upon the soil resource.

Soils on this Forest are of volcanic origin consisting of basalt, andesite, tuff, pyroclastic pumice, cinders, and ash of various geologic ages. About two-thirds of the Forest is situated on the Modoc Plateau Geomorphic Province which is primarily composed of basalt-capped plateaus with nearly level to gently sloping topography. The remaining third is on mountain uplands.

## Current Management

A major goal for soil resource management is long-term maintenance of soil productivity and watershed protection. This requires avoiding management actions that would irreversibly impair soil productivity, and monitoring soil productivity to detect significant changes caused by management actions. Maintaining soil productivity also requires restoring or improving soils in areas where they have been degraded.

Current management includes providing input into environmental analysis, normally through a field-verified Soil Resource Inventory (SRI) Order 3, and recommending proper Best Management Practices (BMPs) and other project-specific mitigation measures for soil and watershed protection. Controlling soil erosion and compaction and maintaining nutrient balance during timber harvest, reforestation, range grazing, vegetative manipulation, and post-fire rehabilitation is vital to long-term timber and range productivity and protection of downstream water quality. The field-verified SRI 3 provides enough soil resource information to adequately document soil characteristics, their capabilities and limitations for most proposed work on the Forest.

Current management focuses on reducing soil erosion and compaction and maintaining nutrient balance. Practices include maintaining ground cover to reduce soil loss, limiting heavy equipment use on moisture sensitive soils during wet weather, prescribing low- to moderate-intensity fires to reduce loss of nutrients and soil structure, and applying fertilizer to timbered soils with low nutrients.

## Productivity

### Soil Concerns and Opportunities

Primary concerns for sustained soil productivity on the Forest include:

**Erosion** – About 350,000 acres have a high or very high Erosion Hazard Rating (EHR). Most of this acreage is located on the Warner Mountain and Big Valley Ranger Districts. Currently, almost 10,000 acres are experiencing various kinds of accelerated erosion (see WIN Inventory in the Soils Analysis of the Management Situation, Planning records).

Many opportunities exist to minimize soil erosion, such as tractor yarding only on slopes less than 40%; yarding unutilized material; lopping and scattering; broadcast burning slash on soils with high EHR; limiting livestock grazing; and restricting OHV use.

**Demand** – The demands for those yields directly dependent on soil productivity are discussed in the Wildlife, Range and Timber Sections of this chapter. Soil erosion also affects water quality and, therefore, recreation demand. Degraded water quality lowers recreational experiences associated with water such as boating, fishing, camping and swimming.

**Cumulative Watershed Impacts** – About 290,000 acres have a high potential for cumulative watershed impacts. This represents 28 third or fourth order watersheds, mostly on the Warner Mountain Ranger District.

To correct the condition the Forest could obliterate unnecessary roads and landings, rehabilitate areas experiencing active soil degradation, and limit further soil disturbance.

**Mass Movement** – About 16,000 acres have been rated as having a high potential for mass movement.

To protect these areas from mass movement the Forest could prohibit new road construction, retain 50% of normal basal area to maintain slope stability, and use full suspension and lateral yarding.

**Compaction** – When wet, nearly all soils are subject to compaction by heavy equipment operation or livestock use. Many pine plantations and some rangelands have serious compaction problems.

Compacted soil could be improved by disking, ripping, or scarifying. Opportunities to reduce soil compaction or mitigate its effects include using low bearing pressure equipment when compaction hazard rating is moderate or high; and prohibiting equipment operation when the soil is wet.

*Summary of the Analysis of the Management Situation*

**Fertility** — Recent timber stand soil and foliar analysis data suggests that perhaps 150,000 acres of timber land may have low amounts of plant available nitrogen, phosphorus or sulfur, or a combination of these in low amounts. Current Regional guidelines predict a 30% to more than 100% increased growth response to nitrogen fertilization. Over the past two years about 3,500 acres of timber lands have been fertilized.

To improve soil productivity and maintain nutrients at or above their natural levels, the Forest can use disking or other less ground-disturbing methods on soils where nutrients are concentrated in the top 2-5 inches. Logging slash could be lopped and scattered with or without a light broadcast burn on soils with low fertility. Fertilization can be combined with chemical or mechanical release on plantations to speed crown closure.

**Conifer Seedling Survival** — Over 150,000 acres of timberland has been rated with a low or very low chance of conifer seedling survival. Most of these acres are on lower elevation soils in areas of low precipitation and long, hot and dry summers.

Opportunities to improve seedling survival include disking or brush rake site preparation; patch or strip cutting; using artificial mulch; planting in excavated depressions; and redistributing topsoil if it is in windrows or old burn piles.

**Soil Displacement** — Two to eight inches of topsoil is displaced on about 6,500 acres in 10- to 30-year-old ponderosa pine plantations. That means the topsoil has been removed from planting sites and windrowed nearby. Soil chemical analysis and direct tree growth measurements indicate a 20-50% loss in productivity. The more topsoil that is displaced, the greater the loss in soil productivity. Recently over 500 acres of these plantations have had windrowed topsoil redistributed to regain productivity.

The Forest can recapture lost soil productivity by integrating topsoil redistribution with other resource projects, and by redistributing old burn piles which contain large amounts of topsoil.

# 19. Special Interest Areas

## Introduction

Special Interest Areas (SIAs) are those recognized by the Forest Service as having special significance for recreational, scientific, cultural, or educational use. These areas are set aside and protected for their scenic, historical, geological, botanical, zoological, paleontological or other special characteristics with an emphasis on public use, study, and enjoyment.

Officially designating an SIA begins with the Forest Supervisor's recommendation. The Regional Forester's approval of the Forest Land Management Plan signifies approval of recommended SIAs. Each formally designated area is managed with its own set of standards and guidelines which may range from no special management to seasonal restrictions on certain activities to year-round prohibitions on all activities.

## Cultural Resource Special Interest Areas

The Modoc National Forest has areas with potential for designation as Cultural Resource SIAs. The goals of the Cultural Resource SIA program are to prevent loss or damage to cultural resources, to integrate the cultural resource program with multiple use management, to facilitate scientific study in an effort to gain knowledge of past human behavior, and to provide interpretation so the public can gain understanding and perspective of our heritage.

Currently, the Modoc National Forest has no designated Cultural Resource SIAs. However, seven cultural resource sites are listed in the National Register of Historic Places (NRHP). Eight additional areas of cultural resource value qualify for nomination to the NRHP. All 15 sites could be considered for designation as Cultural Resource SIAs. Numerous other areas have been inventoried for cultural resource values, and may qualify as candidates for SIAs. As future inventories or studies are completed, they may reveal more candidates.

## Geological Special Interest Areas

Three designated Geological Special Interest Areas exist on the Modoc National Forest for their unique geologic features: Burnt Lava Flow, Medicine Lake Glass Flow and Glass Mountain Glass Flow. All are located within the Medicine Lake Highlands geomorphoric province.

### Burnt Lava Flow

The Burnt Lava Flow, encompassing 8,760 acres, is situated in Siskiyou County. The Burnt Lava Flow is an excellent example of very recent vulcanism (less than 200 years old) appearing as chaotic jumbles of basaltic blocks. Geologically, the Burnt Lava Flow is composed of three separate flows. One is a highly oxidized lava,

another is a fairly smooth pahoehoe, and the third is a broken pahoehoe flow. The flows were very viscous at the time of eruption and merged together without forming discernable boundaries. As the lava flowed onto the surface, it surrounded three older cinder cones.

These cinder cones are now islands in the flow area, covered with conifer vegetation. High Hole crater is a semi-barren cinder cone rising 386 feet above the lava flow. The crater itself is approximately 150 feet deep. These islands of timber, undisturbed by human activities and protected from outside fires by the lava flow, should become valuable for future study of the mixed conifer type.

**Medicine Lake Glass Flow**

The Medicine Lake Glass Flow, encompassing 570 acres, is also located in Siskiyou County. The Medicine Lake Glass Flow is a recent stony to glassy black dacite flow that is located on the floor of the Medicine Lake caldera. The thickness of the flow varies from 50 to 150 feet. Although the exact source of the flow is not known, it exhibits the dynamics of low-viscosity lava. The margin of the flow is very blocky and gives a talus slope appearance.

**Glass Mountain Glass Flow**

The Glass Mountain Flow, encompassing 4,210 acres, is primarily situated in Siskiyou County with a small portion in Modoc County. The Glass Mountain Glass Flow is geologically unique for North American geology. It exhibits the results of multi-stage volcanic activity so recent that there has been no modification by weathering, erosion, or vegetative cover.

The first eruption was along fissures that run north and northwest which ejected pumiceous material in the lapilli and ash sizes. This eruption produced steep-sided cones followed by pumice eruption lava extrusions. The first was a stoney to blocky dacite succeeded by glassy dacite and rhyolite, followed by a rhyolite obsidian. Volcanic lava extruded from the walls of the pumice cones, destroying the cones except those located at the extreme southern edge of the flow.

All three Geologic Special Interest Areas could have interpretive facilities such as information stations and self-guided tours. Access to the areas should be visible to visitors from Medicine Lake, as well as surrounding highways. In addition, pamphlets and maps could be prepared by the Forest for public distribution at all Forest offices.

The Forest will maintain an open file for any future Geologic Special Interest Area. The source of informa-tion may be from Forest personnel, the general public, special interest groups, or the scientific community.

The National Natural Landmark (NNL) program and Research Natural Area (RNA) obligations for geologic elements are two other programs which affect the Forest's three Geologic Areas. Administered by the National Park Service (NPS), the NNL program accepts areas possessing national geologic or ecologic signifi-cance (Appendix F). All three areas were identified through NPS Theme Studies as potential NNLs.

The Forest will recommend Burnt Lava Flow and Medicine Lake Glass Flow for nomination as NNLs. Because of existing mining claims on Glass Mountain Glass Flow, which conflict with NNL objectives, the For-est will not recommend this area as an NNL. However, Glass Mountain Glass Flow and Medicine Lake Glass Flow share similar geologic features; the latter represents this type of geologic value.

**Botanical Special Interest Areas**

Areas on the Modoc NF with potential for designation as Botanical Special Interest Areas include Dismal Swamp in the north Warner Mountains. This meadow/marsh/riparian forest complex boasts an assem-blage of riparian plant communities unique to California. The most notable plant community is the birch (*Betula glandulosa*) riparian shrub community. Bog birch is com-mon in northerly habitats, but unknown in the rest of California.

# 20. Timber

## Introduction

Commercial conifer types are found on 40% of the Forest (639,942 acres). Eastside pine, mixed conifer, red fir and lodgepole pine comprise the four major types.

The *eastside* pine type, growing at 4300-5500 feet, contains ponderosa pine and Jeffrey pine. Associates are incense cedar, white fir, western white pine and sugar pine with occasional California black oak. Eastside pine occupies 64% (405,422 acres) of the Forest's timber-lands, with about half of the stands averaging 70-90 years old and mostly poorly stocked. Another third of the stands are older, averaging 120-130 years old, also poorly stocked. The remaining lands (14%) are either planta-tions or two-storied older stands.

The *mixed conifer* type occupies 31% (200,401 acres) of the timberlands. This type consists of white fir, red fir, ponderosa pine, Jeffrey pine, incense cedar, sugar pine, and western white pine. Black oak and aspen are found in association with these conifers. Mixed conifer grows at 5500-7500 feet. Stands are composed primarily of ponderosa or Jeffrey pine and white fir, although species composition varies throughout the Forest. Mixed conifer in the Warner Mountains contains much western white pine, but has no sugar pine or red fir. Mixed conifer in the Medicine Lake Highlands, however, contains sugar pine, incense cedar and red fir.

The mixed conifer type is older than the eastside pine type with a narrower age class distribution. Over 75% of mixed conifer is 120-130 years. Poorly stocked stands make up about half of the type.

*Red fir* type occurs exclusively in the Medicine Lake Highlands on the Doublehead Ranger District higher than 5500 feet. Red fir comprises the smallest component of the timber types (2%, 13,425 acres). Most red fir stands are heavily stocked.

*Lodgepole pine* type, occurs mostly in pure stands starting at 6000 feet, but sometimes is associated with true firs and western white pine. The lodgepole pine type occupies only 3% (20,694 acres) of Forest timberlands. Size classes are not differentiated for this type.

Tentatively suitable timberlands are:

– forested and currently producing or capable of producing crops for industrial wood;

– not withdrawn from timber production by Congress, the Secretary of Agriculture, or the Chief of the Forest Service;

– not prone to irreversible soil, productivity, or watershed damage when the appropriate technology is used; and

– capable of being adequately restocked within 5 years after final harvest.

Of the Forest's 639,942 acres of timberland, 611,396 acres plus 7,862 acres of nonstocked land (97%) are tentatively suitable for timber production.

Of the suitable acres, 7,862 acres are non-stocked. Approximately 5,800 acres of non-stocked timberland are in soil types which are capable of producing commercial trees, but are dominated by other vegetation. Currently, the land is economically unsuitable for producing timber. Land managers will monitor non-stocked lands to determine their suitability for regeneration.

The remaining 2,000 acres are unstocked to provide diversity, wildlife forage, and fuel breaks in the Scarface and Gerig wildfire areas which burned in 1977. Habitat conditions in these areas will be monitored for change to determine an appropriate time for regeneration.

On suitable timberlands capable of producing greater than 20 cubic feet per acre per year (>20 lands), full, (Regulation Class I), modified (Regulation Class II), and limited (Regulation Class III) timber management can be practiced. Full or modified management can be used on 435,103 acres (70%) of the suitable timberlands where natural or artificial regeneration is used to achieve stocked stands. Even-aged regeneration cutting methods are appropriate here, including clearcutting, seed tree, and shelterwood cutting. Intermediate cutting methods are also used, primarily for commercial thinning. Uneven-aged management may also be appropriate—either group selection (preferred) or single-tree.

Suitable timberlands also include 184,155 acres (30%) of land producing less than 20 cubic feet per acre per year (<20 lands). These lands were included as suitable because past experiences shows that it is possible to manage less productive lands on a sustained yield basis. Timber management on <20 lands is basically opportunistic. Trees are harvested only when sufficient understory trees are present, and when snag numbers and minimum management requirements (MMRs) are met. These areas are treated as separate non-interchangeable components of the allowable sale quantity, where outputs and allocations are not comingled with >20 land outputs.

## Current Management

Current direction for timber management was established in the Modoc National Forest Timber Management Plan and the accompanying Final Environmental Statement (1975).

With improved forest management and analytical methods over the last decade, the Forest identified several shortcomings with the 1975 Timber Management Plan:

– It overestimated yield on lands which actually produced <20 cu. ft. per acre per year, an error which was carried into targets for the 1980 Resources Planning Act (RPA) Program.

– It had no soil inventory to identify soils with low productivity. Therefore, low productivity soils were included in standard and special and marginal component lands.

– Potential yields for special and marginal components were not modeled. Rather, potential yield from the standard component (which was modeled in TIMBER RAM) was used for special component lands. Marginal component yields from the programmed allowable harvest were reduced to historic harvest levels.

– Because minimum management requirements (MMRs) were instituted after the 1975 Timber Management Plan, the Plan did not include them.

## Silvicultural Practices

**Harvest Practices** – Harvest practices under the timber management plan are based on even-aged management. Regeneration cuts (shelterwood and clearcutting methods), intermediate cuts, and overstory removal are used in the standard component. Selection cutting is used in other components.

Between 1976 and 1984, harvested acres and volume were very similar to the acres and volume planned in the 1975 timber management plan. Timber volume harvested exceeded planned volume by 4%, while acres treated were 10% fewer than planned. However, acres and volume harvested by component and treatment varied widely from the original plan based on four factors.

First, the Scarface and Gerig fires of 1977 created many acres requiring salvage logging (47,000 acres). These salvage acres are part of the 60,700 acres of regeneration harvest that occurred from the standard component between 1976 and 1984. Only 17,000 acres were planned for regeneration. The volume, however, was 10% less than planned (191.2 MMBF vs. 211.8 MMBF) because of lower merchantable volumes per acre in salvage logging.

A second factor was the large acreages of overstory removal harvest. Overstory removal was used on 62,100 acres, which was 48,200 acres more than planned. This harvest contributed nearly half the volume harvested from standard component lands and was 142% higher than planned for that treatment type. In many cases, the overstory removal treatment was applied incorrectly; residual stands were left understocked.

Another factor was the scheduled treatments for intermediate thinnings which produced much less volume than anticipated. While 33% more acres were treated than planned for, only 42% of the volume was generated.

The final factor was the scheduled treatments in the special and marginal component. Only 28% of the planned acres were actually harvested, but 89% of the volume was produced.

The cumulative effect of all these factors resulted in harvesting nearly three times more acres in the standard component than planned, while only treating 28% of the special and marginal components. The residual effect left many acres of the standard component in an understocked condition, which will make future timber sales less economical.

**Site Preparation** – After regeneration harvest or brush conversion, the land must be cleared to provide mineral soil for natural seeding when using the shelterwood system. Clearing also removes competing vegetation from planted seedlings. Site preparation is done mechanically, chemically, with prescribed fire, or by combining these techniques. Mechanical site preparation (typically tractor piling or brushraking) in combination with chemical treatments is most common. The Forest has not used herbicides since 1984.

**Reforestation** – One- or two-year-old ponderosa and Jeffrey pine seedlings are usually planted after clearcutting. Incense cedar, sugar pine, and white fir are planted less often. Planted seedlings are grown from seeds collected on the Forest according to zone and elevation.

Overall, establishing timber stands through planting has been successful. The only shortcomings have been high mortality of one-year-old stock and the infrequent occurrence of optimum weather conditions. Using twoyear-old stock has reduced seedling mortality, and better planning and preparation has improved timing for planting.

Natural seeding can be used on lands managed under the shelterwood system. Successfully establishing a stand using natural regeneration depends on a well-prepared site, a good seed crop, and favorable weather conditions. To date, these conditions have been infrequent and the effectiveness of natural seeding poor. On this Forest shelterwood cutting in combination with planted seedlings would be successful. However, clearcutting in combination with planted seedlings would be at least as successful and more cost-effective.

**Timber Stand Improvement** – Timber stand improvement (TSI) includes suppressing competing vegetation (release), thinning young stands (precommercial thinning), protecting seedlings from animal damage, and fertilization. TSI benefits include increased vigor, growth, and reduced susceptibility to insect damage and disease.

**Salvage** – Salvage sales resulting from insect damage, drought and fire totalled 224 MMBF from 1976 to 1985.

**Big Valley Federal Sustained-Yield Unit (BVFSYU)** — Unique to Region 5, the BVFSYU was established on January 27, 1950 under the authority of the Sustained-Yield Act of 1944. The intent of the Act was to maintain stability in communities dependent on the sale of timber or other forest products from federal lands. In a sustained-yield unit, timber bidding is restricted to operators who manufacture lumber within a designated manufacturing zone. The BVFSYU lends support to Big Valley communities (Adin, Bieber, and Lookout) dependent on the timber industry.

The last formal review of the BVFSYU was held in March 1976. Based on the 1970 timber inventory, the annual allowable sale quantity was 13.3 MMBF for the period 1975-1985. According to Unit policy, this volume may change 20% without instituting special hearings or analysis.

## Supply

National forests in Region 5 produced an average of 1.9 billion board feet over the past 10 years. During this time, the Modoc's contribution to the Regional average was 3%. While this volume is small from a regional perspective, to local mills it is a resource of economic significance.

Of the timber harvested from the Forest, 84% is processed in Modoc and Lassen counties. This volume is 34% of all timber processed in the two counties.

Today, 435,100 acres are classed as suitable for full or modified timber management (lands capable of growing >20 cubic feet per acre per year), and 184,200 acreas are classed as suitable for limited timber management (i.e., lands growing <20 cubic feet per acre per year). Standing volume amounts to 4.95 billion board feet and growth averages 24 cubic feet per acre per year. The Forest will base its new allowable sale quantity and 10-year timber sale schedule primarily on this information. Other factors which will influence timber supply are legal requirements for timber and other resources, economic efficiency, management intensity, and desired land use patterns.

## Demand

Demand for timber from the Forest is determined by regional and national markets for wood products. Markets are primarily influenced by population and income levels, interest rates, number of housing starts, and the level of imports and exports in wood products.

Between 1975 and 1982, 25 mills bought timber sales from the Forest. Because of large fire salvage sales, new purchasers were attracted to the market. About 12 mills, mostly from Klamath Falls, Adin, Alturas, Bieber, Burney, Susanville and Weed, are the consistent bidders. By 1982, two of these mills had closed. The remaining mills have a combined annual mill capacity of about 291 MMBF. The combined mill capacity of primary local mills is about 48 MMBF annually on a single shift; this could increase to 75-80 MMBF on a double shift.

Local mills usually buy large-diameter ponderosa, sugar, and Jeffrey pine. Most local mills do not have equipment to efficiently manufacture many small-diameter logs (less than 14-inch dbh). This lack of mill capability is important because most of the available large old-growth trees will be cut in the next 30 years. Mills must convert to small log manufacturing if current harvest volumes on the Forest are to be maintained. Trees with long rotations necessary to produce large diameter logs have lower average annual growth rates than trees with shorter rotations. Also, commercial thinning harvests of timber stands, which contribute to the annual sale volume, will be of small diameter trees.

### Big Valley Federal Sustained-Yield Unit

Agriculture and lumbering supports the present economic base in the Big Valley area. New industries are deterred from the area because of its isolation from large population centers. The present composition of industries in the area will likely remain unchanged.

At present, three sawmills operate within the Unit. All process National Forest timber under the terms of the BVFSYU Policy Statement. Big Valley mills rely heavily on timber outside the Unit to maintain full single-shift operations; the allowable sale quantity of 13.3 MMBF, established for 1975-1981, accounts for 46% of the mill's capacity. Cutting records of these mills during this time indicate sawmill production averaged 22 MMBF annually.

The economic impact of the Unit cannot be measured directly. Whether the sawmills would continue to operate if the Unit were abolished is not known. The installed capacity of the Unit's sawmills is approximately twice the potential yield of 13.3 MMBF. Obviously, other sources of logs are essential for the continued operation of the mills. However, production has been 73% of the stated capacity. Testimony presented at a 1980 public hearing on the status of the Unit indicated that the timber base supplied by the Unit was essential to the mills in the Unit.

# 21. Visual Resources

## Introduction

The Modoc National Forest offers a wide range of scenic landscapes. The Medicine Lake Highlands in the northwest portion of the Forest provides the beauty of mixed conifer stands intermixed with geologic evidence of past volcanic action.

The Modoc Plateau, covering most of the Forest, is a combination of lava outcroppings with a diverse mixture of ponderosa pine stands, juniper, bitterbrush, sagebrush and mountain mahogany. The variety of vegetative color and texture and the distant views to mountain backdrops provide a unique scenic experience.

The Warner Mountains rise above the surrounding plateau on the east side of the Forest with peaks up to 9,800 feet. The Warners offer all the scenic amenities of the Sierra Nevada mountain range, and are covered by broken and diverse patterns of coniferous forests, aspen stands, open shrub-covered patches, rock outcrops and numerous streams.

## Current Management and Future Opportunities

The Forest's capability to provide scenic quality is measured by the current condition and variety of the visual resource. In the future, maintaining scenic quality will be more difficult because of increased regeneration harvesting.

Opportunities exist to mitigate the effects of Forest management activities on visual quality:

– Shape timber harvest units to blend with existing openings.

– Schedule timber sales to avoid cumulative visual effects.

– Use foreground vegetation to screen background disturbances.

– Design structures (roads, utility towers and buildings) to blend with or complement the natural landscape.

– Emphasize visual resource management in areas where visual quality is important to recreation activities. In areas where enjoyment of recreation activity is not dependent on visual quality, management may be less intense.

– Coordinate visual management with other resource planning.

– Use vegetative manipulation to enhance and maintain visual quality for the long term.

– Rehabilitate areas which currently do not meet visual quality objectives through specific visual resource rehabilitation projects or other resource projects.

## Initial Visual Quality Objectives

Variety class, sensitivity level, and viewing distance are three inventories used to initially determine suitable visual quality objectives (VQOs). Landscapes with high scenic values have the greatest variety of vegetation, landforms and waterforms. Three variety classes characterize the Forest:

**A** (9%): a distinctive landscape with varied water and landforms and vegetation;

**B** (38%): a common landscape, less varied with moderate slopes, rounded ridges and broad valleys; and

**C** (53%): a minimal landscape of one-species vegetation and little variation in size, texture or color.

The South Warner Wilderness, SIAs, and the RNA are the only areas on the Forest assigned a Preservation VQO. Retention or Partial Retentention VQOs were assigned to all variety class A lands. Variety class B lands (those areas viewed from a sensitivity level one travel route, or within the foreground viewing distance of a sensitivity level two travel route) were assigned a Retention or Partial Retention VQO. Only those variety class C lands within the foreground or middleground distance zones (viewed from a sensitivity level one travel route) were assigned a Partial Retention VQO. All other areas on the Forest were assigned a Modification or Maximum Modification VQO which allows management activities to visually dominate the landscape with differing considerations.

Retention or Partial Retention IVQOs were assigned to 33% of the Forest. Most lands (63%) were assigned a Modification or Maximum Modification IVQO because most of the Forest is variety class C or unseen.

## Existing Visual Condition

The current condition of the visual resource on the Forest was determined through an inventory of the existing visual condition (EVC). This inventory was done by aerial mapping and field verification. Eighty-four percent

of the Forest has few noticeable changes in the landscape; 14% is noticeably disturbed, but changes do not attract attention.

Activities that have caused visual disturbances include site conversions in geometric shapes, mostly where the planted vegetation failed to establish itself, rock and cinder pit developments, high density roading, major transmission lines, electronic sites, and large-scale fire suppression.

## Visual Quality Index

Visual Quality Index (VQI) quantifies the overall visual quality of the Forest. It reflects both the inherent scenic value of the Forest landscape and the amount of human modification to it. A VQI can be calculated for the existing visual condition as well as for the future visual condition that would result from implementing each alternative.

The VQI for the Forest's existing visual condition is 62.56. Assuming that in 1900 the entire Forest was in visual condition class I (appeared essentially untouched), the VQI would have been 68.80. This figure then provides a benchmark from which to compare the VQI since the turn of the century.

The VQI of 68.80 is not the maximum visual quality the Forest can achieve. Variety class C lands have little variation in size, color or texture. In an untouched condition (VC I) they offer little visual distraction. By minor changes to the characteristic landscape, the overall visual quality in variety class C lands can improve. Because 53% of the Forest is class C lands, managing these lands to the VQO of partial retention (VC III) will maximize the VQI at 103.65. This significant increase over untouched conditions is an anomaly based solely on the high percentage of class C lands.

## Demand

Although demand for the visual resource is difficult to measure, it can be inferred from: (1) increased participation in recreation activities associated with viewing scenery; (2) increased population; and (3) enactment of laws and policies addressing visual quality.

# 22. Water

Proper management and use of water resources, combined with care for the watershed lands from which they originate, are fundamental to managing all other resources on the Forest. The goals are to maintain the soil mantle and to provide water for human, wildlife, fish and vegetative needs. Water is used on the Forest for livestock, dust abatement on roads during timber hauling, human consumption, maintenance of instream flows, and wildlife needs, including wetland habitat. Outside Forest boundaries, water is used primarily for agricultural irrigation, hydroelectric power generation, livestock, recreation and wildlife.

An analysis of the water resource requires separating the topic into its major parts: water quantity, water quality, and cumulative watershed effects. The following sections address each topic and its role in water resource management.

## Water Quantity

### Supply

Twenty watersheds on the Forest produce a cumulative annual yield of 565,800 acre-feet of water per year, not including water yield on private lands within the Forest boundary.

### Current Management

#### Water Rights

The Forest manages distribution and use of water through the Forest water rights program. Currently water is used and managed under reservation rights, riparian rights, and State appropriated water rights.

#### Demand

Since the area was settled in the late 1800's, water use has steadily increased so that present demand exceeds the supply of natural surface runoff.

Much effort is expended to ensure that downstream water users with superior water rights are protected while removing water from streams for roads. Full use of rangeland forage by livestock is limited by shortages in water and by downstream appropriations which make water rights difficult to obtain for stockponds. Insufficient stockwater in some allotments has created livestock distribution problems. Dam construction for wetland development is nearly impossible with water supplies fully appropriated by downstream users.

Instream water needs within the Forest boundary for wildlife, fish and maintenance of riparian vegetation are basically intact because most water diversions to other users occur outside the Forest boundary.

### Opportunities

The Forest has few opportunities to add to existing water supplies. Increases from vegetative manipulation will be undetectable because yearly climatic variations will mask them.

Other opportunities exist, however, to help alleviate Forest and downstream shortages through continued negotiations with other users like the Bureau of Reclamation and Pacific Gas and Electric Company, and through drilling additional wells to tap groundwater sources. Additional stockponds could be developed on many grazing allotments to improve livestock distribution and forage utilization.

## Water Quality

Water use on and off the Forest has many beneficial uses. Although no municipal watersheds or whole communities use this water, several individual domestic uses are scattered throughout or downstream from the Forest on many streams. Wilderness travelers use surface water from lakes and streams in the South Warner Wilderness for drinking or cooking.

Water in streams, lakes, and reservoirs provide habitat for cold- and warmwater fisheries, endangered species, and waterfowl. Numerous stockponds and reservoirs provide water during the summer months for livestock.

Water leaving the Forest is put to beneficial use by irrigating fields in the Pit River, and Surprise, Goose Lake, Langell and Big Valleys. Much of this water is reused for hydroelectric power generation at reservoirs. Water quality also affects downstream riparian-dependent species. Water is also used downstream by recreationists.

### Current Management

Water quality is currently maintained and improved through the application of State certified and EPA approved Best Management Practices (BMPs) for controlling non-point sources of pollution to surface water (USDA Forest Service 1983). Methods and techniques for applying appropriate BMPs are identified during on-site investigation of Forest projects that have the potential to degrade surface water quality.

BMPs have been developed for timber, road construction, mining, recreation, vegetative manipulation, fire suppression, fuels management, and grazing strategies. Implementing BMPs has resulted in protecting water quality in some areas, depending on the resource. Sometimes water quality problems occurred when BMPs were not implemented. The following assessment of water quality relates to various Forest resource management activities.

### Timber

Accelerated surface erosion from historic logging is pronounced in several Forest watersheds. Probable causes are inadequate or no streamside management zone designation and protection; poor skid trail and landing locations; and lack of erosion control on skid trails. Under old logging practices, some wet meadows were used for skidding and landing logs, which gullied and scoured perennial streams and converted wet meadows to dry uplands. These erosion problems are now reduced or avoided on current timber sales through the use of BMPs.

Opportunities to improve management include leaving natural debris in channels; introducing a minimum of additional logging-related debris; and leaving large volumes of mature timber within the streamside management zone.

### Road Construction

Roads are a primary source of accelerated erosion and sedimentation (Gibbons and Salo 1973). Sediment from roads reaches streams through mass soil movement and surface erosion. Downstream sedimentation results from improper road location, inadequate road drainage, lack of energy dissipators at culvert outlets, road use during wet weather, and poor culvert alignment. Fisheries are probably the most adversely affected Forest resource. Many of these problems still exist because funds are insufficient to correct past problems. Construction within the past ten years has followed BMPs and has not significantly degraded water quality.

Opportunities exist to obliterate roads that are no longer needed or are causing water quality degradation, and to abandon old roads which were constructed in or adjacent to stream channels.

### Grazing

Improper grazing management practices degrade water quality by accelerating erosion and sedimentation within stream channels. Stable stream banks; narrow, deep channels; and diverse and productive vegetation are hallmarks of properly managed streams. Stream systems in satisfactory condition provide vegetative cover for fish habitat, sustain water flows into the summer season, and

offer low water temperatures. In contrast, improperly managed streams exhibit altered stream banks, wide and shallow channels, and less productive and diverse vegetation than its properly managed counterparts. Improperly managed streams suffer reduced flows into the summer season and higher water temperatures. Gravels important for fish spawning are often embedded with fine sediment from soil erosion and silting.

Improper grazing management practices have affected, to some extent, nearly all riparian areas on the Forest. Approximately 208,700 acre-feet produced on the Forest does not meet State water quality objectives, and may be adversely affecting beneficial uses.

Properly managed streams have improved rapidly; practices have included fencing to exclude livestock or to establish riparian pastures and early season growth. Timing and duration of grazing — particularly early-season and short-duration grazing — is important for ensuring proper riparian management. One of the best opportunities to improve water quality is implementing improved grazing strategies. In some cases, protective fencing, restoring riparian vegetation, gully repair, rip-rapping and juniper revetment may be needed. Water quality monitoring is an integral part of a program which ensures that water quality objectives are attained.

## Cumulative Watershed Impacts

Cumulative watershed impacts are the additive effects of land disturbing activities. They include all impacts to water quality and soil productivity occurring away from sites of primary development. Cumulative watershed impacts are transmitted from primary development sites to the impact site through water. The most common evidence of cumulative impacts is alteration of sedimentation and erosional processes within stream channels. These include channel scour, deposition, stream bank failure, mass wasting, or other undesirable occurrences such as flooding. Within-channel effects are caused by increases in peak flows due to compaction in the watershed.

Threshold of concern is the level of disturbance beyond which off-site watershed degradation is very likely to occur. When management activities cause the watershed threshold to be exceeded, accelerated channel problems are likely and downstream beneficial uses, such as fisheries and reservoir life expectancy, are threatened.

### Current Management

The potential for cumulative watershed impacts to occur is within second and third order watersheds, and

not within larger watersheds (Chatoian 1983). A method to assess cumulative watershed impacts was developed to determine the off-site impacts caused by timber harvesting, road construction, and livestock grazing. All impacts are reported in percent of equivalent roaded acres (ERA), a measure of the relative amount of disturbance in the watershed.

Watershed thresholds were estimated from soil sensitivity information that includes soil depth, slope stability, erosion hazard rating, and water runoff potential. Three watersheds are estimated to have exceeded their threshold: 032 — Cottonwood Creek; 071 — Dutch Flat Creek; and 072 — Rush Creek. Opportunities to improve these sensitive watersheds include designing activities so impacts to the channel are minimal; increasing buffer and filter strip width; installing erosion control structures; and ripping or scarifying disturbed areas to reduce soil compaction.

In the future, the Forest should not experience an increase in problems from cumulative impacts. Even with intensive timber management, the overall condition of watersheds should remain stable. In the past, the problem of cumulative impacts was never seriously considered; timber and grazing activities were planned without considering overall offsite potential impacts to stream channels. Now that the problem has been recognized, prudently scheduling activities and implementing watershed improvement or mitigation projects will help bring or maintain all watersheds under threshold.

# 23. Wilderness And Roadless Areas

## Introduction

Encompassing 70,385 acres of relatively undeveloped land on the Warner Mountain Ranger District, the South Warner Wilderness contains rugged topography, expansive vistas, rolling hills, mountain meadows, clear streams, and the highest peaks in northeastern California. The South Warner Wilderness appears as a pristine island surrounded by rural human development, which offers excellent opportunities for solitude. Eagle Peak at 9,892 feet, Warren Peak at 9,710 feet and Squaw Peak at 8,646 feet are the conspicuous landmarks within the Wilderness. Vegetation on the precipitous eastern slope is generally sparse. The western slope is characterized by gentle, rolling topography. Vegetation includes ponderosa, Jeffrey, western white, whitebark, and lodgepole pines, white fir, western juniper, aspen, bitterbrush,

mountain mahogany, sagebrush, grasses, and riparian species.

Of the seven lakes in the South Warner Wilderness, Clear Lake, Patterson Lake, and Emerson Lake are the most well known. They provide recreational fishing for rainbow, eastern brook, redband and brown trout.

Wildlife abounds in the Wilderness, affording recreationists opportunities to observe many interesting species in their natural surroundings. In addition to fish and mammals, the Wilderness provides splendid bird-watching for the casual or most seasoned observer.

After the 1978 Roadless Area Review and Evaluation, the Forest Service recommended five areas for incorporation into the Wilderness: Granger (400 acres), Jess (300 acres), Mill (670 acres), Parker (200 acres), and Pepperdine (370 acres). On September 28, 1984, the California Wilderness Act (Public Law 98-425) added these areas (1,940 acres) to the South Warner Wilderness.

All other roadless areas were released from wilderness consideration for this planning period. No other wilderness planning areas exist on the Forest.

## Current Management

### Recreation

During the peak recreation use season, rangers periodically travel the Wilderness to help visitors comply with regulations while providing information or assistance to those who need it. Because Forest involvement and interaction with visitors has decreased over the last five years, user compliance with regulations regarding permits, litter, and recreational stock has declined.

Far from major population centers, the South Warner Wilderness has a low level of visitor use. Visitor use in 1981 was estimated at 12,100 recreation visitor days (RVDs), of which 40% were local users. Two main areas of concentrated use are the Clear Lake and Patterson Lake areas. While Clear Lake is used almost exclusively by day, Patterson Lake is used for both day and overnight activities.

### Trails

The Wilderness trail system consists of 79 miles of maintained trails. An additional 23 miles exist in the Wilderness but are neither maintained nor considered system trails.

Trail density and locations adequately provide access to most of the Wilderness. Developing additional trails into primitive areas could detract from the Wilderness character and preclude a primitive experience for those users seeking solitude and remoteness.

### Fire

Upon detection, all fires are evaluated by the District Ranger for appropriate initial attack by suppression forces. Non-mechanized means of suppression are used if the fire does not threaten resources outside the Wilderness. If fire behavior warrants immediate suppression measures to prevent an escape, then authorization to use mechanical measures (e.g., helicopters, air tankers, chain saws) is requested from the Forest Supervisor. Formerly, fire management policy required immediate and aggressive suppression of all fires regardless of location or cause. Currently, the policy emphasizes cost-effective suppression.

### Grazing

The South Warner Wilderness was grazed long before it was classified as a Wilderness. Grazing in Wilderness areas was legally established under the 1964 Wilderness Act (P.L. 88-577). Approximately 1,655 cattle and 3,000 sheep graze these allotments, generally from July 1 to September 30.

### Visual Quality

Current direction for managing the visual resource in the Wilderness comes from the Wilderness Act. Only ecological changes are permitted, except for very low visual impact facilities, such as trails. Changes can be made to existing visual impacts, however, to make them appear more natural. The Forest Service Visual Resource Management System's initial visual quality objective (IVQO) is Preservation which conforms with the above direction.

### Fish and Wildlife

Stocking of lakes and streams began early this century. Because natural reproduction does not occur in these lakes, fish are brought in by backpack, horse-packing, and aerial drops to maintain the fishery resource. Patterson and Clear Lakes provide the best, most consistent fishing in the Wilderness and also attract the most visitors.

In 1980, fourteen bighorn sheep were transferred from the Lava Beds National Monument to the Raider Canyon area (see Wildlife section of this Chapter). By 1984, herd numbers increased to approximately 31 animals. However, in late 1987 and early 1988, the entire bighorn population died from a pneumonia bacteria (*Pasteurella haemolytica*), probably transmitted from domestic sheep or goats.

## Supply

The average use for the South Warner Wilderness during the early 1980's was 15,060 recreation visitor days (RVDs) with the lowest being 12,100 RVDs in 1981. Comparing this average use to the maximum practical carrying capacity (34,561 RVDs) indicates that the South Warner Wilderness capacity is approximately 2-1/2 times greater than its current use.

## Demand

Projections by California Statewide Recreation Plan (State of CA 1980a) and the Statewide Recreation Needs Analysis (State of CA 1982) for increases in backcountry activities indicate that recreation use in the South Warner Wilderness could increase over 60% by the year 2000. These documents predict that the three main activities enjoyed in the Wilderness — backpacking, hunting, and fishing — will increase at a rate higher than the projected population growth. However, those increases may not occur because of long distances between the Wilderness and major population centers.

Although use may not exceed the capacity of the entire Wilderness prior to the year 2030, use of preferred areas may exceed the capacity much sooner. Popular areas such as Patterson Lake are currently used beyond capacity during peak periods.

## Opportunities

Many opportunities to improve the Wilderness involve management of trails, visual quality, public information, recreation, fire, grazing, wildlife, and fish. Maintenance of existing trails and trailheads could be improved. New trails and trailheads, bridges, and signs could be designed to blend with the Wilderness environment. The Forest could provide Wilderness information at entry points. Wilderness carrying capacity could be broadened by encouraging recreationists to seek a more primitive wilderness experience.

Through standards and guidelines in the Plan, the Forest could allow lightning-caused fire to play its natural role in restoring vegetative succession in the Wilderness. Prescribed burning would reduce hazardous accumulated fuels.

Wilderness water quality and riparian vegetation could improve by implementing better grazing practices. Instream structures and riparian grazing management could improve fisheries. Bighorn sheep herds could be reintroduced into the Wilderness and protected from domestic livestock diseases if livestock were not permitted to graze in Wilderness areas adjacent to bighorn territories.

# 24. Wildlife and Fish

## Introduction

The Forest is home to more than 350 species of wildlife which live in a wide variety of habitats. Each requires a particular combination of food, water, and shelter to exist. Some wildlife species occur in all vegetation types on the Forest, while others are very limited in their habitat needs. Each species plays a role in the balance, persistence, and evolution of the ecosystem of which it is a part.

## Management Indicator Species

Three categories of MIS have been developed, covering 32 species of wildlife and fish.

### Threatened and Endangered (T&E)

T&E species are federally designated because low population levels and loss of habitat may eventually render them extinct. The Forest Service must manage habitat to achieve recovery levels of T&E species. The Forest is required to consult with the U.S. Fish and Wildlife Service (USFWS) whenever the Forest initiates any activity which may affect a federal T&E species. The Forest has six T&E species.

### Sensitive Species

The Forest Service lists as sensitive those species needing special management to prevent federal listing as T&E. The Forest has four MIS that are sensitive.

### Other MIS

Other MIS include harvest species (game and fish), ecological indicator species, and special interest species. *Harvest species* are important because of their contribution to local economies, and hunting opportunities. *Ecological indicator species* are used as barometers to assess the effects of Forest activities on their habitats and other wildlife species requiring similar habitats. *Special interest species* are those that were identified as important because of Resource Planning Act (RPA) goals, state or local concerns, or because of their limited distribution.

## Special Habitats

Special habitats on the Forest include black oak woodlands, dead and down wood, snags, and wetlands. Black oaks provide nesting cavities for various birds and mammals, particularly the western gray squirrel on this Forest. Wildlife species dependent on dead and down material for habitat include marten, pileated woodpeckers, blue grouse, and quail. Nearly 55 species of birds and mammals depend on snags for roosting, nesting, and feeding. Approximately 60% of the Forest land suitable for managing snags is currently snag deficient.

## Demand

Demand for wildlife and fish is determined by commercial, ecological, and social or recreational uses. Furbearing animals are the only wildlife on the Forest with commercial value. Demand for them is expected to continue. The Forest applies minimum management requirements to meet the minimum level of demand. Projections indicate an overall 60% increase in participation in hunting, fishing, and nonconsumptive use during the next 50 years.

# 25. Wild and Scenic Rivers

The Modoc NF inventoried and evaluated all the streams on the Forest, and determined that 17 have high resource values meriting detailed review. The Forest interdisciplinary team evaluated these 17 streams and determined that two, Willow and Boles Creeks, are eligible for wild and scenic river designation because they possess one or more outstandingly remarkable values. Further, the team tentatively identified the highest eligible classification as scenic. This evaluation and a detailed description of Willow and Boles Creeks is presented in EIS Appendix T.

# 26. Woodlands

## Introduction

In addition to the commercial conifer forest discussed under the *Timber* section, the Forest contains another vegetation type broadly classed as woodlands. Woodlands on the Modoc are primarily composed of aspen, black oak, and juniper. These forested lands are not suitable for timber production, but they are valuable for wildlife habitat, firewood, forage, and recreation. Woodlands add aesthetic value to and enhance the visual quality of streams, reservoirs, and lakes.

### Aspen

Aspen are found on 13,400 acres in large contiguous stands in the Warner Mountains, and throughout the Forest in association with riparian areas. However, large stands occur so infrequently that they receive little management emphasis, except for a few rejuvenation projects. Aspen provide variation in the overall diversity of the Forest. It is valuable for deer forage and habitat, and aesthetically pleasing to view, particularly in autumn.

### Black Oak

Black oak woodlands occur in the southwest portion of the Forest below the coniferous zone. Black oak also occurs with eastside pine forests in the southwest portion of the Forest in the transition zone between brush and conifer species. Pure black oak and black oak-pine stands cover about 9,600 acres on the Forest.

Black oak woodlands provide nesting cavities for various birds and mammals, and enhance habitat diversity. Oak are a source of acorns and forage. The young leaders on small trees are forage for deer. The value of black oak to wildlife is discussed in detail in the Special Habitats section of Wildlife in Chapter 3 of the EIS.

Black oak is not managed as commercial timber. Because oak provides acorns for wildlife and regeneration, the Forest usually prohibits cutting these trees. Occasionally a commercial thinning sale is offered to promote oak regeneration or improve growth and mast production for wildlife habitat. Because black oak can stump-sprout after harvest or fire, management of this woodland type is easier than for other vegetation lacking this attribute.

In the past, oaks were often removed with the commercial softwoods in mixed stands, or cleared during site preparation. Their removal reduced visual quality and the diversity of the woodlands and the wildlife dependent on them. It also eliminated acorn producers for regeneration. Today, if oak is found within a timber sale boundary, they are retained to protect diversity, ensure acorn production, and provide wildlife habitat. Removing overstory pine and thinning small pine helps oak by reducing competition.

Oak woodlands are very susceptible to fire damage. While fire kills mature acorn-producing trees, it promotes sprouting. Most oak on the Forest are in thickets of small trees, probably less than 80 years old.

Little forage is produced in black oak or black oak-pine types. However, livestock browse on oak leaders in late summer. Some brush and very little grass grow in these stands.

**Western Juniper**

Western juniper woodlands clearly dominate (28%) all other vegetation types on the Forest, and cover nearly 470,000 acres. Juniper grows throughout the Forest below 7,500 feet, primarily on shallow soils. It also grows with eastside pine.

Juniper provides thermal cover as well as escape and hiding cover for wintering deer herds. Large clearcuts in juniper woodlands on deer winter ranges can harm the herd by contributing to thermal stress during severe weather or very cold temperatures. However, small clearcuts (twenty acres or less), provide excellent forage while still providing cover. Cavity species nest in juniper, even when green. Judicious juniper removal generally benefits wildlife diversity.

Some juniper woodlands are also important as forage areas. When all fires are suppressed, juniper encroachment is unchecked and renders grasslands unusable for forage. When juniper woodlands are allowed to burn, the invading species is removed and soil nutrients are recycled for grass and shrub species. The Big Sage Fire Management Unit (BSFMU) is a special area on the Devil's Garden and Doublehead Districts. The fire plan for this area allows lightning-caused fires to burn with minimal suppression efforts (see Fire and Fuels section). In addition to savings in suppression costs, fires in the BSFMU have reduced juniper trees in about 215 acres. More forage is available for livestock and wildlife.

If the Forest allowed fires to burn in other juniper areas, some acres would convert to bunchgrass ranges. Fire could assume its natural role in restoring ecosystems. All fires are suppressed in recreation areas to preserve recreation values.

Managing juniper for firewood is important because of local demand. The Firewood section discusses supply and demand for juniper. Removing juniper also benefits grasses and shrubs by eliminating encroaching trees and leaving nutrients for grass and brush species important to wildlife and domestic livestock.

In most cases, woodcutters remove large trees which provide the best wildlife habitat, and leave small ones which compete with grasses and shrubs. Another disadvantage of woodcutting is the resulting slash piles which have to be treated to make grass available. However, some wildlife species use slash piles for cover, nesting, and feeding.

Since 1980, the Doublehead Ranger District has removed juniper from about 150 acres per year through firewood sales in the Dry Lake and Clear Lake areas to promote grass and shrub growth. The problem of encroaching juniper can be alleviated by a planned firewood program resembling that on Doublehead Ranger District. Juniper firewood management will accommodate local demand and a growing market in Reno and Lake Tahoe, and enhance grass production for wildlife and livestock forage.

Historically, natural wildfire kept grasslands nearly free of juniper by burning off trees and leaving soil nutrients for grass species. Juniper woodlands have increased in the past 100 years because natural fires were not allowed to burn. The Forest Service fire suppression policy has resulted in juniper encroachment in grassland ecosystems. Historic livestock grazing further aided juniper invasion by removing grass species and providing an excellent seedbed for junipers. Currently, old juniper trees are thriving, and young trees continue to invade new areas.

As juniper woodlands expand, the crown cover closes, depriving grass and shrubs of sunlight and reducing available soil moisture. Areas that produced range forage fifty years ago are almost unusable today. Generally, attempts to eliminate juniper from rangelands have been unsuccessful.

## Opportunities

Opportunities exist to enhance seral stage diversity of both black oak and juniper woodlands. The Forest could maintain existing representations of black oak and juniper within each management area. It could allow land not managed for timber production to cycle naturally, unless management were necessary for other resources.

The Forest lacks consistent data on black oak and juniper. Updated vegetation maps would improve the data base and assist in woodlands management and planning.

**Chapter 4 — Management Direction**

## Table of Contents

A. Introduction . . . . . . . . . . . . . . . **4 - 1**

B. Forest Mission and Goals . . . . . . . . . . . **4 - 1**

C. Forest Objectives . . . . . . . . . . . . . **4 - 6**

D. Forest Standards and Guidelines . . . . . . . . . **4 - 13**

E. Management Prescriptions . . . . . . . . . . . **4 - 34**

F. Management Area Direction . . . . . . . . . . **4 - 146**

   **Warner Mountain Ranger District**

     31 - Highgrade . . . . . . . . . . . . **4 - 149**

     32 - Fandango . . . . . . . . . . . . **4 - 153**

     33 - Lake City . . . . . . . . . . . . **4 - 157**

     34 - Fitzhugh . . . . . . . . . . . . **4 - 161**

     35 - South Warner Wilderness . . . . . . . . **4 - 165**

     36 - Patterson . . . . . . . . . . . . **4 - 169**

   **Big Valley Ranger District**

     41 - Long Bell . . . . . . . . . . . . **4 - 173**

     42 - Stone Coal . . . . . . . . . . . . **4 - 177**

     43 - Portuguese Ridge . . . . . . . . . . **4 - 181**

     44 - North Adin . . . . . . . . . . . . **4 - 185**

     45 - South Adin . . . . . . . . . . . . **4 - 189**

   **Devil's Garden Ranger District**

     51 - Devil's Garden . . . . . . . . . . . **4 - 194**

     52 - Crowder . . . . . . . . . . . . **4 - 199**

     53 - Hackamore . . . . . . . . . . . . **4 - 203**

     54 - Happy Camp . . . . . . . . . . . . **4 - 207**

   **Doublehead Ranger District**

     61 - Medicine Lake . . . . . . . . . . . **4 - 211**

     62 - Black Mountain . . . . . . . . . . . **4 - 215**

     63 - Tionesta . . . . . . . . . . . . **4 - 219**

     64 - Mears . . . . . . . . . . . . . **4 - 223**

     65 - Steele Swamp . . . . . . . . . . . **4 - 227**

     66 - Clear Lake . . . . . . . . . . . . **4 - 231**

     67 - Mount Dome . . . . . . . . . . . . **4 - 235**

# Chapter 4
## Management Direction

## A. Introduction

**M**anagement direction contained in this chapter will guide administration and use of the Modoc National Forest until the Forest Plan is amended or revised. The Plan is a full public disclosure of management practices and activities on the Forest. The document provides Forest managers with clear, consistent direction for implementing those practices and activities.

The hierarchy of management direction for the Forest emanates from laws passed by Congress, such as the National Environmental Policy Act, National Forest Management Act, Resources Planning Act, Multiple-Use Sustained-Yield Act, Threatened and Endangered Species Act, and others which provide direction for various aspects of management. More specific regulations and policies for meeting legislation is contained in the Code of Federal Regulations, the Forest Service Manual (FSM) and Handbook (FSH), and the Pacific Southwest Regional Guide. This Forest Plan supplements, but does not replace, the direction from these sources. The Plan restates FSM or policy statements only when doing so clarifies or strengthens direction.

Management direction unique to this Plan is designed to meet Modoc National Forest Goals and Objectives. **Forest Mission and Goals** (Section B) provide broad direction for the Forest regarding the types and amounts of goods and services it provides. **Forest Objectives** (Section C) are quantified land allocations, resource activities, outputs, and operating costs projected over the next 50 years. Management direction consists of:

**Forest-wide Standards and Guidelines** (Section D) — management actions applicable to all lands within the Forest wherever and whenever relevant situations occur. Application areas are not mapped and may change from time to time.

**Management Prescriptions** (Section E) — integrated sets of management activities and practices conducted on specified land areas throughout the Forest. Each prescription contains management direction and standards and guidelines which govern activities and practices.

**Management Area Direction** (Section F) — Area-specific standards and guidelines as well as quantified objectives for each area. Acreages committed to each of the management prescriptions are included.

At all levels, Standards and Guidelines are used repeatedly throughout the hierarchy of Forest management direction. In all cases, they describe how resources are managed.

The annual budgeting and program planning process is the fiscal backbone of management direction. Whether objectives in this Plan are met depends on funds appropriated by Congress and subsequent allocation to the Forest through the budget process. In addition, management direction may vary due to unforeseen site conditions. In any case, the Forest Plan will not vary from direction based on laws or Forest goals. Changes in management direction will be accommodated through amendments and revisions as explained in Chapter 1.

Environmental analyses will precede projects requiring additional detail for project-level decisions. These EAs will be tiered to the Environmental Impact Statement for the Forest Plan.

## B. Forest Mission and Goals

Overall management of the Forest results in:

– improved rangeland condition, with permitted grazing and forage capacity in balance,
– generally even-aged timberlands with a diversity of age classes,
– a full range of recreation opportunities, ranging from primitive to modern recreation settings,
– improved water quality and riparian areas, and
– higher populations of threatened and endangered species, snag-dependent species, and early successional wildlife, and improved fisheries production;

while:

– protecting significant cultural resources,
– providing mineral and energy resource development,
– continuing to offer firewood commensurate with public demand,
– maintaining soil productivity,
– ensuring scenic attractiveness from major public use areas,
– continuing wetland development, and
– maintaining viable populations of all native and non-native desired vertebrate species.

The desired future condition of the Forest is embodied in the following Forest Mission and Goals, which

respond to the Issues in Chapter 2. The desired future condition is further embodied in the Forest Standards and Guidelines, Management Prescriptions, and Management Area Direction, which translate the Forest Mission and Goals into more specific direction and practices.

**Modoc National Forest Mission: 1990-1999**

The Forest mission, considering efficiency, cost effectiveness, public needs, and congressional discretion, is to: (not by priority)

- Contribute to the community *economy.*
- Provide for public awareness and enjoyment of *cultural resources.*
- Provide for sustained outputs of *forage and timber* products.
- Provide opportunities for *human resource programs* and individual development through employment and volunteer programs.
- Provide for *mineral* and energy resource development.
- Maintain a level of resource *protection* commensurate with values.
- Provide a variety of *recreational opportunities* from primitive to modern recreation settings.
- Maintain and enhance *scenic opportunities.*
- Maintain and enhance *soil productivity.*
- Enhance overall *water quality.*
- Provide diverse and productive habitat for a variety of *wildlife and fish* species.
- Involve and *cooperate* with federal, State and local agencies, industry, private landowners, and the general public in planning resource use, protection and management of government and other land. Solicit viewpoints in developing the Forest Plan and programs. Provide assistance and research information and, implement useful results.
- Provide *equal employment and career opportunities.*

**Modoc National Forest Program Goals: 1990-1999**

**Air Quality**

- Maintain air quality consistent with legal requirements.

**Cultural Resources**

- Protect and manage cultural resources as a non-renewable resource.
- Complete an inventory and evaluation of the Forest's cultural resources by 2050.
- Provide information for public education and enjoyment of the Forest's cultural resources.

- Protect access and use of sites and locations important to traditional Native American religious and cultural practices.

**Diversity**

- Provide vegetative diversity to maintain viable populations and other resource objectives, including scenic quality, wildlife , and reduced wildfire loss.

**Energy**

- Provide energy-efficient facilities through state-of-the-art design, construction and retrofit.
- Encourage the use of surplus biomass.
- Provide for energy resource development, including hydroelectric, geothermal, oil, and gas.

**Facilities**

- Provide and manage a Forest Transportation System (roads and trails) to accomplish resource management objectives while protecting resource values.
- Provide cost-effective administrative facilities.
- Provide a cost-effective communications system designed to meet resource objectives.

**Fire and Fuels**

- Protect national forest resources commensurate with values, hazards, risks, and management objectives.
- Treat fuels commensurate with hazards, risks, economics, values, and losses which could be sustained in the project area.
- Use crews trained to suppress fire through a variety of techniques.
- Maintain or increase inter-forest and inter-agency protection management.
- Use fire as a management tool.
- Cooperate in developing management and protection plans for intermingled State and private forest lands in northeast California.
- Use treatments, such as prescribed fire and fuel utilization, on natural fuels of high risk to reduce wildfire hazard.

## Firewood

- Sustain the firewood supply, with emphasis on personal use.

## Geology and Minerals

- Provide for mineral exploration and development while protecting surface resources.

- Provide for reclamation of disturbed lands as a result of mineral development.

## Human Resources

- Provide opportunities for human resource program enrollees and volunteers to acquire knowledge, skills, and attitudes that will enhance their professional and personal goals.

## Lands

- Achieve a land ownership pattern that facilitates Forest management and reduces administrative costs.

- Survey and mark property boundaries.

- Acquire rights-of-way needed to efficiently manage Forest resources.

- Pursue land withdrawals to protect Forest improvements and areas of special significance.

- Administer special use permits in conformance with Management Area Direction.

- Avoid separate utility rights-of-way.

- Resolve unauthorized occupancies of national forest land.

## Law Enforcement

- Protect life, property, and Forest resources.

## Pests

- Reduce impacts of Forest pests to tolerable levels through integrated pest management.

## Range

- Maintain the wild horse herd population between 275 and 335 animals.

- Balance permitted grazing and forage capacity by 2000 with grazing systems that complement other resource needs.

- Coordinate range resource planning opportunities with BLM, SCS and individuals to achieve goals.

- Support the Experimental Stewardship Program to increase cooperation and gain understanding of resource plans.

- Complete the ecosystem classification program.

## Recreation

- Operate and manage Medicine Lake and Blue Lake as featured campgrounds. Operate other developed sites at standard levels.

- Manage a full spectrum of trail opportunities and ensure proper signing of National Recreation Trails.

- Provide a broad spectrum of recreation opportunities that offer an experience level commensurate with the ROS zone in which the activity takes place.

- Inform and assist the public to make their visits enjoyable. Facilitate an understanding of the various resources and uses of the national forests, and solicit feedback to improve the management of Forest resources.

- Where resource damage is occurring from concentrated use, correct the situation with management techniques that disperse recreationists, or provide facilities to protect sites.

## Research Natural Areas

- Manage research natural areas to protect the values for which they were established.

## Riparian Areas

- Manage lakes, perennial reservoirs, meadows, seeps, wetlands, springs, and streamside management zones (including ephemerals and intermittents) to maintain or improve riparian-dependent resources.

## Sensitive Plants

- Protect habitat for sensitive species sufficient for eventual delisting.

## Soil

- Maintain natural nutrient balance to ensure long-term soil productivity.

- Restore areas of soil degradation.

- Enhance soil productivity on selected sites.

- Accurately assess the capabilities, suitabilities and limitations of soils for better management decisions and recommendations.

## Special Interest Areas

- Manage special interest areas to protect the values for which they were established.

## Timber

- Prepare and offer the Allowable Sale Quantity of sawtimber specified in the Forest Plan.

- Encourage increased utilization of wood products.

- Inform the public to foster an understanding of silvicultural practices.

- Implement post-sale treatments commensurate with resource needs and economics.

- Implement Tree Measurement Sales for low defect timber as opportunities occur.

- Reforest suitable land planned for regeneration within 5 years of harvest.

- Achieve and maintain, through the interdisciplinary process, quality timber sale layout and associated transportation system planning.

## Visual Resource

- Maintain or improve the scenic attractiveness of the Forest as seen from major public use areas. Manage visual resources to meet or exceed adopted visual quality objectives (VQOs).

- Rehabilitate areas not meeting VQOs.

## Watershed

- Use Best Management Practices (BMPs) to meet water quality objectives.

- In second- or third-order watersheds, limit cumulative impacts to protect stream channel conditions and water quality.

- Rehabilitate degraded watershed areas impairing water quality.

- Acquire and maintain water rights for the Forest.

- Ensure Forest activities will not adversely affect groundwater quality.

## Wilderness

- Manage the South Warner Wilderness to maintain or enhance wilderness qualities.

## Wildlife and Fish

- Maintain or improve instream habitat for desired fish.

- Manage riparian areas to optimize fish habitat or populations.

- Attain recovery goals for state and federal threatened and endangered species.

- Maintain or exceed habitat quality and quantity necessary for viable populations of sensitive species.

- Provide habitat quality and quantity, on a seasonal and year-round basis, necessary to meet the Forest's share of population objectives in State management plans for deer, pronghorn and other species.

- Fully develop and maintain suitable Forest wetlands.

- Improve and maintain habitat for species dependent on snags, nest cavities, and dead/down wood.

- Cooperate with State, federal and other agencies in wildlife habitat planning and improvement.

- Meet habitat or population objectives for Management Indicator Species.

## Forest Planning

- Complete, implement, and monitor a Forest Land and Resource Management Plan as outlined in the National Forest Management Act and the Secretary of Agriculture's regulations.

- Revise, maintain, and create data bases for monitoring and Plan revision.

- Coordinate land management planning with local and private planning and assist with related projects.

## General Administration

- Work toward an effectively staffed organization.

- Practice "Toward Excellence" concepts for a more favorable work environment.

- Maintain effective communications and relations within the organization and support a positive and bilateral program of labor-management relations.

- Develop an organizational climate that encourages open communication, understanding and dedication to Forest Goals.

- Develop a workforce that is representative of the population, and has a high level of professionalism with opportunities for development.

- Conduct an informational and educational program to inform and involve the public, other agencies, and Forest employees in activities and issues.

**Table 4-2. Average Annual Outputs and Activities.**

| Output/Activity | Base Year 1982 | 1980 RPA Goals 1990 | 1980 RPA Goals 2030 | Decade[1] 1 | Decade[1] 2 |
|---|---|---|---|---|---|
| **Economics** | | | | | |
| Total Budget (MM$) | 9.6 | 13.2 | 14.2 | 12.1 | 12.9 |
| Total Cost (MM$) | 11.5 | | | 14.4 | 15.2 |
| **Facilities** | | | | | |
| Trail Construction/Reconstruction (Miles) | 0.0 | 3.0 | 3.0 | 9.7 | 5.5 |
| Road Construction (Miles) | 9.3 | | | 11.5 | 10.0 |
| Road Reconstruction (Miles) | 21.7 | | | 25.0 | 25.0 |
| F.S. Road Maintenance (Miles) | 3,178.4 | | | 3,167.3 | 3,189.1 |
| Dams and Reservoirs | | | | | |
| Forest Service (Number) | 120.0 | | | 120.0 | 120.0 |
| Other Federal (Number) | 0.0 | | | 0.0 | 0.0 |
| Other State/Local (Number) | 29.0 | | | 29.0 | 29.0 |
| Private (Number) | 0.0 | | | 0.0 | 0.0 |
| Administrative Sites | | | | | |
| Forest Service Owned (Number) | 12.0 | | | 14.0 | 16.0 |
| Leased (Number) | 4.0 | | | 2.0 | 0.0 |
| **Fire and Fuels** | | | | | |
| Total Fuel Treatment (Acres) | 5,100.0 | 1,800.0 | 1,600.0 | 4,246.0 | 3910.0 |
| Fire-related Fuel Treatment (acre) | 0.0 | | | 350.0 | 350.0 |
| Timber-related Fuel Treatment (acres) | 4,800.0 | | | 3,846.0 | 3,510.0 |
| Other Fuel Treatment (Acres) | 50.0 | | | 50.0 | 50.0 |
| Expected Acres Burned by Wildfire | 8,604.8 | | | 6,236.0 | 6,245.0 |
| Intensity Class 1 | 2.0 | | | 1.0 | 7.0 |
| Intensity Class 2 | 139.8 | | | 133.0 | 133.0 |
| Intensity Class 3 | 838.0 | | | 577.0 | 577.0 |
| Intensity Class 4 | 7,625.0 | | | 5,527.0 | 5,527.0 |
| Intensity Class 5 | 0.0 | | | 0.0 | 0.0 |
| Intensity Class 6 | 0.0 | | | 0.0 | 0.0 |
| **Firewood** | | | | | |
| Firewood (M Cords) | 23.0 | | | 25.0 | 27.8 |
| **Human Resources** | | | | | |
| Programs (Enrollees) | 11.0 | 0.0 | 0.0 | 3.0 | 3.0 |
| **Lands and Minerals** | | | | | |
| Minerals (Operating Plans) | 43.0 | 45.0 | 57.0 | 45.0 | 49.0 |
| Land Acquisition (Acres) | 3,823.0 | 0.0 | 0.0 | 160.0 | 160.0 |
| **Range** | | | | | |
| Grazing (M AUM) | 122.5 | 117.4 | 123.7 | 118.8 | 132.0 |

**Table 4-2. Average Annual Outputs and Activities. (continued)**

| Output/Activity | Base Year 1982 | 1980 RPA Goals 1990 | 1980 RPA Goals 2030 | Decade[1] 1 | Decade[1] 2 |
|---|---|---|---|---|---|
| **Recreation** | | | | | |
| Developed Public (M RVD) | 81.2 | 82.8 | 110.4 | 92.9 | 106.7 |
| Developed Private (M RVD) | 4.6 | 7.2 | 9.6 | 8.1 | 9.3 |
| Dispersed (M RVD) | 102.8 | 120.0 | 158.8 | 122.4 | 142.9 |
| Hunting-related Dispersed* (M RVD) | 98.4 | 114.8 | 152.0 | 92.9 | 103.3 |
| Open, Usable OHV Areas— Summer (M Acres) | 1,077.4 | | | 1,010.8 | 1,010.8 |
| Open, Usable OHV Acres— Winter (M Acres) | 1,092.1 | | | 1,034.6 | 1,034.6 |
| Roads and Trails Open to OHV Use— Summer (Miles) | 2,964.4 | | | 3,021.1 | 3,025.3 |
| Roads and Trails Open to OHV Use— Winter (Miles) | 2,776.4 | | | 2,833.4 | 2,832.0 |
| Roads and Trails Closed to OHV Use— Summer (Miles) | 332.0 | | | 332.0 | 342.0 |
| Roads and Trails Closed to OHV Use— Winter (Miles) | 520.0 | | | 520.0 | 535.0 |
| *Hunting-related RVDs are separate from dispersed recreation RVDs | | | | | |
| **Timber** | | | | | |
| Allowable Sale Quantity (MMCF) | 8.3 | 12.3 | 13.2 | 7.6 | 7.6 |
| (MMBF) | 50.4 | 75.3 | 80.3 | 45.5 | 45.5 |
| Long Term Sustained Yield (MMCF) | 9.7 | | 13.2 | 9.2 | |
| (MMBF) | 58.9 | | 80.3 | 56.3 | |
| Big Valley Federal Sustained-Yield Unit (MMBF) | 13.7 | | | 9.0 | 9.0 |
| Reforestation (M Acres) | 3.7 | 2.9 | 3.1 | 3.4 | 3.9 |
| Timber Stand Improvement (M Acres) | 3.9 | 3.8 | 3.8 | 5.4 | 7.3 |
| **Visual Resources** | | | | | |
| Visual Quality Index | 62.6 | | | 64.1 | 65.9 |
| **Water** | | | | | |
| Quality (M acre-feet meeting objectives) | 357.1 | 792.0* | 801.0* | 357.3 | 458.0 |
| Quantity (M acre-feet) | 565.8 | | | 567.0 | 568.3 |
| Watershed Improvement (Acres) | 0.0 | 180.0 | 200.0 | 260.0 | 230.0 |
| *RPA goals are erroneous because they exceed the Forest's cumulative annual water yield of 565.8 M acre-feet. Correct goals are 357.1 and 565.8 M acre-feet for 1990 and 2030, respectively. | | | | | |
| **Wilderness** | | | | | |
| Wilderness (M RVD) | 7.1 | 8.3 | 11.0 | 9.4 | 12.4 |
| **Wildlife and Fish** | | | | | |
| Bald Eagle (Active Territories) | 7.0 | 8.0 | 21.0 | 10.0 | 21.0 |

**Table 4-2. Average Annual Outputs and Activities. (continued)**

| Output/Activity | Base Year 1982 | 1980 RPA Goals 1990 | 1980 RPA Goals 2030 | Decade[1] 1 | Decade[1] 2 |
|---|---|---|---|---|---|
| Bald Eagle (Potential Territories) | 14.0 | 13.0 | | 11.0 | 0.0 |
| Peregrine Falcon (Active Territories) | 0.0 | 2.0 | 3.0 | 3.0 | 3.0 |
| Modoc Sucker (Suitable Stream Miles) | 13.4 | | | 19.4 | 19.4 |
| Bighorn Sheep (Individuals) | 20.0 | | | 20.0 | 50.0 |
| Deer (M Individuals) | 24.1 | 27.4 | 27.4 | 34.2 | 37.8 |
|   Interstate Deer Herd | 8.2 | | | 10.4 | 10.4 |
|   Glass Mountain Deer Herd | 5.5 | | | 10.0 | 10.0 |
|   Warner Mountain Deer Herd | 7.2 | | | 9.4 | 11.0 |
|   Adin Deer Herd | 3.2* | | | 4.2 | 6.4 |
| Resident Fish (M Pounds)—All | 116.0 | 120 | 170.0 | 118.8 | 121.5 |
|   Resident Trout (M Pounds) | 43.0 | 47.0 | 47.0 | 45.1 | 46.9 |
|   Warmwater Fish (M Pounds) | 73.0 | 73.0 | 123.0 | 73.7 | 74.7 |
| Goshawk (Pairs) | 71.0[2] | | | 100.0 | 100.0 |
| Total Wildlife and Fish User Days— (M WFUDs) (Is not double-counted with dispersed recreation) | 83.1 | 97.0 | 128.3 | 106.6 | 121.6 |
|   Big Game (M WFUD) | 32.8 | | | 47.9 | 53.0 |
|     Direct Habitat Improve. | | | | 0.5 | 0.5 |
|     Induced Habitat Improve. | | | | 16.7 | 17.0 |
|   Upland Game, Waterfowl, & Nongame (M WFUD) | 24.6 | | | 28.3 | 32.1 |
|     Direct Habitat Improve. | 0.0 | | | 2.5 | 3.0 |
|   Resident Fish (M WFUD) | 25.7 | | | 29.8 | 36.5 |
|     Direct Habitat Improve. | | | | 0.3 | 0.6 |
|     Induced Habitat Improve. | | | | 0.2 | 0.4 |
| Acres/Structures of Direct Habitat Improvement | | | | | |
|   Deer (Acres) | 165.0 | | | 330.2 | 0.0 |
|   Wetlands (Acres) | 1,000.0 | | | 362.5 | 284.1 |
|   Upland Game (Acres) | 0.0 | | | 100.0 | 100.0 |
|   Nongame (Acres) | 0.0 | | | 75.0 | 75.0 |
|   Snags (Numbers Created) | 0.0 | | | 2,605.0 | 1,935.0 |
|   Resident Fish (Stream Miles) | 0.0 | | | 1.5 | 1.5 |

*Equal to 72% of deer herd population estimate of 4,300 deer.

1  Decade 1 is the period 1990-1999.

   Decade 2 outputs are shown for long-range comparisons. The Forest Plan will be revised on a 10- to 15-year schedule.

2  Known pairs in 1982.

**Table 4-3. Timber Management Outputs and Activities for the 1st Decade.**

| Management Practice | Acres/Year | Allowable Sale Quantity | |
| --- | --- | --- | --- |
| | | MMCF/Year | MMBF/Year |
| **Regeneration Harvest** | | | |
| By Forest Type: | | | |
| Eastside Pine | 2,490 | 2.7 | 16.4 |
| Mixed Conifer | 985 | 3.3 | 20.4 |
| Red Fir | 95 | 0.4 | 2.4 |
| Lodgepole Pine | 170 | 0.2 | 1.5 |
| **Total** | 3,740 | 6.6 | 40.7 |
| By Cutting Method: | | | |
| Clearcut | 3,120 | 5.2 | 32.0 |
| Shelterwood | 280 | 0.5 | 3.2 |
| Selection | 340 | 0.9 | 5.5 |
| **Total** | 3,740 | 6.6 | 40.7 |
| **Intermediate Harvest** | | | |
| Commercial Thinning | 200 | <0.1 | 0.1 |
| Sanitation Salvage | 1,900 | <0.1 | .2 |
| **Non-Interchangeable Component (NIC)** (Includes harvest from the Visual Retention, Riparian, and <20 Prescriptions) | 2,200 | 0.7 | 4.5 |
| **Total Harvest** | 8,040 | 7.6 | 45.5 |
| Other Practices | | | |
| Release | 3,400 | | |
| Precommercial Thinning | 2,000 | | |
| Total Timber Stand Improvement | 5,400 | | |
| Reforestation | 3,400 | | |

## C. Forest Objectives

The following tables show Forest land use allocations, commodity outputs, resource management activities, and operating costs that accomplish, or are compatible, with the Forest Mission and Goals.

Table 4-1 shows the Forest-wide acreages allocated to each Management Prescription. (Appendix P provides the breakdown by management area.)

Table 4-2 displays objectives for the first two decades of the Forest Plan. Objectives are planned, measurable outputs that will bring us, step by step, to the Forest mission and goals described in the previous section. The objectives are average annual outputs and activities for the first two decades — 1990-1999 and 2000-2010. These outputs provide long-term direction and help in developing annual work plans and budget requests. They are based on the computer-modeled outputs displayed for the Preferred Alternative in the EIS.

Actual outputs may differ substantially from those displayed in Table 4-2 for the following reasons:

– Actual budgets may be less than required to achieve all outputs;

– Outputs are based on assumptions used in modeling — actual outputs from treatments may vary from those projected;

– Activities will comply with the management direction, i.e., standards and guidelines, displayed in Sections D, E and F of this chapter. Compliance with this direction may preclude full realization of projected outputs.

– Conditions on the Forest can change rapidly due to catastrophic damage by fires, insects or disease. These conditions influence the Forest's ability to provide projected levels of outputs.

Chapter 5 displays the monitoring and evaluation process that we can use to amend the Forest Plan if major differences occur between projected and actual accomplishments.

Table 4-3 provides additional objectives for timber management on an annual basis. Following Table 4-3, other resource objectives are highlighted for the 1st decade.

| Table 4-1. Land Allocation to Management Prescriptions. | | | |
|---|---|---|---|
| | Prescription | Acres | % of Forest |
| 1 | Minimum Level | 70,153 | 4.2 |
| 2 | Wilderness Standard | 70,385 | 4.2 |
| 3 | Wilderness Low Standard | 0 | 0.0 |
| 4 | Semi-Primitive Non-Motorized | 23,013 | 1.4 |
| 5 | Developed Recreation Standard | 198 | <0.1 |
| 6 | Developed Recreation Low Standard | 0 | 0.0 |
| 7 | Visual Retention | 31,127 | 1.9 |
| 8 | Special Areas | 14,588 | 0.9 |
| 9 | Raptor Management | 52,111 | 3.1 |
| 10 | Rangeland | 619,212 | 37.2 |
| 11 | Range-Forage | 291,365 | 17.5 |
| 12 | Even-Aged Timber | 145,859 | 8.8 |
| 13 | Timber-Visuals | 66,835 | 4.0 |
| 14 | Timber-Forage | 110,291 | 6.6 |
| 15 | Uneven-Aged Timber | 17,114 | 1.0 |
| 16 | <20 Cu Ft Timber | 142,117 | 8.5 |
| 17 | Riparian Area | 9,274 | 0.6 |

## Other Resource Program Objectives

### Air Quality

Maintain air quality in Class I Wilderness areas within the requirements of the Clean Air Act.

### Cultural Resources

Continue Native American consultation, inventory and evaluation on a project need basis; sign one site per year for two decades; nominate 2 sites to the NRHP per year; and evaluate 50 backlog sites for NRHP significance per year. Complete cultural resources inventory of the Forest by the year 2050. Significant and unevaluated cultural resource sites are protected primarily by project redesign and avoidance. Interpret significant cultural resources through signing, brochures and self-guided tours. Continue cooperative efforts with local groups such as the Modoc County Historical Society.

### Facilities

In addition to timber sale-related roads, construct or reconstruct about 5 miles per year of access roads for recreation, range, and wildlife uses.

### Fire and Fuels

Use the current fire management program which emphasizes suppression. Apportion the budget to the following programs: suppression 74%, prevention 9%, fuels 14%, and detection 3%.

### Minerals

Make all Forest lands available for mineral leasing, except within the South Warner Wilderness or those lands which have been temporarily withdrawn from mineral leasing as a result of proposed land exchange.

### Pests

Manage pests at a level commensurate with moderate levels of vegetation management and resource outputs.

### Range

Revise allotment management plans every 10 years. Adjust permitted livestock grazing to meet Forest Standards and Guidelines, including to improve water quality, fisheries, and riparian areas, and meet State deer herd goals. Increase forage production in designated allotments through 6,800 acres of nonstructural range improvements, such as prescribed burning; and maintain 22,000 acres of seedings. Improve ecologic condition by managing livestock distribution through structural improvements such as fences and watering areas. Continue managing wild horses.

### Recreation

*Developed Recreation:* Where use is high, expand existing facilities or construct new sites. Reconstruct existing facilities in need of rehabilitation. Manage existing sites at the standard level. Emphasize the interpretive services program. Construct interpretive facilities.

*Dispersed Recreation:* Provide a full range of dispersed recreation opportunities. Construct 57 miles of new trails and reconstruct 40 miles of trails in the next 10 years. Maintain these trails at their designed standard. Keep over 87% of the Forest open to OHVs. Provide special management of popular dispersed recreation sites to protect or enhance their values.

### Research Natural Areas

Recommend Raider Basin for a Research Natural Area. Recommend other target elements as needs and opportunities arise.

### Riparian Areas

Enhance habitat for riparian-dependent resources in allotments where resource conflicts are occurring. Build structural range improvements to resolve these conflicts. Implement Riparian Area prescription on four allotments per year.

### Soil and Water

Restore 2,600 acres in decade 1 of primarily actively degrading areas. Maintain and update the Watershed Improvement Needs inventory. Enhance water yield where vegetation manipulation opportunities exist.

Combine an SRI Order 2 and interdisciplinary team effort to more accurately determine timber capability, suitability and management options on non-interchangeable component areas primarily aggregated in SRI 3 map units 174, 222 and 223.

### Visual Resources

Manage visual quality by using the "medium" visual quality program (See EIS Appendix Q). Maintain all distinctive scenery, and all areas adjacent to major roads. Maintain some areas seen at background distances. Rehabilitate 1,500 acres of existing visual resource problems.

### Wilderness

Manage the South Warner Wilderness at the standard level. Manage for a primitive recreation experience, to the extent possible. Improve the Wilderness trail system through reconstruction over the next 20 years. Provide special visual quality protection for lands adjacent to the Wilderness.

**Wildlife and Fish:**

*Sensitive Species:* Provide and maintain habitat for 100 pairs (nest territories) of goshawks.

Manage 13 territories for pine marten.

*RPA Species:* Implement the Riparian Area Prescription on all identified trout streams and, improve 1.5 miles of trout streams annually by direct habitat improvement.

In the 1st decade, provide for deer forage by using the Timber Forage Prescription on 14,800 acres. Adjust livestock grazing by allotment to provide forage for 34,200 deer, and perform direct habitat improvement on 3,300 acres.

*Harvest Species:* Develop all suitable wetlands (4,426 acres) for waterfowl production by the 2nd decade; maintain these and currently developed wetlands to original design standards.

Annually improve 100 acres of habitat for upland game species with emphasis on sage grouse, quail and blue grouse.

Improve 100 acres of reservoir annually for largemouth bass.

*Other Species:* Improve 75 acres per year of habitat for nongame species.

## D. Forest Standards and Guidelines

*Forest Standards and Guidelines apply to the entire Forest. They expand the Forest Mission and Goals into general management direction for each resource.*

*Two additional levels of direction below the Forest Standards and Guidelines are Management Prescriptions and Management Area Direction. They provide more specific direction, but are consistent with the Forest Standards and Guidelines.*

| Resources | Page |
|---|---|
| 1  Air Quality | 4-13 |
| 2  Cultural Resources | 4-14 |
| 3  Energy | 4-14 |
| 4  Facilities | 4-14 |
| 5  Fire and Fuels | 4-15 |
| 6  Firewood | 4-16 |
| 7  Geology | 4-16 |
| 8  Lands | 4-16 |
| 9  Law Enforcement | 4-17 |
| 10  Minerals | 4-18 |
| 11  Pests | 4-18 |
| 12  Range | 4-18 |
| 13  Recreation | 4-19 |
| 14  Research Natural Areas | 4-21 |
| 15  Riparian Areas | 4-21 |
| 16  Sensitive Plants | 4-21 |
| 17  Soils | 4-21 |
| 18  Special Interest Areas | 4-23 |
| 19  Timber | 4-23 |
| 20  Visual Resources | 4-24 |
| 21  Water | 4-25 |
| 22  Wilderness | 4-25 |
| 23  Wildlife and Fish | 4-25 |
| 24  General | 4-33 |

### 1. Air Quality

1. (S) Maintain air quality to meet legal requirements of all levels of government. Comply with applicable Air Pollution Control Districts (APCD) agricultural burn implementation plans.

2. (G) Manage the amounts, timing, and extent of Forest-produced air pollutants on the airshed by the following methods:

   A. Below 6,000 feet, conduct burning activities on designated burn days when atmospheric conditions provide for rapid dispersion and minimizing pollution.

   B. Design the prescription in each burn plan to meet management objectives while minimizing the amount of smoke generated.

   C. Work closely with local and neighboring Oregon APCDs during burning activities to minimize cumulative smoke impacts.

   D. Avoid prescribed ignitions which could adversely affect visibility and total suspended particulate matter in the South Warner Wilderness and the Lava Beds National Monument Class 1 airshed areas during high use periods (July 4 through Labor Day; and holiday weekends, such as Memorial Day).

   E. Schedule prescribed ignitions when weather conditions are favorable for rapidly dispersing smoke from populated and other sensitive areas, and Class I airsheds. Develop guidelines for prescribed fires to protect visibility in Class I areas if necessary.

   F. Follow dust abatement procedures prior to and during any construction activity.

   G. Monitor air quality sensitivity indicators (such as visibility and lichen) to establish baseline conditions.

3. (G) Determine locations for high concentrations of air pollutants and areas of probable adverse effects.

A. Use existing emission data, air quality monitoring, personal observation, modeling or professional consultation.

B. Determine current conditions.

4. Establish monitoring sites for air quality resource values where appropriate to characterize the South Warner Wilderness.

5. Perform Prevention of Significant Deterioration (PSDs) permit application reviews to determine what effect increased emissions from major stationary sources will have on Air Quality Related Values (AQRVs) of Class I areas.

## 2.  Cultural Resources

1. (S) Inventory to identify cultural resource properties prior to any project, activity or license which may affect significant cultural resources consistent with the National Historic Preservation Act of 1966 (as amended) and other pertinent laws and regulations. Adjustments will be made to projects to comply with cultural resource laws.

2. (S) Evaluate cultural resources to determine National Register of Historic Places eligibility.

3. (S) Conserve properties that have been designated on, or are eligible for designation to, the National Register of Historic Places. (Eligibility is assumed if evaluation is incomplete.)

4. (G) Provide for the use and enhancement of cultural resources for educational, scientific, recreational, and other public purposes to the extent consistent with management requirements.

A. Interpret significant cultural resources through signing, brochures, displays, self-guided tours, and programs. Treat and interpret significant cultural resources appropriate to their assessed value and associated level of public interest.

B. Continue cooperative efforts with local groups such as the Modoc County Historical Society.

5. (S) Protect access and use of sites and locations important to traditional Native American religious and cultural practices consistent with the American Indian Religious Freedom Act of 1978.

6. (G) Protect cultural resources largely by directing activities or use away from sensitive areas, by maintaining confidentiality, and by informing Forest users of cultural resource protection requirements.

## 3.  Energy

1. (G) Provide new energy sources by allowing wind, geothermal, solar, hydroelectric, and biomass development. Accommodate development of geothermal, gas, and oil resources.

2. (G) Encourage firewood for home heating by providing free timber sale slash to domestic users.

3. (G) Conserve energy through Forest management activities when using facilities, vehicles, and equipment. Encourage Forest users to conserve energy through stipulations in contracts and special use permits. Monitor and evaluate energy consumption; change policies regarding energy use commensurate with findings.

## 4.  Facilities

1. (S) Provide and manage a Forest transportation system to achieve resource management objectives while protecting resource values.

A. Plan, design, and construct local roads to the lowest standard commensurate with intended use.

B. Plan and construct arterial and collector roads to the standard appropriate for safe and economical use, and commensurate with the road development guidelines in Appendix G, and multiple resource management.

C. Maintain all Forest roads to their objective maintenance levels (defined in Appendix G) .

D. Provide for signing in accordance with road management objectives and MUTCD (Manual on Uniform Traffic Control Devices) standards.

2. (G) Cooperate with federal, State, and county agencies, and private companies to construct, reconstruct, and maintain roads under their jurisdictions, if needed. Review location and design specifications for roads built under permit or license, and require protection of all resources. Coordinate road management and closures with local agencies.

3. (G) Manage and maintain the transportation system to protect soil, water, and all other resource values. Close local roads as needed to meet these objectives. Develop road closure and OHV plans (Appendix A).

4. (G) Plan for and provide a stable and cost-efficient trail system through construction, reconstruction, and maintenance, as outlined in the trail program pre-

sented in Appendix L. Reference trail standards and guidelines under Recreation.

5. (G) Develop and manage Forest facilities to promote energy conservation, to be economically efficient, and to meet other resource objectives.

   A. Limit allocations of single-purpose transmission and transportation corridors. Place new transportation and utility facilities within or contiguous to existing corridors. Encourage the use of private lands, where appropriate, for new corridors. Appropriateness is determined at the site-specific project level.

   B. Potable water sources and designated swimming areas will be monitored according to the Safe Drinking Water Act and other health regulatory requirements. At prescribed intervals, inspect for potable water.

   C. Inspect dams and bridges at prescribed intervals, and ensure maintenance for safety.

   D. Manage, construct, and maintain buildings and administrative sites for economical resource management, and to meet applicable codes.

6. (G) Develop and manage the Forest communications systems to achieve resource management objectives.

   A. Sites necessary to internal communications systems will be administratively withdrawn.

   B. Limit new electronic uses to existing, approved sites, to the extent possible. Approve new sites only if they are in the public interest. Non-compatible uses will not be authorized at the same electronic site.

## 5.  Fire and Fuels

1. (G) Protect national forest resources commensurate with values, hazards, risks, and management objectives.

   A. (G) **Suppression:** Use appropriate suppression strategies of confine, contain and control as specified in the Fire Management Action Plan. All responses will be for the purpose of control unless another response is authorized in the Fire Management Action. Use the strategy of control for wildfire on private lands protected under agreement with the California Department of Forestry. Fire Management is a suppression emphasis; the

Fire Management Effectiveness Index (FMEI) is 3.72 (Appendix H).

   – Take presuppression and suppression actions which protect life and property, and minimize resource degradation.

   – Maintain or increase inter-forest and inter-agency protection management.

   – Insure that other agencies follow Forest-wide Standards and Guidelines when suppressing fires on national forest land.

   – Use crews trained to suppress fires through a variety of techniques.

   – Within the first decade, identify project areas where fires from naturally occurring unplanned ignition may be allowed to burn within the prescription.

   – Cooperate in developing management and protection plans for intermingled State and private forest lands in northeast California.

   B. (G) **Prevention:** Prevent fires commensurate with resource values at risk.

   – Emphasize fire prevention in high use areas.

   – Emphasize periods of heavy use, such as opening of deer season and 3-day weekends from Memorial Day through Labor Day.

   – Analyze and reduce human-caused fires in areas where costly fires occur.

   – On a regular basis, inspect burning permits, industrial operations, powerlines, and residences.

   C. (G) **Detection:** Maintain 1985 level of detection.

   – Maintain all lookouts in operable condition.

   – If lookouts which are operated by other agencies and which provide detection for the Forest are abandoned, the Forest will occupy those lookouts or provide alternate sites.

   – Occupy lookouts during and after lightning storms.

   – Continue air detection to find fires after lightning storms.

2. (G) Treat fuels commensurate with hazards, risks, economics, values, and losses which could be sustained in the project area. Manage fuels to prevent fire and to complement other resource management direction.

A. (S) Treat fuels within parameters set by the Suppression Difficulty Index (Appendix H) not to exceed the following:

| Timber harvest fuels: | |
|---|---|
| Regeneration and Precommercial Entries | 5 |
| All Other Entries | 10 |
| Other fuels: | |
| As specified in Prescriptions and Management Area Direction | |

## 6. Firewood

1. (G) Administer the Forest firewood program to provide opportunities for the orderly removal of firewood, increasing slash utilization, protecting resources, and encouraging local energy conservation.

A. (G) Provide for personal use first; provide for commercial uses as supplies allow.

B. (G) Limit firewood removal as needed to assure viability of cavity-, down log-, and snag-dependent wildlife populations.

C. (G) As opportunities arise, use timber sale contract provisions to provide material for firewood.

D. (G) Where firewood is available, and resource and road management objectives allow, keep roads open after logging is complete for a sufficient period of time to allow firewood utilization.

E. (G) Designate free-use areas.

F. (G) Use the firewood program to improve range and wildlife habitat.

## 7. Geology

1. (G) Protect resources and investments from geologic hazards.

2. (S) Conduct an Order 3 or 4 Geologic Resources Inventory to support project level assessment (GRI). If needed, perform an Order 1 GRI.

3. (G) Protect the quantity and quality of groundwater.

## 8. Lands

1. Land Ownership

A. (G) Initiate land adjustments to achieve a land ownership pattern that facilitates management and reduces administrative costs.

– Utilize land purchase and exchange authorities to acquire lands or interests in lands in specially designated areas, such as wilderness, or where special features exist, such as habitat critical to threatened and endangered species. Conversely, exclude areas of the Forest that possess special values from land exchange consideration.

– Recommend transfers of other federal lands to the national forest system where resource protection and conservation will clearly benefit, and more economical and effective protection and management of forest and watershed lands will result. Conversely, recommend transfer of national forest lands to federal agencies where public interest will materially benefit, and the intended use of the land by the receiving agency cannot be met under national forest laws and regulations.

– Consolidate national forest lands through acquisitions, with emphasis on areas where national forest lands constitute appreciable proportions of the area and where additional land most valuable for national forest purposes is available.

– Continue coordination efforts with the National Park Service, Bureau of Reclamation, Bureau of Land Management, US Fish and Wildlife Service, and the State of California.

2. Special-Use and Rights-of-Way Permits

A. (G) Issue special use permits in conformance with Management Area direction.

– Do not approve special use applications if use can reasonably be made of private land.

– Inventory and set aside within the first decade those electronic sites appropriate for Forest Service and private permittee use.

– Bury new telephone lines up to and including 35 KV, except where environmental analysis indicates that aerial construction provides better protection for national forest resource and environmental values.

– To evaluate special use applications for an infrastructure (facility) serving a proposed interior subdivision: 1) consider impacts generated by the

long-term needs of the private development, including utilities, fire stations, solid waste disposal sites, etc.; 2) generally confine to private land those facilities that are essential to the development; 3) allow only one access route per subdivision or private parcel, unless public safety warrants alternate escape routes in cases of fire or other natural disaster.

– For a proposed hydroelectric project requiring a Federal Energy Regulatory Commission (FERC) license, evaluate likely environmental impacts and prepare a 4(e) letter to FERC listing mitigation requirements. When appropriate, prepare a special use permit including such requirements for facilities on Forest land; issue when the FERC license is issued.

– For an existing hydroelectric facility licensed by FERC, regulate in cooperation with other agencies.

– Limit new electronic uses to existing, approved sites, to the extent possible. Approve new sites only if they are in the public interest. Non-compatible uses will not be authorized at the same electronic site.

3. **Utility Corridor**

A. (G) Minimize proliferation of separate utility corridors by confining future needs to existing corridors, if possible. However, consider construction of new corridors outside existing utility rights-of-way if technology, safety, national and state practices, engineering, or environmental quality precludes coexisting uses.

– (S) When establishing utility corridors, avoid the following areas:

- critical habitat for threatened and endangered species

- designated Wilderness

- Research Natural Areas

- semi-primitive recreation areas

- Special Interest Areas

- areas used in the practice of Native American religions

B. Cooperate with utilities representatives to develop strategies which will minimize the potential for a single- or multiple-line power outages which could result from catastrophic events such as wildfire.

C. (S) In managing Forest activities near the utility corridor, coordinate with respective federal or private utility managers to ensure that Forest activities will not conflict with the intended permitted use and management of the utility corridor.

4. **Property Line Surveys**

A. (G) Survey, mark, and post all property lines and corners to Forest Service standards prior to implementing national forest programs adjacent to these property lines.

B. (G) Trespass

– Resolve unauthorized occupancies on national forest lands through removal occupancy, issuance of special use permits, or approved plans of operation, or land adjustments (including Small Tracts Act) .

C. (G) Rights-of-Way Acquisitions

– Acquire rights-of-ways needed to efficiently manage Forest resources. When analyzing a proposed right-of-way, evaluate the need for full public access vs. limited use (administrative and commercial hauling only) , considering: 1) proportion of public ownership; 2) road maintenance responsiblities; 3) alternate public access; and 4) closures for resource management. Participate in cost-sharing agreements with adjacent landowners.

D. (G) Withdrawals

– (G) Pursue land withdrawals when needed to protect Forest improvements and areas of special significance. Confine withdrawal applications to critical lands vulnerable to mineral or hydropower development that are: 1) occupied by permanent improvements (e.g. developed recreation sites, administrative facilities) , or 2) without improvements but with values that may be threatened (e.g. Research Natural Areas, Special Interest Areas).

## 9.  Law Enforcement

1. (G) Enforce laws and regulations on the Forest by ensuring an adequate internal law enforcement program and staff; and through coordination and cooperation with federal, state, and local law enforcement agencies.

2. (G) Ensure that the Forest is available to all persons for legitimate uses with a minimum of restrictions. Protect Forest resources and facilities as well as employee safety. Priority is given to situations threatening personal injury.

3. (G) Inform visitors of rules and regulations governing national forest system lands.

## 10. Minerals

1. (G) Encourage exploration and development of mineral resources, subject to valid existing rights or withdrawals. Deny mineral leases within the South Warner Wilderness and for lands which have been temporarily withdrawn from mineral leasing as a result of proposed land exchanges.

2. (G) Permits, leases and operating plans will contain provisions that prohibit unnecessary disturbance of the surface and provide for reasonable surface restoration. Special lease stipulations, permit clauses, or conditions related to operating plans will be applied as needed on a case-by-case basis (Appendix I) . Require reclamation plans for rehabilitation of the surface and vegetation.

3. (G) Process geothermal and oil and gas lease applications in a timely manner with appropriate coordination with other agencies.

4. (G) Maintain an inventory of mineral materials sites, specifying which are available for public use and for Forest Service use.

5. (G) Prepare a site development and rehabilitation plan before development and use of a mineral materials site.

## 11. Pests

1. Reduce impacts of forest pests on all resources to acceptable levels through integrated pest management.

   A. (G) Use an integrated pest management (IPM) approach to manage pests when planning and implementing all appropriate activities, particularly those that influence vegetation. Under IPM, consider a full range of pest management alternatives and analyze on a site-specific, project-level basis. Select treatment method(s) through the environmental analysis process after considering environmental effects, treatment efficiency, and cost-effectiveness of each alternative. Determine

monitoring and enforcement plans to implement specific actions during this site-specific process. Pest detection, surveillance, evaluation, prevention, suppression, and post-action evaluation are integral components of the IPM approach.

   B. (G) Coordinate significant animal damage control actions with the California Department of Fish and Game; U.S. Fish and Wildlife Service; Animal, Plant, Health Inspection Service; and other agencies and cooperators.

   C. (G) Cooperate with State and Counties in control of noxious weeds and predation.

   D. (G) Perform direct rodent control (i.e. trapping or fumigation) within or adjacent to developed recreation sites to prevent human-related diseases.

   E. (G) Coordinate control of public health problems with the California Department of Health Services and appropriate local health agencies.

## 12. Range

1. Through allotment management planning, manage rangeland vegetation to provide for healthy ecosystems; and to make forage available for livestock, wild horse herds, and wildlife species.

   A. (G) Implement cost-efficient range improvements.

   B. (S) Maintain or enhance satisfactory ecological condition.

   C. (G) Develop and implement allotment management plans first of all for allotments with rangeland in unsatisfactory ecological condition, or where potential or existing resource conflicts are identified. These plans will outline grazing strategies, and structural and nonstructural range improvements designed to correct the existing condition. Reference Appendix J for guidelines in selecting sites for range vegetative manipulation.

   D. (G) Measure forage utilization using key forage plants. As a general rule, allow up to 50% utilization by weight on permanent rangelands in satisfactory ecological condition. On permanent rangelands in unsatisfactory ecological condition, allow no more than 30% utilization by weight.

   E. (G) Monitor total production and/or condition and trend, as needed, to ensure good plant vigor, adequate plant reproduction, favorable range trend, and good watershed conditions. Monitor

water quality and fish habitat to determine baseline conditions and the effects of range management.

F. (G) Manage allotments to protect soil, water, and streamside-dependent resources.

G. (G) Within each allotment management plan, identify lands in unsatisfactory ecological condition where current technology does not exist to improve conditions.

H. (S) Follow fence standards described in the Modoc Supplement to the FSM.

2. (G) Manage livestock and wild horses to maintain range resource productivity.

3. (G) Determine the suitability of Forest lands for livestock grazing.

   A. Suitability criteria are:

     – Slopes >40% are not suitable for grazing cattle.

     – Slopes >60% are not suitable for grazing sheep.

     – Lands incapable of producing at least 50 pounds of useable forage per acre, including barren lands and permanent bodies of water, are not suitable.

   B. Areas that are inaccessible, including areas with physical barriers, may be designated unsuitable.

4. (G) Make lands allocated to livestock grazing available for use by qualified livestock operators. Prepare allotment management plans and revise every 10 years. Prepare annual operating plans for each allotment.

5. (S) Manage the wild free-roaming horse herds to achieve a Forest population between 275 and 335 (on the average, 305 animals).

   A. (G) Every ten years revise the herd management plan for each wild horse territory, including forage allocation for horses within the carrying capacity of the territory. Cooperate with the Bureau of Land Management in capture and placement of animals.

   B. (G) Monitor the impacts of wild horses on rangelands in allotments where horses are present. Determine if wild horse numbers should be adjusted on high impact areas.

6. (G) Where opportunities exist, coordinate resource planning with BLM, SCS, and individuals to achieve Forest goals, standards and guidelines, and objectives.

7. (G) Use the Experimental Stewardship Program (1) to gain understanding of and support for resource management plans; and (2) to experiment with innovative approaches and incentives for improved rangeland management.

8. (G) Coordinate resource management with County, State, and other federal agencies especially in noxious weed control efforts. Control noxious weeds where the need is identified.

9. (G) Continue the ecosystem classification program.

## 13. Recreation

1. (G) Establish and maintain appropriate recreation facilities and services to:

   A. Service present and future outdoor recreation needs, and ensure customer satisfaction.

   B. Prevent unsanitary conditions, water and air pollution, fires, or other impairment of resources.

2. (G) Provide a variety of developed recreation sites from remote locations to modern facilities.

   A. Manage developed recreation sites according to the Developed Recreation Site Management Prescription.

   B. Operate and manage Medicine Lake and Blue Lake as featured campgrounds. Operate other developed sites at standard level.

3. (G) Manage a full spectrum of trail opportunities.

   A. Manage the High Grade and Blue Lake National Recreation Trails in keeping with their National Recreation Trail designation. Ensure proper signing.

   B. Provide a range of trails varying between easy (suitable for handicapped) and difficult (physically challenging).

   C. Use the Recreation Opportunity Spectrum (Appendix K) system to guide decisions. Locate challenging trails within the most primitive environments and easy trails within the more roaded natural areas.

   D. Provide loop trails whenever appropriate, allowing return to the point of departure without covering the same ground twice.

   E. Consider providing for diverse types of uses such as hikers, cross-country skiers, horses, mountain

bikes, motorcycles, snowmobiles, all terrain vehicles, and 4-wheel drives.

F. Improve or relocate trails where foot traffic currently is causing water quality, fish habitat, or other resource degradation.

G. Provide for interpretation of unique geological, historical, or other features of interest.

H. Encourage participation by volunteers and specialized user groups to maintain trails. Participate in programs such as the State of California Green Sticker Program to improve funding for trails.

I. Develop a signing program appropriate to the ROS class.

4. (G) Design resource management activities to complement the Recreation Opportunity Spectrum (ROS) classes delineated on the ROS map and referred to in each prescription. (Refer to Appendix K and the ROS User's Guide for a full listing of activity opportunities, recreational settings, and experience opportunities by ROS class.)

A. (G) **Roaded Natural:**

– Provide opportunities for such recreation activities as pleasure driving, water-skiing, hunting, and camping in areas characterized by predominantly natural-appearing environments with moderate evidence of human activities.

– Provide developments, including interpretive or vista sites and developed recreation sites.

B. (G) **Semi-Primitive Motorized:**

– Provide opportunities for such recreation activities as off-highway vehicle touring, hunting, and camping in areas characterized by predominantly natural or natural-appearing environments with low concentrations of users.

– Limit site development to resource protection.

– Minimize construction or reconstruction of system roads.

C. (G) **Semi-Primitive Non-Motorized:**

– Provide opportunities for such recreation activities as hiking, fishing, and tent camping in predominantly natural environments with low incidence of interactions between users.

– Prohibit motorized recreation; eliminate and prevent OHV use.

– Limit site development to resource protection.

– Apply the Semi-Primitive Non-Motorized Dispersed Recreation Prescription to specified areas (generally at least 2,500 acre units) .

D. (G) **Primitive:**

– Provide opportunities for such recreation activities as hiking, mountain climbing, fishing, and tent camping in essentially unmodified natural environments with minimal interaction with or evidence of others.

– Prohibit motorized recreation or access; eliminate and prevent OHV use.

– Maintain trails and provide minimum information signs. Provide no other developments.

– Eliminate accumulated evidence of human impact.

– Emphasize low on-site regimentation and primarily off-site controls.

5. (G) Allow dispersed recreation activities in undeveloped areas of the Forest unless otherwise prohibited for resource protection. Adjust land management activities at popular locations to maintain or enhance the natural setting and functional use of the site.

6. (G) Provide off-highway vehicle (OHV) recreation where OHV activities will not cause resource damage nor conflict with other uses. Reference the OHV map for use areas.

7. (G) The following concerns will be addressed and may require corrective action to OHV opportunities identified in the Plan:

A. excessive soil erosion or compaction resulting in reduced productivity;

B. degradation of water quality;

C. unnecessary disturbance to deer and pronghorn on fall and winter range, and during fawning and kidding periods;

D. adverse impacts to threatened, endangered, and sensitive species not fully accommodated in the Plan; and

E. new technological changes in OHVs and their uses.

Corrective actions may include, but are not limited to, improved trail maintenance, adjusting seasons of use, reducing OHV use, signing barriers to redistribute use, partially closing areas, rotating use, prohibiting specific vehicle types causing damage, or totally closing an area.

8. (G) Provide interpretive services which explain the Forest environment and management programs, inform visitors of the availability and locations of recreation opportunities, and encourage public use of the Forest. Solicit feedback from the public to improve the management of Forest resources.

9. (G) Provide for the needs of physically handicapped persons in facility designs.

10. (G) Minimize Forest competition with private-sector recreation-oriented services.

11. (G) Evaluate existing and planned exclusive use recreation developments, and provide for removing those on lands needed for higher public purposes.

12. (G) Monitor water quality and fish habitat to determine baseline conditions and the effects of recreation activities on them.

## 14. Research Natural Areas

1. (S) Manage the Devil's Garden Research Natural Area to protect the values for which it was established through application of the Special Areas Prescription.

2. (S) Protect Raider Basin, a candidate RNA, to preserve its research values.

3. (G) Consider additional areas for RNA status as need and opportunity arise.

## 15. Riparian Areas

1. (G) Manage lakes, perennial reservoirs, meadows, seeps, springs, and streamside management zones (including ephemerals and intermittents) according to the Riparian Area Management Prescription and Appendices M, N, and T.

2. (G) Where uses conflict, favor protection of riparian-dependent resources (water, fish, vegetation, wildlife, and aesthetics) over other resources.

3. (G) Restore degraded riparian areas through structural and nonstructural improvements. Structural improvements include gully control, stream-bank stabilization, and fencing. Nonstructural improvements include modification of timber harvesting within streamside management zones (Appendix M) or changes in grazing management (Appendix S).

## 16. Sensitive Plants

1. (G) Manage and conserve sensitive plant species and their habitats to ensure that viable populations are maintained.

   A. (G) Develop and implement a consistent, systematic, biologically sound program for sensitive plant species and their habitat so that federal listing as threatened or endangered is unnecessary.

   B. (G) Prior to project implementation, conduct inventories if potential habitat or known population locations are identified. The reporting procedures for this process are outlined in the Forest Service Sensitive Plant Handbook.

   C. (G) Complete interim management recommendations for all sensitive plant species.

   D. (G) Allow no new disturbance of identified sensitive plant habitat without an environmental analysis.

   E. (G) Allow scientific studies if no detrimental effects on sensitive species will occur.

   F. (G) Within the planning period, develop Species Management Guides for all species on the Forest sensitive plant list. These documents will provide information on background and present status of the species; new population locations; potential enhancement opportunities; key areas necessary for long-term protection; and maximum impact levels. Use information from the California Natural Diversity Database, and State federal, and private organization.

2. (G) Use partnerships and cooperative programs whenever possible to conserve and enhance sensitive plants and their habitats.

## 17. Soils

1. (G) Maintain soil productivity by applying guidelines to areas where management prescriptions are applied: land for timber production, range allotments, and other areas where healthy or productive vegetation is desired (e.g., riparian areas and campgrounds). The following guidelines do not apply to administrative sites, system roads or special use areas.

2. Monitor for implementation and effectiveness. Areas not meeting guidelines will be rehabilitated. As a minimum, 85% of areas affected by soil-disturbing activities will not exceed soil property thresholds (Guidelines A-G).

A. *Forest floor (litter) and large woody debris.* Both guidelines below should be met for those forested soils in at least a minimally stocked vegetative condition.

– Forest soils are in acceptable condition when: (1) with mechanical site preparation, a minimum of 30% of the soil surface is covered by forest duff which is at least two inches thick (or the existing thickness, if less than two inches) in an intact or nearly intact condition; or (2) for prescribed burns, at least the lower half of the original duff layer which covers 25-50% of the area, should be retained and will be dependent on the erosion hazard potential of the unit (i.e., a higher percentage of duff will be needed where the erosion hazard potential is higher). The intent is to evenly distribute the duff.

– For large woody debris management, leave at least 5 logs per acre in an activity area. Up to 20 logs per acre may be left when there are no other resource conflicts. The amount specified for retention will depend on the amount of logs available and the number needed to provide nutrient cycling and site productivity while also meeting minimum fuels treatment requirements in the Fire Suppression Difficulty Index (SDI).

Preference is for large cull logs at least 16 inches in diameter and about 40 cubic feet in volume. Most logs should be in decomposition classes 3, 4, and 5 (defined in USDA Handbook 553, page 80), except at least two logs per acre should be in class 1 or 2. The class 1 or 2 logs may be the same logs required by the Forest-wide standard for snags and down logs. Smaller logs, stumps and root wads can be substituted when sufficiently large cull logs are not available. Determine the number and size of logs per acre retained through the interdisciplinary process during project level planning. This guideline may be waived in strategic fuelbreak areas and for safety reasons.

B. *Soil porosity* is at least 90% of its natural condition. To help meet this guideline, both items below should be followed:

– During wet soil conditions (as determined on a project level), cease heavy equipment operations or confine equipment and other soil disturbing activities to designated routes. Heavy equipment may be operated (as in dry soil conditions) when (1) sufficient frost exists in the soil (3+ inches); or (2) sufficient snow pack is present (18+ inches); or (3) sufficient surface or subsurface

rockiness (more than 60% rocks by volume), or combinations of the above as determined through the interdisciplinary process, is sufficient to support equipment without causing unnecessary soil resource damage.

– A soil restoration project will be planned and implemented when: proposed management activities will likely result in less than 90% of the natural porosity being maintained on that portion of land dedicated to vegetative production; current activities are resulting in the above; or past management activities, or the cumulative effect from all these have resulted in the above; and when the most favorable opportunity arises. The most favorable opportunity will be determined through the interdisciplinary process.

C. The mineral organic matter in the upper 12 inches of soil should be at least 85% of its natural condition.

D. Design management activities not to exceed an average allowable soil loss of one ton per acre per year. This is mainly accomplished by leaving an effective ground cover. The intent is for the effective ground cover to be evenly distributed over the soil surface. The amount of effective ground cover needed and the means to meet this will vary by soil type, slope, and planned and applied soil conservation managment practices (determined by the erosion hazard rating method 2509.22, chapter 50). The minimum effective ground cover will be determined through the interdisciplinary process during project planning.

E. Treat all degraded watersheds causing active soil degradation in a cost-effective manner and on a priority basis according to beneficial uses. Design improvement activities to meet management objectives. Completion target is two decades. Treat degraded watersheds affecting soil productivity, but not currently in an active state of degradation, within five decades.

F. During project planning, verify areas where soil productivity has been degraded. These areas will either be included in the project plan for restoration and improvement, or added to the Watershed Improvement Needs (WIN) program for future treatment.

G. Complete an SRI Order 2 or field-verified SRI Order 3 during the planning phase of each site-disturbing or vegetative manipulation project. Assess impacts of proposed management activities on the

soil resource. Develop specific soil mitigation measures and soil conservation management practices for each project site as needed.

## 18. Special Interest Areas (SIAs) and National Natural Landmarks (NNLs)

1. (G) Manage special interest areas to protect the values for which they were established. Manage according to the Special Areas Prescription.

   A. Recommend Burnt Lava Flow and Medicine Lake Glass Flow geologic SIAs for nomination as National Natural Landmarks.

   B. Evaluate Dismal Swamp for nomination as a botanical Special Interest Area.

   C. Recommend other areas as needs and opportunities arise.

## 19. Timber

1. (G) Prepare and offer the allowable sale quantity of sawtimber specified in the Forest Plan.

   A. Schedule timber harvest only on lands suitable for timber production. Unsuitable lands may not be harvested except for salvage sales, sales to benefit other multiple-use values, or activities to meet other resource objectives as prescribed in the Forest Plan.

   B. Review lands designated as not suited for timber production at least every 10 years to determine if they have become suited. If determined suited, return these lands to timber production.

   C. Implement the Timber Sale Planning Process, incorporating interdisciplinary analysis into all timber projects.

2. When stands are managed to achieve timber production objectives:

   A. (S) Reforest suitable land planned for regeneration within 5 years.

   B. (S) Allow up to 15% of a clearcut perimeter to open into other clearcuts. Regeneration openings will be considered openings until the minimum number of properly spaced trees (as specified in

the FSHS) are 4.5 feet tall. Another regeneration unit may not be cut immediately adjacent to a regeneration opening until this restocking has occurred.

C. (G) Distances between regeneration units will be sufficient to provide wildlife cover, meet resource management objectives, and provide for economical future harvest units.

D. (G) Regeneration openings will be shaped to visually blend with the natural terrain while providing edge for wildlife.

E. (G) Practices will not necessarily be chosen because they give the greatest dollar return or the greatest wood outputs, but treatments will be practical in terms of costs of preparation and administration, transportation systems, cutting methods, and logging requirements.

F. (G) Reforestation will consist of planting tree species that reflect the natural forest diversity, where possible, on properly prepared sites.

G. (G) Where vegetation competition will substantially inhibit tree survival and growth, analyze a full range of available vegetation management techniques. Select the best method at the project level through site-specific environmental analysis that considers the relative effectiveness of these techniques and implements the applicable prescription and management area direction. Develop monitoring and enforcement provisions through the environmental analysis and include in the project plans.

H. (S) Plantations will receive release treatments before competition from such vegetation as grass, forbs, and shrubs significantly inhibits tree growth or threatens plantation success. Two major standards are used to evaluate the need for release:

   *Current or potential shrub cover.*

   – Shrub cover occupies or has the potential to occupy 30% of the area.

   – Has a crown volume of 5,000 cubic feet per acre.

   *Rate of conifer height growth.*

   - The following information from growth studies on ponderosa pine plantation sets standards for height growth in young stands:

| TREE HEIGHT (FT.) BY AGE AND SITE INDEX | | | | | |
|---|---|---|---|---|---|
| **Site Index** | | | | | |
| Age | 40 | 60 | 80 | 100 | |
| 10 | 5 | 7 | 9 | 11 | Dominant Ht. |
| 10 | 5 | 6 | 8 | 10 | Avg. Tree Ht. |
| 15 | 8 | 12 | 16 | 19 | Avg. Tree Ht. |
| Source: Oliver and Powers (1978) | | | | | |

I. (G) The health and vigor of trees will be maintained through integrated pest management and appropriate silvicultural techniques. The objective is to ensure plantation success and maintain timber stands in good condition.

J. (G) Stands will be precommercially thinned to maintain growth and produce the desired stocking rates by the time of the first commercial entry. Precommercial thinning in regenerated stands is generally scheduled to occur when the stands are 15 years old and ≤4.5 inches in diameter.

K. (G) Stands will be commercially thinned to remove trees that would die before the final harvest if the stand were not thinned, or to attain a desired stocking level. Stands will not be thinned below the basal areas from which they can return to acceptable stocking by the next entry (generally 20 years).

L. (G) Retain small groups in regeneration units of adequately stocked advanced regeneration when such groups will at least equal the new stand's planned growth potential and are relatively disease-free. The groups may contain marginally merchantable timber (i.e., 12 inch dbh) if they are young healthy dominant trees which will blend with the regenerated stand.

3. (G) Generally prohibit tractor logging on slopes exceeding 40%. Cable and helicopter logging will generally be used on slopes over 40%.

4. (G) Encourage increased utilization of wood products. Include the following utilization standards in commercial sales unless otherwise specified by the Regional Forester.

A. (S) For sawlogs, designated trees must contain at least a 10-foot log with not less than a 6-inch top diameter inside bark, 25% sound.

B. (G) Establish specifications for products other than sawlogs and pulpwood (such as firewood) as an integral part of the timber sale planning process for each timber sale that includes such products.

5. (G) Coordinate slash disposal and fuel treatment to ensure regeneration and reduce the risk of wildfires while providing for wildlife needs and soil and water quality protection.

6. (G) Implement post-sale treatments commensurate with resource needs and economics.

7. (G) Implement tree measurement sales where appropriate and as opportunities occur.

8. (G) Achieve and maintain, through the interdisciplinary process, quality timber sale layout and associated transportation system planning.

9. (G) Permit personal-use Christmas tree cutting where timber productivity will be maintained or enhanced. Provide commercial Christmas tree sales to utilize trees that would otherwise be destroyed in sawtimber harvests and in areas where timber productivity will be maintained or enhanced.

## 20. Visual Resources

1. (G) Manage visual resources to prevent unacceptable alteration of landscapes by designing and implementing management activities to meet or exceed adopted Visual Quality Objectives (VQOs) .

2. (G) Allow temporary departures of less than ten years and one VQO class to protect long-term visual values, such as in timbered areas highly susceptible to insect or disease epidemics.

3. (G) Capitalize on opportunities to achieve rehabilitation of unacceptable modification conditions during management activities with other resources.

4. (G) Meet assigned VQOs  when activities are planned within the foreground zone of State Highways 139 and 299. Specific objectives are to:

A. Minimize the visual impact of all existing human-made structures. Locate new structures out of view, or mitigate the impact of them.

B. Blend treated vegetation with adjacent untreated areas for a natural appearance. No distinct edge

*Forest-wide Standards and Guidelines*

between treated and untreated areas should be evident.

# 21. Water

1. (S) Implement Best Management Practices (BMPs) to meet water quality objectives and maintain and improve the quality of surface water on the Forest.

2. (G) Identify methods and techniques for applying BMPs during project level environmental analysis and incorporate into the associated project plan and implementation documents (Appendix N) . Monitor for compliance and effectiveness.

3. (G) Evaluate the effectiveness of BMPs in attaining standards and protecting beneficial uses through on-site inspection, field observation, and water data collection on a case-by-case basis.

4. (G) To minimize the risk of off-site cumulative impacts from management activities on stream channel conditions and water quality, conduct a cumulative watershed effects analysis of each land-disturbing activity on the appropriate second- or third-order watershed prior to undertaking. (See Water AMS for detailed discussion of cumulative watershed impacts).

5. (G) Identify and evaluate watershed conditions causing site deterioration, water pollution, or unsatisfactory water yield. Make plans for correcting these conditions on a complete watershed basis, and enter data in the WIN inventory.

6. (G) Treat all degraded watersheds affecting water quality in a cost-effective manner and on a priority basis according to the Watershed Improvement Needs Inventory (WIN) (Water AMS).. The highest priority beneficial uses are domestic use and fisheries. Design improvement activities to meet management objectives. Treat watersheds with the highest priority in the first two decades (Water Quality AMS, Appendix E). Treat the remaining degraded watersheds in the third and fourth decades. Monitor for effectiveness.

7. (G) Where potential loss or diversion of flow exists, quantify and maintain necessary in-stream flows to protect such beneficial uses as fisheries, recreation, and aesthetics.

8. (G) Acquire and administer water rights for national forest uses permitted through reservation principles, riparian rights, or appropriation processes; or as required by State laws and regulations. If non-Forest

water use is proposed, the Forest will exercise its rights according to State law (including the use of protest) if necessary to protect beneficial uses of water on National Forest System lands.

9. (G) Annually update the WIN inventory before the next planning period.

10. (G) Protect established snow courses and related hydrometeorological data sites including a 400-foot buffer zone in all directions from sampling points, or buffer zones mutually accepted by the Soil Conservation Service, the California Department of Water Resources, and the Forest, from any disturbing influence such as road building, timber harvest, or vegetative disturbance which will affect snow accumulation or measurement. Snow course sites are: Medicine Lake, Adin Mountain, Dismal Swamp, Mt. Bidwell, Cedar Pass, Blue Lake, Barber Creek, and Emerson Creek.

11. (G) Evaluate each vegetative manipulation protect for its opportunities to increase water yields. Design and conduct projects to optimize flow increases where they will have beneficial uses and will not be detrimental to drainage systems.

# 22. Wilderness

1. (S) Maintain wilderness values in the South Warner Wilderness through the application of the Wilderness Prescription (Standard) .

# 23. Wildlife and Fish

The following standards and guidelines apply to Management Indicator Species (MIS) . They are designed to maintain viable populations of all existing native and desired non-native vertebrate species within the planning area. Threatened and endangered species populations are considered to be non-viable; therefore, standards and guidelines provide for enhancement of present population levels. Exceptions will be made for threatened and endangered species on a case-by-case basis, using the consultation process described in the Forest Service Manual and the Endangered Species Act. For all other MIS, exceptions can be made, where appropriate, using the fish and wildlife coordination process described in the FSM.

Management requirements for the indicator species listed in these standards and guidelines and in prescriptions, while providing for most habitat special component and diversity concerns, do not automatically provide for

the minimum needs of all other species on the Forest. Therefore, it will sometimes be necessary to manage for special habitat needs for non-indicator Forest species at the project level.

Currently, there are deficits in some types of habitat. For these cases, the standards and guidelines are goals and objectives for future attainment.

The term "designated" used below refers to lands which are presently identified, or which may be identified as displaying the proper habitat attributes for supporting viable populations of given species. Field investigation, manual map overlays, and computer searches of the Forest data base are means of designating these areas. Key designated areas include important winter range, fawning areas, denning areas, transition range, and roost sites.

1. *Threatened and Endangered Species*

   A. Within designated **bald eagle** habitat:

      – (S) Implement the Pacific States Bald Eagle Recovery Plan as applicable to the Modoc National Forest.

      – (S) Manage all current suitable nesting habitat (both existing and potential) and all winter roosting areas according to the Raptor Management Prescription.

      – (G) The Forest will assist in recovery of the species. To accomplish this goal, the Forest will survey and manage potential sites in addition to those currently occupied.

   B. (G) Within designated **peregrine falcon** habitat begin peregrine falcon reintroduction planning and program implementation in the next decade for a minimum of three suitable reintroduction sites. The environmental assessment for reintroduction provides necessary direction, standards, and guidelines.

      – (S) Implement the Pacific Coast American Peregrine Falcon Recovery Plan as applicable to the Modoc National Forest.

      – (G) Develop a recovery plan for peregrine falcons specific to the Modoc National Forest.

   C. (S) Within designated **Modoc sucker** habitat, manage all streams containing Modoc suckers as directed in the Riparian Area Management Prescription and the Modoc Sucker Recovery Action Plan.

   D. (S) Within designated **Lost River and shortnose sucker** habitat, manage all streams containing these species as directed in the Riparian Area Management Prescription and, when completed and approved, the recovery plans for these species.

   E. Within potential **northern spotted owl** habitat:

      – (G) Continue spotted owl surveys of habitats in and adjacent to the Medicine Lake Highlands and other habitats that are considered suitable for this species. Survey habitats where owls responded in previous years; and expand surveys into areas that are planned for timber harvest, where these include suitable habitat.

      – (G) Manage for spotted owls using the interagency scientific committee (ISC) report as applicable to the Modoc National Forest.

      – (G) If owls are located, consult with the U.S. Fish and Wildlife Service to determine the biological significance of the locations.

      – (G) If a nest territory is located, establish a spotted owl habitat conservation area (HCA) using ISC standards. Coordinate sites with sites on adjacent forests (Shasta-Trinity, Klamath, and Lassen).

2. *Sensitive Species*

   A. Within designated **goshawk** nest stands:

      – (S) Manage 100 suitable goshawk nest stands (of at least medium habitat capability), according to the Raptor Management Prescription.

   B. (G) Within **willow flycatcher** habitat (primarily riparian areas) , maintain viable populations through application of the Riparian Area Management Prescription. The objective in this habitat will be to maintain and improve the quality and quantity of the woody vegetation component within riparian areas.

   C. Within designated **bighorn sheep** habitat:

      – (G) Expand the range of California bighorn sheep to suitable unoccupied habitats according to criteria set in *California Mountain Sheep Recovery Guidelines for Northeastern California* (when completed).

      – (G) Unless analysis reveals that such conversion is not detrimental to bighorn sheep, prohibit the conversion of livestock type from cattle to sheep on or adjacent to existing or approved reintroduction sites.

      – (G) Evaluate potential reintroduction sites in the Warner Mountains and Lava Beds area on a case-by-case basis, using a Coordinated Resource

Management Plan (CRMP) or Technical Review Team (TRT) approach.

– (G) Provide for long-term viability of California mountain sheep populations by reestablishing this species in suitable habitat within historic ranges, giving preference to areas with no current livestock use.

– (G) Permit no increase in existing livestock use if the increase would be harmful to mountain sheep management.

D. Within **pine marten habitat,** maintain a viable population by applying the following standards and guidelines for this species.

– (G) Develop a distribution of pine marten territories that are about 2,000 acres. Develop a minimum of 13 territories on the Forest with at least 4 territories on the Doublehead Ranger District, and 9 on the Warner Mountain Ranger District.

– (G) Distribute these territories so that the distance between territories is 3 miles or less within suitable marten habitat.

– (S) Within each territory, manage seral stages to achieve 60% of the total territory in 4 b/c seral stages, and 20% in 3 b/c seral stages. No more than 20% will be in early seral stage conditions.

– (G) Manage corridors so that adjacent territories are connected by stands that are in 3 b/c or 4 b/c seral stages.

– (S) Manage snag densities in marten territories at no less than 2 snags per acre.

– (S) Manage down logs for no less than ten down logs per acre.

– (G) Manage other habitat characteristics of pine marten stands so that they comply with the regional habitat capability model for this species, at the moderate habitat level.

– (G) Validate assumptions in the pine marten habitat capability model for this Forest.

3. *Other Management Indicator Species*

A. (S) Within **Canada goose and mallard** habitat, maintain viable populations through application of other Forest-wide Standards and Guidelines.

Maintain wetlands to construction standards as required in agreements with the State.

B. (G) Develop suitable wetlands to full waterfowl nesting potential through island construction, livestock management and water management.

C. Within designated **golden eagle, Swainson's hawk, osprey, and prairie falcon** habitat manage all currently active nest territories as directed in the following:

**Golden Eagle**

● (S) Nests located in forested vegetation types will be managed so that at least 25 acres surrounding the nest are designated as a golden eagle nest area.

● (S) Disturbance from timber management activities and firewood cutting will be restricted within 1/4- to 1/2-mile of the nest during the reproductive period, February to August, when they would be detrimental to nesting and fledging.

● (S) Such activities as OHV use and maintenance or construction of facilities, trails, and roads will be restricted within 1/4- to 1/2-mile of the nest during the reproductive period, February to August, because they may be detrimental to nesting and fledging.

**Swainson's Hawk**

● (S) Manage 25 acres around each nest site and designate that stand as a Swainson's hawk nest area.

● (S) Prohibit disturbing management activities with 1/4-mile of nest sites from March 1 through July 31. Disturbance from management activities include firewood cutting; range habitat improvements; and construction or maintenance of facilities, trails or roads.

● (G) Manage juniper stands within designated nest areas to maintain or enhance nest site conditions for Swainson's hawks.

● (G) Inventory suitable habitats to determine distribution of Swainson's hawks on the Forest.

**Osprey**

● (S) Maintain all active nesting and feeding habitat so that at least 30 acres surrounding each nest are designated as an osprey nest area.

- (S) Forested acres within the area will be managed to maintain an average of five trees per acre that are at least 24 to 30 inches in DBH, and preferably ponderosa or sugar pine. Two to three snags or spike-topped trees per acre, 16 to 24 inches DBH or larger, will be maintained within 1/4-mile of the nest.

- (S) Preferred nest trees are 24 to 40 inches DBH or larger and 75 to 125 feet high. Two platforms per 30-acre territory may be substituted in areas deficient of suitable nest trees or where green tree replacements are not adequate. Maintain 10 to 15 trees (snags and broken-top live trees) >24" DBH, within 1/8-mile of the nest (30 acres), and maintain an additional 10 to 15 trees, >24" DBH, within 100 feet of the water edge and within foraging range for the birds.

- (S) Disturbance from timber management activities and firewood cutting within 1/8- to 1/2-mile of the nest may be detrimental to nesting and fledging during the reproductive period, March to August. Disturbing activities will be restricted.

- (S) Disturbance from human activities, including foot traffic and OHV use within 1/8- to 1/2-mile of the nest, may be detrimental to nesting and fledging during the reproductive period, March to August. Disturbing activities will be restricted.

**Prairie Falcon**

- (S) Disturbance from timber management activities within 1/4- to 1/2-mile of the nest may be detrimental to nesting and fledging during the reproductive period, March 1 to August 31. Disturbing activities will be restricted.

- (S) Disturbance from human activities, including foot traffic and OHV use within 1/4- to 1/2-mile of the nest, could be detrimental to nesting and fledging during the reproductive period, March 1 to August 31. Disturbing activities will be restricted.

D. (S) Within **blue grouse** habitat, maintain viable populations through application of other Forest-wide Standards and Guidelines, particularly for vegetative diversity, dead and down materials, and aspen, and through implementation of the Riparian Area Management Prescription.

E. Within **sandhill crane** nesting and brood-rearing habitat:

- (G) Identify suitable wetlands and meadow complexes that could be used by nesting and brood-rearing sandhill cranes. Manage 15% of these wetlands to facilitate the successful nesting and fledging of sandhill cranes (approximately 20 pairs).

- (G) Address management objectives for sandhill cranes on a site-specific basis in allotment management plans.

- (G) Manage vegetation in sandhill crane habitat following the Riparian Management Prescription.

F. (G) Within designated **sage grouse** habitat, manage big sagebrush and low sagebrush within an eight-mile radius of all identified leks (strutting grounds), in accordance with the habitat capability model for sage grouse, at the moderate level. Manage meadows, seeps, springs, and riparian areas within a two-mile radius of leks according to the Riparian Area Management Prescription to provide forbs desirable for sage grouse, such as dandelion *(Taraxacum)*, yarrow *(Achillea)*, and aster *(Aster)*.

G. (G) Within **pileated woodpecker** habitat, insure a viable population by developing a network of habitats for these species.

- (S) Manage for pileated woodpecker territories that are at least 600 acres. Manage for at least five pileated woodpecker territories on the Big Valley and Devil's Garden Ranger Districts. On the Doublehead and Warner Mountain Ranger Districts, overlap pileated woodpecker territories with pine marten territories.

- (S) Within suitable habitat, manage for a territory distribution of one every 13,000 acres .

- (S) Reproductive areas should be maintained in a contiguous 300-acre block where possible. Manage seral stages within reproductive habitat for old-growth/mature (4 b/c) seral stages. If not possible, habitat may be arranged in blocks no less than 50 acres, no more than 1/4-mile apart, totalling 300 acres. Within pileated woodpecker reproductive territories, manage for two snags per acre; 1.7 snags/acre 15-24" dbh (diameter at breast height), and .3 snags/acre >24".

– (S) Foraging areas will be maintained in 300-acre contiguous blocks adjacent to reproductive areas. Feeding areas will not be more than 1/2-mile from reproductive areas. Manage foraging areas so that they meet standards and guidelines for seral stage diversity.

– (G) Validate assumptions in the pileated woodpecker model for this Forest.

– (G) Where possible, overlay pileated woodpecker territories with other old-growth management indicator species (i.e., pine marten and goshawk).

H. (S) Within **hairy woodpecker** habitat, maintain viable populations through application of other Forest-wide Standards and Guidelines, particularly for snags and diversity. Refer to *4. Special Habitats – Snags* below for direction in habitat management to achieve the MMR of 1.5 snags per acre. Provide for long-term snag habitat during rehabilitation of wildfires by utilizing large diameter burned and unburned trees for future snag management.

I. (S) Within **red-breasted and red-naped sapsucker** and **yellow warbler** habitat (primarily riparian areas), maintain viable populations through application of the Riparian Area Management Prescription. The objective in this habitat will be to maintain and improve the quality and quantity of the woody vegetation component.

J. (S) Within **western gray squirrel** habitat, maintain viable populations through application of other Forest-wide Standards and Guidelines, particularly for oaks.

K. Within **mule deer** habitat:

– (S) Manage the winter range of each deer herd to provide a 30/70 to 50/50 ratio of thermal cover to forage. Thermal cover is defined as naturally occuring tree crown closure of at least 60%, or at least 75% crown closure of shrubs.

– (S) Manage the summer and transition ranges for each herd to provide a 20/80 to 40/60 ratio of thermal cover to forage on each management area.

– (G) Seasonal forage requirements for deer are calculated as follows:

| | |
|---|---|
| Spring/Summer Range | Young, abundant browse ranges - four pounds of forage per deer per day or eight deer per Animal Unit Month (AUM); decadent or low frequency browse ranges<br><br>Five pounds of forage per deer per day or six and one-half deer per AUM. |
| Fall Range | Four pounds of forage per deer per day or eight deer per AUM. |
| Winter Range | Three pounds of forage per deer per day or eleven deer per AUM. |

– (G) Analyze the effects of livestock grazing on seasonal forage requirements in assessing capacity and stocking levels for all allotments, and in developing AMPs. Refer to EIS Appendix L for information on deer forage requirements.

– (G) Where water deficiency limits summer range, develop water sources when feasible.

– (G) On deer winter ranges where OHV use is demonstrated to adversely affect deer, institute OHV closures from December 1 through March 31.

L. Within **pronghorn** habitat:

– (G) Manage for suitable proportions of forb, grass, and shrub cover, referencing (a) BLM Technical Note 347, (b) Interstate Antelope Conference Guidelines, and (c) the Pronghorn Habitat Capability Model.

– (G) For planning purposes, use the forage requirement for pronghorn of one pound of herbaceous forage per pronghorn per day, which is equivalent to 30 pronghorn per Animal Unit Month (AUM) .

– (S) Follow fence standards described in the Modoc supplement to the FSM.

– (G) Analyze the effects of livestock grazing on pronghorn habitat and forage availability in AMPs.

M. Within **Goose Lake redband trout** habitat:

– (S) Manage all streams containing migratory or resident populations as directed in the Riparian Area Management Prescription.

– (S) Do not implement habitat improvements with the potential of favoring non-native trout species over the Goose Lake redband trout.

– (G) Cooperate with county, state, and other federal agencies, private conservations groups or interested parties to acquire lands or develop coordinated resource management plans with downstream owners for protecting or enhancing the migration route, spawning, and rearing habitats of the migratory Goose Lake redband trout population.

N. (S) Within **rainbow, brook,** and **brown trout** habitat, manage all streams identified as directed in the Riparian Area Management Prescription. Initiate instream habitat improvements only in those streams with potential for at least medium habitat capability.

O. (S) Within **largemouth bass** habitat, manage all reservoirs identified as habitat for largemouth bass according to the Riparian Area Management Prescription. Initiate habitat improvements only in reservoirs with potential for at least medium habitat capability.

4. **Special Habitats**

   A. Snags

   – (S) Provide habitat conditions for viable populations of snag-dependent species by meeting the snag requirement targets listed below as specific areas are treated.

   – (G) As dictated by natural diversity, snag requirements cannot be met on every acre. To the extent possible, the area of accountability will be the timber compartment; all forested lands within each compartment will be used to assess average snag densities. Clumped dispersion of snags is desired, but no more than five snags per acre may be counted for determining average snag densities. Twenty feet is the minimum height for snags. See EIS Appendix G for information on snag modeling procedures.

   – (S) On well-stocked stands in eastside pine, manage snags on treated acres. Retain both existing snags and replacement trees in harvest units to meet snag requirements throughout the rotation. In well-stocked stands where sufficient snag densities are not present, select live trees and manage as snags.

   – (S) On poorly stocked stands with too few trees to meet snag requirements, reserve green, dead, and

dying trees (e.g., spike-tops) to meet the large snag component throughout the rotation.

– **Suitable timber lands** ( > 20 cu.ft./acre)

● (S) *Montane Conifer, Riparian and Aspen* (includes ponderosa pine, white fir, mixed conifer, lodgepole pine, red fir, subalpine forest, and black oak vegetation types):

| Average Density: | |
|---|---|
| 15-24" DBH | 1.2 snags/acre |
| >24" DBH | 0.3 snags/acre |
| **Total** | **1.5 snags/acre** |
| Location | Preference is around meadows, seeps, and springs and within habitat edges, but it is also important to maintain snags throughout areas. |
| Acceptable species for snags | Ponderosa pine, Jeffrey pine, western white pine, sugar pine red fir, white fir, lodgepole pine, black oak, mountain hemlock |

– **Low Productivity Timberlands** ( < 20 cu.ft./acre)

● (S) These lands produce < 20 cubic feet per acre per year and include vegetation types described under Montane Conifer. Juniper and other non-commercial species may be present.

| Average Density: | |
|---|---|
| >24" DBH | 0.5 snags/acre |
| **Total** | **0.5 snags/acre** |
| Location | No preference due to the dispersed nature of trees on these lands. |
| Acceptable Species | Those species listed under Montane Conifer. |

– (S) Naturally occurring densities of snags will not be manipulated in the Wilderness, RNA, or Special Interest Areas.

– **Snag Recruitment**

● (G) Timber sales will be regulated to achieve snag densities. Green and salvage sales will provide for snag recruitment by designation, leaving an adequate number of living and dead trees for future snags and, when necessary, treating living trees to produce snags.

● (G) Recruitment snags will generally be selected from the following prioritized list:

- broken-topped, spike-topped, or other damaged trees;

- living culls (generally true fir) with evidence of heart rot;

- high-risk trees which may die in the near future;

- sound trees.

● (G) Snag recruitment trees will be signed or otherwise designated, as on appraisal maps and stand record cards.

● (G) Living trees will be topped to meet and manage for minimum snag numbers if analysis indicates other methods cannot ensure meeting the standard.

B. **Dead and Down Materials**

– (S) In all coniferous vegetation types (outside marten habitat), leave a minimum average of one down log per acre, at least 20 inches in diameter at the large end and 10 or more feet long. In areas of known or suspected marten habitat, leave a minimum average of 10 cull logs per acre, at least 15 inches in diameter and 15 feet long. Because of the low cull factor in ponderosa pine, it will be difficult to achieve the one-log-per-acre average. Leave all dead and down pine logs up to the one-log average.

– (G) Where possible, leave an average of one slash pile that is ≤15 feet wide and ≤12 feet high per acre.

– (G) Slash piles and logs are preferred within 100 yards of meadows, standing water, streamsides, and the perimeter of regeneration units. Whenever possible, yard logs to achieve a density of two to three logs per acre in these areas.

– (G) Protect designated logs when burning regeneration units.

– (G) Control firewood cutting where necessary to maintain minimum densities of down logs.

C. **Oak**

– (S) On deer intermediate and winter ranges, maintain at least 36 square feet of basal area of oak stands per acre. If oaks do not naturally occur to at least this density, maintain that which exists.

– (S) On all other areas where oaks occur, maintain at least 10 square feet of basal area per acre. If oaks do not naturally occur to at least this density, maintain existing stands.

D. **Aspen**

– (S) Manage aspen stands (including aspen/conifer stands) larger than 1/2-acre as distinct plant communities and special wildlife habitats.

– (G) Manage aspen stands to achieve a mixture of different-aged stands.

E. **Vegetative Diversity**

– (G) If naturally present, maintain representative seral stages within the following vegetation types within each management area:

| Vegetation Types | | |
|---|---|---|
| Perennial Grassland | Montane Shrub | Eastside Pine |
| Wet Meadow/Wetlands | Alpine Shrub | Mixed Conifer |
| Low Sagebrush | Subalpine Forest | White Fir |
| Big Sagebrush | Riparian | Red Fir |
| Bitterbrush | Black Oak | Lodgepole Pine |
| Mountain Mahogany | Juniper | |

– (S) Maintain a minimum of 5% of each seral stage for eastside pine, mixed conifer, white fir, red fir, and lodgepole pine on lands capable of growing >20 cubic feet per acre per year.

– (S) Maintain a minimum of 5% in seral stages 1, 2, 3a, 4a and 4a-older (as defined below) for each conifer and hardwood vegetation type on lands growing <20 cubic feet per acre per year. Requirements for high and low productivity lands will not be interchangeable.

| Wildlife Habitat Relationship (WHR) Seral Stages | | | | |
|---|---|---|---|---|
| Minimum Proportion | Seral Stage | WHR Seral Stage Code | Age Group (Years) | General Description |
| 5% | Grass/forb/seedlings | 1 (PL) | <10 | Plantations with seedlings tree seedlings and highly variable amounts of grasses, forbs and shrubs. |
| 5% | Shrub/sapling/pole | 2 | 20-50 | Mixed or pure stands sapling/pole of shrubs, tree saplings 1 to 11 inches DBH. |
| 5% | Small tree | 3a | 60-130 | Trees in the 11-24" DBH size range; <40% tree canopy, typically with a shrub understory. |
| 5% | Small tree | 3b/c | 60-130 | Trees in the 11-24" DBH size range; >40% tree canopy, typically with varying amounts of shrub understory, lessening as canopy coverage increases. |
| 5% | Medium to large tree | 4a | 140-180 | Mature stand of large trees >24" DBH; <40% tree canopy, typically with a shrub understory. Does not apply to >20 lands. |
| 5% | Medium to large tree | 4b/c | 140-180 | Mature stand of large trees >24" DBH; >40% tree canopy, typically with varying amounts of shrub understory, lessening as canopy coverage increases. Does not apply to <20 lands. |
| 2-1/2% | Medium to large tree | 4b | 190-270+ ("old growth") | Same as above, canopy cover is 40-70%, and the stand is older to provide old growth decadence. Does not apply to <20 lands. |
| 2-1/2% | Medium to large tree | 4c | 190-270+ ("old growth") | Same as above, except canopy is >70%, and the stand is older to provide old growth decadence. Does not apply to <20 lands. |
| 5% | Medium to large tree | 4a | 190-270+ ("old growth") | Old growth stand of trees >24" DBH; <40% tree canopy, typically with a shrub understory. Does not apply to >20 lands. |

– (S) Apply these standards to both >20 cu. ft. and <20 cu. ft. lands at the project level, with the management area serving as the control unit.

– (G) Land not managed for timber production will be allowed to cycle naturally, unless management is determined to be necessary for other resources. Deficits in amounts of seral stages within management areas may be corrected by vegetative manipulation. Current deficits will be corrected over time, in some cases by selecting individual stands and documenting in project EAs and on stand record cards that these stands are to be grown to old growth conditions.

– (S) Provide at least the following amounts of old growth forest habitat (see table on 4-32) for viable populations of dependent species.

| Species | >20 cu.ft. | <20 cu.ft. |
|---|---|---|
| Ponderosa Pine | 13,083 acres | 7,499 ac. |
| Mixed Conifer | 7,679acres | 2,322 ac. |
| Red Fir | 666 acres | 1.6 ac. |
| Lodgepole | 804 acres | 224 ac. |

(G) Old growth stands maintained for habitat will be at least 40 acres. In areas where a contiguous 40-acre stand does not naturally occur, 25-acre stands within one mile of each other may be sufficient.

– (G) In management areas with insufficient old growth, select stands which nearly meet old-growth standards and so manage them.

– (G) In the development of vegetation manipulation projects, assess acreages of vegetation types and seral stages within the management area prior to activities and predict resultant changes for each alternative.

5. **General**

A. (G) Coordinate with the state Fish and Game departments, other federal and state agencies, Modoc and Lassen counties, private conservation groups, and interested publics to fulfill comprehensive fish and wildlife programs.

B. (G) Coordinate with the U. S. Fish and Wildlife Service and state Fish and Game departments in the control of specific animal populations when populations compete with or further endanger a recovery species, or threaten excessive damage to other resources.

## 24. General

1. (G) Provide an efficient public service program with the viewpoint of the user, visitor, or client as priority.

2. (G) Consider all resources in projects, regardless of size or potential impact on the environment. The environmental analysis required by FSM will determine whether a project may proceed under a categorical exclusion, or requires documentation in an Environmental Assessment or Environmental Impact Statement.

## E. Management Prescriptions

Management prescriptions direct resource management for producing goods and services and meeting management goals and objectives. They outline management practices, time schedules, and standards and guidelines for specific areas. Forest-wide Standards and Guidelines (S&Gs) always apply. Although they may not be reiterated, they are incorporated by reference. The reader is invited to seek not only a particular management prescription for direction, but also higher levels of direction in the S&Gs or General Program Direction.

A management prescription consists of four parts:

**Description** — includes the purpose of the prescription, and the blend of management activities and practices permitted. Acres allocated to the prescription and the distribution are given.

**Management Direction** — provides direction for each resource under the prescription.

**Standards and Guidelines** — give specific guidance for implementing the prescription. A *standard* is a performance criterion indicating acceptable norms, specifications, or quality that actions must meet; a rule to measure against; a principle requiring a specific level of attainment. A *guideline* is an indication of policy or conduct; an issuance that directs the course of action to accomplish a specific objective. The intent is to adhere to standards and guidelines regardless of their title as "standards" or "guidelines".

The Forest Interdisciplinary Team developed 17 management prescriptions. They range from full timber and range management to minimum management level. Each acre of national forest land is assigned only one prescription.

Distribution of prescriptions is shown on the map of the Preferred Alternative accompanying the EIS. Because many prescriptions apply to relatively small and noncontiguous areas, this map is approximate and simplified. Detailed maps (1 inch = 1 mile) of the areas allocated to each prescription are part of the Planning Records and are on file at the District Ranger Offices. These will be used by the Districts for Forest management activities, and occasionally corrected by the Forest Supervisor where boundaries are illogical.

## Wildlife Habitat Capability Models

Because the Forest Service has legal authority to manage wildlife habitat, but not populations directly, wildlife habitats are described in the management prescription Standards and Guidelines below, according to their potential or capability to support animal populations. Standards and Guidelines list the relative capabilities of habitats provided for various management indicator species that are emphasized under the prescription. Conditions necessary to achieve relative habitat capabilities are defined in Wildlife Habitat Capability Models (Shimamoto and Airola 1980).

| | Management Prescription | Page |
|---|---|---|
| 1 | Minimum Management Level | 4-35 |
| 2 | Wilderness (Standard) | 4-39 |
| 3 | Wilderness (Low Standard) | 4-51 |
| 4 | Semi-Primitive Non-Motorized Dispersed Recreation (SPNM) | 4-61 |
| 5 | Developed Recreation (Standard) | 4-65 |
| 6 | Developed Recreation (Low Standard) | 4-71 |
| 7 | Visual Retention | 4-77 |
| 8 | Special Areas | 4-81 |
| 9 | Raptor Management | 4-85 |
| 10 | Rangeland Management | 4-93 |
| 11 | Rangeland Management with Forage Improvements (Range-Forage) | 4-99 |
| 12 | Even-Aged Timber | 4-109 |
| 13 | Timber Management with Partial Retention Visual Quality (Timber-Visuals) | 4-113 |
| 14 | Timber Management with Forage Production (Timber-Forage) | 4-117 |
| 15 | Uneven-Aged Timber | 4-127 |
| 16 | Timber Management on Low Productivity Lands (<20 cu. ft. Timber) | 4-131 |
| 17 | Riparian Area Management | 4-135 |

# Minimum Level Management Prescription - 1

*This prescription maintains existing physical characteristics of the land through custodial management. Minimum management and protection and maintenance of environmental values are the objectives.*

*Off-highway vehicle use is permitted.*

*Lands under this prescription are not suitable for capital investments. They include areas with steep slopes, water, or no vegetation. Other lands suitable for this prescription include: rangelands uneconomical to manage; non-productive forest lands; productive forest lands uneconomical to manage; tentatively suitable timberlands reserved for late seral stage and furbearer habitat; and lands scheduled for exchange. Firewood cutting is not permitted.*

*The Forest maintains existing roads and trails that are necessary for access. Others will be obliterated or allowed to revegetate naturally. Utility corridors and other special uses may exist. Activities such as mineral exploration, hunting, fishing, other dispersed types of recreation use, and previous timber harvesting are evident.*

*Current conditions are maintained and influenced primarily by natural forces.*

*This prescription applies to 70,153 acres distributed within 21 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Cooperate with State and other agencies to support air quality regulations on the Forest.

### Facilities

Management includes signing, gating or otherwise closing roads, basic custodial care, and correcting or preventing damage to adjacent lands and resources. Only those facilities necessary to fulfill Forest functions at minimum level are maintained. Dams are inspected and maintained. Administrative sites and recreation facilities are maintained to protect investments.

### Lands

Special uses and corridor rights-of-way are compatible with this prescription. Boundaries are located and posted to the extent necessary to resolve encroachment situations.

### Minerals

Management activity includes protecting surface resources, and administering existing leases and all surface activity associated with unpatented mining claims.

## Standards and Guidelines

## Management Direction

## Standards and Guidelines

### Protection

Apply Forest-wide Standards and Guidelines.

#### Integrated Pest Management

Forest insect and disease outbreaks are allowed to run their course unless there is clear and imminent danger to resources adjacent to the Forest.

### Range

#### Range

Incidental livestock grazing occurs although no grazing capacity is assigned to the area. No capital investments are made to develop or enhance forage production.

#### Wild Horses and Burros

Management meets the legal requirements of protecting free-roaming wild horses and burros.

### Recreation

Recreation opportunities may be semi-primitive non-motorized, semi-primitive motorized, or roaded natural as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific ROS class.

OHV use is generally open, but may be subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Visual quality objective may be retention, partial retention, modification, or maximum modification. Refer to VQO map for specific VQO.

### Timber

No timber activities occur under this prescription. Commercial firewood sales and personal use firewood cutting are not permitted.

*Management Direction*

## Management Direction

### Standards and Guidelines

### Water and Soils

Limit watershed improvement projects to those necessary to maintain water quality, instream uses and natural soil productivity. Cooperate with water users and other agencies to ensure quality and quantity of water running off the Forest. Monitor soil to prevent soil damage on the Forest or adjacent lands. Maintain basic productivity of the land.

### Wildlife and Fish

Cooperate with State and federal agencies to the extent necessary to support regulations of incidental hunting and fishing use.

**This page intentionally left blank.**

## Wilderness Prescription (Standard) - 2

*Manage existing units of the National Wilderness Preservation System in accordance with wilderness values and character. Primitive recreation opportunities are provided. Trails are maintained for hiking and packstock and equestrian use. Mechanized travel and motorized equipment are not permitted. Fish and wildlife species are affected by natural vegetative succession. Livestock grazing is permitted. Timber is not harvested or managed. Firewood cutting is not permitted. Mining is no longer permitted, subject to valid existing rights. Fire protection activities minimize suppression impacts while seeking to maintain or enhance long-term Wilderness values.*

*This prescription applies to the South Warner Wilderness.*

## Management Direction

### Air Quality

Maintain air quality in Class I wilderness areas within the requirements of the Clean Air Act.

Identify and monitor air quality resource values (AQRVs) for Class I wilderness areas.

### Facilities

Provide trails, bridges, signing, and trailheads to protect and enhance the Wilderness resource.

## Standards and Guidelines

### Facilities

1. (G) Trails and trail bridges will be located, designed, constructed, and maintained to be suitable for foot and packstock travel, where appropriate.

2. (G) Provide bridges or turnpike sections only where impassable by foot or packstock, and to protect soil and water resources.

3. (G) Trail maintenance will include:

    a.  maintaining primary system trails;

    b.  signing entrances and trailheads;

    c.  all measures necessary to ensure resource protection.

4. (G) Obliterate unauthorized shortcuts and undesired trails. Reroute trails where resource damage occurs or is likely to occur.

### Lands

Apply Forest-wide Standards and Guidelines.

| Management Direction | Standards and Guidelines |
|---|---|

## Minerals

Allow prospecting, mining, and leasing activities that are provided for by law. Administer activities to mitigate impacts on the Wilderness.

### Minerals

1. (S) Wilderness lands are withdrawn from mineral entry and mineral leasing, subject to valid existing rights.

2. (G) Examine unpatented mining claims for validity when a notice of intent to operate or an operating plan is received that involves surface-disturbing activities.

3. (G) Where surface-disturbing activities are involved, regularly inspect each prospecting or operating site during the periods of operation to assure compliance with laws, regulations, and operating plans.

4. (G) The reclamation portion of the operating plan will provide for complete site rehabilitation, and an appropriate bond will be collected to ensure completion.

## Protection

### Fire

Maintain an aggressive fire prevention program, using the most effective and economical means to eliminate human-caused fires.

### Protection

#### Fire

1. (G) Provide fire prevention information through public contacts, and at Wilderness portals.

2. (G) Promote the use of portable gas and fuel stoves to minimize risks of human-caused fires and impacts on the Wilderness resource from campfires.

3. (G) Provide public education concerning fire management strategies for the Wilderness.

Suppress wildfires in a manner which is compatible with wilderness management objectives, protects life and property at risk, and is consistent with the capability of suppression forces.

1. (G) Implement suppression techniques which are compatible with the protection of wilderness values.

a. Tractors will be used only when there is imminent threat to life, property, or significant resources outside the Wilderness. Use tractors only with Regional Forester approval. Use of such mechanized equipment as power saws and portable pumps may be authorized by the Forest Supervisor when their use would be less devastating to wilderness values than fire damage or other suppression action.

| Management Direction | Standards and Guidelines |
|---|---|

**Standards and Guidelines**

    b.  Drop chemical fire retardant only after approval from the Forest Supervisor. Use fugitive (clear) retardants when available. Water drops from aerial tankers or from external helibuckets may be used without restriction.

    c.  Do not drop retardant within 300 feet of lakes or flowing streams except under extreme conditions where human lives or property are at risk.

    d.  Allow aerial transportation of crews only when life is threatened or the potential for unacceptable resource damage is severe.

2. (G) Develop a plan to permit prescription fires from unplanned ignitions to perpetuate the natural diversity of plant and animal communities.

3. (G) Allow no incident bases in the Wilderness. Temporary spike camps may be allowed with Forest Supervisor approval.

4. (G) Reseed damaged areas only with native species.

5. (G) Use existing natural barriers, when available, to confine fire. Natural barriers, including streams, rock outcroppings, vegetation type changes, and existing trails will be used in lieu of line construction, even at the expense of additional acres burned.

6. (G) Use minimum-impact line construction techniques when constructing hand line.

    a.  Construct the narrowest and shallowest lines that will contain fire.

    b.  Limb trees rather than felling them, unless this is a safety or holding factor. Leave the bole intact rather than bucking it into shorter lengths.

    c.  When possible, cold-trail the fire perimeter instead of constructing line. If available, use water to cool or extinguish the fire perimeter.

    d.  Generally, use hand tools (shovel, McLeod, Pulaski, crosscut saw) for line construction.

7. (G) Fire-out from the narrowest line that conditions will allow, and use natural barriers or existing trails where practical.

**Management Direction**                    **Standards and Guidelines**

8. (G) If appropriate, fire-out from strategic locations such as natural barriers, trails, or openings to reduce the impact and the time required to establish control lines through these areas.

9. (G) Use minimum-impact methods of mop-up.

   a. Allow snags to burn down if well inside the fire perimeter. Snags along the perimeter that threaten to throw sparks or cross the line will be felled. Snags within the fire perimeter that threaten firefighter safety along trails or other identified locations will also be felled.

   b. Where feasible, allow logs on the ground to burn instead of bucking them into shorter lengths.

   c. Avoid extensive spading of duff layers; allow the duff to burn, or saturate it with water if available.

   d. Take necessary action on potential reburns if they threaten to cross the line and escape containment.

   e. Place less emphasis on actual mop-up and more emphasis on patrolling and monitoring the fire; allow the fire to burn out naturally if conditions allow.

   f. Increase mop-up if weather changes threaten containment.

10. (G) Rehabilitate to restore natural conditions or obscure the impacts of suppression activities.

   a. Naturalize the environment around spike camps.

   b. Firelines will be naturalized by scattering duff and blocking them with limbs, logs, and rocks, where possible.

   c. All garbage, flagging, discarded tools, and other debris will be packed out.

   d. Use native species when revegetating.

## Management Direction

– Use prescribed fire to:

- reduce the risk of natural fires by reducing accumulated fuels;
- restore and maintain natural plant communities;
- enhance threatened or endangered wildlife species habitat.

**Law Enforcement**

Apply Forest-wide Standards and Guidelines.

**Integrated Pest Management**

Control insects and plant diseases only when necessary to prevent unacceptable damage to resources on adjacent lands or an unnatural loss to the Wilderness from exotic pests.

## Range

Allow grazing of domestic livestock where that use was established prior to wilderness classification. Planning and administration of grazing systems, stocking levels, utilization standards, and all range improvements will conform to the objectives of wilderness management.

## Standards and Guidelines

1. (G) Develop a prescribed fire program.

## Range

1. (G) Forage utilization will be consistent with the maintenance or improvement of the Wilderness resource.

2. (G) Manage livestock grazing to minimize competition with wildlife. Native wildlife have priority for use of Wilderness forage.

3. (G) Livestock may be excluded from areas identified as critical for wildlife and fish, where deterioration of the soil, water, or vegetative resource is occurring, and where resource conflicts are identified at specified lakes, streams, and trails.

4. (G) Maintain natural vegetative composition.

5. (S) Structural range improvements may be constructed only when necessary to protect the Wilderness resource, and not to accommodate increased numbers of livestock. Existing improvements will generally be maintained.

6. (G) Emphasize range structures of rustic- or natural-appearing material where their use will not impose unreasonable additional cost to grazing permittees.

**Management Direction**

**Standards and Guidelines**

7. Minimize concentrations of livestock in riparian areas.

   a. (G) Develop utilization standards in allotments management plans using the following guidelines:

      – Under season-long grazing, use 30% or less of the total annual grass/forb production.

      – Under deferred early- or late-season grazing, or rest-rotation grazing, graze up to 50% of the grass/forb production (60% utilization, if in good condition). All classes of animals are included in these use figures. Wildlife use may need to be estimated at a given rate and livestock use adjusted accordingly.

      – Under any grazing system, manage grazing to enable riparian-associated shrubs to reach at least 50% of the natural site potential.

      – Shrub utilization (including willows and aspen) may not exceed 20% under season-long grazing, or 30% under deferred or rest-rotation grazing.

   b. (G) Control livestock distribution within allotments to protect water quality by such methods as riding and temporarily placing salt at least 1/4-mile away from water.

   c. (G) Maintain streambanks in stable condition as specifically defined in allotment management plans.

   d. (G) Avoid livestock driveways within SMZs, where possible, and locate driveways away from recreation trails.

8. (G) Prevent livestock from drifting into the bighorn sheep reintroduction area.

9. (S) The following restrictions will apply to recreational livestock:

   a. A maximum of 25 head of recreational livestock are permitted per party, including pack and saddle stock. The Forest Supervisor may permit more stock animals per party by approval of a written justification statement.

## Management Direction

## Standards and Guidelines

b. No pack or saddle livestock are permitted within 50 yards of the shoreline of any lake except for the purpose of loading, unloading, watering, or traveling on established trails.

c. Users will provide supplemental, pelletized feed where adequate forage is not available. Public contacts will encourage the use of pelletized feeds. Signs may be posted at trailheads and in areas where forage is insufficient and pelletized feed is required.

d. To prevent the introduction of noxious or non-native plant species, hay will not be brought into the Wilderness.

e. Hobble, picket, or confine pack and saddle animals overnight in temporary corrals (rope or electric fence). They may not be tied directly to the boles of live trees at any time.

10.(S) Monitor water quality as necessary to determine baseline conditions and the effects of range management in the Wilderness.

11.(S) Take corrective action where livestock grazing has caused stream channel degradation.

### Recreation and Wilderness

#### Wilderness Recreation

Provide primitive recreation opportunities that emphasize solitude, self-reliance, physical and mental challenge, inspiration, and the unique experiences dependent on a wilderness setting. The Forest regulates use emphasizing voluntary compliance by visitors to and users of the Wilderness.

*Recreation and Wilderness*

*Wilderness Recreation*

1. (G) All management activities will adhere to the direction for the Primitive Recreation Opportunity Spectrum described in the Recreation section of Forest-wide Standards and Guidelines.

2. (S) Limit group size to 25 persons or less, unless excepted by the Forest Supervisor on a case-by-case basis.

3. (S) Limit groups to a maximum of 25 stock animals. All recreation stock will be held or grazed at least 50 yards from lakes or streams and 50 yards from primary trails.

## Management Direction

## Standards and Guidelines

4. (G) Enforce all laws and regulations using permits, restrictions, and citations along with educational programs to assure compliance and to reduce the impacts of visitor use on the Wilderness resource.

5. (S) Off-highway vehicle use is prohibited within the Wilderness. Generally, the use of mechanized equipment is prohibited. Exceptions that may be authorized by the Forest Supervisor include:

   a. motorized medical rescue equipment for evacuation of dead or severely injured persons;

   b. aerial stocking of fish where that use has been previously established. The Forest will cooperate with the State on finding less disturbing stocking methods, e.g., use of pack animals.

6. (G) Discourage concentrated recreation use in the bighorn sheep reintroduction area.

7. (G) Reduce the use of areas approaching capacity through dispersal techniques.

8. (S) Restore or rehabilitate overused campsites in condition classes 4 or 5.

9. (G) Rehabilitate sites damaged by trail use to natural conditions to maintain or restore site productivity and water quality.

10. Limit special uses to those activities compatible with wilderness management.

   a. (G) Issue outfitter-guide special use permits when such use provides a needed public service and assists in the administration and utilization of resources. Restrictions will be imposed on specific areas of heavy use to prevent degradation of natural resources.

   b. (G) Outfitter-guides must develop operating plans which will be inspected periodically to ensure compliance. An environmental analysis will be required for new outfitter-guide permits.

   c. (S) Commercial group size will be limited to 25 persons and 25 head of recreational livestock unless otherwise approved on a case-by-case basis.

| Management Direction | Standards and Guidelines |
|---|---|
| Implement planning and inventory projects to provide information and direction for management of the Wilderness. | 1. (G) Complete a physical and social carrying capacity study of the Wilderness and selected areas within it. |
| | 2. (G) Revise and implement the trail system maintenance and development plan that provides access in the Wilderness for recreational users while assuring the protection of the Wilderness resource and ensuring a low frequency of visitor contacts by trail users. Identify trails to be obliterated that are not planned as part of the system. |
| | 3. (S) Inventory recreation use annually through the Recreation Information Management (RIM) system using special-use permit counts, field counts, and compliance checks of legal Wilderness uses. |
| | 4. (G) Monitor recreation use impacts on the Wilderness using classification system outlined in FSM and provide for amendment to this plan as required for protection of the Wilderness resource. |
| Maintain an interpretive service program to complement management of the Wilderness and to provide the public with Wilderness-related information. | 1. (G) Use brochures, maps, and signs at primary Wilderness portals to provide information on minimum-impact methods, alternative dispersed recreation areas, proper stock use, etc. Use interior signs for resource protection. |
| | 2. (G) Maintain Wilderness ranger coverage at primary portals to contact at least 25% of the visitors between July 1 and September 1. This coverage will require at least one Wilderness ranger working half-time at portals and half-time in the field. |

**Cultural Resources**

Apply Forest-wide Standards and Guidelines.

**Visual Resource**

Meet the visual quality objectives of preservation. Manage adjacent lands, as seen from the Wilderness at middleground distances, to meet or exceed partial retention. Apply Forest-wide Standards and Guidelines for visual rehabilitation opportunities.

Visual Resources

1. (G) Activities that alter the landscape are generally prohibited, with the following exceptions:

   a. low visual-impact facilities, such as trails and small-scale rustic-appearing bridges;

| Management Direction | Standards and Guidelines |
|---|---|

b.  existing range improvement structures, although reconstruction or rehabilitation of such structures will be designed to meet retention objectives.

## Timber

Protect and maintain natural conditions and processes of plant communities. Prohibit firewood cutting.

## Water and Soils

Manage watershed and soil resources commensurate with wilderness objectives.

### Water and Soils

1. (S) Except for existing special use permits, watersheds will not be altered or managed to increase water quantity or to change the timing of the spring runoff.

2. (G) The Bowman Ditch may be maintained by appropriate mechanical means.

## Wildlife and Fish

Wildlife and fish coordination and habitat improvement actions will be compatible with Wilderness management objectives. Allow the natural distribution and population of indigenous wildlife and fish species to maintain a natural balance with their habitat, each other, and people.

### Wildlife and Fish

1. (G) Permit scientific studies which are not readily evident and do not detract from wilderness character.

2. (G) Hunting, trapping, and fishing are permitted, subject to State laws and regulations.

3. (G) Reintroductions or supplemental transplants of wildlife species in the Wilderness are permitted if native species have been eliminated or reduced to levels where elimination is likely, and the action would enhance or restore the species without impairing other Wilderness values.

4. (G) Cooperate with the California Department of Fish and Game and the Experimental Stewardship Committee to develop and implement a bighorn sheep recovery plan.

5. (S) Manage streams containing redband, rainbow, brook, and brown trout to at least maintain viable populations, as specified in the Riparian Area Management Prescription.

**Management Direction**                    **Standards and Guidelines**

6. (G) Develop fish stocking programs consistent with wilderness management activities in cooperation with the California Department of Fish and Game.

**This page intentionally left blank.**

# Wilderness Prescription (Low Standard) - 3

**M**anage at low standard maintenance level all existing units of the National Wilderness Preservation System in accordance with wilderness values and character. Primitive recreation opportunities are provided. Trails are maintained for hiking or equestrian use. Mechanized travel and motorized equipment are not permitted. Fish and wildlife species are affected by natural vegetative succession. Livestock grazing is permitted. Timber is not harvested or managed. Firewood cutting is not permitted. Mining is no longer permitted subject to valid existing rights. Fire protection activities minimize suppression impacts while seeking to maintain or enhance long-term wilderness values.

==This prescription applies to the RBU Alternative displayed in the EIS.==



## Management Direction

### Air Quality

Maintain air quality in Class I wilderness areas within the requirements of the Clean Air Act.

Identify and monitor air quality resource values (AQRVs) for Class I wilderness areas.

### Facilities

Provide trails, bridges, signing, and trailheads to protect and enhance the Wilderness resource.

### Lands

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Facilities

1. (G) Trails and trail bridges will be located, designed, constructed, and maintained to be suitable for foot and horseback travel, where appropriate.

2. (G) Provide bridges or turnpike sections only where impassable by foot or horseback, and to protect soil and water resources.

3. (G) Trail maintenance will include:

   a.  maintaining primary system trails;

   b.  signing entrances and trailheads;

   c.  all necessary measures to ensure resource protection.

4. (G) Obliterate unauthorized shortcuts and undesired trails using wilderness volunteers. Reroute trails where resource damage occurs or is likely to occur.

## Management Direction

## Standards and Guidelines

### Minerals

Allow prospecting, mining, and leasing activities that are provided for by law. Administer activities to mitigate impacts on the Wilderness.

*Minerals*

1. (S) Wilderness lands are withdrawn from mineral entry and mineral leasing, subject to valid existing rights.

2. (G) Examine unpatented mining claims for validity when a notice of intent to operate or an operating plan is received that involves surface-disturbing activities.

3. (G) Where surface-disturbing activities are involved, regularly inspect each prospecting or operating site during the periods of operation to assure compliance with laws, regulations, and operating plans.

4. (G) The reclamation portion of the operating plan will provide for complete site rehabilitation, and an appropriate bond will be collected to ensure completion.

### Protection

#### Fire

Maintain an aggressive fire prevention program, utilizing the most effective and economical means to eliminate preventable human-caused fires.

*Protection*

*Fire*

1. (G) Provide fire prevention information through public contacts, and at Wilderness portals.

2. (G) Promote the use of portable gas stoves to minimize risks of wildfires and impacts on the Wilderness resource from campfires.

3. (G) Provide public education concerning fire management strategies for the Wilderness.

Suppress wildfires in a manner which is compatible with wilderness management objectives, protects life and property at risk, and is consistent with the capability of suppression forces.

1. (G) Implement suppression techniques which are compatible with the protection of wilderness values.

   a. Tractors will be used only when there is imminent threat to life, property, or significant resources outside the Wilderness. Use tractors only with Regional Forester approval. Use of such mechanized equipment as power saws and portable pumps may be authorized by the Forest Supervisor when their use would be less devastating to wilderness values than the resultant fire damage or other suppression action.

## Management Direction

## Standards and Guidelines

    b.   Drop chemical fire retardant only after approval from the Forest Supervisor. Use fugitive retardants (initially colored but which quickly dissipate and become colorless) when available. Water drops from aerial tankers or from external helibuckets may be used without restriction.

    c.   Do not drop retardant within 300 feet of lakes or flowing streams except under extreme conditions where human lives or property are at risk.

    d.   Allow aerial transportation of crews only when life is threatened or the potential for unacceptable resource damage is severe.

2. (G) Develop a plan to permit prescription fires from unplanned ignitions to perpetuate the natural diversity of plant and animal communities.

3. (G) Allow no incident bases in the Wilderness. Temporary spike camps may be allowed with Forest Supervisor approval.

4. (G) Reseed damaged areas with native species.

5. (G) Use existing natural barriers when available to confine fire. Natural barriers, including streams, rock outcroppings, and vegetation type changes, and existing trails will be used in lieu of line construction, even at the expense of additional acres burned.

6. (G) Use minimum-impact line construction techniques when constructing hand line.

    a.   Construct the narrowest and shallowest lines that will contain fire.

    b.   Limb trees rather than felling them, unless this is a safety or holding factor. Leave the bole intact rather than bucking it into shorter lengths.

    c.   When possible, cold-trail the fire perimeter instead of constructing line. If available, use water to cool or extinguish the fire perimeter.

    d.   Generally, use hand tools (shovel, McLeod, Pulaski, crosscut saw) for line construction.

| Management Direction | Standards and Guidelines |
|---|---|

**Management Direction**

**Standards and Guidelines**

7. (G) Fire-out from the narrowest line that conditions will allow, and use natural barriers or existing trails where practical.

8. (G) If appropriate, fire-out from strategic locations such as natural barriers, trails, or openings to reduce the impact and the time required to establish control lines through these areas.

9. (G) Use minimum-impact methods of mop-up.

   a. Allow snags to burn down if well inside the fire perimeter. Fell snags along the perimeter that threaten to throw sparks or cross the line. Snags within the fire perimeter that threaten firefighter safety along trails or other identified locations will also be felled.

   b. Where feasible, allow logs on the ground to burn instead of bucking them into shorter lengths.

   c. Avoid extensive spading of duff layers; allow the duff to burn, or saturate it with water if available.

   d. Take necessary action on potential reburns if they threaten to cross the line and escape containment.

   e. Place less emphasis on actual mop-up and more emphasis on patrolling and monitoring the fire; allow the fire to burn out naturally if conditions allow.

   f. Increase mop-up if weather changes threaten containment.

10. (G) Rehabilitate to restore natural conditions or obscure the impacts of suppression activities.

   a. Naturalize the environment around spike camps.

   b. Firelines will be naturalized by scattering duff and blocking them with limbs, logs, and rocks, where possible.

   c. All garbage, flagging, discarded tools, and other debris will be packed out.

   d. Use only native species when revegetating.

| Management Direction | Standards and Guidelines |
|---|---|

**Management Direction**

Use prescribed fire to:

- reduce the risk of natural fires by reducing accumulated fuels;
- restore and maintain natural plant communities;
- enhance threatened or endangered wildlife and fish species habitat.

**Law Enforcement**

Apply Forest-wide Standards and Guidelines.

**Integrated Pest Management**

Control insects and plant diseases only when necessary to prevent unacceptable damage to resources on adjacent lands or an unnatural loss to the wilderness from exotic pests.

**Range**

Allow grazing of domestic livestock where that use was established prior to wilderness classification. Planning and administration of grazing systems, stocking levels, utilization standards, and all range improvements will conform to the objectives of wilderness management.

**Standards and Guidelines**

11.(G) Develop a prescribed fire program.

Range

1. (G) Forage utilization will be consistent with the maintenance or improvement of the Wilderness resource.

2. (G) Manage livestock grazing to minimize competition with wildlife. Native wildlife have priority for use of Wilderness forage.

3. (G) Livestock may be excluded from areas identified as critical for wildlife, where deterioration of the soil, water, or vegetative resource is occurring, and where conflicts are identified at specified lakes, streams, and trails.

4. (G) Maintain natural vegetative composition.

5. (S) Structural range improvements may be constructed only when necessary to protect the Wilderness resource, and not to accommodate increased numbers of livestock. Existing improvements will generally be maintained.

6. (G) Emphasize range structures of primitive or natural appearing material where their use will not impose unreasonable additional cost to grazing permittees.

| Management Direction | Standards and Guidelines |
|---|---|

7. Minimize concentrations of livestock in riparian areas.

    a. (G) Develop utilization standards in allotment management plans using the following guidelines:

        – Under season-long grazing, <30% of the total annual grass/forb production.

        – Under deferred early- or late-season grazing, or rest-rotation grazing, graze up to 50% of the grass/forb production (60% utilization, if in good condition). All classes of animals are included in these use figures. Wildlife use may need to be estimated at a given rate and livestock use adjusted accordingly.

        – Under any grazing system, manage grazing to enable riparian-associated shrubs to reach at least 50% of the natural site potential.

        – Shrub utilization (including willows and aspen) may not exceed 20% under season-long grazing, or 30% under deferred or rest-rotation grazing.

    b. (G) Control livestock distribution within allotments to protect water quality by such methods as riding and temporarily placing salt at least 1/4-mile away from water.

    c. (G) Maintain streambanks in stable condition as specifically defined in allotment management plans.

    d. (G) Avoid livestock driveways within SMZs, where possible, and locate driveways away from recreation trails.

8. (G) Prevent unauthorized livestock from drifting into the bighorn sheep reintroduction area.

9. (S) The following restrictions will apply to recreational livestock:

    a. A maximum of 25 head of recreational livestock are permitted per party, including pack and saddle stock. The Forest Supervisor may permit more stock animals per party by approval of a written justification statement.

*Management Direction*

## Management Direction

## Standards and Guidelines

b. No pack or saddle livestock are permitted within 50 yards of the shoreline of any lake or stream except for the purpose of loading, unloading, watering, or traveling on established trails.

c. Users will provide supplemental, pelletized feed where adequate forage is not available. Public contracts will encourage the use of pelletized feeds. Signs may be posted at trailheads and in areas where forage is insufficient and pelletized feed is required.

d. To prevent the introduction of noxious or non-native plant species, hay may not be brought into the Wilderness.

e. Hobble, picket, or confine pack and saddle animals overnight in temporary corrals (rope or electric fence). They may not be tied directly to the boles of live trees at any time.

10.(S) Monitor water quality as necessary to determine baseline conditions and the effects of range management in the Wilderness.

11.(S) Take corrective action where livestock grazing has caused stream channel degradation.

### Recreation and Wilderness

#### Wilderness Recreation

Provide primitive recreation opportunities that emphasize solitude, self-reliance, physical and mental challenge, inspiration, and the unique experiences dependent on a wilderness setting. Management involves regulation of use emphasizing voluntary compliance.

### Recreation and Wilderness

#### Wilderness Recreation

1. (G) All management activities will adhere to direction for Primitive Recreation Opportunity Spectrum described in the Forest-wide Standards and Guidelines.

2. (S) Limit group size to 25 persons or less, unless excepted by the Forest Supervisor on a case-by-case basis.

3. (S) Limit groups to a maximum of 25 stock animals. All recreation stock will be held or grazed at least 50 yards from lakes or streams and 50 yards from primary trails.

4. (G) Enforce laws and regulations, restrictions, and citations.

**Management Direction**                    **Standards and Guidelines**

5. (S) Off-highway vehicle use is prohibited within the Wilderness. Generally, the use of mechanized equipment is prohibited. Exceptions that may be authorized by the Forest Supervisor include:

   a. motorized medical rescue equipment for evacuation of dead or severely injured persons;

   b. aerial stocking of fish where that use has been previously established.

6. (G) Discourage concentrated recreation use in the bighorn sheep reintroduction area.

7. (G) Reduce the use of areas approaching capacity through dispersal techniques.

8. (G) Rehabilitate sites damaged by trail use to as near natural conditions as possible to maintain or restore site productivity and water quality.

9. Limit special uses to those activities compatible with wilderness management.

   a. (G) Issue outfitter-guide special use permits when such use provides a needed public service and assists in the administration and utilization of resources. Restrictions will be imposed on specific areas of heavy use to prevent degradation of the resources.

   b. (G) Outfitter-guides must develop operating plans which will be inspected periodically to ensure compliance. An environmental analysis will be required for new outfitter-guide permits.

   c. (S) Commercial group size will be limited to 25 persons and 25 head of recreational livestock unless otherwise approved on a case-by-case basis.

Maintain an interpretive service program to complement management of the Wilderness and to provide the public with Wilderness-related information.

1. (G) Use brochures, maps, and signs to provide information on minimum-impact methods, alternative dispersed recreation areas, proper stock use, safety, etc. Use interior signs for resource protection.

2. (G) Between July 1 and September 1, maintain coverage at primary portals to contact at least 25% of the visitors.

## Management Direction

### Standards and Guidelines

**Cultural Resources**

Apply Forest-wide Standards and Guidelines.

**Visuals**

Meet the visual quality objective of preservation. Apply Forest-wide Standards and Guidelines for visual rehabilitation opportunities.

### Visuals

1. (G) Activities that alter the landscape are prohibited, with the following exceptions:

   a. low visual-impact facilities, such as trails and small-scale bridges;

   b. existing range improvement structures, although reconstruction or rehabilitation of such structures will be designed to meet the preservation VQO.

## Timber

Protect and maintain natural conditions and processes of plant communities. Prohibit firewood cutting.

## Water and Soils

Manage watershed and soil resources commensurate with wilderness objectives.

### Water and Soils

1. (S) Except for existing special use permits, watersheds will not be altered nor managed to increase water quantity or to change the timing of the spring runoff.

2. (G) The Bowman Ditch may be maintained by appropriate mechanical means.

## Wildlife and Fish

Wildlife coordination and habitat improvement actions will be compatible with wilderness management objectives. Allow the natural distribution and population of indigenous wildlife and fish species to maintain a natural balance with their habitat, each other, and people.

### Wildlife and Fish

1. (G) Permit scientific studies as long as they are not readily evident nor detracting from wilderness character.

2. (G) Hunting, trapping, and fishing are permitted, subject to State laws and regulations.

3. (G) Reintroductions and supplemental transplants of wildlife and fish species in the Wilderness are permitted if native species have been eliminated or reduced to levels where elimination is likely, and the action would enhance or restore the species without impairing other wilderness values.

## Management Direction

## Standards and Guidelines

4. (G) Cooperate with the California Department of Fish and Game to develop and implement a bighorn sheep herd and habitat management plan.

5. (G) Inform visitors of appropriate, non-disturbing behavior when near bighorn sheep.

6. (G) Define specific areas that are critical to bighorn sheep (e.g., lambing grounds). Encourage recreationists to stay on the trails at specific times of the year in these areas.

7. (S) Manage streams containing redband, rainbow, brook, and brown trout to at least maintain viable populations, as specified in the Riparian Area Management Prescription.

8. (G) Develop fish stocking programs consistent with wilderness management activities in cooperation with the California Department of Fish and Game.

*Management Direction*

# Semi-primitive Non-motorized Dispersed Recreation (SPNM) Management Prescription - 4

*Emphasize high-quality semi-primitive non-motorized dispersed recreation in a natural-appearing environment. Permanent roads are not constructed and public access by vehicle is not permitted; off-highway vehicles are not allowed. Generally, fish and wildlife are affected by natural vegetative succession, although habitat improvements are permitted. Livestock grazing is permitted as are range improvement projects. Timber harvest is not scheduled, but may occur to enhance recreational values. Firewood cutting is not permitted. Vegetation treatments maintain a predominantly natural-appearing environment. Mineral exploration and development is permitted with restrictions.*

*This prescription applies to 23,013 acres distributed within 15 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines

### Facilities

Maintain semi-primitive recreation opportunities by restricting road development and maintenance.

### Lands

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Facilities

1. (S) Roads required for administrative purposes or for access to adjacent areas will be controlled by locked gates. All other roads will be closed or obliterated. Roads may be converted to trails for access to sites or to provide linkage with other trails.

2. (G) Return obliterated roads to resource production, and barricade them where necessary.

3. (G) Temporary roads may be permitted for one-time resource management purposes, but they will be obliterated immediately following completion of projects.

4. (G) Prohibit motorized travel on or off Forest roads except for administrative and resource management entry or for access to private land.

5. (G) Construct and maintain trails and trailheads for resource protection and distribution of recreation users.

## Management Direction

## Standards and Guidelines

### Minerals

Manage mineral, geothermal, and oil and gas activity in a manner compatible with semi-primitive non-motorized recreation direction. Apply a conditional no-surface occupancy stipulation to leasable minerals.

*Minerals*

1. (G) Encourage preliminary exploration by cross-country travel, where terrain permits, or by placement of drills by helicopter.

2. (G) Following activities, reclamation measures are required to restore the recreation values to the extent practical.

3. (G) Obliterate access roads when activities are completed.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects are designed to achieve the recreation objectives of this prescription.

*Range*

1. (G) New structural improvements for livestock management are developed with the following stipulations:

   a. Do not locate improvements near trail corridors and foreground areas visible for trails.

   b. Design improvements with a natural appearance.

2. (G) Manipulate vegetation to improve forage production so that the natural appearance of the landscape is not disturbed for more than a year.

3. (G) Prevent conflicts between livestock use and recreation, where possible.

### Recreation

#### Recreation

Manage suitable areas to provide high quality semi-primitive non-motorized dispersed recreation opportunities.

*Recreation*

*Recreation*

1. (G) Adhere to Forest-wide Standards and Guidelines for the Semi-Primitive Non-Motorized Recreation Opportunity Spectrum class.

2. (G) Limit site development to rustic facilities for resource protection and visitor safety. Keep site modification to a minimum.

## Management Direction

## Standards and Guidelines

3. (G) Implement programs to inform visitors of recreational opportunities in these areas.

4. (G) Alleviate use pressures on the Wilderness by making the public aware of the recreation opportunities available in these areas.

5. (G) Promote sanitation and the "pack it in, pack it out" trash program through trailhead signing, information pamphlets, and on-site encounters with Forest personnel.

6. (G) Identify the semi-primitive non-motorized areas as dispersed areas in RIM, and record use separately.

7. (G) Motorized travel off Forest system roads is prohibited except for administrative and resource management entry.

**Cultural Resources**

Apply Forest-wide Standards and Guidelines.

**Visual Resource**

Meet the visual quality objective of retention. Apply Forest-wide Standards and Guidelines for visual enhancement and rehabilitation opportunities.

## Timber

Manage timber stands to maintain visual quality and wildlife habitat diversity. Reduce insect and disease hazards, as needed. No scheduled harvest is planned. Firewood cutting is not permitted.

## Water and Soils

Apply Forest-wide Standards and Guidelines.

## Wildlife and Fish

Wildlife and fish management and habitat improvement projects are compatible with the recreation objectives of this prescription.

*Timber*

1. (G) Trees destroyed by fire, insects, or disease may be harvested if they are in stands 5 acres or larger, and if 75% of the standing trees have been killed.

*Wildlife and Fish*

2. (G) Fish stocking programs consistent with SPNM activities may be developed in cooperation with CDFG.

**This page intentionally left blank**

## Developed Recreation Site Management Prescription (Standard) - 5

*Manage developed recreation sites to maintain or enhance developed recreation values and opportunities on a cost-effective basis, while simultaneously managing riparian area resources. Manage other resources to be compatible with developed recreation management objectives. The character of the landscape appears natural or nearly natural. Off-highway vehicle use is confined to designated roads. Livestock grazing is permitted outside the recreation season on a site-by-site basis. Wildlife and fish habitat improvements are permitted. Timber harvesting may be used to improve sites for recreation or visual purposes, but no scheduled harvest is planned. Firewood cutting is permitted. Most sites are closed to mineral entry. Special roads and trails are provided into sites.*

*This prescription applies to all existing public- and private-sector developed recreation sites administered on the Forest, including riparian areas within developed sites; but it does not apply to lakes and reservoirs associated with developed sites. This prescription may also be applied to popular dispersed recreation sites that have the potential to become developed sites (198 acres).*

## Management Direction

## Standards and Guidelines

### Air Quality

Apply Forest-wide Standards and Guidelines

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Withdraw developed recreation sites from mineral entry for locatable minerals. Apply no-surface-occupancy stipulations for leaseable minerals.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects are compatible with developed recreation objectives.

Range

1. (S) Prohibit livestock grazing in existing sites during the recreation season (Memorial Day to Labor Day).

2. (G) Do not include developed recreation sites in the calculation of range carrying capacity. Make use of

**Management Direction**

**Standards and Guidelines**

these areas on an opportunistic basis when not in conflict with recreation use.

3. (G) Use rustic fencing (such as posts, poles, and rails) to exclude livestock from developed sites when fencing is needed.

## Recreation

### Recreation

Recreation

Recreation

– Operate and maintain public recreation sites commensurate with their development scale and management level, emphasizing those activities associated with the Roaded Natural Recreation Opportunity Class.

1. (G) Maintain facilities and sites at Maintenance Class 1 standards based on their development scale.

2. (G) Manage fee sites at full-service level.

3. (G) Where sites are compartmentalized and demand is less than capacity, develop a rest-rotation or deferred-use system which minimizes resource maintenance and maximizes cost-effective management.

4. (G) Manage sites receiving use <10% of theoretical capacity at the reduced-service level. Phase out sites that receive use <5% of the theoretical capacity.

5. (S) Monitor water quality as necessary to determine baseline conditions and the effects of resource management.

6. (S) Construct and maintain water developments to meet EPA, State of California, and Forest Service drinking water quality standards.

– Administer public developed sites to provide for quality recreation experiences.

1. (G) Comply with *Regulations for Occupancy and Use of Developed Sites* (36 CFR 261.14 and 261.15).

2. (G) Prevent violations through facility design, visitor contacts, signing, and clear communication of regulations.

3. (G) Negotiate cooperative law enforcement agreements that provide for Development Level 3 campgrounds to be patrolled at least once during high-use periods (e.g., Memorial Day, Labor Day, and Independence Day weekends) and on a random basis during other periods of the recreation season.

| Management Direction | Standards and Guidelines |
|---|---|
| | 4. (G) Charge fees at all Development Level 3 campgrounds which qualify as fee sites where it is administratively and economically feasible to use the fee system. |
| | 5. G) Establish fees that are comparable to those charged at similar facilities operated by the private sector within the area of influence to minimize competition with the private sector. |
| | 6. (G) Inventory site use at Reliability Level 2 for all developed sites using occupancy rate sampling procedures. |
| | 7. (G) Maintain annual RIM facility condition updates. |
| | 8. (G) Limit motorized vehicle use to Forest roads. |
| | 9. (G) Limit camping at developed recreation campgrounds to a maximum of 14 days. |
| | 10.(G) Regulate opening and closing dates for recreation facilities to achieve the most efficient and cost-effective use and administration. |
| | 11.(G) Developed facilities receiving heaviest use will receive first priority for maintenance. |
| | 12.(G) Maintain updated site plans for all existing developed recreation sites. |
| – At public developed sites inform recreationists of regulations and available opportunities. | 1. (G) Develop and make available the Recreation Opportunity Guide System at all administrative sites. |
| | 2. (G) Provide campground hosts at fee sites, when feasible. Emphasize the use of volunteers as campground hosts. |
| – Restrict OHV use within one-half mile radius of recreation sites. | 1. (G) Generally, vehicles shall be confined to roads, parking areas, or camp spurs. |
| – Administer special use permits for recreation residences to comply with FSM standard management. | 1. (G) Continue all recreation residence special use permits unless a future use determination (FUD) identifies a higher public need. |
| | 2. (G) FUDs should be scheduled in advance of termination date of the permit in order to allow sufficient time for public input. |

| Management Direction | Standards and Guidelines |
|---|---|
| | 3. (S) If a higher public need is identified, permittees are given a minimum of 10 years notice. |
| | 4. (S) Approve no new recreation residence tracts. |
| — Administer the Cedar Pass Ski Hill special use permit to provide a quality skiing experience. | 1. (G) Allow for expansion of the ski hill permit area and development of new facilities when supported by recreational demand, and economic and resource evaluation. |
| | 2. (G) Provide additional parking area capacity in response to increased use of expansion of the ski hill. |
| | 3. (G) Allow tree and brush removal for the maintenance of existing ski runs. |
| | 4. (G) Allow silvicultural treatment of tree stands to perpetuate existing stands. |
| | 5. (G) Maintain fees commensurate with the facilities and opportunities provided to the public. |
| | 6. (G) Prohibit motorized vehicle use on the ski hill except as authorized for the maintenance of the ski hill or facilities. |
| — Rehabilitate sites to original construction standards, where appropriate. When considering rehabilitation, determine if the site will best be managed by:<br>• Retaining the site and upgrading the facilities to serve the user;<br>• Retaining the site but redesigning it to meet present standards;<br>• changing the site to meet land management planning and ROS objectives; or<br>• Removing the facilities and restoring the site. | 1. (G) Rehabilitate facilities in maintenance classes 2 through 5 (in the RIM system). |
| | 2. (S) In developed recreation sites where water quality or soil stability have been degraded, implement watershed restoration measures. Rehabilitate deteriorating vegetation, and compacted and eroded soil, as needed. Rehabilitation measures may include seeding, fertilization, irrigation, planting, and mulching. |

| Management Direction | Standards and Guidelines |
|---|---|

**Standards and Guidelines (continued):**

3. (G) Prioritize site rehabilitation in anticipation of available funding. Priorities for rehabilitation are based on site and resource protection; maintenance of capital investment; increased cost-effectiveness of operation, maintenance, and administration; improvement of users' recreation experience; and opportunity for partnerships and cost-sharing.

4. (G) Rehabilitate existing campgrounds with the potential for inclusion in the fee system when economically and administratively feasible.

5. (G) Provide for the physically handicapped when upgrading existing facilities.

6. (G) Use only Service-wide or Regionally approved designs for development or replacement of facilities. Where standard designs are not appropriate or satisfactory, submit special plans to the Regional Office for approval.

**Management Direction:**

– Expand site capacity when supported by recreational demand, and economic and resource evaluation.

**Cultural Resources**

Apply Forest-wide Standards and Guidelines. Place cultural resource awareness signs (standard Forest Service signs) at camp bulletin boards.

**Visual Resource**

Meet the visual quality objective of retention or partial retention. Apply Forest-wide Standards and Guidelines for visual enhancement or rehabilitation opportunities.

## Timber

Manage tree stands to enhance scenic and recreation values. Firewood cutting is permitted only to maintain or enhance other resource values.

## Water and Soils

Apply Forest-wide Standards and Guidelines.

**Timber**

1. (G) Manage vegetation in all developed sites to ensure perpetuation of desired stand characteristics.

## Management Direction

## Standards and Guidelines

**Wildlife and Fish**

Apply Forest-wide Standards and Guidelines.

wildlife and Fish

2. (G) Coordinate with CDFG to improve fishing access to benefit fish; e.g., improve road access or boat launching facilities in waters with underutilized fish populations.

# Developed Recreation Site Management Prescription (Low Standard) - 6

*Manage developed recreation sites to maintain or enhance developed recreation values and opportunities on a cost-effective basis, while simultaneously managing riparian area resources. Manage other resources to be compatible with or complementary to developed recreation management objectives. The character of the landscape appears natural or nearly natural. Off-highway vehicle use is confined to designated roads. Livestock grazing is permitted outside the recreation season on a site-by-site basis. Timber harvesting may be used to improve sites for recreation or visual purposes, but no scheduled harvest is planned. Firewood cutting is permitted. Most sites are closed to mineral entry. Special roads and trails are provided into sites.*

==This prescription applies to the RBU Alternative displayed in the EIS.==



## Management Direction

## Standards and Guidelines

### Air Quality

Apply Forest-wide Standards and Guidelines

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Withdraw developed recreation sites from mineral entry for locatable minerals. Apply no-surface-occupancy stipulations for leaseable minerals.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects are compatible with developed recreation objectives.

Range

1. (S) Prohibit livestock grazing in existing sites during the recreation season (Memorial Day to Labor Day).

2. (G) Do not include developed recreation sites in the calculation of range carrying capacity. Make use of these areas on an opportunistic basis when not in conflict with recreation use.

## Management Direction

## Standards and Guidelines

3. (G) Use rustic fencing (such as posts, poles, and rails) to exclude livestock from developed sites when fencing is needed.

### Recreation

#### Recreation

– Operate and maintain public recreation sites commensurate with their development scale and management level, emphasizing those activities associated with the roaded natural recreation opportunity class.

### Recreation

Recreation

1. (G) Maintain facilities and sites at standard maintenance levels commensurate with their development scale.

2. (G) Where sites are compartmentalized and demand is less than capacity, develop a rest-rotation or deferred-use system which minimizes resource maintenance and maximizes cost-effective management.

3. (G) Manage sites receiving use < 10% of theoretical capacity at the reduced-service level. Phase out sites that receive use < 5% of the theoretical capacity.

4. (S) Monitor water quality as necessary to determine baseline conditions and the effects of resource management.

5. (S) Construct and maintain water developments to meet EPA, State of California, and Forest Service drinking water quality standards.

– Administer public developed sites to provide for quality recreation experiences.

1. (G) Comply with *Regulations For Occupancy And Use Of Developed Sites* (36 CFR 261.14 and 261.15).

2. (G) Prevent violations through facility design, visitor contacts, signing, and clear communications of regulations.

3. (G) Negotiate cooperative law enforcement agreements that provide for Development Level 3 campgrounds to be patrolled at least once during high-use periods (e.g., Memorial Day, Labor Day, and Independence Day weekends).

4. (G) Charge fees at all Development Level 3 campgrounds which qualify as fee sites where it is administratively and economically feasible to use the fee system.

| **Management Direction** | **Standards and Guidelines** |
|---|---|
| | 5. (G) Establish fees that are comparable to those charged at similar facilities operated by the private sector within the area of influence to minimize competition with the private sector. |
| | 6. (G) Inventory site use at Reliability Level 4 for all developed sites using occupancy rate sampling procedures. |
| | 7. (G) Maintain biannual RIM facility condition updates. |
| | 8. (G) Limit motorized vehicle use to Forest roads. |
| | 9. (G) Limit camping at developed recreation campgrounds to a maximum of 14 days. |
| | 10. (G) Opening and closing dates for recreation facilities are regulated to achieve the most efficient and cost-effective use and administration. |
| | 11. (G) Developed facilities receiving heaviest use will receive first priority for maintenance. |
| | 12. (G) Maintain updated site plans for all existing developed recreation sites. |
| – Provide for information and education at public developed sites to inform recreationists of regulations and available opportunities. | 1. (G) Develop and make available the Recreation Opportunity Guide System at all administrative sites. |
| | 2. (G) Provide campground hosts at fee sites, when feasible. Emphasize the use of volunteers as campground hosts. |
| – Restrict OHV use within a one-half mile radius of recreation sites. | 1. (G) Generally, vehicles shall be confined to roads, parking areas, or camp spurs. |
| – Administer special use permits for recreation residences to comply with FSM standard management. | 1. (G) Continue all recreation residence special use permits unless a future use determination (FUD) identifies a higher public need. |
| | 2. (G) FUDs should be scheduled in advance of termination date of the permit in order to allow sufficient time for public input. |
| | 3. (S) If a higher public need is identified, permittees are given a minimum of 10 years notice. |

*Management Direction*

## Management Direction

- Administer the Cedar Pass Ski Hill special use permit to provide for a quality skiing recreational experience.

- Rehabilitate sites to original construction standards , where appropriate. When considering rehabilitation, determine if the site will best be managed by:
  - Retaining the site and upgrading the facilities to serve the user;
  - Retaining the site but redesigning it to meet present standards;
  - changing the site to meet land management planning and ROS objectives; or
- Removing the facilities and restoring the site.

## Standards and Guidelines

4. (S) Approve no new recreation residence tracts.

1. (G) Allow for expansion of the ski hill permit area and the development of new facilities when supported by recreational demand, and economic and resource evaluation.

2. (G) Provide additional parking area capacity in response to increased use or expansion of the ski hill.

3. (G) Allow tree and brush removal for the maintenance of existing ski runs.

4. (G) Allow silvicultural treatment of tree stands to perpetuate existing stands.

5. (G) Maintain fees commensurate with the facilities and opportunities provided to the public.

6. (G) Prohibit motorized vehicle use on the ski hill except as authorized for the maintenance of the ski hill or facilities.

1. (G) Rehabilitate facilities in standard maintenance levels 2 through 5.

2. (S) In developed recreation sites where water quality or soil stability have been degraded, implement watershed restoration measures. Rehabilitate deteriorating vegetation, and compacted and eroded soil, as needed. Rehabilitation measures may include seeding, fertilization, irrigation, planting, and mulching.

3. (G) Prioritize site rehabilitation in anticipation of available funding. Priorities for rehabilitation are based on site and resource protection; maintenance of capital investment; increased cost-effectiveness of op-

## Management Direction

## Standards and Guidelines

eration, maintenance, and administration; improvement of users' recreation experience; and opportunity for partnerships and cost-sharing.

4. (G) Provide for the physically handicapped when upgrading existing facilities.

5. (G) Use only Service-wide or Regionally approved designs for development or replacement of facilities. Where standard designs are not appropriate or satisfactory, submit special plans to the Regional Office for approval.

**Cultural Resources**

Apply Forest-wide Standards and Guidelines. Place cultural resources awareness signs (standard Forest Service signs) at camp bulletin boards.

**Visual Resource**

Meet the visual quality objective of retention or partial retention. Apply Forest-wide Standards and Guidelines for visual enhancement or rehabilitation opportunities.

## Timber

Manage tree stands to enhance scenic and recreation values. Firewood cutting is permitted only to maintain or enhance other resource values.

## Water and Soils

Apply Forest-wide Standards and Guidelines.

## Wildlife and Fish

Apply Forest-wide Standards and Guidelines.

Timber

1. (G) Manage vegetation in all developed sites to ensure perpetuation of desired stand characteristics.

**This page intentionally left blank.**

## Visual Retention Management Prescription - 7

*Description: Manage the foreground zone of the visual corridor so that management activities are not appaent to the casual Forest visitor. Recreation opportunities are provided in a natural-appearing environment. Off-highway vehicle use is permitted, but with restrictions. Fire management, wildlife, and range improvements are permitted. A scheduled harvest of timber occurs, but with reduced yields. Roads and trails are allowed, but limited. The area is open to mineral entry, but with restrictions.*

*This prescription applies to the foreground zone of sensitivity level one travel routes or other designated areas where managing the visual resource is a high priority.*

*This prescription applies to 31,127 acres distributed within 16 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

| Management Direction | Standards and Guidelines |
|---|---|

### Air Quality

Apply Forest-wide Standards and Guidelines

### Facilities

In addition to the Forest-wide Standards and Guidelines, develop and maintain the road system to provide for roaded natural recreation opportunities and the safety of recreation users.

1. (G) New material sources will not be established within the foreground visual distance zone.

2. (G) Projects involving soil disturbance will require preventing environmental damage and restoring soil stability and natural vegetative cover within one year.

### Lands

Apply Forest-wide Standards and Guidelines.

### Lands

1. (G) No new utility corridors/developments will be permitted within foreground retention where alternative locations exist. Utilities which must be located here will be designed to achieve the retention VQO.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

## Management Direction

### Range

Range planning and administration of grazing systems, stocking levels, utilization standards, and all range-improvement projects will be designed to achieve the objectives of this prescription.

### Recreation

#### Recreation

Manage for roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines.

Areas within this prescription are open to OHV use if impacts cannot be seen from the primary roads.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the visual quality objective of retention for the visual corridor.

## Standards and Guidelines

### Range

1. (G) Limit the number and visibility of structural improvements within the foreground zone so that they are not apparent to the casual observer.

2. (G) Limit the impact of fence lines by selecting locations and designs that blend with the form, line, color, and texture of the natural landscape. Avoid silhouetting fence lines against the sky.

### Recreation

1. (G) Random entry from main roads is discouraged by maintenance of ditches, natural barriers, vegetation, signing, etc. Use is subject to restrictions identified on the OHV map.

1. (G) Complete Visual Corridor Plans for Level 1 travel routes, as needed.

2. (G) When a management activity is planned within or adjacent to a location in need of visual rehabilitation, emphasize accomplishing this work with the project.

3. (G) Temporary departure from assigned VQOs may be necessary in areas highly susceptible to insect or disease epidemics in order to protect long-term values.

4. (G) Identify and prioritize potential visual enhancement opportunities and rehabilitation needs. Develop as funds become available.

## Management Direction

### Timber

Manage the timber resource to retain or create the desired Forest character.

Firewood cutting is permitted only to maintain or enhance other resource values. The visual impacts of timber harvest activities in the foreground will be reduced by implementing special treatments as needed.

### Water and Soils

Apply Forest-wide Standards and Guidelines.

### Wildlife and Fish

Wildlife coordination efforts and habitat improvement projects will be compatible with the management objectives of this prescription.

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Timber

1. (G) All silvicultural practices and logging systems are permissible, provided they are compatible with achieving the VQO of retention or other objectives in the Visual Corridor Plan.

2. (G) Shape timber harvest units to resemble the natural characteristic landscape; i.e., naturally established landscape within a scene or scenes being viewed.

3. (G) Timber harvest units will be in scale with the characteristics of the surrounding landscape.

4. (G) Maintain large-tree character by retaining an average of five 30"-diameter trees per acre in the immediate foreground (up to 200 feet from the road's edge); or retain trees as large as the site is capable of growing in 250 years.

5. (G) Regeneration cuts at road edges will be located at non-focal points.

6. (G) Slash in the immediate foreground will be treated to resemble a natural forest floor.

7. (G) Logging roads are located to the rear of retention zone parallel to primary road. Direct access off primary road is minimized, and log deck locations are not apparent.

**This page intentionally left blank.**

# Special Areas Management Prescription - 8

*Description: Manage selected areas to maintain their special features, generally in an unmodified condition. These areas include Research Natural Areas (RNAs), Special Interest Areas (SIAs) and National Natural Landmarks (NNLs). SIAs and NNLs are of special interest because of unusual scenic, historic, prehistoric, cultural, scientific, natural, or other values, excluding wilderness values. RNAs are designated for research, study, observation, monitoring, and non-destructive, non-manipulative educational activities. They provide for genetic diversity of flora and fauna, and protection of threatened and endangered species and their habitat. They may also include areas of Native American Indian traditional religious or cultural value. They are managed to meet the Visual Quality Objective of Preservation or Retention. Off-highway vehicle use is not permitted. Firewood cutting is not permitted. Most sites are closed to mineral entry.*

*This prescription is applied to 14,588 acres distributed within 3 management areas. Acreage for the Raider Basin Research Natural Area is included in the Wilderness. Management direction is contained in this prescription. The size and configuration of the areas will vary. Some will be large, contiguous areas, while others may be isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Maintain roads, trails and other facilities to serve administrative, scientific, and recreation purposes.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Where practical, withdraw Special Areas from entry for locatable minerals. Apply no-surface-occupancy stipulations for mineral leasing.

### Protection

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Facilities

1. (S) Roads required for administrative or scientific purposes will be controlled by locked gates. Other roads will be closed or obliterated.

2. (S) Return obliterated roads to resource production and barricade them where necessary.

3. (G) Maintain trails and trailheads for resource protection.

## Management Direction

### Range

Design range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvements which are compatible with specific special area objectives.

### Recreation

#### Recreation

Provide recreation and public education opportunities which are compatible with the management objectives of the specific type of Special Area. Manage for semi-primitive non-motorized recreation opportunity class, as defined in Forest-wide Standards and Guidelines.

Develop a management plan with specific objectives and direction for each RNA and SIA. The current designated areas are:

- Devil's Garden Research Natural Area
- Burnt Lava Flow Geologic Area
- Glass Mountain Lava Flow Geologic Area
- Medicine Lake Lava Flow Geologic Area

## Standards and Guidelines

### Range

1. (S) Exclude livestock grazing from RNAs unless needed to preserve the vegetative communities for which the RNA was established. Fence RNAs if necessary to prohibit grazing.

### Recreation

1. **Research Natural Areas**

   a. (G) Sign or fence RNAs as necessary to discourage general recreational use and especially restrict off-highway vehicle use.

2. **Special Interest Areas and National Natural Landmarks**

   a. (S) Encourage public use and enjoyment of SIAs where resource damage is unlikely.

   b. (G) Provide interpretive signs and brochures to create learning experiences for users. Where public use is invited or permitted, take steps to protect any remaining scientific or research values.

## Management Direction

Proposed designated area is:

- Raider Basin Research Natural Area

### Cultural Resources

Apply Forest-wide Standards and Guidelines.

### Visual Resource

Meet the visual quality objective of preservation or retention. Apply Forest-wide Standards and Guidelines for enhancement and rehabilitation opportunities.

## Timber

Prohibit timber management activities, including firewood cutting, where they would conflict with special area objectives.

## Water and Soils

Apply Forest-wide Standards and Guidelines.

## Wildlife and Fish

Develop wildlife management and habitat improvement projects which are compatible with RNA and SIA objectives.

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

1. (G) Protect the Raider Basin Research Natural Area as if it were an approved RNA until completion of establishment reports and final decision by the Chief of the Forest Service.

# Definitions

*Natural History Resources:* Areas composed of natural phenomena which reference the development of the earth's surface and the evolution of life. Two interrelated categories of natural features are recognized. One, the geological category, results from forces and processes acting on the earth's surface to produce land forms and other non-living entities. The other, the ecological category, involves processes between biological forms and their environments. Five kinds of areas may be classified under 36 CFR 294 (FSM 2362). They are generally suitable for limited development for public interpretation, education, and enjoyment.

*Scenic Areas:* Places of outstanding or matchless beauty which require special management to preserve these qualities.

*Geological Areas:* Units of land with outstanding formations of unique geologic features of the earth's development.

*Botanical Areas:* Areas that contain specimens or group exhibits of plants, plant groups, and plant communities which are significant because of form, color, occurrence, habitat, location, life history, arrangement, ecology, environment, rarity, or other features.

*Zoological Areas:* Areas that contain authentic, significant, and interesting animals, animal groups, or animal communities which are natural and important because of occurrence, habitat, location, life history, ecology, environment, rarity, or other features.

*Paleontological Areas:* Areas containing fossil specimens of flora and fauna that span geologic time between the period when life first appeared on earth and the age of man.

## Raptor Management Prescription - 9

*Description: Manage habitat to promote the recovery of the bald eagle and to maintain the viability of goshawks. Dispersed recreation opportunities are in a natural or nearly natural-appearing environment. Off-highway vehicle use has seasonal restrictions. Wildlife management indicator species are favored in general, particularly the bald eagle and goshawk. Wildlife habitat improvements are permitted. Livestock grazing occurs if forage is available and improvements are allowed. Timber harvesting is recognized as a tool in habitat management, but is unregulated. Personal use firewood cutting is not permitted. Bald eagle areas are open for mineral leasing with special stipulations. Roads and trails are allowed, but limited.*

*This prescription applies to 52,111 acres distributed within 18 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Facilities management within or near wildlife habitats emphasized in this prescription will be compatible with the wildlife direction.

## Standards and Guidelines

### Facilities

1. Within bald eagle nesting and wintering habitat:

   a. (G) Whenever possible, existing roads will be relocated outside of primary zones of active nest territories. When roads cannot be relocated outside of nesting and wintering areas, the roads may be reconstructed and maintained only when the birds are not wintering or nesting.

   b. (S) New roads will not be constructed in winter roosts. Existing roads in winter roosts will be closed during the wintering period. New roads will not be constructed within primary zones of active nest territories. Construction within secondary zones will be determined on a case-by-case basis.

   c. (G) Seasonal or permanent road closures may be necessary to limit human disturbance during the reproductive or wintering period, depending on the area.

| **Management Direction** | **Standards and Guidelines** |
|---|---|

2. Within goshawk habitat:

    a.  (S) Commercial access on roads within nest stands is allowed August 1 through December 31.

    b.  (G) New roads should not be constructed within nest stands.

    c.  (G) Roads may be maintained, constructed and reconstructed within 1/4-mile of nest stands from August through February.

## Lands

*Lands*

Lands activities within or near wildlife habitats emphasized in this prescription will be guided by the following standards and guidelines.

1. Within bald eagle nesting and wintering habitat:

    a.  (G) Cadastral surveys and associated activities will be permitted August 15 to November 1.

    b.  (G) Acquire lands or interest in lands identified as critical or essential bald eagle habitat.

    c.  (G) Where possible, phase out special use permits which conflict with desired habitat characteristics and species objectives.

    d.  (G) Within the limits of Forest Service authority, mitigate impacts associated with utilities construction, operations, and maintenance in nesting territories, foraging areas, and wintering areas.

2. Within goshawk habitat:

    a.  (G) Cadastral surveys and associated activities may be conducted from August through February.

    b.  (G) Within the limits of Forest Service authority, mitigate impacts associated with utilities construction, operations, and maintenance in and within 1/4-mile of nest stands.

*Management Prescriptions*

## Management Direction

### Standards and Guidelines

### Minerals

In addition to Forest-wide Standards and Guidelines, adhere to the following standards for threatened, endangered, and sensitive species.

### Minerals

1. (S) For leasable and saleable minerals, no surface occupancy will be permitted within approximately one-half mile of known active bald eagle nests, to comply with protection required for the species under the Endangered Species Act of 1973, as amended.

2. (G) In order to protect critical seasonal and year-round habitat for bald eagles and goshawks, no leasable or saleable activities will be allowed in the following areas during the times specified.

   a. Bald eagle winter roost core areas and nesting habitat: year-round

   b. Remainder of bald eagle winter roost habitat: November 1 to April 15

   c. Goshawk nesting territories: March 1 to August 1

      Exceptions will be made if the lessee or permittee can demonstrate to the satisfaction of the Forest Service that unacceptable environmental impacts will not occur from the proposed operations. During periods when entry is allowed, limited surface disturbance including placement of some pipelines will generally be permissible. However, extensive development, such as power plants, are unlikely to be permitted.

3. (S) Activities related to locatable minerals will be mitigated by requiring the operator to take all reasonable measures to ensure that critical species and habitat are protected. Specific mitigation measures will be determined during project environmental analyses.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Range planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects will be compatible with the objectives of this prescription.

### Range

1. (G) The management objective for all rangelands that are not type-converted will be satisfactory ecologic condition.

*Management Prescriptions*

**4 - 87**

| **Management Direction** | **Standards and Guidelines** |
|---|---|
| Acceptable nonstructural and structural range practices include rejuvenation, fencing, and water developments. | 2. (G) Forage utilization will not normally exceed levels which provide sufficient herbage residue of key forage species to ensure plant vigor, adequate plant reproduction, favorable range trend, and good watershed conditions. |
| | 3. Within bald eagle nesting and wintering habitat: |
| |    a. (G) Structural maintenance and improvements and general range administration activities involving the use of motorized vehicles are acceptable only after August 15 in nesting territories. Authorization of these activities prior to August 15 will be assessed on a case-by-case basis. Use the annual operating plan to record decisions. |
| |    b. (S) Predator control and pesticide use are not normally planned for nesting territories, foraging areas, and winter roosts. These activities require consultation with the U.S. Fish and Wildlife Service. |
| | 4. (G) Within 1/4-mile of goshawk habitat, structural maintenance and improvements will be scheduled after August. |

## Recreation

### Recreation

Management of recreational activities within or near wildlife habitats emphasized in this prescription will be compatible with the wildlife direction. Manage for semi-primitive non-motorized, roaded natural, or semi-primitive motorized recreation opportunities in a predominantly natural or natural-appearing environment, as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class. Refer to OHV map for seasonal closure areas.

*Recreation*

1. Within bald eagle nesting and wintering habitat:

   a. (G) Disturbance from existing recreational facilities will be assessed on a case-by-case basis. Where human activity limits reproductive success or disturbs wintering bald eagles, facilities and areas may be recommended for restrictions including closure.

   b. (G) Motorized vehicles will be permitted September through December in nesting territories and April through October in wintering areas.

## Management Direction

## Standards and Guidelines

Other times of the year these areas may be administratively closed.

2. Within and near goshawk habitat:

   a. (G) Disturbance from recreational facilities may limit reproductive success. New or expanding facilities should be at least 1/2-mile from nest stands. Maintenance or reconstruction of existing facilities within 1/4-mile of nest stands will be scheduled August through February.

   b. (G) Disturbance from trail users may also limit reproductive success. New trails should be constructed at least 1/4-mile from nest stands. Maintenance or reconstruction of trails within 1/4-mile of nest stands will be scheduled August through February.

   c. (G) Within 1/4-mile of nest stands, motorized vehicles will be permitted August through February. Other times of the year these areas may be administratively closed.

### Cultural Resources

Apply Forest-wide Standards and Guidelines.

### Visual Resources

Meet or exceed the visual quality objectives of retention or partial retention. Apply Forest-wide Standards and Guidelines for enhancement or rehabilitation opportunities. Refer to VQO map for specific VQO.

## Timber

Timber management within or near wildlife habitats emphasized in this prescription will be compatible with wildlife direction. A silvicultural prescription will be prepared and scheduled to perpetuate specific habitat objectives.

Timber

1. Within bald eagle nesting and wintering habitat:

   a. (G) Timber Management activities will be scheduled within active nest territories and within 1/4-mile of foraging and loafing trees between August 15 and November 1. Timber management activities will be scheduled within wintering areas between April and October. Where nesting habitat and wintering areas coincide, management activities will be scheduled after the fledging period

## Management Direction

Reference standards and guidelines for road work in the Facilities and Recreation section of this Prescription.

## Standards and Guidelines

and before winter concentration buildup, usually August through November.

b.  (S) Permits for personal and commercial firewood cutting will be permitted if needed to achieve habitat improvement.

c.  (S) Pesticide use is not normally planned for nesting territories, foraging areas, and winter roosts. This activity requires consultation with the U.S. Fish and Wildlife Service.

2.  Within and near goshawk habitat:

a.  (G) Within 1/4-mile of nest stands, timber management activities will be scheduled from August through February.

b.  (S) Permits for personal use and commercial firewood cutting will be permitted if needed to achieve habitat improvement.

c.  (S) Pesticide use is not normally planned for nesting territories, foraging areas, and winter roosts. This activity requires consultation with the U.S. Fish and Wildlife Service.

## Water and Soils

Apply Forest-wide Standards and Guidelines.

## Wildlife and Fish

### Bald Eagle (Nesting and Wintering Areas)

— For all identified nest territories, primary and secondary zones will be established in accordance with the variable identified as suitable in the Bald Eagle Habitat Capability Model. Bald eagle nesting territory plans will be developed for each identified territory. These plans will give special consideration to bald eagles during the reproductive period, January to August.

*Wildlife and Fish*
*Bald Eagle*

1.  (G) Where opportunities arise, maintain and enhance fish, waterfowl, and other prey-base populations within the nest territory, within the closest known forage areas, and within winter foraging areas.

*Management Prescriptions*

## Management Direction

— Utilize the presence of bald eagles and the Habitat Capability Model to establish boundaries of wintering areas, including winter roosts, foraging areas, and daytime perches. Bald eagle wintering area plans will be developed for each wintering area. These plans will give special consideration to bald eagles from November to March.

**Goshawk**

— Within its habitat range, manage goshawk territories to maintain a density of at least one territory per 18 square miles. Distances between territories or clumps of territories should not exceed 12 miles. (The habitat range is defined as the area of land containing active or potential nesting habitat as described in the Goshawk Habitat Capability Model.)

**All Threatened, Endangered, and Sensitive Species**

— Cooperate with State and federal agencies in wildlife related matters.

— As part of coordination responsibilities with the U.S. Fish and Wildlife Service, cooperate in monitoring active bald eagle nest territories at least three times during the reproductive period (territory occupancy, incubation/hatching, and fledging) and participate in the California winter bald eagle survey.

## Standards and Guidelines

**Goshawk**

1. (G) Each territory will contain at least 100 acres of habitat suitable for the nest stand and an alternate nest stand. If the nest stand and alternate nest stand are known, delineate at least 50 acres around each stand. If only the nest stand is known, either (a) delineate at least 100 acres around the nest stand, or (b) delineate at least 50 acres around the nest stand, and, within a 1/2-mile radius, delineate an additional 50 acres around a potential alternate nest stand.

2. (G) Active nest territories will take preference in delineation of a population network. Where possible, nest stands will not be located in areas of intensive timber management. The primary objective, however, is to designate the highest capable and currently suitable nest stands. The secondary objective is to locate them in areas that will least conflict with intensive timber management.

3. (G) As opportunities arise, enhance prey base populations within two miles of nest stands.

**All Threatened, Endangered, and Sensitive Species**

4. (G) A free exchange of information between the Forest and State agencies relative to status reviews, listing of species, critical habitat proposals, and threatened and endangered species programs and activities shall be maintained at all times. The Forest Service will cooperate with State agencies to inventory, protect, manage, and plan for threatened, endangered, and sensitive species.

5. (S) The Forest will cooperate with the U.S. Fish and Wildlife Service on critical habitat determinations, in consultation needed when management affects threatened and endangered species, and in developing and implementing recovery plans.

*Management Prescriptions*

*4 - 91*

**This page intentionally left blank.**

## Rangeland Management Prescription - 10

*Description: The primary emphasis is to manage rangeland vegetation, providing for healthy ecosystems and making forage available for use by livestock, wildlife, and wild horse herds. The vegetation management goal is to provide desired expressions of herbaceous, shrub and forest vegetation according to site potential and resource needs. Resource uses occur to the extent that they do not adversely affect maintenance of the desired vegetation expression. Livestock grazing is permitted and recreation facilities may be located here consistent with Forest-wide Standards and Guidelines.*

*To achieve vegetation management objectives through livestock grazing, either a maintenance or extensive management level is applied to grazing allotments. To allotments with a maintenance management level, we minimally use structural improvements such as fences and water developments. In extensively managed allotments, we use structural improvements to improve distribution and more fully utilize allotment capacity. Nonstructural range improvement, such as brush control, generally are not used.*

*The landscape appears nearly natural; if changes are made, they are not distracting to the average Forest visitor. Recreation opportunities are provided in a roaded, natural-appearing environment. Off-highway vehicle use is permitted.*

*Wildlife management indicator species whose preferred habitat is rangeland are maintained or enhanced.*

*Firewood harvesting is permitted, as is geothermal and oil and gas leasing, and mineral entry and development. Road construction and reconstruction are allowed.*

*This prescription applies to 619,212 acres distributed within 19 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

Protection

1. (G) Outside riparian zones use prescribed burning to improve forage for wildlife and livestock and to reduce the potential for catastrophic fires.

## Management Direction

## Standards and Guidelines

### Range

Manage grazing to maintain desired vegetation expressions and satisfactory ecological condition. Where potential or existing resource conflicts are identified, correct through allotment management plans, annual operating plans, and grazing permits.

### Range 

1. (G) The management objective for all rangelands will be satisfactory ecological condition as defined below:

| Range Condition | Trend | Ecological Condition |
|---|---|---|
| Excellent | Static | Satisfactory |
| Good | Static/Upward | Satisfactory |
| Fair | Upward/Static | Satisfactory |
| Fair | Downward | Unsatisfactory |
| Poor | - | Unsatisfactory |
| Very Poor | - | Unsatisfactory |

2. (G) Forage utilization levels do not normally exceed levels displayed in Forest-wide Standards and Guidelines.

3. (S) Measure utilization on a percent by weight basis by Forest Service personnel in cooperation with grazing permittees and other interested public.

4. (G) Maintain existing boundary fences and other improvements; but undertake no new improvements unless necessary for protecting soil, water, or streamside-dependent resources.

5. (G) Construct structural range improvements (fences and water developments) to implement grazing systems which promote vegetation management objectives, and provide uniform livestock distribution and proper forage utilization.

6. (S) Follow structural improvement standards described in the Forest Service Manual.

7. (S) Schedule maintenance and replacement of structural improvements through allotment management plans and grazing permits.

## Management Direction

**Maintenance Allotments**

Manage livestock with a minimal investment in range improvement construction, allotment planning, permit administration, and monitoring.

**Extensive Allotments**

Manage grazing with a moderate investment in structural improvement construction, allotment planning, permit administration, and monitoring.

**Maintenance and Extensive Allotments**

— Range allotment planning and administration of livestock grazing, stocking levels, and range improvement projects will maintain or enhance habitat for management indicator species occurring on rangelands.

## Standards and Guidelines

1. (G) Within pronghorn habitat:

   a. Reference Interstate Antelope guidelines for more specific grazing standards and guidelines. Generally, graze livestock after mid-May until proper utilization is achieved. Graze wetlands to make forbs available to pronghorn.

2. (G) Within sage grouse habitat:

   a. Meadows within an eight-mile radius around each active lek will be managed to provide forbs desirable to sage grouse, such as dandelion (*Taraxacum* spp.), yarrow (*Achillea* spp.), and aster (*Aster* spp.). Manage for high water tables, forbs, and hiding cover in meadows.

   b. Delay sheep grazing until June 1.

3. (G) Within deer winter range and transition habitat:

   a. Allow an annual (July - April) average of no more than 40% utilization of bitterbrush by deer and livestock combined.

   b. Of the 40% total utilization of bitterbrush, on an allotment-by-allotment basis, allow 50% utilization by livestock and 50% utilization by wildlife.

4. (G) Manage riparian areas to achieve satisfactory ecological condition and desired vegetation expressions through improved livestock distribution and structural improvements.

## Management Direction

## Standards and Guidelines

### Recreation



#### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. See ROS map for specific class.

1. (G) When the presence of dispersed recreationists interferes with deer using water developments, prohibit camping by signing within 1/4-mile of water developments. Probable conflict areas are summer and fall ranges for the Glass Mountain deer herd.

Permit OHV use subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the adopted visual quality objective of retention or partial retention. Apply Forest-wide Standards and Guidelines for potential visual enhancement and rehabilitation opportunities. Refer to VQO map to identify the specific VQO.

### Timber



Firewood cutting will be administered to increase forage production or to rejuvenate aspen.

1. (G) Whenever possible, treat slash prior to the next grazing season in a manner conducive to forage production.

2. (G) In firewood cutting areas not currently accessed, construct temporary roads to and within the cutting areas to prevent resource damage.

### Water and Soils

Apply Forest-wide Standards and Guidelines.

### Wildlife and Fish

Maintain or develop water structures, springs, or seeps when needed to improve water availability, quality, or presence throughout the year.

1. (G) In general, water will be developed where lacking to provide water sources one to three miles apart.

2. (G) Provide escape routes for wildlife to and from water. Incorporate natural terrain and vegetation.

*Management Prescriptions*

| Management Direction | Standards and Guidelines |
|---|---|

**Standards and Guidelines**

3. (G) When necessary, fence the water source from livestock access, piping the water to drinking trough or other receptacle.

4. (S) Install water structures designed to prevent wildlife from drowning.

5. (S) Water sources in the Glass Mountain deer herd summer range will be designed to prevent foot rot infection.

6. (G) Provide for livestock watering devices when water quantity is sufficient or when needed to meet allotment objectives.

7. (S) Design water sources in the Long Bell area to prevent blue tongue disease.

**Structural practices will be applied to improve habitat for consumptive wildlife species.**

1. *Mule Deer*

   a. (G) Herbs and shrubs will be managed to provide a vigorous forage base with the diversity of forage species. Forage and cover areas will be developed where they are insufficient, and a mixture of forage and cover areas will be maintained in proper balance.

2. *Pronghorn*

   a. (G) Manage herbs and shrubs to provide a vigorous forage base with a diversity of forage species. Improve forage conditions where conditions are poor or decadent to favor a variety of grasses, forbs, and shrubs suitable for pronghorn. Manage rangelands with the objective of achieving desired ecological condition which is conducive to pronghorn.

**Firewood**

**Firewood cutting is permitted to increase forage production by juniper removal; and to rejuvenate aspen stands.**

1. (G) Firewood cutting will be encouraged on those range sites which can produce an average of at least 300 pounds per acre.

2. (S) No permits will be issued for personal use of commercial cutting of juniper on deer winter ranges with less than 30% cover.

## Management Direction

## Standards and Guidelines

3. (S) On deer winter ranges, firewood clearcuts will be 20 acres or less. On summer and transition ranges, firewood cutting units will be 40 acres or less.

4. (G) Regenerate aspen and foster regrowth in units smaller than 20 acres.

5. (G) Ensure survival of aspen regeneration by effective livestock management.

6. (G) Reduce fuels in a manner conducive to forage production.

Develop wetlands using structural and non-structural improvements to improve habitat for Canada geese and mallards. Improvements include dam construction or reconstruction, nest facilities such as islands and platforms, seeding, protection fencing, potholes, ditches, moats, gully plugs, dikes, and waterfowl food planting.

1. (G) Wetlands may exclude livestock grazing. The project environmental analysis will determine site-specific consequences of livestock access to wetland developments.

# Rangeland Management with Forage Improvements (Range-Forage) Management Prescription - 11

*Description: The primary emphasis is to manage rangeland vegetation, providing for healthy ecosystems and making forage available for use by livestock, wildlife, and wild horse herds. These emphases are achieved through structural and nonstructural wildlife and livestock improvement projects. The vegetation management goal is to provide desired expressions of herbaceous, shrub and forest vegetation according to site potential and resource needs. Resource uses occur to the extent that they do not adversely affect maintenance of the desired vegetation expression. Livestock grazing is permitted and recreation facilities may be located here consistent with Forest-wide Standards and Guidelines.*

*To achieve vegetation management objectives through livestock grazing, either an extensive or intensive management level is applied to grazing allotments. Under extensive management, cultural practices, such as brush control or firewood cutting, are combined with fencing and water developments to better achieve vegetation management objectives. Cultural practices are also applied to ensure proper forage utilization by livestock and wildlife. Type-conversions and seedings are permitted on allotments under intensive management to increase forage production.*

*Overall, management activities do not detract from the nearly natural appearance. However, in localized situations changes to the landscape are easily noticed and may attract attention. Recreation opportunities are provided in a roaded, natural-appearing to somewhat modified environment. Off-highway vehicle use is permitted.*

*Wildlife management indicator species whose preferred habitat is rangeland are maintained or enhanced.*

*Firewood harvesting is permitted and may be encouraged in some locations. Geothermal, oil and gas, and mineral exploration and development is permitted. Road construction and reconstruction are allowed.*

*This prescription applies to 291,365 acres distributed within 13 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines for transportation and facilities management and administration.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Protection

1. (G) Outside riparian zones, use prescribed burning to improve forage for wildlife and livestock, and to reduce the potential for catastrophic fires.

## Management Direction

### Range

Manage grazing to maintain desired vegetation expressions and satisfactory ecological condition. Where potential or existing resource conflicts are identified, correct through allotment management plans or annual operating plans.

Range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects will be designed to achieve the objectives stated in the prescription description.

## Standards and Guidelines

 Range

1. (G) The management objective for all rangelands that are not type-converted is desired vegetation expressions and satisfactory ecological condition as defined below:

| Range Condition | Trend | Ecological Condition |
|---|---|---|
| Excellent | Static | Satisfactory |
| Good | Static/Upward | Satisfactory |
| Fair | Upward/Static | Satisfactory |
| Fair | Downward | Unsatisfactory |
| Poor | - | Unsatisfactory |
| Very Poor | - | Unsatisfactory |

2. (G) Forage utilization will not normally exceed levels displayed in the Forest-wide Standards and Guidelines.

3. (S) Utilization is measured on a percent by weight basis by Forest Service personnel in cooperation with grazing permittees and other interested public.

4. (G) *Within pronghorn habitat,* reference Interstate Antelope guidelines for specific grazing standards and guidelines. Generally, graze livestock after mid-May until proper utilization is achieved. Graze wetlands to make forbs available to pronghorn.

5. (G) *Within sage grouse habitat:*

   — Meadows within an eight-mile radius around each active lek will be managed to provide forbs desirable to sage grouse, such as Taraxacum spp., Archillea spp., and Aster spp. Manage for high water table, forbs and hiding cover in meadows.

   — Delay sheep-grazing until June 1.

| **Management Direction** | **Standards and Guidelines** |
|---|---|

**Standards and Guidelines**

6. (G) *Within deer winter range and transition habitat*, allow an annual (July - April) average of no more than 40% utilization of bitterbrush by deer and livestock combined.

   a.   (G) Of the 40% total utilization of bitterbrush, on an allotment-by-allotment basis, allow 50% utilization by livestock and 50% utilization by wildlife.

7. (G) Riparian areas will be managed to satisfactory ecological condition through improved livestock distribution and nonstructural and structural improvements.

**Extensive Allotments**

● Manage grazing with a moderate investment in range improvement construction, allotment planning, permit administration, and monitoring.

*Extensive Allotments*

1. (G) Maintain existing range improvements and utilize new range improvements as tools to improve distribution and more fully utilize allotment capacity as well as to protect soil, water, or streamside-dependent resources.

2. (G) Use cultural practices, such as brush control or firewood cutting, to achieve vegetation management objectives and to ensure proper forage utilization by livestock and wildlife.

**Intensive Allotments**

● Manage grazing at a high investment in range improvement construction, allotment planning, permit administration, and monitoring.

*Intensive Allotments*

1. (G) Combine type-conversions and seedlings as needed with cultural practices (e.g., brush control and firewood cutting) and structural improvements (e.g., fencing and water developments) (1) to better achieve vegetation management objectives, (2) to increase forage production, and (3) to ensure proper forage utilization.

**Extensive and Intensive Allotments**

**Nonstructural improvements**

● Vegetation rejuvenation activities, including such practices as prescribed burning, herbicide spraying, chaining, crushing, and masticating, may be used to increase forage production and rejuvenate mature to decadent brush.

*Extensive and Intensive Allotments*
*Nonstructural improvements*

1. (G) Cultural practices are restricted to range sites which can produce at least an average of 300 pounds of forage per acre. Low sagebrush sites will not be treated.

2. (G) Temporary fencing may be necessary to protect project areas from livestock and wildlife use.

## Management Direction

## Standards and Guidelines

3. (G) Maintain or improve forage conditions with emphasis on increasing the variety of vigorous plants available for forage and on providing a mixture of shrub age classes. Priority will be given to areas of decadent shrubs and other poor-condition rangelands. Shrub rejuvenation is the objective, not type-conversion of shrub to grass.

4. (G) All known deer and pronghorn fawning areas will be deferred from manipulation between May 1 and July 15.

5. *Within mule deer habitat:*

   a. (S) On transition and summer ranges, allow maximum manipulation on units no larger than 200 acres. Units < 100 acres are preferred.

   b. (S) On winter ranges, units will not be > 50 acres; units < 25 acres are preferred.

   c. (G) With the exception of prescribed burns, units will be irregular in shape and designed so that they are no more than 600 feet from cover from any point. For example, within a 100-acre unit, leave 5 to 10 islands of cover, ranging in size from 2 to 5 acres.

6. *Within sage grouse habitat:*

   a. (S) Within an eight-mile radius around each lek, rejuvenation projects will not reduce big sagebrush to < 20% canopy cover. When present, sagebrush will be retained up to 100 yards from the edge of riparian areas, meadows, seeps, and springs.

Firewood

Firewood cutting may be used as a nonstructural improvement to increase forage production by juniper removal, and to rejuvenate aspen stands.

1. (S) On juniper sites, if reseeding of native species does not occur during the following growing season, the area may be seeded with non-native forage species. After seeding, temporary fences may be necessary to protect the area from livestock and wildlife use.

2. (G) Firewood cutting will be encouraged on those range sites which can produce an average of at least 300 pounds per acre. Firewood cutting will not be planned for forage improvement on low sagebrush sites.

## Management Direction

## Standards and Guidelines

3. (G) No personal use or commercial cutting of juniper should be permitted on deer winter ranges with a cover ratio of <30%.

4. (G) On deer winter ranges, firewood clearcuts should be no more than 20 acres. On summer and transition ranges, firewood cutting units will generally be under 40 acres.

5. (G) Regenerate aspen and foster regrowth in 20-acre units or smaller.

6. (G) Reduce fuels in a manner conducive to forage production.

Type - conversions (cultivated)

Type-conversions (cultivated) consisting of preparing the soil, seeding non-native vegetation, and normally, fertilization are permitted. Cultivation is an accepted form of nonstructural improvement, and substantially increases forage production on a depleted site. Generally, cultivation will be used only on intensive allotments.

1. (S) All cultivated acres will be rested at least one growing season after seeding.

2. (G) Cultivation will be restricted to the following range sites:

   — 12 Loamy, 10-14" ppt

   — 13 Loamy, 14-18" ppt

   — 14 Loamy, 18-25" ppt

3. (G) Cultivated acres will be treated as needed to maintain stand productivity.

4. (G) Generally, monoculture grass seedings will not be done.

5. (S) *Within sage grouse habitat:*

   a. When present, sagebrush will be retained up to 100 yards from the edge of riparian areas, meadows, seeps, and springs.

# Management Direction

## Standards and Guidelines

### Structural Improvements

— Construct fences to (1) confine permitted livestock or (2) implement grazing systems which maintain desired vegetation expressions, and provide for uniform livestock distribution and proper forage utilization.

— Construct water structures (tanks, wells, windmills, springs) to facilitate livestock management and increase forage availability.

— Provide water for wildlife using Standards and Guidelines presented under Wildlife in this prescription.

### Structural Improvements

1. (S) Adhere to fence standards described in the Forest Service Handbook.

2. (G) Schedule maintenance and replacement of structural improvements through allotment management plans and grazing permits.

## Recreation

### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. See ROS map for specific class.

Permit OHV use subject to restrictions identified on the OHV map.

### Cultural Resources

Apply Forest-wide Standards and Guidelines.

### Visual Resource

Meet or exceed the adopted visual quality objective of partial retention or modification. Apply Forest-wide Standards and Guidelines for potential visual enhancement or rehabilitation opportunities. Refer to VQO map for specific VQO

### Recreation

1. (G) When conflicts with deer use occur, prohibit camping within 1/4-mile of water developments. Probable conflict areas are summer and fall ranges for the Glass Mountain deer herd.

## Timber

Firewood cutting may be administered to increase forage production or to rejuvenate aspen.

Reference firewood cutting Standards and Guidelines under the Wildlife and Range sections in this prescription.

### Timber

1. (G) Whenever possible, treat slash prior to the next grazing season in a manner conducive to forage production.

2. (G) In firewood cutting areas not currently accessed, construct temporary roads to and within the cutting areas to prevent resource damage.

## Management Direction

### Water and Soils

Apply Forest-wide Standards and Guidelines.

### Wildlife and Fish

Protect and develop water structures, springs, or seeps when needed to improve water availability, quality, or presence throughout the year.

Nonstructural and structural practices will be applied to improve habitat for consumptive wildlife species.

## Standards and Guidelines

*Wildlife and Fish*

1. (G) In general, where it is lacking, water will be developed to provide water sources one to three miles apart.

2. (G) Provide escape routes for wildlife to and from water. Incorporate natural terrain and vegetation.

3. (G) When necessary, fence the water source from livestock access, piping the water to drinking trough or other receptacle.

4. (S) Install water structures designed to prevent wildlife from drowning.

5. (S) Water sources in the Glass Mountain deer herd summer range will be designed to prevent foot rot infection.

6. (G) Provide livestock watering devices when watering quantity is insufficient or when needed to meet allotment objectives.

7. (S) Design water sources in the Long Bell area to prevent blue tongue disease.

1. *Mule Deer*

   a. (G) Forbs and shrubs will be managed to provide a vigorous forage base with a diversity of forage species. Forage and cover areas will be developed where they are insufficient, and a mixture of forage and cover areas will be maintained in proper balance.

   b. (G) Manage fawning areas to enhance cover and improve forage where lacking. At least 40% of the vegetative component should be brushfields composed of 25% seedling, 25% young, and 50% old growth age classes. An additional 20% of each fawning area should be composed of dense tree thickets or mature timber with at least 60% can-

*Management Prescriptions*

*4 - 105*

## Management Direction

## Standards and Guidelines

opy closure. Habitat manipulation will maintain high-value forage (forbs and shrubs).

2. *Pronghorn*

   a.  (G) Manage forbs and shrubs to provide a vigorous forage base with a diversity of forage species. Improve forage conditions where browse is decadent to favor a variety of grasses, forbs, and shrubs suitable for pronghorn. Manage rangelands with the objective of achieving desired ecological condition which is conducive to pronghorn.

3. *Sage Grouse, Blue Grouse, Canada Goose, and Mallard*

   a.  (G) Reference the respective Habitat Capability Models for suitable habitat conditions.

Vegetation rejuvenation activities, including prescribed burning, herbicide spraying, chaining, crushing, masticating, bitterbrush planting, and mahogany cutting, may be used to increase forage production and rejuvenate mature to decadent brush.

1. (G) Rejuvenation activities will be restricted to those range sites which can produce at least 300 pounds of forage per acre, on the average. Generally, low sagebrush sites will not be rejuvenated.

2. (G) Temporary fencing may be necessary to protect project areas from livestock and wildlife use.

3. (G) Maintain or improve forage conditions with emphasis on increasing the variety of vigorous plants available for forage, and on providing a mixture of shrub age classes. Priority will be given to areas of decadent shrubs and other poor-condition rangelands. Shrub rejuvenation is the objective, not type-conversion of shrub to grass. Wildlife habitat improvement projects will emphasize montane shrubs, manzanita, big sagebrush, and Ceanothus spp. vegetation types. In some cases, prescribed burns on bitterbrush may be beneficial.

4. (G) When rejuvenating mahogany stands, leave approximately 50 seed-producing trees per acre and prepare the seedbed (scarify the litter) beneath the seed trees.

5. (G) All known deer and pronghorn fawning areas will be deferred from manipulation between May 1 and July 15.

6. *Within mule deer habitat:*

## Management Direction

## Standards and Guidelines

a. (S) On transition and summer ranges allow maximum manipulation on units no larger than 200 acres. Units that are not more than 100 acres are preferred.

b. (S) On winter ranges, units will not be larger than 50 acres; units <25 acres are preferred.

c. (G) With the exception of prescribed burns, units will be irregular in shape and designed so that they are no more than 600 feet from cover from any point. For example, within a 100-acre unit, leave 5 to 10 islands of cover, ranging in size from 2 to 5 acres.

7. *Within sage grouse habitat:*

a. (S) Within an eight-mile radius around each lek, rejuvenation projects will not reduce big sagebrush to <20% canopy cover. When present, sagebrush will be retained up to 100 yards from the edge of riparian areas, meadows, seeps, and springs.

Firewood

Firewood cutting is permitted to increase forage production by juniper removal, and to rejuvenate aspen and selected and marked mahogany stands.

1. (G) On juniper sites, if reseeding of native species does not occur during the following growing season, the area may be seeded with non-native forage species. After seeding, temporary fencing may be necessary to protect the area from livestock and wildlife use.

2. (G) Firewood cutting will be encouraged on those range sites which can produce at least 300 pounds of forage per acre, on the average. Firewood cutting will be planned for forage improvement on low sagebrush sites.

3. (G) No permits should be issued for personal use or commercial cutting of juniper on deer winter ranges with less than 30% cover.

4. (G) On deer winter ranges, firewood clearcuts should be 20 acres or less. On summer and transition ranges, firewood clearcuts should be 40 acres or less.

5. (G) Regenerate aspen and foster regrowth in units 20 acres or smaller.

6. (G) Fuels reduction will be done in a manner conducive to forage production.

## Management Direction

Fertilization may be selectively applied on key deer winter and spring foraging areas to improve forage production. Applications will be three- to five-year intervals.

Wetlands will be developed using structural and non-structural improvements to improve habitat for Canada geese and mallards. Improvements include dam reconstruction, nest facilities such as islands and platforms, seeding, protection fencing, potholes, ditches, moats, gully plugs, dikes, and waterfowl food planting.

Apply Forest-wide Standards and Guidelines for Fish.

## Standards and Guidelines

Wetlands

1. (G) Selected wetlands may exclude livestock grazing. The project environmental analysis will determine site-specific consequences of livestock access to wetland developments.

 **Even-Age Timber Management Prescription - 12**

*Description: Manage timber stands to emphasize a scheduled production of sawlogs and miscellaneous wood products, utilizing state-of-the-art technology. Use even-age silvicultural systems on timberlands growing > 20 cubic feet per acre per year. The landscape appears nearly natural or modified. Dispersed recreation opportunities are in a roaded, natural-appearing, but modified environment. Off-highway vehicle use is permitted. In general, wildlife management indicator species are maintained but none are favored. Livestock grazing is permitted if forage is available and managed in a manner consistent with timber management objectives. Wildlife habitat improvement work is permitted, but subordinate to timber management objectives. Firewood harvesting is permitted. Geothermal, oil, gas, and mineral exploration and development is also permitted. Road construction and reconstruction occur in support of timber production.*

*This prescription applies to 145,859 acres distributed within 18 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

**Air Quality**

Apply Forest-wide Standards and Guidelines.

**Facilities**

Apply Forest-wide Standards and Guidelines.

**Lands**

Apply Forest-wide Standards and Guidelines.

**Minerals**

Apply Forest-wide Standards and Guidelines.

**Protection**

Apply Forest-wide Standards and Guidelines.

**Range**

Permit and regulate livestock grazing.

## Standards and Guidelines

### Range

1. (G) As forage is available on suitable timberlands, utilize on a temporary basis.

2. (G) Regulated livestock grazing in plantations will be encouraged when it contributes to or accomplishes plantation cultural objectives. Salt should not be placed in plantations.

   a. Avoid grazing during tree shoot elongation.

   b. Minimize soil compaction and erosion hazards.

   c. Remove livestock before forage is dry.

## Management Direction

All range improvement projects will be compatible with the timber and visual character objectives of this prescription.

### Recreation

#### Recreation

Manage for roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class.

Permit OHV use subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

— Meet or exceed the visual quality objective of partial retention or modification. Apply Forest-wide Standards and Guidelines for visual enhancement and rehabilitation. Refer to VQO map for specific VQO

### Timber

Manage timber intensively, utilizing all silvicultural practices and logging systems, as listed in Forest-wide Standards and Guidelines.

## Standards and Guidelines

### Timber

1. (S) Size of openings will be from 5 to 40 acres, except in the case of catastrophic occurrences or on a specific timber sale after 60 days public notice and review by the Regional Forester.

2. (G) When utilizing the shelterwood system, harvest of seed trees will generally occur in the decade after the seed-step cut. (Shelterwood will generally not occur on slopes over 40%.)

3. (G) Overstory removal will occur if sufficient releasable understory will remain after harvest.

4. (G) On soils identified as low in regeneration potential, activities which will favorably modify the microclimate to help ensure plantation success will be planned. Such activities may include shelterwood-cutting and shade-cast devices for seedlings.

5. (G) On soils identified as having a potential for mass-wasting, harvesting activities and road-work will be designed to reduce the risk.

| Management Direction | Standards and Guidelines |
|---|---|
| | 6. (S) Monitor water quality as necessary to determine baseline conditions and effects from timber management activities. |
| When fuels are treated, treatment will be to a preplanned condition in a manner that meets timber management objectives, providing site preparation or stand release as well as reduced fire risk. | 1. (G) Priority will be given to treatments for which net value change is maximized. |
| | 2. (G) Fuel treatments may be modified to meet other resource objectives. |
| | 3. (G) Encourage use of wood residue where it does not conflict with other resource needs. |
| Convert non-stocked suitable timberlands to conifer plantations, using appropriate means of site preparation. | |
| Coordinate timber sale and firewood cutting through the timber sale planning process. Commercial firewood sales and personal use cutting outside timber sale boundaries are permitted subject to Forest and district policies. | |

**Water and Soils**

Apply Forest-wide Standards and Guidelines.

**Wildlife and Fish**

*Wildlife and Fish*

Wildlife coordination efforts and all habitat improvement projects will be compatible with the timber objectives of this prescription.

1. (G) As needed, protect seedlings from animal damage.

Apply Forest-wide Standards and Guidelines.

**This page intentionally left blank.**

# Timber Management with Partial Retention Visual Quality (Timber-Visuals)
## Management Prescription - 13

*Description: Manage for a nearly natural-appearing landscape using even-age and uneven-age silvicultural systems on all timberlands growing > 20 cubic feet per acre per year. All management activities are subordinate to maintaining the visual quality objective of partial retention. All aspects of dispersed recreation activities in a roaded, nearly natural-appearing environment are accommodated. Off-highway vehicle use is permitted. Late seral stage wildlife management indicator species are favored under this prescription. Wildlife habitat improvement may occur if compatible with visual and timber management objectives. Livestock grazing is permitted if forage is available. Firewood harvesting may occur. Geothermal, oil, gas, and mineral exploration and development is permitted, but special surface stipulations may be required to ensure that development is compatible with visual objectives. Road construction and reconstruction are permitted.*

*This prescription applies to 66,835 acres distributed within 15 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Permit and regulate livestock grazing.

## Standards and Guidelines

### Range

1. (G) As forage is available on suitable timberlands utilize on a temporary basis.

2. (G) Livestock grazing in plantations will be encouraged when use is controlled and does not retard tree growth.

   a. Avoid grazing during tree shoot elongation.

   b. Minimize soil compaction and erosion hazards.

## Management Direction

All range improvement projects will be designed to be compatible with timber and other resource objectives of this prescription.

### Recreation

#### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities, as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class.

Permit OHV use subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the visual quality objective of partial retention. Apply Forest-wide Standards and Guidelines for visual enhancement and rehabilitation. Refer to VQO map for specific VQO

### Timber

Manage the timber resource to provide timber outputs while maintaining the visual character and allowing for semi-primitive recreation experiences. Utilize silvicultural practices and logging systems listed in Forest-wide Standards and Guidelines.

## Standards and Guidelines

c.  Remove livestock before forage is dry.

1. (G) Apply this prescription to popular dispersed recreation sites and their immediate surroundings. Special consideration will be given to the needs and values of the site when other management activities are planned and implemented nearby.

1. (G) As needed, protect seedlings from deer damage.

Timber

1. (G) Rotation lengths will generally be longer than under intensive timber management to meet VQOs.

2. (S) Size of openings will generally be a maximum of 20 acres, except in the case of catastrophic occurrences.

3. (G) Shelterwood-cutting will be emphasized over clearcutting where appropriate. Harvest of seed trees will generally occur in the decade after the seed-step cut.

4. (G) Overstory removal will only occur if sufficient releasable understory will remain after harvest.

*Management Prescriptions*

## Management Direction

When fuels are treated, treatment will be to a preplanned condition in a manner that meets timber and other resource objectives. Encourage utilization of wood residue.

Non-stocked lands (brush fields) may be reforested, rejuvenated, or not treated, depending on site characteristics, treatment of adjacent areas, and funding.

Coordinate timber sales and firewood cutting through the timber sale planning process. Commercial firewood sales and personal use cutting outside timber sale boundaries are permitted subject to Forest and district policies.

### Water and Soils

Apply Forest-wide Standards and Guidelines.

### Wildlife and Fish

Wildlife coordination efforts and habitat improvement projects will be compatible with timber and visual objectives of this prescription.

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

5. (G) On soils identified as low in regeneration potential, activities which will favorably modify the microclimate to help ensure plantation success will be considered. Such activities may include shelterwood-cutting and shade-casting devices for seedlings.

6. (G) On areas with a potential for mass-wasting, harvesting activities and road work will be designed to reduce the risk.

7. (S) Monitor water quality as necessary to determine baseline conditions and effects from timber management activities.

1. Activity Fuels

   a. (G) Priority will be given to treatments for which net value change is maximized.

   b. (G) Fuel treatments may be modified to meet other resource objectives.

**This page intentionally left blank.**

.

# Timber Management with Forage Production (Timber-Forage) Management Prescription - 14

*Description: Manage timberlands to provide both sawtimber and forage outputs. Less than full yields of timber are expected under this prescription. Livestock and wildlife forage production is given equal emphasis with timber. Provide suitable habitat for mule deer, balancing forage and cover requirements with seasonal habitat needs. Management activities bring changes to the landscape ranging from nearly natural to modified. Recreation opportunities are provided in a near natural-appearing or modified environment. Off-highway vehicle use is permitted, but seasonally restricted. Wildlife management indicator species preferring early seral stage forest habitat, such as deer, are favored. Wildlife habitat improvement projects are permitted. Livestock grazing is permitted, as are range improvement projects. Even-aged timber management is applied, resulting in a scheduled harvest. Firewood cutting is allowed. Geothermal, oil, gas, and mineral exploration and development are permitted. Road construction and reconstruction occur in support of timber and forage production.*

*This prescription applies to 110,291 acres distributed within 9 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

## Standards and Guidelines

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Range allotment planning and administration of grazing systems, stocking levels, utilization standards, and all range improvement projects will be compatible with the livestock forage allocation in the allotment.

### Range

1. (G) Outside riparian zones use controlled burning to improve forage for wildlife and livestock, and to reduce the potential for catastrophic fires.

2. (G) Forage utilization will not normally exceed levels which provide sufficient herbage residue of key forage species to ensure good plant vigor, adequate plant

| Management Direction | Standards and Guidelines |
|---|---|
| | reproduction, favorable range trend, and good watershed conditions. |
| | 3. (G) <u>Within deer winter range and transition habitat,</u> allow an annual (July - April) average of no more than 40% utilization of bitterbrush by livestock and deer combined. |
| | a. (G) Of the 40% total utilization of bitterbrush, on an allotment-by-allotment basis, allow 50% utilization by livestock and 50% utilization by wildlife. |
| Vegetation rejuvenation activities, including such practices as prescribed burning, herbicide spraying, chaining, crushing, and masticating, may be used to increase forage production and rejuvenate mature to decadent brush. | 4. (G) Livestock grazing in plantations will be encouraged when use is controlled and does not retard tree growth. Salt should not be placed in plantations. |
| | a. Avoid grazing during tree shoot elongation. |
| | b. Minimize soil compaction and erosion hazards. |
| | c. Remove livestock before forage is dry. |

## Management Direction

### Structural Improvements

— Construct fences to control allotment boundaries or to develop grazing systems in order to provide uniform livestock distribution and proper utilization of forage species and to meet specific objectives in allotment management plans.

— Construct water structures (tanks, wells, windmills, springs) to facilitate livestock and wildlife management and increase forage availability.

— Schedule maintenance and replacement of structural improvements.

## Standards and Guidelines

1. (S) Adhere to fence standards described in the Modoc Supplement to the Forest Service Handbook.

2. (G) To a protect water source from degradation, fence the water source from livestock access, piping the water to a drinking trough or other suitable waterholding device.

3. (G) Install water structures designed to prevent wildlife from drowning.

*Management Prescriptions*

## Management Direction

### Recreation

#### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class. Refer to OHV map to locate areas of seasonal closure.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the adopted visual quality objectives of partial retention or modification. Apply Forest-wide Standards and Guidelines for visual enhancement or rehabilitations opportunities. Refer to VQO map for specific VQO

### Timber

In *ponderosa pine* stands on slopes that are <40%, manage for a sustained yield of wood products and forage for livestock and wildlife. Local field experience indicates that the ponderosa pine/bitterbrush plant community is difficult to perpetuate under normal timber management practices. For the next decade, a variety of regeneration practices will be tested to meet the dual objectives of (1) maintaining an understory of bitterbrush and associated vegetation, primarily for fall range, and (2) providing a regulated but reduced yield of timber.

In *all other conifer* types on slopes <40%, manage the stands to:

— maintain a suitable understory of shrubs, grasses, and forbs desirable to deer and livestock, and provide a sustained yield of timber, although not at full yield.

## Standards and Guidelines

1. (G) When conflicts with deer use occur, prohibit camping by signing within 1/4-mile of water developments. Probable conflict areas are summer and fall ranges for the Glass Mountain deer herd.

 Timber

1. **Harvest**

   a. (S) Final harvest openings will generally be 5 to 20 acres on the summer and transition ranges, and 5 to 10 acres on the winter range.

   b. (G) Where opportunities exist in harvest units, provide hiding cover for deer along roads; adjacent to meadows; and within migration routes,

| **Management Direction** | **Standards and Guidelines** |
|---|---|

fawning areas, and holding areas. Opportunities include using advanced tree reproduction, brush, and terrain.

c.  (G) Regeneration openings are considered openings until:

— tree heights average 20 feet; and useable forage produced meets or exceeds the following:

| | |
|---|---|
| Eastside pine | 150 lbs/ac/yr |
| Eastside pine/bitterbrush | 175 lbs/ac/yr |
| Mixed conifer | 100 lbs/ac/yr |
| Lodgepole pine | 68 lbs/ac/yr |
| Red fir | 250 lbs/ac/yr |

All cut units will have adjacent logical leave-units.

2. (G) **Site Preparation**

a.  *Option 1* - Manage areas equally but apparently for wood and forage production. Project design may include alternating strips of trees and preferred brush (see below) or blocks of trees and blocks of preferred brush. Any method of site prep may be used on the areas managed for wood production. (This option is referred to as the "50:50" option.)

b.  *Option 2* - Site preparation is modified to the extent that some existing ground vegetation will remain and recover within the stand. (This option is most appropriate in stands with vigorous young to mature shrub plants.) Site preparation practices may include:

— disk (single pass is preferred to multiple passes)

— masticate

— brushrake and burn (teeth will not be sunk into ground more than six inches)

— windrow/pile and burn

— herbicide application at lowest recommended rates

*Management Prescriptions*

**Management Direction**

**Standards and Guidelines**

(This is the "modified site prep" option.)

c. *Option 3* - Site preparation is not restricted; bitterbrush will be spring-seeded in conjunction with tree-planting. (This is the "seeding" option.)

d. *Option 4* - Any other method which provides pre-ferred brush species and meets forage production objectives.

Preferred Brush Species - The objective is to provide as diverse a mix of browse as possible.

| | |
|---|---|
| Serviceberry | (Amelanchier sp.) |
| Manzanita* | (Arctostaphylos sp.) |
| Curlleaf mahogany | (Cercocarpus ledifolius) |
| Prostrate ceanothus | (Ceanothus prostratus) |
| Snowbrush | (Ceanothus velutinus) |
| Bittercherry, Chokecherry | (Prunus sp.) |
| Bitterbrush | (Purshia tridentata) |
| Currant, Gooseberry* | (Ribes sp.) |
| Rose | (Rosa sp.) |
| Snowberry | (Symphoricarpos sp.) |

**\*These species should not dominate the site, but may be part of the species mix.**

**Forage Production Objectives (Useable)**

| | |
|---|---|
| Eastside pine | 150 lbs/ac/yr |
| Eastside pine/bitterbrush | 175 lbs/ac/yr |
| Mixed conifer | 100 lbs/ac/yr |
| Lodgepole pine | 68 lbs/ac/yr |
| Red fir | 250 lbs/ac/yr |

e. *Eastside Pine/Bitterbrush*

— The objective will be to achieve a density of at least 700 plants per acre (primarily bitterbrush and snowberry) within five years after site preparation. Cultural treatments will be aimed at achieving this objective by using any of the above options. All options will be attempted in the first decade of Plan implementation.

f. *All Other Conifer Types*

— As described above, apply Option 1, 2, or 4. All options will be attempted in the first decade of Plan implementation.

| Management Direction | Standards and Guidelines |
|---|---|

**Standards and Guidelines**

3. (S) **Planting**

  a. Ponderosa Pine/Bitterbrush

  When using Site Preparation Option 1:

  - Plant alternate strips at densities no greater than 680 stems per acre (8' x 8' spacing) or blocks with 435 stems per acre (10' x 10' spacing).

  When using Site Preparation Option 2:

  - Option a: Plant 225 stems per acre (14' x 14' spacing).
  - Option b: Plant at densities no greater than 680 stems per acre (8' x 8' spacing); lower densities are preferred, but uniform spacing and number of surviving trees are important to plantation certification. Weed trees to 225 stems per acre within one year of plantation certification, generally the 5th to 6th year after planting.

  When using Site Preparation Option 3:

  - Plant 225 stems per acre (14' x 14' spacing).

  When using Site Preparation Option 4:

  - Plant in accordance with site preparation, and weed if necessary, to achieve 225 stems per acre (14' x 14' spacing) within one year after plantation certification.

  b. Other Timber Stands

  — On winter range, plant 435 stems per acre (10' x 10' spacing). On summer and transition ranges, either plant 225 or plant 435 stems per acre and weed to 225 stems per acre after plantation certification.

4. (G) **Release**

  a. No release treatments are allowed on bitterbrush, except shredding bitterbrush to 18-24 inches high (which is designed to retard growth and allow for resprouting). Chemical release treatments are allowed on other broadleaf vegetation, with the ob-

## Management Direction

## Standards and Guidelines

jective of relieving trees of competition while maintaining moderate levels of brush.

b. Ground application of herbicides on timbered areas of the 50:50 option may be undertaken where this release treatment will not affect adjacent bitterbrush areas.

c. Apply chemicals to control grasses if needed for tree and bitterbrush survival.

5. (G) **Precommercial Thinning**

    a. On suitable timberlands needed for cover acres, do not precommercial thin.

    b. On suitable timberlands selected as forage areas, thinning is allowed.

    c. On timbered areas receiving the 50:50 site preparation option, reduce stocking levels so that the average DBH will be 13 inches in 65 years (estimate: 100 stems per acre).

    d. Thinning will generally occur when the trees are 15 years old (DBH no greater than 4.5 inches). Treat slash as directed in the Forest-wide Standards and Guidelines.

6. (G) **Commercial Thinning**

    a. Thinning is designed to reduce stocking levels to a selected basal area, as described in the Timber section of the Forest-wide Standards and Guidelines, but not to capture mortality.

    b. Thinning will generally occur on a 20-year cutting cycle when required.

7. **Roads**

    a. (G) Where possible, locate roads and trails away from fawning and kidding areas, migration routes, and transition ranges. Otherwise:

      — To reduce harassment to deer, restrict motorized access on fall and winter deer ranges, and within fawning areas; or obliterate roads after the completion of timber harvest, where feasible.

*Management Prescriptions*

| **Management Direction** | **Standards and Guidelines** |
|---|---|

**Standards and Guidelines**

b. (G) No more than five miles of road per section will be constructed. No more than 2.5 miles per section will be left open for access after timber harvest in designated areas.

1. **Activity Fuels**

When fuels are treated, treatment will be to a preplanned condition in a manner that meets forage objectives.

a. (G) Priority will be given to treatments for which net value change is maximized.

b. (G) On summer range, treat approximately 50% of stands within one-half mile of water by lopping and scattering. Elsewhere, treat activity fuels while maintaining at least as much dead and down material as listed in Forest-wide Standards and Guidelines. Fuelbreaks will have irregular shapes to enhance edge. Non-stocked suitable timberlands (brushfields) will receive rejuvenation treatment: in most cases, prescribed burns.

Reforestation after wildfires will follow the objectives of this prescription on acres to which it is applied.

Coordinate timber sales and firewood cutting through the timber sale planning process. Commercial firewood sales and personal use cutting outside timber sale boundaries are permitted subject to Forest and district policies.

**Water and Soils**

Apply Forest-wide Standards and Guidelines.

**Wildlife and Fish**

Apply Forest-wide Standards and Guidelines for fish.

Wildlife and Fish

1. (G) Protect and develop water structures, springs, or seeps when needed to improve water availability, quality, or presence throughout the year.

2. (G) In general, water will be developed where lacking to provide water sources one to three miles apart.

3. (G) Provide escape routes for wildlife to and from water. Maintain natural terrain and vegetation.

4. (G) When necessary, fence the water source, piping the water to a drinking trough or other receptacle.

5. (G) Install water structures designed to prevent wildlife from drowning.

*Management Prescriptions*

| **Management Direction** | **Standards and Guidelines** |
|---|---|
| | 6. (S) Water sources in the Glass Mountain deer herd summer range will be designed to prevent foot rot infection. |
| | 7. (S) Design water sources in the Long Bell area to prevent the spread of blue tongue disease. |
| Non-structural and structural practices will be applied to improve habitat for wildlife species. | 1. **Mule Deer** |
| | a. (G) Forbs and shrubs will be managed to provide a vigorous forage base with a diversity of forage species. Forage conditions will be improved where conditions are poor or decadent. Forage and cover areas will be developed where they are insufficient or lacking, and a mixture of forage and cover areas will be maintained in proper balance, as outlined in the Wildlife section of Forest-wide Standards and Guidelines. |
| | b. (G) Manage fawning areas to enhance cover and improve forage, where lacking. At least 40% of the vegetative component should be brushfields composed of 25% seedling, 25% young, and 50% mature or decadent age classes. An additional 20% of each fawning area should be composed of dense tree thickets or mature timber with at least 60% canopy closure. Habitat manipulation will maintain high-value forage (forbs and shrubs). |

**This page intentionally left blank.**

*Management Prescriptions*

# Uneven-aged Timber Management Prescription - 15

*Description: Manage timber stands to emphasize a scheduled production of sawlogs and miscellaneous wood products, utilizing state-of-the-art technology. Use uneven-age silvicultural systems on timberlands growing > 20 cubic feet per acre per year. The visual landscape may be modified at some locations. However, this prescription may be applied to achieve a modified, nearly natural, or natural-appearing landscape in special situations, however. Dispersed recreation opportunities are in a roaded environment. Off-highway vehicle use is permitted. In general, wildlife management indicator species are maintained, but none are favored. Livestock grazing is permitted and managed in a manner consistent with timber management objectives. Wildlife habitat improvement work is permitted, but subordinate to timber management objectives. Firewood harvesting is permitted. Geothermal, oil, gas, and mineral exploration and development are also permitted. Road construction and reconstruction occur in support of timber production.*

*This prescription applies to to one timber compartment on each ranger district and totals 17,114 acres distributed within four management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Permit and regulate livestock grazing.

## Standards and Guidelines

### Range

1. (G) Livestock grazing will be encouraged when use is controlled and does not retard tree growth.

   a. Avoid grazing during tree shoot elongation.

   b. Minimize soil compaction and erosion hazards.

   c. Remove livestock before forage is dry.

## Management Direction

All range improvement projects will be compatible with or complementary to the timber and visual character objectives of the prescription.

### Recreation

#### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class.

Permit OHV use subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the adopted visual quality objective of modification, retention, or partial retention. Apply Forest-wide Standards and Guidelines for visual enhancement and rehabilitation. Refer to VQO map for specific VQO

### Timber

Manage timber intensively, utilizing uneven-aged silvicultural practices and logging systems.

## Standards and Guidelines

*Recreation*

1. (G) This prescription may be applied to popular dispersed recreation sites and their immediate surroundings. It may also be applied to meet partial retention visual quality objectives where other prescriptions cannot meet them.

*Timber*

1. (S) Size of openings will be 2 acres or less, except in the case of catastrophic occurrences.

2. (G) On areas identified as low in regeneration potential, activities which will favorably modify the microclimate to help ensure plantation success will be planned. Such activities may include shade-cast devices for seedlings, and retention of slash or organic matter.

3. (G) On soils identified as having a potential for mass-wasting, harvesting activities and road work will be designed to reduce the risk.

4. (S) Monitor water quality as necessary to determine baseline conditions and effects from timber management activities.

## Management Direction

When fuels are treated, treatment will be to a preplanned condition in a manner that meets timber management objectives, providing site preparation or stand release as well as reduced fire risk.

Convert non-stocked suitable timberlands to conifer plantations, using appropriate means of site preparation.

Coordinate timber sales and firewood cutting through the timber sale planning process. Commercial firewood sales and personal use cutting outside timber sale boundaries are permitted subject to Forest and district policies.

### Water and Soils

Apply Forest-wide Standards and Guidelines.

### Wildlife and Fish

Wildlife coordination efforts and all habitat improvement projects will be compatible with the timber objectives of this prescription.

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

5. (S) The silvicultural method which will be employed to create an uneven-aged forest will be group selection or single-tree selection.

1. Activity Fuels

   a. (G) Priority will be given to treatments for which net value change is maximized.

   b. (G) Fuel treatments may be modified to meet other resource objectives.

   c. (G) Encourage use of wood residue where it does not conflict with other resource needs..

Wildlife and Fish

1. (G) As needed, protect seedlings from deer damage.

**This page intentionally left blank.**

# Timber Management on Low Productivity Lands ( < 20 Timber) Prescription - 16

*Description: Manage timber stands on an opportunity basis, rather than for maximum timber production. Silvicultural systems rely on natural regeneration. Dispersed recreation opportunities are in a roaded and modified or nearly natural-appearing environment. Off-highway vehicle use is permitted. In general, wildlife management indicator species are maintained, but none are favored. Livestock grazing is permitted. Wildlife habitat improvement work is permitted, but subordinate to timber management objectives. Firewood harvesting is permitted. Geothermal, oil, gas, and mineral exploration and development are also permitted.*

*This prescription applies to 142,117 acres distributed within 20 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

## Standards and Guidelines

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

Apply Forest-wide Standards and Guidelines.

### Lands

Apply Forest-wide Standards and Guidelines.

### Minerals

Apply Forest-wide Standards and Guidelines.

### Protection

Apply Forest-wide Standards and Guidelines.

### Range

Permit and regulate livestock grazing.

Range

1. (G) Livestock grazing in plantations will be encouraged when use is controlled and does not retard tree growth.

   a. Avoid grazing during tree shoot elongation.

   b. Minimize soil compaction and erosion hazards.

   c. Remove livestock before forage is dry.

## Management Direction

All range improvement projects will be designed to be compatible with or complementary to the timber and visual character objectives of this prescription.

### Recreation

#### Recreation

Manage for semi-primitive motorized or roaded natural dispersed recreation opportunities as defined in the Forest-wide Standards and Guidelines. Refer to ROS map for specific class.

Permit OHV use subject to restrictions identified on the OHV map.

#### Cultural Resources

Apply Forest-wide Standards and Guidelines.

#### Visual Resource

Meet or exceed the visual quality objective of partial retention or modification. Apply Forest-wide Standards and Guidelines for visual enhancement and rehabilitation. Refer to VQO map.

### Timber

Timber will be harvested on an opportunity basis. When possible, harvesting will be scheduled as part of timber sales on more productive lands but may be conducted separately. Low productivity lands will not be managed for maximum timber production or regeneration by clearcut. Timber will be harvested only when standards for snags and diversity have been met, and when an adequately stocked understory exists or enough overstory trees are retained to provide a seed source for regeneration by the shelterwood method.

Firewood cutting areas may be designated.

When fuels are treated, treatment will be to a preplanned condition in a manner that meets timber management objectives, as well as reduced fire risk.

## Standards and Guidelines

### Timber

1. (S) Monitor water quality as necessary to determine baseline conditions and effects from timber management activities.

1. Activity Fuels

   a. (G) Priority will be given to treatments for which net value change is maximized.

   b. (G) Fuel treatments may be modified to meet other resource objectives.

## Management Direction

**Water and Soils**

Apply Forest-wide Standards and Guidelines.

**Wildlife and Fish**

Wildlife coordination efforts and all habitat improvement projects will be compatible with the timber objectives of this prescription.

Apply Forest-wide Standards and Guidelines.

## Standards and Guidelines

2. (G) Encourage use of wood residue where it does not conflict with other resource needs.

Wildlife and Fish

1. (G) As needed, protect seedlings from animal damage.

**This page intentionally left blank.**

## Riparian Area Management Prescription - 17

*Description: The primary emphasis is to protect and enhance riparian-dependent resources (water, fish, wildlife, and vegetation) while utilizing the habitat for non-dependent resources (timber, range, recreation) when possible. The vegetative management goal is to manage for desired expressions of herbaceous, shrub, and forest riparian vegetation, according to site potential and resource needs. Stream channel stabilization is essential to meeting these objectives. Resource uses and activities in riparian areas will occur to the extent that they do not adversely affect the maintenance of the riparian area-dependent resources. New developed recreation facilities are not located here when viable alternatives exist. Boat ramps, beaches, trails, etc., may be developed when appropriate. Off-highway vehicle use is restricted. All wildlife management indicator species are favored in general, but particularly those dependent on riparian areas. Wildlife and fish habitat improvement is permitted. Livestock grazing is permitted. Timber yields will be reduced under selection harvesting. Firewood cutting is permitted. The area is open to geothermal, oil, gas, and mineral exploration and development with conditional surface occupancy stipulation*. Roads and trails are allowed, but limited.*

*This prescription applies to geographically delineable areas with distinctive resource values and characteristics that are comprised of aquatic and riparian ecosystems. The aquatic ecosystem includes the stream channel, lake bed and water, biotic communities, and habitat features that occur therein. The riparian ecosystem includes the aquatic ecosystem as well as the transition between the aquatic ecosystem and the adjacent terrestrial ecosystem, and is identified by soil characteristics or distinctive vegetation communities that require free or unbound water. These are descriptive of such areas as streamside management zones (SMZs), as well as lakes, perennial reservoirs, meadows, seeps, springs, and 100 feet adjacent to each. (These areas will be identified and managed at the project level, such as allotment management plans, timber sales, etc.)*

*This prescription applies to 9,274 acres distributed within 14 management areas. The size and configuration of the areas vary. Some are large, contiguous areas, while others are isolated, small inclusions.*

## Management Direction

## Standards and Guidelines

### Air Quality

Apply Forest-wide Standards and Guidelines.

### Facilities

In addition to applying Forest-wide Standards and Guidelines for management of system roads and facilities, avoid water quality problems and riparian impacts from roads, trails, and associated stream crossings.

### Facilities

1. (G) When possible, undertake construction and other work on facilities when probabilities of rain or runoff are low. Minimize the time that an area's soil surface is disturbed and unvegetated, surfaced or otherwise treated.

2. (S) Minimize sediment production and mass-wasting during pioneer road construction.

3. (G) When roads or stream crossings are incomplete and construction must be shut down at the end of the normal operating season, undertake the following measures as necessary to prevent erosion or water quality degradation:

**Management Direction**

**Standards and Guidelines**

a. Remove temporary culverts, diversion dams, and elevated causeways.

b. Install temporary culverts, side drains, energy dissipators, sediment basins, etc.

c. Remove debris and spoil material from channels; seed and mulch disturbed land areas.

4. (S) Prohibit equipment servicing and refueling within riparian areas.

5. (S) Prohibit road construction related activities in riparian areas, except at designated crossings.

6. (S) All excavation on perennial streams and potable water sources will meet State water quality objectives.

7. (S) Material deposited within SMZs from foundation or other excavation will not be discharged directly into or placed where it can enter live streams.

8. (S) If the channel is damaged during construction, it will be restored to its natural condition, as nearly as possible and as soon as possible.

9. (S) When projects take place within the stream channel, the site will be dewatered temporarily if State water quality objectives would not be met.

10. (S) Stream crossings on permanent and temporary roads will be constructed to avoid damage to streams which may preclude fish passage.

a. Crossings will be as near a right angle as possible.

b. In excavating fittings and abutments, care shall be taken to avoid stream damage and sedimentation.

c. Toes of fills at stream crossings will be stabilized to an elevation above the high water mark.

11. (S) During bridge and culvert installation:

a. Place excavated material away from live streams.

b. Remove materials stocked on floodplains prior to high water.

*Management Direction*

**Management Direction**                    **Standards and Guidelines**

12.(S) Streamside gravel borrow will only be removed above the water table and when resource damage will not occur.

13.(S) Construction debris within SMZs will be removed unless site-specific environmental analysis indicates retaining debris is needed to meet resource objectives.

14.(G) Refer to *Fish Migration and Fish Passage,* R-5, June 1980, and *Planning Forest Roads to Protect Salmon Habitat,* PNW-109, June 1980, before installing fish passage improvements.

## Lands

Apply Forest-wide Standards and Guidelines.

## Minerals

Apply Forest-wide Standards and Guidelines. In addition, apply special stipulations as needed.

Minerals

1. (S) Existing water in ponds, lakes, reservoirs, springs, creeks or streams is not available for use in leasable and saleable mineral development unless specifically permitted by the Forest Supervisor, except when the leasee has water rights or the authorized use of such water rights. Access for wildlife watering at all natural water sources appropriated for operations uses will be provided. No surface disturbance is allowed within riparian areas, ponds, springs, wet meadows or other water sources unless specifically permitted by the Forest Supervisor for leasable and saleable mineral activities. Locatable mineral development will have mitigating measures incorporated into approved operating plans to protect riparian areas and water quality.

2. (S)Stipulations for the protection of specific water sources will be developed and imposed at the permit stage.

## Protection

### Fire and Fuels

Apply Forest-wide Standards and Guidelines.

## Management Direction

## Standards and Guidelines

### Range

Manage grazing to protect riparian-dependent resources. Where potential or existing resource conflicts are identified, correct through the allotment management plan (AMP) or annual operating plan.

### Range



1. (S) The revised allotment management plan prescription will become the standards for the AMP based on site-specific data. AMP standards may deviate from the following guidelines to reflect site-specific conditions and objectives.



2. (G) Use the following guidelines in developing utilization standards in AMPs:

| Grazing Management System Stubble Height Levels[1] /Utilization[2] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Riparian Priorities [3] | Season-Long | | Deferred | | Rest-Rotation | | Early Season with Regrowth | |
| | Herbaceous[4] | Shrubs[5] | Herbaceous | Shrubs | Herbaceous | Shrubs | Herbaceous | Shrubs |
| [a] High Priority | 4-6"/25-35% | 20 | 4-5"/30-45% | 20 | 4-5"/35-45% | 20 | 3"/45-55% regrowth 4-8" | 20% |
| [b] Medium Priority | 3-5"/35-50% | 20 | 3-4"/40-55% | 20 | 3"/45-60% | 20 | 3"/55-65% | 20% |
| [c] Low Priority | n/a | 20 | n/a | 20 | n/a | 20 | n/a | 20% |

[1]  Stubble height remaining at end of grazing season.  Early season grazing allows for regrowth.
[2]  Utilization = percent by weight.
[3]  See Appendix T for detailed information on determining stream type and priority.
[4]  Utilization levels primarily derived from review of Clary, W.P.; Webster, B.F. 1989, USDA, Forest Service General Technical Report Int-263.
[5]  Shrub utilization = percent of current year's annual growth.  Includes willows and aspen.
[a]  High priority streams = Priority 1 and 2 streams, Appendix T, pp T-4,5 (unstable streams and streams with high sediment loads).
[b]  Medium priority streams = Priority 3 streams, Appendix T, pp T-4,5 (stable streams with potential for grazing impacts).
[c]  Low priority streams = Priority 4 streams, Appendix T, pp T-4,5 (stable streams with little potential for grazing impacts).
      Riparian area is not considered a limiting factor. Utilization criteria will be established consistent with contiguous upland sites.

3. (G) Under any grazing system, manage grazing to enable riparian-associated shrubs to reach at least 50% of the natural site potential.

4. (G) Control livestock distribution within allotments to protect water quality. Methods include construction of fences, water developments, riding, and salt placement.

5. (G) Place salt at least 1/4-mile from water unless explicitly directed by the District Ranger.

## Management Direction

## Standards and Guidelines

6. (G) Maintain streambanks in stable condition as specifically defined in allotment management plans.

7. (G) Avoid locating livestock driveways within SMZs where possible.

8. (G) Avoid early-season grazing when non-normally saturated soils are saturated.

9. Follow additional Standards and Guidelines under the Water and Soils section of this Prescription.

Where livestock grazing has caused stream channel degradation, undertake erosion control measures.

1. (G) If riparian areas are excluded from livestock use, develop other water sources as needed to offset those sources made inaccessible.

2. (G) When appropriate, manage upland shrub/herbaceous communities to attract livestock away from riparian areas.

3. (G) The following are some acceptable practices to remedy stream channel degradation:

- Channel revetment
- Gully stabilization
- Seeding
- Bank reshaping
- Fencing
- Riprapping
- Matting
- Mulching
- Planting shrubs

## Recreation

### Recreation

Lands under this prescription will be managed for the roaded natural or semi-primitive motorized ROS class. Refer to the ROS map to identify the adopted class. Limit OHV use to trails, roads and designated

## Management Direction

crossings. Apply Forest-wide Standards and Guidelines.

**Cultural Resources**

Apply Forest-wide Standards and Guidelines.

**Visual Resource**

Manage for the adopted VQOs in which riparian areas lie, as shown on the accompanying VQO map. Apply Forest-wide Standards and Guidelines for visual rehabilitation and enhancement.

## Timber

Timber may be harvested while protecting riparian-dependent resources.

## Standards and Guidelines



1. (G) Adhere to the following practices:

    a. Individually mark trees to be harvested.

    b. Exclude heavy equipment from riparian areas except at designated crossings.

    c. Remove all slash and other logging debris from stream courses except where it contributes to riparian values.

    d. Directionally fall and end-line timber in riparian areas on slopes equal to or less than 40%. Fall trees away from stream courses, bogs and lakes, unless required for riparian enhancement.

    e. Logs will be fully airborne in suspended log harvesting (slopes >40%). Do not yard through streams.

    f. Locate landings and decking areas away from riparian areas.

    g. Prevent equipment operations which would excessively damage the soil. Exclude sensitive areas from slash treatment with mechanized equipment.

    h. Avoid placement of clearcut blocks directly across from each other on either side of a stream to minimize risks of blowdown.

    i. Use non-recurring "special C clause" provisions when necessary to prevent water quality problems.

*Management Direction*

## Management Direction

## Standards and Guidelines

j.  Modify timber sale contracts if new circumstances indicate that irreversible damage to soil or water quality will occur.

2.  (G) Maintain 50-70% of the timbered sites within SMZs in an old-growth state, where possible.

3.  (G) As a goal, maintain shade on at least 80% of the stream surface between 9 a.m. and 4 p.m. from June 1 through September 30. Streamside vegetation will provide most of the water surface shade.

4.  (G) Within riparian areas, provide at least 80% of the potential crown cover on sites dominated by trees, or 80% of the potential live ground cover, including all classes of vegetation, on non-timbered sites. Do not harvest timber when crown cover is less than 80% on tree-dominated sites. On areas with less than 80% crown closure potential of trees, shrubs will be allowed to contribute toward the difference. In the event that total live vegetative cover is less than 80%, dead and down material can contribute ground cover.

*wet meadows, seeps & springs*

Modify timber and other vegetative manipulation around wet meadows, seeps, and springs.

1.  (S) Leave strips or small clumps of uncut residual timber or shrubs around meadows. Because windthrow is a hazard, care must be taken in selecting the trees to be left. (FSM 2405)

a.  If natural cover is lacking, distribute slash piles or logs along the perimeter, when possible.

b.  Tree overstory removal within 200 feet of a wet meadow's edge will be <5% per decade of the surrounding acreage. From 200 to 400 feet from the natural edge, overstory removal will be <7% of the surounding acreage per decade.

2.  (G) Suppress encroaching vegetation, such as juniper, lodgepole pine and white fir, to maintain meadows, seeps, and springs on a site-specific basis.

## Management Direction

## Standards and Guidelines

Protect riparian areas from vegetative manipulation projects unless the project is specifically for the protection or enhancement of riparian-dependent species.

Do not cut hardwoods from riparian areas unless the project specifically protects or enhances riparian-dependent species.

Firewood cutting is permitted only to maintain or enhance other resource values.

Where timber management activities have caused stream channel degradation, undertake erosion control measures.

1. (G) The following are some acceptable practices to remedy stream channel degradation:

    —Channel revetment
    —Gully stabilization
    —Bank reshaping
    —Debris removal
    —Woody debris placement or rearrangement
    —Riprapping
    —Matting
    —Mulching
    —Planting Shrubs

### Water and Soils

Perform restoration on existing eroded streams.

Monitor water quality to detect and prevent on- and off-Forest problems.

Apply the following directions and associated standards and guidelines when recreation, wildlife, range, and timber projects are implemented.

— Conserve soil and water resources through implementation of Best Management Practices.

### Water and Soils

1. (S) In watersheds where water quality or soil stability have been degraded by resource management, implement watershed restoration measures.

2. (S) Monitor water quality to determine baseline conditions and the effects of resource management.

1. (S) Place no substance in or near riparian areas that would adversely affect water quality.

2. (G) Pesticides may not be applied in riparian areas, except where dependent resources benefit. All bodies of water will be protected with an appropriate filter strip.

*Management Direction*

## Management Direction

## Standards and Guidelines

3. (G) To prevent loss of soil productivity and to prevent ash, sediment, nutrients, and debris from entering water bodies, avoid intense fires, and waterbar fire-lines.

— Maintain water temperatures to meet State water quality objectives.

— For portions of streams containing or historically containing redband, rainbow, brook, or brown trout, manage to at least maintain viable populations of these species.

1. (S) Make no changes in water temperature that would adversely affect beneficial uses.

2. (S) For cold-water streams, both intra- and interstate shall be maintained or rehabilitated to achieve temperatures of 70°F. or less.

3. (S) For warm-water streams, in all water regions, water temperature will meet State water quality objectives.

## Wildlife and Fish

For streams containing Modoc sucker, rehabilitate and maintain habitat as directed in the Modoc Sucker Recovery Plan. The following streams are affected:

- Johnson Creek
- Dutch Flat Creek
- Washington Creek
- Hulbert Creek
- Turner Creek
- Rush Creek

For streams containing Lost River and shortnose suckers, rehabilitate and maintain habitat as directed in their respective recovery plans when they are completed and approved. The following streams may be affected:

- Willow Creek (DHRD and DGRD)
- Boles Creek (DHRD and DGRD)
- Fletcher Creek (DGRD)
- Lost River (DHRD)
- Mowitz Creek (DHRD)

Wildlife and fish coordination efforts and habitat improvement projects will be compatible with the riparian management objectives of this prescription.

## Wildlife and Fish

1. (G) Inventory habitat suitability within Willow Creek (BVRD) and Ash Creek for purposes of reintroducing Modoc suckers, following the Modoc Sucker Recovery Plan.

## Management Direction

## Standards and Guidelines

If T&E species habitat occurs within the riparian area, manage to maintain or enhance their habitat. Direction from species recovery plans and the Raptor Management Prescription is applicable to these areas.

Coordinate with the California Department of Fish and Game to enhance fish habitat.

Maintain or improve stream fish habitat through structural and non-structural improvement work. Fisheries improvement practices include but are not limited to ladders, spawning beds, pools, fish cover, and removing debris jams.

1. Within streams containing fisheries:

2. (G) To promote fish passage, remove barriers which impede fish migration, if appropriate.

    a. (G) Control beaver populations when they threaten to destroy desirable riparian vegetation or impair fish migration.

3. (G) Maintain or enhance substrate composition for the benefit of fish species, as determined by fish habitat relationship studies.

4. (G) Activities within the stream should be restricted to the following periods, adjustable by a biologist:

    a. Redband and rainbow trout: Activities within streams are allowed between August 1 and September 15.

    b. Brook trout: Activities are allowed between July 1 and September 15.

    c. Brown trout: Activities are allowed between February 1 and September 15.

    d. If a stream contains a combination of trout species, the most restrictive time period applies.

5. (G) As a goal, maintain shade on at least 80% of the stream surface between 9 a.m. and 4 p.m. from June 1 through September 30. Streamside vegetation will provide most of the water surface shade.

6. (G) Large woody debris providing habitat for fish will be maintained through:

    —maintenance of stream material, and

*Management Direction*

## Management Direction

## Standards and Guidelines

—natural recruitment of trees from the adjacent SMZ.

7. (G) Cooperate with CDFG in stocking and management programs.

Within lakes and reservoirs containing trout or large-mouth bass:

— Improve habitat through structural and non-structural improvement work. Fisheries improvement practices for lakes and reservoirs include but are not limited to spawning bed construction, cover development, aquatic weed control, and dam reconstruction and maintenance.

*Within lakes and reservoirs containing trout or large mouth bass*

1. (G) In cooperation with the California Department of Fish and Game, and through the public participation process, establish minimum pool levels for all reservoirs where fisheries occur.

2. (G) Conduct surveys to establish fish habitat requirements for reservoirs (forage/prey ratios, habitat factors, spawning areas, etc.).

3. (G) Modify adjacent land management activities to maintain acceptable water quality levels.

4. (G) Cooperate with the California Department of Fish and Game in stocking and management programs.

— In selected riparian areas, willow planting and fencing may be implemented to speed recovery and enhance the habitat.

*Within selected riparian areas*

1. (G) To protect wildlife habitat and investments, livestock will be excluded or deferred from these areas.

## F. Management Area Direction

**A** management area is a contiguous unit of land with similar topography, geology, and resource uses. The Forest is divided into 22 management areas to enable land managers to implement the Forest Plan (Figure 4-1). These areas are groups of pre-existing timber compartments and are, therefore, administrative rather than natural units of land.

The discussion for each management area includes:

- **Management Area Map** — Shows the area boundary and spatial relation to the entire Forest, general geographic features, and developed recreation sites.

- **Description** — Describes the location, size, prominent features, terrain, watershed, vegetation, wildlife, cultural resources, recreation, mining, and other uses. Acreage is given for rangeland, timberland producing greater than 20 cubic feet per acre per year (>20 lands), and timberland

producing less than 20 cubic feet per acre per year (<20 lands).

- **Standards and Guidelines** — States management direction unique to each management area.

- **Prescription Allocation** — Lists the acreage allocated to each management prescription. Acreage is broken out by >20 lands, <20 lands, and rangelands (Range).

- **Range Allotment Strategies** — Lists the target range objectives for each allotment within a management area. See Appendix O, Livestock Managment Strategies.

The Forest-wide goals, objectives, and standards and guidelines previously discussed in this chapter, and monitoring requirements outlined in Chapter 5, apply to all management areas unless specifically exempt.

Range allotment boundaries do not always coincide with managment area boundaries. The following list indicates the management area where direction will be found for each allotment.



## Figure 4-1. Management Areas by Ranger District

| Warner Mountain | | Devil's Garden | |
|---|---|---|---|
| 31 | Highgrade | 51 | Devil's Garden |
| 32 | Fandango | 52 | Crowder |
| 33 | Lake City | 53 | Hackamore |
| 34 | Fitzhugh | 54 | Happy Camp |
| 35 | South Warner Wilderness | | |
| 36 | Patterson | | |

| Big Valley | | Doublehead | |
|---|---|---|---|
| 41 | Long Bell | 61 | Medicine Lake |
| 42 | Stone Coal | 62 | Black Mountain |
| 43 | Portuguese Ridge | 63 | Tionesta |
| 44 | North Adin | 64 | Mears |
| 45 | South Adin | 65 | Steele Swamp |
| | | 66 | Clear Lake |
| | | 67 | Mount Dome |

| Allotment | Management Area |
|---|---|
| **Warner Mountain Ranger District** | |
| Bearcamp | 36 |
| Bidwell | 31 |
| Blue Lake | 36 |
| Bald Mountain | 33 |
| Blue Lake (Sheep) | 36 |
| Buck Creek | 32 |
| Cedar Canyon | 34 |
| Cottonwood-Owl-Mill | 35 |
| Coyote | 36 |
| Davis Creek | 32 |
| Emerson | 35 |
| Eagle Peak-Barber | 35 |
| Granger | 35 |
| Henderson Meadow | 34 |
| Joseph Creek | 32 |
| Lassen Creek | 32 |
| Mt Bidwell | 31 |
| Myrtle Creek | 31 |
| Mill Creek-Eagle Peak | 35 |
| North Creek | 36 |
| North Parker | 34 |
| Outlet | 34 |
| Parsnip Creek | 36 |
| Selic Canyon | 36 |
| Thoms Creek | 32 |
| West Valley | 36 |
| Yankee Jim | 34 |
| **Devil's Garden Ranger District** | |
| Beaver Dam | 52 |
| Blue Mountain | 52 |
| Big Sage | 51 |
| East Grizzlie | 52 |
| Emigrant Springs | 51 |
| Happy Camp | 54 |
| Howard's Gulch-Lost Valley | 53 |
| Mowitz | 53 |
| 139 | 51 |
| Pit River | 54 |
| Pine Springs | 51 |
| Surveyor's Valley | 51 |
| Timbered Mountain | 51 |
| Triangle | 51 |
| West Grizzlie | 52 |
| Willow Creek Ranch | 51 |

| Allotment | Management Area |
|---|---|
| **Big Valley Ranger District** | |
| Ash Valley | 44 |
| Barber Canyon | 44 |
| Ballard Ridge | 43 |
| Administered by BLM | 43 |
| Barrows | 44 |
| Centerville | 43 |
| Crites | 42 |
| Crank Springs | 42 |
| Delta Lake | 43 |
| East Bieber | 45 |
| Egg Lake | 41 |
| Gerig | 42 |
| Happy Camp | 41 |
| Johnson Creek | 44 |
| Oxendine | 45 |
| Rush Creek | 44 |
| Refuge 1-N | 41 |
| Round Mountain | 41 |
| Rocky Prairie | 43 |
| Round Valley | 44 |
| Stone Coal | 42 |
| Spring Hill | 45 |
| Splawn Mountain | 42 |
| Shawville | 42 |
| West Bieber | 45 |
| Willow Creek | 45 |
| White Horse | 41 |
| **Doublehead Ranger District** | |
| Boles | 65 |
| Clear Lake | 66 |
| Crumes (Sheep) | 67 |
| Dalton | 66 |
| Deep Lake | 67 |
| Glass Mountain (Sheep) | 63 |
| Lavas | 66 |
| Mammoth | 66 |
| Mount Dome | 67 |
| Mud Lake (Sheep) | 63 |
| Perez | 66 |
| Potters | 64 |
| Timber Mountain | 64 |
| Tucker | 66 |
| Warm Springs | 65 |

# HIGHGRADE ● Management Area 31



# 31 - Highgrade
## Warner Mountain Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 38,450 | | |
| Rangelands | | 16,145 | |
| Timberlands | | 22,305 | |
| < 20 cu. ft. per acre | | | 5,410 |
| > 20 cu. ft. per acre | | | 16,895 |
| Unsuitable for Timber Management | | 7,017 | |
| < 20 cu. ft. per acre | | | 2,843 |
| > 20 cu. ft. per acre | | | 4,174 |



Highgrade Management Area is located on the extreme north end of the District with elevations ranging from 4,500 to 8,000 feet, the area is dissected by numerous drainages which have formed steep canyons. Mt. Bidwell and Mt. Vida dominate the landscape. High elevation meadows, such as Dismal Swamp, and large stands of aspen characterize the high plateaus.

Most of the unit is timbered with lodgepole pine at the highest elevations, and white fir, western white pine, and ponderosa pine on the lower slopes. Incense-cedar, an infrequent occurrence in the Warners, is also found in this MA. Because of steep terrain and a limited transportation system, timber management opportunities are few. The area embraces timber compartments 301-306.

The northeastern portion of the MA is largely rangeland within the Mt. Bidwell cattle allotment and the Bidwell sheep allotment. The south and east slopes are dry and characterized by sagebrush, juniper, and bunch grass. Montane meadows and riparian areas provide additional forage.

The distribution of wildlife is typical of the District. Mule deer and coyotes are seen most often. Other interesting species include beaver, porcupine, blue grouse, and sage grouse. Several goshawk nest sites are found within the MA.

Bidwell Creek and Mill Creek are popular, high-quality trout fisheries. Small developed campsites are located at Cave and Lily Lakes, which draw many visitors from Oregon as well as local residents. Deer hunting and associated activities are the primary forms of dispersed recreation in the summer and fall. Rockhounding, fish-

ing, mining and horseback riding are also popular. The Highgrade National Recreation Trail traverses the old mining district.

Large volumes of water originate within the eastside watersheds of Bidwell, Mill and Twelvemile Creeks, and the westside watersheds of Cottonwood and Pine Creeks. The water is used for agricultural, fisheries, recreation and domestic purposes. Downstream in Oregon, Twelvemile Creek contains Warner suckers *Catostomus warnerensis* a federally threatened species.

The Highgrade Mining District is contained within the area. It was the scene of an early 19th century gold rush which had limited gold production. Several exploration efforts are still moderately active.

Access to this MA is provided by Modoc County Roads 1,2, and 224, and by a system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the High Grade Mining District and nominate to the National Register of Historic Places. Develop interpretive brochure and signing in cooperation with the Modoc County Historical Society.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

**Minerals**

– Other management activities should not preclude future mining in this management area. Arterial road construction should consider the needs of the mineral resource.

**Range**

– Use technical review teams to (1) recommend needed adjustments in permitted numbers or grazing seasons, and (2) develop grazing systems on all allotments.

**Sensitive Plants**

– Monitor and protect populations of *Galium serpenticum warnerense*.

**Soils**

– Conduct an SRI Order 2 on sensitive watersheds 010, 020, 031, 032, and 181, and sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) and the SCS soil survey (USDA SCS 1974) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

– On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

– Analyze white fir timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Special Areas**

– Evaluate Dismal Swamp as a potential Special Interest Botanical Area.

**Water and Riparian**

– Maintain watershed structural improvements in Dismal Swamp.

– In watersheds 010, 020, 031, 032, and 181, minimize cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity prior to its undertaking.

– When an estimated cumulative watershed threshold is approached, employ mitigating measures such as increasing buffer and filter strip width, installing erosion control structures, and ripping and scarifying disturbed areas as needed to minimize impacts to water quality and beneficial uses.

**Wildlife and Fish**

– Provide for 785 acres of old growth in the mixed conifer type.

– Manage snag densities through natural recruitment, but use active management to achieve specific project objectives.

– Determine fish habitat needs and opportunities in Bidwell, Mill and Twelvemile creeks.

– Implement aspen management projects within timber sale areas.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1  Minimum Level | 1,628 | 1,022 | 103 | **2,753** |
| 4  Semi-Primitive Non-Motorized | 1,666 | 1,519 | | **3,185** |
| 7  Visual Retention [1] | 3,325 | 913 | | **4,238** |
| 9  Raptor Management | 196 | 121 | 103 | **420** |
| 10  Rangeland | | | 4,369 | **4,369** |
| 11  Range-Forage | | | 11,241 | **11,241** |
| 12  Even-Aged Timber | 1,320 | | | **1,320** |
| 13  Timber-Visuals | 2,798 | | | **2,798** |
| 14  Timber-Forage | | | | **5,278** |
|      Partial Retention | 1,489 | | | |
|      Modification | 3,789 | | | |
| 16  < 20 Cu Ft Timber | | 1,654 | | **1,654** |
| 17  Riparian Area | 684 | 181 | 329 | **1,194** |
| **Total** | **16,895** | **5,410** | **16,145** | **38,450** |

[1] Current developed recreation sites contain nominal acreage (< 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## Range Allotment Strategies (see Appendix 0)

| Allotment | Strategy |
|---|---|
| Bidwell | C |
| Mt Bidwell | D |
| Myrtle Creek | B |

# FANDANGO ● Management Area 32



# 32 - Fandango

## Warner Mountain Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 68,435 | | |
|    Rangelands | | 20,406 | |
|    Timberlands | | 48,029 | |
|       < 20 cu. ft. per acre | | | 11,359 |
|       > 20 cu. ft. per acre | | | 36,670 |
| Unsuitable for Timber Management | 4,110 | | |
|       < 20 cu. ft. per acre | | | 834 |
|       > 20 cu. ft. per acre | | | 3,276 |



**F**andango Management Area is located north of Highway 299, and is bordered on the east by the crest of the Warner Mountains. The area extends south from the Highgrade District, along the west side of the mountains, to Cedar Pass. At 8,000 feet, Bald Mountain is the highest point in the MA. Buck Creek Guard Station, a seasonal guard station, is located in the northern portion of the area.

The most significant timber resource on the District, the 5,000-acre Sugar Hill plantation, occurs within this MA. Approximately 40 years old, this plantation is rapidly approaching commercial size. It consists of nearly pure stands of ponderosa pine. Much of the remaining area contains mature stands of readily accessible timber. The area includes timber compartments 307-320.

The Lassen Creek Allotment is the largest producer of forage, primarily forbs and grasses, on the District. Numerous meadows dissect the area.

This MA is frequented by pronghorn and is also an important source of summer forage for resident deer populations. Several goshawk nest sites occur in this area.

The major watersheds include Lassen, Davis, Willow, and Joseph Creeks which all drain to the west. Lassen and Willow Creeks drain into Goose Lake, while Joseph Creek feeds the Pit River to the Central Valley. Water originating in this unit is important for downstream irrigation and for maintaining fisheries habitat.

Lassen, Willow, and Davis Creeks are the major fisheries. Lassen, Cold, Willow and Buck Creeks are spawning habitat for the Goose Lake redband trout.

In addition to a small developed campground at Plum Valley, the MA offers dispersed recreation experiences including camping, hunting and rockhounding.

A variety of obsidian is found in the MA. In colors of golden sheen, mahogany, rainbow and black, its forms range from boulders to delicate needles. Prehistoric Indians used obsidian for stone tools.

Access to the MA is provided by State Highway 299, Modoc County Roads 9, 11, 12, 52, and 118, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Lassen/Applegate Emigrant Trail and nominate to the National Register of Historic Places (NRHP). Develop an interpretive brochure.

– Research the extensive prehistoric obsidian sites and evaluate for nomination to the NRHP.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use technical review teams to (1) recommend needed adjustments in permitted numbers or grazing seasons, and (2) develop grazing systems on all allotments.

**Soil**

- Conduct an SRI Order 2 on sensitive watersheds 033, 034, 035, 041, 042, and 043, and sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) and the SCS soil survey (USDA SCS 1974) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

- On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

- Restore soil productivity and stop watershed degradation through outsloping of terraces and topsoil redistribution at Cottonwood Flat, Lassen Creek, and Bear Valley.

- Maintain fertilization plots and analyze timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Water and Riparian**

- Restore degraded stream channel conditions along Willow, Lassen, Cold, and Joseph Creeks using watershed improvement funds.

- Maintain structural improvements along Lassen and Cold Creeks.

- In watersheds 033, 034, 035, 041, 042, and 043, minimize cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity to its undertaking.

- When an estimated cumulative watershed threshold is approached, increase buffer and filter strip width, install erosion control structures, and rip and scarify disturbed areas as needed to minimize impacts to water quality and beneficial uses.

- Use range structural improvement funds to restore degraded riparian areas in the Lassen Creek and Davis Creek Allotments.

- Maintain watershed improvement structures in Couch Creek.

**Wildlife and Fish**

- Provide for 1065 acres of old growth in the mixed conifer type and 735 acres in the eastside pine type.

- Use a variety of active snag management techniques to achieve 1.5 snags per acre in each timber compartment.

- Continue fish habitat enhancement work in Lassen and Cold creeks and complement, where possible, watershed improvement acitivities. Evaluate fish habitat improvement needs and opportunities in Couch and Joseph Creeks, and North, Middle, and South forks of Davis Creek.

- Improve deer habitat through brushfield rejuvenation under prescribed fire and aspen stand management.

| Prescription Allocation | | | | |
|---|---:|---:|---:|---:|
| **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1  Minimum Level | 1,762 | 81 | 332 | **2,175** |
| 4  Semi-Primitive Non-Motorized | 1,041 | 589 | | **1,630** |
| 7  Visual Retention | 1,908 | 1,516 | | **3,424** |
| 10  Rangeland | | | 17,382 | **17,382** |
| 11  Range-Forage | | | 2,464 | **2,464** |
| 12  Even-Aged Timber | 8,120 | | | **8,120** |
| 13  Timber-Visuals | 6,783 | | | **6,783** |
| 14  Timber-Forage | | | | **16,583** |
|     Partial Retention | 7,153 | | | |
|     Modification | 9,430 | | | |
| 16  < 20 Cu Ft Timber[1] | | 9,009 | | **9,009** |
| 17  Riparian Area | 473 | 164 | 228 | **865** |
| **Total** | **36,670** | **11,359** | **20,406** | **68,435** |

[1] Current developed recreation sites contain nominal acreage (< 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## Range Allotment Strategies

| Allotment | Strategy |
|---|:---:|
| Buck Creek | B |
| Davis Creek | C |
| Joseph Creek | B |
| Lassen Creek | D |
| Thoms Creek | C |

## LAKE CITY ● Management Area 33



# 33 - Lake City

## Warner Mountain Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 22,879 | |
| Rangelands | 11,553 | |
| Timberlands | 11,326 | |
| < 20 cu. ft. per acre | | 4,711 |
| > 20 cu. ft. per acre | | 6,615 |
| Unsuitable for Timber Management | 6,148 | |
| < 20 cu. ft. per acre | | 2,183 |
| > 20 cu. ft. per acre | | 3,965 |



Lake City Management Area primarily consists of steep slopes and ravines along the east side of the Warner Mountains from the Goose Creek watershed south to Cedar Pass. The rugged area is largely inaccessible and ranges in elevation from approximately 4,600 feet to more than 8,000 feet at Bald Mountain.

Vegetation consists of a mosaic of mixed conifer stands, brush fields, range, and steep, rocky barren areas. A small part of the crest area is operable by tractor. However, the majority of the MA cannot be economically managed for timber production because of specialized harvesting equipment, high transportation and logging costs, and scattered timber stands. The area includes timber compartments 313, 316, 318, and 320.

Grazing is limited because of shallow soils and steep, dry slopes. The area provides nesting habitat for raptors, and winter range for mule deer.

Mill Creek and Soldier Creek are the dominant watersheds. Nearly all the water which drains from the area is used for irrigation. Unused volume from the creeks empties into Upper and Middle Alkali Lakes in Surprise Valley.

A small developed campground at Stough Reservoir is used primarily by local residents. Popular dispersed recreation activities include deer hunting, stream fishing, firewood gathering, nordic skiing and snowmobiling.

The national forest portion of the Lake City Known Geothermal Resource Area (KGRA) lies within this MA, and was leased in 1982.

Access to the MA is provided by State Highway 299, Modoc County Roads 11, 12, and 118, and by a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Research the extensive prehistoric obsidian sites and evaluate for nomination to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use technical review teams to (1) recommend needed adjustments in permitted numbers or grazing seasons, and (2) develop grazing systems on all allotments.

### Sensitive Plants

– Monitor and protect populations of *Galium glabrescens modocense.*

### Soil

– Conduct an SRI Order 2 on sensitive watersheds 182, 183, 184, and 191, and sensitive soil areas identified in the SCS soil survey (USDA SCS 1974) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

– On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as

needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

**Water and Riparian**

– In watersheds 182, 183, 184, 191, and other second or third order watersheds, minimize the cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity prior to its undertaking.

– When an estimated cumulative watershed threshold is approached, increase buffer and filter strip width, install erosion control structures, and rip and scarify disturbed areas as needed to minimize impacts to water quality and beneficial uses.

– Restore degraded stream channel conditions along Mill Creek using watershed improvements, range structural improvements, and grazing strategies.

**Wildlife and Fish**

– Provide for 315 acres of old growth in the mixed conifer type.

– Manage for snags through natural recruitment.

## Prescription Allocation

| | Prescription | >20 Acres | <20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| 1 | Minimum Level | 2,078 | | 50 | **2,128** |
| 4 | Semi-Primitive Non-Motorized | 1,577 | 2,123 | | **3,700** |
| 7 | Visual Retention | 1,216 | 619 | | **1,835** |
| 10 | Rangeland | | | 4,053 | **4,053** |
| 11 | Range-Forage | | | 7,336 | **7,336** |
| 12 | Even-Aged Timber[1] | 125 | | | **125** |
| 13 | Timber-Visuals | 108 | | | **108** |
| 14 | Timber-Forage[1] | | | | **1,201** |
| | Partial Retention | 277 | | | |
| | Modification | 924 | | | |
| 16 | <20 Cu Ft Timber | | 1,909 | | **1,909** |
| 17 | Riparian Area | 310 | 60 | 114 | **484** |
| | **Total** | **6,615** | **4,711** | **11,553** | **22,879** |

[1] Current developed recreation sites contain nominal acreage (<10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

**Range Allotment Strategies**

| Allotment | Strategy |
|---|---|
| Bald Mountain | D |

## FITZHUGH ● Management Area 34



*Management Area Direction*

# 34 - Fitzhugh

## Warner Mountain Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 77,356 | |
| Rangelands | | 29,460 |
| Timberlands | | 48,896 |
| < 20 cu. ft. per acre | | 18,337 |
| > 20 cu. ft. per acre | | 29,559 |
| Unsuitable for Timber Management | 12,113 | |
| < 20 cu. ft. per acre | | 7,011 |
| > 20 cu. ft. per acre | | 5,102 |



Fitzhugh Management Area extends from Cedar Pass south to the Pit River watershed at Jess Valley, excluding the South Warner Wilderness. While the north end of the MA has steep slopes and ravines, elsewhere the terrain is gentle. Elevation ranges from 5,000 to 7,600 feet. Scattered parcels of private land are intermingled with Forest land; and Jess Valley is the largest private land block within the District.

Ponderosa pine, white fir and aspen stands pattern the MA which is well-suited for timber production. The transportation system is essentially complete for long-term management needs. This area includes timber compartments 321-337.

Large areas of rangelands are scattered through timber stands. An intensive management grazing strategy is used on portions of the Henderson Meadow Allotment. Juniper encroachment is a serious problem on several allotments.

Part of the State Game Refuge C-10 is included within this area. Deer and pronghorn are the primary management indicator species. Portions of the MA have been deferred from management to provide for goshawk habitat needs. This MA also has a peregrine falcon reintroduction site.

Numerous streams and associated riparian areas are located in this MA, principally Parker, Shields, Fitzhugh, Deep and Pine Creeks. All of the major streams support fisheries.

Popular Wilderness trailheads are located at Pepperdine, Soup Springs, and Mill Creek Campgrounds.

An undeveloped site at Pine Creek provides another trailhead. The MA receives heavy dispersed camping use, especially along streamside areas. Cedar Pass Campground on Highway 299 is primarily an overnight stop for travelers. A small ski area (under special use permit) at Cedar Pass provides recreation for alpine skiers. On the west side of the MA, the West Warner Road parallels the Wilderness boundary. The road provides a paved surface for pleasure driving, and accesses most trailheads.

Mining claims have been filed near the Jess Valley area. Applications have been filed for oil and gas leasing; one area north of the Wilderness is currently leased. All other applications have been withdrawn or leases terminated.

Access to the MA is provided by State Highway 299, Modoc County Roads 25, 56, 58, 64, and 258, and by a developed system of National Forest roads.

## Standards and Guidelines

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use technical review teams to (1) recommend needed adjustments in permitted numbers or grazing seasons, and (2) develop grazing systems on all allotments.

**Soil**

– Conduct an SRI Order 2 on sensitive watersheds 043, 044, 045, 051, 052, 053, 191, 192, 193, and 194, and sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) and the SCS soil survey (USDA SCS 1974) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

– On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

– Maintain fertilization plots and analyze white fir timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Water and Riparian**

– Use watershed improvement funding to control gullying in the Granger Canyon and Smalls Canyon Watersheds. Repair streambank erosion along the South Fork of Fitzhugh Creek.

– Maintain watershed improvement structures in Cedar Creek.

– In watersheds 043, 044, 045, 051, 052, 053, 191, 192, 193, and 194, minimize the cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity prior to its undertaking.

– When an estimated cumulative watershed threshold is approached, increase buffer and filter strip width, install erosion control structures, and rip and scarify disturbed areas as needed to minimize impacts to water quality and beneficial uses.

– Use range structural improvements and grazing strategies to restore degraded riparian areas in the West Valley, North Parker, and Yankee Jim Allotments.

**Wildlife and Fish**

– Provide for 1075 acres of old growth in the mixed conifer type and 405 acres in the eastside pine type.

– Manage snag densities through natural recruitment in the mixed conifer type and by active management techniques in the eastside pine type.

– Implement fish habitat improvements in the Shields, Pine, Fitzhugh Creek drainages, and in the South Fork of the Pit River. Complement watershed improvement projects in Cedar Creek and other areas, where possible.

– Seek opportunities for aspen management within timber sale areas.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1 Minimum Level | 1,621 | 1,905 | | **3,526** |
| 4 Semi-Primitive Non-Motorized | 1,826 | 4,201 | | **6,097** |
| 7 Visual Retention[1] | 5,769 | 1,777 | | **7,546** |
| 9 Raptor Management[1] | 245 | 349 | 1,081 | **1,675** |
| 10 Rangeland | | | 28,108 | **28,108** |
| 12 Even-Aged Timber | 1,872 | | | **1,872** |
| 13 Timber-Visuals[1] | 7,924 | | | **7,924** |
| 14 Timber-Forage[1] | | | | **8,842** |
| Partial Retention | 1,848 | | | |
| Modification | 7,044 | | | |
| 16 < 20 Cu Ft Timber | | 9,549 | | **9,549** |
| 17 Riparian Area | 1,340 | 556 | 271 | **2,167** |
| **Total** | **29,559** | **18,337** | **29,460** | **77,356** |

[1] Current developed recreation sites within these prescription areas contain nominal acreage ( < 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Cedar Canyon | C |
| Henderson Meadow | C |
| North Parker | C |
| Outlet | C |
| Yankee Jim | C |

## SOUTH WARNER WILDERNESS ● Management Area 35



# 35 - South Warner Wilderness

## Warner Mountain Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 70,385 | |
|    Rangelands | | 42,226 |
|    Timberlands | | 28,159 |
|     < 20 cu. ft. per acre (no timber mgt.) | | |
|     > 20 cu. ft. per acre (no timber mgt.) | | |



Encompassing more than 70,000 acres of primitive land on the Warner Mountain Ranger District, the South Warner Wilderness contains rugged topography, expansive vistas, rolling forest, mountain meadows, clear streams, and the highest peaks in northeastern California. Eagle Peak at 9,892 feet, Warren Peak at 9,710 feet, and Squaw Peak at 8,646 feet are the conspicuous landmarks within the Wilderness. The summit of the Warner Mountain range marks the upper edge of a huge fault plane, with an elevation differential of 5,500 feet.

The South Warner Wilderness is designated as Class I area under the Clean Air Act. The area lies geographically within the Northeast Plateau Air Basin. The air quality at present is excellent.

Vegetation on the precipitous eastern slope is generally sparse. The western slope is characterized by more gentle, rolling topography. Vegetation includes ponderosa, Jeffrey, western white, whitebark, and lodgepole pines, white fir, western juniper, aspen, bitterbrush, mountain mahogany, sagebrush, grasses, and riparian species.

Currently six cattle and three sheep allotments are located wholly or partially within the Wilderness. The general grazing season lasts from July 1 to September 30.

Wildlife abounds in the Wilderness, affording recreationists opportunities to observe many interesting species in their natural surroundings, including mule deer, California bighorn sheep, goshawks, and pronghorn. In addition to fish and mammals, the Wilderness provides splendid bird-watching for the casual or most seasoned observer.

In 1980, fourteen bighorn sheep were transferred from the Lava Beds National Monument and Inyo National Forest to the Raider Canyon area. By 1985, herd numbers had increased to approximately 60 animals. In 1987/88, the entire bighorn sheep population died. The suspected cause was bacterial pneumonia

Far from major population centers, the South Warner Wilderness has a low level of visitor use. Visitor activities include backpacking, day hiking, bird-watching, nature study, photography, trout fishing, cross-country skiing, snowshoeing, horseback riding, hunting and camping. Two main areas of concentrated use are the Clear Lake and Patterson Lake areas. While Clear Lake is used almost exclusively by day, Patterson Lake is used for both day and overnight.

The Wilderness trail system consists of 79 miles of maintained trails with an additional 23 miles which are neither maintained nor considered system trails. Any part of the interior served by the trail network can be accessed in one long day's hike. Cross-country travel is not difficult in most areas, except on the precipitous east slopes.

Water from this MA flows to Surprise Valley and the north and south forks of the Pit River, and is used for agriculture and fisheries.

Access to the Wilderness is provided by State Highway 299, Modoc County Road 40 and a developed system of National Forest roads.

## Standards and Guidelines

### Air Quality

– Maintain air quality according to the Clean Air Act.

– Identify and monitor Air Quality Resource Values (AQRVs).

## Cultural Resources

– Conduct non-project related cultural resource in-
ventories to collect information on high-elevation
prehistoric populations, as opportunities arise.

## Fire and Fuels

– Suppress all wildfires using the appropriate sup-
pression response.

– Use prescribed fire from naturally occurring un-
planned ignitions, according to an approved plan,
to perpetuate natural ecosystems.

– Use prescribed fire from planned ignitions if
needed to maintain natural ecosystems, to return
them to a natural condition, or to protect adjacent
resources.

## Range

– Use technical review teams to (1) recommend
needed adjustments in permitted numbers or graz-
ing seasons, and (2) develop grazing systems on all
allotments.

## Sensitive Plants

– Monitor and protect populations of *Galium
glabrescens warnerense*.

## Soils

– Monitor trails and campgrounds for watershed deg-
radation, and when necessary, rehabilitate those
areas.

## Water and Riparian

– Use range structural improvement funds to restore
degraded riparian areas in the Granger Allotment.
Improve riparian area condition in Pine Creek
Basin, adjacent to the middle fork of Pine Creek,
and in Mill Creek Meadow.

## Wildlife and Fish

– Monitor potential conflicts between recreational
use, and livestock grazing. Identify opportunities
and execute management strategies which will elim-
inate or reduce these conflicts.

– Manage livestock distribution and utilization to
achieve riparian and fish habitat objectives.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 2  Wilderness Standard | | | | **70,385** |
| **Total** | | | | **70,385** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Cottonwood-Owl-Mill | C |
| Eagle Peak-Barber | C |
| Emerson | C |
| Granger | C |
| Mill Creek-Eagle Peak | C |

*Management Area Direction*

**This page intentionally left blank.**

## PATTERSON ● Management Area 36



# 36 - Patterson

## Warner Mountain Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 56,270 | | |
| Rangelands | | 25,452 | |
| Timberlands | | 30,818 | |
| < 20 cu. ft. per acre | | | 8,957 |
| > 20 cu. ft. per acre | | | 21,861 |
| Unsuitable for Timber Management | | 8,284 | |
| < 20 cu. ft. per acre | | | 3,865 |
| > 20 cu. ft. per acre | | | 4,419 |



**P**atterson Management Area is located south of Jess Valley and the Wilderness. With typically gentle topography, the elevation ranges from 5,000 to 8,000 feet.

The largest stands of lodgepole pine on the District grows near Hat Mountain. The stands have a history of mortality from mountain pine beetle infestations. Ponderosa pine, white fir, and aspen stands are also dispersed throughout the area. Primary timber producing areas have been cut or are currently under contract. This area includes timber compartments 336 and 338-348.

Range vegetation occupies more total acres than timber. Juniper and mountain mahogany are common invaders on rangelands at lower elevations. Encroachment by these species continue to reduce the forage potential. Bear Camp and Blue Lake Allotments are intensively managed, and demonstrate fair to good riparian conditions. Most of the rangelands are on the south and west facing slopes, while the shaded sites are timbered.

Blue Lake is the largest lake on the District; the associated campground receives the heaviest use. The site is managed for camping, boating, picnicking, fishing, hiking, summer homes, and a summer youth camp. This MA contains part of the Blue Lake National Recreation Trail. This area is, perhaps, the most popular deer hunting area on the Warner Mountains. Dispersed area camping is another popular recreation activity. The trailhead from Patterson Campground offers a popular entry to the Wilderness.

The Forest has identified goshawk habitat throughout the timbered portions of this MA. Higher elevations provide excellent summer range for mule deer. Prong-horn also frequent the area. Blue Lake supports one nesting pair of bald eagles. Anglers enjoy East Creek, Parsnip Creek, and Blue Lake for their high quality fishing.

Applications for oil and gas leases cover most of this MA; Bear Camp Flat is almost totally leased. All other applications have been withdrawn, or leases terminated. A low-head hydroelectric plant proposal is being studied on Parsnip Creek. Parsnip and East Creeks are the primary watersheds, both of which provide water for fisheries and downstream irrigation.

Access to the MA is provided by Modoc County Roads 42, 64, and 258, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Research the extensive prehistoric obsidian sites and evaluate for nomination to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use technical review teams to (1) recommend needed adjustments in permitted numbers or grazing seasons, and (2) develop grazing systems on all allotments.

**Soil**

– Conduct an SRI Order 2 on sensitive watersheds 052, 054, and 201, and sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) and the SCS soil survey (USDA SCS 1974) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

– On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

– Maintain fertilization plots and analyze white fir timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Timber**

– One compartment (336) within this management area has been set aside for evaluating uneven-aged management.

**Water and Riparian**

– Use watershed improvement funding to control gullying in Corporation Meadow, Bearcamp Flat, Homestead Flat, Skunk Cabbage Meadow, and in Alaska Canyon. Control streambank erosion along Parsnip Creek.

– Maintain the water quality of Blue Lake. Evaluate the potential of each project in the watershed to degrade the lake's water quality. Periodically monitor water quality to establish background data and detect changes.

– In watersheds 052, 054, and 201, minimize the cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity prior to its undertaking.

– When an estimated cumulative watershed threshold is approached, increase buffer and filter strip width, install erosion control structures, and rip and scarify disturbed areas as needed to minimize impacts to water quality and beneficial uses.

**Wildlife and Fish**

– Manage for 840 acres of old growth in the mixed conifer type and 165 acres in the eastside pine type.

– Manage for snags through natural recruitment except when project activities dictate otherwise.

– Implement fish habitat improvements in East, Parsnip and Skunk Cabbage Creeks and combine with watershed improvements where possible.

– Manage aspen habitat within timber sale areas.

*Management Area Direction*

| **Prescription Allocation** | | | | |
|---|---|---|---|---|
| **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1  Minimum Level | 3,646 | 3,459 | 61 | **7,166** |
| 4  Semi-Primitive Non-Motorized | 422 | | | **422** |
| 7  Visual Retention[1] | 5,356 | 2,187 | | **7,543** |
| 9  Raptor Management | 278 | 65 | 646 | **989** |
| 10  Rangeland | | | 21,572 | **21,572** |
| 11  Range-Forage | | | 2,782 | **2,782** |
| 12  Even-Aged Timber | 855 | | | **855** |
| 13  Timber-Visuals | 1,752 | | | **1,752** |
| 14  Timber-Forage | | | | **6,328** |
|    Partial Retention | 789 | | | |
|    Modification | 5,539 | | | |
| 15  Uneven-Aged Timber | 3,151 | | | **3,151** |
| 16  < 20 Cu Ft Timber | | 2,905 | | **2,905** |
| 17  Riparian Area | 73 | 341 | 391 | **805** |
| **Total** | **21,861** | **8,957** | **25,452** | **56,270** |

[1] Current developed recreation sites within these prescription areas contain nominal acreage (< 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Bearcamp | C |
| Blue Lake (cattle) | D |
| Blue Lake (sheep) | D |
| Coyote | C |
| North Creek | C |
| Parsnip Creek | C |
| Selic Canyon | C |
| West Valley | B |

*Management Area Direction*

## LONG BELL ● Management Area 41



*Management Area Direction*

# 41 - Long Bell
## Big Valley Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 64,270 | |
| Rangelands | 18,180 | |
| Timberlands | 46,090 | |
| < 20 cu. ft. per acre | | 30,292 |
| > 20 cu. ft. per acre | | 15,798 |
| Unsuitable for Timber Management | 6,620 | |
| < 20 cu. ft. per acre | | 2,269 |
| > 20 cu. ft. per acre | | 4,351 |



Long Bell Management Area is located in the northwest corner of the District, and borders the Shasta-Trinity National Forest. The area encompasses the Long Bell State Game Refuge and much private property. The terrain is primarily lava reefs.

Vegetation includes sagebrush, mountain mahogany, juniper, and pockets of commercial timber species. The predominant commercial species is ponderosa pine, with nominal amounts of incense-cedar, sugar pine, and white fir. Aspen grow at the base of lava reefs. Land near Round Mountain and within the Scarface Burn have productive manageable soils, which is uncharacteristic of this MA. Timber compartments 403 through 416 are located in the area.

Because water is scarce, range opportunities are limited. Most of the area provides suitable sheep range. Although forage is abundant, much of it grows beyond the reach of deer. While the area has a low potential for producing deer, it provides spring and summer mule deer range. Bald eagle and osprey occur in the Egg Lake area.

Deer hunting is the most popular recreation activity. Lava Camp Campground receives concentrated use only during the hunting season.

This area is partially leased for geothermal and oil and gas exploration. Applications for both commodities also cover portions of the area. Burlington-Northern railroad, the California-Oregon transmission powerline (COTP), a 500kv Pacific Power and Western Area Power Administration utility line, and Pacific Gas and Electric natural gas line cross the MA. Fire crews occupy the Long Bell Guard Station during fire season.

Access to the MA is provided by Modoc County Roads 91 and 95, and a developed system of National Forest roads.

## Standards and Guidelines

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Sensitive Plants

– Monitor and protect populations of *Calochortus longebarbatus longebarbatus* and *Mimulus pygmaeus.*

### Soil

– Conduct an SRI Order 2 on < 20 timberlands with SRI Order 3 soil units 174, 222, and 223. Reassess capability, suitability, and limitations for management.

– Maintain fertilization monitoring plots and analyze timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

– Restore soil productivity through fertilization or topsoil redistribution on problem acres near the Round Mountain-Snell Butte area.

### Special Uses

– Ensure that Forest activities do not significantly interfere with the use, operation, and maintenance of 500kv lines and natural gas lines in the area.

*Management Area Direction*                                    *4 - 173*

**Wildlife and Fish**

– Manage for 140 acres of old growth in the mixed co-nifer type and 660 acres in eastside pine type.

– Maintain browse production areas within the Scarface Burn, as identified in the Scarface Burn Rehabilitation EA.

– Apply the Timber/Forage Prescription in silvicul-tural treatments in current plantations on acres allo-cated to this prescription.

– Improve water distribution for deer and other wild-life through guzzler installation in timber sale areas

and installation of big game guzzlers southwest of Round Mountain.

– Develop a current bald eagle nest territory manage-ment plan and begin management of potential habi-tat.

– Identify and plan browse rejuvenation projects in Porcupine and Scarface Burns. Conduct 600 to 1200 acres of habitat improvement through pre-scribed burning.

– Inventory and protect goshawk nest territories nec-essary to meet target population levels.

| Prescription Allocation | | | | | |
|---|---|---|---|---|---|
| | **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 4,239 | | 560 | **4,799** |
| 4 | Semi-Primitive Non-Motorized | | 1,839 | | **1,839** |
| 9 | Raptor Management | 112 | 430 | 289 | **831** |
| 10 | Rangeland | | | 14,113 | **14,113** |
| 11 | Range-Forage | | | 3,218 | **3,218** |
| 12 | Even-Aged Timber[1] | 9,447 | | | **9,447** |
| 13 | Timber-Visuals | 2,000 | | | **2,000** |
| 16 | < 20 Cu Ft Timber | | 28,023 | | **28,023** |
| | **Total** | **15,798** | **30,292** | **18,180** | **64,270** |

[1] Current developed recreation sites contain nominal acreage ( < 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

*Management Area Direction*

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Egg Lake | D |
| Happy Camp | C |
| Refuge 1-N | C |
| Round Mountain | C |
| White Horse | B |

## STONE COAL ● Management Area 42



# 42 - Stone Coal

## Big Valley Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 35,986 | |
| Rangelands | 19,241 | |
| Timberlands | 16,745 | |
| < 20 cu. ft. per acre | | 4,4860 |
| > 20 cu. ft. per acre | | 11,885 |
| Unsuitable for Timber Management | 4,361 | |
| < 20 cu. ft. per acre | | 1,334 |
| > 20 cu. ft. per acre | | 3,027 |



Stone Coal Management Area lies north of the Big Valley Federal Sustained-Yield Unit. It is bordered by the Devil's Garden Ranger District to the north, and the Pit River on the south. Rucker Hill and Armentrout Flat are prominant geographical features. Highway 299 traverses the eastern side of the MA.

Much of the MA is characterized by foothills and moderate slopes. Juniper and grass dominate the lower elevations, grading into ponderosa pine and incense-cedar, and culminating in higher elevation fir. Timber compartments 401, 402, 417, 418, 419, 424, and 425 are included in the area. Most suitable timber sites have been reforested.

Open timbered stands intermingled with grass and brush provide primarily transitory cattle range. Forage production for deer and sheep has increased dramatically since the 1979 2500-acre Happy Fire.

Dispersed recreation opportunities are available in this MA, the most popular being hunting. While the Pit River provides limited fishing opportunities, access is restricted by private ownership. There are no developed recreation sites.

The MA provides moderate summer range and important winter range for mule deer. Bald eagle, golden eagle, and osprey nesting sites are found adjacent to the Pit River and other native wetlands.

Although most of the MA is under lease for oil and gas, potential for development is low. Most of the water originating in this area drains directly into the Pit River, the most significant local water source.

Access to the MA is provided by State Highway 299, Modoc County Roads 85 and 91, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Lassen Emigrant Trail and nominate to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing systems in the Management Area.

### Sensitive Plants

– Monitor and protect populations of *Calochortus longebarbatus longebarbatus* at Crank Springs and in other suitable habitats.

### Soils

– Conduct an SRI Order 2 on sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) (see FEIS bibliography). Develop site-specific management practices for soil-disturbing activities during the project planning phase.

– On sensitive soil areas, allow OHV use only on established roads and trails. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails when necessary to protect the soil resource and maintain water quality.

**Wildlife and Fish**

– Provide for 590 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on snag surveys.

– Develop a current bald eagle nest territory management plan and begin management of potential habitat.

– Design browse manipulation projects in the Happy Burn for implementation during the 2nd decade.

– Inventory and protect active goshawk nest territories necessary to meet target population levels.

| Prescription Allocation | | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| | **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 935 | 338 | 1,578 | **2,851** |
| 4 | Semi-Primitive Non-Motorized | 228 | | | **228** |
| 7 | Visual Retention | 234 | 54 | | **288** |
| 9 | Raptor Management | 1,717 | 952 | 1,860 | **4,529** |
| 10 | Rangeland | | | 7,834 | **7,834** |
| 11 | Range-Forage | | | 7,922 | **7,922** |
| 12 | Even-Aged Timber | 5,172 | | | **5,172** |
| 13 | Timber-Visuals | 3,452 | | | **3,452** |
| 16 | < 20 Cu Ft Timber | | 3,472 | | **3,472** |
| 17 | Riparian Area | 147 | 44 | 47 | **238** |
| | **Total** | **11,885** | **4,860** | **19,241** | **35,986** |

**Range Allotment Strategies**

| Allotment | Strategy |
|---|---|
| Crites | B |
| Crank Springs | D |
| Gerig | B |
| Stone Coal | C |
| Splawn Mountain | B |
| Shawville | C |

## PORTUGUESE RIDGE ● Management Area 43



# 43 - Portuguese Ridge

**Big Valley Ranger District**

| Acreage | | |
|---|---|---|
| National Forest | 29,562 | |
| Rangelands | | 19,043 |
| Timberlands | | 10,519 |
| < 20 cu. ft. per acre | | 3,309 |
| > 20 cu. ft. per acre | | 7,210 |
| Unsuitable for Timber Management | 1,771 | |
| < 20 cu. ft. per acre | | 409 |
| > 20 cu. ft. per acre | | 1,362 |



Portuguese Ridge Management Area extends south of Canby along Portuguese Ridge to Likely Mountain. The outstanding features of this area are the large parcels of private land (California Pines Recreational Estates) which isolate the Ridge from the rest of the District.

The Likely Mountain area grows predominantly juniper and grasses. Most of the timberland, consisting primarily of ponderosa pine, lies in the Portuguese Ridge area with white fir at higher elevations. Although the MA has several good timber sites, steep terrain, poor access, and lack of rights-of-way in the Ridge area render timber management costly and difficult. The area includes timber compartments 436-440 and 445-448.

Grazing is the major activity for this entire area, which also provides important winter range for mule deer. Other wildlife include osprey at White Reservoir and golden eagles throughout the MA.

Hunting is the most popular dispersed recreation form. The potential for developed recreation in this MA is extremely low because sites are generally of poor quality.

Virtually the entire area is leased for oil and gas, but no exploration or development has taken place. Potential for geothermal resources exists at the extreme northern edge of the MA.

The land is droughty with shallow, porous soils and low surface water. The water from this low-value watershed is used for irrigation.

Likely Mountain is an important electronic site providing microwave communications services to the Al-turas area under special use permits. The California Department of Forestry also maintains a fire lookout during summer months on Likely Mountain.

Access to the MA is provided by Modoc County Roads 71, 77 and 175, and a developed system of National Forest roads.

## Standards and Guidelines

**Fire and Fuels**

– Suppress all wildfires using the appropriate suppression response.

**Range**

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing systems in the Management Area.

**Soil**

– Conduct an SRI Order 2 on sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) (see FEIS bibliography). Develop site-specific management practices for soil-disturbing activities during the project planning phase.

– On sensitive soil areas, allow OHV use only on established roads and trails. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails when necessary to protect the soil resource and maintain water quality.

– Analyze white fir timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Water and Riparian**

– Use watershed improvement funding to correct gullying in Sears Flat, and to correct streambank erosion in Canyon Creek.

**Wildlife and Fish**

– Manage for 170 acres of old growth in mixed conifer and 195 acres in eastside pine.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on snag surveys.

– Maintain Portuguese Ridge as deer winter range.

– Inventory and protect active goshawk nest territories necessary to meet target population levels.

| Prescription Allocation | | | | | |
|---|---|---|---|---|---|
| | **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 938 | | 20 | **958** |
| 4 | Semi-Primitive Non-Motorized | | 392 | | **392** |
| 7 | Visual Retention | 22 | | | **22** |
| 9 | Raptor Management | 424 | 17 | 314 | **755** |
| 10 | Rangeland | | | 7,667 | **7,667** |
| 11 | Range-Forage | | | 11,042 | **11,042** |
| 12 | Even-Aged Timber | 4,680 | | | **4,680** |
| 13 | Timber-Visuals | 1,146 | | | **1,146** |
| 16 | < 20 Cu Ft Timber | | 2,900 | | **2,900** |
| | **Total** | **7,210** | **3,309** | **19,043** | **29,562** |

*Management Area Direction*

## Range Allotment Strategies

| Allotment | Strategy |
|-----------|----------|
| Ballard Ridge | B |
| Centerville | B |
| Delta Lake | C |
| Rocky Prairie | B |

# NORTH ADIN ● Management Area 44



# 44 - North Adin
## Big Valley Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 88,640 | |
|    Rangelands | 28,958 | |
|    Timberlands | 59,682 | |
|       < 20 cu. ft. per acre | | 16,301 |
|       > 20 cu. ft. per acre | | 43,381 |
| Unsuitable for Timber Management | 11,673 | |
|       < 20 cu. ft. per acre | | 5,996 |
|       > 20 cu. ft. per acre | | 5,677 |



North Adin Management Area provides most of the timber for the Big Valley Federal Sustained-Yield Unit. The MA wraps around the northern part of Adin, extending from Rattlesnake Butte on the west to Stone Coal Valley on the north, and from Manzanita Ridge on the east to Ash Creek on the south. Highway 299 crosses the area. Topography varies from steep, forested slopes to flat, open meadows.

Most of the Sustained-Yield Unit's volume is contained in this MA. Timber species include ponderosa pine and white fir, with moderate amount of incense-cedar. California black oak grows at lower elevations. Timber compartments contained in the area are 420-423, 426-428, 432-435, 441-444, 456, and 464. It is an important grazing area as well.

This MA supports wildlife habitat for several species of birds and large mammals. The Modoc sucker, federally listed as an endangered species, inhabits Dutch, Rush, and Johnson Creeks. This area produces most of the goshawks found on the District. Golden and bald eagles, in addition to osprey, inhabit areas along the Pit River and Ash Creek.

The most popular form of dispersed recreation is deer hunting.

Although oil and gas leases cover the MA, there has been no activity. The Winters Mining District, in the Adin Pass area, was active from about 1890 to the 1920's. In 1982, an enterprise received a mining patent which has been validated by suitable quantities of gold and silver.

Rush and Ash Creeks are important watersheds for trout fisheries and downstream irrigation. Most of the MA drains into Ash Creek and subsequently into the Pit River. The area has an abundant snowpack for water production.

Access to the MA is provided by State Highway 299, Modoc County Roads 85, 88, and 198, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Lassen Emigrant Trail and nominate to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing systems in the Management Area.

### Sensitive Plants

– Monitor and protect populations of *Calochortus longebarbatus longebarbatus* at Higgins Flat and in other suitable habitats.

- Monitor and protect populations of *Eriogonum prociduum* near Knox Flat and in other suitable habitats.

**Soil**

- Conduct an SRI Order 2 on sensitive watersheds 071, 072, and 073, and sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) (see FEIS bibliography). Develop site specific management practices for soil disturbing activities.

- On sensitive watersheds and other sensitive areas, limit OHV to established roads and trails, as needed. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails, when necessary, to protect the soil resource and maintain water quality.

- Maintain fertilization monitoring plots and analyze white fir timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Timber**

- One compartment (427) within this management area has been set aside for evaluating uneven-aged management.

**Water and Riparian**

- Use watershed improvement funding to correct gullying in Roney Flat, Higgens Flat, Swaggert Flat, and Pothole Springs. Correct streambank erosion and headcutting along Rush Creek, Johnson Creek, Messenger Gulch, and Dutch Flat Creek. Obliterate the Plum Springs and Harper Springs Roads.

- Maintain the watershed improvement structures in Roney and Higgens Flats.

- In watersheds 071, 072, and 073, minimize the cumulative watershed impacts on stream channel condition and water quality by assessing the effects of each land-disturbing activity prior to its undertaking.

- When an estimated cumulative watershed threshold is approached, increase buffer and filter strip width, install erosion control structures, and rip and scarify disturbed areas as needed to minimize impacts to water quality and beneficial uses.

- Use range structural improvement funds to restore degraded riparian areas in the Rush Creek and Round Valley Allotments.

**Wildlife and Fish**

- Designate 1325 acres of old growth in mixed conifer and 850 acres in eastside pine.

- Increase snag densities through use of snag management techniques. Base actual recruitment needs on snag surveys.

- Fence and improve springs and seeps for nongame species.

- Maintain or improve oak densities through timber sales.

- Improve Modoc sucker habitat in Rush, Johnson, and Dutch Flat creeks. Improve trout habitat in upper Rush Creek and Ash Creek.

- Identify opportunities for blue grouse improvements in timber sale planning.

- Implement habitat needs for pileated woodpecker.

- Inventory and protect active goshawk nest territories necessary to meet population targets.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1  Minimum Level | 3,853 | 5,156 | 204 | **9,213** |
| 4  Semi-Primitive Non-Motorized | 1,150 | | | **1,150** |
| 7  Visual Retention | 337 | 506 | | **843** |
| 9  Raptor Management | 404 | 757 | 200 | **1,361** |
| 10  Rangeland | | | 28,522 | **28,522** |
| 12  Even-Aged Timber | 20,843 | | | **20,843** |
| 13  Timber-Visuals | 12,490 | | | **12,490** |
| 15  Uneven-Aged Timber | 4,034 | | | **4,034** |
| 16  < 20 Cu Ft Timber | | 9,799 | | **9,799** |
| 17  Riparian Area | 270 | 83 | 32 | **385** |
| **Total** | **43,381** | **16,301** | **28,958** | **88,640** |

## Range Allotment Strategies

| **Allotment** | **Strategy** |
|---|---|
| Ash Valley | B |
| Barber Canyon | B |
| Barrows | B |
| Johnson Creek | B |
| Rush Creek | C |
| Round Valley | C |

## SOUTH ADIN ● Management Area 45



# 45 - South Adin

## Big Valley Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 90,226 | |
| Rangelands | 39,158 | |
| Timberlands | 51,068 | |
| < 20 cu. ft. per acre | | 20,269 |
| > 20 cu. ft. per acre | | 30,799 |
| Unsuitable for Timber Management | 7,692 | |
| < 20 cu. ft. per acre | | 2,130 |
| > 20 cu. ft. per acre | | 5,562 |



Forest land in South Adin Management Area is interspersed with parcels of private land. Ash Creek forms the northern border, with the balance of the MA extending southwest to Dixie Valley. Outstanding landmarks include Hayden Hill, the Gerig Burn area, Willow Creek, and Hunsinger Flat. Highway 139 crosses the area.

Pure pine with juniper is the predominant vegetation type. California black oak grows on some valley-facing slopes. The area, all of which is contained within the Big Valley Federal Sustained-Yield Unit, produces large volumes of ponderosa pine. It includes timber compartments 429-431, 449-455, and 457-463.

Heavy forage production and range use are characteristic of this MA. Pronghorn use the area as summer and winter range, depending on forage availability. This is also mule deer summer range, with winter range use concentrated along the perimeters. Golden eagles inhabit lands where timber opens into valley-facing slopes. The Hayden Hill State Game Refuge is contained in this area.

Nearly all the water from this area is used for off-site irrigation and on-site stock watering. The Forest has developed numerous reservoirs and ponds for a variety of wildlife and range uses. South Adin MA is a low-value watershed because surface flows are minimal.

Willow Creek picnic site and campground provide a roadside recreation opportunity for many travelers along Highway 139. Willow Creek within the Forest is a low-quality fishery for trout. Deer hunting is the primary dispersed use for the rest of the area.

The Hayden Hill mining district lies in the southern portion of this MA. It was an historical gold mining community (1869-1920), and further exploration and development is planned.

Access to the MA is provided by State Highway 139, Modoc County Road 527, Lassen County Roads 510, 512, 513, 527, and 534, and a developed system of National Forest roads.

## Standards and Guidelines

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing systems in the Management Area.

### Sensitive Plants

– Monitor and protect populations of *Ivesia paniculata* near Willow Creek Campground and in other suitable habitats.

### Water and Riparian

– Use watershed improvement funding to correct streambank erosion in Willow Creek.

– Use range structural improvement funds to restore degraded riparian areas in the Willow Creek and East Bieber Allotments.

**Wildlife and Fish**

– Provide for 1535 acres of old growth in eastside pine.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on snag surveys.

– Plan and implement habitat improvements, barriers and other actions necessary for reintroduction of Modoc suckers into Willow Creek.

– Inventory and protect active goshawk nest territories necessary to meet population targets.

| Prescription Allocation | | | | | |
|---|---|---|---|---|---|
| | **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 4,445 | | 1,910 | **6,355** |
| 4 | Semi-Primitive Non-Motorized | | 1,042 | | **1,042** |
| 7 | Visual Retention[1] | 313 | 476 | | **789** |
| 9 | Raptor Management | 958 | 999 | 1,278 | **3,235** |
| 10 | Rangeland | | | 35,917 | **35,917** |
| 12 | Even-Aged Timber | 19,431 | | | **19,431** |
| 13 | Timber-Visuals | 5,493 | | | **5,493** |
| 16 | < 20 Cu Ft Timber | | 17,663 | | **17,663** |
| 17 | Riparian Area | 159 | 89 | 53 | **301** |
| | **Total** | **30,799** | **20,269** | **39,158** | **90,226** |

[1] Current developed recreation sites contain nominal acreage (< 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

**Range Allotment Strategies**

| Allotment | Strategy |
|-----------|----------|
| East Bieber | D |
| Oxendine | B |
| Spring Hill | B |
| West Bieber | D |
| Willow Creek | B |

# DEVIL'S GARDEN ● Management Area 51 North



*Management Area Direction*

## DEVIL'S GARDEN ● Management Area 51 South



# 51 - Devil's Garden

## Devil's Garden Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 348,830 | |
| Rangelands | 334,870 | |
| Timberlands | 13,960 | |
| < 20 cu. ft. per acre | | 7,148 |
| > 20 cu. ft. per acre | | 6,812 |
| Unsuitable for Timber Management | 2,733 | |
| < 20 cu. ft. per acre | | 1,039 |
| > 20 cu. ft. per acre | | 1,694 |



Devil's Garden Management Area is the largest MA on the District. It extends from Goose Lake on the northeast to the pine timber belt on the west, and from Fletcher Creek on the north to the Forest boundary above Canby. Prominant landmarks include the Devil's Garden Research Natural Area, Big Sage Reservoir, and the Blue Mountain Lookout. Bonneville Power Administration constructed a new (1985) 230kv power transmission line from Malin, Oregon, to Alturas, California, which crosses the southern portion of the MA, paralleling its boundary.

The primary vegetation of this flat, rocky terrain is juniper woodlands interspersed with sage and grass flats. Local woodcutters remove large volumes of juniper for firewood. Isolated patches of ponderosa pine and mixed conifer grow on Blue Mountain and Timbered Mountain and provide commercial timber sales. This MA includes timber compartments 512, 513, 517, and 518.

Because it produces large amounts of forage, the area is used heavily for grazing cattle. The area also contains fall and winter range important for the Interstate deer herd. Pronghorn use the range in summer and fall. Half the Forest's wild horse herd roams the MA. Waterfowl nest on the reservoirs and wetlands, Triangle Ranch being the focal development.

Water originating in the MA flows into the Klamath and Pit River drainages. Fishing in reservoirs, deer hunting and woodcutting are the main recreation activities. Primitive campgrounds are located at Big Sage Reservoir and Reservoir C. The Lost River and shortnose suckers,

federally listed as endangered species, inhabit the Fletcher Creek system.

Geothermal potential exists along the southern and eastern edges of the Devil's Garden plateau. A few oil and gas leases have been filed for the area along the Forest boundary in the MA, but no activity has taken place.

Access to the MA is provided by State Highways 139, 299, and 395, Modoc County Roads 48, 53, 55, 73, 181, and 180, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Nominate the Fairchild Swamp Rock Art Site to the National Register of Historic Places. Conduct non-project related cultural resource inventories to locate, record, and evaluate other rock art sites, as opportunities arise.

– Complete inventory of the Applegate Emigrant Trail and nominate to the National Register of Historic Places.

### Fire and Fuels

– Manage fire within the guidelines of the Big Sage Fire Management Unit Plan.

– In areas outside the Big Sage Fire Management Unit, suppress wildfires using the appropriate suppression response.

**Range**
– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing system in the Management Area.

**Research Natural Area**
– Devils Garden Natural Research Area is found in this management area. Forest activities should not alter the scenic and scientific value of this resource.

**Sensitive Plants**
– Monitor and protect populations of *Polygonum polygaloides esotericum* at Rimrock Valley Reservoir and in other suitable habitats.

– Monitor and protect populations of *Antennaria flaggelaris* in low sagebrush flats.

**Soil**
– Conduct an Order 2 SRI on Timbered Mountain to more accurately assess the capability, suitability, and limitations for management.

**Water and Riparian**
– Use watershed improvement funding to correct gullying in Howard's Gulch.

– Maintain watershed improvement structures in Howard's Gulch.

– Use range structural improvement funds to restore degraded riparian areas in the Timbered Mountain Allotment.

**Wildlife and Fish**
– Maintain 340 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Implement sage grouse improvement projects based on needs identified through research.

– Improve up to 1000 acres of largemouth bass habitat in selected reservoirs. Work with California Department of Fish and Game to improve forage and harvest species mix.

– Manage seeps and springs to improve nongame species habitat.

– Complete wetlands developments in Fairchild Swamp, Boles Meadows and other selected wetlands and maintain existing developments to project standards in accordance with State cooperative agreements. Implement wetland improvements for water birds, sandhill cranes, and other nongame species.

– Develop management plans for the bald eagle nesting territory, and begin management of potential habitat.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1   Minimum Level | 876 | | 433 | **1,309** |
| 4   Semi-Primitive Non-Motorized | | 90 | | **90** |
| 7   Visual Retention | | 187 | | **187** |
| 8   Special Areas | | | 800 | **800** |
| 9   Raptor Management | 818 | 915 | 9,959 | **11,692** |
| 10   Rangeland | | | 310,675 | **310,675** |
| 11   Range-Forage | | | 12,423 | **12,423** |
| 12   Even-Aged Timber | 5,118 | | | **5,118** |
| 16   < 20 Cu Ft Timber | | 5,922 | | **5,922** |
| 17   Riparian Area | | 34 | 580 | **614** |
| **Total** | **6,812** | **7,148** | **334,870** | **348,830** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Big Sage | C |
| Emigrant Springs | C |
| 139 | C |
| Pine Springs | C |
| Surveyor's Valley | C |
| Timbered Mountain | C |
| Triangle | D |
| Willow Creek Ranch | C |

*Management Area Direction*

**This page intentionally left blank.**

## CROWDER ● Management Area 52



# 52 - Crowder

## Devil's Garden Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 62,007 | |
| Rangelands | | 24,695 |
| Timberlands | | 37,420 |
| < 20 cu. ft. per acre | | 8,517 |
| > 20 cu. ft. per acre | | 28,903 |
| Unsuitable for Timber Management | 4,811 | |
| < 20 cu. ft. per acre | | 1,316 |
| > 20 cu. ft. per acre | | 3,495 |



Crowder Management Area is adjacent to the Oregon border in the northeastern portion of the District. Much of the MA is privately owned. Crowder Flat Guard Station is a prominent landmark of the area.

Important for commercial timber, the area grows ponderosa pine with some mixed conifer on wetter sites. Old-growth timber is particularly valuable and is currently being harvested. This MA encompasses timber compartments 501-507, 509-511, 514, and 516.

The timbered sites on this relatively flat terrain are intermingled with many meadows. The range produces forage of high quality for cattle grazing, as well as good spring and summer range for deer and pronghorn, and fall range for the Interstate deer herd. An active bald eagle nest is located at Wildhorse Reservoir. Wetlands provide nesting and rearing habitat for waterfowl.

In addition to wetlands, several irrigation reservoirs dot the landscape. The area is within Goose Lake and Klamath River watersheds.

Although the MA has no developed recreation sites, deer hunting, fishing and camping are popular dispersed activities.

The Lost River and shortnose suckers, federally listed as endangered species, inhabit the Willow Creek system.

Access to the MA is provided by Modoc County Roads 48, 73, and 181, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Applegate Emigrant Trail and nominate to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Water and Riparian

– Maintain watershed improvement structures in Stateline Meadow and in Wildhorse Creek.

– Implement range structural improvements and grazing strategies to improve riparian vegetation and water quality along Willow Creek.

### Wildlife and Fish

– Manage for 115 acres of old growth in the mixed conifer type and 1320 acres in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Continue to improve trout and warmwater fisheries through fencing and instream improvements. Improve habitat for largemouth bass in selected reservoirs and work with California Department of Fish and Game to improve forage and harvest species mixes.

– Develop a bald eagle nest territory management plan and begin managing potential habitat.

## Prescription Allocation

| | Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| 1 | Minimum Level | 1,346 | | 157 | **1,503** |
| 9 | Raptor Management | 1,946 | 1,224 | 3,430 | **6,600** |
| 10 | Rangeland | | | 20,863 | **20,863** |
| 12 | Even-Aged Timber | 23,823 | | | **23,823** |
| 13 | Timber-Visuals | 1,585 | | | **1,585** |
| 16 | < 20 Cu Ft Timber | | 7,201 | | **7,201** |
| 17 | Riparian Area | 203 | 92 | 245 | **540** |
| | **Total** | **28,903** | **8,517** | **24,695** | **62,115** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Beaver Dam | C |
| Blue Mountain | D |
| East Grizzlie | C |
| West Grizzlie | C |

*Management Area Direction*

**This page intentionally left blank.**

## HACKAMORE ● Management Area 53



*Management Area Direction*

# 53 - Hackamore

## Devil's Garden Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 91,720 | |
|    Rangelands | 20,455 | |
|    Timberlands | 71,265 | |
|      < 20 cu. ft. per acre | | 7,240 |
|      > 20 cu. ft. per acre | | 64,025 |
| Unsuitable for Timber Management | 4,401 | |
|      < 20 cu. ft. per acre | | 40 |
|      > 20 cu. ft. per acre | | 4,361 |



Hackamore Management Area is located on the west side of the District. Its flat, timbered terrain is bordered on the south by Highway 139. The Southern Pacific Railroad passes through the MA. Bonneville Power Administration constructed a new (1985) 230kv power transmission line from Malin, Oregon, to Alturas, California, which parallels the western and southern boundaries of the MA.

The primary vegetation of the land is ponderosa pine and juniper with a shrub understory. Mixed conifer stands grow on wetter sites. An important timber producer, the area is forested with a large volume of old-growth pine. Most of the District's remaining old-growth timber lies within this MA in which the majority of future timber sales are concentrated. The MA encompasses timber compartments 519-537.

Many low sage flats and several productive wetlands are scattered throughout the area. The range produces high value forage for domestic livestock as well as wildlife. Excellent bitterbrush understory is used by sheep and provides fall range for the entire Interstate deer herd. Pronghorn use open areas and wetlands which also provide nesting and rearing habitat for waterfowl. The area supports an active bald eagle nest, and potential for others exists.

The MA lies in the Pit and Klamath River watersheds. The irrigation reservoirs are productive fisheries.

Although the area contains no developed recreation sites, deer hunting, fishing, and woodcutting are popular activities.

Approximately one-third of the MA is covered by oil and gas leases, but no activity has taken place.

Access to the MA is provided by State Highway 139 and a developed system of National Forest roads.

## Standards and Guidelines

**Fire and Fuels**
- Suppress all wildfires using the appropriate suppression response.

**Sensitive Plants**
- Monitor and protect populations of *Calochortus longebarbatus longebarbatus* near Sevenmile Flat and in other suitable meadow habitats.

**Soil**
- Restore soil productivity through fertilization or topsoil redistribution on problem areas near the Mears burn.

- Develop site specific management practices on timber plantation sites and monitor for effectiveness.

- Maintain fertilization monitoring plots and analyze for effectiveness.

**Timber**
- One compartment (532) within this management area has been set aside for evaluating uneven-aged management.

*Management Area Direction*

**Wildlife and Fish**

– Designate 3200 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Conduct studies on bitterbrush and timber regeneration practices to monitor effectivness of Timber-Forage Prescription.

| Prescription Allocation | | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| **Prescription** | | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 4,347 | | 82 | **4,429** |
| 7 | Visual Retention | 78 | | | **78** |
| 9 | Raptor Management | 14 | 40 | 254 | **308** |
| 10 | Rangeland | | | 20,119 | **20,119** |
| 14 | Timber-Forage | | | | **55,981** |
| | Partial Retention | 31,489 | | | |
| | Modification | 24,492 | | | |
| 15 | Uneven-Aged Timber | 3,605 | | | **3,605** |
| 16 | < 20 Cu Ft Timber | | 7,200 | | **7,200** |
| | **Total** | **64,025** | **7,240** | **20,455** | **91,720** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Howard's Gulch | C |
| Mowitz | C |

**This page intentionally left blank.**

## HAPPY CAMP ● Management Area 54



# 54 - Happy Camp
## Devil's Garden Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 41,280 | |
| Rangelands | 17,513 | |
| Timberlands | 23,767 | |
| < 20 cu. ft. per acre | | 5,725 |
| > 20 cu. ft. per acre | | 18,042 |
| Unsuitable for Timber Management | 2,516 | |
| < 20 cu. ft. per acre | | 1,248 |
| > 20 cu. ft. per acre | | 1,268 |



Happy Camp Management Area is located south and west of Highway 139 to the District boundary with a terrain that consists of plateaus and mountains. Happy Camp Mountain the most prominent land feature upon which are a fire lookout and an electronic site.

Vegetation is a mixture of pine stands with a shrub understory and low sage flats on the plateau. On the mountains, black oak, aspen and mixed conifer stands grow with a shrub understory and scattered brushfields. This MA is the best timber producer on the District. Most of the stands have been or are scheduled to be harvested. Located within the area are timber compartments 538-546.

The high quality forage produced in this MA is important for cattle as well as deer and pronghorn. Part of Happy Camp MA provides important fall and winter range for the Adin deer herd.

Other wildlife depend on the streams, reservoirs, and wetlands of this MA which are within the Pit River watershed. The Modoc sucker, a federally listed endangered species, inhabits Washington, Turner, and Hulbert Creeks. A bald eagle nesting territory is located at Beeler Reservoir; and wetlands are important waterfowl producers.

The major recreation activities in this MA are deer hunting and woodcutting. In addition, developed campgrounds are located at Howard's Gulch and Cottonwood Flat.

Approximately one-half of the MA is covered by oil and gas leases, but no activity has taken place.

Access to the MA is provided by State Highways 139 and 299, Modoc County Roads 84 and 91, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources
– Complete inventory of the Lassen Emigrant Trail and nominate to the National Register of Historic Places.

### Fire and Fuels
– Suppress all wildfires using the appropriate suppression response.

### Range
– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons and (2) to develop grazing systems in the management area.

### Sensitive Plants
– Monitor and protect populations of *Calochortus longebarbatus longebarbatus* near Craig Springs and in other suitable habitats.

– Monitor and protect populations of *Antennaria flagellaris*.

### Soil
– Maintain fertilization monitoring plots and analyze white fir timber stands for possible fertilization pro-

jects to improve the nutrient balance and tree growth rates.

**Water and Riparian**

– Use watershed improvement funding to correct streambank erosion in Hulbert Creek, Washington Creek, and Turner Creek.

– Maintain watershed improvement structures in Washington Creek.

– Use range structural improvement funds to restore degraded riparian areas in the Happy Camp and Pit River Allotments.

**Wildlife and Fish**

– Provide for 210 acres of old growth in the mixed conifer type and 695 acres in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Improve seep and spring areas for nongame wildlife species.

– Manage habitat for pileated woodpecker requirements.

– Improve habitat for blue grouse in the Happy Camp area.

– Develop browse improvement plans for old burn areas near Happy Camp.

– Develop a bald eagle nest territory management plan, and begin managing potential habitat.

– Enhance Modoc sucker habitat with instream and range structural improvements in Hulbert, Washington, and Turner Creeks, and their significant tributaries.

## Prescription Allocation

| | Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| 1 | Minimum Level | 453 | 499 | | **952** |
| 4 | Semi-Primitive Non-Motorized | 484 | 251 | | **735** |
| 7 | Visual Retention | 159 | 89 | | **248** |
| 9 | Raptor Management | 152 | 448 | 2,056 | **2,656** |
| 10 | Rangeland | | | 15,411 | **15,411** |
| 12 | Even-Aged Timber | 6,424 | | | **6,424** |
| 13 | Timber-Visuals[1] | 1,073 | | | **1,073** |
| 14 | Timber-Forage[1] | | | | **9,118** |
| | Partial Retention | 3,702 | | | |
| | Modification | 5,416 | | | |
| 16 | < 20 Cu Ft Timber | | 4,388 | | **4,388** |
| 17 | Riparian Area | 179 | 50 | 46 | **275** |
| | **Total** | **18,042** | **5,725** | **17,513** | **41,280** |

[1]Current developed recreation sites within these prescription areas contain nominal acreage (<10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## Range Allotment Strategies

| Allotment | Strategy |
|-----------|----------|
| Happy Camp | C |
| Pit River | B |

## MEDICINE LAKE  ● Management Area 61



# 61 - Medicine Lake
## Doublehead Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 26,549 | |
| Rangelands | 2,674 | |
| Timberlands | 23,875 | |
| < 20 cu. ft. per acre | | 59 |
| > 20 cu. ft. per acre | | 23,816 |
| Unsuitable for Timber Management | 7,730 | |
| < 20 cu. ft. per acre | | 59 |
| > 20 cu. ft. per acre | | 7,671 |



Medicine Lake Management Area borders the Klamath National Forest on the west, and consists of the summit and upper slopes of the Medicine Lake Highlands. The terrain is rocky with forested acres interrupted by volcanic flows. Elevations range from 6,200 feet at Medicine Lake to 8,000 feet at Mt. Hoffman. The Caldera, Mt. Hoffman, Little Mt. Hoffman, Lyons Peak, and Red Shale Butte are the dominant features of the area. A fire guard station is located at Medicine Lake.

The area is forested with dense stands of red fir, white fir, and lodgepole pine on better soils, small amounts of mountain hemlock, and sparse tree cover on volcanic soils. Most of the timber-producing areas have been entered for salvage or sanitation cutting. Only small areas have been thinned or cut for regeneration. Included in this area are timber compartments 609-611 and 614-616.

Lack of understory, scarce flowing water, and porous soils which inhibit forage production render domestic grazing virtually impossible. Mature timber stands provide habitat for goshawks and marten. Bald eagle habitat is located near Medicine Lake and Modoc Lake. Other major lakes such as Bullseye and Little Medicine are also stocked with rainbow and brook trout.

Most streams except Paynes Creek are intermittent, only flowing after snowmelt and as intense storm runoff. Medicine Lake is the largest lake on the District and the most popular recreation area. A paved road allows easy access into the area. Hemlock, Headquarters, A.H. Houge, and Medicine Campgrounds associated with the lake receive moderate to heavy use in late summer and early fall. Medicine Lake also features a concrete boat ramp with courtesy docks and paved parking, a developed swimming beach with paved parking and picnicking, day use and picnicking at Little Medicine Lake, and group camping at Schonchin Spring. In addition to camping, the developed lake area is used for boating, fishing, picnicking, water skiing, and swimming. Several summer homes ring the lake. Paynes Spring, Bullseye Lake and Blanch Lake are also popular developed sites. Dispersed recreation activities include camping, pleasure riding, fishing, and hunting, popular throughout summer and fall. Winter sports activities are currently under development.

All of the MA is within the Glass Mountain KGRA, and is almost covered by geothermal leases. Several temperature gradient holes and one deep exploratory well have been drilled, but no development of the resource has taken place.

An area of recent volcanic activity, Medicine Lake Glass Flow has been designated a Geologic Special Interest Area. Obsidian (volcanic glass) was quarried by prehistoric Indians from various tribes in northern California.

Access to the MA is provided by Modoc County Road 97, and a developed system of National Forest roads.

## Standards and Guidelines

**Cultural Resources**

– Research the prehistoric obsidian sites located in the management area and nominate to the National Register of Historic Places.

**Fire and Fuels**

– Suppress all wildfires using the appropriate suppression response.

**Minerals**

– Other management activities should not preclude geothermal development.

**Sensitive Plants**

– Monitor and protect populations of *Collomia debilis larsenii* on the talus slopes of Little Mt. Hoffman and in other suitable habitats.

**Recreation**

– Feature outdoor recreation use in the Medicine Lake caldera.

**Soil**

– Conduct an SRI Order 2 on sensitive soil areas identified in the Modoc SRI Order 3 (Luckow 1984) (see FEIS bibliography). Develop site-specific management practices for soil-disturbing activities during the project planning phase.

– On sensitive soil areas, allow OHV use only on established roads and trails. Rehabilitate areas causing watershed degradation. Restrict use or obliterate roads and trails when necessary to protect the soil resource and maintain water quality.

– Analyze timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

**Special Interest Areas**

– Medicine Lake Glass Flow Geologic Special Interest Area is located within this management area. Forest activities should not alter the scenic and scientific value of this resource. This direction is applied by the Klamath National Forest on their share of the Flow. Recommend this SIA for nomination as an NNL.

**Timber**

– One compartment (610) within this management area has been set aside for evaluating uneven-aged management.

**Water and Riparian**

– Maintain the water quality of Medicine Lake. Evaluate the potential of each project in the watershed to degrade the lake's water quality. Periodically monitor water quality to establish gackground data and detect changes.

**Wildlife and Fish**

– Manage four territories for pine marten. Also manage down logs, snags and riparian areas for marten habitat. Maintain habitat for marten during geothermal exploration and development.

– Manage for snags through natural recruitment.

– Inventory and protect active goshawk territories needed to meet population targets.

– Develop a bald eagle nest territory management plan.

*Management Area Direction*

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1  Minimum Level | 4,139 | 59 | 1,628 | **5,826** |
| 4  Semi-Primitive Non-Motorized | 1,934 | | | **1,934** |
| 7  Visual Retention | 1,658 | | | **1,658** |
| 8  Special Areas | | | 570 | **570** |
| 9  Raptor Management[1] | 1,579 | | 472 | **2,051** |
| 12  Even-Aged Timber | 5,683 | | | **5,683** |
| 13  Timber-Visuals[1] | 2,480 | | | **2,480** |
| 15  Uneven-Aged Timber[1] | 6,324 | | | **6,324** |
| 17  Riparian Area | 19 | | 4 | **23** |
| **Total** | **23,816** | **59** | **2,674** | **26,549** |

[1] Current developed recreation sites within these prescription areas contain nominal acreage ( < 10 acres per site), and will be managed under the Developed Recreation Prescription (#5).

## BLACK MOUNTAIN ● Management Area 62



*Management Area Direction*

# 62 - Black Mountain
## Doublehead Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 46,115 | |
| Rangelands | 14,299 | |
| Timberlands | 31,816 | |
| < 20 cu. ft. per acre | | 832 |
| > 20 cu. ft. per acre | | 30,984 |
| Unsuitable for Timber Management | 4,756 | |
| < 20 cu. ft. per acre | | 354 |
| > 20 cu. ft. per acre | | 4,402 |



Black Mountain Management Area is bounded by Glass Mountain on the northwest, Cougar Butte on the north, block of private lands on the east, and the Klamath National Forest on the southwest. Prominent features of the area include Yellowjacket Butte, Shotgun Peak, Black Mountain, and Burnt Lava and Glass Mountain Flows.

Vegetation consists of large areas of mixed conifer stands composed of ponderosa pine, white fir, incense-cedar, and sugar pine. In addition to these timber stands, brush fields and grasslands are broken by major lava flows. Most of the area suited for timber production has been harvested. Black Mountain has extensive ponderosa pine plantations established after fires in the early 1960's. Included in this MA are timber compartments 605-608, 612, 618, 619, and 622.

Although the area is too rugged for domestic livestock, it is an important provider of summer range for the Glass Mountain deer herd. Goshawk, marten and other animals dependent on old-growth habitat have been observed throughout timbered areas.

The area receives heavy dispersed recreation use during hunting season. Sightseeing and snowmobiling are popular during the rest of the year. Snowmobilers for the Medicine Lake area primarily use the Doorknob snowmobile trailhead located on Forest Rd. 49 two miles south of Lava Beds National Monument.

No permanent surface water sources are located in this MA.

Two significant pumice mining areas support numerous loose and block pumice claims. Most of the area is within the Glass Mountain KGRA, and is almost covered by geothermal leases. A few temperature gradient holes have been drilled in the MA, but no further activity has taken place.

The MA includes two designated Geologic Special Interest Areas: Glass Mountain, a unique mountain of obsidian; and the Burnt Lava Flow, originally classified as a virgin area because of virgin old-growth forested islands that break up 14 square miles of jet black lava. Prehistoric Indians used obsidian extensively to manufacture stone tools.

Access to the MA is provided by Modoc County Road 97 and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Research the prehistoric obsidian sites located in the management area and nominate to the National Register of Historic Places.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Minerals

– Other management activities should not preclude geothermal development.

**Soil**

– Maintain fertilization monitoring plots and analyze timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

– On nutrient deficient pumice soils, develop site specific management practices for soil disturbing activities.

– Restore soil productivity through fertilization or topsoil redistribution on those affected acres on Black Mountain.

**Special Interest Areas**

– Burnt Lava Flow SIA and Glass Mountain Glass Flow SIA are located in this management area. Forest activities should not alter the scenic and scientific values of these resources. This direction is applied by the Shasta-Trinity National Forest on their share of the Burnt Lava Glass Flow. Recommend Burnt Lava Flow SIA for nomination as an NNL.

– Feature geological interpretive resources for the Burnt Lava Flow and Glass Mountain Glass Flow SIAs.

**Wildlife and Fish**

– Manage for 640 acres of old growth in the mixed conifer type, 655 acres in the eastside pine type, and 130 acres in the red fir type.

– Manage for snags through natural recruitment, except where snag densities are deficient in individual timber compartments.

– Develop a management plan and improve condition of stands at the bald eagle roost through silvicultural treatments.

– Install big game guzzlers to improve habitat capability for deer.

– Inventory and protect active goshawk nests needed to meet target populations.

| Prescription Allocation | | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
|---|---|---|---|---|---|
| **Prescription** | | | | | |
| 1 | Minimum Level | 3,654 | 263 | 1,081 | **4,998** |
| 4 | Semi-Primitive Non-Motorized | 438 | 40 | | **478** |
| 7 | Visual Retention | 1,309 | 32 | | **1,341** |
| 8 | Special Areas | | | 13,218 | **13,218** |
| 9 | Raptor Management | 310 | 51 | | **361** |
| 12 | Even-Aged Timber | 15,130 | | | **15,130** |
| 13 | Timber-Visuals | 9,024 | | | **9,024** |
| 14 | Timber-Forage | | | | **1,119** |
| | Partial Retention | 0 | | | |
| | Modification | 1,119 | | | |
| 16 | < 20 Cu Ft Timber | | 446 | | **446** |
| | **Total** | **30,984** | **832** | **14,299** | **46,115** |

*Management Area Direction*

**This page intentionally left blank.**

## TIONESTA ● Management Area 63



# 63 - Tionesta
## Doublehead Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 56,246 | |
| Rangelands | | 13,477 |
| Timberlands | | 42,769 |
| < 20 cu. ft. per acre | | 15,294 |
| > 20 cu. ft. per acre | | 27,475 |
| Unsuitable for Timber Management | 6,674 | |
| < 20 cu. ft. per acre | | 20 |
| > 20 cu. ft. per acre | | 6,654 |



Tionesta Management Area borders the south side of the Lava Beds National Monument and extends to the southern boundary of the District. The terrain consists of gentle slopes at the base of the Medicine Lake Highlands. Burlington-Northern railroad, the California-Oregon transmission powerline (COTP), a 500kv Pacific Power and Western Area Power Administration utility line, and Pacific Gas and Electric natural gas line cross the MA.

Much of the area is timbered with ponderosa pine, sugar pine, white fir, and incense-cedar, with an understory of bitterbrush or mountain mahogany. The Twin Burn of 1978 and the Scarface Burn of 1977 have resulted in major reforestation projects. Included in this MA are timber compartments, 601-604, 613, 617, and 620.

About two-thirds of the area is within a sheep allotment. Much of the grazing is deferred for plantation establishment. The area provides key winter range and transitional range for the Glass Mountain deer herd.

Dispersed recreation is a primary use in summer and fall. Most popular are hunting and associated camping, wood and mushroom gathering, and viewing deer on winter range.

Mud Lake is the only source of permanent surface water. It has no outlet and is used marginally by transient and nesting waterfowl.

A small portion of the Glass Mountain KGRA and non-competitive geothermal leases are located in three-fourths of the MA. Little activity has taken place in this MA.

Access to the MA is provided by Modoc County Road 91 and a developed system of National Forest roads.

## Standards and Guidelines

### Fire and Fuels
– Suppress all wildfires using the appropriate suppression response.

### Range
– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons and (2) to develop grazing systems in the management area.

### Soil
– Conduct an SRI Order 2 on < 20 timberlands with SRI Order 3 soil map units 174, 222, and 223. Reassess the soil capabilities for other resource needs.

– Maintain fertilization monitoring plots and analyze timber stands for possible fertilization projects to improve the nutrient balance and tree growth rates.

– On nutrient deficient pumice soils, develop site specific management practices for soil disturbing activities.

– Restore soil productivity through fertilization or topsoil redistribution on affected areas near Mud Springs.

**Special Uses**

– Ensure that Forest activities do not significantly interfere with the use, operation, and maintenance of 500kv lines and natural gas lines in the area.

**Wildlife and Fish**

– Provide for 1365 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Continue efforts to reestablish bitterbrush stands that were destroyed in the Twin Fire.

– Implement browse forage projects in the Tionesta Bench area.

– Develop a management plan to implement improvements on the bald eagle winter roost.

**Other**

– Tichnor Cave, Bertha's Cave, and Mammoth Cave are several of the cave resources in this management area. Continue to monitor use and develop management plans if needed.

| Prescription Allocation | | | | | |
|---|---|---|---|---|---|
| | **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1 | Minimum Level | 3,912 | | 1,283 | **5,195** |
| 4 | Semi-Primitive Non-Motorized | 77 | 14 | | **91** |
| 7 | Visual Retention | 546 | 14 | | **560** |
| 9 | Raptor Management | 2,665 | 6 | 760 | **3,431** |
| 10 | Rangeland | | | 5,960 | **5,960** |
| 11 | Range-Forage | | | 5,474 | **5,474** |
| 12 | Even-Aged Timber | 11,548 | | | **11,548** |
| 13 | Timber-Visuals | 8,727 | | | **8,727** |
| 16 | < 20 Cu Ft Timber | | 15,260 | | **15,260** |
| | **Total** | **27,475** | **15,294** | **13,477** | **56,246** |

**Range Allotment Strategies**

| Allotment | Strategy |
|---|---:|
| Glass Mountain | B |
| Mud Lake | C |

## MEARS ● Management Area 64



# 64 - Mears

## Doublehead Ranger District

| Acreage | | |
|---|---|---|
| National Forest | 45,349 | |
| Rangelands | | 27,188 |
| Timberlands | | 18,161 |
| < 20 cu. ft. per acre | | 10,742 |
| > 20 cu. ft. per acre | | 7,419 |
| Unsuitable for Timber Management | 1,336 | |
| < 20 cu. ft. per acre | | 0 |
| > 20 cu. ft. per acre | | 1,336 |



Mears Management Area consists of rolling timbered hills on the west and flat, open, rocky grasslands to the east. The prominent features are Timber Mountain and its fire lookout, Southern Pacific Railroad, and State Highway 139 which dissects the MA.

Commercial timber stands of ponderosa pine are located on Timber Mountain, and all such stands have been entered for sanitation and salvage cutting. Juniper is used for commercial and free-use firewood. The area includes timber compartments 621, 623, and 627.

Although water is scarce in this MA, the lowlands support juniper, sagebrush, and bunchgrass which are important forage for grazing cattle and sheep. Part of the wild horse territory is located in this MA. In addition to livestock, the area provides important range for the Interstate and Glass Mountain deer herds.

Primary dispersed recreation sports are deer and pronghorn hunting.

Access to the MA is provided by State Highway 139, Modoc County Road 91, and a developed system of National Forest roads.

## Standards and Guidelines

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing system in the Management Area.

### Sensitive Plants

– Monitor and protect populations of *Poa fibrata* near Potter's Well and in other suitable habitats.

### Soil

– Conduct an SRI Order 2 on < 20 timberlands with SRI Order 3 soil map units 222 and 223. Reassess capability, suitability, and limitations for management.

– Restore soil productivity through fertilization or topsoil redistribution on affected acres in the Mears burn area.

### Wildlife and Fish

– Manage for 370 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Implement browse improvement projects in the Timber Mountain and Potters areas.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1 Minimum Level | 1,336 | | | **1,336** |
| 7 Visual Retention | 292 | 235 | | **527** |
| 10 Rangeland | | | 12,438 | **12,438** |
| 11 Range-Forage | | | 14,750 | **14,750** |
| 14 Timber-Forage | | | | **5,791** |
|    Partial Retention | 3,433 | | | |
|    Modification | 2,358 | | | |
| 16 < 20 Cu Ft Timber | | 10,507 | | **10,507** |
| **Total** | **7,419** | **10,742** | **27,188** | **45,349** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Potter's Pasture | D |
| Timber Mountain | C |

*Management Area Direction*

This page intentionally left blank.

## STEELE SWAMP ● Management Area 65



*Management Area Direction*

# 65 - Steele Swamp
## Doublehead Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 57,607 | | |
| Rangelands | | 47,615 | |
| Timberlands | | 9,992 | |
| < 20 cu. ft. per acre | | | 3,629 |
| > 20 cu. ft. per acre | | | 6,363 |
| Unsuitable for Timber Management | | 346 | |
| < 20 cu. ft. per acre | | | 176 |
| > 20 cu. ft. per acre | | | 170 |



Steele Swamp Management Area is bounded by the Oregon border to the north, Devil's Garden Ranger District to the east, Boles Meadow to the south, and sections of Boles and Willow Creeks to the west. The area is characterized by large stretches of relatively flat lands.

Ponderosa pine overstory with bitterbrush and mountain mahogany dominate higher points at Four Mile near the Oregon border, Bird Springs Ridge, and Timbered Ridge. All areas of productive timber land have been harvested. Included in this area are timber compartments 624-626.

The MA is dominated by juniper, bunchgrass, and sagebrush, and intersected by intermittent and permanent springs. The entire area is grazed by cattle or sheep. Part of the wild horse territory is located in the MA. In addition to livestock forage, the area provides good range for the Interstate deer herd.

The Lost River and shortnose suckers, federally listed as endangered species, inhabit the Willow and Boles Creek systems.

Although there are no developed recreation sites, the most popular dispersed recreation activities are deer and pronghorn hunting.

Access to the MA is provided by Modoc County Roads 73 and 136, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Applegate Emigrant Trail and nominate to the National Register of Historic Places. Consider nominating the Boles Creek Rock Art District to the National Register of Historic Places.

– Consider historical or archaeological interpretive trails or displays to provide recreation opportunities.

### Fire and Fuels

– Manage fire within the guidelines of the Big Sage Fire Management Unit Plan.

– In areas outside the Big Sage Fire Management Unit, suppress wildfires using the appropriate suppression response.

### Range

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing system in the Management Area.

### Water and Riparian

– Use watershed improvement funding to correct streambank erosion and gullying in Boles and Willow Creeks.

*Management Area Direction*

– Use range structural improvement funds to restore degraded riparian areas in the Boles and Warm Springs Allotments.

**Wild and Scenic Rivers**

– Evaluate Willow and Boles creeks for classification and suitability as an inclusion to the Wild and Scenic River System.

– Provide interim protection of the outstandingly remarkable values (cultural resources) in the Willow and Boles drainages by applying the cultural resources standards and guidelines.

**Wildlife and Fish**

– Provide for 320 acres of old growth in the eastside pine type.

– Increase snag densities through use of snag management techniques. Base actual recruitment needs on current detailed surveys.

– Continue habitat improvement projects which remove juniper and release mahogany and other desirable forage species. Monitor livestock use to prevent other than light utilization by cattle.

– Develop a bald eagle nest territory management plan and begin managing potential habitat.

*Management Area Direction*

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1 Minimum Level | 123 | | | **123** |
| 9 Raptor Management | 22 | 115 | 1,615 | **1,752** |
| 10 Rangeland | | | 59 | **59** |
| 11 Range-Forage | | | 45,229 | **45,229** |
| 12 Even-Aged Timber | 6,193 | | | **6,193** |
| 16 < 20 Cu Ft Timber | | 3,453 | | **3,453** |
| 17 Riparian Area | 25 | 61 | 712 | **798** |
| **Total** | **6,363** | **3,629** | **47,615** | **57,607** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Boles | C |
| Warm Springs | D |

## CLEAR LAKE ● Management Area 66



# 66 - Clear Lake
## Doublehead Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 206,207 | | |
| Rangelands | | 204,899 | |
| Timberlands | | 1,308 | |
| < 20 cu. ft. per acre | | | 794 |
| > 20 cu. ft. per acre | | | 514 |
| Unsuitable for Timber Management | | 439 | |
| < 20 cu. ft. per acre | | | 0 |
| > 20 cu. ft. per acre | | | 439 |



Clear Lake Management Area is bounded by the Oregon border on the north, Lava Beds National Monument on the west, and Steele Swamp on the east. Topography consists of closed basins and gently sloping drainages on the Devil's Garden Plateau. The area is crossed by State Highway 139, Southern Pacific Railroad, and Pacific Gas and Electric and Bonneville Power Administration power lines. Prominent landmarks include Dry Lake Guard Station, Modoc War military fortification ruins, and the Modoc War Battle of Scorpion Point.

Juniper dominates the area and varies from single trees to dense stands. Because sites are unproductive, timber activity is limited to firewood gathering. Included in this area are timber compartments 628 and 629.

Other vegetation includes stretches of bunchgrass and sagebrush which are broken up by rocks. The entire MA is grazed by cattle. Important for wildlife as well as livestock, the area provides important winter, spring, and fall range for the Interstate deer herd and year-round habitat for pronghorn. A portion of the Clear Lake pronghorn herd that summers in Oregon also winter in this MA.

Clear Lake National Wildlife Refuge, a protective haven for a variety of upland and migratory birds, is surrounded by the MA. Numerous man-made impoundments, a few natural springs, and permanent water courses (Willow and Boles Creeks) flow through the area. Lost River and shortnose suckers, federally listed as endangered species, inhabit Clear Lake and the Lost River, Willow, and Boles Creek systems.

Deer hunting is the most popular dispersed recreation activity. A small amount of waterfowl hunting occurs along the creeks, although the lake itself is closed.

One non-competitive geothermal lease exists in the extreme southwest corner of the MA. No activity has taken place.

The United States Air Force holds a special use permit for the construction, operation, and maintenance of the Over-the-Horizon Backscatter (OTH-B) electronic radar receiver site.

Access to the MA is provided by State Highway 139, Modoc County Roads 108 and 136, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Complete inventory of the Applegate Emigrant Trail and nominate to the National Register of Historic Places. Consider nominating the Boles Creek Rock Art District to the National Register of Historic Places.

– Complete inventory of sites related to the Modoc War; nominate to the NHRP and interpret for public education.

– Consider historical or archaeological interpretive trails or displays to provide recreation opportunities.

**Fire and Fuels**

– Manage fire within the Big Sage Fire Management Unit guidelines.

– In areas outside the Big Sage Fire Management Unit, suppress all wildfires using the appropriate suppression response.

**Range**

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons, and (2) to develop grazing systems in the Management Area.

**Sensitive Plants**

– Monitor and protect populations of *Eryngium mathiasiae* and *Polygonum polygaloides esotericum* in the vernal pool habitats common to this management area.

**Special Uses**

– Coordinate management activities and resource developments (e.g., fire suppression, firewood use, timber management, and mineral development) ensuring their compatibility with the protection and use of the OTH-B radar system.

**Water and Riparian**

– Use watershed improvement funding to correct streambank erosion and gullying in Boles, Willow, and Mowitz Creeks.

– Use range structural improvement funds to restore degraded riparian areas in the Dalton, Mammoth, and Clear Lake Allotments.

**Wild and Scenic Rivers**

– Evaluate Willow and Boles creeks for classification and suitability as an inclusion to the Wild and Scenic River System.

– Provide interim protection of the outstandingly remarkable values (cultural resources) in the Willow and Boles drainages by applying the cultural resources standards and guidelines.

**Wildlife and Fish**

– Increase snag densities through use of snag management techniques where possible. Base actual recruitment needs on current detailed surveys.

– Improve spring range for deer through cover maintenance or improvement and selected forage plantings. Improve deer winter forage by ensuring proper levels of livestock utilization and by initiating habitat improvements, such as juniper removal and browse or other species establishment.

– Continue or initiate riparian improvements for Lost River/Shortnose suckers on Clear Lake Reservoir drainages (Mowitz, Boles and Willow Creeks).

– Manage livestock and initiate improvements based on research results for sage grouse populations in the Clear Lake area.

– Manage roads and road use on deer winter range to maintain high habitat capability.

– Prepare a bald eagle nest territory management plan.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| **Prescription** | **> 20 Acres** | **< 20 Acres** | **Range Acres** | **Total Acres** |
| 1  Minimum Level | 439 | | | **439** |
| 9  Raptor Management | | | 4,186 | **4,186** |
| 10  Rangeland | | | 55,433 | **55,433** |
| 11  Range-Forage | | | 144,695 | **144,695** |
| 12  Even-Aged Timber | 75 | | | **75** |
| 16  < 20 Cu Ft Timber | | 794 | | **794** |
| 17  Riparian Area | | | 585 | **585** |
| **Total** | **514** | **794** | **204,899** | **206,207** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Clear Lake | D |
| Dalton | D |
| Lavas | C |
| Mammoth | C |
| Perez | C |
| Tucker | C |

*Management Area Direction*

*4-233*

## MOUNT DOME ● Management Area 67



# 67 - Mount Dome
## Doublehead Ranger District

| Acreage | | | |
|---|---|---|---|
| National Forest | 38,967 | | |
| Rangelands | | 38,520 | |
| Timberlands | | 447 | |
| < 20 cu. ft. per acre | | | 370 |
| > 20 cu. ft. per acre | | | 77 |
| Unsuitable for Timber Management | | 384 | |
| < 20 cu. ft. per acre | | | 307 |
| > 20 cu. ft. per acre | | | 77 |



Mt. Dome Management Area borders the Lava Beds National Monument to the east, the Klamath National Wildlife Refuge to the northwest, and the Klamath National Forest to the south. The highest point at 6,518 feet, Mt. Dome straddles the western border of the Forest. The terrain is a series of faults and intervening plains.

Grasses, sagebrush and juniper are dispersed within extensive lava fields. No manageable commercial timber or compartments exist in the area, all of which is used for livestock grazing. The MA provides spring and fall habitat for deer and pronghorn. Deer, pronghorn, and quail hunting and off-highway vehicle use are the most popular dispersed recreation activities. The Forest shares management responsibility for the Mt. Dome Bald Eagle roost. This MA is a reintroduction site for peregrine falcons.

Several lakes and man-made impoundments are located in this MA, noteably Crumes, Sheep Camp, Bonita, and Deep Lakes. They are part of the Lost River drainage, but have no run-off.

A non-competitive geothermal lease exists in the southeast corner of the MA. No activity has taken place.

Access to the MA is provided by State Highway 139, Modoc County Road 111, and a developed system of National Forest roads.

## Standards and Guidelines

### Cultural Resources

– Conduct non-project related cultural resource inventories to fill information gaps regarding prehistoric use of this area as opportunity arises.

### Fire and Fuels

– Suppress all wildfires using the appropriate suppression response.

### Range

– Use an interdisciplinary team or coordinated resource management planning approach (1) to recommend needed changes in permitted numbers or grazing seasons and (2) to develop grazing systems in the management area.

### Wildlife and Fish

– Cooperate with the BLM on reintroduction of peregrine falcon and management of bald eagle habitat at Mount Dome. Implement and follow established management plans for the area.

| Prescription Allocation | | | | |
|---|---|---|---|---|
| Prescription | > 20 Acres | < 20 Acres | Range Acres | Total Acres |
| 1 Minimum Level | 32 | | 2,087 | **2,119** |
| 9 Raptor Management | 45 | 307 | 4,927 | **5,279** |
| 10 Rangeland | | | 8,717 | **8,717** |
| 11 Range-Forage | | | 22,789 | **22,789** |
| 16 < 20 Cu Ft Timber | | 63 | | **63** |
| **Total** | **77** | **370** | **38,520** | **38,967** |

## Range Allotment Strategies

| Allotment | Strategy |
|---|---|
| Crumes | D |
| Deep Lake | C |
| Mount Dome | C |

*Management Area Direction*

## Chapter 5 — Monitoring and Evaluation Requirements

### Table of Contents

Introduction . . . . . . . . . . . . . . . 5 - 1

Monitoring and Evaluation Requirements . . . . . . . . . 5 - 1

Monitoring Levels . . . . . . . . . . . . . . 5 - 2

Monitoring Plan . . . . . . . . . . . . . . 5 - 2

Evaluation . . . . . . . . . . . . . . . 5 - 3

# Chapter 5
## Monitoring and Evaluation Requirements

## Introduction

Implementing the Modoc National Forest Plan requires moving from an existing management program to a new management program with the budget, goals, and objectives described in Chapter 4 of this document. This Forest Plan, used in conjunction with Forest Service Manuals, Handbooks and the Pacific Southwest Regional Guide, establishes direction for the Modoc National Forest for the next 10 to 15 years. Appendix A contains a list of existing plans superseded by this Forest Plan, incorporated by reference or needed to provide complete management direction.

Implementation will occur through identification, selection, scheduling, and execution of management practices to meet management direction provided in Chapter 4. Implementation will also involve responding to proposals by others for use and/or occupancy of National Forest System lands. Subject to valid existing rights, all outstanding and future permits, contracts, cooperative agreements, or instruments of occupancy and use of lands will be consistent with the Forest Plan.

Projects will be subject to environmental analysis and documentation in accordance with the National Environmental Policy Act. Appropriate public involvement will be a part of the analysis process. Regardless of the form of NEPA documentation (environmental impact statement, environmental assessment, or categorical exclusion), an analysis file will be maintained and available for public review.

The Forest mission, goals and objectives described in Chapter 4 are translated yearly into program budget requests. The rate of implementation (amount of goods and services produced, improvements made, etc.) will depend on actual appropriated funds. The Forest will monitor the influence of budget on meeting Forest Plan goals and objectives as discussed below.

The National Forest Management Act and other regulations require forests to monitor and evaluate their plans at established intervals. Monitoring and evaluation are separate, sequential activities designed to compare projected versus actual accomplishments of objectives; to determine if standards and guidelines are being followed; and to determine whether the initial data, assumptions, and coefficients used in developing the Forest Plan

are correct. The remainder of this chapter outlines the monitoring and evaluation framework for the Forest.

## Monitoring and Evaluation Requirements

Various monitoring requirements are listed in the National Forest Management Act regulations (36 CFR 219) and are highlighted below. Numbers in parentheses refer to sections within 36 CFR 219.

– Monitoring and evaluation determine whether: (219.7(f))

- activities on nearby lands managed by other federal, state, or local agencies are affecting management of the Forest.

- the Forest Plan is precluding other land management agencies from realizing their stated objectives.

– Monitoring requirements shall provide for: (219.12(k))

- a quantitative estimate of performance comparing outputs and services with those projected by the Forest Plan;

- documentation of the measured prescriptions and effects, including significant changes in productivity of the land;

- documentation of costs associated with carrying out the planned management prescriptions as compared with costs estimated in the Forest Plan.

- a determination of compliance with the following standards:

    a. Lands are adequately restocked as specified in the Forest Plan.

    b. Lands identified as not suited for timber production are examined at least every 10 years to determine if they have become suited; and that, if determined suited, such lands are returned to timber production.

c. Maximum size limits for harvest areas are evaluated to determine whether such size limits should be continued.

d. Destructive insects and disease organisms do not increase to potentially damaging levels following management activities.

– Population trends of the management indicator species will be monitored and relationships to habitat changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable (219.19(a)(6)).

– Monitoring determines (1) whether existing and emerging public issues and management concerns are adequately addressed, and (2) whether opportunities are realized.

## Monitoring Levels

Table 5-1 identifies key activities and outputs we will monitor during Plan implementation. Three kinds of monitoring identified in Table 5-1 are outlined below:

**Implementation Monitoring**—The objective of implementation monitoring is to determine if plans, programs, projects, and activities are implemented in compliance with Forest Plan objectives and management direction. Implementation monitoring answers the question, "Did we do what we said we would?"

District and Forest personnel routinely conduct implementation monitoring:

– Projects are designed using Forest Plan Standards and Guidelines. Consistency is determined when the project is approved.

– During periodic review, project administrators determine if projects are implemented in accordance with project designs and Forest Plan standards.

– Forest ID team members and the management team participate in functional assistance trips and general management reviews to determine whether projects are implemented in compliance with the Forest Plan.

– Each year districts and various branches of the Supervisor's Office file Management Attainment Reports. These accomplishments can be readily compared against projected outputs from the Forest Plan.

Implementation monitoring is an integral part of management and is largely built into current workloads and budgets.

**Effectiveness Monitoring**—Effectiveness monitoring determines if plans, prescriptions, projects and activities are effective in meeting management direction and objectives. This is a two-part objective. First, do projects implemented according to the Forest Plan meet the intent of that direction? Second, if they do meet the intent of direction, are they the most efficient methods to meet that intent? Effectiveness monitoring answers the questions, "Did our actions accomplish what we intended, and are they the most efficient way to accomplish what we intended?"

Effectiveness monitoring is directly linked to implementation monitoring. Often they can be done simultaneously. This level of monitoring is conducted by resource and/or technical specialists on a limited basis as determined by resource values and risks, and public issues. A statistical sample of projects is usually sufficient to determine effectiveness.

**Validation Monitoring**—Validation monitoring determines whether initial data, assumptions, and coefficients used in developing the Forest Plan are correct. Validation monitoring should also determine if management actions are resolving the issues and concerns identified in the Forest Plan. Validation monitoring answers the question, "Are we achieving what we intended to achieve?"

Validation monitoring is conducted when effectiveness monitoring results indicate basic data, assumptions, or coefficients are questionable. Testing and evaluating predictive models, basic resource inventories, and modeling coefficients are conducted continuously.

Validation monitoring is conducted on a limited number of projects and resources due to the high costs. The Forest will cooperate with neighboring Forests, Forest Service research, other federal, State and local agencies, and private interest groups to conduct validation monitoring.

## Monitoring Plan

Monitoring requirements for the Forest Plan are outlined in Table 5-1. These requirements will be coordinated with continuous project-level monitoring required by NEPA analysis by the reporting staff listed. The Forest planning staff provides overall coordination. The following definitions will assist in understanding the contents of the table.

**Activity, Effect or Resource to be Measured** — This is a concise description of the specific item to be measured.

**Monitoring Objective** — A statement indicating the purpose of monitoring this specific item. The monitoring level is indicated in parentheses, I = implementation monitoring, E = effectiveness monitoring, and V = validation monitoring. For some items more than one level of monitoring is indicated.

**Monitoring Technique** — Description of the specific sampling or inventory techniques, or sources of information to be employed.

**Precision and Reliability** — Precision is the exactness or accuracy with which data are collected. Reliability is the extent to which monitoring accurately reflects the Forest condition. Precision and reliability are qualitatively rated as high, moderate, or low. Data with key targets (e.g., thousand board feet and animal unit month) which have a low bias and a definable precision are very accurate with a high probability of reflecting actual conditions. Other data, such as analyzing public comments, are less precise and reliable because they are subjective and, therefore, difficult to monitor with techniques currently available.

**Monitoring Frequency** — The time frame or schedule during which the activity, practice, or effect is sampled.

**Reporting Frequency** — The frequency that results will be summarized and reported. Evaluation of results may be at a different time period.

**Standard** — The tolerance limits or standards by which the activity, practice or effect will be evaluated.

**Variation from Standard Requiring Further Action** — A statement which describes the tolerance limits within which actual performance can vary from predicted performance. When these limits are exceeded, further evaluation and monitoring are inititated. (See evaluation description.)

**Reporting Staff** — Identifies the staff area responsible for collecting, evaluating and maintaining monitoring information for this specific item.

**Annual Cost** — Estimated average annual costs for monitoring. Only includes costs which are in addition to on-going monitoring processes. Actual costs could vary depending on the Forest's ability to work cooperatively with agencies, private interests, and other forests.

## Evaluation

Regulations in 36 CFR 219 describe the purposes for evaluating the Forest Plan. They can be summarized as follows:

- To determine if conditions or demands in the area covered by the Forest Plan have changed significantly to require revision (219.10(g)).

- To determine if budgets have significantly changed the long-term relationships between levels of multiple-use goods and services to require amendment (219.10(e)).

- To determine how well objectives have been met (219.12(k)).

- To determine how closely management standards and guidelines have been followed (219.12(k)).

- To review research needs for management of the Forest (219.28(a)).

Evaluation is the analysis and appraisal of observations made during the monitoring process. Determining whether conditions or long-term relationships have changed significantly requires more than one year of monitoring. Consequently, some items in Table 5-1 are only reported and evaluated after 5 years of monitoring. The reporting staff prepares an annual summary of findings for other items. When monitoring results are compiled, the interdisciplinary team evaluates the data's significance and recommends further action to the Forest Supervisor. Recommendations include:

- No action needed. Monitoring indicates goals, objectives, and standards are achieved.

- Modify the management prescription as a Plan amendment.

- Modify the application of a prescription as a Plan amendment.

- Revise the projected schedule of outputs.

- Intensify monitoring where evaluation is not conclusive.

- Initiate revision of the Plan.

Figure 5-1 graphically displays the monitoring and evaluation process.

## Figure 5-1. Monitoring and Evaluation Decision Tree.



*Monitoring and Evaluation Requirements*

*Monitoring and Evaluation Requirements*

## Table 5-1. Monitoring Plan by Resource.

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **AIR QUALITY** | | | | | | | | | |
| Prescribed burning: planned and unplanned ignitions. | Assure all prescribed fires comply with air quality regulations (I) | Report of fuels burned for each project. | Low/Low | Each project | Annual | Annual R5 Smoke Management Plan; Clean Air Act; individual burn plans, State air quality standards. | Visual deterioration in smoke sensitive areas or measurements indicative of particulate levels exceeding standards. | Fire Management | $2,000 |
| Road construction | Assure dust control measures applied.(I) | Report of dust control measures applied vs. number of road miles constructed. | Low/Low | Each project | Annual | R5 Guidelines | Visual deterioration indicator of particulate levels exceeding standards. | Air | $2,000 |
| Total suspended particulate emission production from Forest activities. | —Establishing baseline data —Comparison with established baseline values. (E,V) | Visibility reports from the camera installed at Likely Mtn. Lookout. | Mod/Mod | Daily from 6/1 to 9/30 | Annual | R5 | 10% change in visibility produced from baseline values | Air | $10,000 |
| Effects of Forest activities on AQRVs of Class I areas | —Identify AQRVs —Establish baseline data —Identify trends. —Identify areas of potential impairment (I,E,V). | —Detailed inventory of Class I Wilderness areas first year for vegetation incuding lichens, rocks & soils to establish AQRVs. —Inventory AQRVs annually. | Mod/Mod | Annual | Annual | Screening levels established in General Technical Report RM-165 | 10% change in screening levels. | Air | $30,000 first year & $10,000 annually thereafter. |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **CULTURAL RESOURCES** | | | | | | | | | |
| Effect of deterioration or destruction of cultural resources through vandalism or natural causes. | Determine effects of vandalism and natural factors on cultural resources and means to mitigate effects. (I,E) | Field review of cultural resource conditions. | Mod/Mod | Every 4 years for very significant/NRHP resources; annual for those in areas of active vandalism or natural deterioration. | Annual | FSM 2361 cultural resource guidelines | 10% | Cultural Resources | $1,800 |
| Effect of land use projects on cultural resources. | Ensure cultural resources receive adequate protection. (I) | Field review during and following projects; 25% of projects per district. | High/High | Annual | Annual | FSM 2361 cultural resource guidelines. | Any variation from standard. | Cultural Resources | $3,500 |
| **ENERGY AND FACILITIES** | | | | | | | | | |
| Building, utility, and dam function | Evaluate facility maintenance, replacement needs, and energy consumption. (I,E) | Field and office review. | Mod/Mod | Every 2 years or as stipulated by dam classification. | Every 2 years or as stipulated by dam classification. | Adequate facilities and energy consumption and R5 standards. | Inadequate facilities or excessive energy consumption. | Engineering | $10,000 |
| Road and bridge construction, reconstruction, and maintenance. | Ensure road facilities support Forest objectives, protect resources, and comply with road development guidelines. (I) | Field review all projects. | Mod/Mod | Annual | Annual | Road development guidelines and project levels commensurate with management. | Any unexplained deviation. | Engineering | $15,000 |
| Trail construction and maintenance. | Ensure adherence to the Trail system presented in Appendix L and evaluate compliance with trail standards and guidelines. (I) | Field review all projects. | Mod/Mod | Annual | Annual | Trail program and trail standards and guidelines. | Any unexplained deviation from trail standards and guidelines. | Engineering and Recreation | $2,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **FIRE AND FUELS** | | | | | | | | | |
| Burned acres from wildfires by fire intensity class and management prescriptions | Compare actual and predicted burned acres for the Forest and for designated fire management areas (I). | Review fire reports. | High/High | Annual | Annual | Predicted acres burned. | More than 35% discrepancy within a 5-year period. | Fire | $500 |
| Fuel treatment | Evaluate compliance with management area direction for treatment of fuels (I, E). | Review all prescribed burn plans, annual fuel treatment accomplishment reports; field inspection of at least one project per district annually. | Mod/Mod | Annual | Annual | Forest Plan S&Gs | + or - 25% of planned target. | Fire | $1,500 |
| Effectiveness of fire management program | Collect and evaluate sum of costs plus net resource value change for the Forest (E). | Complete fire management financial review. | Mod/Mod | Annual | Annual | Dollars/acres protected. | + or - 20% from fire management efficiency curve from 5-year average. | Fire | $1,000 |
| **FIREWOOD** | | | | | | | | | |
| Firewood | Verify supply and use of both charge and free-use (E,V). | MAR Cut & Sold reports. | Mod/Low | Annual | Annual | None | Variable monitor trend + or - 50% from 10-year average. | Timber | $500 |
| **GEOLOGY** | | | | | | | | | |
| Geologic resource inventory | Assesss GRI when completed to determine if inventory is correct (V). | Review GRI and project proposals | Mod/Mod | Annual | Annual | Forest Plan | Incomplete or inadequate GRI. | Forest Geologist | $2,500 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **LANDS** | | | | | | | | | |
| Effect of land adjustment on total Forest land base for all resources | Assure that Forest's outputs are not adversely affected by land adjustments (E). | Determine net change in acres and inventory for each land adjustment. | High/Mod | Annual | Every 5 years | Forest Plan. | -5% | Lands | $500 |
| **MINERALS** | | | | | | | | | |
| Mineral Development | Assess level of mining and mineral leasing operations to ensure operations are not unreasonably impaired (E). | Review environmental documents for Plans of Operation. | Low/Mod | Annual | Every 5 years. | Acres of high and moderate mineral potential not available or constrained. | Increase over 10% from current unavailable or constrained acres. | Minerals | $1,000 |
| Plan of Operation | Assure compliance with Plan of Operation (I). | Review operations and activities of each project. | High/High | Annual | Every 5 years. | Plan of Operation. | Any deviation | Minerals | $2,000 |
| Withdrawals | Review Forest Service initiated withdrawals to assess whether they are needed (V). | Review withdrawals. | High/High | Ongoing | Every 5 years. | FLPMA Requirement [Sec. 2041(1)] | None | Minerals | $500 |
| **FOREST PESTS** | | | | | | | | | |
| Effects of pests and damage | Early detection and evaluation of pest-related problems and damage (I). | Aerial and ground surveillance and detection surveys, resource exams, FPM evaluations. | Mod/Mod | Ongoing | Annual | Pest-related damage maintained at acceptable levels relative to management objectives. | Pest-related damage becomes unacceptable relative to management objectives. | Timber | $4,000 |

.

*Monitoring and Evaluation Requirements*

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **RANGE** | | | | | | | | | |
| Range health | Determine range ecologic condition and trend. (E,V). | Photo points and C&T transects; Ecodata field observations. | Mod/Mod | Ongoing | Every 5 years. | Forest Standards and Guidelines. | Continued downward or static trend in problem areas. | Range | $46,000 |
| Permitted AUMs | Compare permitted to Forest Plan projected AUMs (I). | Annual grazing statistical report. | High/High | Annual | Annual | Forest Plan | Permitted AUMs do not meet Forest Plan estimates for 3 consecutive years. | Range | $2,000 |
| Wild horse management | Determine number of wild horses and territory expansion (I). | Aerial counts. | High/High | Annual | Annual | Forest Standards and Guidelines. | Numbers exceed 335 or fall below 275. | Range | $10,000 |
| Riparian health | Assure riparian objectives are in AMPs (I). | Review EAs and AMPs. | High/High | Annual | Annual | Forest Plan | Lack of riparian objectives in AMPs. | Range | $500 |
| Forage availability | Determine compliance with S&Gs for forage utilization and evaluate stocking to ensure available capacity is not exceeded. (I, E). | Production utilization studies; field observations; use mapping and utilization measurements. | High/High | Ongoing | Annual | Forest Standards & Guidelines. | Exceeding utilization S&Gs as specified in AMPs and AOPs. | Range | $70,000 |
| Noxious weeds | Determine if noxious weeds have increased to damaging levels. (I) | County weed inventory. | Mod/Mod | Annual | Annual | Infestation levels acceptable for management objectives. | Levels impact meeting management objectives. | Range | $1,500 |
| Developing allotment management plans. | Ensure AMPs are developed for all allotments within 10 years. (I) | Number of AMPs completed. | High/High | Annual | Every 5 years. | 8 AMPs per year. | Less than 5 per year. | Range | $100 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Implementing allotment management plans | Ensure AMPs include S&Gs and are implemented. Determine effectiveness of S&Gs (I,E). | Conduct field reviews. | Mod/Mod | Annual | Annual | Forest Standards and Guidelines | Deviation from management direction. | Range | $1,000 |
| **RECREATION** | | | | | | | | | |
| Physical, social and managerial setting for recreation opportunities. | Assure that selected physical and visual attributes described in the ROS User's Guide are being protected from degradation (I,E). | Review all projects. | Mod/Mod | Every 5 years | Every 5 years | Acres not meeting desired attributes. | More than 10% change in designated ROS classes. | Recreation | $1,000 |
| Condition and use of developed and dispersed sites | Identify need for maintenance and/or regulation of sites (I,E). | Field review 20% of sites, occupancy rate samples and RIM reports. | Mod/Mod | Every 2 years | Every 5 year. | Development and maintenance standards. | Deterioration of site beyond that anticipated under normal use. | Recreation | $1,000 |
| User (visitor) needs and expectations | Identify changing needs and expectations (V). | Interview public at recreation sites; review public comments. | Low/Mod | Annual | Every 5 years | None | When more than 50% of comments indicate need for change. | Recreation | $1,000 |
| Off-highway vehicle (OHV) effects | Determine effects of OHVs on sensitive soil areas, vegetation, cultural, wildlife, and visual resources. Determine conflicts between OHV users and other recreationists (I,E). | Visual evaluation, visitor reports, other resource surveys and data observation. | Mod/Mod | Every 3 years | Every 5 years | Forest Standards and Guidelines | Excessive conflict or resource damage. | Recreation | $2,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **RIPARIAN AREAS** | | | | | | | | | |
| Riparian areas | Evaluate compliance with Plan goals and effectiveness of BMPs and S&Gs in protecting riparian-dependent resources (I,E). | Photo points, bank stability, cover, water temperature, and fish surveys. | Mod/Mod | Annual | Annual | Baseline photos, bank stability, BMPs, Forest Standards and Guidelines. | 10% reduction in channel and riparian condition or riparian area standards. | Water, Wildlife | $4,000 |
| **SENSITIVE PLANTS** | | | | | | | | | |
| Sensitive plants | Detect changes in key populations of sensitive plants and assess management impacts on populations and habitat (I,E,V). | Techniques identified in interim or existing management guides for selected species. | High/High | Annual for specific projects. Key populations monitored according to interim or existing species management guides. | Minimum of every 5 years or as specified in species management guides. | As specified in species management guide, FSM 2670, and sensitive plant handbook. | As specified in species management guide. | Ecology | $25,000 |
| **SOILS** | | | | | | | | | |
| Soil compaction. | Assess loss in productivity; evaluate compaction on 5% of disturbed areas (E). | Nuclear gauge, penetrometer, bulk density sample, visual inspection. | Mod/Mod | Annual | Every 5 years | Porosity of soil before and after activity. | 10% or more reduction in soil porosity on 15% or more of the area. | Soils | $8,000 |
| Significant change in soil productivity | Assess compliance and effectiveness of prescribed mitigation measures and soil-related BMPs to maintain productivity (I,E). | Review EAs and contract provisions, field activity reviews, measure soil parameters. | Mod/Mod | Ongoing as part of EA and contract review process; annual activity reviews. | Every 5 years | R5 soil quality standards. | Meet soil quality standards on at least 85% of lands dedicated to producing vegetation. | Soils | $5,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Response to fertilization | Identify which soil types respond to fertilization and their level of response at selected sites (V). | Use semi-permanent plots and existing Forest fertilization monitoring plan. | High/High | Every 5 years | Every 5 years | R5 preliminary fertilization guidelines for nitrogen fertilization. | Deviation of 10% from expected results. | Soils | $4,000 |
| Soil and water improvement projects | Accomplish projects in priority order (I). | Review attainment reports. | High/High | Annual | Every 5 years | As per project guidelines. | Scheduled projects not accomplished. | Soils | $1,000 |
| SPECIAL INTEREST AND RESEARCH NATURAL AREAS | | | | | | | | | |
| Natural integrity of Research Natural Areas, and Special Interest Areas. | Assess preservation of features for which the area was established (I,V). | Field inspection. | Mod/Mod | Annual | Every 5 years | Establishment report and/or area management plan. | Any encroachment or degradation. | Lands, Cultural Resources, Ecology | $500 |
| TIMBER | | | | | | | | | |
| Land suitability for timber | Verify classification of land as to suited or not suited for timber production (V). | EA reviews; soil survey evaluation; timber stand data; inventory. | Mod/Mod | Each project; at least once each planning period for all lands. | Every 5 years | Existing inventory. | Reclassification leading to a net change of >10% of the current suitable land. | Timber | $1,000 |
| Growth and yield projections. | Determine if growth and yield projections for silvicultural prescriptions are occurring as projected (V). | Timber inventory of plantations and untreated stands. | Mod/Mod | Every 5 years | Every 5 years | Regional and Forest inventory standards. | Unacceptable results based on an ID team review. | Timber | $1,000 |
| Reforestation and timber stand improvements | Verify consistency with scheduled acre outputs and LMP prescriptions (I,E). | Record data from all projects using SRS system. | High/Mod | Annual | Annual | Forest Plan | + or - 20% planned activity schedule on a fiscal year basis. | Timber | $1,000 |

# Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Annual sale quantity and acreage. | Ensure consistency of the timber sale program with the Forest Plan (I). | Record sale quantity and acreage by Forest type regulation class and harvest method on all sales. | High/High | Fiscal year basis | Annual | TRACS | 20% deviation from Forest Plan. | Timber | $1,000 |
| Size of harvest openings | Ensure openings meet Regional policy (I). | Review timber sale EAs, project plans, and reports. | High/High | Each timber sale | Annual | Forest Standards and Guidelines | Exceeds size standard or did not follow process to obtain approval for a larger opening. | Timber | Included in project cost. |
| Dispersal of harvest openings | Ensure that spacing of harvest openings conforms to Regional policy (I). | Review timber sale EAs, projects, plans, and reports. | Mod/Mod | Each timber sale | Annual | Openings nearly surrounded by stands >5 acres (15% of periphery may be in common with other openings). | Any variation. | Timber | Included in project cost. |
| Reforestation survival | Determine success of reforestation practices, (adequately restocked within 5 years) (I,E). | Described in FSH 2409.26; minimum 1% sample. | High/High | FSH 2409.26 Currently 1st and 3rd years and thereafter until certified | Annual | Described in FSH 2409.26 each project. | More than 10% of the acreage is not reforested to standard. | Timber | Included in project cost. |
| Timber stand improvement | Determine success of release and stand improvement practices (E). | Systematic and/or random samples of project areas; 10% of projects. | High/High | Within 5 years of project completion | Annual | Stocking and growth rate that will produce the height, basal area, and volume predicted in yield tables. | More than 10% of timber units growing potentially below standard; −20% deviation from yield tables. | Timber | Included in project cost. |
| Non-chargeable and firewood quantities | Assess trend to determine how detailed management should be (E). | Record volume by species. | Mod/Mod | Fiscal year basis | Annual | TRACS | 20% deviation from Forest Plan | Timber | $1,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Timber-forage plantations | Evaluate growth and survival of conifers and pounds of forage produced (I,E,V). | Systematic and/or random sample. | High/High | 1st and 3rd years and thereafter until certified | Annual | Stocking growth rate that produce the height, basal areas, volume and pounds predicted in yield tables. | More than 10% of unit growing below standard; or -25% deviation from yield tables. | Timber, Wildlife | $10,000 |
| **VISUAL RESOURCES** | | | | | | | | | |
| Trend of visual character | Determine if desired character stated in plan is being approached or maintained (I). | Field reviews with landscape control point method. | High/Mod | Every 5 years | Every 5 years | Forest Standards and Guidelines | Indication of trend away from the stated goal on greater than 5% of areas. | Recreation | $1,000 |
| Visual condition of Forest | Determine compliance with visual quality objectives (VQOs) (I,E). | Review and field check all projects in Retention, 50% of projects in Partial Retention, and periodic review of projects in Modification. | Mod/Mod | Annual | Every 5 years | Forest Plan VQOs. | -10% of 1 and 2 sensitivity level acreages; -33% of other acreage. | Recreation | $500 |
| **WATER** | | | | | | | | | |
| Water quality management | Assess compliance with BMPs, S&Gs direction, and State water quality objectives. Evaluate the effectiveness of BMPs (I,E). | Field inspection of BMP and S&G implementation. Evaluation of effectiveness through field data collection and analysis. | High/Mod | Annual | Annual | Full implementation of BMPs and S&Gs; maintenance or improvement of pre-project water quality. | — 10% non-implementation in any year. —20% of BMPs not effective in any year. | Water | $5,000 |

*Monitoring and Evaluation Requirements*

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Watershed condition | Determine existing watershed condition and provide basis for watershed restoration program (V). | Stream reach inventory and channel stability evaluation. WIN inventory | Mod/Mod | Annual | Annual | Stable condition | Backlog of restoration needs (acres/mile) increases as a result of management activities and does not decrease in response to watershed and riparian area treatments. | Water | $5,000 |
| Cumulative watershed effects | Identify adverse cumulative impacts in specific watersheds (I). | Cumulative watershed impact analysis (FSH 2509.22, Ch. 20). Stream reach inventory and channel stability evaluation. | Mod/Mod | Annual | Annual | Stable stream channels. | Deteriorating stream channels. | Water | $4,000 |
| Cumulative watershed effects | Determine effectiveness and validity of cumulative watershed effects modeling process, and management thresholds (E,V). | Select specific projects for an administrative study. Collect baseline information. | Mod/Mod | Annual | Every 5 years | Predicted vs. actual effects. | Current process does not protect resource values or overly constrains management options. | Water | $50,000 |
| **WILDERNESS** | | | | | | | | | |
| Physical, social, and managerial setting for wilderness opportunities | Assure that wilderness attributes are maintained (I,E). | Sample field observation of heavy use areas and travel corridors. | Mod/Mod | Annual | Every 5 years | Acres not meeting Forest Standards and Guidelines. | When Forest Standards and Guidelines are not being met or a downward trend is observed. | Recreation | $5,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requir- ing Further Ac- tion | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| User (visitor) needs and expec- tations | Identify changing needs and expec- tations. Monitor interactions of wildlife, recreationists, and livestock (V). | Interview public at trailheads, re- view public com- ments. | Low/Mod | Annual | Every 5 years | None | When more than 50% of comments indicate a need for change. | Recreation | $5,000 |
| **WILDLIFE AND FISH** | (see Appendix E for detailed discussion) | | | | | | | | |
| Bald eagle (breeding) | —Determine trend and produc- tivity of breeding population; —Evaluate trend of habitat deline- ated to meet Re- covery Plan objectives. —Assess effec- tiveness of S&Gs (I,E). | Aerial or ground nest surveys, habi- tat condition and use surveys, popu- lation surveys. | Mod/Mod | Annual and spe- cific project re- views | Annual | USFWS Recovery Plan, nest man- agement plans, State survey pro- cedures, Forest Standards and Guidelines, Rap- tor Prescription. | Any decline in habitat or popula- tion. | Wildlife | $5,000 |
| Bald eagle (wintering) | Determine condi- tion and trend of identified active and potential roost sites. Assess effectiveness of S&Gs (I,E). | Vegetation sur- veys, habitat capa- bility analyses, and silvicultural prescriptions, population sur- veys. | Mod/Mod | Annual or project induced | Every 5 years | USFWS Recovery Plan, roost man- agement plans, Forest Standards and Guidelines, Raptor Prescrip- tion. | Any significant decline in habitat capability or de- cline in roosting population. | Wildlife | $12,000 |
| Peregrine falcon | Verify nesting and reproductive suc- cess during and after reintroduc- tion. Assess effec- tiveness of S&Gs (I,E). | Observation dur- ing reintroduction and follow-up sur- veys. | Mod/Mod | Annual | Annual | Success rates of other similar sites within the State. | Lower success or greater loss of birds than State- wide average. | Wildlife | $2,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Northern spotted owl | Survey to determine if nesting pairs occur on Forest. Assess effectiveness of S&Gs (I,E). | Survey protocols and habitat surveys. | Mod/Mod | | Annual | | Species recovery plan. | Noncompliance with Recovery Plan. | Wildlife | $10,000 |
| Bighorn sheep | Evaluate habitat condition, population trend and livestock or recreation interactions (I,E). | Aerial and ground surveys; composition counts; identify conflicts with other resources. | Mod/High | Annual | Annual | Wilderness Prescription, Standards and Guidelines, Bighorn Sheep Management Plan. | Any decline in population attributable to management activity. | Wildlife | $6,000 |
| Goshawk | Determine population and habitat trends; evaluate prescription effectiveness (I,E,V). | Nest surveys for occupancy and production in existing and potential habitat. | Mod/Mod | Annual for selected areas or territories or project induced | Annual | Habitat improvement; Raptor Prescription; Forest Standards and Guidelines; habitat capability models. | Any decline in a sample population over a 3-year period; consistent deviation from Standards and Guidelines, Prescription or target population. | Wildlife | $10,000 |
| Modoc Sucker | Determine condition and trend in critical habitat and populations, effectiveness of BMPs and S&Gs (I,E,V). | Stream surveys, channel profiles, photo points, population sampling, and project reviews. | Mod/Mod | Annual or project induced | Annual | Recovery Plan, Riparian Prescription, Forest Standards and Guidelines. | Any significant decline in habitat condition or population. Noncompliance with Recovery Plan | Wildlife | $10,000 |
| Lost River and shortnose suckers | Determine habitat and population trends, effectiveness of BMPs and S&Gs (I,E,V). | Stream and population surveys, photo points, project reviews. | Mod/Mod | Annual or project induced | Annual | Riparian Prescription, Recovery Plan, Forest Standards and Guidelines, BMPs | Failure to implement Riparian Prescription or meet Recovery Plan objectives. | Wildlife | $10,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Goose Lake redband trout— Lake-run | Determine habitat and population trends, effectiveness of BMPs and S&Gs (I,E,V). | Stream and population surveys, photo points, project reviews. | Mod/Mod | Annual or project induced; population every 5 years or project induced. | Annual | Riparian Prescription, Recovery Plan, Forest Standards and Guidelines, BMPs. | Failure to implement Riparian Prescription or meet Recovery Plan objectives. | Wildlife | $6,000 |
| Fisheries (trout and largemouth bass) | Determine habitat and population trends, effectiveness of BMPs and S&Gs (I,E,V). | Stream/lake habitation surveys, project reviews. | Mod/Mod | Annual | Annual | Riparian Prescription, Forest Standards and Guidelines, habitat capability models, State goals. | Downward or static trend in habitat or populations. | Wildlife | $22,000 |
| Pine marten, Pileated woodpecker | Insure quantity and quality of available habitat to maintain viable populations. Assess effectiveness of S&Gs (I,E,V). | Vegetation mapping, down log and snag transects, population surveys. | Mod/Mod | Every 5 years, or project induced | Every 5 years. | Forest Standards and Guidelines, Riparian Prescription, habitat capability models, old growth acreage goals. | Reduction in acres of old growth below management area objectives; reduction in population levels. | Wildlife | $10,000 |
| Mule deer | Evaluate habitat condition, population trend and effectiveness of S&Gs (I,E). | Deer use surveys, annual CDFG composition counts, vegetation sampling and mapping. | Mod/Mod | Annual and project induced | Annual | State deer herd plans, Timber-Forage Prescription, habitat capability models. | + or - 10% attainment of Forest Plan targets for each herd. Non-compliance with Forest Standards and Guidelines. | Wildlife | $10,000 |
| Pronghorn | Determine habitat condition, population trend and effectiveness of S&Gs (I,E). | State herd counts, forage surveys, type maps, range condition and trend. | Mod/Mod | Annual | Annual | Forest Standards and Guidelines, allotment management plans, State Pronghorn Management Plan. | Downward trend in habitat condition or population. | Wildlife | $10,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Canada goose, Mallard, Sandhill crane | Verify production due to wetland improvements and evaluate habitat conditions. Assess effectiveness of S&Gs (I,E,V). | Nest survey and livestock utilization measurements. | Mod/High | Annual | Annual | Forest Standards and Guidelines, State collection agreements, wetlands objectives. | 10% decine attributable to management activity or inadequate maintenance. | Wildlife | $16,000 |
| Sage grouse | Determine trends in population and habitat. Assess effectiveness of S&Gs (I,E,V). | CDFG or FS lek and brood count, etation mapping and condition and trend measurements. | Low/Mod | Annual bird counts, 5-year habitat trends | Every 5 years | Forest Standards and Guidelines, habitat capability models, State lek and brood counts. | Downward trend in populations or habitat over 5 years. | Wildlife | $6,000 |
| Western grey squirrel, Blue grouse | Monitor acres of habitat and application of S&Gs (I,E). | Vegetation mapping and sampling. | High/Mod | Annual or project induced | Every 5 years | Forest Standards and Guidelines, habitat capability models. | Failure to meet Standards and Guidelines on a Forest-wide basis. Downward trend in population over 5 years. | Wildlife | $2,000 |
| Hairy woodpecker | Verify acres of required vegetation, snag numbers and trends, and implementation of other S&Gs (I,E). | Snag and down log transects, vegetation mapping and project evaluation. | Low/Mod | Every 5 years or project induced | Every 5 years. | Forest Standards and Guidelines, habitat capability models. | Decline in oldgrowth acres or snag numbers due to management activities. | Wildlife | $2,000 |
| Prairie falcon, Osprey, Golden eagle | Ensure existing or potential nest territories are maintained. Assess effectiveness of S&Gs (I,E). | Nest surveys, population surveys, and habitat utilization assessment. | Mod/Mod | Every 5 years or project induced | Every 5 years. | Forest Standards and Guidelines. | Decline in population over 5 years. | Wildlife | $3,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Swainson's hawk | Ensure existing or potential nest territories are maintained. Assess effectiveness of S&Gs (I,E,V). | Nest surveys, population surveys, and habitat utilization assessment. | Mod/Mod | Every 5 years or project induced | Annual | Forest Standards and Guidelines. | Decline in population over 5 years. | Wildlife | $5,000 |
| Riparian species: (Red-breasted and red-naped sapsuckers; willow flycatcher, yellow warbler) | Determine trends in woody vegetation and habitat capability in riparian areas. Assess effectiveness of S&Gs (I,E,V). | Vegetation sampling, photo points, point counts for birds, nesting and reproductive success surveys. | Mod/Mod | Annual to every 5 years | Every 5 years. | Riparian Prescription, Forest Standards and Guidelines, habitat capability models, baseline population or vegetation assemblages. | Decline or static trend in vegetation or population. | Wildlife | $10,000 |
| Habitat improvements | Determine compliance with planned habitat improvement program (I). | Compare accomplishments with Forest-wide and management area direction; all planned improvements. | High/High | Annual | Annual | Forest Standards and Guidelines and management area direction. | + or - 5% of attainment targets. | Wildlife | Costs are part of program. |
| Habitat improvement success | Determine effectiveness of habitat improvements (E,V). | Pre- and post-project sampling of wildlife use; selected improvements. | Mod/Mod | Annual to every 5 years | Every 5 years | Forest-wide and management area direction. | Absence of intended habitat improvement or use. | Wildlife | $5,000 |
| Snags | Assess the numbers, distribution and characteristics of snags on each management area. Assess effectiveness of S&Gs (I,E,V) | Compartment exams, belt transects; use surveys. | High/High | Every 5 years or project induced | Every 5 years | Forest Standards and Guidelines, management area direction, and habitat capability models. | Noncompliance with S&Gs, snag longevity not attained, use rates not achieved. | Wildlife | $10,000 |

## Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| **DIVERSITY** | | | | | | | | | |
| | Assess the amounts, types and distribution of vegetation communities and seral stages. Assess and validate S&Gs (I,E,V) | Compartment exams, landscape analysis. | Mod/Mod | Every 5 years or project induced | Every 5 years | Forest Standards and Guidelines, management area direction. | Noncompliance with Forest Standards and Guidelines. | Wildlife, Timber | $5,000 |
| **ECONOMICS** | | | | | | | | | |
| Unit costs and values | Improve cost and value estimates for planning purposes (V). | Examine expenditure and allocation reports as needed for accuracy. | High/Mod | Annual | Annual | Costs and values in Plan formulation. | 10% variance from standard. | Planning | $1,500 |
| Budget | Determine if budgets have significantly affected the production of projected outputs (I,E,V). | Compare annual budget and output levels with Forest Plan projections. | High/Mod | Annual | Every 5 years | Forest Plan Chapter 4. | Average outputs for 5 years are + or - 10% of decade average. | Planning | $500 |
| **PLANNING** | | | | | | | | | |
| Management direction | To determine compliance with and effectiveness of Chapter 4 direction (I,E). | ID Team reviews of selected projects and districts. | Low/Mod | Annual | Annual | Forest Plan Chapter 4 | Noncompliance or documented need for change. | Planning | $5,000 |
| Management direction | To determine validity of Chapter 4 direction and the effects of the direction on sustained production of goods and services (V). | Management team review of selected projects and districts. | Low/Mod | Annual | Annual | Forest Plan Chapter 4 | Documented need for change. | Planning | $5,000 |

5-22

*Monitoring and Evaluation Requirements*

### Table 5-1. Monitoring Plan by Resource (continued).

| Activity, Effect, or Resource to be Measured | Monitoring Objective | Monitoring Technique | Precision/ Reliability | Monitoring Frequency | Reporting Frequency | Standard | Variation from Standard Requiring Further Action | Reporting Staff | Annual Cost |
|---|---|---|---|---|---|---|---|---|---|
| Issues and Concerns | To determine degree of issue and concern resolution and identify new issues (V). | Public involvement | Mod/Mod | Annual | Annual | Forest Plan Chapter 4 | Adverse public response. | District Rangers, Public Affairs Officer | $1,000 |

# Appendices
## Table of Contents

A.    Implementation Plans      A-1

B.    Research Needs and Technical Planning Needs      B-1

C.    Tentative 10-year Timber Sale Action Plan      C-1

D.    Timber Data      D-1

E.    Fish and Wildlife Monitoring Techniques      E-1

F.    Management Practices (deleted)      F-1

G.    Facilities Management      G-1

H.    Fire Management      H-1

I.    Special Stipulations for Geothermal, Oil, and Gas Leasing      I-1

J.    Guidelines for Range Vegetation Manipulation      J-1

K.    Recreation Opportunity Spectrum      K-1

L.    Trail Program      L-1

M.    Streamside Management Zones      M-1

N.    Water Quality Best Management Practices      N-1

O.    Livestock Management Strategies      O-1

P.    Acreage Allocations by Management Prescription and Management Areas      P-1

Q.    Visual Quality Objectives      Q-1

R.    Big Valley Federal Sustained-Yield Unit Policy Statement      R-1

S.    Range Allotment and Riparian Improvement Priorities      S-1

T.    Stream Classification      T-1

U.    Electronic Sites Designation and Recommendation      U-1

# Appendix A
## Implementation Plans

| Existing Plans Superseded by the Forest Plan |
|---|
| Ranger District Multiple-Use Plans: |
|     Big Valley Ranger District |
|     Devil's Garden Ranger District |
|     Doublehead Ranger District |
|     Warner Mountain Ranger District |
| Medicine Lake Unit Land Management Plan |
| Timber Management Plan & Five-Year Action Plan |
| Land Adjustment Plan |
| South Warner Wilderness Interim Management Plan |
| Off-Highway Vehicle Plan |
| Wetlands Development Plan 1979-84 |
| Geologic Special Interest Areas Interim Plan |
| Fire Pre-Attack Plans |
| Fisheries Habitat Management Plan |
| Deer Herd Habitat Management Plan |

| Existing Plans Retained and Incorporated by Reference into the Forest Plan and Updated to be Consistent |
|---|
| Wild Horse Management Plan |
| Modoc Sucker Recovery Action Plan |
| Transportation Plan |
| Deer Herd Plans |
|     Warner Mountain |
|     McCloud Flat (Glass Mountain) |
|     Interstate |
| Pronghorn Habitat Management Plan |
| Three Sisters Bald Eagle Winter Roost Management Plan |
| Mt. Dome Bald Eagle Winter Roost Management Plan |
| Range Allotment Plans |
| Triangle Lands Development & Management Plan |
| Big Valley Federal Sustained-Yield Unit (BVFSYU) Policy Statement |
| Big Sage Fire Management Plan |

| Needed Implementation Plans |
|---|
| Bald Eagle Nest Territory Plans |
| Bighorn Sheep Management Plan |
| Modoc Sucker Recovery Plan |
| RNA Establishment Report - Raider Basin |
| Off-Highway Vehicle (OHV) Plan |
| Land Adjustment Plan |
| Rights-of-Way Plan |
| Fire Management Action Plan |
| Visual Rehabilitation Plan |
| Viewshed Corridor Plans |
| Medicine Lake Glass Flow Special Interest Area Management Plan |
| Burnt Lava Flow Special Interest Area Management Plan |
| Glass Mountain Glass Flow Special Interest Area Management Plan |
| Erosion and Compaction Control Plan |
| Law Enforcement Plan |
| Road Closure Plan |
| Caldwell-Cougar Bald Eagle Management Plan |
| Lost River and Shortnose Sucker Recovery Plan |
| Forest Reservoir Fisheries Plan |
| Goose Lake Redband Trout Management Plan |
| Peregrine Falcon Recovery Plan |
| Wilderness Management Plan |
| Sensitive Plants Species Management Guides |
| Allotment Management Plans (AMPs) |

# Appendix B
## Research and Technical Planning Needs

This appendix lists and briefly describes research and technical planning needs. Research includes studies needed to fully implement the Forest Plan. Technical planning which can be gathered with existing techniques is needed for the scheduled Plan revision .

## Research Needs

### Air Quality

- Establish and validate region-wide standards for screening AQRV.

### Cultural Resources

- Develop and implement suitable criteria for allocation of cultural resource properties to preservation, conservation, public use (interpretation), or no management.

- Research the significance of information gathered from light density, surface lithic scatters.

- Determine the significance of large obsidian quarry sites present on the Medicine Lake Highlands, Blue Mountain, and Warner Mountains.

### Range

- Rejuvenate mountain mahogany stands.

### Riparian

- Establish the relationship of grazing to riparian area maintenance and recovery.

- Determine the composition and condition of climax riparian communities.

- Study the effects of large woody debris on channel stability, pool development, and fish populations.

- Develop a riparian classification system to determine riparian area potential and predict management effects.

### Sensitive Plants

- Develop species management guides.

### Soil and Water

- Establish and validate a Region-wide standard for estimating cumulative disturbance effects.

- Refine thresholds for unacceptable cumulative disturbance in sensitive watersheds.

- Refine thresholds for unacceptable soil compaction.

- Refine data on soil disturbance to relate to soil productivity.

- Determine relationships between vegetative ecosystems, channel morphology, and aquatic communities.

### Timber

- Improve site preparation and release methods for natural regeneration of true fir.

- Develop practical and cost-effective methods or management schemes for vegetation management without herbicides.

- Determine conifer growth losses from different species of competing vegetation and varying densities.

- Determine soil, plant, and wildlife needs for biomass retention in the event of requests for biomass utilization.

- Improve and develop growth and yield projections for conifer species managed under the uneven-aged system.

- Develop better management schemes for low productivity (<20 cubic feet) timberlands.

- Develop criteria for using fertilizer treatments, i.e., when, what kind, and how much fertilizer is required for what results?

- Evaluate uneven-age management techniques and related growth rates.

### Wildlife and Fish

- Assist the Pacific Southwest Experiment Station and adjacent national forests in a research study to evaluate snag management requirements in eastside pine.

- Determine reasons for decline of sage grouse population  and methods to reverse the trend.

- Determine reasons for low fawn rates for pronghorn on the Devil's Garden Plateau and methods to increase these rates.

- Develop new vegetation sampling techniques which meet wildlife and fish resource management needs to revise the Forest Data Base.

- Conduct a literature review and refine techniques for bitterbrush and other brush species establishment.

- Quantify the relationship between thermal and hiding cover and deer forage.

- Develop a habitat capability model for Swainson's hawk and sandhill crane.

- Assist Pacific Southwest Experiment station in research study to determine the relationship between cumulative watershed effects and condition of the aquatic biota.

- Determine reasons for stunting of largemouth bass in reservoirs and habitat related methods to achieve better growth.

- Assist Pacific Southwest Experiment Station in research study to develop fish habitat relationship models.

- Determine relationships between vegetative ecosystems, channel morphology, and aquatic communities.

- Determine relationships between old-growth habitats and species dependent on this seral stage.

- Determine relationships between riparian areas and species dependent on them.

**Woodlands**

- Develop juniper yield tables.

- Quantify the effects of juniper cutting patterns on diversity.

## Technical Planning Needs

**Cultural Resources**

- Integrate plans for the management of cultural resources with those of the State of California Historic Resources Plan.

- Determine the research potential of known archaeological sites by site type (e.g., lithic scatter, temporary camp, seasonal base camp, etc.)

- Develop a Programmatic Memorandum of Agreement with the State Historic Preservation Officer and Advisory Council on Historic Preservation for managing lithic scatters and obsidian quarry sites.

- Complete a Forest assessment of National Natural Landmarks.

**Geology**

- Complete a Forest-wide third-order Geological Resource Inventory (GRI).

**Minerals**

- Develop a data base for mineral potential of the Forest.

**Range**

- Continue developing the habitat type classification program; and initiate a community type classification and mapping program.

**Recreation**

- Determine the optimum carrying capacity of the Medicine Lake Caldera, including Bullseye Lake, Payne Springs, and other peripheral sites. Prepare a general plan for the area that identifies priorities for development.

- Identify acres that are to managed for semi-primitive recreation. Determine where controls or signing is needed to prevent motorized use of semi-primitive non-motorized areas. Determine carrying capacity and evaluate the accuracy of capacity coefficients used in the Plan.

- Refine and correct the ROS inventory based on current aerial photos and field surveys.

- Complete an inventory of caves, lava tubes, popular dispersed recreation sites, and other features of value for recreation. Compile data on these sites and display in the Recreation Opportunity Guide. Identify measures to protect and enhance recreational values.

**Riparian**

- Develop a riparian area inventory.

**Special Interest Areas**

- Evaluate Dismal Swamp as a potential bontanical special interest area.

**Soil and Water**

- Complete a Forest-wide Watershed Improvement Needs (WIN) Inventory to determine the location and priority of needed watershed restoration.

- Assess soil fertilization opportunities on the forest.

- Conduct an Order 2 Soil Resource Inventory in sensitive watersheds and other sensitive areas, and on the Standard Non-interchangeable Component lands.

- Inventory and analyze the physical, chemical, and biological water quality of select streams and lakes.

- Inventory the instream (non-consumptive) flow needs of select streams.

**Timber**

- Inventory growth and stocking of plantations.

- Determine land base lost to landings, skid trails, and roads.

- Complete a new forest timber inventory before the next plan revision.

- Verify inventory of < 20 cu. ft. growth potential lands.

- Verify changes to land base caused by large fires and harvesting since the 1974 aerial photos were taken, which is the basis for the Forest Plan.

**Wildlife and Fish**

- Identify deer migration routes and key areas and habitat improvement needs for these areas.

- Develop computer habitat capability models for all species currently without them and validate all models.

- Conduct fish habitat assessment and stream surveys on all streams on the Forest that do or could contain fisheries.

- Determine the benefits and costs of wildlife and fishery habitat improvements.

- Identify peregrine falcon cross-fostering sites.

- Determine effects on fish populations of various management practices, including but not limited to logging, livestock grazing, mining, and recreation.

- Develop management strategies for reservoir fisheries.

- Validate all fish habitat relationship models for fish species on the Forest.

- Develop and validate fish habitat relationship models for all species on the Forest currently without them.

- Conduct surveys for amphibians and reptiles to add to the data base for fish and wildlife.

**Visuals**

- Identify priorities for rehabilitation of areas that do not meet Adopted VQOs. Prepare a comprehensive strategy to accomplish work.

**Wild and Scenic Rivers**

- Evaluate Willow and Boles Creeks for wild and scenic river designation.

**Woodlands**

- Quantify the ecological relationships unique to juniper woodlands and identify management opportunities for these areas.

# Appendix C
## Tentative Ten-Year Timber Sale Program

## Reasons for Harvest

**Stands to be Managed Intensively—**Timber will be harvested for the following purposes:

- To regenerate stands to meet regeneration acreage allocations to provide planned future yields.

- To remove trees with insufficient net growth.

- To salvage dead and dying trees.

- To reduce stocking where trees are in excess of desired basal area stocking.

- To meet local and national demand for wood fiber.

**Stands to be Managed for Special Emphasis—**Timber yields are realized by managing for other resource objectives such as landscape or wildlife.

## Harvest Priority

Priorities for timber harvest follow the linear program solution (FORPLAN) for the Plan alternative. Two types of harvest are recognized:

**Regeneration Harvest—**for moving the Forest toward a regulated condition.

**Intermediate Cuttings—**for maintaining stocking for optimum net growth of young stands; or capturing mortality in older stands.

The highest timber management priority is to regenerate stands. Regeneration is the means by which productivity is increased and regulation approached. Poorly-stocked and poorly-growing strata should receive first consideration. The FORPLAN harvest schedule for the Plan alternative shows the timber strata of highest priority for the Plan decade.

Generally, intermediate harvests have second priority—except in the case of catastrophic salvage. Where heavy, concentrated losses cause understocking, land managers must consider trading affected strata for strata that would otherwise have been regenerated. In such cases, achieving regeneration acreage goals is more important than distribution among strata. Although intermediate harvests for stocking control are important, they are scheduled only after regeneration acreage objectives are met, as feasible, in any compartment.

Table C-1 shows tentative priorities for harvest by type of harvest (regeneration and intermediate) as interpreted from the FORPLAN Harvest Report. Priorities are graded from 1 to 3 with priority 3 the lowest for entry.

### Table C-1. Tentative Priorities for Timber Harvest—Decade 1 (1990-1999)

| Type of Harvest | Timber Strata | Priority | Decade Acreage |
|---|---|---|---|
| Even-aged Regeneration Harvest (clearcut, shelterwood, seed tree) | LXX | 2 | 1,700 |
| | M3G | 2 | 1,300 |
| | M4G | 2 | 5,400 |
| | M4P | 1 | 1,500 |
| | M6G | 2 | 300 |
| | P3G | 2 | 9,500 |
| | P4G | 2 | 4,500 |
| | P4P | 1 | 8,900 |
| | R3G | 2 | 200 |
| | R4G | 2 | 300 |
| | R4P | 1 | 400 |
| Intermediate Harvest (Thinning and Sanitation) | All Strata | 2 | 21,000 |
| Uneven-aged Selection | M4G | 2 | 1,400 |
| | P4G | 2 | 2,000 |
| Other Harvest (NIC) | All Strata | 3 | 22,000 |

## Silvicultural Systems

The Forest will write a silvicultural prescription for each stand to be treated. We determine the silvicultural

system through site-specific analysis of each stand. The analysis is based on land management objectives, environmental considerations, stand and site conditions, and economic considerations.

We will consider both even-aged and uneven-aged systems when appropriate. The following criteria should be used as a guide for identifying those stands which are the best candidates for uneven-aged management systems (selection cutting):

- land management objectives which restrict large openings, or a continuous tree cover is desired (i.e., visual retention areas, streamside management zones);

- land management objectives which emphasize resource values other than timber growth and yield (i.e., key wildlife habitat);

- stands which display an uneven or mixed size structure (three or more distinct size/age classes);

- stands which have adequate stocking levels in the various size/age classes, including a manageable component of sapling and pole-size trees which are of crop tree quality;

- younger stands which are relatively vigorous and free of insect and disease problems (i.e., dwarf mistletoe and root diseases);

- stands which are on slopes less than 40% (tractor loggable);

- stands of tree species which are not highly susceptible to logging damage;

- stands of tree species which are very or moderately tolerant to shade;

- stands where repeated entries do not create significant soil compaction problems.

## Timber Management Controls

Regulation is the organization and control of the Forests' growing stock to achieve a sustained yield of wood products over time. The Forests' goal is to approach regulation through scheduled regeneration harvests over a *conversion period*. Two methods of control are commonly employed during this conversion period:

**Area Control**—This method is generally associated with even-aged silviculture. It provides for harvesting and regenerating areas of equal productivity. The expected result at the end of the conversion period is an equal distribution of age classes. Table C-2 shows area controls for the planning period.

| Table C-2. Vegetative Management Practices. Annual Average in the 1st Decade for Suitable Land. | |
|---|---|
| **Practice** | **Acres** |
| *Regeneration Harvest:* | |
| Clearcut | 3,120 |
| Shelterwood and Seed Tree: | |
| Preparatory Cut | 0 |
| Seed Cut | 280 |
| Removal | 0 |
| Selection | 340 |
| *Intermediate Harvest:* | |
| Commercial Thinning | 200 |
| Salvage/Sanitation | 1,900 |
| Timber Stand Improvement | 5,400 |
| Reforestation[*] | 3,400 |
| [*] Almost 10% of harvest acres will not require planting. | |

**Volume Control**—This method can be applied to even-aged or uneven-aged management schemes. It provides for nearly equal yields over the conversion period based on present and predicted stand volumes. Table C-3 shows volume controls for the planning period.

| Table C-3. Allowable Sale Quantity and Timber Sale Program Quantity[1]. (Annual Average for 1st Decade.) | | |
|---|---|---|
| **Harvest Method** | **Allowable Sale Quantity[2]** | |
| | Sawtimber (MMCF) | Other Products (MMCF) |
| *Regeneration Harvest:* | | |
| Clearcut | 4.9 | 0.4 |
| Shelterwood and Seed Tree | - | - |
|   Preparatory Cut | - | - |
|   Seed Cut | 0.6 | - |
|   Removal Cut | - | - |
| Selection | 0.8 | 0.1 |
| *Intermediate Harvest:* | | |
|   Commercial Thinning | <0.1 | nominal |
|   Salvage/Sanitation | <0.1 | nominal |
| *Special Harvest*[3] | 0.7 | - |
| **Total** | 7.1 | 0.5 |
| **Additional Sale[4]** | | |
| **Total for all harvest methods** | - | 0.3 |
| Allowable sale quantity: 7.6 MMCF or 45.5 MMBF[5] | | |
| Timber sale program quantity[6]: 7.9 MMCF or 47.5 MMBF[5] | | |

[1] To be expressed to nearest .1 MM board and cubic feet.
[2] Only includes chargeable volumes from suitable lands.
[3] <20 ft[3] lands, Retention, and Riparian.
[4] Only includes nonchargeable volumes from suitable and/or unsuitable lands.
[5] Based on local unit of measure.
[6] Total of allowable sale quantity and additional sales.

Implementing the timber management portion of the Plan requires maintaining control over volume and area to achieve optimum yields during and after the conversion period.

Allowable Sale Quantity (ASQ) is established as the maximum harvest for the planning period. Scheduled volume offered in a single year may fluctuate, but the decade scheduled volume must reflect the average annual ASQ. Scheduled volume is based on inventory data and growth and yield projections from the suitable, regulated timber land base. Additional non-scheduled volume may be obtained from unsuitable timber lands. Non-scheduled volume may be offered for sale in any year, depending on its availability, demand for it, and funding available for preparing sales.

Figure C-1 shows the relationship of ASQ to long-term sustained yield.



**Figure C-1. Long-Term Sustained Yield Capacity (LTSYC) and Allowable Sale Quantity (ASQ).**

nations that consider site specific-conditions and factors;

– consistent trends in per-acre volume yields that differ from predicted yields.

## Tentative Ten-Year Timber Sale Action Plan

Preparing a reliable timber sale program, especially for periods longer than five years, is difficult because of factors beyond our control. One critical factor is that much suitable timber land on the Forest is currently under timber sale contracts; termination dates for many sales are uncertain.

In addition, the timber sale planning process for an individual sale—from compartment inventory and analysis until sale date—takes at least six years to complete. Also, harvest levels in the first few years of the program are tied to current program budget levels. Therefore, the first five years of the program—particularly the first two or three years—respond largely to the existing timber management plan and projected budget levels.

Table C-4 outlines the Forest's Tentative 10-Year Timber Sale Action Plan.

**First Five Years (1990-1994)**—Individual sale information is presented by ranger district and fiscal year. (The projected volume to be sold during this period averages 49 MMBF per year.) This program is based on current information. It is a tentative plan subject to periodic revisions, at least annually.

**Second Five Years (1995-1999)**—Specific details of sale areas, volume to be harvested, and road construction are not known for sales in the second half of the planning period. This information will be available, and incorporated into the Forest Plan, as the timber sale program is updated and revised. (The projected volume to be sold during this period averages 42 MMBF per year.) Timber sales during this period are subject to volume and area controls discussed previously in this Appendix. The ten-year average is about 45.5 MMBF.

**Table C-4. Tentative 10-Year Timber Sale Action Plan.** (See key to abbreviations at end of Appendix.)

| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Proposed Volume (MMBF) | Road Miles Const. | Road Miles Reconst. | Primary Harvest Methods Silvicultural | Primary Harvest Methods Logging Methods |
|---|---|---|---|---|---|---|---|---|---|
| FY 90 | Warner Mtn | Joseph II | 34 | 540 | 7.2 | 0 | 3.9 | OSR[1], CC | Tractor |
| | | Middle | 34 | 800 | 4.5 | 0.1 | 0 | OSR, CC | Tractor |
| | | Refuge | 34 | 760 | 6.8 | 0.1 | 7.0 | OSR, CC | Tractor |
| | | Bridge | 36 | 430 | 5.8 | 0 | 0 | OSR, CC | Tractor |
| | Big Valley | COPT | 41 | 100 | 2.1 | 0 | 0 | CC | Tractor |
| | | Southsun (BVFSYU) | 44 | 470 | 7.3 | 0 | 0 | CC | Tractor |
| | | Long Bell | 41 | 800 | 10.0 | 21.0 | 0 | CC, OSR | Tractor |
| | Devil's Garden | Mowitz | 53 | 1,100 | 3.5 | 0 | 0 | OSR, CC | Tractor |
| | Doublehead | Buckborde | 62 | 110 | 3.5 | 0.8 | 0 | CC, OSR | Tractor |
| | | Shotgun | 62 | 430 | 7.2 | 0.1 | 0 | CC, OSR, SHELT | Tractor |
| | **Total FY 90** | | | **5,540** | **57.9** | **1.1** | **33.0** | | |
| FY 91 | Warner Mtn | Del Prat | 32 | 1,520 | 4.4 | 4.5 | 2.6 | OSR, CC | Tractor |
| | | Lassen | 32 | 1,280 | 5.1 | 0 | 0 | OSR, CC | Tractor |
| | | Sheeprock | 34 | 880 | 13.5 | 9.5 | 0 | CC, OSR | Tractor/ Cable |
| | Big Valley | Foxy (BVFSYU) | 44 | 290 | 4.0 | 0.8 | 5.5 | OSR, CC | Tractor |
| | Devil's Garden | Badger I | 53 | 1,050 | 6.0 | 0 | 12.4 | UEAM | Tractor |
| | | Badger II | 53 | 1,330 | 6.0 | 0 | 0 | UEAM | Tractor |
| | Doublehead | Bruin | 61 | 230 | 4.6 | 0.3 | 2.3 | CC, OSR | Tractor |
| | | Paynetakers | 61 | 670 | 9.0 | 0 | 5.1 | OSR, CC, SHELT | Tractor |
| | **Total FY91** | | | **7,250** | **52.6** | **15.1** | **27.9** | | |

**Table C-4.Tentative 10-Year Timber Sale Action Plan (cont'd)**

| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Proposed Volume (MMBF) | Road Miles Const. | Road Miles Reconst. | Primary Harvest Methods Silvicultural | Primary Harvest Methods Logging Methods |
|---|---|---|---|---|---|---|---|---|---|
| FY 92 | Warner Mtn | Mill | 31 | 1,300 | 16.0 | 9.6 | 0 | SHELT | Tractor |
| | | Horse II | 34 | 380 | 7.6 | 1.2 | 0 | OSR, CC | Tractor |
| | Big Valley | Canyon II (BVFSYU) | 44 | 500 | 2.0 | 4.0 | 1.1 | CC, OSR | Tractor |
| | | Big John II (BVFSYU) | 45 | 1,550 | 2.1 | 1.2 | 1.0 | CC | Tractor |
| | | Letterbox II (BVFSYU) | 45 | 570 | 1.3 | 0 | 0.5 | OSR, CC | Tractor |
| | | Stratton II (BVFSYU) | 45 | 1,300 | 2.0 | 0 | 1.0 | OSR, CC | Tractor |
| | Devil's Garden | Grizzlie | 52 | 1,500 | 3.0 | 0 | 0.2 | CC, OSR | Tractor |
| | | Badger III | 53 | 1,570 | 3.0 | 1.6 | 7.1 | UEAM | Tractor |
| | Doublehead | Red Lyon | 62 | 620 | 2.0 | 0 | 1.0 | OSR, CC, SHELT | Tractor/ Cable |
| | | Bertha | 63 | 1,250 | 5.0 | 0 | 2.0 | CC, OSR, SHELT | Tractor |
| | **Total FY 92** | | | **10,450** | **44.0** | **17.6** | **13.9** | | |
| FY 93 | Warner Mtn | Compt 301 | 31 | 500 | 3.0 | 8.0 | 0 | OSR, CC | Tractor |
| | | Franklin CT | 32 | 500 | 2.0 | 0 | 0 | CT | Tractor |
| | | N. Fork | 32 | 270 | 4.0 | 6.0 | 0 | OSR, CC | Tractor |
| | | Irons | 33 | 200 | 3.0 | 1.5 | 0 | CC, OSR | Tractor |
| | | Pepperdine | 34 | 600 | 2.0 | 1.0 | 0 | OSR, CC | Tractor |
| | | Compts 338-342 | 36 | 600 | 6.0 | 1.5 | 0 | OSR, CC | Tractor |

**Table C-4.Tentative 10-Year Timber Sale Action Plan (cont'd)**

| Fiscal Year | Ranger District | Sale Name | Management Area | Harvest Area (Acres) | Volume (MMBF) | Road Miles Const. | Road Miles Reconst. | Silvicultural | Logging Methods |
|---|---|---|---|---|---|---|---|---|---|
| | Big Valley | Snicker | 41 | 2,300 | 3.0 | 0.2 | 1.0 | SEL | Tractor |
| | | Manzanita | 44 | 60 | 1.5 | 0.4 | 0.5 | CT, CC | Tractor |
| | | Dutch II (BVFSYU) | 44 | 485 | 6.0 | 1.0 | 1.2 | OSR, CC | Tractor/ Cable |
| | | Exchange (BVFSYU) | 45 | 2,500 | 1.5 | 0.3 | 0.5 | OSR | Tractor |
| | Devil's Garden | Craig Springs | 54 | 2,800 | 1.0 | 0 | 1.5 | OSR, CC | Tractor |
| | | Fingers | 54 | 2,200 | 0.5 | 1.0 | 0.2 | OSR | Tractor |
| | | Spaulding | 54 | 2,700 | 0.5 | 0 | 0.5 | OSR | Tractor |
| | | Shot | 62 | 500 | 5.0 | 1.0 | 0.5 | OSR, CC | Tractor/ Cable |
| | | Shacknasty | 63 | 1,000 | 2.0 | 0 | 5.9 | OSR, CC | Tractor |
| | **Total FY 93** | | | **14,215** | **44.0** | **21.9** | **5.9** | | |
| **FY 94** | Warner Mtn | Compt 303 | 31 | 600 | 3.0 | 1.5 | 0 | OSR, CC | Tractor |
| | | Compt 304 | 31 | 400 | 3.0 | 2.5 | 0 | SHELT, OSR | Tractor |
| | | Plum Compt 312 | 32 | 530 | 8.0 | 3.0 | 0 | CC, OSR | Tractor |
| | | Parsnip I | 36 | 240 | 6.0 | 1.0 | 0 | CC | Tractor |
| | Big Valley | Dutch III (BVFSYU) | 44 | 350 | 3.0 | 1.0 | 0.5 | CC, OSR | Tractor/ Cable |
| | | Foxy II (BVFSYU) | 44 | 200 | 2.0 | 0.3 | 1.0 | CC | Tractor |
| | | Hunter Rdg II (BVFSYU) | 44 | 300 | 5.0 | 0.1 | 0.5 | OSR, CC | Tractor |
| | Devil's Garden | Badger Short | 53 | 3,150 | 1.5 | 0 | 0 | OSR | Tractor |

**Table C-4. Tentative 10-Year Timber Sale Action Plan (cont'd)**

| Fiscal Year | Ranger District | Sale Name | Management Area | Harvest Area (Acres) | Proposed Volume (MMBF) | Proposed Road Miles Const. | Proposed Road Miles Reconst. | Primary Harvest Methods Silvicultural | Primary Harvest Methods Logging Methods |
|---|---|---|---|---|---|---|---|---|---|
| | | Duncan | 53 | 1,900 | 2.5 | 1.0 | 0.5 | OSR | Tractor |
| | | Gas Drum II | 53 | 3,700 | 2.0 | 0 | 0 | OSR | Tractor |
| | Doublehead | Black | 62 | 330 | 5.0 | 2.0 | 1.0 | CC, OSR, SH | Tractor |
| | | Damudtim | 64 | 1,250 | 5.0 | 3.0 | 3.0 | OSR, CC | Tractor |
| | **Total FY 94** | | | **12,950** | **46.0** | **24.9** | **9.5** | | |
| FY 95 | Warner Mtn | Compt 333 & 334 | 34 | 1,500 | 5.0 | 1.5 | 1.0 | OSR, CC | Tractor |
| | | Granger SL | 34 | 300 | 4.5 | 1.0 | 1.0 | CC | Tractor |
| | | Compt 343 | 36 | 250 | 2.0 | 0 | 0.5 | CC, OSR | Tractor |
| | | Compt 348 | 36 | 400 | 1.0 | 2.0 | 8.0 | OSR | Tractor |
| | | Parsnip 2 | 36 | 320 | 8.0 | 1.5 | 1.0 | CC | Tractor |
| | Big Valley | Southsun II | 44 | 400 | 5.0 | | 2.0 | CC, OSR | Tractor |
| | | Sweagert Flat (BVFSYU) | 44 | 400 | 1.0 | 0 | 0.5 | OSR | Tractor |
| | | Rush II (BVFSYU) | 44 | 250 | 3.0 | 2.0 | 1.0 | OSR, CC | Tractor |
| | | Heartrock (BVFSYU) | 45 | 2,000 | 4.0 | 0 | 2.0 | OSR | Tractor |
| | | Ash Ck Ex (BVFSYU) | 45 | 900 | 2.0 | 0.5 | 1.0 | OSR | Tractor |
| | Devil's Garden | East Blue | 52 | 3,000 | 2.0 | 0 | 1.5 | OSR | Tractor |
| | | Beeler | 54 | 2,700 | 2.0 | 0 | 2.0 | OSR | Tractor |

| Table C-4.Tentative 10-Year Timber Sale Action Plan (cont'd) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Proposed** | | | **Primary Harvest Methods** | |
| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Volume (MMBF) | Road Miles | | Silvicultural | Logging Methods |
| | | | | | | Const. | Reconst. | | |
| | Doublehead | Hawk | 62 | 740 | 4.0 | 0 | 1.0 | OSR, CC | Tractor/Cable |
| | | Border II | 62 | 600 | 6.0 | 1.0 | 0.5 | OSR, CC | Tractor |
| | **Total FY 95** | | | 13,760 | **49.5** | **8.5** | **23.0** | | |
| **FY 96** | Warner Mtn | Compt 314, 315 | 32 | 350 | 7.0 | 5.0 | 2.0 | OSR, CC | Tractor |
| | | Compt 318 | 33 | 400 | 4.0 | 0 | 3.0 | OSR, CC | Tractor |
| | | Blue CT | 34 | 600 | 3.0 | 1.0 | 0.5 | CT | Tractor |
| | | Cedar SL | 34 | 250 | 5.0 | 0 | 3.0 | OSR, CC | Tractor |
| | | Green SL | 34 | 450 | 2.0 | 0.5 | 1.0 | OSR, CC | Tractor |
| | | S.Pine SL | 34 | 880 | 4.0 | 0 | 3.0 | OSR, CC | Tractor |
| | | Yellow | 34 | 650 | 3.0 | 0 | 1.5 | OSR, CC | Tractor |
| | Big Valley | Fir (BVFSYU) | 44 | 500 | 3.0 | 0.5 | 1.0 | OSR, CC | Tractor |
| | | Letterbox II (BVFSYU) | 45 | 1,000 | 3.0 | 0 | 1.8 | OSR | Tractor |
| | | Moron Spring (BVFSYU) | 44 | 500 | 1.5 | 0 | 0 | OSR | Tractor |
| | | Manzanita II (BVFSYU) | 44 | 130 | 2.0 | 0.2 | 0.2 | OSR | Tractor |
| | | Quaking Aspen (BVFSYU) | 44 | 500 | 3.0 | 0.3 | 1.0 | OSR | Tractor |

**Table C-4. Tentative 10-Year Timber Sale Action Plan (cont'd)**

| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Volume (MMBF) | Proposed Road Miles Const. | Proposed Road Miles Reconst. | Primary Harvest Methods Silvicultural | Primary Harvest Methods Logging Methods |
|---|---|---|---|---|---|---|---|---|---|
| | Devil's Garden | Wart | 53 | 2,000 | 1.5 | 0 | 0 | OSR | Tractor |
| | Doublehead | Stud | 61 | 500 | 5.0 | 0 | 2.5 | OSR, SHELT, CC | Tractor |
| | | Four Mile | 65 | 200 | 2.5 | 0.5 | 1.0 | OSR | Tractor/ Cable |
| | **Total FY 96** | | | **8,910** | **49.5** | **8.0** | **21.5** | | |
| **FY 97** | Warner Mtn | Compt 307-309 | 32 | 1,500 | 10.0 | 3.0 | 5.0 | CC | Tractor |
| | | Compt 327-328 | 34 | 450 | 3.0 | 0 | 1.5 | CC | Tractor |
| | Big Valley | Compt 417-419 | 42 | 400 | 2.0 | 0.2 | 0.2 | CC | Tractor |
| | | Compt 456 (BVFSYU) | 44 | 1,600 | 8.0 | 1.5 | 3.0 | CC | Tractor |
| | Devil's Garden | Timber Mtn | 52 | 800 | 0.5 | 0 | 0 | OSR | Tractor |
| | | Stovepipe | 53 | 2,400 | 2.0 | 0 | 1.5 | OSR | Tractor |
| | | Ambrose | 54 | 3,100 | 2.5 | 0 | 1.5 | OSR | Tractor |
| | Doublehead | Mt Hoff-man | 61 | 600 | 6.0 | 5.0 | 0.5 | CC, OSR, SHELT | Tractor/ Cable |
| | | Medicine Lake | 61 | 1,200 | 6.0 | 2.0 | 3.5 | CC, OSR, SHELT | Tractor/ Cable |
| | **Total FY 97** | | | **12,050** | **40.0** | **7.0** | **11.7** | | |
| **FY 98** | Warner Mtn | Compt 310-312 | 32 | 1,800 | 10.0 | 0 | 0 | OSR, CC | Tractor |
| | Big Valley | Compt 410 | 41 | 1,800 | 10.0 | 0 | 0 | CC | Tractor |

| Table C-4.Tentative 10-Year Timber Sale Action Plan (cont'd) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Proposed | | | Primary Harvest Methods | |
| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Volume (MMBF) | Road Miles | | Silvicultural | Logging Methods |
| | | | | | | Const. | Reconst. | | |
| | | Compt 422, 423 (BVFSYU) | 44 | 1,800 | 8.0 | 1.0 | 5.0 | CC, OSR | Tractor/ Cable |
| | Devil's Garden | Compt 505-508 | 52 | 800 | 3.0 | 0 | 2.0 | CC | Tractor |
| | | Compt 542, 543 | 54 | 500 | 2.0 | 0 | 0 | CC | Tractor |
| | Doublehead | Compt 605-607 | 61 | 700 | 8.0 | 1.0 | 6.0 | CC | Tractor |
| | **Total FY 98** | | | **6,800** | **37.0** | **6.0** | **2.4** | | |
| **FY 99** | Warner Mtn | Compt 345-348 | 36 | 1,200 | 6.0 | 2.0 | 4.0 | OSR, CC | Tractor |
| | | Compt 336 | 36 | 1,500 | 3.0 | 1.0 | 2.0 | UEAM | Tractor |
| | | Compt 340-342 | 36 | 500 | 2.0 | 0 | 1.0 | OSR, CC | Tractor |
| | Big Valley | Compt 411-413 | 41 | 1,000 | 5.0 | 0 | 3.0 | UEAM | Tractor |
| | | Compt 450-454 (BVFSYU) | 44 | 1,200 | 4.0 | 1.0 | 2.0 | OSR, CC | Tractor |
| | | Compt 443-444 (BVFSYU) | 44 | 1,000 | 2.0 | 0 | 1.5 | OSR, CC | Tractor |
| | | Compt 460-462 (BVFSYU) | 45 | 1,000 | 3.0 | 0 | 1.0 | CC, OSR | Tractor |
| | Devil's Garden | Compt 509-511 | 52 | 1,000 | 2.0 | 0 | 1.0 | OSR | Tractor |
| | | Compt 520-525 | 53 | 1,000 | 2.0 | 0 | 2.0 | OSR | Tractor |

**Table C-4 (cont'd.)**

| Fiscal Year | Ranger District | Sale Name | Manage-ment Area | Harvest Area (Acres) | Proposed | | | | Primary Harvest Methods | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Volume (MMBF) | Road Miles | | | Silvicultural | Logging Methods |
| | | | | | | Const. | Reconst. | | | |
| | Doublehead | Compt 616, 618 | 61, 62 | 700 | 3.0 | 0 | 2.0 | OSR | Tractor | |
| | | Compt 608, 609, 622 | 62 | 800 | 4.0 | 0 | 3.0 | OSR | Tractor | |
| | Total FY 99 | | | 10,900 | 36.0 | 4.0 | 22.5 | | | |

**Key to Abbreviations:**

**CC** clearcut

**OSR** overstory removal

**SHELT** shelterwood (seed tree)

**CT** commercial thinning

**UEAM** uneven-aged management

**SEL** selection

**MMBF** Million board feet

**C** construction

**R** Reconstruction

**SL** small log (sale)

**BVFSYU** Big Valley Federal Sustained-Yield Unit

**Compt** compartment.

# Appendix D
## Timber Data

| Table D-1. Present and Future Forest Timber Conditions | | | |
|---|---|---|---|
| | **Unit of Measure** | **Suitable Land** | **Unsuitable Land** |
| **Present forest:** | | | |
| Growing stock | MMCF | 615.2 | 188.3 |
| | MMBF | 3,778.6 | 1,151.5 |
| Live cull | MMCF | 11.6 | 3.1 |
| | MMBF | 52.6 | 14.5 |
| Salvable dead | MMCF | 4.1 | 1.3 |
| | MMBF | 26.9 | 8.1 |
| Annual net growth | MMCF | 8.9 | 2.5 |
| | MMBF | 57.5 | 16.2 |
| Annual mortality | MMCF | 1.3 | 0.4 |
| | MMBF | 8.3 | 2.7 |
| **Future forest:** | | | |
| Growing stock | MMCF | 647.4 | |
| Annual net growth | MMCF | 10.3 | |
| **Rotation ages:[1]** | | | |
| Lodgepole pine | 70-140 | | |
| Mixed conifer | 70-150 | | |
| Eastside pine | 70-150 | | |
| Red fir | 80-140 | | |
| [1] Rotations shown are average rotations | | | |

| Table D-1. (cont'd.) | | |
| --- | --- | --- |
| Age class distribution --- suitable acres | | |
| Age Class | Present Forest | Future Forest |
| 10 | 62,270 | 26,860 |
| 20 | | 28,350 |
| 30 | | 26,580 |
| 40 | | 32,690 |
| 50 | | 32,690 |
| 60 | | 33,230 |
| 70 | 77,850 | 29,310 |
| 80 | | 26,600 |
| 90 | 166,070 | 34,570 |
| 100 | 15,570 | 40,800 |
| 110 | 5,190 | 18,690 |
| 120 | 93,420 | 23,030 |
| 130 | 67,470 | 17,680 |
| 140 | 5,190 | 9,490 |
| 150 | | 3,930 |
| 160 | | 4,300 |
| 170 | | 20,220 |
| 180 | 25,950 | |
| 190 | | |
| 200 + | | 110,260 |
| **Total** | 518,980 | **518,980** |

## Table D-2. Land Classification

| | Classification | Acres | % of Forest |
|---|---|---|---|
| 1 | **Non-Forest Land** | 505,024 | 30% |
| | Includes rangeland vegetation, meadows, water, barren areas, rock, and developed areas. | | |
| 2 | **Forest Land** | 1,158,296 | 70% |
| | Item 11 less Item 1 | | |
| 3 | **Forest Land Withdrawn From Timber Production** | 28,604 | 2% |
| | Forest lands withdrawn by Act of Congress, the Secretary of agriculture, or the Chief of the Forest Service. Includes the South Warner Wilderness. | | |
| 4 | **Forest Land Not Capable of Producing Industrial Wood** | 492,594 | 30% |
| | Available forest land with species not currently utilized such as western juniper, aspen, black oak, and white-bark pine. | | |
| 5 | **Forest Land Physically Unsuitable** | | |
| | a. Irreversible damage to soils, watershed, or productivity likely to occur. | 0 | 0% |
| | b. Cannot be adequately restocked within 5 years of final harvest | 17,840 | 1% |
| 6 | **Forest Land For Which Information is Inadequate To Predict Response** | 0 | 0% |
| 7 | **Tentatively Suitable Forest Land** | 619,258 | 37% |
| | Item 2. less Items 3, 4, 5, and 6. | | |
| | a. >20 cu. ft. lands | 435,103 | 26% |
| | b. <20 cu. ft. lands | 184,155 | 11% |
| 8 | **Forest Land Not Appropriate for Timber Production** | 100,278 | 6% |
| | a. Minimum Management Requirements | 69,403 | 4% |
| | b. Multiple-use Objectives | 23,013 | 1% |
| | c. Cost Efficiency | 7,862 | <1% |
| 9 | **Unsuitable Forest Land** | 639,316 | 38% |
| | (Items 3, 4, 5, 6, and 8) | | |

## Table D-2 (cont'd.)

| Classification | Acres | % of Forest |
|---|---|---|
| 10  **Total Suitable Forest Land** | 518,930 | 31% |
| (Items 2 minus Item 9) | | |
| a. > 20 cu. ft. lands | 366,510 | 22% |
| b. < 20 cu. ft. lands | 152,470 | 9% |
| 11  **Total National Forest** | **1,663,320** | **100%** |

## Table D-3. Eastside Pine Age and Size Class Distribution

| Description | Stratum Label | Average Age[1] | Acres | (%) |
|---|---|---|---|---|
| Plantations, seedlings, saplings, good stocking | PLG | 10[2] | 40,513 | (9%) |
| Plantations, seedlings, saplings, poor stocking | PLP | 10[2] | 16,001 | (4%) |
| Poles and small sawtimber, good stocking | P3G | 90 | 40,202 | (10%) |
| Poles and small sawtimber, poor stocking | P3P | 70 | 168,207 | (42%) |
| Medium and large sawtimber, good stocking | P4G | 130 | 28,069 | (7%) |
| Medium and large sawtimber, poor stocking | P4P | 120 | 109,967 | (27%) |
| Two-storied stand | P6G | 110-230 | 2,463 | (1%) |
| **Total** | | | 405,422 | |

[1] Average age is equal to the basal areas weighted age.
[2] Plantations are 1-50 years old. As a matter of convenience, they were assigned ages of 10 years.

### Table D-4. Mixed Conifer Age and Size Class Distribution.

| Description | Stratum Label | Average Age | Acres | (%) |
|---|---|---|---|---|
| Saplings | M1X | 10 | 9,460 | (5%) |
| Poles and small sawtimber, good stocking | M3G | 120 | 54,840 | (27%) |
| Poles and small sawtimber, poor stocking | M3P | 130 | 64,198 | (32%) |
| Medium and large sawtimber, good stocking | M4G | 180 | 36,516 | (18%) |
| Medium and large sawtimber, poor stocking | M4P | 130 | 31,580 | (16%) |
| Two-storied stand | M6G | 90-490 | 3,807 | (2%) |
| **Total** | | | 200,401 | |

### Table D-5. Red Fir Age and Size Class Distribution.

| Description | Stratum Label | Average Age | Acres | (%) |
|---|---|---|---|---|
| Poles and small sawtimber, good stocking | R3G | 140 | 5,099 | (38%) |
| Poles and small sawtimber, poor stocking | R3P | 110 | 3,897 | (29%) |
| Medium and large sawtimber, good stocking | R4G | 160 | 3,208 | (24%) |
| Medium and large sawtimber, poor stocking | R4P | 170 | 1,221 | (9%) |
| **Total** | | | 13,425 | |

### Table D-6. Timber Age and Size Class Distribution.

| Description | Stratum Label | Average Age | Acres | (%) |
|---|---|---|---|---|
| Plantations, seedlings, saplings, good stocking | PLG, M1X | 10 | 49,999 | (8%) |
| Plantations, seedlings, saplings, poor stocking | PLP | 10 | 16,001 | (2%) |
| Poles and small sawtimber, good stocking | P3G, M3G R3G, LXX | 90-140 | 120,809 | (19%) |
| Poles and small sawtimber, poor stocking | P3P, M3P, R3P | 70-130 | 236,302 | (37%) |
| Medium and large sawtimber, good stocking | P4G, M4G, R4G | 130-180 | 67,793 | (11%) |
| Medium and large sawtimber, poor stocking | P4P, M4P, R4P | 120-170 | 142,768 | (22%) |
| Two-storied stand | P6G, M6G | 90-490 | 6,270 | (1%) |
| **Total** | | | **639,942** | |

**Table D- 7. Suitable Timberland : >20 and <20 Cubic Feet Per Acre Per Year.**

| Strata | Total Acres | Acres | |
|---|---|---|---|
| | | >20 cu.ft. | <20 cu.ft. |
| LXX | 17,903 | 5,570 | 2,333 |
| M1X | 9,407 | 8,733 | 674 |
| M3G | 49,452 | 49,452 | 0 |
| M3P | 57,245 | 30,705 | 26,540 |
| M4G | 29,558 | 29,558 | 0 |
| M4P | 28,134 | 19,386 | 8,748 |
| M6G | 2,654 | 2,654 | 0 |
| PLG/PLP | 56,579 | 51,568 | 5,011 |
| P3G | 39,960 | 39,960 | 0 |
| P3P | 167,310 | 84,394 | 82,916 |
| P4G | 27,976 | 27,976 | 0 |
| P4P | 109,934 | 52,015 | 57,919 |
| P6G | 1,859 | 1,859 | 0 |
| R3G | 5,099 | 5,099 | 0 |
| R3P | 3,897 | 3,883 | 14 |
| R4G | 3,208 | 3,208 | 0 |
| R4P | 1,221 | 1,221 | 0 |
| Subtotal | 611,396 | 427,241 | 184,155 |
| Nonstocked[1] | 7,862 | 7,862 | 0 |
| Total | 619,258 | 435,103 | 184,155 |

NOTE: Total acreage is 340 acres less than the data base because of rounding errors when aggregating analysis areas.

[1]    Productive soils capable of acceptable tree growth, but currently without tree cover. These lands are probably non-stocked because of natural causes, such as wildfires.

## Table D-8. Timber Management Outputs and Activities.

| Management Practice | Acres/Year | Allowable Sale Quantity | |
|---|---|---|---|
| | | MMCF/Year | MMBF/Year |
| Regeneration Harvest | | | |
| *By Forest Type:* | | | |
| Eastside Pine | 2,490 | 2.68 | 16.4 |
| Mixed Conifer | 985 | 3.3 | 20.4 |
| Red Fir | 95 | 0.4 | 2.4 |
| Lodgepole Pine | 170 | 0.2 | 1.5 |
| **Total** | 3,740 | **6.6** | **40.7** |
| *By Cutting Method:* | | | |
| Clearcut | 3,120 | 5.2 | 32.0 |
| Shelterwood | 280 | 0.5 | 3.2 |
| Selection | 340 | 0.9 | 5.5 |
| **Total** | 3,740 | **6.6** | **40.7** |
| Intermediate Harvest | | | |
| Commercial Thinning | 200 | <0.8 | <0.1 |
| Sanitation Salvage | 1,900 | 0.5 | 0.2 |
| **Non-Interchangeable Component (NIC)** (Includes harvest from the Visual Retention, Riparian, and <20 Prescriptions) | 2,200[1] | 0.7 | 4.5 |
| **Total Harvest** | 8,040 | **7.6** | **45.5** |
| Other Practices | | | |
| Release | 3,400 | | |
| Precommercial Thinning | 2,000 | | |
| Total Timber Stand Improvement | 5,400 | | |
| Reforestation | 3,400 | | |

[1] **Estimated actual harvest rather than allocation amount.**

**Table D-9. Timber Productivity Classification.**

| Potential Growth (Cubic Feet/ Acre/Year) | Suitable Lands (M Acres) | Unsuitable Lands (M Acres) |
|---|---|---|
| Less than 20 | 152.5 | 49.5 |
| 20-49 | 131.8 | 34.9 |
| 50-84 | 193.5 | 51.3 |
| 85-119 | 40.1 | 10.6 |
| 120-164 | 1.1 | 0.3 |
| 165-224 | 0.0 | 0.0 |
| 225 + | 0.0 | 0.0 |

*Timber Data*

# Appendix E
## Fish and Wildlife Monitoring Techniques

## Threatened and Endangered Species

### Bald Eagle

#### Populations

Objectives

– Nest occupancy and productivity
– Occupancy of identified potential habitat
– Use of winter roosts
– Mortality, nesting failures, and decreased productivity

Techniques

– Aerial surveys
– Ground surveys

Precision/Reliability - High/High
Frequency - Annual
Standard -State survey and procedures, predicted populations, recovery plan goals

#### Habitat

Objectives

– Monitor effects of other resource uses
– Evaluate silvicultural treatments and habitat improvements
– Monitor habitat conditions and presence of insects and disease in nest territories and winter roosts

Techniques

– Ground surveys and interpretation
– Habitat use
– Measuring techniques

Precision/Reliability - Moderate/High
Frequency - 1-5 years
Standard -Forest Standards and Guidelines (S&Gs), Raptor Management prescription, Nest/Roost Territory Plans, silvicultural objectives

### Peregrine Falcon

#### Populations

Objectives

– Identify suitable cross-foster sites
– Monitor reintroduction
– Determine nesting success and productivity
– Determine new active nest sites

Techniques

– Ground surveys

Precision/Reliability - High/High
Frequency - Annually for 5 years after reintroduction
Standard - Forest S&Gs, Raptor Management prescription, Recovery Plan, Reintroduction Plan

### Modoc Sucker

#### Populations

Objectives

– Measure trends in populations by stream and habitat units
– Determine causes of mortality or population fluctuations
– Determine availability of suitable spawning and holding habitat
– Determine use of habitat units

Techniques

– Seining and dipnetting
– Visual and snorkeling
– Electrofishing (last resort)

Precision/Reliability - Moderate/High
Frequency - 2 years
Standard - Forest S&Gs, Monitoring Plan, Riparian Area Prescription, Action Plan for the Recovery of the Modoc Sucker

#### Habitat

Objectives

– Evaluate effects of all activities in the watershed
– Evaluate habitat improvements
– Meaure streambank and channel recovery

Techniques

– Fish habitat assessment and mapping
– Channel profiles
– Photo points

– Invertebrate sampling
– Activity reviews

Precision/Reliability - Moderate/High
Frequency - 2 years or project induced
Standard - Forest S&Gs, Monitoring Plan, Riparian Area Prescritpion, Action Plan for Recovery of the Modoc Sucker

### Northern Spotted Owl

Objectives

– Determine habitats used on Modoc
– Continue surveys in suspected habitats
– Consult with USFWS for biological significance of located birds

Techniques

– Calling surveys
– Mousing
– Vegetation mapping/analysis

Precision/Reliability - Moderate/Moderate
Frequency - Annual
Standard - R5 survey protocal

### Lost River and Shortnose Suckers

### Populations

Objectives

– Measure trends in populations by stream and habitat units
– Measure trends in populations by reservoir
– Determine causes of mortality or population fluctuations
– Determine availability of suitable sqawning and holding habitat
– Determine use of habitat units

Techniques

– Seining and dipnetting
– Visual and snorkeling
– Electrofishing (last resort)
– Coordinating with CDFG for boat-electrofishing in reservoirs

Precision/Reliability - Moderate/High
Frequency - 2 years
Standard - Forest S&Gs, Monitoring Plan, Riparian Area Prescription, future Recovery Plan for the Shortnose and Lost River Suckers

### Habitat

Objectives

– Evaluate effects of all activities in the watershed
– Evaluate habitat improvements
– Measure streambank and channel recovery

Techniques

– Fish habitat assessment and mapping
– Channel profiles
– Photo points
– Intertebrate sampling
– Activity reviews

Precision/Reliability - Moderate/High
Frequency - 2 years or project induced
Standard - Forest S&Gs, Monitoring Plan, Riparian Area Prescription, future Recovery Plan for the Shortnose and Lost River Suckers

## Sensitive Species

### Bighorn

Objectives

– Implement recovery guidelines
– Monitor population trends, reproductive rates and mortality factors
– Identify release sites
– Determine habitat use and dispersion
– Identify bighorn, livestock, and recreation conflicts

Techniques

– Analyse reintroduction sites
– Aerial surveys
– Ground surveys
– Composition counts
– Vegetation mapping

Precision/Reliability - Moderate/Moderate
Frequency - annually
Standard - Wilderness prescription, S&Gs, Bighorn Management Plan

### Goshawk

### Populations

Objectives

– Identify active nest territories to meet population goals by District
– Determine nesting use of potential suitable habitat
– Monitor nest success/reproduction

Techniques
– Aerial photo interpretation
– Ground surveys during nesting season

Precision/Reliability - Moderate/High
Frequency - annually in planned timber sales
Standard - Raptor Management prescription, S&Gs

### Habitat

Objectives
– Determine effect of resource activity on nest stands
– Monitor continued suitability of designated nest stands

Techniques
– Ground surveys and vegetation measurement

Precision/Reliability - Moderate/Moderate
Frequency - project induced
Standard - Raptor Management prescription, Habitat Capability Models (HCMs)

### Pine Marten

Objectives
– Determine habitat use by martens
– Validate territories
– Identify required seral stages, snag, old growth and down logs
– Hair snare/aluminum track plates

Techniques
– Vegetation Mapping
– Down log and snag transects
– Snow surveys

Precision/Reliability - Moderate/Moderate
Frequency - 5 years
Standard - S&Gs, HCMs, Riparian Area prescription

## Harvest Species

### Deer

Objectives
– Determine population trends
– Evaluate and predict resource management effects on deer and habitat
– Benefits and execution of Timber-Forage prescription
– AUM allocations

– Habitat improvement benefits and costs
– Changes in seasonal ranges

Techniques
– Annual composition counts
– HCMs
– Vegetation sampling and mapping
– Deer use surveys

Precision/Reliability - Moderate/Moderate
Frequency - annual and project induced
Standard - S&Gs, Timber-Forage prescription, State Deer Herd Plans, HCMs

### Pronghorn

Objectives
– Determine population trends
– Determine AUM allocation needs and habitat trends

Techniques
– State herd counts
– Forage condition, trend, and utilization surveys
– Type maps

Precision/Reliability - Moderate/Moderate
Frequency - annual
Standard - S&Gs, Allotment Management Plans, Revised Vegetation Inventory, State Pronghorn Management Plan

### Sage Grouse

Objective
– Population trends
– Habitat trends

Techniques
– Lek counts
– Livestock utilization measurements
– Vegetation mapping and trend measurements
– Brood counts

Precision/Reliability - Low/Moderate
Frequency - annual counts, 5 years
Standard - S&Gs, HCMs

### Western Gray Squirrel and Blue Grouse

Objectives
– Successional stage distribution and diversity
– Special habitat component - oaks and down logs

Techniques
– Veg type maps and project evaluation

Precision/Reliability - Low/Moderate
Frequency - project induced for 5 years
Standard - S&Gs, HCMs

**Canada Goose and Mallard**

Objectives
– Monitor nest success and wetlands use
– Measure whether project or wetlands met objectives

Techniques
– Nest surveys
– Livestock utilization measurements

Precision/Reliability - Moderate/High
Frequency - annual
Standard - S&Gs, State collection agreements, wetlands objectives

**Fisheries (Trout and Largemouth Bass)**

Objectives
– Estimate populations and relative abundances
– Monitor water quality
– Monitor stream, lake, reservoir, and riparian condition
– Determine availability of suitable sqawning and holding habitat
– Determine use of habitat units
– Evaluate habitat improvement effects
– Evaluate effects of all activities in the watersheds

Techniques
– Electrofishing, seining, dipnetting, snorkeling, visual fish population estimations
– Invertebrate sampling
– Photo points
– Vegetation sampling
– Fish habitat assessment and mapping
– Channel profiles
– Activity review

Precision/Reliability - Moderate/Moderate
Frequency - 2-5 years or project induced
Standard - Forest S&Gs, Riparian Area prescription, Monitoring Plan, fisheries program plans

**Other Species**

**Pileated Woodpecker**

Objective
– Old-growth area designation
– Snag densities
– Down log component
– Determine habitat use (seral stages, etc.)
– Validate territories

Techniques
– Vegetation mapping and project evaluation
– Snag transects for density and use
– Down log transects
– Call counts

Precision/Reliability - Low/Moderate
Frequency - 5 years
Standard - S&Gs, HCM

**Hairy Woodpecker**

Objectives
– Monitor snag densities and management

Techniques
– Snag transects & use measurements

Precision/Reliability - Moderate/Moderate
Frequency - annual or project induced
Standard - S&Gs, HCM

**Prairie Falcon, Swainson's Hawk, Osprey, Golden Eagle**

Objectives
– Measure project effects

Techniques
– Nest surveys

Precision/Reliability - High/High
Frequency - project induced
Standard - S&Gs

**Red -breasted/Red-naped Sapsuckers, Willow Flycatcher, Yellow Warbler**

Objective
– Determine trends in woody vegetation in riparian areas

– Monitor trends in populations for these species and/or resident bird species.

Techniques

– Vegetation sampling
– Photo points
– Species counts, nesting surveys

Precision/Reliability - Low/Moderate

Frequency - Annual for species counts at selected sites; 5 years for habitat changes.

Standard - S&Gs, Riparian Area prescription, HCMs

**Sandhill Crane**

Objective

– Monitor riparian/wetland areas for nesting and brood rearing
– Residual vegetation in wetlands and riparian areas

Techniques

– Nest surveys
– Livestock utilization

Precision/Reliability - Moderate/High

Frequency - annual

Standard - S&Gs, wetlands and riparian area objectives

# Appendix F
## Management Practices

**This Appendix has been deleted since the DEIS.**

# Appendix G
## Facilities Management

## Road Functional Classifications

**Forest Arterial Road -** provides service to large land areas and usually connects with public highways or other Forest arterial roads to form an integrated network of primary travel routes. The location and standard are often determined by mobility and efficiency needs rather than by specific resource management service needs. It is usually developed and operated for long-term land and resource management purposes and for constant service. These roads are usually paved, and often have safe travel speeds in excess of 25 mph.

**Forest Collector Road -** serves smaller land areas than a Forest arterial road, and is usually connected to a Forest arterial or public highway. Collects traffic from Forest local roads and terminal facilities. The location and standard are influenced by long-term multiple-resource service needs as well as by travel efficiency. May be operated for either constant or intermittent service, depending on land use and resource management objectives for the area served by the facility. The roads typically have an aggregate, aggregate and oil, or chip seal surface. Travel speed is often 15 to 25 mph and the road is usually 5 to 15 miles in length. The road generally serves three or more local roads.

**Forest Local Road -** connects terminal facilities such as campgrounds and timber harvest areas with Forest collector or Forest arterial roads, or public highways. The location and standard are usually controlled by a specific resource activity rather than travel efficiency. Forest local roads may be developed and operated for either long- or short-term service. The road may be closed until a future activity occurs or may be left open if on-going activities are necessary. The road is typically short in length (less than five miles), with a low travel speed (5-15 mph), and are typically unsurfaced except where necessary for resource protection (e.g. erosion), or in developed recreation sites which receive seasonally high use.

## Road Development Guidelines

This chart summarizes the system used to construct and maintain Forest roads.

| | Functional Classification | | |
|---|---|---|---|
| | **Arterial** | **Collector** | **Local** |
| Travel Speed: | Average 15-55 mph. | Average 10-35 mph. | Average 0-15 mph. |
| Lanes: | Generally 2 lanes | Generally 1 lane. | Usually 1 lane except for developed recreation sites. |
| Surface: | All weather generally asphalt or gravel (cinders). | All weather gravel (cinders) or chip seal, sometimes asphalt. | Varies from asphalt to native surface, majority native surface. |
| Width: | Typically 20-24 feet but some 1 lane with intervisable turnouts. | Typically 12-16 feet with turnouts, usually intervisable. | Typically 10-14 feet, turnouts usually not intervisable or optional. |
| Drainage: | Permanent, not to impede traffic. | Permanent, but may impede traffic. May have some outslope and dips. | Usually outsloped with dips. |
| Maintenance Level: | 3,4, or 5 | 2,3, or 4 | 1-5 |

## Road Maintenance Levels

The following are definitions of the five levels of maintenance of Forest roads.

**Level 1:** Roads are closed to traffic. This level is basic custodial care as required to protect the road investments and to see that damage to adjacent land and resources is held to a minimum. Level 1 maintenance requires an annual inspection to determine what work, if any, is needed to maintain drainage and keep the road stable.

**Level 2:** Roads are open to limited traffic. This level is used on roads where Forest management activities require that the road be open for limited passage of high clearance vehicles. Traffic is minor, usually consisting of one or a combination of administrative use, permitted use, or specialized traffic. Level 2 requires the basic care of Level 1.

**Level 3:** Roads are open to traffic. This level is used on roads that are open for public traffic and generally applies when use does not exceed 15 vehicles per day average daily traffic (ADT). ADT should be used as a guide in determining the maintenance level and not as the sole criterion. A road may receive only one or two vehicles a day for most of the year; however, during a brief period, such as hunting season, the road may receive 20 or 30 vehicles a day. Total traffic types and planned land use are important criteria for selecting maintenance level. The road is maintained for safe and moderately convenient travel suitable for passenger cars.

**Level 4:** Roads are open to traffic. This level generally applies when use of a road is between 15 ADT and 100 ADT. At this level, more consideration is given to the comfort of the user. These roads are frequently surfaced with aggregate material, but some routes are paved.

**Level 5:** Roads are open to traffic. This level is generally maintained for use of 100 ADT and greater. Roads in this category are generally paved surfaces. Safety and comfort are important considerations. Abrupt changes in maintenance will be posted to warn a traveler until these deficiencies are corrected.

## Dam Classification

**Class A:** Dams that are 100 feet high or more, or impound 50,000 acre-feet or more of water.

**Class B:** Dams that are 40 feet high or more, but less than 100 feet high, or impound 1,000 acre-feet or more, but less than 50,000.

**Class C:** Dams that are 25 feet high or more, but less than 40 feet high, or impound 50 acre-feet or more, but less than 1,000.

**Class D:** Dams that are less than 25 feet high and impound less than 50 acre-feet.

## Dam Hazard Rating

**Low Hazard (L):** built in areas where failure would result in little economic loss; damage would be limited to undeveloped or agricultural lands, improvements are not planned, and loss of life is unlikely.

**Moderate Hazard (M):** built in areas where failure would result in appreciable economic loss, with damage limited to improvements such as commercial and industrial structures, public utilities, and transportation system. A few habitable structures could be involved, but loss of life is unlikely.

**High Hazard (H):** built in areas where failure could result in loss of life or severe economic loss. Generally, urban or community development would be involved.

# Appendix H
## Fire Management

This appendix describes (1) the Plan's fire management program, (2) the fire management effectiveness index, (3) the program's implementation, (4) annual fuel treatment, (5) expected annual acres burned by wildfire, and (6) the suppression difficulty index matrix.

## Fire Management Program

Suppression is emphasized with a current (1982) budget for five decades. The Forest-wide fire management organization for current budget is:

– 8 engine crews
– 6 prevention units
– 4 fixed lookouts
– 2 ten-person handcrews

## Fire Management Effectiveness Index

The index is a relative measure of wildfire suppression effectiveness of the fire management organization. It is calculated by the equation:

$$FMEI = \frac{Annual(FFP + FFF + NVC) - Fuels\ Investment}{National\ Forest\ Acres\ Protected}$$

Where FFP = the forest protection costs,
FFF = fire fighting costs, and
NVC = net value change.

## Fire Management Action Plan

When prepared, this action plan will guide implementation of the fire management program described above.

## Annual Fuel Treatment

The proposed annual fuel treatment by prescribed fire for five decades is:

| Decade | Timber-Related | Fire-Related | Other |
|--------|--------|--------|--------|
| 1 | 2100 | 350 | 50 |
| 2 | 2200 | 350 | 50 |
| 3 | 2800 | 350 | 50 |
| 4 | 3000 | 350 | 50 |
| 5 | 3400 | 350 | 50 |

## Expected Annual Acres Burned by Wildfire

The expected annual extent of wildfire for five decades by fire intensity level is:

| Fire Intensity Level | Decade | Annual Burned Acres |
|--------|--------|--------|
| 1 | 1 | 2 |
|  | 2 | 6 |
|  | 3 | 50 |
|  | 4 | 85 |
|  | 5 | 85 |
| 2 | 1 | 132 |
|  | 2 | 132 |
|  | 3 | 132 |
|  | 4 | 132 |
|  | 5 | 99 |
| 3 | 1 | 172 |
|  | 2 | 172 |
|  | 3 | 465 |
|  | 4 | 482 |
|  | 5 | 552 |
| 4 | 1 | 5,930 |
|  | 2 | 5,930 |
|  | 3 | 5,930 |
|  | 4 | 5,784 |
|  | 5 | 5,555 |
| Total | 1 | 6,236 |
|  | 2 | 6,241 |
|  | 3 | 6,577 |
|  | 4 | 6,484 |
|  | 5 | 6,291 |

**Suppression Difficulty Index Matrix**

The Suppression Difficulty Index (SDI) matrix is applied to fuels in harvest areas to determine fuel treatment needs. The SDI does not prescribe a fuel treatment method. Instructions for this matrix are found in the fire management analysis and planning handbook (FSH 5109.19, chapter 50).

If the resultant SDI is greater than the prescribed threshold index in the Forest Standards and Guidelines for the harvest activity that generates the fuel, then fuel treatment is necessary. Examination of the rating values for each element can lead to the appropriate treatment methods.

# Appendix I

## Special Stipulations for Geothermal, Oil and Gas Leasing

### Protection of Surface Areas with Scientific, Educational Value, Developed Recreation Sites, and Other Facilities and Improvements

This stipulation protects lands with critical surface resource values to preserve them in as nearly natural condition as possible. These lands are identified as:

– National Register cultural resource sites;
– Developed recreation sites;
– Devil's Garden Research Natural Area;
– Glass Mountain Glass Flow, Burnt Lava Flow, and Medicine Lake Glass Flow Geologic Special Interest Areas.

> **Special Stipulation 1**
> Lessee shall not occupy or use the surface of *[name site]* to protect *[name value]* more particularly described as *[township, range, and section(s)]*.

### Protection of Active Bald Eagle Nest Sites

Direction for bald eagle management and its habitat comes from the Endangered Species Act of 1973, as amended, which directs government agencies to "utilize their authorities...by carrying out programs for the conservation of endangered species and threatened species listed." The term "conserve" means "to use...all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." The Forest Service must manage threatened and endangered species at recovery levels (the point at which they can be removed from the federal threatened and endangered list).

> **Special Stipulation 2**
> Lessee shall not occupy or use the surface of the lands within one-half mile of active bald eagle nest sites.
>
> These sites are more particularly described as *[township, range, and section(s)]*.

### Protection of Modoc, Shortnose and Lost River Sucker Habitat

Direction for Modoc, shortnose and Lost River sucker management and its habitat comes from the Endangered Species Act of 1973, as amended, which directs government agencies to "utilize their authorities...by carrying out programs for the conservation of endangered species and threatened species listed." The term "conserve" means "to use...all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." The Forest Service must manage threatened and endangered species at recovery levels (the point at which they can be removed from the federal threatened and endangered list).

> **Special Stipulation 3**
> Lessee shall not occupy or use the surface within 300 feet of those streams designated as habitat for the Modoc shortnose or Lost River sucker. This restriction applies to *[streams in township, range, and section (s)]*.

## Protection of Highly Scenic and Sensitive Visual Areas

This stipulation protects highly scenic and sensitive visual areas as identified in Visual Quality Objectives (VQOs) as Retention and those areas identified in the Recreation Opportunity Spectrum (ROS) as Semi-Primitive Non-Motorized (SPNM).

The Forest Service will require that the lessee's or operator's plan of operation is consistent with this stipulation, and may require restrictions or modifications to the operating plan.

---

**Special Stipulation 4A and 4B**

To protect areas designated as *[SPNM (4A) or Retention (4B)]* by the Modoc National Forest *[VQO/ROS]* inventory, the lessee shall not conduct surface disturbing activities on lands more particularly described as *[township, range, and section(s)]*.

Exceptions will be made if the lessee demonstrates to the satisfaction of the Forest Service and Bureau of Land Management, through a plan of operation or permit application, that unacceptable environmental impacts to the *[name resource]* will not occur from the proposed operation.

---

Lessee may not conduct activities in the following areas at any time:

– bald eagle winter roosts and nesting habitat;
– bald eagle feeding sites in high concentration areas;
– goshawk nesting territories;
– peregrine falcon nesting territories;
– sage grouse strutting grounds;
– old-growth forest (marten habitat);
– streamside management zones.

---

**Special Stipulation 5**

To protect areas designated as *[name habitat]*, the lessee shall not conduct surface disturbing activities within lands more particularly described as *[township, range, and section(s)]*.

Exceptions will be made if the lessee demonstrates to the satisfaction of the Forest Service, Bureau of Land Management and the United States Fish and Wildlife Service, through a plan of operation or permit application, that unacceptable environmental impacts to *[name resource]* will not occur from the proposed operations.

---

## Protection of Wildlife During Critical Periods

The following lands are within critical seasonal or year-round wildlife habitat for the species listed below and cannot be occupied during the periods specified, unless the lessee can demonstrate to the satisfaction of the Forest Service and Bureau of Land Management that unacceptable environmental impacts will not occur to the resource. This stipulation is intended to allow as much activity as possible while assuring that wildlife management objectives are met. It is not intended to restrict normal maintenance of existing or authorized facilities.

Lessee may not conduct activities in the following areas during the times specified:

| | |
|---|---|
| osprey nesting territories | February 1 to August 1 |
| golden eagle nesting territories | February 1 to August 1 |
| winter deer and pronghorn range | November 1 to May 1 |
| deer fawning areas | May 1 to August 1 |
| pronghorn kidding areas | May 1 to June 1 |
| Swainson's hawk areas | April 1 to August 1 |

---

**Special Stipulation 6**

To protect areas designated as *[name habitat]*, the lessee shall not conduct surface disturbing activities on the following lands, more particularly described as *[township, range, and section(s)]* during *[specify time period]*.

Exceptions will be made if the lessee demonstrates to the satisfaction of the Forest Service, Bureau of Land Management and the United States Fish and Wildlife Service, through a plan of operation or permit application, that unacceptable environmental impacts to *[name resource]* will not occur from the proposed operations.

---

## Protection of Wetlands

This stipulation protects wetlands.

---

**Special Stipulation 7**

To protect wetlands, the lessee shall not conduct surface disturbing activities on lands more particularly described as *[township, range, section(s)]*.

Exceptions will be made if the lessee demonstrates to the satisfaction of the Forest Service and the Bureau of Land Management, through a plan of operation or permit application, that unacceptable environmental impacts to *[name resource]* will not occur from the proposed operations.

---

## Protection of Permitted or Leased Areas

This stipulation protects areas already under permit from oil and gas ground-disturbing activities. It also ensures that new leases will not conflict with existing permits.

---

**Special Stipulation 8**

All plans to conduct surface-disturbing operations on the identified lands will require the review and concurrence of the United States Forest Service and the lessee, prior to approval by the Bureau of Land Management. Such operations may be restricted or denied on part or all of the following described lands: *[township, range, and section(s)]*.

Exceptions will be made if the lessee demonstrates to the Bureau of Land Management, the Forest Service and the permittee, through a plan of operation or a permit application, that unacceptable impacts to *[name resource]* will not occur from the proposed operations.

---

## Protection of Watershed

This advisory notice protects watersheds from cumulative effects of ground-disturbing activities. Currently, the Modoc National Forest uses an equivalent roaded acres (ERA) index to determine management thresholds.

---

**Advisory Notice 1**

Lessee's or operator's cumulative ground-disturbing activities related to oil and gas development shall not exceed the established management threshold index for the *[name of watershed]* when combined with planned ground-disturbing activities for this watershed.

---

## Protection of Surface Water Sources

This advisory notice protects limited water supplies from being exhausted.

> **Advisory Notice 2**
>
> Lessee may not use existing water in stock tanks, ponds, lakes, reservoirs, springs, creeks or streams for any activity under this lease unless specifically permitted by the Forest Supervisor, except where the lessee has water rights or the authorized use of such water rights.

## Protection of Erodable Soils

This advisory notice protects sensitive soils and unstable slopes.

> **Advisory Notice 3**
>
> Access and development in areas or unstable slopes or sensitive soils may require special mitigation measures prior to and during any ground-disturbing activities. The exact mitigation will be determined at the notice of staking or the application for permit to drill stage.

# Appendix J
## Guidelines for Range Vegetative Manipulation

Vegetative manipulation includes mechanical, chemical, and biological methods for increasing forage production. To simplify, all methods were placed into three groups:

**Cultivation:** Type conversion to non-native species by plowing, fertilizing, and seeding.

**Rejuvenation:** Any one of a group of practices, including prescribed burning, herbicide spraying, chaining, crushing, and masticating.

**Firewood cutting:** Removal of aspen or juniper by commercial firewood sales.

The following criteria for range sites, condition class, slope, and vegetation may be used to guide site selection for range improvements. Reference the Analysis of the Management Situation for Range (Forest Planning Records) for more detail.

| | Cultivation | Rejuvenation | Firewood |
|---|---|---|---|
| **Range Sites:** | 12 - loamy, 10-14"<br>13 - loamy, 14-18"<br>14 - loamy, 18-35"<br>16 - gravelly, coarse loam, 10-16"<br>25/52 - semi-wet/wet meadow | 4 - shallow loam, 12-18"<br>7 - shallow, stony loam, 10-14"<br>8 - shallow, stony loam, 14-18"<br>9 - shallow, stony loam, 18-35"<br>12 - loamy, 12-14"<br>13 - loamy, 14-18"<br>14 - loamy, 18-35"<br>16 - gravelly, coarse loam, 10-16"<br>17 - stony loam, 10-14"<br>18 - stony loam, 14-18"<br>19 - stony loam, 18-35"<br>23 - shallow, stony clay, 12-18"<br>25/52 - semi-wet/wet meadow<br>50 - sandy loam, 12-25"<br>53 - shallow, stony loam, 12-16"<br>55 - stony loam, 12-14"<br>57 - sandy loam, 16-25" | 4 - shallow loam, 12-18"<br>7 - shallow, stony loam, 10-14"<br>8 - shallow, stony loam, 14-18"<br>9 - shallow, stony loam, 18-35"<br>12 - loamy, 12-14"<br>13 - loamy, 14-18"<br>14 - loamy, 18-35"<br>16 - gravelly, coarse loam, 10-16"<br>17 - stony loam, 10-14"<br>18 - stony loam, 14-18"<br>19 - stony loam,  18-35"<br>23 - shallow, stony clay, 12-18"<br>25/52 - semi-wet/wet meadow<br>50 - sandy loam, 12-25"<br>53 - shallow, stony loam, 12-16"<br>55 - stony loam, 12-14"<br>57 - sandy loam, 16-25" |
| **Condition Classes:** | poor, very poor | fair, poor | fair, poor |
| **Slope** | 0-10% | 0-30% | 0-30% |
| **Understory:** | big sagebrush, bitterbrush, bitterbrush/big sagebrush, montane shrubs, rabbitbrush, perennial grasses, dry meadow, existing seedings, wet meadow | (same as firewood) | big sagebrush, bitterbrush, bitterbrush/big sagebrush, montane shrubs, rabbitbrush, perennial grasses, dry meadow, perennial forbs, streamside, wet meadow |
| **Overstory:** | (same as understory) | (same as understory)<br>ponderosa pine<br>juniper | juniper<br>aspen |

# Appendix K
## Recreation Opportunity Spectrum

The Recreation Opportunity Spectrum (ROS) is a system for classifying and managing recreation opportunities based on the following criteria: physical setting, social setting, and managerial setting. The combination of the three criteria results in several ROS Classes, briefly described as:

*Primitive* (P) - The area is 3 miles or more from roads and trails with motorized use and generally 5,000 acres or greater. The setting is essentially an unmodified natural environment with some evidence of trails. Motorized use is prohibited. The social setting provides for less than 6 parties encountered on trails and less than 3 parties visible from camp sites. Capacity is 0.5 RVD/acre/year. On-site controls are extremely limited with most regulation accomplished off-site. Typical activities include hiking, horseback riding, fishing, hunting, and camping. No areas on the Forest are categorized as Primitive.

*Semi-Primitive Non-Motorized* (SPNM) - The area is 1/2 mile from roads or trails with motorized use and generally exceeds 2,500 to 5,000 acres unless contiguous to primitive areas and wilderness. There is little evidence of roads. The area is closed to motorized travel. Access roads are maintenance level 1. The natural setting may have subtle modifications that would be noticed but would not draw the attention of an observer in the area. Structures are rare and isolated. The social setting provides for 6-15 parties encountered per day on trails and 6 or less parties visible at camp sites. Capacity is 1.0 RVD/acre/year. On-site controls are present but subtle. Interpretation is through self discovery with some use of maps, brochures, and guide books. Typical activities include hiking, cross-country skiing, horseback riding, canoeing, hunting, and fishing.

*Semi-Primitive Motorized* (SPM) - The area is 1/2 mile from roads or trails with motorized use and generally 2,500 to 5,000 acres. Roads and motorized use of roads and trails are evident. Access roads are usually Maintenance Level 1 or 2 local roads. The natural setting may have moderately dominant alterations but would not draw the attention of motorized observers. Structures are rare and isolated. Recreation sites may be development scale 1 or 2 local roads. The natural setting may have moderately dominant alterations but would not draw the

attention of motorized observers. Structures are rare and isolated. Recreation sites may be development scale 1 or 2. The social setting provides for a low to moderate contact with other parties. Capacity is 1.5 RVDs/acre/year. On-site controls are present but subtle. Interpretation is through very limited on-site facilities along with use of maps, brochures, and guide books. Typical activities include OHV touring, snowmobiling, hiking, cross-country skiing, canoeing, hunting, and fishing.

*Roaded Natural* (RN) - The area is 1/2 mile or less from roads and trails open to motorized use. Resource modifications and utilization practices are evident but harmonize with the natural environment. Roads may be maintenance levels 2-5. Recreation sites may be development level 2-4. The social setting provides for moderate to high frequency of contact on roads and low to moderate frequency on trails away from roads. Capacity is 2.5 RVDs/acre/year. On-site user controls are noticeable but harmonize with the natural environment. Typical activities include but are not limited to hiking, cross-country skiing, downhill skiing, power boating, snowmobiling, OHV touring, trailer camping, hunting, and fishing.

*Rural* (R) - The natural environment is substantially modified to the point that developments are dominant to the sensitive travel route observer. Structures are readily evident and may range from scattered to small dominant clusters. Pedestrian or other slow-moving observers are constantly within view of culturally changed landscapes. The social setting provides for moderate to high visitor contact. Capacity is estimated at 75 RVDs/acre/year. Recreation sites may be development scale 3-5. Controls and regulations are obvious and law enforcement visible. Interpretation may be through more complex wayside exhibits including small lighted structures. Typical activities or facilities include but are not limited to camping, fishing information center, convenience stores, resorts, marinas, and downhill ski areas. The compatible visual quality objective is retention.

*Urban* (U) - The area is substantially urbanized. Sights and sounds of man predominate. This ROS class does not occur on this Forest.

# Appendix L
## Trail Program

## Maintenance and Reconstruction

The first priority of the Forest's Trail Program is to maintain 118 miles of existing trails. A backlog of work exists on trails within the South Warner Wilderness where most use occurs. All alternatives include trail reconstruction in the 1st decade.

## New Construction

Although new trail construction cannot be justified solely by demand, the existing trail system could be expanded and diversified. Most existing trails are located in the South Warner Wilderness at high elevations. The season of use is short and the weather can be harsh. Additional trails outside the Wilderness would attract users, reduce use within the Wilderness, and allow a more primitive experience. This is especially important as the Wilderness use approaches capacity. New trails can accommodate uses that are not allowed within the Wilderness, such as trail bikes. Also, they may be available at times of the year when access to the Wilderness is restricted.

Properly located trails and trailheads can improve management efficiency. Information at trailheads allows management concerns to be communicated to Forest visitors. Trails disperse use, offer new opportunities, and complement developed recreation sites.

## Specific Proposals

The following projects are conceptual at this time. Prior to implementation a detailed analysis must be done. Some opportunities may have been overlooked, or proposed projects may not be practical. Effects on other resources must be considered. Projects below are listed by priority and are subject to change.

| Proposed Projects | Miles | District |
|---|---|---|
| Medicine Lakeshore Trail | 2 | Doublehead |
| Cave and Lily link with Crane and Highgrade NRTs | 9 | Warner Mtn. |
| Lava Beds Modoc War Interpretive Trail | 7 | Doublehead |
| Lava Beds Semi-Primitive Non-Motorized Area | 12 | Doublehead |
| Blue Lake NRT completion | 1 | Warner Mtn. |
| Medicine Lake Caldera System | 20 | Doublehead |
| Mill Creek and Slide Creek Connection | 3 | Warner Mtn. |
| Warner Crest Trail System | 61 | Warner Mtn. |
| Rush Creek and Ash Creek Connection | 18 | Big Valley |
| **Total New Construction** | **133** | |

**Medicine Lakeshore Trail:** This paved trail connects four developed sites along the north shore of Medicine Lake.

**Cave and Lily link with Crane NRT and Highgrade NRT:** Cave Lake and Lily Lake Campgrounds lie between two National Recreation Trails: the Crane NRT to the north on the Fremont N.F., and the Highgrade NRT to the South. They are linked through the campgrounds which can be used as a trailhead.

**Lava Beds Modoc War Interpretive Trail:** This project interprets historical and geological features in the area. It would be the first phase of the Lava Beds system, which would include a trailhead.

**Lava Beds Semi-Primitive Non-Motorized (SPNM) Area:** Most alternatives include a SPNM area east of Lava Beds National Monument. This project converts primitive roads to a hiking trail and excludes motorized access. It links the existing trail system within the Lava Beds Wilderness and the proposed Lava Beds Modoc War Interpretive Trail.

**Blue Lake NRT Completion:** This project completes the loop around Blue Lake by connecting the boat launch with the campground. Some or all of the trail could be modified to accommodate handicapped use.

**Medicine Lake Caldera System:** This system is a series of loops radiating from the developed recreation facilities at Medicine Lake. The Medicine Lake Loop extends the above Lakeshore Trail around the south side of the lake to complete the loop. The trail cannot be located adjacent to the shoreline because rights-of-way through private land will be needed. Glass Flow Loop rings the Medicine Lake Glass Flow. The Caldera Rim Loop is about 12 miles long connecting prominant peaks, craters, and geologic features. It accesses the Mt. Hoffman SPNM area which is managed in most alternatives. Short spur loops accessing such features as Hot Spot and Little

Medicine Lake are included. These trails have outstanding potential for interpretation.

**Mill Creek and Slide Creek Connection:** This trail utilizes existing trails within the Wilderness to create a loop for day hikers. Clear Lake is a popular destination for day hikers. This trail will reduce use on the existing trail, and complement Mill Creek Campground.

**Warner Crest Trail System:** This system includes a main trail located along the crest of the Warner Mountains with several loops extending from it. It connects the South Warner Wilderness Trail System with the Desert Intertie Trail in Oregon. Several trailhead locations use existing developed sites or popular dispersed sites.

**Rush Creek and Ash Creek Connection:** This trail connects two of the most popular sites on the Big Valley District. A day-use loop is provided out of Rush Creek Campgrounds.

## Trail Maintenance

Priorities maintaining trails will be based on the amount of use and the difficulty rating of the trail. For instance, a trail designated as challenging with a tree fallen across it would still not be a maintenance priority. However, if the trail was designated for wheelchair access, it would be prioritized for maintenance and the tree would be removed to provide wheelchair access. Volunteers, properly trained or supervised, are encouraged to assume responsibility for trail maintenence.

## Costs Used For Planning Purposes

Regional guidelines were used to estimate costs of trail activities. They were adjusted downward to reflect easier terrain characteristic of the Modoc National Forest.

| | | |
|---|---|---|
| **New Trail Construction** | cost per mile | $8,000 |
| **Reconstruction** | cost per mile | $2,500 |
| **Maintenance** | cost per mile per year | $ 150 |

# Appendix M
## Streamside Management Zones

Streamside management zones (SMZs) are determined by stream class, channel stability, and side-slope stability. Included in the SMZ are the channel (waterway and upper banks) and side slopes (see Figure M-1). The SMZ exceeds the area dominated by riparian vegetation. Although managing an SMZ width that includes 50 feet on either side of the channel is typical, managing SMZs of variable widths affords more direct protection of riparian-dependent resources.

Side slope distances are determined by stream class and percent of side slope. The stream class, described below, is based on the relative importance or significance of a stream or segment, based on resource values and beneficial uses. The percent of side slope is inversely related to side slope stability (i.e., the higher the percent of side slope, the less the stability of the side slope). Streams that are more important or are less stable are assigned longer side slope distances and thus wider SMZs.

The table below contains recommended side slope distances for a given stream class and range of percent of side slope. At the project level, management standards are flexible so that widths may vary as additional information is learned about channel and side slope stability. Stream classes may also change as more information is collected about the stream.

| SMZ Width in Feet (Slope Distance) | | | | |
|---|---|---|---|---|
| | **% Side Slope** | | | |
| **Stream Class** | **0 - 20** | **21 - 40** | **41 - 60** | **61 +** |
| Class I | 100 | 150 | 200 | 250 |
| Class II | 75 | 100 | 150 | 175 |
| Class III | 50 | 75 | 100 | 125 |
| Class IV | 50 | 50 | 75 | 100 |

## Figure M-1. Streamside Management Zones



| Stream Class Determinations |
|---|

| | |
|---|---|
| **Class I**<br>*Highly Significant* | These are either perennial or intermittent streams, or segments thereof, which meet one or more of the following criteria:<br><br>a. are habitat for large numbers of resident and/or migratory fish for spawning, rearing, or migration<br><br>b. furnish water locally for domestic or municipal supplies<br><br>c. have flows large enough to materially influence downstream water quality<br><br>d. are characterized by major fishing or other water-oriented recreational uses<br><br>e. have special classification or designation, such as wild, scenic, or recreation rivers<br><br>f. have special visual or distinctive landscape features, and are classified as variety Class A as defined in *National Forest Landscape-Volume 2* (Agr. Handbook 462)<br><br>g. are habitat for threatened or endangered animal species, or contain plants which are potential or viable candidates for threatened or endangered classification<br><br>h. exhibit ethnological, historical, or archaeological evidence that makes them eligible for or are included in the National Register of Historical Places. |
| **Class II**<br>*Significant* | These are either perennial or intermittent streams, or segments thereof, which meet one or more of the following criteria:<br><br>a. are used by moderate numbers of fish and spawning, rearing, or migration<br><br>b. furnish water locally for industrial or agricultural use<br><br>c. have enough water flow to exert a moderate influence on downstream quality<br><br>d. are used moderately for fishing and other recreational purposes<br><br>e. are of moderate visual quality and meet variety Class B as defined in *National Forest Landscape Management-Volume 2* (Agr. Handbook 462)<br><br>f. exhibit ethnological, historical, or archaeological evidence that makes them eligible for State or local registers of historical significance or interest. |
| **Class III**<br>*Moderate Significant* | These include perennial or intermittent streams, or segments thereof, which meet one or more of the following criteria:<br><br>a. are habitat for few fish or spawning, rearing, or migration<br><br>b. are rarely used for fishing or other recreational purposes<br><br>c. have enough water flow to exert minimum influence on downstream water quality<br><br>d. are of relatively low visual quality in the landscape and classified as variety Class B as defined in *National Forest Landscape Management-Volume 2* (Agr. Handbook 462)<br><br>e. exhibit historical or archaeological properties that are of archaeological interest in accordance with the Archaeological Resource Protection Act of 1979. |
| **Class IV**<br>*Minor Significance* | These are intermittent or ephemeral streams, or segments thereof, not previously classified. |
| | Source: FSM 2521, R-5 Supplement No 17 (2/76)<br>FSH 2509 22, R-5, Chapter 32 (1987) |

# Appendix N
## Water Quality Best Management Practices

## Introduction

The Forest Service water quality maintenance and improvement measures called Best Management Practices (BMPs) were developed in compliance with Section 208 of the Federal Clean Water Act, PL92-500, as amended. After a lengthy development and public review process from 1977 to 1979, the practices developed by the Forest Service were certified by the State Water Resources Control Board and approved by the Environmental Protection Agency (EPA). The signing of a 1981 Management Agency Agreement (MAA) resulted in the formal designation of the Forest Service as the water quality management agency for the public domain lands it administers. BMPs are the measures both the State and Federal water quality regulatory agencies expect the Forest Service to implement to meet water quality objectives and to maintain and improve water quality. Of the 98 practices currently documented, 96 are certified and approved. The two remaining practices are still being improved before referral to the State and EPA for certification and approval. Similarly, work continues on developing new management practices and evaluating the effectiveness of the existing BMPs. Due to the dynamic nature of management practice development and refinement, the original Forest Service publication documenting BMPs is continually being updated. The current publication reference is Water Quality Management for National Forest System Lands in California, U.S. Forest Service, Pacific Southwest Region publication, 1979. This publication is hereby incorporated by reference into this document. Work is underway to republish the updated version of this text as a Soil and Water Conservation Handbook.

Water quality management is administered on National Forest lands through the continued implementation of BMPs and through the guidance of a 1981 MAA with the State of California Water Resources Control Board.

## Implementation Process

Forest Plans are broad planning documents that encompass entire forests and many management activities. Because of the physical and biological diversity of any national forest (soils, vegetation, slopes, presence of surface water, etc.) and the mixture of activities that can occur on various portions of the Forest, site-specific methods for implementing BMPs are not identified at the Forest planning level. For each project that is initiated to implement the Forest Plan, a separate site-specific environmental assessment is conducted. Appropriate BMPs necessary to protect or improve water quality and methods of implementing BMPs are identified during this on-site, project-specific assessment. In this manner, the techniques can be tailored to fit the specific physical and biological environment as well as the proposed project activities. Many methods are available for implementing a BMP, and not all are applicable to every site. An example is BMP 2.7 Control of Road Drainage. This BMP dictates that roads will be correctly drained to disperse water runoff to minimize the erosive effects of concentrated water. Roads are drained in various ways: outsloping the road surface, installing water bars, installing French drains, insloping the road surface, installing culverts, etc. During the on-site environmental assessment of a proposed road construction project, the appropriate method(s) to correctly drain the road are identified.

After the methods of implementing appropriate BMPs are identified, they are discussed by the project interdisciplinary team. A combination of implementation methods are selected and incorporated into the environmental document as required mitigation measures. These mitigation measures are then carried forward into project plans and implementation documents (contract language, design specifications, etc.) to assure they are part of the project work accomplished. Implementation on the ground is assured by the Forest Service official responsible for on-site administration of the project. Supervisory quality control of BMP implementation is attained through review of environmental assessments and contracts, field reviews of projects, and monitoring the quality of the water in the project area when warranted.

## The Best Management Practices

*There are 98 practices identified in eight resource categories:*

### Timber

| | |
|---|---|
| 1.1 | Timber Sale Planning Process |
| 1.2 | Timber Harvest Unit Design |
| 1.3 | Use of Erosion Hazard Rating for Timber Harvest Unit Design |
| 1.4 | Use of Sale Area Maps for Designating Water Quality Protection Needs |
| 1.5 | Limiting Operating Period of Timber Sale Activities |
| 1.6 | Protection of Unstable Areas |
| 1.7 | Prescribing the Size and Shape of Clearcuts |
| 1.8 | Streamside Management Zone Designation |
| 1.9 | Determining Tractor Loggable Ground |
| 1.10 | Tractor Skidding Design |
| 1.11 | Suspended Log Yarding in Timber Harvesting |
| 1.12 | Log Landing Location |
| 1.13 | Erosion Prevention and Control Measures During Timber Sale Operations |
| 1.14- | Special Erosion Prevention Measures on Disturbed Land |
| 1.15 | Revegetation of Areas Disturbed by Harvest Activities |
| 1.16 | Log Landing Erosion Prevention and Control |
| 1.17 | Erosion Control on Skid Trails |
| 1.18 | Meadow Protection During Timber Harvesting |
| 1.19 | Streamcourse Protection |
| 1.20 | Erosion Control Structure Maintenance |
| 1.21 | Acceptance of Timber Sale Erosion Control Measures Before Sale Closure |
| 1.22 | Slash Treatment in Sensitive Areas |
| 1.23 | Five-Year Reforestation Requirement |
| 1.24 | Non-recurring "C" Provision That Can Be Used For Water Quality Protection |
| 1.25 | Modification of the Timber Sale Contract |

### Road and Building Site Construction

| | |
|---|---|
| 2.1 | General Guidelines for the Location and Design of Roads |
| 2.2 | Erosion Control Plan |
| 2.3 | Timing of Construction Activities |
| 2.4 | Road Slope Stabilization (Preventive Practice) |
| 2.5 | Road Slope Stabilization (Administrative Practice) |
| 2.6 | Dispersion of Subsurface Drainage from Cut and Fill Slopes |
| 2.7 | Control of Road Drainage |
| 2.8 | Constraints Related to Pioneer Road Construction |
| 2.9 | Timely Erosion Control Measures on Incomplete Road and Streamcrossing Projects |
| 2.10 | Construction of Stable Embankments |
| 2.11 | Minimization of Sidecast Material |
| 2.12 | Servicing and Refueling Equipment |
| 2.13 | Control of Construction in Streamside Management Zones |
| 2.14 | Controlling In-channel Excavation |
| 2.15 | Diversion of Flows Around Construction Sites |
| 2.16 | Streamcrossings on Temporary Roads |
| 2.17 | Bridge and Culvert Installation |
| 2.18 | Regulation of Streamside Gravel Borrow Areas |
| 2.19 | Disposal of Right-of-way and Roadside Debris |
| 2.20 | Specifying Riprap Composition |
| 2.21 | Water Source Development Consistent with Water Quality Protection |
| 2.22 | Maintenance of Roads |
| 2.23 | Road Surface Treatment to Prevent Loss of Materials |
| 2.24 | Traffic Control During Wet Periods |
| 2.25 | Snow Removal Controls to Avoid Resource Damage |
| 2.26 | Obliteration of Temporary Roads |
| 2.27 | Restoration of Borrow Pits and Quarries |
| 2.28 | Surface Erosion Control at Facility Sites |

## Mining

**3.1** Administering Terms of the U.S Mining Laws (Act of May 10, 1872) for Mineral Exploration and Extraction on National Forest System Lands

**3.2** Administering Terms of BLM-Issued Permits or Leases for Mineral Exploration and Extraction on National Forest System Lands

**3.3** Administering Common Variety Mineral Removal Permits

## Recreation

**4.1** Sampling and Surveillance of Designated Swimming Sites

**4.2** On-site Multi-disciplinary Sanitary Surveys Will Be Conducted to Augment the Sampling of Swimming Waters

**4.3** Provide Safe Drinking Water Supplies

**4.4** Documentation of Water Quality Data

**4.5** Control of Sanitation Facilities

**4.6** Control of Refuse Disposal

**4.7** Assuring that Organizational Camps Have Proper Sanitation and Water Supply Facilities

**4.8** Water Quality Monitoring Off-Highway Vehicle Use According to a Developed Plan

**4.9** Sanitation at Hydrants and Faucets Within Developed Recreation Sites

**4.10** Protection of Water Quality Within Developed and Dispersed Recreation Areas

**4.11** Location of Pack and Riding Stock Facilities in Wilderness, Primitive, and Wilderness Study Areas

## Vegetative Manipulation

**5.1** Seed Drilling on the Contour

**5.2** Slope Limitations for Tractor Operation

**5.3** Tractor Operation Excluded from Wetlands and Meadows

**5.4** Revegetation of Surface Disturbed Areas

**5.5** Tractor Windrowing on the Contour

**5.6** Soil Moisture Limitations for Tractor Operation

**5.7** Contour Disking

**5.8** Pesticide Use Planning Process

**5.9** Apply Pesticide According to Label and EPA Registration Directions

**5.10** Pesticide Application Monitoring and Evaluation

**5.11** Pesticide Spill Contingency Planning

**5.12** Cleaning and Disposal of Pesticide Containers and Equipment

**5.13** Untreated Buffer Strips for Riparian Area and Streamside Management Zone (SMZ) Protection During Pesticide Spraying

**5.14** Controlling Pesticide Drift During Spray Application

## Fire Suppression and Fuels Management

**6.1** Fire and Fuel Management Activities

**6.2** Consideration of Water Quality in Formulating Fire Prescriptions

**6.3** Protection of Water Quality from Prescribed Burning Effects

**6.4** Minimizing Watershed Damage from Fire Suppression Efforts

**6.5** Repair or Stabilization of Fire Suppression Related Watershed Damage

**6.6** Emergency Rehabilitation of Watersheds Following Wildfires

## Watershed Management

7.1   Watershed Restoration

7.2   Conduct Floodplain Hazard Analysis and Evaluation

7.3   Protection of Wetlands

7.4   Oil and Hazardous Substance Spill Contingency Plan

7.5   Control of Activities Under Special Use Permit

7.6   Water Quality Monitoring

7.7   Management by Closure to Use (Seasonal, Temporary, and Permanent)

## Grazing

8.1   Range Analysis, Allotment Management Plan, Grazing Permit System, and Permittee Operating Plan

8.2   Controlling Livestock Numbers and Season of Use

8.3   Controlling Livestock Distribution Within Allotments

8.4   Rangeland Improvements



*Water Quality Best Management Practices*

# Appendix O
## Livestock Management Strategies

### Intensive Management (Strategy D)

Management seeks to optimize production and utilization of forage available for livestock use consistent with maintaining the environment and providing for multiple uses of the range. From all existing range and livestock management technology, practices may be selected and used to develop cost effective methods for achieving improved forage supplies and uniform livestock distribution and forage use. Brush control, type conversion, fertilization, site preparation and seeding of improved forage species may be used to improve quality and quantity of forage. These practices may be combined with fencing and water developments to implement complex grazing systems.

### Extensive Management (Strategy C)

Management seeks full utilization of forage available to livestock. Cost effective management systems and techniques, including fencing and water developments, are designed and applied to obtain relatively uniform livestock distribution and use of forage to maintain plant vigor.

### Some Livestock Management (Strategy B)

Management controls livestock numbers so that livestock use is within present grazing capacity. Improvements are minimal and constructed only to the extent needed to protect and maintain the range resource in the presence of grazing.



Source: FSH 1309.11, Management Information Handbook

# Appendix P
## Acreage Allocations by Management Prescriptions and Management Areas

| Mgt. Rx | Prescription Description | | Mgt. Area 31 | Mgt. Area 32 | Mgt. Area 33 | Mgt. Area 34 | Mgt. Area 35 | Mgt. Area 36 | Mgt. Area 41 | Mgt. Area 42 | Mgt. Area 43 | Mgt. Area 44 | Mgt. Area 45 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **PRF - Preferred Alternative** | | | | | | | | | | | | |
| 1 | Minimum Level | >20 | 1,628 | 1,762 | 2,078 | 1,621 | 0 | 3,646 | 4,239 | 935 | 938 | 3,853 | 4,445 |
| | | <20 | 1,022 | 81 | 0 | 1,905 | 0 | 3,459 | 0 | 338 | 0 | 5,156 | 0 |
| | | Range | 103 | 332 | 50 | 0 | 0 | 61 | 560 | 1,578 | 20 | 204 | 1,910 |
| 2 | Wilderness - Standard | | 0 | 0 | 0 | 0 | 70,385 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | Wilderness - Low Standard | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | Semi-Primitive Non-Motorized [§] | >20 | 1,666 | 1,041 | 1,577 | 1,896 | 0 | 422 | 0 | 228 | 0 | 1,150 | 0 |
| | | <20 | 1,519 | 589 | 2,123 | 4,201 | 0 | 0 | 1,839 | 0 | 392 | 0 | 1,042 |
| 5 | Dev. Recreation - Standard | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | Dev. Recreation - Low Standard | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | Visual Retention [§] | >20 | 3,325 | 1,908 | 1,216 | 5,769 | 0 | 5,356 | 0 | 234 | 22 | 337 | 313 |
| | | <20 | 913 | 1,516 | 619 | 1,777 | 0 | 2,187 | 0 | 54 | 0 | 506 | 476 |
| 8 | Special Areas | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | Raptor Management | >20 | 196 | 0 | 0 | 245 | 0 | 278 | 112 | 1,717 | 424 | 404 | 958 |
| | | <20 | 121 | 0 | 0 | 349 | 0 | 65 | 430 | 952 | 17 | 757 | 999 |
| | | Range | 103 | 0 | 0 | 1,081 | 0 | 646 | 289 | 1,860 | 314 | 200 | 1,278 |
| 10 | Rangeland | | 4,369 | 17,382 | 4,053 | 28,108 | 0 | 21,572 | 14,113 | 7,834 | 7,667 | 28,522 | 35,917 |
| 11 | Range-Forage | | 11,241 | 2,464 | 7,336 | 0 | 0 | 2,782 | 3,218 | 7,922 | 11,042 | 0 | 0 |
| 12 | Even-Aged Timber | | 1,320 | 8,120 | 125 | 1,872 | 0 | 855 | 9,447 | 5,172 | 4,680 | 20,843 | 19,431 |
| 13 | Timber-Visuals | | 2,798 | 6,783 | 108 | 7,924 | 0 | 1,752 | 2,000 | 3,452 | 1,146 | 12,490 | 5,493 |
| 14 | Timber-Forage | PR [†] | 1,489 | 7,153 | 277 | 1,848 | 0 | 789 | 0 | 0 | 0 | 0 | 0 |
| | | MOD [‡] | 3,789 | 9,430 | 924 | 7,044 | 0 | 5,539 | 0 | 0 | 0 | 0 | 0 |
| 15 | Uneven-Aged Timber | | 0 | 0 | 0 | 0 | 0 | 3,151 | 0 | 0 | 0 | 4,034 | 0 |
| 16 | <20 Cu. Ft. Timber | | 1,654 | 9,009 | 1,909 | 9,549 | 0 | 2,905 | 28,023 | 3,472 | 2,900 | 9,799 | 17,663 |
| 17 | Riparian Area | >20 | 684 | 473 | 310 | 1,340 | 0 | 73 | 0 | 147 | 0 | 270 | 159 |
| | | <20 | 181 | 164 | 60 | 556 | 0 | 341 | 0 | 44 | 0 | 83 | 89 |
| | | Range | 329 | 228 | 114 | 271 | 0 | 391 | 0 | 47 | 0 | 32 | 53 |

[§]  Timber Acres only; range acres are in Prescriptions 10 and 11.
[†]  PR = Partial Retention
[‡]  MOD = Modification

| | | | | | | | | | | | | PRF - Preferred Alternative (continued) | |

| Mgt. Area 51 | Mgt. Area 52 | Mgt. Area 53 | Mgt. Area 54 | Mgt. Area 61 | Mgt. Area 62 | Mgt. Area 63 | Mgt. Area 64 | Mgt. Area 65 | Mgt. Area 66 | Mgt. Area 67 | TOTAL | Prescription Description | | Mgt. Rx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 876 | 1,346 | 4,347 | 453 | 4,139 | 3,654 | 3,912 | 1,336 | 123 | 439 | 32 | 45,802 | Minimum Level | >20 | 1 |
| 0 | 0 | 0 | 499 | 59 | 263 | 0 | 0 | 0 | 0 | 0 | 12,782 | | <20 | |
| 433 | 157 | 82 | 0 | 1,628 | 1,081 | 1,283 | 0 | 0 | 0 | 2,087 | 11,569 | | Range | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70,385 | Wilderness - Standard | | 2 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Wild.- Low Standard | | 3 |
| 0 | 0 | 0 | 484 | 1,934 | 438 | 77 | 0 | 0 | 0 | 0 | 10,913 | SPNM [§] | >20 | 4 |
| 90 | 0 | 0 | 251 | 0 | 40 | 14 | 0 | 0 | 0 | 0 | 12,100 | | <20 | |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 198 | Dev. Rec. - Standard | | 5 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | Dev. Rec. - Low Std. | | 6 |
| 0 | 0 | 78 | 159 | 1,658 | 1,309 | 546 | 292 | 0 | 0 | 0 | 22,522 | Visual Retention [§] | >20 | 7 |
| 187 | 0 | 0 | 89 | 0 | 32 | 14 | 235 | 0 | 0 | 0 | 8,605 | | <20 | |
| 800 | 0 | 0 | 0 | 570 | 13,218 | 0 | 0 | 0 | 0 | 0 | 14,588 | Special Areas | | 8 |
| 818 | 1,946 | 14 | 152 | 1,579 | 310 | 2,665 | 0 | 22 | 0 | 45 | 11,885 | Raptor Management | >20 | 9 |
| 915 | 1,224 | 40 | 448 | 0 | 51 | 6 | 0 | 115 | 0 | 307 | 6,796 | | <20 | |
| 9,959 | 3,430 | 254 | 2,056 | 472 | 0 | 760 | 0 | 1,615 | 4,186 | 4,927 | 33,430 | | Range | |
| 310,675 | 20,863 | 20,119 | 15,411 | 0 | 0 | 5,960 | 12,438 | 59 | 55,433 | 8,717 | 619,212 | Rangeland | | 10 |
| 12,423 | 0 | 0 | 0 | 0 | 0 | 5,474 | 14,750 | 45,229 | 144,695 | 22,789 | 291,365 | Range-Forage | | 11 |
| 5,118 | 23,823 | 0 | 6,424 | 5,683 | 15,130 | 11,548 | 0 | 6,193 | 75 | 0 | 145,859 | Even-Aged Timber | | 12 |
| 0 | 1,585 | 0 | 1,073 | 2,480 | 9,024 | 8,727 | 0 | 0 | 0 | 0 | 66,835 | Timber-Visuals | | 13 |
| 0 | 0 | 31,489 | 3,702 | 0 | 0 | 0 | 3,433 | 0 | 0 | 0 | 50,180 | Timber-Forage | PR [†] | 14 |
| 0 | 0 | 24,492 | 5,416 | 0 | 1,119 | 0 | 2,358 | 0 | 0 | 0 | 60,111 | | MOD [‡] | |
| 0 | 0 | 3,605 | 0 | 6,324 | 0 | 0 | 0 | 0 | 0 | 0 | 17,114 | Uneven-Aged Timber | | 15 |
| 5,922 | 7,201 | 7,200 | 4,388 | 0 | 446 | 15,260 | 10,507 | 3,453 | 794 | 63 | 142,117 | <20 Cu. Ft. Timber | | 16 |
| 0 | 203 | 0 | 179 | 19 | 0 | 0 | 0 | 25 | 0 | 0 | 3,882 | Riparian Area | >20 | 17 |
| 34 | 92 | 0 | 50 | 0 | 0 | 0 | 0 | 61 | 0 | 0 | 1,755 | | <20 | |
| 580 | 245 | 0 | 46 | 4 | 0 | 0 | 0 | 712 | 585 | 0 | 3,637 | | Range | |

# Appendix Q
## Visual Quality Objectives

This appendix briefly describes visual quality objectives (VQOs) and the program levels used in the alternatives.

## Definitions

Visual Quality Objectives are standards for the visual management of all Forest lands. They have been assigned to each acre of the Forest based on public concern for scenic quality as well as diversity of natural features. For a description of the process used to arrive at these objectives, see the DEIS Visual Resources Affected Environment, Chapter 3. The five VQOs are:

### Preservation (P)

Only ecological changes are permitted. Most management activities are prohibited. Trails, trail bridges, and other trail-related improvements are designed and located to be visually unobtrusive.

### Retention (R)

Management activities result in a natural appearing landscape. Activities may occur but are not visually evident to the casual observer. Activities repeat form, line, color, and texture found frequently in the characteristic landscape. Changes in the qualities of size, amount, intensity, direction, and pattern should not be evident. Reducing contrast in form, line, color, and texture to meet retention should be accomplished during operation or immediately thereafter.

### Partial Retention (PR)

Management activities remain visually subordinate to the characteristic landscape. Activities and structures may repeat form, line, color, or texture common in the characteristic landscape. Activities and structures may also introduce form, line, color or texture which are found infrequently or not at all in the characteristic landscape. Reducing contrast in form, line, color, and texture to meet partial retention should be accomplished as soon as possible after project completion or within the first year.

### Modification (M)

Management activities may dominate the original landscape. However, activities of vegetative and land form alteration must borrow from naturally established form, line, color, or texture so completely and at such a scale that its visual characteristics are those of natural occurrences within the surrounding area or character type. Reducing form, line, color, and texture contrast to meet modification should be accomplished in the first year.

### Maximum Modification (MM)

Management activities of vegetative and land form alterations may dominate the characteristic landscape. However, when viewed as background, the visual characteristics must be those of natural occurrences within the surrounding area or character type. When viewed as foreground or middleground they may not appear to borrow from naturally established form, line, color, or texture. Alterations may also be out of scale or contain detail that is incongruent with natural occurrences as seen in foreground or middleground. Reducing form, line, color, and texture contrast to meet maximum modification should be accomplished within five years.

## Meeting Visual Quality Objectives

Many design principles used to develop VQOs can also be used on project level activities to minimize impacts and help meet the visual quality objective. General guidelines for meeting retention and partial retention are found in the Visual Retention and Timber-Visuals Prescriptions, respectively (Chapter 4). Modification and VQO guidelines are found in the Even-Aged Timber and Timber-Forage Prescriptions. More detailed guidance is found in the visual resource management handbooks:

- USDA Handbook Number 434, National Forest Landscape Management Volume 1.

- USDA Handbook Number 462, National Forest Landscape Management Volume 2. Chapter 1, The Visual Management System.

- USDA Handbook Number 559, National Forest Landscape Management Volume 2. Chapter 5, Timber.

# Appendix R
## Big Valley Federal Sustained-Yield Unit Policy Statement

## I. Sale of Timber

1. Except as noted below and as otherwise approved by the Regional Forester to meet emergencies, not less than 80 percent of all National Forest sawtimber sold in the Unit must be given primary manufacture within the Big Valley Community, hereafter also called the Big Valley area, which is defined as that portion of the Pit River Drainage commonly known as Big Valley as shown on the attached map, and includes the towns of Adin, Bieber, Lookout and Nubieber. Sawtimber is defined as material suitable for the manufacture of lumber which meets customary minimum specifications as to size, percent sound, and net scale.

2. Cull (fiber) logs are exempt from the requirements cited herein. Cull (fiber) logs are logs 8 inches or larger in large-end diameter, 10 feet or more in length and containing less than 25 percent sound material.

3. National Forest sawtimber and other forest products will be offered for sale on a competitive basis. Standard Forest Service appraisal methods will be used in arriving at advertised rates. In determining the time and amount of such offerings, consideration will be given to the fact that there are now established in the Big Valley area sawmills with a total capacity more than sufficient to utilize the budgeted sawtimber cut of the Unit.

4. National Forest sawtimber and other forest products shall continue to be available in sufficient amounts to meet the needs of bona fide farmers, settlers, miners, residents and prospectors for minerals, and ranchers, for personal and domestic use, as provided by law and by regulation.

5. Applicable provisions to effectuate this policy statement will be included as conditions of sale, in timber sale contracts covering National Forest sawtimber and other forest products in the Unit.

## II. Cutting Budget

1. The annual cutting budget, in log scale Scribner unless otherwise indicated, established for the Unit for the period October 1, 1985 to September 30, 1999, is as follows:

| Sawtimber (MM Bd. Ft.) Suitable Timberland | |
|---|---|
| Pine type | 2.8 |
| Mixed Conifer type | 4.7 |
| **Subtotal** | **7.5** |
| Low productivity lands (NIC lands[1]) | 1.5 |
| **Total sawtimber** | **9.0** |

It is recognized that marketing and operating conditions may not permit cutting at the above-stated average annual rates in any single year. Sales of regulated sawtimber therefore will be programmed to promote the attainment of this average rate within plus or minus five percent for the plan period. No such program attainment target for unregulated sawtimber and forest products other than sawtimber will be attempted.

Revision of the cutting budget to reflect changes in utilization, marking policy, improved timber inventory information, including more reliable growth and mortality data, unanticipated timber losses, a national emergency, and acquisition of private lands, or other significant factors, may be made at any time upon recommendation of the Regional Forester and approval of the Chief, Forest Service.

---

[1] Non-interchangeable component; mostly ponderosa pine, not suitable for intensive timber production.

Before any decrease of 20 percent or more in the potential yield is recommended, an advisory hearing will be held at which interested persons will be invited to express themselves on the advantages or disadvantages of the Big Valley Sustained-Yield Unit in the light of the proposed revisions.

2. The annual cutting budget for forest products other than sawtimber may be established from time to time upon recommendation of the Regional Forester and approval of the Chief, Forest Service.

3. In the event that thrifty sawtimber on private lands within the Unit is added to the Federal Unit through land exchange, the selected sawtimber cut in exchange for such private land and sawtimber will not be charged against the annual programmed allowable harvest, and such selected sawtimber may be exempted from the other provisions of this policy statement, provided the annual programmed allowable harvest is not reduced.

## III. Provisions for Community Support

The primary purpose for establishment of the Big Valley Federal Sustained-Yield Unit is to provide the maximum feasible permanent support to the Big Valley community from the lumber industry.

Sawtimber from the Unit therefore will be sold under conditions designed to promote the following objectives:

1. Maintenance of steady employment opportunities in the Big Valley community, both within each year and from year to year.

2. Employment of local resident labor.

3. Opportunity for those living within and near the Unit to obtain lumber for their local requirements.

4. Efficient operation and maintenance of, and addition to, plan facilities to keep them in step with technical advances in forest products utilization and manufacture which are feasible for adoption under the economic conditions of the Big Valley area. This means, as a minimum, sufficient yard facilities for drying all lumber and sufficient planning mill capacity to surface approximately 50 percent of total production.

## IV. Major Changes

Before any major changes are made in this policy statement, an advisory public hearing will be held at which interested persons will be invited to express themselves on the advantages or disadvantages of the proposed change.

# APPENDIX S

## Range Allotment and Riparian Improvement Priorities

To meet Forest Plan goals in range, wildlife, riparian and watershed management, land managers must analyze range and riparian conditions on a site-specific basis. When analysis is complete, the Forest can develop and implement strategies based on management direction in Chapter 4. This appendix lists the priorities for range (Table S-1) and riparian (Table S-2) analysis. Depth of analysis and extent of implementation of strategies depends on funding level.

### Table S-1. Range Allotments for Analysis by Priority

| Warner Mountain Ranger District | Big Valley Ranger District | Devil's Garden Ranger District | Doublehead Ranger District |
|---|---|---|---|
| Lassen Creek | Oxendine | Happy Camp | Pott ers |
| Yankee Jim | Ash Valley | Howard's Gulch | Boles |
| Bear Camp | Round Valley | Triangle Ranch | Perez |
| Davis Creek | Delta Lake | Big Sage | Dalton |
| Selic | East Bieber | Emigrant Springs | Mammoth |
| North Parker Creek | West Bieber | Surveyor's Valley | Clear Lake |
| Mount Bidwell/Bidwell | Stone Coal | West Grizzlie | Mt. Dome |
| North Creek | Crank Springs | Pine Springs | Deep Lake |
| Eagle-Barber | Ballard Ridge | 139 | Lavas |
| Mill-Eagle | Barber Canyon | Pit River | Warm Springs |
| Cottonwood-Owl | Centerville | Willow Creek Ranch | Timber Mountain |
| Henderson Meadow | Happy Camp | Blue Mountain | Glass Mountain |
| West Valley | Egg Lake | Mowitz | Mud Lake |
| Outlet | Rush Creek | East Grizzlie | Crumes |
| Cedar Canyon | Willow Creek | Avanzino | Tucker |
| Blue Lake | White Horse | Beaver Dam | |
| Granger | Round Mountain | Timbered Mtn. | |
| Buck Creek | Splawn Mountain | | |
| Coyote | Spring Hill | | |
| Thoms | Shawville | | |
| Myrtle | Sherer | | |
| Bald Mountain | Kramer | | |
| Emerson/Cottonwood | Gerig | | |
| Joseph Creek | Parks Pasture | | |
| Parsnip | Baird | | |
| | Refuge 1-N | | |
| | Derner | | |
| | Canyon Creek | | |

| Table S-1.  Streams Needing Riparian Improvement | | | |
|---|---|---|---|
| Management Area | Allotment | Stream | Priority[1] |
| **Warner Mountain Ranger District** | | | |
| 31 | Mt. Bidwell | Mill Creek | 2 |
| 32 | Davis Creek | N.F. Davis Creek | 1 |
| 32 | Davis Creek | M.F. Davis Creek | 1 |
| 32 | Lassen Creek | Lassen Creek | 1 |
| 32 | Lassen Creek | Cold Creek | 1 |
| 33 | Bald Mountain | Mill Creek | 2 |
| 34 | Cedar Canyon | Cedar Creek | 2 |
| 34 | Cedar Canyon | N. Deep Creek | 2 |
| 34 | Cedar Canyon | S. Deep Creek | 1 |
| 34 | Granger | Granger Creek | 2 |
| 34 | Granger | N.F. Parker Creek | 2 |
| 34 | Granger | M.F. Parker Creek | 2 |
| 34 | Granger | S.F. Parker Creek | 2 |
| 34 | Henderson Meadow | N.F. Fitzhugh Creek | 2 |
| 34 | Henderson Meadow | M.F. Fitzhugh Creek | 2 |
| 34 | Henderson Meadow | S.F. Fitzhugh Creek | 2 |
| 34 | Henderson Meadow | Mill Creek | 1 |
| 34 | North Parker | Shields Creek | 2 |
| 34 | North Parker | Parker Creek | 1 |
| 34 | North Parker | Dry Creek | 2 |
| 34 | North Parker | Little N.F. Parker | 2 |
| 34 | North Parker | Willow Springs Canyon | 2 |
| 34 | Yankee Jim | Shields Creek | 2 |
| 34 | Yankee Jim | N.F. Shields Creek | 2 |
| 34 | Yankee Jim | S.F. Shields Creek | 2 |

[1] Priorities for correcting riparian problems were determined with the following considerations:

— Beneficial use of the riparian area and water quality;
— Magnitude of the problem (access and the amount of difficulty in correction); and
— Benefit to other resources if the problem were corrected.

Priority 1:   Significant problems that should be corrected in the 1st decade.

Priority 2:   Problems that should be corrected within the first 2 decades.

| Management Area | Allotment | Stream | Priority |
|---|---|---|---|
| 34 | Yankee Jim | S.F. Shields Creek | 2 |
| 34 | Yankee Jim | N.F. Pine Creek | 2 |
| 34 | Yankee Jim | M.F. Pine Creek | 1 |
| 34 | Yankee Jim | S.F. Pine Creek | 2 |
| 34 | Yankee Jim | N.F. Fitzhugh Creek | 1 |
| 34 | Yankee Jim | S.F. Fitzhugh Creek | 2 |
| 35 | Cottonwood | Mill Creek Tributary | 1 |
| 35 | Granger | M.F. Parker Creek | 2 |
| 35 | Granger | S.F. Parker Creek | 2 |
| 35 | Henderson Meadow | Mill Creek | 1 |
| 35 | Yankee Jim | N.F. Shields Creek | 2 |
| 35 | Yankee Jim | N.F. Pine Creek | 2 |
| 35 | Yankee Jim | M.F. Pine Creek | 1 |
| 35 | Yankee Jim | Pine Cr. Basin | 1 |
| 36 | Bearcamp | Bearcamp Flat Creek | 1 |
| 36 | Bearcamp | S.F. East Creek | 1 |
| 36 | Bearcamp | Homestead Flat Creek | 2 |
| 36 | Bearcamp | East Creek | 1 |
| 36 | Bearcamp | Skunk Cabbage Creek | 2 |
| 36 | Bearcamp | Silver Creek | 2 |
| 36 | Blue Lake Cattle | Blue Lake Tributary | 2 |
| 36 | Blue Lake Cattle | Gopher Creek | 2 |
| 36 | Parsnip Creek | Little Parsnip Creek | 1 |
| **Big Valley Ranger District** | | | |
| 44 | Ash Valley | Cottonwood Creek | 2 |
| 44 | Ash Valley | Rail Canyon | 2 |
| 44 | Barber Canyon | Dutch Flat Creek | 1 |
| 44 | Rush Creek | Rush Creek | 2 |
| 44 | Rush Creek | Johnson Creek | 1 |
| 44 | Round Valley | Ash Creek | 2 |
| 45 | East Barber | E.F. Juniper Creek | 2 |
| 45 | Oxendine | Butte Creek | 2 |
| 45 | Willow Creek | Willow Creek | 1 |

| Management Area | Allotment | Stream | Priority |
|---|---|---|---|
| **Devil's Garden Ranger District** | | | |
| 51 | Blue Mountain | N.F. Willow Creek | 2 |
| 51 | Big Sage | Logan Slough | 2 |
| 51 | Carey SUP | Fletcher Creek | 2 |
| 51 | Carey SUP | Beaver Creek | 2 |
| 51 | Emigrant Springs | Rattlesnake Creek Tributary | 2 |
| 51 | 139 Allotment | Howard's Gulch | 2 |
| 51 | Timbered Mountain | Fletcher Creek | 1 |
| 51 | Timbered Mountain | Logan Slough | 2 |
| 51 | Triangle Ranch | Bottle Creek | 2 |
| 51 | West Grizzlie | Fletcher Creek | 2 |
| 51 | Willow Creek Ranch | Fletcher Creek | 1 |
| 51 | Willow Creek Ranch | Willow Creek | 2 |
| 52 | Beaver Dam | Willow Creek | 1 |
| 52 | Blue Mountain | Willow Creek | 2 |
| 52 | Blue Mountain | Wildhorse Creek | 2 |
| 52 | West Grizzlie | Grassy Ravine | 2 |
| 52 | West Grizzlie | Fletcher Creek | 2 |
| 52 | Willow Creek Ranch | Fletcher Creek | 1 |
| 54 | Happy Camp | Washington Creek | 1 |
| 54 | Happy Camp | Coffee Mill Gulch | 1 |
| 54 | Happy Camp | Hulbert Creek | 1 |
| 54 | Happy Camp | Turner Creek | 1 |
| 54 | Pit River | Turner Creek | 1 |
| 54 | Pit River | Washington Creek | 1 |
| **Doublehead Ranger District** | | | |
| 65 | Boles | Boles Creek | 1 |
| 65 | Boles | N.F. Willow Creek | 1 |
| 65 | Dalton | Boles Creek | 1 |
| 66 | Boles | Boles Creek | 1 |
| 66 | Boles | Pothole Creek | 2 |
| 66 | Clear Lake | N.F. Willow Creek | 1 |
| 66 | Clear Lake | Lost River | 2 |
| 66 | Clear Lake | Willow Creek | 1 |
| 66 | Clear Lake | Rock Creek | 2 |
| 66 | Dalton | Mowitz Creek | 1 |
| 66 | Mammoth | Boles Creek | 1 |

# Appendix T

## Stream Classification For Implementing the Riparian Area Management Prescription

This appendix describes each stream type found on the Modoc National Forest. This information should be used to prioritize streams for implementing Standard and Guidelines as found in the Riparian Area Management Prescription (Plan Chapter 4). This appendix should guide the manager in implementing specific Forest-wide Standards and Guidelines only on stream types that need stream recovery and maintenance—not all streams on the Forest. A description of physical and vegetative characteristics of stream types which are properly managed is provided as a guide for the reader.

### Stream Types

Table 1 lists stream type classification developed by Rosgen (1985). Stream channel gradient are designated by the letter A (high), B, (moderate), or C (low). Braided stream channels are designated with the letter D. Channels that are completely confined are designated by the letter F. The size of channel bottom materials, from bedrock to silt or clay, is designated numerically from 1 to 6.

### Recovery Priority

Table 2 presents the recovery priority for streams with grazing impacts. Priority 1 streams generally are very sensitive to livestock grazing and have high potential to recover. Often these streams have been degraded from past management practices; e.g., from stream type C6 to C3. Priority 2 streams have high sediment loads and also have the potential to recover from livestock grazing disturbances. Priority 3 and 4 streams are inherently stable and generally are not subject to grazing impacts.

### Stream Type Descriptions and Management Recommendations

The following describes each stream type and recommendations measures for protection and recovery.

Vegetative plant communities are listed for each stream type, if known. Specific plant communities or cover types are referenced whenever possible. Source documents for referenced plant communities are Kovalchik (1987) and Padgett, et al (1988). Additional information was obtained from Clary (1989), and ongoing work in the ecological classification of riparian areas on the Modoc, Lassen, and Plumas National Forests.

**A1 - High Gradient Bedrock Streams:** High gradient, stable, bedrock streams with steep side slopes and/or vertical rock walls.

Vegetation is characterized by stable stands of trees and shrubs. Represented communities include black cottonwood, white fir, chokecherry, and bitter cherry.

Only the utilization Standards and Guidelines (S&Gs) for shrubs in the Range section of the Riparian Area Management Prescription apply. All S&Gs in the Timber section apply. Because A1 channels are important sources of large woody debris, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

**A1-a - Very High Gradient Bedrock Streams:** Very steep, deeply incised drainages with steep side slopes and/or vertical rock walls.

Vegetation is characterized by stable stands of trees and shrubs. Communities include white fir, black cottonwood, chokecherry, and bitter cherry.

The Range section of the Riparian Prescription does not apply. All S&Gs in the Timber section apply. Because A1 channels are important sources of large woody debris, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

**A2 - High Gradient Boulder Streams:** High gradient, stable boulder streams with steep side slopes.

Vegetation is characterized by stable stands of trees and shrubs. Communities include white fir, black cottonwood, chokecherry, bitter cherry, red osier dogwood, and lemon willow.

Only the utilization S&Gs for shrubs in the Range section of the Riparian Prescription apply. All S&Gs in the Timber section apply.

## Table T-1. Stream Types

| Stream Type | Gradient | Sinuosity | Width to Depth Ratio | Dominant Particle Size of Channel Materials | Entrenchment Valley Confinement | Landform Feature Soil/Stability |
|---|---|---|---|---|---|---|
| A1 | 4-10 | 1.0-1.1 | 10 or less | Bedrock | Very deep; very well confined | Deeply incised bedrock drainage way with steep side slopes and/or vertical rock walls. |
| A1-a | 10 + | | | Same as A1 | | |
| A2 | 4-10 | 1.1-1.2 | 10 or less | Large and small boulders with mixed cobbles. | Same as A1 | Steep side slopes with predominantly stable material. |
| A2-a | 10 + | | | Same as A2 | | |
| A3 | 4-10 | 1.1-1.3 | 10 or less | Small boulders, cobble, coarse gravel. Some sands. | Same as A1 | Steep, depositional features with predominantly coarse-textured soils. Debris avalanche is the predominant erosion process; stream-side slopes are rejuvenated with extensive exposed mineral soil. |
| A3-a | 10 + | | | Same as A2 | | |
| A4 | 4-10 | 1.2-1.4 | 10 or less | Predominantly gravel, sand, and some silts. | Same as A1 | Steep side slopes with mixture of either depositional landforms with fine-textured soils such as glacialfluvial or glaciallacustrine deposits or highly erodible residual soils such as grussic granite, etc. Slump-earth flow and debris avalanche are dominant erosional processes; stream-adjacent slopes are rejuvenated. |
| A4-a | 10 + | | | Same as A4 | | |
| A5 | 4-10 | 1.2-1.4 | 10 or less | Silt and/or clay bed and bank materials. | Same as A1 | Moderate to steep side slopes; fine-textured cohesive soil. Slump-earthflow erosional processes dominate. |
| A5-a | 10 + | | | Same as A5 | | |
| B1-1 | 1.5-4.0 | 1.3-1.9 | 10 or more ( $\bar{x}$=15 ) | Bedrock bed; banks are cobble, gravel, some sand. | Shallow entrenchment; moderate confinement. | Bedrock controlled channel with coarse-textured depositional bank materials. |
| B1 | 2.5-4.0 ( $\bar{x}$=3.5 ) | 1.2-1.3 | 5-15 ( $\bar{x}$=10 ) | Predominantly small boulders and very large cobble. | Moderate entrenchment; moderate confinement. | Moderately stable, coarse-textured resistant soil materials; river terrace. |
| B2 | 1.0-2.5 ( $\bar{x}$=2.0 ) | 1.3-1.5 | 8-20 ( $\bar{x}$=14 ) | Large cobble mixed with small boulders and coarse gravel. | Moderate entrenchment; moderate confinement. | Coarse-textured, alluvial terrace with stable, moderately steep side slopes. |
| B3 | 1.5-4.0 ( $\bar{x}$=2.5 ) | 1.3-1.7 | 8-20 ( $\bar{x}$=12 ) | Cobble bed with mixture of gravel and sand, some small boulders. | Moderate entrenchment; well confined. | Glacial outwash terrace and/or rejuvenated slopes. Unstable, moderate to steep slopes; unconsolidated, coarse-textured unstable banks; depositional landforms. |
| B4 | 1.5-4.0 ( $\bar{x}$=2.0 ) | 1.5-1.7 | 8-20 ( $\bar{x}$=10 ) | Very coarse gravel with cobbles, sand and finer material. | Deeply entrenched; well confined. | Relatively fine-grained river terrace. Unconsolidated coarse to fine depositional material; steep slopes; highly unstable banks. |
| B5 | 1.5-4.0 ( $\bar{x}$=2.5 ) | 1.5-2.0 | 8-25 ( $\bar{x}$=15 ) | Silt/clay. | Deeply entrenched; well confined. | Cohesive fine-textured soils; slump-earthflow erosional processes. |
| B6 | 1.5-4.0 | 1.8-2.0 | 0.1-4 | Gravel with few cobbles and with noncohesive sand and finer soil. | Deeply entrenched and slightly confined. | Narrow and deep meandering coarse-grained channel with well vegetated banks and with accessible flood plain. |

(Table T-1. Stream Types - continued)

| Stream Type | Gradient | Sinuosity | Width to Depth Ratio | Dominant Particle Size of Channel Materials | Entrenchment Valley Confinement | Landform Feature Soil/Stability |
|---|---|---|---|---|---|---|
| C1-1 | 1.5 or less ($\bar{x}$=1.0) | 1.5-2.5 | 10 or greater ($\bar{x}$=30) | **Bedrock** bed, gravel, sand or finer banks. | Shallow entrenchment, partially confined. | Bedrock controlled channel with depositional fine-grained bank material. |
| C1 | 1.0-1.5 ($\bar{x}$=1.3) | 1.5-2.0 | 10 or greater ($\bar{x}$=18) | **Cobble**, coarse gravel bed, gravel, sand banks. | Moderate entrenchment; well confined. | Predominantly coarse-textured with stable, high alluvial terraces. |
| C2 | 0.3-1.0 ($\bar{x}$=0.6) | 1.3-1.5 | 12-30 ($\bar{x}$=20) | Large **cobble** bed with mixture of small boulders and coarse gravel. | Moderate entrenchment; well confined. | Overfit channel, deeply incised in coarse-grained alluvial terraces or other depositional features. |
| C3 | 0.5-1.0 ($\bar{x}$=0.3) | 1.8-2.4 | 10 or greater ($\bar{x}$=25) | **Gravel** bed with mixture of small cobble and sand. | Moderate entrenchment; slightly confined. | Predominantly moderate to fine-textured multiple low river terraces; unstable banks, unconsolidated, noncohesive soils. |
| C4 | 0.1-0.5 ($\bar{x}$=0.3) | 2.5 + | 5 or greater ($\bar{x}$=25) | **Sand** bed with mixture of gravel and silt, no bed armor. | Moderate entrenchment; slightly confined. | Predominantly fine-textured, alluvium with low flood terraces. |
| C5 | 1.0 or less ($\bar{x}$=0.5) | 2.5 + | 5 or greater ($\bar{x}$=10) | **Silt/clay** with mixture of medium to fine sand, no bed armor. | Moderate entrenchment; slightly confined. | Low, fine-textured alluvial terraces, delta deposits, lacustrine, loess or other fine-textured soils; predominantly cohesive. |
| C6 | 1.5 or less | 2.5 + | 3 or greater ($\bar{x}$=5) | **Sand** bed with mixture of silt and some gravel. | Deeply entrenched; unconfined. | Same as C4 except has more resistant vegetated banks. |
| D1 | 1.0 or greater ($\bar{x}$=2.5) | Braided | n/a | **Cobble** bed with mixture of coarse gravel and sand and small boulders. | Slightly entrenched; no confinement. | Glacial outwash, coarse depositional soil, very erodible; excess sediment supply of coarse size material. |
| D2 | 1.0 or less ($\bar{x}$=1.0) | Braided | n/a | **Sand** bed with mixture of small to medium gravel and silt. | Slightly entrenched; no confinement. | Fine-textured depositional soil, very erodible; excess of fine textured sediment. |
| F1 | 1.0 or less | 1.3 | 10-40 | **Bedrock** bed with few boulders, cobble and gravel. | Total confinement | Flat-gradient, confined, meandering bedrock stream. Highly weathered bedrock where stream has been deeply incised. |
| F2 | 1.0 or less | 1.3 + | 10-40 | **Boulder** with small amounts of cobble, gravel and sand. | Same as F1 | Flat gradient, confined, meandering boulder bed stream. Weathered bedrock and/or very coarse depositional or residual material, such as talus; deep stream incision. |
| F3 | 1.0 or less | 1.3 + | 10-40 | **Cobble/gravel** bed with locations of sand in depositional sites. | Same as F1 | Flat-gradient, confined, meandering, cobble/gravel bed streams. Weathered bedrock or depositional coarse-grained terraces where stream is deeply incised. |
| F4 | 1.0 or less | 1.3 + | 10-40 | **Sand** bed with smaller amounts of silt | Same as F1 | Flat-gradient, confined, meandering, sand bed channel; highly weathered bedrock or fine-textured depositional and/or residual soil where the stream has deeply incised. |
| F5 | 1.0 or less | 1.3 + | 10-40 | **Silt/clay** bed and banks with smaller amounts of sand. | Same as F1 | Flat-gradient, confined, meandering, silt/clay streams;  highly weathered bedrock or fine-textured depositional and/or residual soil where the stream has deeply incised. |

## Table T-2. Stream Type Recovery Priority [1]

| Stream Type | Priority [2] | Sensitivity to Grazing Impacts [3] | Recovery Potential [3] | Altered State | Recovered State | Utilization Herbaceous Communities % by Weight/Stubble Height | | | | Bank Stability Allowable Bank Disturbance (trampling) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | SL [5] | DR [6] | RR [7] | ES [8] | |
| C6 | 1 | 5 | 4 | C3, C4, C5, F3, F4, F5 | C6 | | | | | <5% |
| C4 | 1 | 5 | 5 | F4, C4 | C6 | | | | | |
| C3 | 1 | 5 | 5 | F3, C3 | C6 | | | | | <20% |
| F4 | 1 | 2-5 [4] | 4 | F4, C4 | C6 | | | | | |
| F3 | 1 | 2-5 | 4 | F3, C3 | C6 | 25-35% 4-6" | 30-45% 4-5" | 35-45% 4-5" | 45-55% 3" (Re-growth to 4-8") | |
| F5 | 1 | 2-5 | 4 | F5, C5 | C6 | | | | | |
| B6 | 1 | 5 | 4 | B3 | B6 | | | | | <5% |
| C5 | 1 | 4 | 5 | C5, F5 | C5, C6 | | | | | <20% |
| B4 | 2 | 4 | 2 | B4 | B4 | | | | | |
| B3 | 2 | 3 | 1 | B3 | B3, B6 | | | | | |
| B5 | 2 | 3 | 2 | B5 | B5 | Do Not Occur on Modoc NF | | | | |
| C1-1 | 3 | 3 | 3 | C1-1 | C1-1 | | | | | |
| C1 | 3 | 3 | 4 | C1 | C1 | 35-50% 3-5" | 40-55% 3-4" | 45-60% 3" | 55-65% 3" (Re-growth to 4-8") | <20% |
| B2 | 3 | 2 | 5 | B2 | B2 | | | | | |
| B1-1 | 3 | 2 | 3 | B1-1 | B1-1 | | | | | |
| B1 | 3 | 1 | n/a | B1 | B1 | | | | | |
| F2 | 3 | 1 | n/a | F2 | F2 | | | | | |
| C2 | 3 | 1 | n/a | C2 | C2 | | | | | |
| F1 | 3 | 1 | n/a | F1 | F1 | | | | | |

---

[1]  Stream type recovery was first developed by Sherman Swanson, Extension Range Specialist and Research Associate, University of Nevada, Reno. Slight modifications were made by Dick Jones, former Forest Hydrologist, Modoc National Forest, to fit conditions on the Forest.

[2]  Priority 1 (high priority) streams are very sensitive to grazing or a high recovery potential or both. Priority 2 (high priority) streams are well confined and have high sediment loads. Priority 3 (medium priority) streams are stable. Priority 4 (low priority) streams have little potential for grazing impacts. (See Riparian Area Management Prescription—Plan 4-138.)

[3]  Sensitivity to grazing and recovery potential:

   1 = Very Low; 2 = Low; 3 = Medium; 4 = High; 5 = Very High.

[4]  Sensitivity to grazing varies based on gully age. Young, narrow channels are not often subject to intense grazing; however, older, wide channels can be subject to intense grazing.

[5]  Season-long Grazing

[6]  Deferred Rotation (includes late season grazing)

[7]  Rest-Rotation

[8]  Early Season with Regrowth

*Stream Classification*

**(Table T-2. Stream Type Recovery Priority - continued)**

| Stream Type | Priority[2] | Sensitivity to Grazing Impacts[3] | Recovery Potential[3] | Altered State | Recovered State | Utilization Herbaceous Communities % by Weight/Stubble Height | | | | Bank Stability |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | SL[5] | DR[6] | RR[7] | ES[8] | Allowable Bank Disturbance (trampling) |
| A3 | 4 | n/a | n/a | A3 | A3 | | | | | |
| A4 | 4 | n/a | n/a | A4 | A4 | | | | | |
| A1 | 4 | n/a | n/a | A1 | A1 | | | | | |
| A2 | 4 | n/a | n/a | A2 | A2 | Little Potential for Grazing Impacts | | | | <20% |
| A5 | 4 | n/a | n/a | A5 | A5 | | | | | |
| D1 | 4 | 1 | n/a | D1 | D1 | | | | | |
| D2 | 4 | 1 | n/a | D2 | D2 | | | | | |

**A2-a - Very High Gradient Boulder Streams:**
Very high gradient, stable boulder streams with steep side slopes.

Vegetation is similiar to *A2-High Gradient Boulder Streams* above.

The Range section in the Riparian Prescription does not apply. All S&Gs in the Timber section apply.

**A3 - High Gradient Cobble/Gravel Streams:** High gradient, cobble/gravel streams with steep rejuvenated slopes and extensive exposed mineral soil.

Vegetation is characterized by trees and shrubs. Tree communities include water birch, white fir, and aspen. Shrub communities include yellow willow, lemon willow, coyote willow, firmleaf willow, and red-osier dogwood. Prunus species can be present in these communities. One herbaceous cover type, Nebraska sedge, has been documented.

Only utilization S&Gs in the Range section of the Riparian Prescription apply. All S&Gs of the Timber section apply. Because of steep, rejuvenated slopes, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

**A3-a - Very High Gradient Cobble/Gravel Streams:**
Very high gradient, cobble/gravel streams with steep rejuvenated slopes and extensive exposed mineral soil.

Vegetation is similiar to A3 above.

Debris avalanche is the predominant erosional process.

S&Gs in the Range section of the Riparian Prescription do not apply. All S&Gs in the Timber section apply. Because of steep, rejuvenated slopes, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

Due to the nature of the rejuvenating side slopes, also apply S&G #2 of the Facilities section: *"Minimize sediment production and mass-wasting during pioneer road construction."* Because culvert blockage and subsequent channel blowout of this stream type can be significant, plan all crossings with these problems in mind.

**A4 High Gradient Gravel/Sand Streams:** High gradient, gravel/sand streams with steep depositional features and erodible residual soils. Slump-earthflow is the dominant erosional process.

This type is characterized by stands of trees and shrubs. Soils are unstable. Tree communities can include water birch and white fir. Shrub communities can include eastwood willow, booth willow, yellow willow, firmleaf willow, coyote willow, and Prunus species.

Only the utilization S&Gs in the Range section of the Riparian Prescription apply. All S&Gs in the Timber section apply. Because of steep, rejuvenated slopes, apply S&G #2 of the Timber section: *"Maintain 50-*

*Stream Classification*                                                                 *T-5*

*70% of the timbered sites within SMZs in an old-growth state...."*

Due to the nature of the rejuvenating side slopes, also apply S&G #2 of the Facilities section: *"Minimize sediment production and mass-wasting during pioneer road construction."* Because culvert blockage and subsequent channel blowout of this stream type can be significant, plan all crossings with these problems in mind.

### A4-a Very High Gradient Gravel/Sand Streams:
Very high gradient, gravel/sand streams with steep depositional features and erodible residual soils. Slump-earthflow and debris avalanche are the dominant erosional process.

Vegetation is similiar to that described for A4.

S&Gs in the Range section of the Riparian Prescription do not apply. All S&Gs in the Timber section apply. Because of steep, rejuvenated slopes, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

Due to the nature of the rejuvenating side slopes, also apply S&G #2 of the Facilities section: *"Minimize sediment production and mass-wasting during pioneer road construction."* Because culvert blockage and subsequent channel blowout of this stream type can be significant, plan all crossings with these problems in mind.

Because the potential for slump-earthflow and debris avalanche is high, crossings on these stream types is not recommended.

### A5 and A5-a High and Very High Gradient Silt Streams:
These stream types do not occur on the Modoc National Forest.

### B1-1 Moderate Gradient Bedrock Streams:
Moderate gradient, stable, bedrock streams with coarse-textured depositional bank materials.

This stream type is characterized by tree, shrub, and herbaceous communities. Tree types include white fir, ponderosa and jeffrey pine, and black cottonwood. Shrub types include red osier dogwood, willow, and prunus cover types. Herbaceous cover types include Nebraska sedge, baltic rush, tufted hair grass, and bentgrass communities.

Only the utilization S&Gs for shrubs in the Range section of the Riparian Prescription apply. All S&Gs of the Timber section apply.

### B1 Moderate Gradient Boulder Streams:
Moderate gradient, stable, boulder streams with coarse-textured, resistant soil materials.

Vegetation is similiar to B1-1.

Only the utilization S&Gs for shrubs under Element D, Range, in the Riparian Prescription apply. All of Element E, Timber, applies. Excellent fish habitat is provided by the numerous boulders.

### B2 Moderate Gradient Cobble Streams.
Moderate gradient, stable, cobble streams with coarse-textured, moderately steep side slopes.

Vegetation is similiar to the B1 and B1-1 types.

Only the utilization S&Gs for shrubs in the Range section of the Riparian Prescription apply. All S&Gs of the Timber section apply. Fish habitat is provided mostly from large woody debris. Because woody debris is often sparse in these stream types, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

### B3 Moderate Gradient Cobble/Gravel Streams:
Moderate gradient, cobble/gravel streams with unconsolidated, coarse-textured unstable banks.

These stream types can be occupied by tree, shrub, or herbaceous plant communities. Tree cover types include white fir, yellow pines, aspen, black cottonwood, and water birch. Shrub types include booth willow, lemmon willow, firmleaf willow, whiplash willow, and coyote willow. Coyote willow is an aggressive, many-stemmed pioneer on gravelly sites in habitats that are favorable, e.g., gravel bars or exposed cut banks. Red osier dogwood and Prunus plant communities also occur. Herbaceous cover types include Nebraska sedge, baltic rush, tufted hairgrass, and bentgrass. Smallfruit bulrush stands can often be found along streambanks.

All S&Gs in the Range and Timber sections of the Riparian Prescription apply. Fish habitat is provided mostly from large woody debris. Because woody debris is often sparse in these stream types, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

### B4 Moderate Gradient Gravel/Sand Streams:
Moderate gradient, gravel/sand streams with unconsolidated, fine-textured unstable banks.

Vegetation cover types are similiar to B3. This stream type is unstable and can experience gullying.

All S&Gs in the Range and Timber sections of the Riparian Prescription apply. Fish habitat is provided

mostly from large woody debris. Because woody debris is often sparse in these stream types, apply S&G #2 of the Timber section: *"Maintain 50-70% of the timbered sites within SMZs in an old-growth state...."*

**B5 Moderate Gradient Silt/Clay Streams:**
This stream type does not occur on the Modoc National Forest.

**B6 Moderate Gradient Fine-Textured Deeply Entrenched Streams:** Moderate gradient, fine-textured, deeply entrenched streams with well vegetated banks.

This site is favorable for the establishment of willow communities. Willow cover types include lemmon willow, firmleaf willow, whiplash willow, yellow willow, geyer willow, and coyote willow. Coyote willow is an important early seral species on cut banks and gravel bars. Herbaceous cover types found on these stream reaches include baltic rush, wooly sedge, Nebraska sedge, and aquatic sedge.

When subjected to improper livestock management, these streams readily alter to the B3 stream type. When this occurs, the stream widens; meanders are cut so the channel straightens; vegetation changes from species dominating a wet site to those dominating a dry site; and fisheries habitat is degraded or eliminated.

All S&Gs in the Range section of the Riparian Prescription apply. Where channels have been altered to stream type B3, monitor recovery to a B6 stream type. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Riparian Prescription.

**C1-1 Low Gradient Bedrock Streams:** This stream type does not occur on the Modoc National Forest.

**C1 Low Gradient Cobble Streams:** Low gradient, cobble streams with stable alluvial terraces.

All S&Gs in the Range and Timber section of the Riparian Prescription apply.

**C2 Low Gradient Cobble Overfit Streams:** Low gradient, cobble, overfit streams incised in coarse-grained alluvial terraces.

S&Gs in the Range section of the Riparian Prescription do not apply. All S&Gs in the Timber section apply.

**C3 Low Gradient Gravel Streams:** Low gradient, gravel streams with unstable banks and unconsolidated, noncohesive soils.

Shrubs and herbaceous types comprise the vegetative community types. The Region 6 Riparian Zone Associations in this stream type include the willow/wooly sedge, willow/Kentucky bluegrass, the sagebrush/cusick bluegrass plant associations, and the R4 coyote willow cover type. Herbaceous communities include types dominated by Kentucky bluegrass, Nebraska sedge, wooly sedge, aquatic sedge, tufted hairgrass, and baltic rush. The potential stream type is C6. Willow plantings of coyote willow and other willows are appropriate in the early stages of a recovery program. Lemon willow appears to be somewhat less palatable to livestock than other willow species. Geyer willow is very palatable and should not be planted in a recovery program. Kentucky bluegrass and silver sage occur in degraded, drained sites. In general, sedge communities are indicators of the healthiest ecological condition. Bluegrass dominated communities indicate that the site is somewhat drained. Silver sage and, finally, big sagebrush and rabbitbrush will occupy these sites when they are severely degraded and drained.

C3 streams are generally, if not always, altered from the C6 stream type. The cause of alteration on this Forest is almost always improper livestock management. C3 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. C3 streams are wider, shallower, and straighter than the C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Many intermittent C3 streams on the Forest may once have been perennial C6 streams.

All S&Gs in the Range section of the Riparian Prescription apply. Monitor the recovery of C3 streams to a C6 stream type. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

**C4 Low Gradient Sand Streams:** Low gradient, sand streams with unstable, fine-textured banks.

Vegetation is similiar to that described for C3. Shrubs and herbaceous species predominate. Willow/sedge and sedge communities are indicators of desireable or improving ecological conditions.

Like the C3 stream type, C4 streams are generally, if not always, altered from the C6 stream type. The cause of alteration on this Forest is usually improper livestock management. C4 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. C4 streams are wider, shallower, and

straighter than the C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Some intermittent C4 streams on the Forest may once have been perennial C6 streams.

All S&Gs in the Range section of the Riparian Prescription apply. Monitor the recovery of C4 streams to a C6 stream type. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

**C5 Low Gradient Silt/Clay Streams:** Low gradient, silt/clay streams with fine-textured cohesive banks.

Vegetation communities are primarily grasses and sedges. The fine textured materials and slow permeability of the sites do not favor shrub establishment. Plugs of strongly rhizometous species such as Nebraska sedge, aquatic sedge, or baltic rush are suitable for planting in a recovery program. Willow plantings may be less successful than sedge establishment in stabilizing these streams. Recovery potential is high where livestock management can be changed to allow sedges and grasses to establish and spread.

Like the C3 stream type, C5 streams are generally, if not always, altered from the C6 stream type. The cause of alteration on this Forest is usually improper livestock management. C5 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. C5 streams are wider, shallower, and straighter than the C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Some intermittent C5 streams on the Forest may once have been perennial C6 streams.

All S&Gs in the Range section of the Riparian Prescription apply. Monitor the recovery of C5 streams to a C6 stream type. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

**C6 Low Gradient Fine-Textured Deeply Entrenched Streams:** Low gradient, fine-textured, deeply entrenched streams with well vegetated banks.

Vegetation communities in these channels are dominated by species of shrubs and herbaceous plants. The sites are usually seasonally wet and can be marshy. Healthy C6 reaches with fully developed water relations often are too poorly drained to be suitable for extensive stands of tall willows, although single individuals or small clumps can be found. Some willows, such as Eastwood willow, can tolerate the water-logged conditions. Sometimes extensive stands of

these and similiar willows are found in the riparian areas associated with the C6 stream type. Tall willow establishment is important and encouraged in the recovery of C3 and C4 sites toward the C6 morphology.

The Region 6 willow/aquatic sedge and R4 Eastwood willow community types occur in these stream reaches. Herbaceous communities include few flowered spikerush, creeping spikerush, aquatic sedge, beaked sedge, holm's sedge, short-beaked sedge, Nebraska sedge, wooly sedge, Nevada rush, and small fruit bulrush communities.

Improper grazing management can alter these stream to the C3, C4, C5, F3, F4, or F5 stream types. When this occurs, the stream widens; meanders are cut so the channel straightens; vegetation changes from species dominating a wet site to those dominating a dry site; and fisheries habitat is degraded or eliminated.

All S&Gs in the Range section of the Riparian Prescription apply. Where these channels have been altered to another state, monitor their recovery to a C6 stream type. When timber exists within close proximity to these streams apply S&Gs in the Timber section of the Prescription.

**D1 Moderate Gradient Cobble Braided Streams:** Moderate gradient, cobble, braided streams.

Vegetation is favorable for willow establishment. These streams may have short-term potential to attain a B3 morphology with willow dominated vegetation.

S&Gs in the Range section of the Riparian Prescription do not apply. All S&Gs in the Timber section apply.

**D2 Low Gradient Sand Braided Streams:** Low gradient, sand, braided streams.

Channel potential is C3 or C4, and, ultimately, C6. Coarse substrate materials and good drainage favor willow establishment. Coyote willow will thrive in bar communities. Sedge communities, such as Nebraska sedge, aquatic sedge, and wooly sedge, can occur in this stream type.

S&Gs in the Range section of the Riparian Prescription do not apply. All S&Gs in the Timber section apply.

**F1 Low Gradient Bedrock Total Confinement Streams:**

This stream type does not occur on the Modoc National Forest.

**F2 Low Gradient Boulder Total Confinement Streams:**

Low gradient, boulder, totally confined streams.

All S&Gs in the Range and Timber section of the Riparian Prescription apply.

**F3 Low Gradient Cobble/Gravel Total Confinement Streams:** Low gradient, cobble/gravel totally confined streams with unstable banks.

Vegetation is similiar to that described for the C3 stream type.

F3 streams are generally, if not always, altered from C3 and C6 stream types. The cause of alteration on this Forest is often improper past livestock management. F3 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. F3 streams are wider, shallower, and straighter than the parent C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Some intermittent F3 streams on the Forest may once have been perennial C6 streams.

S&Gs in the Range section of the Riparian Prescription apply. Monitor the recovery of F3 streams to C3 and C6 stream types. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

**F4 Low Gradient Sand Total Confinement Streams:** Low gradient, sand totally confined streams with unstable banks.

Vegetation is similiar to that described for the C4 stream type.

F4 streams are generally, if not always, altered from C4 and C6 stream types. The cause of alteration on this Forest is often improper past livestock grazing. F4 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. F4 streams are wider, shallower, and straighter than the parent C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Some intermittent F4 streams on the Forest may once have been perennial C6 streams.

S&Gs in the Range section of the Riparian Prescription apply. Monitor recovery of F4 streams to C4 and C6 stream types. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

**F5 Low Gradient Silt/Clay Total Confinement Streams:** Low gradient, silt/clay totally confined streams with unstable banks.

Vegetation types include silver sage, big sagebrush, and grass communities.

F5 streams are generally, if not always, altered from the C5 and C6 stream types. The cause of alteration on this Forest is often improper past livestock grazing. F5 streams occur in dry meadows or flats that once were wet, productive meadows before these streams downcut and the water tables dropped. F5 streams are wider, shallower, and straighter than the parent C6 stream type. Fisheries habitat is always degraded from the natural C6 stream type, and in many instances eliminated. Many intermittent F5 streams on the Forest may once have been perennial C6 streams.

S&Gs in the Range section of the Riparian Prescription apply. Monitor recovery of F5 streams to C5 and C6 stream types. When timber exists within close proximity to these streams, apply S&Gs in the Timber section of the Prescription.

## LITERATURE CITED

Clary, W. P.; Webster, B. F. 1989.  Managing grazing of riparian areas in the Intermountain Region. USDA Forest Service General Technical Report INT-263.

Kovalchik, B. L. 1987.  Riparian zone associations, Deschutes, Ochoco, Fremont, and Winema National Forests. USDA Forest Service, Pacific Northwest Region. R6-ECOL-TP-279-87.

Padgett, W. G.; Manning, M. E. 1988.  Preliminary riparian community type classification for Nevada. USDA Forest Service, Intermountain Region Ecology and Classification Program.

Rosgen, D. L. 1985.  A stream classification system. *in:* Johnson, R. R., et al, tech. coords. Riparian ecosystems and their management: reconciling conflicting uses: first North American riparian conference; 1985 April 16-18; Tucson, AZ. USDA Forest Service GTR-RM-120 pp. 91-95.

## LIST OF PLANT NAMES:

| COMMON NAME | SCIENTIFIC NAME |
|---|---|
| Aquatic sedge | *Carex aquatilis* |
| Arrowleaf balsamroot | *Balsamorhiza sagitata* |
| Baltic rush | *Juncus balticus* |
| Beaked sedge | *Carex rostrata* |
| Bentgrass | *Agrostis sp.* |
| Big sagebrush | *Artemisia tridentata* |
| Bitter cherry | *Prunus emarginata* |
| Black Cottonwood | *Populus trichocarpa* |
| Booth willow | *Salix boothii* |
| Cherry | *Prunus sp.* |
| Chokecherry | *Prunus virginiana* |
| Coyote willow | *Salix exigua exigua* |
| Creeping spikerush | *Eleocharis palustris* |
| Eastwood willow | *Salix eastwoodii* |
| Fewflowered spikerush | *Eleocharis pauciflora* |
| Firmleaf willow | *Salix pseudocordata* |
| Geyer willow | *Salix geyeriana* |
| Holm's sedge | *Carex scopulorum* |
| Jeffrey pine | *Pinus jeffreyi* |
| Kentucky bluegrass | *Poa pratensis* |
| Lemmon willow | *Salix lemmoni* |
| Nebraska sedge | *Carex nebraskensis* |
| Nevada rush | *Juncus nevadensis* |
| Ponderosa pine | *Pinus ponderosa* |
| Rabbitbrush | *Chrysothamnus sp.* |
| Red osier dogwood | *Cornus stolonifera* |
| Short-beaked sedge | *Carex simulata* |
| Silver sagebrush | *Artemisia cana* |
| Smallfruit bulrush | *Scirpus microcarpus* |
| Tufted hairgrass | *Deschampsia caespitosa* |
| White fir | *Abies concolor* |
| Wooly sedge | *Carex lanuginosa* |
| Yellow willow | *Salix lutea* |

# Appendix U

## Electronic Site Designation and Recommendations

The following sites have been previously designated by the Regional Forester as electronic sites; or the Forest has recommended their designation.

| Site | Ranger District | Designated by the Regional Forester | Recommended by the Forest |
|------|-----------------|-------------------------------------|---------------------------|
| Grouse Mountain | Big Valley | | ● |
| Likely Mountain | Big Valley | | ● |
| Manzanita Lookout | Big Valley | | ● |
| Happy Camp | Devil's Garden | | ● |
| Harvey Jones | Doublehead | ● | |
| Red Shale | Doublehead | ● | |
| Timber Mountain | Doublehead | ● | |
| Payne Peak | Warner Mountain | | ● |
| Sugar Hill | Warner Mountain | | ● |

*Electronic Site Designation and Recommendations*                                                    *U-1*

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN, CARLA BOWERS, RETURN TO FREEDOM, <br><br> Plaintiffs, <br><br> v. <br><br> TOM VILSACK, Secretary of Agriculture, THOMAS TIDWELL, Chief of U.S. Forest Service, & ANN D. CARLSON, Acting Forest Supervisor <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )     Civ. No. 1:14-cv-485 (ABJ) |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs American Wild Horse Preservation Campaign, Carla Bowers, and Return to Freedom (collectively, "Plaintiffs") move for summary judgment in this case challenging decisions by the United States Forest Service concerning the management of wild horses that reside on public lands in the Modoc National Forest in California. As explained in the accompanying Memorandum, there are no material issues in dispute and Plaintiffs are entitled to judgment as a matter of law. In support of this motion, Plaintiffs rely on the Memorandum, the Statement of Facts therein, Exhibits A through C, and the cited portions of the Administrative Record. Pursuant to Local Rule 7(f), Plaintiffs hereby request an oral hearing on this motion, should the Court deem it helpful for resolution of this case.

Respectfully submitted,

/s/_____
William S. Eubanks II
(D.C. Bar No. 987036)
MEYER GLITZENSTEIN & CRYSTAL

1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206 / (202) 588-5049 fax
beubanks@meyerglitz.com

/s/
David Zaft
(CA Bar No. 237365)
Admitted Pro Hac Vice

Matthew W. O'Brien
(CA Bar No. 261568)
Admitted Pro Hac Vice

CALDWELL LESLIE & PROCTOR, PC
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 629-9040 / (213) 629-9022 fax
zaft@caldwell-leslie.com
obrien@caldwell-leslie.com

/s/
Jeff Pierce
(CA Bar No. 293085)
Admitted Pro Hac Vice
ANIMAL LEGAL DEFENSE FUND
170 Cotati Ave.
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280
jpierce@aldf.org

Date:  November 17, 2014

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION ) | |
| CAMPAIGN, CARLA BOWERS, RETURN ) | |
| TO FREEDOM, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 1:14-cv-485 (ABJ) |
| ) | |
| TOM VILSACK, Secretary of Agriculture, ) | |
| THOMAS TIDWELL, Chief of U.S. Forest Service,) | |
| & ANN D. CARLSON, Acting Forest Supervisor ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES………………………………………………………… iii

GLOSSARY………………………………………………………………………….vi

INTRODUCTION ..................................................................................................1

I.    STATUTORY AND REGULATORY FRAMEWORK .................................3

II.   FACTUAL AND PROCEDURAL BACKGROUND.....................................5

   A.   The Devil's Garden Wild Horse Territory ..........................................5

      1.   The Inclusion of the Middle Section in the Devil's Garden WHT .............5

         (a)   The Triangle Exchange Lands ...........................................6

         (b)   Avanzino ..........................................................................7

         (c)   Carr, Big Sage, and Timbered Mountain ..........................8

      2.   The Incorporation of the Middle Section in the 1991 Forest Plan...............9

      3.   Wild Horses' Use of the Middle Section ....................................10

   B.   Procedural History ..........................................................................11

      1.   The July 2011 Scoping Letter ....................................................11

      2.   The Modoc County Farm Bureau's Role in the New Management Plan ..............12

      3.   The December 2012 Scoping Letter ...........................................13

      4.   The December 2012 Resource Monitoring Report ......................15

      5.   The January 2013 AML Evaluation.............................................15

         (a)   The Removal of the Middle Section .................................16

         (b)   The Reduced AML ...........................................................17

      6.   The February 2013 Wild Horse Specialist Report .......................18

      7.   The Draft EA.............................................................................18

      8.   The Final EA ............................................................................19

         (a)   The Removal of the Middle Section .................................19

         (b)   The Reduced AML ...........................................................21

      9.   The FONSI and the 2013 Devil's Garden WHT Management Plan .........22

      10.  Plaintiffs' Administrative Appeal ...............................................23

III.   LEGAL STANDARD ..................................................................................................23

IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ...................................24

    A.    Plaintiffs Are Entitled To Summary Judgment on Their Claims
        Concerning the Elimination of the Middle Section ...............................................24

        1.    The Forest Service Violated the Wild Horse Act By Eliminating
            the Middle Section from the WHT ...........................................................25

            (a)    The Forest Service Violated Its Duty To Protect and
                Manage Wild Horses As Integral Components of the
                Middle Section ...................................................................................25

            (b)    Abolishing the Middle Section of the WHT Is Not a
                "Minimally Feasible" Management Activity .................................28

            (c)    The Forest Service Has Violated Its Duty To "Continue
                Recognition" of the Middle Section ...............................................29

        2.    The Forest Service Violated NEPA in Eliminating the Middle
            Section ......................................................................................................29

            (a)    The EA Does Not Analyze the Impact of Eliminating the
                Middle Section ...................................................................................29

            (b)    The FONSI Was Improper ...............................................................33

        3.    The Forest Service Violated NFMA By Ignoring the Mandate of
            the 1991 Forest Plan for a Single, 258,000-acre WHT ...........................36

    B.    Plaintiffs Are Entitled to Summary Judgment on Their Claims Concerning
        the AML Reduction ..............................................................................................39

        1.    The Elimination of the Middle Section Renders the AML
            Reduction Defective..................................................................................39

        2.    The Reduction of the Low AML Violates NEPA....................................40

            (a)    The Forest Service Failed To Analyze the Impact the New
                 AML Will Have on the Genetic Diversity of the Wild
                 Horse Populations at Devil's Garden...............................................40

            (b)    The Forest Service Failed To Analyze the Effects Caused
                By Livestock ......................................................................................43

        3.    The Reduction of the Low AML Violates the NFMA..............................44

    CONCLUSION.......................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Farm Bureau Fed'n v. EPA*,
    559 F.3d 512 (D.C. Cir. 2009) ...................................................................................24

*Am. Wildlands v. U.S. Forest Serv.*,
    No. 97-CV-160 (D. Mont. Apr. 14, 1999) ..................................................................38

*Animal Legal Def. Fund v. Glickman*,
    154 F.3d 426 (D.C. Cir. 1998) ...................................................................................24

*Bluewater Network v. Salazar*,
    721 F. Supp. 2d 7 (D.D.C. 2010) ...............................................................................44

*Colo. Wild Horse & Burro Coal., Inc. v. Salazar*,
    639 F. Supp. 2d 87 (D.D.C. 2009) .............................................................................28

*Colo. Wild, Inc. v. U.S. Forest Serv.*,
    523 F. Supp. 2d 1213 (D. Colo. 2007) .......................................................................32

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) .................................................................................33

*Defenders of Wildlife v. Jewell*, No. 12-CV-1833,
    2014 WL 4714847 (D.D.C. Sept. 23, 2014) ..............................................................42

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................................................24

\* *Fund for Animals v. Clark*,
    27 F. Supp. 2d 8 (D.D.C. 1998) ...........................................................................43, 44

*Garvey v. Nat'l Transp. Safety Bd.*,
    190 F.3d 571 (D.C. Cir. 1999) ...................................................................................23

\* *Grand Canyon Trust v. F.A.A.*,
    290 F.3d 339 (D.C. Cir. 2002) ...............................................................33, 34, 35, 42

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................................24

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...................................................................................................24

*In Def. of Animals v. U.S. Dep't. of Interior*,
    909 F. Supp. 2d 1178 (E.D. Cal. 2012)....................................................44

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)..............................................................................43

\* *Lands Council v. Martin*,
    529 F.3d 1219 (9th Cir. 2008) ......................................................37, 38

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ............................................................32

\* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).................................................................24, 28, 29

\* *Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ......................................................36, 38

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) .....................................................44

\* *Sierra Club v. Watkins*,
    808 F. Supp. 852 (D.D.C. 1991) ...................................................30, 31

**Statutes**

\* 5 U.S.C. §§ 701-706, Administrative Procedure Act .............................3, 23, 29, 35

\* 16 U.S.C. §§ 1331-1340, Wild Horse Act ...........................................................1

\* 16 U.S.C. § 1331 ...............................................................................4, 26, 27

\* 16 U.S.C. § 1333(a) ...........................................................................4, 25, 28

16 U.S.C. § 1333(b)(1) ...............................................................................28

\* 16 U.S.C. §§ 1600-1687, National Forest Management Act .......................................1

16 U.S.C. § 1604 ..............................................................................4, 36, 37, 45

\* 42 U.S.C. §§ 4321-4370h, National Environmental Policy Act ....................................1

42 U.S.C. § 4332(C) ....................................................................................5

**Regulations**

36 C.F.R. § 219.5 .......................................................................................38

36 C.F.R. § 222.60(b)(15) .............................................................................27

* 36 C.F.R. § 222.61 ...............................................................................................4, 26, 29

40 C.F.R. § 1501.4 ...........................................................................................................5

* 40 C.F.R. § 1502.2(g) .............................................................................................32, 40

* 40 C.F. R. § 1502.5 .................................................................................................32, 40

40 C.F.R. § 1502.14 ......................................................................................................32

40 C.F.R. § 1506.5 ........................................................................................................32

* 40 C.F. R. § 1508.9 ................................................................................................5, 32

* 40 C.F. R. § 1508.27 .........................................................................................5, 35, 43

**GLOSSARY**

AML          Appropriate Management Level

APA          Administrative Procedure Act

AR           Administrative Record

AUM          Animal Unit Month

AWHPC        American Wild Horse Preservation Campaign

BLM          Bureau of Land Management

EA           Environmental Assessment

EIS          Environmental Impact Statement

FONSI        Finding of No Significant Impact

LRMP         Land and Resource Management Plan

MDF          Modoc National Forest

NEPA         National Environmental Policy Act

NFMA         National Forest Management Act

WHT          Devil's Garden Wild Horse Territory

## INTRODUCTION

In this case, Plaintiffs American Wild Horse Preservation Campaign ("AWHPC"), Carla Bowers, and Return to Freedom (collectively, "Plaintiffs") challenge a recent decision by the United States Forest Service ("Forest Service") to drastically and fundamentally depart from its longstanding management approach with respect to federally protected wild horses in the Devil's Garden Wild Horse Territory ("WHT") in northeastern California.  The WHT is the Forest Service's largest protected area for wild horses in California, and one of the largest such areas in the western United States.  *See* AR04762.  Pursuant to the Wild and Free Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 ("Wild Horse Act"), the Forest Service managed the WHT as a single, contiguous 258,000-acre protected area from roughly 1980 to 2013.  *See* AR00158.[1]

In 2013, the Forest Service abruptly changed course, eliminating approximately 23,631 acres (roughly 36 square miles) from the middle of the WHT and thereby splitting the remaining WHT into two distinct, non-contiguous parcels.  *See* AR00156-57.  The Forest Service's sole explanation was that the newly eliminated section (the "Middle Section") had been included in the WHT since 1980 because of an "administrative error."  AR03811-12.  Purporting to fix this "error," the Forest Service simply erased the Middle Section (and other areas) from the WHT map and reduced the WHT's size from 258,000 to 232,520 acres.

In addition to severing the WHT into two separate portions and cutting its overall size by ten percent, the Forest Service substantially reduced the WHT's minimum wild horse population threshold, known as the Appropriate Management Level ("AML"), from 275 horses to 206 horses.  The Forest Service's justification for the reduced AML was that the condition of the rangelands had deteriorated so much that it could no longer support an AML of 275 wild horses.

---

[1]  All citations to the administrative record lodged by the Forest Service correspond to the numbers stamped in the bottom right corner of the respective pages.

In making this decision, however, the Forest Service did not consider the impact of the far more numerous cattle that the agency allows to graze the very same WHT rangelands, and which consume five times as much forage in the WHT as wild horses.  *See* AR00227, Figure 10.

The agency's decisions to eliminate the Middle Section, reduce the wild horse AML, and divide that reduced wild horse population between two unconnected parcels were memorialized in an Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Notice.  These decisions constitute arbitrary and capricious decisionmaking, fail to observe procedures required by law, and must be vacated for the following reasons.

First, with respect to the major boundary modification and division of the WHT into two separate units, the Forest Service has set forth no scientific or factual support for the elimination of the Middle Section.  The agency's sole theory for abolishing the Middle Section is that no wild horses inhabited the Middle Section in 1971 when the Wild Horse Act was enacted.  In turn, the Forest Service asserts that it "erroneously" included the Middle Section in the WHT from 1980 to 2013.  Among the myriad problems with this argument is that the agency lacks evidence to show that wild horses did not live in the Middle Section in 1971.  To the contrary, the record indicates that wild horses inhabited the Middle Section in 1971 and continue to do so today.

In its decision documents, the Forest Service asserted that, in 1971, the Middle Section consisted mostly of private ranches (which would have been inhospitable to wild horses), and thus it was unlikely that wild horses inhabited the Middle Section in the 1970s.  In its Answer, however, the Forest Service concedes that its previous explanation rested on a fallacy: in fact, the *majority* of the Middle Section was publicly held *by the Forest Service* at all relevant times and was not private ranch lands.  *See* Dkt. No. 9, ¶ 3.  Hence, the Forest Service lacks any support for its arbitrary and capricious removal of the Middle Section from the WHT.  The Forest Service's

significant boundary revision and WHT division violate the substantive requirements of the Wild

Horse Act as well as the obligations imposed by the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321-4370h; the National Forest Management Act ("NFMA"), 16

U.S.C. §§ 1600-1687; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

Second, the reduction of the AML for wild horses—and the division of that substantially

reduced AML between two unconnected parcels—was unlawful. As with the elimination of the

Middle Section, the Forest Service reduced the AML without preparing an Environmental

Impact Statement ("EIS") to analyze its decision. This shortcut is particularly egregious given

that the effect of reducing the number of wild horses and splitting them into two isolated

populations will bring their numbers below the level that the agency concedes is necessary to

adequately preserve their genetic health. Despite this undisputed effect of the AML reduction,

the Forest Service decided that a genetic study and analysis should wait until *after* the decision is

implemented and its effects felt.

Because the Forest Service has violated the Wild Horse Act, NEPA, NFMA, and the

APA, as well as the Forest Service's own regulations and policies, Plaintiffs respectfully request

that the Court enter summary judgment in their favor, vacate and remand the August 2013 EA

and FONSI, and order Defendants to prepare an Environmental Impact Statement ("EIS") and

formal amendment to the 1991 Land & Resource Management Plan governing the WHT.

I.      **STATUTORY AND REGULATORY FRAMEWORK**

Although described in more detail below in the context of each specific legal claim,

Plaintiffs hereby provide a brief summary of the pertinent legal framework.

In 1971, both houses of Congress passed the Wild Horse Act by unanimous votes. In

doing so, Congress found that "wild free-roaming horses and burros are living symbols of the

historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms

within the Nation and enrich the lives of the American people."  16 U.S.C. § 1331.  The Wild

Horse Act requires the Forest Service to "protect and manage wild free-roaming horses and

burros as components of the public lands."  *Id.* § 1333(a).  Congress mandated that "wild-free

roaming horses and burros shall be protected from capture, branding, harassment, [and] death,"

and that wild horses would be "considered in the area where presently found, as an integral part

of the natural system of the public lands."  *Id.* § 1331.  On public lands home to wild horses,

"[a]ll management activities shall be at the minimal feasible level."  *Id.* § 1333(a).

In 1980, the Forest Service adopted regulations that require it to "[a]dminister wild free-

roaming horses and burros and their progeny on the National Forest System in the areas where

they now occur (wild horse and burro territory) to maintain a thriving ecological balance

considering them an integral component of the multiple use resources."  36 C.F.R.

§ 222.61(a)(1).  The regulations require the agency to "[e]stablish wild horse and burro territories

in accordance with the Act and continue recognition of such territories where it is determined

that horses and/or burros will be recognized as part of the natural system."  *Id.* § 222.61(a)(3).

The Forest Service also has various obligations under NFMA and NEPA.  Pursuant to

NFMA, the Forest Service must "develop, maintain, and, as appropriate, revise land and resource

management plans ("LRMPs") for units of the National Forest System" when material changes

are made to existing plans.  16 U.S.C. § 1604(a).  In developing and revising these LRMPs, the

Forest Service "shall use a systematic interdisciplinary approach to achieve integrated

consideration of physical, biological, economic, and other sciences."  *Id.* § 1604(b).

Likewise, NEPA requires that the agency prepare an EIS to analyze the effects of any

"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(C).  Only if an agency determines that an action will not result in a significant environmental impact may the agency avoid its duty to prepare an EIS, in which case the agency still must prepare a less detailed EA accompanied by a FONSI setting forth the specific grounds for why an EIS is unnecessary.  *See* 40 C.F.R. §§ 1501.4(b), (c), 1508.9, 1508.27.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Wild horses have lived in the area now known as the Devil's Garden WHT since the 1800s.  *See* AR00120; AR02969.  While there were sporadic efforts to extirpate the wild horse population at Devil's Garden in the early- to mid-1900s, and periodic roundups severely reduced the population through the early 1950s, sufficient numbers of wild horses remained when the Wild Horse Act was enacted in 1971 to ensure their survival.  *See* AR00120; AR02969-70.

### A.    The Devil's Garden Wild Horse Territory

After the enactment of the Wild Horse Act, the Forest Service established the Devil's Garden WHT, which is the only large wild horse territory in California.  *See* AR04762.

#### 1.    *The Inclusion of the Middle Section in the Devil's Garden WHT*

In 1975, the Forest Service adopted a Wild Horse Management Plan for the Devil's Garden WHT, *see* AR02965-3040, which included two units covering approximately 236,000 acres.  *See* AR02970-71, AR2986-87.  The two units were separated by the Middle Section.  *See* AR02986.

The Forest Service acted quickly to incorporate the Middle Section into the WHT.  As described below, the agency acquired certain private lands in the Middle Section via private-public land exchanges in the 1970s, all of which were added to the Middle Section once acquired.  At some point in the early 1980s, the Forest Service formally modified the boundary of the WHT to include the newly acquired public lands as well as existing public lands in one

contiguous WHT.  *See* AR00158.[2]  The newly added Middle Section comprised approximately

23,631 acres (or 36 square miles), bringing the total area of the WHT to roughly 258,000 acres.

*See* AR00156.[3]  The lands that were added to the WHT as the Middle Section include portions of

the Triangle, Avanzino, Carr, Big Sage, and Timbered Mountain Allotments.[4]

<div align="center">(a)        <i>The Triangle Exchange Lands</i></div>

In August 1976, the Forest Service acquired most of what it called the "Triangle

Exchange Lands" (or the "Triangle Allotment").  *See* AR03968.  As of the 1976 acquisition,

almost all of the Triangle Exchange Lands were publicly held as part of the Modoc National

Forest.  *See id.*  A 1979 map confirms that only two small parcels in the Triangle Exchange

Lands—Point Ranch in the Round Valley unit, and Carey Ranch in the Boles Meadows unit—

were privately held at that time.  AR03970.  Because the Forest Service's acquisition of the

Triangle Exchange Lands postdated the 1975 WHT Management Plan, they were not part of that

plan.  *See* AR03997 (1979 EA noting that "[n]one of the Triangle Lands Management Unit are

included within" the five wild horse management units from the 1975 plan).

---

[2] The Forest Service's record does not identify the exact date of the change.  In its 2013 Final
EA, the Forest Service states that the Middle Section was included in the WHT as of 1980.  *See*
AR00158.  Notes from a 1979 Forest Service meeting show that Tex Scofield, a Forester for the
Devil's Garden Ranger District, presented an agenda including "chang[ing] the existing wild
horse boundaries from five management units to one wild horse territory."  AR04345.  When a
Forest Service ranger asked, "Do I understand correctly that no one opposes one territory?," the
response was "[a]s long as you take out horses to the agreed management level, no one opposes."
AR04346.  However, the 1980 and 1982 WHT management plans indicate that the Middle
Section may not have not been incorporated by that time.  *See* AR02953, AR02843.  While the
exact date of the change is not known, it appears to have occurred sometime in the early 1980s.

[3] The acreage numbers of the pre-1980 WHT and the Middle Section are not clearly defined in
the record, as differing figures are stated.  Plaintiffs cite to the acreage numbers found in the
2013 decision documents that serve as the basis of the Court's review.

[4] The WHT overlaps with several grazing "allotments," which are administrative boundaries
used by the Forest Service and are conceptually distinct from the boundaries of the WHT.  *See,
e.g.*, AR03927 (showing allotment boundaries in red and the new, two-unit WHT boundary in
yellow); AR00627 (showing color-coded allotments, but excluding the Middle Section).

Around 1980, the northern part of the Triangle Exchange Lands, including all of the Boles Meadows and most of Round Valley, was incorporated into the WHT.  *Compare* AR03969 (showing all of the Triangle Exchange Lands), *with* AR04351 (a 2003 map showing the single, contiguous WHT incorporating the northern portion of the Triangle Exchange Lands); *and* AR00158 (an agency map dating the inclusion of the Middle Section in the WHT as of 1980).

Wild horses have used the Triangle Exchange Lands continuously since the early 1970s and likely well before that time.  *See* AR04339 (1972 flight notes observing "bunches of 5 to 9 head [of wild horses] along Boles Creek, and the *west side of Boles Meadows*") (emphasis added); AR04033 (1979 report noting summer use of Boles Meadows by wild horses); AR03927-28 (wild horses identified around Boles Meadows during censuses in 1988 or 1990); AR00496 (four wild horses were removed from Triangle in 2003); AR00633 (ten wild horses were identified in Triangle in 2012); AR04301 (2012 document estimating that five to ten wild horses inhabit Triangle); AR04133, ¶ 9 (Boles Meadow and Round Valley are "prime examples" of wild horse habitat).

<div align="center">(b)    <em>Avanzino</em></div>

The Avanzino Allotment ("Avanzino") is a relatively small strip of land between the Timbered Mountain Allotment (to the east), the Carr and Triangle Allotments (to the west), and the Big Sage Allotment (to the south).  *See* AR03927.  As with the adjacent Triangle area, Avanzino contains important water sources.  *See id.*; AR04133, ¶ 9.  At all relevant times, roughly 41% of Avanzino has been privately owned and 59% has been publicly held as part of the Modoc National Forest.  *See* AR00156.  Around 1980, the Forest Service incorporated the public lands in Avanzino into the WHT.  *See* AR00158.

<div align="center">7</div>

Wild horses have long inhabited Avanzino.  *See* AR04325 (2002 inventory showing that 2 bands of wild horses (totaling 11 individuals) were spotted in Avanzino); AR04301 (noting that six wild horses were spotted in Avanzino during a 2010 inventory and estimating that 20-80 wild horses inhabited Avanzino); AR00633 (noting that 80 wild horses were observed in Avanzino in 2012); AR00610 (wild horses moved from the Timbered Mountain Allotment into Avanzino in 2012); AR03927 (showing wild horse identifications in Avanzino from 1979-1990).

*(c)     Carr, Big Sage, and Timbered Mountain*

In addition to the northern part of the Triangle Exchange Lands and the Avanzino Allotment, the Middle Section contains portions of three other allotments:  (1) the southeast section of the Carr Allotment (comprising the northwest portion of the Middle Section); (2) the northwest section of the Big Sage Allotment (comprising the southeast portion of the Middle Section); and (3) the central-western portion of the Timbered Mountain Allotment (comprising the northeast portion of the Middle Section).  *See* AR03929 (showing, in the orange-shaded sections between the eastern and western units of the WHT (demarcated by the yellow boundary line), the portions of the Carr, Timbered Mountain, and Big Sage Allotments in the Middle Section); AR00549 (showing, in light green, the portion of the Timbered Mountain Allotment in the Middle Section (to the west of the purple line) and showing, in purple, the portion of the Carr Allotment in the Middle Section (to the east of the purple line); *see also* Dkt. No. 9, ¶ 39 ("Federal Defendants admit that the 1991 Forest Plan included portions of the Big Sage, Timbered Mountain, Carr, and Pine Springs Allotments in the Devil's Garden WHT for administrative convenience."); *id.*, ¶ 61 ("Federal Defendants admit that the majority of the

middle area was never part of the Triangle or Avanzino Ranches, and consist [sic] of portions of the Big Sage, Timbered Mountain, Carr and Pine Spring Allotments").[5]

The portions of the Carr, Big Sage, and Timbered Mountain Allotments that are part of the Middle Section have been utilized by wild horses for decades. *See, e.g.*, AR03927 (map with census results from 1979-1990 showing six wild horse identifications in the southeast corner of the Carr Allotment, two in the northwest corner of the Big Sage Allotment, and two in the central-western portion of the Timbered Mountain Allotment); AR04133-34, ¶ 9.

## 2.    *The Incorporation of the Middle Section in the 1991 Forest Plan*

In 1991, the Forest Service completed the formal LRMP revision process for the Modoc National Forest. *See* AR02838. In its final LRMP (the "1991 Forest Plan"), the Forest Service recognized the Middle Section's incorporation in the WHT. *Id.* at 3-18 ("The Forest has one wild horse territory of about 258,000 acres . . . .").[6] Indeed, the 1991 Forest Plan made clear the agency's view that "[u]nder the Wild Horses and Burros Act, the Forest is legally obligated to manage horses within a 258,000-acre wild horse territory" in Devil's Garden. *Id.* at 3-17.

The 1991 Forest Plan also formally established the AML in the WHT at 275 to 335 wild horses. *Id.* at 3-18–3-19 ("Fulfilling requirements of the [Wild Horse] Act, the Forest prepared

---

[5] In the EA and FONSI that are the subject of this lawsuit, the Forest Service eliminated more than just the Middle Section from the WHT. For example, the northeastern portion of the Pine Springs Allotment, the northern edge of the WHT in the Carr Allotment, and the northeastern corner of WHT in the Carr Allotment also were eliminated from the WHT in August 2013. The Forest Service has never provided any explanation or justification for eliminating these areas from the WHT. While Plaintiffs focus on the elimination of the Middle Section herein, Plaintiffs also object to and challenge these modifications, which unnecessarily and unlawfully reduce the WHT by substantial amounts. *See* AR04138, ¶ 20.

[6] During the parties' meet-and-confer regarding the record, the Forest Service agreed that documents accessible by links in the agency's Index to the Administrative Record are considered part of the record. With respect to these citations, Plaintiffs first identify the AR index cite (e.g., AR02838) and then the specific page pin-cite within the online document (e.g., 3-18).

the Wild Horse Management Plan in 1985, which identifies a population objective of 275-335 animals to manage."); *id.* at 4-1, 4-3 (setting as a "Forest Mission and Goal[]" to "[m]aintain the wild horse herd population between 275 and 335 animals").  The Forest Service has not formally revised the 1991 Forest Plan; thus, it remains the operative management plan.

### 3.    *Wild Horses' Use of the Middle Section*

With its numerous meadows and water sources, the Middle Section is "prime territory that would historically have been used by wild horses."  *See* AR04133, ¶ 7.  Indeed, there are "no geographical boundaries that would normally prohibit wild horses from using the middle section" for forage and water and to travel between the eastern and western portions of the WHT. *Id.*  The Middle Section is home to several high-quality habitats for wild horses, including Boles Meadow and Round Valley (in the Triangle Allotment), and Dutch Flat, Williams Valley, and portions of Graves Valley in the Big Sage Allotment.  *Id.*, ¶ 9.  As recently as February 2013, wild horses were documented throughout the Middle Section.  AR00499.

Marla Bennett—a biologist currently employed with the U.S. Fish and Wildlife Service with extensive experience studying wild horses in the western United States, including at Devil's Garden, *see* AR04131-32—concluded that it "is highly likely that the middle section of the WHT . . . is actually currently part of the home ranges of several horse bands and certainly part of a migratory corridor" for wild horses.  AR04136, ¶ 15.  Ms. Bennett adds, "in my professional opinion, there is every reason why wild horses would have historically used the middle section, … due to the availability of water and forage in the area."  *Id.*, ¶ 16; *see also* AR04137, ¶ 19 ("wild horses always have used the middle section of the WHT").

Based on her experience and review of the agency's decisionmaking record, Ms. Bennett concludes that the Middle Section was included in the WHT around 1980 in order

to reflect actual horse usage during years when some of the land between the east and west WHT area was privately owned.  For at least the last 33 years, the Devil's Garden Plateau WHT has included the middle section, consisting of approximately 36 square miles. . . . The [Forest Service] administrators in 1980 clearly understood the error made in 1975 when the center section was erroneously omitted from inclusion in the WHT, and tried to rectify it.  It is possible that some [Forest Service] employees were actual witnesses to horse use of the middle section in the 1970s.

AR04136-37, ¶ 17.

## B.    Procedural History

### 1.    The July 2011 Scoping Letter

The events leading to this lawsuit began on July 27, 2011, when the Forest Service issued a scoping letter in which it "propos[ed] to update the Devils Garden Plateau Wild Horse Territory Plan which will guide management of wild horses on Modoc National Forest for the next 15-20 years."  AR03911-20; *see also* AR03072-73 (June 20, 2011 initiating letter for the project).  This was the first such effort since the 1991 Forest Plan.  The proposed actions in the scoping letter included determining "if the current [AML] of 335 head, as established in the Modoc National Forest LRMP, 1991 continues to be valid, and if not determine the optimum number of animals the Territory will support on a yearlong basis."  AR03912.  The scoping letter noted that the objectives for this project included the need to manage the "wild horse herd over the next 15-20 years in a manner *that supports a healthy, genetically diverse horse population*."  AR03911 (emphasis added).

Nowhere in the scoping letter did the Forest Service even raise the possibility that it was considering eliminating the Middle Section from the WHT.  Indeed, the scoping letter includes a map showing the same single, contiguous WHT that the Forest Service had been managing since approximately 1980.  *See* AR03919-20; AR03911 (noting that the WHT was "approximately 268,750 in size," plus "an additional 8,500 acres" of BLM land).

Plaintiffs AHWPC and Ms. Bowers submitted comments on the initial scoping letter in

which they expressed concerns about, *inter alia*, reductions to the AML for wild horses that

effectively would prioritize livestock use of the WHT.  *See* AR03831-72, AR03882-85.

### 2.    *The Modoc County Farm Bureau's Role in the New Management Plan*

The Forest Service subcontracted the development of the revised WHT plan to an entity

representing local agricultural interests.  In August 2012, the Modoc County Farm Bureau

("Farm Bureau") entered into an agreement with the Forest Service to develop the new

management plan for the WHT.  *See* AR04700-23; AR04699 ("The entire plan development, not

just the data collection, will now be funded through a new challenge cost share agreement

between the Forest and the Modoc County Farm Bureau.").

The Farm Bureau is not a disinterested party.  The Farm Bureau's purpose "is to protect

and promote agricultural interests in Modoc County," including the grazing allotments that

overlap with the WHT that are used to feed cattle.  AR04700.  The Farm Bureau "has many

members whose livelihoods depend on grazing operations affected by the ever-expanding wild

horse herd within or adjacent to" the WHT.  AR04701.  Under its agreement with the agency, the

Farm Bureau agreed to collect all of the data on wild horses and related issues, draft a monitoring

report, prepare the draft EA and final EA, and oppose any appeal of the agency's decision.  *See*

AR04713.  In return, the Forest Service paid $203,000 to the Farm Bureau.  *See* AR04715.

Soon after this agreement was entered, the scope of the project changed dramatically.  On

October 31, 2012, fifteen months after the initial scoping letter was issued, Susan Stokke, Field

Manager for the Farm Bureau's project, *see* AR04760, spoke with the Forest Service's Devil's

Garden District Ranger and informed him that the Farm Bureau wanted to change the WHT

boundaries.[7]  *See* AR04698 ("Based on all the advice I have received, I have decided to re-scope

the project.  I spoke with Suzie [Stokke] today and it seems that not only are we adding a Plan

Amendment (in the form of a new plan) but *we may find a need to change boundaries*.")

(emphasis added).  Ms. Stokke then prepared a job description for the natural resources specialist

who would develop the new WHT management plan.  *See* AR04760-61.  The responsibilities

included monitoring "wild horse use *outside* the WHT" in areas with "Horses Present," *including*

the Avanzino and Triangle areas.  *Id.* (emphasis added).  Even though the WHT still formally

included the Middle Section, the Farm Bureau already was treating it as having been removed.

### 3.     *The December 2012 Scoping Letter*

Based on the Farm Bureau's push to change the WHT boundaries, the Forest Service[8]

quickly issued a new scoping letter on December 13, 2012 in which it publicly proposed—for the

first time—to eliminate the Middle Section of the WHT.  *See* AR03809-24.  Describing the

WHT as comprising only "232,520 acres of federal land," AR03810, the Forest Service proposed

to "return the management of wild horses within the WHT boundary established in 1975."

AR03812.  The Forest Service justified its proposal as follows:

> During the mid-1980's, the MDF [Modoc National Forest] appears to have
> adjusted the WHT boundary *for administrative convenience*. . . .    An
> *administrative error* was made in expanding the WHT beyond the herd's known
> territorial limits.

---

[7] Ms. Stokke is the wife of Sean Curtis, the Director of the Farm Bureau.  *See* AR03878-79.  Mr.
Curtis also is the Modoc County employee centrally involved in the development of the new
WHT management plan, as confirmed by the declaration he submitted in support of the ranching
intervenors in this case.  *See* Dkt. No. 15-5.

[8] Although it appears that, from December 2012 going forward, the Farm Bureau carried out
most of the work discussed herein on behalf of the Forest Service (*see* AR04684-4761), to avoid
confusion Plaintiffs will attribute all such efforts to the Forest Service.

AR03811-12 (emphases added).  Citing no evidence, the new scoping letter asserts that only the

1975 map—and not the 1980 map or the 1991 Forest Plan—reflects the "territorial limits" of

wild horses in the area as of 1971 when the Wild Horse Act was enacted.  *See* AR03812.

According to the new scoping letter, the WHT boundary needed to be redrawn because

the "Avanzino and Triangle private ranch lands which lay in between the West and East home

ranges were not included in the [1975] WHT" and were incorporated into the WHT in the 1980s

"for administrative convenience."  AR03811.  The scoping letter did not address the fact that—as

Defendants have now conceded in their Answer—"the majority of the middle area was never

part of the Triangle and Avanzino Ranches and were [sic] part of the Modoc National Forest at

all relevant times."  Dkt. No. 9, ¶ 3.

As for the appropriate number of horses for the soon-to-be-diminished WHT, the scoping

letter explained that the Forest Service "would establish an [AML] for wild horses within the

designated WHT based on in-depth analysis of population inventory, resource monitoring and

other current available data and information."  AR03813.  All such studies, which were

performed under the Farm Bureau's direction, ultimately assumed that the Middle Section

already had been eliminated.

AWHPC and Ms. Bowers each submitted comments to the scoping letter.  *See* AR03713-

25, AR03688-92.  In their comments, they reiterated their previous concerns and also objected to

the new proposal to eliminate the Middle Section.  *See* AR03714, AR03689.  AWHPC

specifically noted that the Forest Service had "offer[ed] no data regarding this acreage" (i.e., the

Middle Section) and inquired about the results of the 1971 wild horse census.  AR03714.

### 4.     *The December 2012 Resource Monitoring Report*

The same month that the Forest Service issued its December 2012 scoping letter, it issued the "Resource Monitoring Report" for the WHT.  *See* AR00622-95.  Although a formal decision was eight months away, the Resource Monitoring Report already assumed that the Middle Section had been eliminated from the WHT.  Directly contradicting the statement in the governing document—the 1991 Forest Plan—that the WHT was a single area comprising 258,000 acres that the Forest Service "is legally obligated to manage [for] horses," AR02838 at 3-17, the Resource Monitoring Report proclaimed that the WHT comprised only 232,521 acres and was split into two separate sections.  *See* AR00627.

The Resource Monitoring Report's treatment of different parts of the Middle Section is inconsistent.  For example, in one map, the Forest Service excludes from the WHT the southwestern section of the Carr Allotment and the center-western section of the Timbered Mountain Allotment that are part of the Middle Section.  *See* AR00627, Map 1.  On the very next page, however, the Forest Service presents a map which *includes* the southwestern section of the Carr Allotment and the center-western section of the Timbered Mountain Allotment in the WHT but excludes the rest of the Middle Section.  *See* AR00628, Map 2.  The same two maps also present conflicting information about areas entirely outside the Middle Section that the Report assumed were eliminated, including the northeastern corner of the Pine Springs Allotment and the northern portions of the WHT that fall within the Carr Allotment.  *Compare* AR00627, Map 1, *with* AR00628, Map 2.  The Report offers no explanation for any of these discrepancies.

### 5.     *The January 2013 AML Evaluation*

In January 2013, the Forest Service released the 74-page Evaluation of Monitoring Data for the Purpose of Determining an Appropriate Management Level ("AML Evaluation"), which

borrows heavily from (and in many cases is directly copied from) the 75-page December 2012

Resource Monitoring Report.  *See* AR00542-621.

<div align="center">(a)     <em>The Removal of the Middle Section</em></div>

As with the Resource Monitoring Report, the AML Evaluation treats the Middle Section

as already having been eliminated from the WHT and does not consider the possibility that the

elimination of the Middle Section—proposed for the first time only one month earlier—would

not be adopted.  *See* AR00547-48.  The Forest Service asserts that "[a]lthough the Triangle and

Avanzino Ranch lands were included in the WHT boundary in the [1991] Forest Plan as a result

of an administrative error, the AML was established as 0 wild horses for the two areas."

AR00547.  The rationale for why "the AML was established as 0 wild horses" for the Triangle or

Avanzino Allotments was (in its entirety):

> This is because the Triangle Ranch lands were acquired in 2006 [sic] (nearly five
> years after the passage of the 1971 WFRHBA) and the high percentage of
> unfenced private land in the Avanzino Ranch.[9]

*Id*.

The AML Evaluation does not mention that the Middle Section comprises not just lands

from the Triangle and Avanzino Allotments, but includes portions of the Carr, Timbered

Mountain and Big Sage Allotments that have been owned by the Forest Service at all relevant

times.  *See* AR00548, Map 1 (showing public lands in green, and private lands in white); Dkt.

No. 9, ¶¶ 48, 61.  Nor does the AML Evaluation mention that 59% of Avanzino is *not* unfenced

private land but rather is part of the publicly held Modoc National Forest.  AR00156.

Although the AML Evaluation seeks to "zero out" the wild horse AML in these areas, it

demonstrates that wild horses were using the eliminated portions.  For example, several of the

---

[9] Plaintiffs assume the reference to 2006 as the year "the Triangle Ranch lands were acquired"
was an error and should read 1976.

<div align="center">16</div>

Forest Service's maps confirm that the eliminated section of the Timbered Mountain Allotment
is wild horse habitat.  *See* AR00620 (showing three "key areas" in the carved-out portion of the
Timbered Mountain Allotment (west of the grey, concave boundary in the center of the map);
AR00617 (showing areas of "moderate," "light," and "slight" use by wild horses in the same
eliminated section, and including a smaller map in the lower right-hand corner showing the
eliminated sections of the Timbered Mountain Allotment).  Likewise, the eliminated portion of
the Carr Allotment is subject to "heavy" use by wild horses.  *See* AR00566 (the orange-shaded
section in the southeast corner adjacent to Avanzino (also depicted, in the smaller map in the
lower-right hand corner, as the orange-shaded section east of the grey boundary)).

<div align="center">

*(b)      The Reduced AML*

</div>

The AML Evaluation recommends an AML of 206 to 402 wild horses for the reduced,
two-unit WHT.  *See* AR00552, Table 3; AR00549, Map 2 & Table 1.  However, because the
elimination of the Middle Section splits the WHT into two isolated units, the real proposed AML
ranges are 105 to 183 wild horses for the West Portion, and 101 to 219 wild horses for the East
Portion.  *See* AR00552, Table 3.

The AML Evaluation notes the important role that wild horse genetic diversity plays in
establishing a sustainable AML, but admits that "a baseline has not yet been established for this
herd."  AR00553.  The document recommends that genetic data be collected during the first
"gather" under the new WHT Management Plan and thereafter "at least every 6-10 years."  *Id.*[10]
Notwithstanding the absence of any genetic study, the Forest Service asserted that "[t]he
proposed AML, coupled with *known movement of animals between each allotment and pasture*,
is expected to maintain an acceptable level of genetic diversity."  *Id.* (emphasis added.)  The

---

[10] A "gather" is the Forest Service's euphemistic term for the periodic and permanent removal of
wild horses from their native habitat.  *See, e.g.*, AR00336-341.

<div align="center">17</div>

AML Evaluation does not attempt to explain how its express reliance on the "movement of animals between each allotment" can be reconciled with its proposal to remove the Middle Section and thereby split the WHT into two smaller, isolated units.

### 6.      *The February 2013 Wild Horse Specialist Report*

In February 2013, the Forest Service produced a "Wild Horse Specialist Report." AR00489-541 (the "Specialist Report").  Like the Resource Monitoring Report and the AML Evaluation, the Specialist Report assumes the elimination of the Middle Section from the WHT. It claims that the WHT "consists of approximately 232,521 acres," AR00489, and depicts the WHT as comprising two, separate units.  *See* AR00490.  Like the Resource Monitoring Report, the maps in the Specialist Report show inconsistent approaches regarding which parts of the Middle Section would be eliminated.  *Compare* AR00490, Map 1, *with id.*, Map 2.

The Specialist Report addresses, in general terms, the elimination of the Middle Section. It states that "the long-term needs of the Devils Garden wild horse herd" would be met by "future management of two distinct, home ranges:  West and East," rather than by the larger, 33-year old, contiguous WHT.  AR00509.  Without any analysis or explanation, the Wild Horse Specialist concludes that removing the Middle Section and splitting the WHT into two smaller units "has no effect on wild horses or their habitat and is consistent with Forest Plan goals."  *Id.* The Specialist Report provides no data concerning wild horses' natural migratory and movement patterns to support this assumption.

### 7.      *The Draft EA*

On May 2, 2013, the Forest Service released its Draft EA for the revised Devil's Garden WHT Management Plan.  *See* AR03453-3658.  The Draft EA "*proposes* to return to the management of wild horses within the WHT boundary established in 1971," even though the

agency had assumed that the Middle Section already was eliminated in the Resource Monitoring

Report, AML Evaluation, and Wild Horse Specialist Report.  *See* AR03465 (emphasis added).

The Draft EA *itself* assumes that the Middle Section already was eliminated by repeatedly

asserting that the WHT comprised only "232,520 acres of federal land."  AR03459, AR03461.

     In their comments to the Draft EA, Ms. Bowers and AWHPC opposed the elimination of

the Middle Section and the proposal to revise the AML.  Ms. Bowers and AWHPC specifically

noted that wild horses always had been present in the Middle Section, and that the Forest Service

had offered no evidence to the contrary nor any evidence supporting any "administrative error."

AR03334, AR03349-50.  AWHPC again inquired about the 1971 wild horse census—

documentation of which the Forest Service had not (and still has not) disclosed.  *See* AR03335.

### 8.     The Final EA

     On August 26, 2013, the Forest Service issued the Final EA, in which the agency adopted

the proposed action from the Draft EA with certain minor modifications.  *See* AR00146-386.

#### (a)     The Removal of the Middle Section

     As in the Draft EA, the Final EA "*proposes* to return to the management of wild horses

within the WHT boundary established in 1971," AR00159 (emphasis added), even though the

Forest Service had assumed for almost a year that the WHT boundary already had been changed.

Each of the three action alternatives in the EA proposed to eliminate the Middle Section:

> Establish a boundary for the WHT *based on the long-term needs of the Devil's Garden wild horse herd* and within the herds' known territorial limits (1971 WFRHBA) rather than for administrative convenience.  This boundary will provide for future management of two distinct home ranges:  West and East.

AR00177 (Guideline 5C) (emphasis added); AR00271 (same).  The EA does not explain how a

smaller, bisected WHT is "based on the long-term needs of the Devil's Garden wild horse herd."

The Final EA concedes that the 1991 Forest Plan "made the decision to manage wild horses on about 258,000 acres" in the WHT, but it asserts that "an AML was not established for the added lands" and that "zero AML allocations were assigned to the acquired land," i.e., the Middle Section.  AR00156-59.  The Final EA does not mention that the 1991 Forest Plan set an AML of 275-335 horses for the entire, contiguous WHT.  *See* AR02838, at 3-18–3-19 ("The Forest has one wild horse territory of about 258,000 acres . . . .  Fulfilling requirements of the [Wild Horses and Burros] Act, the Forest prepared the Wild Horse Management Plan in 1985, which identifies a population objective of 275-335 animals to manage.").

Like the Draft EA, *see* AR03462, the Final EA argues that the inclusion of the Middle Section was "[a]n administrative error," but offers no evidence in support of this explanation.  AR00159.  Nor does the Final EA provide any historical or scientific support for the Forest Service's claim that "few, if any, wild horses were found" in the Middle Section.  AR00156.  To the contrary, the Final EA includes proof that wild horses inhabit the Middle Section.  *See* AR00255 (four wild horses were removed from the Triangle lands in 2003); AR00256 (five wild horses were seen in Avanzino in 2010, eighty wild horses were identified in Avanzino in 2012, and ten wild horses were identified in Triangle in 2012); AR00257 (59 wild horses were counted in Avanzino and Triangle in 2013); AR00258 (map showing where wild horses had been spotted in Middle Section in 2013, including in the northwest corner of the Big Sage Allotment).

The Final EA sets forth the agency's response to Plaintiffs' comments about the elimination of the Middle Section.  *See* AR00373-374.  The Forest Service asserts that the EA's reference to the "administrative convenience" of including the Middle Section in the WHT for 33 years "explains the origin of the error."  AR00373 (Response to Comment 2-3).  The Final EA provides no further explanation of how this decision was made and cites no evidence supporting

its conclusion.  *See id.*  Instead, the agency merely states that, as of 1975, there was "[l]ittle or no

use by wild horses" of the Middle Section "due to the number of fences and the ongoing

livestock operationson [sic] this *privately owned land*."  *Id.* (emphasis added.)  However, as

noted above, the Forest Service subsequently admitted that this explanation is erroneous:  "the

majority of the middle area was never part of the Triangle and Avanzino Ranches and were part

of the Modoc National Forest at all relevant times."  Dkt. No. 9, ¶¶ 3, 39, 48, 61.

In response to twelve comments that wild horses used the Middle Section in 1971, the

Final EA does *not* claim that no wild horses inhabited the Middle Section in 1971.  *See*

AR00373-374 (Response to Comment 2-5).  Rather, the Forest Service argues as follows:

> As the Triangle Lands were under private ownership at the time the act was
> passed, and Avanzino remains 41% private property, they did not meet the criteria
> for being included into the Territory. . . .  As the lands were private, there *may
> have been some incidental use* of the areas by wild horses, however *it is likely*
> wild horse use was excluded *for the most part* as the forage was needed for the
> livestock operations.

*Id.* (emphases added.)  The EA does not identify any evidence supporting its speculation that in

1975 wild horses "likely" did not inhabit the Middle Section "for the most part," or explain what

it means by "incidental use."

### (b)      The Reduced AML

The Final EA expressly adopts the proposed AML from the AML Evaluation; hence, the

proposed action, Alternative 2, adjusts the AML to 206 to 402 wild horses.  *See* AR00173,

AR00275.  As in the AML Evaluation, the Final EA assumes:  (1) that the Middle Section

already had been eliminated, *see* AR00347-51 (addressing only "East Home Range" and "West

Home Range"), and (2) that the AML for the Middle Section is thus zero.  As with the AML

Evaluation, the Final EA does not attempt to reconcile its discussion of the importance of genetic

diversity among the WHT's wild horses with the Forest Service's lack of any genetic data for the

WHT's horses or its decision to split the WHT into two smaller, isolated units.  *See* AR00169, AR00183, AR00260.

### *9.*     *The FONSI and the 2013 Devil's Garden WHT Management Plan*

On August 27, 2013, the Forest Service issued a Decision Notice & Finding of No Significant Impact ("FONSI"), *see* AR00100-13, which incorporates by reference the EA and the supporting specialist reports.  *See* AR00100.  The Forest Service formally selected "Alternative 2," which it concluded "would not pose significant short or long term adverse effects" on the "quality of the human environment considering the context and intensity of impacts," and "[t]hus, an environmental impact statement will not be prepared."  AR00106-07.

The FONSI states that the "boundary of the territory would be returned to the one established at the passage of the WFRHBA of 1971 . . . bringing it into compliance with the Act."  AR00104.  The FONSI does not explain this assertion, or how it is reconcilable with the fact that the WHT was not established until 1975.  The FONSI instead states that "[p]roposed activities are consistent objectives [sic] in the Modoc National Forest Land and Resource Management Plan, as amended . . . and applicable law and regulations."  AR00107.  The FONSI also states that future actions related to livestock grazing had been analyzed in adopting the selected alternative, and that such actions were "found to be relatively minor for all resources." AR00109.  In selecting Alternative 2, the agency made the decision to replace the AML for the WHT set in the 1991 Forest Plan (275-335 wild horses) with a new AML of 206 to 402 wild horses.  AR00101-02.  The FONSI also approves a strategy that would set the low AML number as the target "so gathers to maintain AML would only be necessary every 4-5 years."  AR00103.

On August 27, 2013, the Forest Service also issued the new Devil's Garden Plateau Wild Horse Territory Management Plan, *see* AR00114-45, which was attached to the FONSI and

adopted by the Forest Service's decision.  *See* AR00100-01.  The Plan incorporates the boundary

modifications and AML limits describe above.  *See* AR00119-20, AR00124.

### 10.   *Plaintiffs' Administrative Appeal*

On August 29, 2013, the Forest Service published its Legal Notice of Decision.  *See*

AR00099.  Plaintiffs timely appealed the agency's decision on November 18, 2013.  *See*

AR04088-4289.  The Forest Service denied that appeal on January 2, 2014.  *See* AR00001-65.

Having fully exhausted their administrative remedies, Plaintiffs now seek judicial review.

## III.   <u>LEGAL STANDARD</u>

Under the APA, the Court "shall . . . set aside" an agency's decision if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" or was adopted

"without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  Although this

standard is deferential, "[d]eference, of course, does not mean blind obedience."  *Garvey v. Nat'l*

*Transp. Safety Bd.*, 190 F.3d 571, 580 (D.C. Cir. 1999).  Rather, the Court must "perform a

searching and careful inquiry into the facts underlying the agency's decision" in an effort to

"ensure that the [agency] has examined the relevant data and has articulated an adequate

explanation for its action."  *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009)

(citations and quotation marks omitted).  In addition, the Court "must consider whether the

decision was based on a consideration of the relevant factors."  *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30-31 (1983).  Thus, a decision is "arbitrary and

capricious if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, [or] offered an explanation for its

decision that runs counter to the evidence before the agency . . . ."  *Id.* at 43.

## IV.   <u>PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT</u>

Because the Forest Service's decisions to eliminate the Middle Section and reduce the AML for wild horses in the WHT were arbitrary and capricious, Plaintiffs are entitled to summary judgment on each of their claims under the Wild Horse Act, NEPA, and NFMA.[11]

### A.   **Plaintiffs Are Entitled To Summary Judgment on Their Claims Concerning the Elimination of the Middle Section**

The Forest Service's elimination of the Middle Section is arbitrary and capricious because it rests on a fallacy:  the agency asserts that most of the Middle Section was privately held in 1971, so therefore no wild horses could have been present in the Middle Section at that time, and hence the inclusion of the Middle Section in the WHT in the early 1980s must have been an "administrative error."  This argument has several fatal flaws:

- The Forest Service repeatedly has mischaracterized the Middle Section as comprising only the Triangle and Avanzino lands that were privately held in 1971, even though, as Defendants now admit, the majority of the Middle Section comprises portions of the Carr, Timbered Mountain, and Big Sage Allotments which were owned by the Forest Service in 1971.

---

[11] Plaintiffs have standing to pursue these claims.  *See, e.g.*, *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 429 (D.C. Cir. 1998) (*en banc*) (the court need only find that one plaintiff has established Article III standing); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (describing the elements of Article III standing); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 340-45 (1977) (explaining the standing requirements for organizations representing the interests of their members); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (drain on an organization's resources caused by agency action is sufficient for Article III standing).  Ms. Bowers has aesthetic interests in observing wild horses engaged in natural wild behaviors in the WHT as a whole (including the Middle Section), and those interests are impaired by the Forest Service's decision to modify the boundaries of the WHT, zero out the wild horses in the Middle Section, and reduce the total AML for the entire WHT.  *See* Declaration of Carla Bowers, Pl. Ex. A.  Plaintiff AWHPC likewise has shown that it has members and supporters who meet these same requirements, and that these interests are germane to the organization's missions.  *See* Declaration of Suzanne Roy, Pl. Ex. B.  AWHPC also has shown that it suffers resource injury as a result of having to continue to monitor, educate its members and supporters about, and advocate against and counteract the Forest Service's unlawful decisions.  *See* Roy Decl., Pl. Ex. B.

- There is no evidence that wild horses were not present in the Middle Section in 1971. To the contrary, the record indicates that the Middle Section is ideal wild horse habitat and at least some portions of it were being used by wild horses around that time.

- There is no evidence of an "administrative error" anywhere in the record.

- The Forest Service never uttered a word about eliminating the Middle Section for three decades until the Farm Bureau signed on to conduct the WHT planning process in 2012.

As set forth in more detail below, these problems doom the agency's elimination of the Middle Section and boundary modification under the Wild Horse Act, NEPA, and NFMA.

### 1.   *The Forest Service Violated the Wild Horse Act By Eliminating the Middle Section from the WHT*

The Forest Service's elimination of the Middle Section violates the Wild Horse Act and its implementing regulations in at least three ways.

#### (a)   *The Forest Service Violated Its Duty To Protect and Manage Wild Horses As Integral Components of the Middle Section*

Under the Wild Horse Act, the Forest Service is "*directed to protect and manage* wild free-roaming horses and burros *as components* of the public lands." 16 U.S.C. § 1333(a) (emphases added). The Forest Service "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* "[W]ild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as *an integral part* of the natural system of the public lands." 16 U.S.C. § 1331 (emphasis added); *see also* 36 C.F.R. § 222.61(a)(1) (agency must "[a]dminister wild free-roaming horses and burros and their progeny on the National Forest System in the areas where they now occur (wild horse and burro territory) to maintain a thriving ecological balance considering them *an integral component* of the multiple use resources") (emphasis added); 36

C.F.R. § 222.61(a)(2) (agency shall "[p]rovide direct administration for the welfare of wild free-roaming horses and burros that are located on the National Forest System").

The Forest Service's elimination of the Middle Section violated each of the aforementioned mandates because the agency abdicated its statutory duty to protect and manage wild horses in the Middle Section. Rather than protecting the wild horses in the Middle Section, the Forest Service seeks to remove them and to bar their continued use of these public lands. In violation of the agency's statutory and regulatory obligations, the Forest Service's decision treats wild horses in the Middle Section as accidental nuisances, *not* integral components.

From roughly 1980 to 2013, the Forest Service treated the Middle Section as public lands where horses qualified for full protection under the Wild Horse Act. *See, e.g.*, AR02838 at 3-17 ("[u]nder the Wild Horses and Burros Act, the Forest is legally obligated to manage horses within a [single] 258,000-acre wild horse territory" in Devil's Garden); AR00158 (Forest Service's map entitled "1980 Wild Horse Territory" showing the Middle Section as part of the WHT); AR04762 (Forest Service's 2007 map showing the Middle Section as part of the WHT). Prior to the intervention of the Farm Bureau in 2012, the Forest Service never claimed that the Middle Section was not entitled to protection under the Wild Horse Act. *See supra* at 5-10, 11-12. Yet the Forest Service now asks the Court to ratify the agency's wholesale abdication of its legal obligation to manage and protect wild horses as integral components of the Middle Section.

The sole justification that the Forest Service offered throughout the planning process for the 2013 WHT Management Plan—that the Middle Section comprised private ranches in 1971 and hence would have been inhospitable to wild horses when the Wild Horse Act was enacted—

is false.[12]  *See* Dkt. No. 9, ¶¶ 3, 39, 48, 61.  In fact, the Middle Section is, and always has been, prime wild horse habitat.  *See supra* at 7-11.  The Forest Service's own censuses and maps indicate that wild horses regularly have been identified throughout the Middle Section.  *See id.* Notably, even before it recanted its "private lands" theory, the Forest Service was equivocal about the alleged absence of wild horses in the Middle Section in the 1970s.  *See* AR00373-74 ("As the lands were private, there *may have been some incidental use* of the areas by wild horses, however *it is likely* wild horse use was excluded *for the most part* as the forage was needed for the livestock operations.") (emphases added).  In other words, the Forest Service *admits* that wild horses may well have used the Middle Section in the 1970s.

The fact that the record is silent as to why the Middle Section was not included in the WHT in 1975 (other than showing that a small fraction of the Middle Section was privately held at the time) does not even remotely establish that the Middle Section exceeded the known territorial limits of wild horses in the 1970s, particularly when the available evidence indicates that wild horses always have used the Middle Section.  *See supra* at 7-11.

Accordingly, because the Forest Service "has relied on factors which Congress has not intended it to consider" and "offered an explanation for its decision that runs counter to the evidence before the agency," the Court should reject the agency's revisionist assertion that, after 33 years, an undocumented, undated, and unexplained "administrative error" allows the Forest Service to abandon its "legal[] obligat[ion]" under the Wild Horse Act to manage and protect wild horses as  integral components of the Middle Section.  *State Farm*, 463 U.S. at 43.

---

[12] *See* 16 U.S.C. § 1331 (limiting protections in 1971 to "the area where [wild horses are] presently found"); 36 C.F.R. § 222.60(b)(15) (defining "wild horse . . . territory" as "territorial habitat of wild free-roaming horses . . . at the time of the passage of the Act").

(b)    *Abolishing the Middle Section of the WHT Is Not a "Minimally Feasible" Management Activity*

In the WHT, "[a]ll management activities shall be at the minimal feasible level."  16 U.S.C. § 1333(a).  The decision to remove *all* of the wild horses from a large area of the WHT is the opposite of the "minimal feasible level" of management required by law.  *See Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87, 96 (D.D.C. 2009) (Collyer, J.) ("*Salazar*") ("It is difficult to think of a 'management activity' that is farther from a 'minimal feasible level' than removal [of wild horses from a wild horse territory].").  As Judge Collyer noted in *Salazar*, "while Congress did not specifically define 'manage,' it did provide a list of the 'management activities' it envisioned," in 16 U.S.C. § 1333(b)(1).  *Id.*  Those activities, such as determining and implementing AMLs, involve scientifically based, affirmative conduct aimed at implementing the federal recognition of wild horse territories.  In contrast, here, the Forest Service seeks to permanently abandon its responsibility to manage the Middle Section as part of the WHT.  Such a surrender flouts both the spirit and letter of the Wild Horse Act.

In *Salazar*, the court rejected the agency's argument that it could remove all of the wild horses from one section of a designated wild horse area because no provision of the Wild Horse Act expressly barred such a tactic.  *See id.* at 96-97.  The Forest Service's "management activity" here is even more egregious than the BLM's proposed action in *Salazar*.  Whereas in *Salazar* the BLM proposed removing all wild horses from a particular area, here the Forest Service seeks to permanently remove the protected status from the Middle Section altogether.  There is no statutory basis for such an end-run around the Wild Horse Act.  As in *Salazar*, "[i]n light of the statute's purpose to protect wild free-roaming horses and burros, . . . the only plausible inference to be drawn from the omission of any procedure" for the agency's proposed action "is that Congress did not intend for [the agency's] management authority to be so broad."  *Id.* at 97.

28

<div align="center">

*(c)*     *The Forest Service Has Violated Its Duty To "Continue*
*Recognition" of the Middle Section*

</div>

Finally, the Forest Service's own regulations require it to "[e]stablish wild horse . . .

territories in accordance with the Act *and continue recognition of such territories* where it is

determined that horses and/or burros will be recognized as part of the natural system."  36 C.F.R.

§ 222.61(a)(3) (emphasis added).  As noted, the agency formally treated the Middle Section as a

"wild horse and burro territory" from roughly 1980 to 2013.  During that period, the Forest

Service "determined that horses . . . will be recognized as part of the natural system" of the

WHT.  *Id.*  Accordingly, by failing in the challenged decision to "continue recognition" of the

Middle Section as a "wild horse . . . territory," the Forest Service's elimination of the Middle

Section violated the agency's own regulations.  *Id.*

In sum, by violating the Wild Horse Act and its regulations, and by failing to provide any

legally adequate explanation for its decision (much less reconciling the contrary evidence in the

record), the Forest Service's elimination of 36 square miles from the center of the WHT is

arbitrary, capricious, an abuse of discretion, and not in accordance with the Wild Horse Act, in

violation of Section 706(2) of the APA.  *State Farm*, 463 U.S. at 43, 56-57.[13]

<div align="center">

**2.**     **The Forest Service Violated NEPA in Eliminating the Middle Section**

*(a)*     *The EA Does Not Analyze the Impact of Eliminating the Middle*
*Section*

</div>

Rather than analyzing what effect the elimination of the Middle Section would have on

wild horses or the WHT as a whole, the EA simply writes off the 33-year-old Middle Section as

---

[13] At minimum, because the agency's decision constituted an abrupt reversal of position
concerning management in the Middle Section, the agency has failed on this record to supply the
"reasoned analysis" required when adopting a management change and the decision therefore
fails even under rudimentary administrative law principles.  *E.g.*, *State Farm*, 463 U.S. at 57.

<div align="center">

29

</div>

an "administrative error."  *Supra* at 20-21.  By sweeping this crucial issue under the rug, the

Forest Service flouted the letter and spirit of NEPA and its implementing regulations.

"One of NEPA's primary purposes is to make certain 'that the agency, in reaching its

decision, will have available, and will carefully consider, detailed information concerning

significant environmental impacts.'"  *Sierra Club v. Watkins*, 808 F. Supp. 852, 858 (D.D.C.

1991) (Lamberth, J.) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989)).  The "regulations require a federal agency proposing major federal action that does *not*

have a significant effect on the environment to file a document called an 'environmental

assessment' ('EA') that explains how the agency reached that conclusion."  *Id.* at 859 (citing 40

C.F.R. § 1508.13).  "An EA should be brief, but also should set out sufficient evidence for the

Finding of No Significant Impact ('FONSI')."  *Id.* (citing 40 C.F.R. § 1508.9(a)(1)).

Here, other than a few fleeting references to "administrative error" and "administrative

convenience," *see* AR00156, AR00159, and the erroneous explanation—since disavowed—that

the Middle Section comprised mostly "private lands" in the 1970s, *see* AR00373 (Response to

Comment 2-3), the EA contains no *analysis* as to the basis for eliminating the Middle Section.

Likewise, the EA does not even purport to assess the environmental impacts caused by the

removal of the Middle Section from the WHT.  The EA lacks any scientific data supporting its

bald claim that the removal of ten percent of the WHT, including numerous important meadows

and water sources, somehow is "based on the long-term needs of the Devil's Garden wild horse

herd."  AR00177; AR00271 (same).  Rather, the EA simply asserts, without explanation, that

"[a]s [the elimination of the Middle Section] corrects a boundary established for administrative

convenience, this amendment has no effect on wild horses or their habitat."  AR00271.  This

conclusory claim defies common sense as well as science.  *See* AR04136-38, ¶¶ 17, 19.

This is not a case of an EA "assessing difficult questions regarding scientific and technical disputes," necessitating deference to the agency's expertise. *Sierra Club*, 808 F. Supp. at 859 (citing cases). Here, the Forest Service conducted *no analysis whatsoever* as to the impact that permanently eliminating the central portion of a *wild horse* territory would have on wild horses (or any other species). *See* AR00252-83. The EA admits as much: "[w]ild horse populations outside the [new, 2-unit] territory *were not considered* as it is assumed they will be removed." AR00264 (emphasis added.) Notably absent is any analysis, for example, as to how the elimination of the Middle Section would impact the ability of the WHT's remaining wild horses (*i.e.*, in the East and West units) to access essential resources such as forage and water in the Middle Section, which they have accessed and used for decades, and to migrate seasonally and reproduce in a manner that supports genetic interchange and the overall health of the population. *Cf.* AR04133-38, ¶¶ 9-11, 15-17, 19. These critical failures render the EA patently inadequate under NEPA, and must be set aside on that basis alone.

By the same token, the Forest Service's underlying motivation for abolishing the Middle Section and for failing to conduct even a cursory review of its environmental effects—i.e., to accede to the desires of the Farm Bureau, *see supra* at 12-13—makes crystal clear that the agency did not seriously consider alternatives to eliminating the Middle Section as required by NEPA, *see* 40 C.F.R. §§ 1502.14, 1508.9(b), because it was merely using this sham process to justify a decision already made concerning the Middle Section long before the final decision was issued. *See* 40 C.F.R. § 1502.2(g) (requiring that the NEPA process "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made"); *id.* § 1502.5 (mandating that NEPA review "will not be used to rationalize or justify decisions already made"). These violations, too, require vacatur and remand. *See, e.g.*,

*Metcalf v. Daley*, 214 F.3d 1135, 1142-45 (9th Cir. 2000) (explaining that NEPA review "must

be taken objectively and in good faith, not as an exercise in form over substance, and not as a

subterfuge designed to rationalize a decision already made," rejecting EA because "[i]t is highly

likely that because of the Federal Defendants' prior written commitment to the Makah and

concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling

proposal would not significantly affect the environment," and holding "that by making such a

firm commitment before preparing an EA, the Federal Defendants failed to take a 'hard look' at

the environmental consequences of their actions and, therefore, violated NEPA").

　　　Likewise, the Forest Service has violated NEPA by hiring the Farm Bureau to prepare all

of the NEPA documentation.  *See* 40 C.F.R. §§ 1506.5(b)-(c) (requiring that the agency "shall

make *its own* evaluation of the environmental issues and take responsibility for the scope and

content of the environmental assessment" and must "avoid *any* conflict of interest" when hiring a

contractor to assist with the NEPA review) (emphases added).  The Farm Bureau has an

inexorable conflict of interest relating to the outcome of the boundary modification (and the

AML reduction), due to the grazing permits held by its members, who freely admit having vested

financial interests adverse to wild horses in the WHT.  This is yet another basis for setting aside

the Final EA.  *See, e.g.*, *Colo. Wild, Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1229-30 (D.

Colo. 2007) (finding unlawful "bias as a result of an improper relationship that developed

between" the Forest Service and an interested party that was "in routine communication

regarding the substance, scope and timing of the" NEPA review process, and holding that the

"resulting contractor bias [likely] compromised the objectivity and integrity of the NEPA

process") (citation and quotation marks omitted); *Davis v. Mineta,* 302 F.3d 1104, 1113 (10th

Cir. 2002) (invalidating tainted NEPA document due to contractor's biased analysis).

(b)      *The FONSI Was Improper*

Under circuit case law, courts review an agency's FONSI to determine whether:

> First, the agency [has] accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (citation omitted).

With respect to the Middle Section, the EA fails to satisfy any of these requirements.

*First*, the EA does not "identif[y] the relevant environmental concern" because it fails to examine the impact of the elimination of the Middle Section on the wild horse population at Devil's Garden.  *Grand Canyon Trust*, 290 F.3d at 340.  There is no analysis, for example, of the impact that the elimination of wild horses' protected access to the meadows and water sources in the Middle Section will have on the animals, or the impact that separating the population into two, non-interacting herds will have on the genetic viability of the population.

*Second*, even assuming *arguendo* that the Forest Service had identified the relevant environmental concern, the agency failed to take a "'hard look' at the problem in preparing the EA." *Id.* at 340-41.  Indeed, the Forest Service barely glanced at the appropriateness of protecting the wild horses in the Middle Section under the Wild Horse Act.  *See* AR00264 ("[w]ild horse populations outside the [new, 2-unit] territory *were not considered* as it is assumed they will be removed") (emphasis added).  The section of the EA devoted to the "No Action" alternative does not even discuss the appropriate size of the WHT.  *See* AR00272-75.  Instead, on the basis of unexplained "administrative convenience," AR00271, the agency implemented its foregone conclusion to remove the Middle Section in a scientific vacuum.

As explained above, the NEPA process was nothing more than a *post hoc* attempt to justify the removal of the Middle Section at the behest of the Farm Bureau, an interested party that was heavily involved in—and received significant federal funding for—developing the wild horse strategy adopted by the Forest Service in its EA.  *See supra* at 12-13, 31-32.  Beginning in December 2012 (when the second scoping letter first announced that the Middle Section would be eliminated from the WHT), *every* planning document and report that the agency issued *assumed* that the Middle Section already had been eliminated.  *See supra* at 13-23.  Each document referred to the WHT as comprising only 232,520 acres of federal land and excluding the Triangle and Avanzino areas, and each AML discussion assumed that the AML for the Middle Section would be zero.  *See id.*  Thus, the technical reports on which the Final EA and the FONSI were based *never* analyzed the impact that the elimination of the Middle Section will have on the environment.

*Third*, the Forest Service failed "to make a convincing case" for its FONSI.  *Grand Canyon Trust*, 290 F.3d at 341.  Like the EA, the FONSI simply does not address the impact of the removal of the Middle Section on wild horses.  Instead, the FONSI incorporates the EA by reference and hence suffers from each of the defects described above.  The Forest Service's central premise—that because the elimination of the Middle Section "corrects a boundary established for administrative convenience, this amendment has no effect on wild horses or their habitat," AR00271—strains credulity.  In fact, the only evidence on this subject in the record suggests just the opposite:  the elimination of the Middle Section will substantially alter the environmental status quo in the WHT by limiting wild horses' access to forage, water, and other resources in the Middle Section, and by severing connectivity and natural genetic interchange

34

that has existed between wild horse bands throughout the contiguous WHT for at least 30 years and likely much longer.  *See, e.g.*, AR04133-38, ¶¶ 9-11, 15, 19.

*Fourth*, even assuming *arguendo* that the Forest Service had evaluated the significance of the Middle Section, no "changes or safeguards in the project sufficiently reduce the impact [of eliminating the Middle Section] to a minimum."  *Grand Canyon Trust*, 290 F.3d at 341.  To the contrary, the agency is *exacerbating* the problems wrought by the eradication of the Middle Section by slashing the AMLs for wild horses in the remaining East and West units.  *See supra* at 17-18, 22.  This two-pronged attack on wild horses in the WHT is the *opposite* of mitigation.

In sum, the removal of the Middle Section requires an EIS, or, at minimum, a NEPA document that has actually taken a "hard look" at the issue and credibly determined that no significant environmental impacts will occur.  By violating NEPA and its regulations with respect to the Middle Section, the Forest Service's actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of Section 706(2) of the APA.[14]

---

[14] Not only did the agency fail to "make a convincing case" for its FONSI by refusing to even address the effects of abolishing the Middle Section, but its cursory dismissal of NEPA's "significance" factors found at 40 C.F.R. § 1508.27(b) cannot be sustained on this record.  *See* AR00106-09.  Among other significance factors implicated by the elimination of the Middle Section—any one of which triggers the need for EIS preparation, *see Humane Soc'y of the U.S. v. Johanns,* 520 F. Supp. 2d 8, 20 (D.D.C. 2007) (Kollar-Kotelly, J.)—are: (1) the action will affect "[u]nique characteristics of" a federally designated WHT which is an "ecologically critical area" for wild horses due to its meadows and water sources, as well as serving as a genetic connectivity corridor, 40 C.F.R. § 1508.27(b)(3); (2) the splitting of the WHT into two isolated units will lead to "highly uncertain" or "unknown" risks to the wild horse population's genetic viability, 40 C.F.R. § 1508.27(b)(5); (3) the elimination of the Middle Section sets a precedent for wild horse management with significant effects that will carry through to future agency decisions in Devil's Garden, 40 C.F.R. § 1508.27(b)(6); (4) the elimination of the Middle Section, in conjunction with the significant reduction in AML, will cause serious cumulative effects, 40 C.F.R. § 1508.27(b)(7); and (5) the action "threatens a violation of Federal . . . law" in the Wild Horse Act and NFMA, 40 C.F.R. § 1508.27(b)(10).  AR00106-09.  Thus, the Court should set aside the FONSI.

> **3.      The Forest Service Violated NFMA By Ignoring the Mandate of the
> 1991 Forest Plan for a Single, 258,000-acre WHT**

The Forest Service's decision to abolish the Middle Section contravenes the operative

1991 Forest Plan, which makes clear that the agency must manage a single, contiguous 258,000-

acre WHT.  *See* AR02838 at 3-17 ("Under the Wild Horses and Burros Act, the Forest is *legally*

*obligated* to manage horses within a [single] 258,000-acre wild horse territory.") (emphasis

added).  Despite making drastic changes to the WHT boundary and eliminating significant WHT

acreage, the agency ignored NFMA's requirements for formally amending the 1991 Forest Plan.

NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise"

forest plans.  16 U.S.C. § 1604(a).  All site-specific "[r]esource plans . . . and other instruments

for the use and occupancy of National Forest System lands *shall be consistent* with the land

management plans."  *Id.* § 1604(i) (emphasis added).  The Forest Service's Range Management

Manual ("Manual") provides further guidance to the agency, stating that the agency may only

"adjust territorial boundaries if justified in the Forest [LRMP]."  FSM 2200 § 2260.41.  The

Manual also instructs that: (1) "Wild Horse and Burro Territory plans are to conform with the

Forest [LRMPs]," *id.* § 2263.11; (2) territory plans must be in "compliance with the management

direction identified in . . . Forest [LRMPs]," *id.* § 2263.1; and (3) the agency's policies include

"[r]ecogniz[ing] wild horse-burro territory boundaries in Forest [LRMPs]," *id.* § 2260.3(5).

The Forest Service's elimination of the Middle Section violates each of these mandates.

As set forth above, the 1991 Forest Plan provides that the WHT is a single, 258,000-acre unit.

Because the removal of the Middle Section reduces the WHT to a two-unit 232,500-acre area, it

directly contravenes the 1991 Forest Plan.  Faced with this significant inconsistency, the Forest

Service was obligated, at bare minimum, to formally amend the 1991 Forest Plan.  *See Native*

*Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) ("If the Forest

Service thinks any provision of the 1986 HNF Plan is no longer relevant, the agency should propose amendments to the HNF Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents.").[15]

Instead of formally amending the 1991 Forest Plan, however, the Forest Service merely asserted that it did not have to do so because of its self-serving statement, without any analysis, that the proposed action only consists of "non-significant Forest Plan amendments."  AR00101; *see also* AR00110 ("The selected alternative, including the adoption of the insignificant Forest Plan amendments, is consistent with the [1991 Forest Plan], as required by . . . the National Forest Management Act.").  Although, in certain circumstances, a forest plan may be amended absent the formal NFMA amendment process, that is the case only where the Forest Service analyzes the action and sets forth evidence establishing that "such amendment would [not] result in a significant change in such plan."  16 U.S.C. § 1604(f)(4).  Here, as discussed above, the Forest Service never performed *any* analysis of the elimination of Middle Section, much less one that sets forth evidence justifying how this major boundary modification will not result in a significant change to the 1991 Forest Plan or alter the long-term management objectives for the Middle Section now that wild horses are excluded there.  *See* FSM 1920 § 1926.51.

The "significance" determination under NFMA has serious legal ramifications.  *See, e.g.*, *Lands Council v. Martin*, 529 F.3d 1219, 1227 (9th Cir. 2008) (explaining that "the correct procedure depends on the scope of the amendment: 'Significant' amendments require a lengthy

---

[15] Although the Forest Service did not even purport to evaluate whether the proposed action is a significant amendment to the 1991 Forest Plan, had it done so the agency's own NFMA manual provides guidance making clear that "[c]hanges to the land management plan that are not significant" include "[a]djustments of management area boundaries" only "when the adjustments do *not* cause significant changes in the multiple-use goals and objectives for long-term land and resource management."  Forest Service Manual 1920 § 1926.51, available at http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsm?1900!.. (emphasis added).

and detailed amendment process; otherwise, a simpler notice and comment process suffices");

*see also* 36 C.F.R. § 219.5(a)(2)(ii) (describing plan amendment process and explaining that the

level of process required "depend[s] upon the scope and scale of the amendment and its likely

effects").  As the Forest Service's regulations explain, "[a] proposed amendment that may create

a significant environmental effect and thus require preparation of an [EIS] is considered a

significant change in the plan for the purposes of the NFMA."  36 C.F.R. § 219.13(b)(3).

    Therefore, because NFMA required this plainly significant agency action—which will

eliminate more than 23,000 acres from the existing WHT and divide it into two isolated units—

to go through the formal NFMA amendment process, the Court must vacate and remand this

action.  *See, e.g.*, *Native Ecosystems Council*, 418 F.3d at 962 ("An agency's position that is

contrary to the clear language of a Forest Plan is not entitled to deference.") (citation omitted);

*Am. Wildlands v. U.S. Forest Serv.*, No. 97-CV-160, at 9-15 (D. Mont. Apr. 14, 1999) (Pl. Ex. C)

(rejecting Forest Service's insignificance finding under NFMA where the question of

"'significance' arises in the context of a decision affecting a discrete mountain range that is

managed as a specialized unit emphasizing wildlife preservation" and where "the amendment

significantly changes the 'goals, objectives and outputs' for the Elkhorns by placing other

activities such as mining, timber, and grazing on par with wildlife conservation"); *cf. Martin*, 529

F.3d at 1227-28 (deferring to the agency's insignificance finding only because the Forest Service

specifically "considered the four factors listed in the Forest Service Handbook" and made a

decision concerning "significance" based on that careful examination).

**B.      Plaintiffs Are Entitled to Summary Judgment on Their Claims Concerning the AML Reduction**

*1.      The Elimination of the Middle Section Renders the AML Reduction Defective*

If the Court finds that the Forest Service's elimination of the Middle Section was unlawful, then the new reduced AML also is defective because it is based on only those portions of the WHT that lie *outside* of the Middle Section.  *See* AR00119 ("[T]he Territory is made up of East and West Home Ranges.  The boundary is the same as that established in the initial Devil's Garden Wild Horse Management Plan, approved in 1975."); AR00121 (map showing WHT without Middle Section); AR00124, Table 1 (showing AMLs for individual allotments outside the Middle Section); *see also* AR00547 (statement in AML Evaluation that "the AML was established as 0 wild horses for" the Triangle and Avanzino Allotments).

Given the number of wild horses already inhabiting the Middle Section and the favorable quality of the pastures and water sources there, *see* AR04133-37, ¶¶ 9, 15, 16, 19, an AML of zero for the allotments in the Middle Section cannot be sustained.  Indeed, the Forest Service confirms that many wild horses inhabited the Middle Section as recently as 2012.  *See* AR00482, Table 9 (showing 80 wild horses in Avanzino, and 10 wild horses in Triangle); AR00258 (map showing where wild horses had been seen in Middle Section in 2013, including in the northwest corner of the Big Sage Allotment).  While the AML Evaluation analyzes the forage, water, cover and range conditions in the eight allotments that make up the West and East Portions of the reduced WHT, *see, e.g.,* AR00558-69 (Carr Allotment), AR00570-81 (Emigrant Spring

Allotment), etc., it presents no genuine analysis of the Middle Section. For these reasons, the

adoption of an AML of zero for the Middle Section was legally impermissible.[16]

### 2.      The Reduction of the Low AML Violates NEPA

Separate and independent from consideration of the Middle Section, the new AML for

the two-unit WHT should be rejected because it violates NEPA in multiple ways.

### (a)      The Forest Service Failed To Analyze the Impact the New AML Will Have on the Genetic Diversity of the Wild Horse Populations at Devil's Garden

The Forest Service violated NEPA by failing to assess the impacts that the proposed

action will have on the genetic health of the two isolated wild horse populations in the West and

East Portions of the redrawn WHT. While the Forest Service asserts that the new AML for the

entire WHT (206 to 402 wild horses) "is *expected* to maintain an acceptable level of genetic

diversity," AR00553 (emphasis added), this expectation not only lacks evidentiary support but is

directly undermined by the little analysis that the agency performed.

Although the Forest Service correctly identified genetic diversity as an environmental

concern to be considered, *see* AR03911, it failed to take the necessary "hard look" at the effect

that the new AML will have. As stated in the Final EA, the population size necessary "to

maintain an acceptable level of genetic diversity within reproducing [wild horse and burro]

populations" is "50 effective breeding animals (i.e., a population size of about 150-200

animals)." AR00273; *see also* AR00553. While the new low AML adopted by the agency—206

wild horses—exceeds the alleged minimum population size necessary for genetic sustainability

---

[16] As with the elimination of the Middle Section, the Forest Service assumed from the beginning that the AML for the Middle Section would be zero (thereby prejudicing the remainder of the AML determination). *See supra* at 16. Therefore, the NEPA process served not as an objective evaluation of the environmental impacts of, and alternatives to, the new AML, but instead as a *post hoc* process designed to reach a pre-determined outcome—a result expressly forbidden by NEPA and its regulations. *See supra* at 31-32; 40 C.F.R. §§ 1502.2(g), 1502.5.

of 150 to 200 animals, this AML is for the entire, two-unit WHT.  *See* AR00124.  Because the

WHT now consists of two *isolated* units between which no genetic interchange will take place,

the AMLs for the West and East Portions must be considered separately.  The Forest Service

*never* took this step and, accordingly, it never analyzed whether reducing and separating the wild

horse populations would adversely impact their genetic health.

Under the 2013 Management Plan, the low AML for the West Portion is 105 wild horses,

and the low AML for the East Portion is 101 wild horses.  *Id.*  The Plan expressly states that

gathers will be implemented to achieve the lower AML limit in order to reduce the frequency of

such gathers.  *See* AR00123.  Thus, achieving the low AMLs in the West and East portions will

reduce those populations to 105 and 101 wild horses, respectively—approximately 33% below

the *minimum* threshold the agency considers necessary to preserve adequate genetic diversity.

The Forest Service's failure to take the required "hard look" at the genetic impacts of its

decisions to separate the wild horse populations and reduce their numbers to below the

genetically sustainable threshold is further highlighted by the admission that it undertook no

genetic study *before* deciding to adopt these measures.  *See* AR00553 (noting "a [genetic]

baseline has not yet been established for this herd"), AR00260 ("Genetic diversity has not been

sampled within the WHT").  Instead, the agency proposes to conduct genetic sampling "[d]uring

the initial removal(s) to achieve [the new] AML."  AR00125.  Thus, the genetic condition of the

population will be established *as the populations in the West and East Portions are reduced to

their new AMLs*.  Thereafter, genetic sampling will be conducted "every 8-10 years[] to reassess

genetic diversity."  *Id.*  This *post hoc* data will come too late to contribute to the environmental

analysis that the Forest Service is required to perform *before* it makes a decision, as it has here,

to drastically and permanently reduce the AMLs of the two isolated wild horse populations.

This case is analogous to this Court's recent ruling concerning the U.S. Fish and Wildlife Service's delisting of the gray wolf in Wyoming under the Endangered Species Act. *Defenders of Wildlife v. Jewell*, No. 12-CV-1833, 2014 WL 4714847 (D.D.C. Sept. 23, 2014) (Berman Jackson, J.). In that case, the Court held that where the agency had set forth a specific standard for determining the minimum number of breeding pairs necessary for ensuring genetic viability of a population, *id.* at *10-11, it was arbitrary and capricious for the agency to then proceed with an action that falls short of that standard. *Id.* at *12-13 (finding that "that it was unreasonable in this instance for FWS to determine that it was necessary for Wyoming to manage for more than ten breeding pairs and 100 wolves as a condition for delisting but then accept a plan that did not commit to that"). Likewise, here, the Forest Service explained its genetic viability standard, *see* AR00273, but then developed a low AML far below that standard without any attempt to ensure, scientifically or otherwise, that this below-standard AML would result in genetic viability.

In short, the Forest Service has made far less than the "convincing case" required under *Grand Canyon Trust* for its purported finding that the new AML "is expected to maintain an acceptable level of genetic diversity." AR00553. While the AML Evaluation suggests that the "known movement of animals between each allotment and pasture" will facilitate adequate genetic interchange, *id.*, given the low numbers of horses planned for each of the two isolated portions of the WHT, there will not be a sufficient population within each portion to ensure adequate genetic diversity. *See* AR04137-38, ¶ 19. For these reasons, the agency must prepare an EIS to analyze the impact that the new AML, in the context of a divided WHT, will have on

the wild horses at Devil's Garden, or, at minimum, must on remand prepare a far more detailed

EA that seriously addresses these topics.  *See Grand Canyon Trust*, 290 F.3d at 341.[17]

> (b)     **The Forest Service Failed To Analyze the Effects Caused By Livestock**

In reviewing a NEPA claim, courts must "insure that the agency has taken a 'hard look'

at [the] environmental consequences" of its actions.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410

n.21 (1976).  Agencies must consider all critical information relevant to proposed action,

including the combined effects of managing different species using a given area.  *See Fund for*

*Animals v. Clark*, 27 F. Supp. 2d 8, 12-14 (D.D.C. 1998) (enjoining agency's action because EA

on bison management and removal did not consider the "combined environmental impacts" of an

elk feeding program where "it is undisputed that . . . the elk feeding program will continue to be

a factor to be considered in managing the bison").

Here, the Forest Service has lowered the AML for wild horses, purportedly in order to

address rangeland conditions, without undertaking *any* analysis of the contributory impacts of

the substantial number of livestock that graze the WHT lands.  To the extent the Forest Service

believes that the total utilization of AUMs (animal unit months) of forage must be reduced in

order to address rangeland conditions, its focus on only one species of forager (wild horses) is

arbitrary and capricious given that thousands of livestock use the same rangelands and consume

---

[17] In the same way that the elimination of the Middle Section implicated various NEPA
"significance" factors thereby triggering preparation of an EIS, *see supra* at 35 n.14, the Forest
Service's significant reduction in the Devil's Garden AML also required an EIS for the following
reasons:  (1) the AML reduction will lead to "highly uncertain" or "unknown" risks to the wild
horse population's genetic viability, 40 C.F.R. § 1508.27(b)(5); (2) the elimination of the Middle
Section sets a precedent for wild horse management in Devil's Garden with significant effects
that will carry through to future agency decisions, 40 C.F.R. § 1508.27(b)(6); (3) the major AML
reduction, in conjunction with the elimination of the Middle Section, will cause serious
cumulative effects, 40 C.F.R. § 1508.27(b)(7); and (4) the action "threatens a violation of
Federal . . . law" in the Wild Horse Act and NFMA, 40 C.F.R. § 1508.27(b)(10).

far greater amounts of forage and water than the much smaller wild horse population. *See* AR00227, Figure 10 (showing Forest Service allocation of 500% more forage to livestock than wild horses in the WHT). Given that wild horses and livestock grazing "take place in the same geographic area," and livestock grazing "has a profound effect" on the depletion of resources available to wild horses, as well as the condition of the rangelands, *Clark*, 27 F. Supp. 2d at 14, livestock grazing and wild horse use in the WHT "should have been considered together in the … EA so that [the Forest Service] could determine the combined impact of the programs." *Id.*

Because "[t]he record is clear that the EA … does not consider the combined environmental impact of these [] actions … [the] federal defendants are in violation of NEPA." *Id.*; *see also Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 39-43 (D.D.C. 2010) (Kessler, J.) (agency's "conclusory reasoning" regarding impacts amounted to a failure to take a "hard look"); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 106-08 (D.D.C. 2006) (Bates, J.). For this reason, the decision to establish a lower AML for the WHT is legally defective and should be vacated.

### 3. *The Reduction of the Low AML Violates the NFMA*

Finally, the Forest Service's significant reduction of the low AML by more than 25% from the AML established in the governing 1991 Forest Plan violated NFMA by failing to adhere to the LRMP amendment process. As courts have explained, "AMLs are determined through revisions to the applicable [Forest] Plan." *In Def. of Animals v. U.S. Dep't. of Interior*, 909 F. Supp. 2d 1178, 1192 (E.D. Cal. 2012), *aff'd*, 751 F.3d 1054 (9th Cir. May 12, 2014).

The 1991 Forest Plan made clear that the applicable wild horse AML was 275-335. AR02838 at 3-18–3-19. Although the 1991 Forest Plan contemplated that the agency may, in the future, adjust the AML based on certain factors, *see id.* at 4-19, the 1991 Forest Plan did *not* excuse the agency from complying with the normal LRMP amendment/revision process when

seeking to do so.  Hence, as explained above, *see supra* at 36-38, the Forest Service was required either to formally amend/revise the 1991 Forest Plan when significantly reducing the wild horse AML, or set forth specific evidence establishing that "such amendment would [not] result in a significant change in such plan."  16 U.S.C. § 1604(f)(4).

As noted, the Forest Service undertook no analysis of whether its decision is "a significant change" to the 1991 Forest Plan, *see supra* at 37-38, and instead conclusorily asserted that the decision was an insignificant amendment without proffering any evidence to justify that statement.  *See* AR00101; AR00110.  The complete lack of any supporting documents in the record renders the agency's assertion inadequate to dispense with its obligation under NFMA to formally amend the 1991 Forest Plan.  The agency's assertion of insignificance is especially undeserving of deference in light of the Forest Service's refusal to even grapple with the crucial questions of whether:  (1) it is scientifically defensible to maintain wild horse populations far below the agency's own genetic viability threshold, and (2) a significant reduction of the wild horse AML is legally or scientifically warranted where far more of the rangeland damage and resource consumption derives from private livestock using this federally protected wild horse territory.  For these reasons, the agency's "insignificance" finding cannot be upheld, and a formal amendment to the 1991 Forest Plan is required under NFMA.

<u>**CONCLUSION**</u>

Plaintiffs respectfully request that the Court enter summary judgment in their favor, vacate the Forest Service's decisions, and remand to the agency for further consideration consistent with federal law.

Respectfully submitted,

/s/ _____
William S. Eubanks II
(D.C. Bar No. 987036)
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206 / (202) 588-5049 fax
beubanks@meyerglitz.com


/s/ _____
David Zaft
(CA Bar No. 237365)
Admitted Pro Hac Vice

Matthew W. O'Brien
(CA Bar No. 261568)
Admitted Pro Hac Vice

CALDWELL LESLIE & PROCTOR, PC
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017
(213) 629-9040 / (213) 629-9022 fax
zaft@caldwell-leslie.com
obrien@caldwell-leslie.com


/s/ _____
Jeff Pierce
(CA Bar No. 293085)
Admitted Pro Hac Vice
ANIMAL LEGAL DEFENSE FUND
170 Cotati Ave.
Cotati, CA 94931
(707) 795-2533 / (707) 795-7280
jpierce@aldf.org

Date:  November 17, 2014

**EXHIBIT E**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Civil Action No. 14-0485 (ABJ) |
| TOM VILSACK, Secretary, U.S. Department of Agriculture, *et al.*, | ) ) ) |
| Defendants. | ) ) |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that plaintiffs' Motion for Summary Judgment [Dkt. # 20] is **DENIED**, defendants' Cross-Motion for Summary Judgment [Dkt. # 22] is **GRANTED**, and defendant-intervenors' Cross-Motion for Summary Judgment [Dkt. # 24] is **DENIED** as moot.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2015

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN WILD HORSE                     )
PRESERVATION CAMPAIGN, *et al.*,        )
                                        )
               Plaintiffs,              )
                                        )
       v.                               )      Civil Action No. 14-0485 (ABJ)
                                        )
TOM VILSACK, Secretary,                 )
U.S. Department of Agriculture, *et al.*, )
                                        )
               Defendants.              )
_____)

## MEMORANDUM OPINION

Plaintiffs the American Wild Horse Preservation Campaign, Carla Bowers, and Return to Freedom have brought this action against the Secretary of the United States Department of Agriculture, Thomas J. Vilsack; the Chief of the United States Forest Service, Thomas Tidwell; and the Acting Director of the Modoc National Forest, Ann Carlson. Compl. [Dkt. # 1]. The case arises out of the Forest Service's 2013 management plan for the Devil's Garden Wild Horse Territory ("WHT"). *Id.*

The Devil's Garden WHT is a wild horse territory located in the Modoc National Forest in California. *Id.* ¶ 1. Plaintiffs acknowledge that the territory consisted of two separate, non-contiguous parcels when it was established in 1975. *Id.* ¶ 39. However, they allege that at some point in the 1980s, the Forest Service adjusted the borders of the WHT to create a larger, unified territory, and that these more expansive borders were also recognized in a 1991 forest plan. *Id.* ¶¶ 39–40. In this lawsuit, they claim that the Forest Service acted improperly in 2013, when it adopted a new management plan which delineated the territory's borders in accordance with the original 1975 layout and explained that any previous references to one contiguous territory were

the result of "administrative error."  *Id.* ¶¶ 3–4, 48–49.  The Forest Service also adjusted the territory's minimum wild horse population threshold, called the appropriate management level ("AML").  *Id.* ¶¶ 5–6, 51–52.  Plaintiffs allege that these decisions are contrary to multiple statutes and reflect arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  *Id.* ¶¶ 58–91.

Plaintiffs' first set of challenges to the Forest Service's actions are premised upon their assertion that the disputed 25,000-acre parcel – which lies between the two original non-contiguous portions of the Devil's Garden WHT – was made an official part of the WHT at some point prior to 2013.  In its 2013 environmental assessment, the Forest Service explained that any previous drawings or plans that appeared to incorporate the parcel – and unite the territory's two non-contiguous halves – had done so in error.  The Court does not find this action to have been unreasonable or unlawful.  Plaintiffs have failed to demonstrate that the disputed parcel was ever formally incorporated into the Devil's Garden WHT through the required public process or that it could have been.  So they are unable to meet their burden to show that the record does not support the agency's 2013 decision to correct and clarify the boundaries.

With respect to the second issue raised in the complaint, the Forest Service has articulated a rational connection between the facts it found and its choice to broaden the AML range for the Devil's Garden WHT.  Thus, the Court finds that the challenged actions were not arbitrary and capricious or contrary to law, and it will grant defendants' cross-motion for summary judgment.

## BACKGROUND

The complaint recognizes that the Devil's Garden WHT consisted of two separate, non-contiguous parcels, totaling an estimated 236,000 acres, when it was established in 1975.  Compl. ¶ 39.  Plaintiffs allege that at some point in the 1980s, the Forest Service adjusted the borders of

the WHT to create one contiguous territory of roughly 258,000 acres. *Id.* Plaintiffs further claim that the Forest Service improperly revised those borders in 2013. *Id.* ¶¶ 3–4. They seek to vacate the Forest Service's clarification of the territorial borders and its simultaneous adjustment of the AML as arbitrary and capricious under the APA, and on the grounds that the agency's actions violated all of the applicable statutes. *Id.* ¶ 8.

## I.   Statutory Framework

Three statutory schemes control the Forest Service's management of the Devil's Garden WHT and form the basis for plaintiffs' challenges to the decisions embodied in the 2013 environmental assessment and management plan:  the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. §§ 1331–1340, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370.

The Wild Horses Act, passed in 1971, states that wild horses and burros "shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. The Act requires the Forest Service to "protect and manage" wild horse populations on lands under its administration in order to "achieve and maintain a thriving natural ecological balance." *Id.* § 1333(a). To manage the wild horses, the Forest Service has established wild horse and burro territories on "lands which were territorial habitat of wild free-roaming horses and/or burros at the time of the passage of the Act," and it develops and maintains a "management plan" for each territory. 36 C.F.R. §§ 222.60(b)(15), 222.61(3)–(4). Each unit or subunit of a wild horse territory is assigned an appropriate management level, or AML, which represents the number of animals the territory can sustainably support. 16 U.S.C. § 1333(b)(1).

The National Forest Management Act requires the Forest Service to "develop, maintain, and, as appropriate, revise" a Land and Resource Management Plan (herein, a "forest plan") for all sections of the National Forest System. *Id.* § 1604(a). While a management plan under the Wild Horses Act applies to a specific wild horse and burro territory, a forest plan under the NFMA governs a particular unit of the National Forest System. The Forest Service may make non-significant amendments to a forest plan "in any manner whatsoever" after giving public notice. *Id.* § 1604(f)(4). However, significant amendments to a forest plan must undergo more extensive approval procedures and require greater public involvement. *Id.*

The National Environmental Policy Act requires all federal agencies to analyze the impact of any agency action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.27 (listing factors to be considered in reaching a determination of significance). Under NEPA, an agency must first prepare an environmental assessment ("EA"), which briefly discusses the environmental impacts of the proposed agency action and sets out "sufficient evidence and analysis for determining whether to prepare" one of two additional documents: an environmental impact statement ("EIS") or a finding of no significant impact ("FONSI"). 40 C.F.R. §§ 1501.4(b), 1508.9. If the agency finds, on the basis of the EA, that the proposed action will have a significant impact on the quality of the human environment, it must prepare an EIS, which examines five factors relevant to the cumulative environmental impact of the action. 42 U.S.C. § 4332(C). If, however, the agency finds that the action does not significantly affect the environment, it need only prepare a FONSI setting forth the reasons "why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13; *see also id.* § 1501.4(b), (e).

## II.    History of the Devil's Garden WHT

After the passage of the Wild Horses Act in 1971, the Forest Service established a wild horse territory at Devil's Garden, a large, flat plateau located within the Modoc National Forest in northeastern California.  *See* AR02969–70.[1]  The first formal Devil's Garden WHT management plan was issued in 1975.  AR02965–97 (the "1975 Management Plan").  It provided for a wild horse territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  AR02970–71.

The two ranges were separated by a strip of land that was not incorporated into the Devil's Garden WHT when it was established.  *See, e.g.*, AR00157 (depicting the "1975 Wild Horse Territory").  This strip, which the Court will refer to as the "disputed territory," consisted of the Triangle Ranch and Avanzino Ranch grazing lands, some of which were privately-owned.  *See, e.g.*, AR00156 ("The Avanzino and Triangle private ranch lands which lay in between the West and East home ranges were not included in the WHT.").  It also included portions of the Carr, Big Sage, and Timbered Mountain livestock grazing allotments.  *See, e.g.*, AR03927 (showing boundaries of grazing allotments in red and boundaries of Devil's Garden WHT in yellow).  In 1976, the Forest Service acquired the Triangle Ranch lands through a land exchange and incorporated them into the Modoc National Forest.  AR03965; AR03968.  However, the Forest Service did not make the Triangle Ranch lands part of the Devil's Garden WHT at that time.  *See* AR03998 (1979 Decision Notice stating that "Triangle is not part of a designated horse management unit").

---

1    The parties' Joint Appendix ("JA") of the Administrative Record in this case was filed in six parts due to the size of the files, and each page has been stamped with a Bates number.  *See* JA Part 1 [Dkt. # 29-1] (AR00001–695); JA Part 2 [Dkt. # 29-2] (AR00707–2201); JA Part 3 [Dkt. # 29-3] (AR02206–3658); JA Part 4 [Dkt. # 29-4] (AR03667–4217); JA Part 5 [Dkt. # 29-5] (pages AR04218–532); JA Part 6 [Dkt. # 29-6] (AR04533–762).  In referring to the Administrative Record, the Court will cite to the Bates numbers appearing at the bottom of each page.

The Forest Service revised the Devil's Garden WHT management plan in 1980, AR02949–64 (the "1980 Management Plan"), and again described the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres." AR02953.  In 1982, the Forest Service issued another management plan, AR02839–51 (the "1982 Management Plan"), which again characterized the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  AR02843.[2]

In 1991, the Forest Service revised the forest plan for Modoc National Forest.  AR02838 (the "1991 Forest Plan").[3]  It incorporated by reference all existing resource management plans that it found to be consistent with, and appropriate for, the 1991 Forest Plan, which included the existing Wild Horse Management Plan.  *Id.* at 1-1.  But this time, the 1991 Forest Plan stated that the Modoc National Forest "has one wild horse territory of about 258,000 acres," *id.* at 3-18, and it observed that "[u]nder the Wild Horses and Burros Act, the Forest is legally obligated to manage horses within [that] 258,000-acre wild horse territory."  *Id.* at 3-17.  The plan included a statement that the Forest Service "prepared the Wild Horse Management Plan in 1985,"[4] which had "identifie[d] a population objective of 275–335 animals to manage."  *Id.* at 3-18 to 3-19.

In July 2011, the Forest Service issued a scoping notice, seeking comments on proposed updates to the existing Devil's Garden WHT management plan, including an adjustment to the

---

2      The Forest Service issued a management plan in 1981, but the version that was made part of the Joint Appendix in this case appears to be incomplete.  *See* AR02941–48.

3      Unlike the remainder of the Joint Appendix, the 1991 Forest Plan does not have Bates numbers at the bottom of each page.  Instead, it contains chapter and page numbers inherent to the original document.  Thus, the Court will cite to the chapter and page numbers that appear at the bottom of each page of the 1991 Forest Plan.

4      The record does not contain any 1985 management plan.  As discussed below, *see infra* note 7, it appears that the 1991 Forest Plan's reference to a 1985 management plan was a mistake, and that the Forest Plan most likely was referring instead to the 1982 Management Plan.

AML range of 275 to 335 animals established in the 1991 Forest Plan.  AR03911–20.  The scoping

notice stated that the Devil's Garden WHT "is approximately 268,750 acres in size," AR03911,

and it included a map depicting one contiguous territory.  AR03919–20.

In August 2012, the Forest Service entered into a cost-sharing agreement with the Modoc

County Farm Bureau ("Farm Bureau") for the development of the new Devil's Garden WHT

management plan.  AR04700–23.  The Farm Bureau agreed to collect, summarize, and evaluate

all data, prepare the draft EA and the final EA, and provide support for any appeal.  AR04713.

The Forest Service was to supervise the Farm Bureau's specialists, employ its own specialist to

review the specialists' reports, review and comment on the draft EA, and prepare the notice of

decision and any finding of no significant impact.  AR04714.

The Forest Service issued another scoping notice in December 2012, AR03809, and

attached a proposed action to that notice.  AR03810–24 (the "Proposed Action").  In the Proposed

Action, the Forest Service described the Devil's Garden WHT as consisting of "approximately

232,520 acres of federal land."  AR03810.  It also stated that "[t]he territory comprised West and

East home ranges in the areas where it was known that wild free-roaming horses ranged in 1971,"

and that "[t]he Avanzino and Triangle private ranch lands which lay in between the West and East

home ranges were not included in the WHT."  AR03811.

The Proposed Action also recognized that "[d]uring the mid-1980's, the [Forest Service]

appears to have adjusted the WHT boundary for administrative convenience," incorporating the

disputed territory into the WHT, "including Triangle Ranch lands acquired in 1976 and the

Avanzino Ranch (41 percent of which remains in private ownership)."  *Id.*  It stated that "[a]n

administrative error was made in expanding the WHT beyond the herd's known territorial limits,"

and it added that the "[i]nclusion of the Triangle Ranch lands . . . was clearly in error."  AR03812.

The Forest Service therefore "propose[d] to return to the management of wild horses within the WHT boundary established in 1975," which did not include the disputed territory.  *Id.*  The Proposed Action also included a proposal to amend the 1991 Forest Plan to remove the fixed AML range of 275 to 335 animals and to establish the AML range in the WHT management plan instead, which would be updated as necessary when wild horse population and resource monitoring data suggested the existing AML range was no longer appropriate.  AR03815.

Also in December 2012, the Forest Service released the Resource Monitoring Report for the Devil's Garden WHT, AR00622–95, in which it again characterized the territory as consisting of two non-contiguous parcels.  *See* AR00627 (discussing "the approximately 232,521 acre Devil's Garden Plateau Wild Horse Territory" with map depicting two separate territories).

One month later, in January 2013, the Forest Service published a report evaluating the monitoring data collected to establish a new AML range for the Devil's Garden WHT.  AR00542–621 (the "AML Evaluation").  This document also stated that the inclusion of the disputed territory in the Devil's Garden WHT was the "result of an administrative error," and it noted that "the AML was established as 0 wild horses" for the disputed territory.  AR00547.  The AML Evaluation went on to recommend an AML of 206 to 402 horses for the two-unit WHT, with an AML range of 105 to 183 horses on the Western portion and 101 to 219 horses on the Eastern portion.  AR00552.

In April 2013, the Forest Service released the draft EA for the proposed changes to the management of the Devil's Garden WHT.  AR03453–658 (the "Draft EA").  The Draft EA stated that the Devil's Garden WHT "comprises approximately 232,520 acres of federal land," AR03459, and like the Proposed Action, it recognized that the boundary of the Devil's Garden WHT appeared to have been adjusted "for administrative convenience" during the 1980s as a result of "an

8

administrative error."  AR03462; AR03465.  It proposed "to return to the management of wild

horses within the WHT boundary established in 1971."  AR03465.

After a notice and comment period, in which plaintiffs participated, *see* AR03333–54, the

Forest Service published its final EA in August 2013.  AR00146–386 (the "Final EA").  The Final

EA once again stated that the inclusion of the disputed territory in the Devil's Garden WHT had

been "[a]n administrative error," and it described the total acreage of the Devil's Garden WHT as

232,520 acres of federal land, and not the larger 258,000 acres that would include the disputed

territory.  AR00154–59.  It proposed establishing an AML of 206 to 402 wild horses for the Devil's

Garden WHT, and "return[ing] to the management of wild horses within the WHT boundary

established in 1971."  AR00153; AR00159.  The Final EA also responded to plaintiffs' comments

opposing the boundary correction, explaining that "the 1991 Forest Plan erroneously included" the

disputed territory as within the boundaries of the Devil's Garden WHT.  AR00373–74.

Incorporating the Final EA by reference, the Forest Service published its Decision Notice

and FONSI in August 2013, AR00100–13 ("Decision Notice & FONSI"), in which it found that

the boundary correction and the AML adjustment would "not have a significant effect on the

quality of the human environment."  AR00106.  It formally adopted the proposed action set forth

in the Final EA, AR00100, which delineated the boundary of the Devil's Garden WHT to be

consistent with its original form, with two non-contiguous territories totaling approximately

232,520 acres, and which revised the AML range to 206 to 402 horses.  *See* AR00153; AR00159.

Along with the Decision Notice and FONSI, the Forest Service issued a new management plan,

which incorporated the new AML range and adopted the territorial boundary as it was established

in the 1975 Management Plan.  AR00114–45 (the "2013 Management Plan").

### III.    Procedural History

During the administrative process, plaintiffs the American Wild Horse Preservation Campaign ("AWHPC") and Bowers provided comments on both scoping notices and the Draft EA. *See* AR00315; AR00318–19; AR00353–54.  In October 2013, after the release of the Decision Notice and FONSI, the Final EA, and the 2013 Management Plan, plaintiffs AWHPC and Bowers filed a timely administrative appeal.  AR00068–94.  In January 2014, the Appeal Deciding Officer affirmed the Forest Service's actions.   AR00001–03.   This decision constituted the final administrative determination in this matter.  AR00003.

Plaintiffs initiated this action on March 24, 2014.  Compl.  They bring six claims against defendants, all under the APA.   In Counts I, II, and III, plaintiffs allege that the boundary clarification was arbitrary and capricious because it violated the Wild Horses Act, the NFMA, and NEPA, and in Counts IV, V, and VI, they claim that the adjustment to the AML range was arbitrary and capricious because it was contrary to the same three statutes. *Id.* ¶¶ 58–91.

Plaintiffs filed the instant motion for summary judgment on November 17, 2014.  Pls.' Mot. for Summ. J. [Dkt. # 20] ("Pls.' Mot."); Mem. in Supp. of Pls.' Mot. [Dkt. # 20] ("Pls.' Mem.").  Defendants filed a cross-motion for summary judgment on January 12, 2015.  Defs.' Mot. for Summ. J. [Dkt. # 22] ("Defs.' Mot."); Mem. in Supp. of Defs.' Mot. [Dkt. # 22] ("Defs.' Mem.").  The same day, the intervenor-defendants – private landowners with land near the Devil's Garden WHT and users of public land resources within the Modoc National Forest – filed their cross-motion for summary judgment.   Intervenor-Defs.' Mot. for Summ. J. ("Intervenor-Defs.' Mot.") [Dkt. # 24]; Mem. in Supp. of Intervenor-Defs.' Mot. & in Opp. to Pls.' Mot. ("Intervenor-Defs.' Mem.") [Dkt. # 24-1].  All motions have been fully briefed.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or "without observance of procedure required by law." 5 U.S.C. § 706(2). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The review is "[h]ighly deferential" and it "presumes the validity of agency action." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000). A court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Thus, the action will be upheld if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). Agency action will be overturned only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43.

In reaching its decision, the agency may rely on comments submitted during the notice and comment period as justification for the action, so long as they are examined critically.  *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984).  It "need not – indeed cannot – base its every action upon empirical data; depending upon the nature of the problem, an agency may be 'entitled to conduct . . . a general analysis based on informed conjecture.'"  *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005), quoting *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998).

## ANALYSIS

I.    **The Forest Service's decision to correct the boundaries of the Devil's Garden WHT was not arbitrary and capricious or in violation of the Wild Horses Act, the NFMA, or NEPA.**

In Count I, plaintiffs contend that when the Forest Service corrected the boundaries of the Devil's Garden WHT in the 2013 Management Plan, it disregarded the requirement in the Wild Horses Act that it protect and manage wild horses within the disputed territory.  Compl. ¶¶ 58–63.  In Count II, plaintiffs claim that the Forest Service violated the National Forest Management Act because it ignored a mandate in the 1991 Forest Plan that the Devil's Garden WHT consist of one single, contiguous wild horse territory.  *Id.* ¶¶ 64–68.  And in Count III, plaintiffs allege that the Forest Service failed to analyze the environmental impact of eliminating the disputed territory in developing the 2013 EA and the FONSI, in violation of the National Environmental Policy Act.  *Id.* ¶¶ 69–74.  They argue that the Forest Service's failure to comply with these statutes renders the 2013 decision to clarify the boundaries of the Devil's Garden WHT invalid under the APA.

But all of these counts presuppose that the disputed territory was in fact incorporated into the Devil's Garden WHT at some point during the 1980s, or in the 1991 Forest Plan.  This premise fails for two reasons, and in sections I.A.1 and I.A.2 below, the Court will take up this defect that

is fatal to each of plaintiffs' three claims, before addressing the specific statutory claims individually in sections I.B, I.C, and I.D.

First, as will be set out in more detail in section I.A.1, plaintiffs can point to nothing in the Administrative Record showing that an actual incorporation ever took place.  No formal process was invoked, and there is no record of any official decision.  To the extent that the 1980 Map or the 1991 Forest Plan did refer to a single, contiguous WHT that incorporated the disputed territory, there is nothing in the record that casts doubt on defendants' explanation that this was the result of an "administrative error" and that it did not affect the actual management of the Devil's Garden WHT.

Second, as discussed in section I.A.2, it would not have been legally proper or possible to subsume the disputed central parcel into the Devil's Garden WHT and create a unified whole, because a significant portion of the disputed territory was, and remains, privately owned, and the Forest Service determined that it was not the territorial habitat of wild horses at the time the Wild Horses Act was passed.  So the land could not lawfully have been deemed to be a part of the wild horse territory under the applicable statutes.

For these reasons, the Court finds that it was not arbitrary and capricious for the Forest Service to address the administrative error in the 2013 EA and Management Plan, and it finds that the boundary correction was not contrary to any of the three statutes or the APA.  In other words, in the absence of any indication that the creation of a map that failed to exclude the parcel in the 1980s, or the use of those boundaries in a forest plan in the 1990s, was the product of a deliberate decision to expand and unify the territory, it was reasonable for the agency entrusted with these matters to conclude that a mistake had been made that needed to be rectified.  Therefore, defendant's cross-motion for summary judgment on Counts I, II, and III will be granted.

**A.**   **The Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT and that any reference to a single, contiguous territory was the result of an administrative error.**

Plaintiffs concede that the disputed territory was not part of the Devil's Garden WHT when it was first created in 1975.  Compl. ¶ 39; Pls.' Mem. at 5; *see also* AR00157.  However, they claim that "[t]he Forest Service acted quickly to incorporate the [disputed territory] into the WHT," and that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT to include the newly acquired public lands as well as existing public lands in one contiguous WHT."  Pls.' Mem. at 5–6.

Plaintiffs acknowledge, as they must, that they cannot identify any document in the Administrative Record that memorializes such an action or shows exactly when or how the alleged incorporation took place.  *See id.* at 6 n.2 ("While the exact date of the change is not known, it appears to have occurred sometime in the early 1980s.").  They rely on a 1980 map and the 1991 Forest Plan to support their claim that the disputed territory was incorporated into the Devil's Garden WHT "at some point in the early 1980s." *Id.* at 5–6, 9–10.  But the Court is not authorized to undertake its own investigation into whether the disputed territory was in fact made part of the Devil's Garden WHT at any point during the relevant time period.  Instead, the Court is limited to reviewing the Forest Service's conclusion that the references to a single, contiguous wild horse territory were the result of "[a]n administrative error," *see* AR00159, and determining whether that 2013 conclusion was consistent with the evidence before the agency at the time the decision was made.  The Court finds that it was.

       1.      **The Forest Service's conclusion that the references to a single, contiguous territory were the result of an administrative error is not counter to the record evidence.**

The Court begins with the 1980 map, which was included as part of the 2013 EA and does not appear separately in the record.  *See* AR00158 (the "1980 Map").  Although the 1980 Map itself is not dated, it is captioned within the 2013 EA as "Figure 2:  1980 Wild Horse Territory." *Id.*  Plaintiffs contend that it shows that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT to include the newly acquired public lands as well as existing public lands in one contiguous WHT."  Pls.' Mem. at 5–6.

The Forest Service disputes this.  The 2013 EA stated that at some point in the mid-1980s, the Forest Service "appears to have adjusted the WHT boundary for administrative convenience," referring to the 1980 Map.  AR00156.  It added, though, that "[a]n administrative error was made in expanding the WHT beyond the herd's known territorial limits," and it noted that the "[i]nclusion of the Triangle Ranch lands . . . was clearly in error."  AR00159.  Defendants now further explain that the 1980 Map was created "[t]o keep track of wild horses roaming outside of the territory in the 1980s."  Defs.' Mem. at 11.  They state that the 1980 Map was designed to enable the Forest Service "to administratively manage horses that had exceeded the actual Territory boundaries," Reply in Supp. of Defs.' Mot. [Dkt. # 27] ("Defs.' Reply") at 4, and so, it "depicted the general location of these horses" across "a continuous area," "includ[ing] non-territory lands and significant private lands . . . where horses had been observed in the 1980s." Defs.' Mem. at 11–12.  Thus, defendants contend, "the inclusion of [the disputed territory] in the 1980s map was for administrative convenience and did not formally change the territory boundary established in 1975."  Defs.' Reply at 11; *see also* Defs.' Mem. at 12 ("This map was not approved in any wild horse territory plan.").

The Court finds the Forest Service's explanation of the origin of the 1980 Map and its statement that the disputed territory was included in the map for "administrative convenience" to be reasonable and consistent with record evidence.  At a minimum, the 1980 Map certainly does not show, as plaintiffs claim, that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT" to include the disputed territory.  *See* Pls.' Mem. at 5.  And there are no other records that reflect any "formal" process at all.  Indeed, the Forest Service could not have amended an existing management plan solely by creating a map changing the borders of the Devil's Garden WHT – the Wild Horses Act and the NFMA require the creation of a management plan or a forest plan to direct the management of a wild horse or forest territory.[5]  *See* 16 U.S.C. § 1604(a); 36 C.F.R. § 222.61(a)(4).  And plaintiffs cannot point to any formal plan implementing a territorial change.

In addition, the 1980 Map is inconsistent not only with the ownership of the land, which will be discussed in section I.A.2 below, but also with the management plans that were in existence around the time it was created.  While the 1980 Map depicts one contiguous horse range which includes the disputed territory, both the 1980 Management Plan and the 1982 Management Plan unequivocally refer to the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  *Compare* AR00158 (the 1980 Map) *with* AR02953 (the 1980 Management Plan) *and* AR02843 (the 1982 Management Plan).  The Administrative Record also contains a map prepared in connection with an April 1990 wild horse

---

5      Plaintiffs' position is somewhat inconsistent on this point.  They complain that defendants improperly altered the boundaries of the Devil's Garden WHT through the 2013 EA "without going through the formal Forest Plan amendment or revision process."  Compl. ¶ 65.  But they appear to be asking the Court to assume that the Forest Service simply increased the size of the Devil's Garden WHT either through the creation of the 1980 Map along those boundaries or by incorporating that map by reference in the 1991 Forest Plan, without undertaking any "formal Forest Plan amendment or revision process."  *Id.*

inventory that depicts the WHT in a two-part configuration, with the disputed territory excluded. AR03934–35.  In other words, well after the time that plaintiffs contend that the 1980 Map shows that the Forest Service officially expanded the Devil's Garden WHT, the Forest Service continued to treat the territory as consisting of two separate and non-contiguous ranges which did not include the disputed territory.  Thus, the Court finds that it was not arbitrary and capricious for the Forest Service to determine that the 1980 Map was created for "administrative convenience" and that it does not reflect a formal adjustment of the boundaries of the WHT.[6]

Plaintiffs also rely on the 1991 Forest Plan in support of their claim that the disputed territory was incorporated into the Devil's Garden WHT in the 1980s.  Pls.' Mem. at 9–10, 36–38.  While the 1991 Forest Plan does refer to the WHT as a contiguous whole, the Forest Service explained in the 2013 EA that "[a]n administrative error was made in expanding the WHT beyond the herd's known territorial limits," and it added that the "[i]nclusion of the Triangle Ranch lands (which were not acquired by the Forest Service until 1976, nearly five years after the 1971 [Wild Horses Act] passed)," and the inclusion of the Avanzino Ranch lands, of which 41 percent remained privately owned, "was clearly in error."  AR00156; AR00159.  It further emphasized that "an AML was not established for the added lands and few, if any, wild horses were found there."  AR00156; AR00159.  Defendants now reiterate that the 1991 Forest Plan's reference to a

---

[6]    The Court notes that this is not a situation in which the agency's counsel advanced a litigating position that is contrary to, or inconsistent with, the position put forth by the agency during the administrative process.  *Cf. State Farm*, 463 U.S. at 50 (stating that "the courts may not accept . . . counsel's *post hoc* rationalizations for agency action" where "the agency submitted no reasons at all" during the administrative process for rejecting an alternative approach), citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  Here, the Court finds that the explanation proffered by defendants regarding the "administrative error" is consistent with the rationale offered by the agency in the 2013 EA and with the evidence in the record.

single, contiguous wild horse territory was "clearly an error as the Forest Service never designated or managed this non-territory for wild horses." Defs.' Mem. at 1–2.

The Court finds the Forest Service's explanation of the administrative error and its conclusion that the 1991 Forest Plan does not demonstrate that the disputed territory was ever formally incorporated into the Devil's Garden WHT to be reasonable and consistent with the record evidence. The 1991 Forest Plan referred twice to a single, contiguous, 258,000-acre wild horse territory. *See* 1991 Forest Plan at 3-17 ("[T]he Forest is legally obligated to manage horses within a 258,000-acre wild horse territory."); *id.* at 3-18 ("[T]he Forest has one wild horse territory of about 258,000 acres."). But it does not contain any map of the Devil's Garden WHT, let alone a map depicting one contiguous territory, that could provide a source for that acreage figure.

And more importantly, the plan is internally inconsistent in referring to the boundaries and acreage of the Devil's Garden WHT. For example, the 1991 Forest Plan stated that it "will supersede most previous Forest resource management plans." *Id.* at 1-1. But it then noted that "[a]ll existing resource management plans were re-examined by the Forest's interdisciplinary planning team," and it stated that the planning team found the "Wild Horse Management Plan" to be "consistent with, and still appropriate for, the Forest Plan." *Id.* Thus, the 1991 Forest Plan stated that it "incorporated by reference" the existing wild horse management plan. *Id.* And that

plan – the 1982 Management Plan[7] – referred unambiguously to a territory "broken into two large

units which encompasses a gross acreage estimated at 236,000 acres."

In other words, the 1991 Forest Plan referred to a contiguous 258,000 acre horse territory

while simultaneously incorporating a management plan that provided for a non-contiguous, two-

---

7      As noted above, *see supra* note 4, the 1991 Forest Plan referred elsewhere to a 1985 management plan that is not contained in the Administrative Record. *See* 1991 Forest Plan at 3-18 to 3-19 ("[T]he Forest prepared the Wild Horse Management Plan in 1985 . . . ."). *But see* AR00159 (2013 EA listing previous management plans as those "developed . . . in 1975, 1980, and 1982"). Defendants assert that this reference was a typographical error, and that the 1991 Forest Plan must have been referring instead to the 1982 Management Plan, the plan in place at that time. Defs.' Mem. at 12 & n.7; Defs.' Reply at 5; *see also* Intervenor-Defs.' Reply in Opp. to Pls.' Mot. [Dkt. # 28] at 12. Plaintiffs, for the first time in their reply, assert that the 1991 Forest Plan's reference to a 1985 management plan was not a typographical error, and that it is instead evidence that there is an additional Devil's Garden WHT management plan missing from the record that would support plaintiffs' position regarding the incorporation of the disputed territory. *See* Reply in Supp. of Pls.' Mot. [Dkt. # 25] ("Pls.' Reply") at 17. Plaintiffs did not raise the issue of a missing management plan during the administrative process, *see, e.g.*, AR00068–94; *see also* Defs.' Reply at 6, and they have thus waived this argument. *See, e.g.*, *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004) (finding that respondents "forfeited any objection" to an EA that they failed to raise in their comments to the rulemaking).

And in any event, judicial review of an agency action under the APA is limited to the administrative record that was before the agency at the time it made its decision. *See* 5 U.S.C. § 706; *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("In applying [the abuse of discretion] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). That record must include "all documents and materials that the agency directly or indirectly considered" and "neither more nor less." *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (citations and internal quotation marks omitted). "[A]n agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006); *see also LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003). "[T]o rebut the presumption of regularity," a party must "introduce non-speculative, concrete evidence to support their belief that the specific documents allegedly missing from the administrative record were directly or indirectly considered by the actual decision makers involved in the challenged agency action." *Dist. Hosp. Partners, LP v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015). Other than the singular reference to a 1985 management plan in the 1991 Forest Plan, plaintiffs have provided no such evidence here. So the Court will afford defendants the presumption of regularity to which they are entitled and treat the 1982 Management Plan as the operative management plan in place at the time of the 1991 Forest Plan.

part horse territory of 236,000 acres as "consistent with, and still appropriate for, the Forest Plan."

1991 Forest Plan at 1-1.  This internal inconsistency undermines plaintiffs' insistence that the 1991

Forest Plan recognized that the disputed territory was added to the Devil's Garden WHT "[a]t

some point in the early 1980s," Pls.' Mem. at 5, and it belies the notion that the 1991 Forest Plan

was the document through which a formal incorporation was effectuated.

There is additional evidence in the record supporting the Forest Service's conclusion that

the reference in the 1991 Forest Plan was an administrative error, and that evidence contradicts

plaintiffs' assertion that "the Forest Service managed the WHT as a single, contiguous 258,000-

acre protected area from roughly 1980 to 2013."  *See* Pls.' Mem. at 1.  The record reflects that "an

AML was not established" for the disputed territory in the 1991 Forest Plan.  AR00156; *see also*

AR00547 (2013 AML Evaluation noting that "[a]lthough the Triangle and Avanzino Ranch lands

were included in the WHT boundary in the Forest Plan as a result of an administrative error, the

AML was established as 0 wild horses for the two areas").  That means that no wild horses were

intended to reside there, even at the time plaintiffs contend that it was part of the WHT.  And the

management level for the disputed territory remained at zero throughout the relevant period.  For

example, two wild horse inventories from 2002 and 2010 demonstrate that the designated

management herd minimum size for the Avanzino grazing allotment – which falls completely and

exclusively within the disputed territory, *see* AR03927 – was set at zero.  AR04323; AR04325.

Consistent with its conclusion that the disputed territory was never properly incorporated

into the Devil's Garden WHT, the Forest Service removed horses from the disputed territory

throughout the relevant period.  *See* AR00255 (table showing number of animals gathered between

2003 and 2013 from grazing allotments that overlap with the disputed territory, including

Timbered Mountain, Big Sage, Carr, Triangle, and Boles); AR03933 (1990 recommendation that

wild horses be captured and removed from Boles Meadow).  In other words, well after plaintiffs contend that the disputed territory was incorporated into the Devil's Garden WHT, and despite the reference in the 1991 Forest Plan to a single, contiguous wild horse territory, the Forest Service was removing horses from the disputed territory and treating it as distinct from the Devil's Garden WHT.  Thus, the Court finds that the Forest Service's conclusion that any references to a single WHT were the result of administrative error was reasonable and consistent with the evidence before the agency.

> **2.  The disputed territory could not have been properly incorporated into the Devil's Garden WHT.**

As further support for their position, defendants argue that the disputed territory could not have been properly incorporated into the Devil's Garden WHT in any event.  *See* Defs.' Mem. at 2, 19–22; *see also* Intervenor-Defs.' Mem. at 8–11, 13–14.  The Court agrees.

The implementing regulations for the Wild Horses Act define "[w]ild horse and burro territory" as "lands of the National Forest System which are identified . . . as lands which were territorial habitat of wild free-roaming horses and/or burros *at the time of the passage of the Act*." 36 C.F.R. § 222.60(b)(15) (emphasis added).  The Forest Service has interpreted this to mean that only public lands that were home to wild horses at the time of the passage of the Act in December 1971 could qualify for inclusion in a wild horse territory.  *See* AR00159 (concluding that under the Wild Horses Act, the Forest Service's authority to direct "the management of wild horses and burros is limited to the areas where wild horses and burros were found in 1971"), citing 36 C.F.R. § 222.60(b)(13); *see also* 36 C.F.R. § 222.60(b)(14) ("Wild-horse and burro range means an area of National Forest System specifically so designated . . . for the purpose of sustaining an existing herd or herds of wild free-roaming horses and burros, provided the range does not exceed known territorial limits . . . .").

21

At the time of the passage of the Wild Horses Act, significant portions of the disputed territory were privately held and would not have qualified for inclusion in the WHT.  For example, the Triangle Ranch lands were privately owned until 1976, when the Forest Service acquired them in a land exchange, AR03965, and as plaintiffs acknowledge, approximately 41 percent of the Avanzino Ranch lands were privately held in 1971 and remain privately held to this day.  Pls.' Mem. at 7, citing AR00156.  Thus, these lands are disqualified from inclusion in the Devil's Garden WHT as a matter of law, since the Forest Service can only designate public lands – "lands of the National Forest System" – as wild horse and burro territory.  *See* 36 C.F.R. § 222.60(b)(15).

Furthermore, the disputed territory does not consist of "lands which were the territorial habitat of wild free-roaming horses and/or burros at the time of the passage of the Act."  *Id.*  The 1975 Management Plan did not include the disputed territory as part of the Devil's Garden WHT, and neither did the 1980 or 1982 Management Plans.  *See* AR02965–97; AR02949–64; AR02839–51.  And the 2013 EA notes that the 1975 Management Plan recognized that "the Avanzino and Triangle Ranch lands were specifically excluded" from the Devil's Garden WHT because "[l]ittle or no use by wild horses of these areas occurred during this time due to the number of fences and the ongoing livestock operations on this privately owned land."  AR00373; *see also* AR03995 (map showing boundary fences in the disputed territory in 1979).  In other words, at the time the Devil's Garden WHT was established, the Forest Service concluded that the disputed territory did not qualify as the territorial habitat of wild free-roaming horses.

Plaintiffs contend the disputed territory "is, and always has been, prime wild horse habitat." Pls.' Mem. at 27.  In support, they rely on the testimony of Marla Bennett, an employee of the U.S. Fish and Wildlife Service with experience studying and gathering wild horses on the Sheldon

National Wildlife Refuge in Nevada.[8]  *Id.* at 10–11, citing AR04131–38; *see also* Reply in Supp. of Pls.' Mot. [Dkt. # 25] ("Pls.' Reply") at 18–20.  Bennett concluded that wild horses likely would have used the disputed territory for grazing and migratory behaviors at the time the Wild Horses Act was passed.  AR04136–37.  But unlike the Forest Service employees who drafted and implemented the original 1975 Management Plan near the time of the passage of the Wild Horses Act, Bennett based her conclusion on visits to the disputed territory decades after the Act was passed and her observation of two recent wild horse gathers on the Devil's Garden WHT.  *See* AR04131–32.  The Court finds that this testimony is of little use in answering the question of whether the disputed territory was the "territorial habitat of wild free-roaming horses and/or burros *at the time of the passage of the Act*."  36 C.F.R. § 222.60(b)(15) (emphasis added).  In any event, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), and the Forest Service's determination in 1975 that the disputed territory was not a territorial habitat of wild horses is entitled to deference.

Based on all of these facts and circumstances, the Court finds that the Forest Service has articulated a rational connection between its finding that the references in the 1980 Map and the 1991 Forest Plan to a single, contiguous 258,000-acre territory were the result of administrative error, and its choice in the 2013 EA and the 2013 Management Plan to specify that the correct boundaries of the Devil's Garden WHT are those first established for the territory in 1975.  As discussed below, this finding is fatal to plaintiffs' first three challenges under the APA.

---

8      Bennett's declaration was submitted as part of plaintiffs' administrative appeal in 2013 and is part of the Administrative Record in this case.  *See* AR04131–38.

**B.    The Forest Service reasonably determined that it was under no obligation to manage wild horses outside the Devil's Garden WHT.**

In Count I, plaintiffs contend that the Forest Service violated the Wild Horses Act by failing to protect and manage wild horses as "integral components" of the disputed territory, by conducting management activities within the disputed territory above the "minimal feasible level," and by declining to continue the recognition of the disputed territory as a wild horse territory.  Pls.' Mem. at 25–29.

Since the Court finds that the Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT, it follows that the Forest Service was not required to manage wild horses on, or to treat them as integral components of, the disputed territory.  Further, the Forest Service was not obligated to conduct management activities within the disputed territory "at the minimal feasible level."  *See* 16 U.S.C. § 1333(a).  Plaintiffs contend that "the Forest Service seeks to permanently abandon its responsibility to manage the [disputed territory] as part of the WHT" and "permanently remove the protected status" from the disputed territory.  Pls.' Mem. at 28.  But if the disputed territory was never formally incorporated into the Devil's Garden WHT in the first place, the Forest Service was not required to manage the territory as such, and it did not have a duty to treat the disputed territory as a protected area.[9]  And

---

9       The case upon which plaintiffs rely in support of this claim is inapposite.  *See* Pls.' Mem. at 28, citing *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87 (D.D.C. 2009). In that case, the Bureau of Land Management ("BLM") sought to remove an entire herd of horses from the West Douglas Herd Area and put them into "private adoption or long-term care," without first finding that the herd represented "excess animals" subject to removal.  *Salazar*, 639 F. Supp. 2d at 95–96.  The court found that the BLM had exceeded its authority because "Congress did not authorize BLM to 'manage' the wild horses by corralling them for private maintenance or long-term care as *non*-wild free-roaming animals *off* of the public lands."  *Id.* at 96.  Here, as the Court has already determined, the Forest Service reasonably concluded that the disputed territory was never part of the Devil's Garden WHT, and so it cannot be said to be removing wild horses from an existing wild horse habitat, as the BLM sought to do in *Salazar*.

finally, the Forest Service was not obligated to continue recognition of the disputed territory as a wild horse habitat, since the Forest Service never formally established it as a wild horse territory and it never determined that wild horses were "part of the natural system" in that area.  *See* 36 C.F.R. § 222.61(a)(3) (requiring the Forest Service to "[e]stablish wild horse and burro territories in accordance with the Act and continue recognition of such territories where it is determined that horses and/or burros will be recognized as part of the natural system").

For those reasons, the Court finds that the Forest Service did not violate the Wild Horses Act when it corrected the boundaries of the Devil's Garden WHT in the 2013 EA and the 2013 Management Plan, and defendants are therefore entitled to summary judgment on Count I.

> ### C.     The Forest Service reasonably determined the boundary adjustment was not a "significant" amendment under the NFMA.

The National Forest Management Act states that "instruments for the use and occupancy of National Forest System lands shall be consistent with" forest plans developed for the same area. 16 U.S.C. § 1604(i).  Plaintiffs contend that the 2013 EA and the 2013 Management Plan are inconsistent with the 1991 Forest Plan because they ignore its mandate that the Devil's Garden WHT be managed as a single, contiguous 258,000-acre horse territory.  Pls.' Mem. at 36–38. Further, because plaintiffs claim that the purported elimination of the disputed territory from the Devil's Garden WHT was a "significant" change in the management of the territory, they allege that the Forest Service was required to go through the formal NFMA process to amend the 1991 Forest Plan, which it failed to do.  *Id.*

Under the NFMA, the Forest Service is permitted to make non-significant amendments to the Forest Plan "in any manner whatsoever after final adoption after public notice," while significant amendments require a lengthier and more involved public approval process.  16 U.S.C. § 1604(f)(4).  An agency may rely on its own regulations for guidance in determining whether an

action is significant. *See, e.g.*, *Hammond v. Norton*, 370 F. Supp. 2d 226, 262–63 (D.D.C. 2005).

The Forest Service Manual states that an amendment to a forest plan is significant if it would

"significantly alter the long-term relationship between levels of multiple-use goods," or "have an

important effect on the entire [forest] plan." AR00162. As for a boundary adjustment, an

amendment is not significant if it does not cause "significant changes in the multiple-use goals and

objectives for long-term land and resource management." *Id*.

In the 2013 EA, the Forest Service examined whether the proposed boundary correction

would constitute a significant amendment, and it reached the following conclusion:

> The proposed amendment which would manage wild horses within the
> territorial limits established in the 1975 Wild Horse Management Plan
> would not alter the multiple-use goals and objectives of the Forest Plan.
> Appropriate management of wild horses to meet the goals and objectives
> identified in the Forest Plan would occur. The proposed change would bring
> the Forest Plan into alignment with the 1971 [Wild Horses Act] and would
> not be NFMA significant.

*Id.*

The Court finds that this conclusion was reasonable. It has already determined that the

Forest Service was managing the Devil's Garden WHT consistently with the 1982 Management

Plan, which provided for a territory "broken into two large units which encompasses a gross

acreage estimated at 236,000 acres," AR02843, that it had established an AML of zero for the

disputed territory, AR00547, and that it was removing wild horses from the disputed territory

during the relevant time period, even after the adoption of the 1991 Forest Plan. *See* AR00255

(table showing number of horses gathered between 2003 and 2013 from grazing allotments that

overlap with the disputed territory, including Timbered Mountain, Big Sage, Carr, Triangle, and

Boles). Thus, the Court finds that it was reasonable for the Forest Service to determine that

correcting the boundary description would not result in a significant change in the goals for and

use of the Devil's Garden WHT, and that it was not required to amend the Forest Plan or go through the more rigorous public-approval process.  Accordingly, the Court finds that the Forest Service complied with the NFMA, and defendants are entitled to summary judgment on Count II.

> **D.   The Forest Service complied with NEPA, and its decision-making process was not tainted by the involvement of the Farm Bureau.**

The National Environmental Policy Act "requires that all 'proposals for major federal action significantly affecting the quality of the environment must be accompanied by a detailed discussion of the reasonably foreseeable effects on the environment of reasonable alternative courses of action.'"  *Hammond*, 370 F. Supp. 2d at 239, quoting *Taxpayers Watchdog v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987).  "This requirement is 'essentially procedural'; as long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference." *Id.* at 239–40, quoting *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988).

Plaintiffs challenge the boundary correction under NEPA on two separate grounds.  First, they allege that the 2013 EA does not adequately analyze the environmental impact of eliminating the disputed territory from the Devil's Garden WHT, and thus, the Forest Service's decision to issue a FONSI instead of an EIS was improper.  Pls.' Mem. at 29–33.  And second, they contend that the involvement of the Farm Bureau in the NEPA process tainted the outcome.  *Id.* 31–34; Pls.' Reply at 26–29.  The Court finds that neither argument is persuasive.

> **1.   The Forest Service reasonably determined that the boundary correction would not significantly affect the quality of the human environment under NEPA.**

Plaintiffs argue that the 2013 EA "contains no *analysis* as to the basis for eliminating" the disputed territory and "does not even purport to assess the environmental impacts" caused by that removal.  Pls.' Mem. at 30.  Thus, they contend that the Forest Service's issuance of a FONSI, instead of an EIS, was improper.  *Id.* at 33–35.

The D.C Circuit has identified the following criteria for a court reviewing an agency's decision to forego the preparation of an EIS:

> First, the agency must have accurately identified the relevant environmental concern.  Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA.  Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.

*Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985).  The Court finds that the Forest Service complied with these requirements and with NEPA, and that its decision to issue a FONSI instead of an EIS with regard to the 2013 boundary correction was reasonable.

First, the Forest Service examined the relevant environmental concern with respect to the border adjustment – the potential impact on wild horses living in the Devil's Garden WHT – and second, it took the necessary "hard look" at the issue while preparing the EA.  *See* AR00252–83 (examining "affected environment" and "environmental impacts" of the various alternatives proposed in the 2013 EA on the wild horse population); *see also* AR00171 (explaining that the amendment "[e]stablish[es] a boundary for the WHT based on the long-term needs of the Devil[']s Garden wild horse herd and within the herd's known territorial limits").  In light of its finding that the boundary adjustment simply corrected an administrative error and resulted in the continued management of the disputed territory as distinct from the Devil's Garden WHT, the Court finds that the Forest Service made a convincing case for its determination that "this amendment has no effect on wild horses or their habitat."  AR00271.

"[F]ederal agencies have discretion to decide whether a proposed action is significant enough to warrant preparation of an EIS . . . ."  *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341–42 (D.C. Cir. 2002) (internal quotation marks omitted).  Here, the Forest Service reasonably determined that correcting the references to the boundaries of the Devil's Garden WHT would not

have any significant environmental impact, because the management of the Devil's Garden WHT would remain the same and because no territory was actually being removed from the wild horse range.  Plaintiffs' disagreement with the Forest Service's decision is not sufficient grounds for this Court to find that its action was arbitrary and capricious or in violation of NEPA.  *See, e.g.*, *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987) ("[T]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."), quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983).

### 2.      Plaintiffs fail to show that the NEPA analysis was predetermined or tainted by a conflict of interest due to the Farm Bureau's involvement.

Plaintiffs also allege that the results of the NEPA analysis and the decision to eliminate the disputed territory from the Devil's Garden WHT were predetermined and tainted by the Farm Bureau's involvement, and that the Forest Service's decision should therefore be vacated.  Pls.' Mem. at 31–34; *see also id.* at 12–13.  They contend that "[o]nce the Farm Bureau signed on . . . the Forest Service immediately reversed itself" on whether the disputed territory was part of the Devil's Garden WHT, and that it contracted "with the Farm Bureau to prepare a FONSI before the NEPA process had even started."  Pls.' Reply at 27.

The standard for proving that a NEPA outcome was predetermined is high: "predetermination occurs only when an agency *irreversibly* and *irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome."  *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 70 (D.D.C. 2012), quoting *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011) ("[A]n individual should be disqualified from rulemaking only when there has been a clear and convincing showing that the . . . member has an unalterably closed mind on matters critical to the disposition of the

proceeding."), quoting *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1564 (D.C. Cir. 1991).  "An

agency can have a preferred alternative in mind when it conducts a NEPA analysis."  *Forest*

*Guardians*, 611 F.3d at 712, citing 40 C.F.R. § 1502.14(e); *see also Comm. of 100 on Fed. City v.*

*Foxx*, No. 1:14-CV-01903 (CRC), 2015 WL 1567902, at *9 (D.D.C. Apr. 7, 2015) ("Bias towards

a preferred outcome does not violate NEPA so long as it does not prevent full and frank

consideration of environmental concerns."), citing *NRDC v. Nuclear Regulatory Comm'n*, 547

F.2d 633, 659 n.5 (D.C. Cir. 1976) (Tamm, J., concurring).  "The test of compliance . . . then, is

one of good faith objectivity rather than subjective impartiality."  *Forest Guardians*, 611 F.3d at

712, quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 470 F.2d 289, 296 (8th Cir.

1972).

Plaintiffs contend that the Forest Service's contract with the Farm Bureau shows that the

Forest Service agreed that it would prepare a FONSI, instead of an EIS, before the NEPA process

had even started, meaning that the Forest Service preemptively determined that there would be no

significant environmental impact from the boundary correction before engaging in the required

analysis.  Pls.' Reply at 27, citing AR04714.  The contract, signed in August of 2012, does state

that the Forest Service shall "Prepare Decision Notice and Finding of No Significant Impact –

summer 2013."  AR04714.  However, it also shows that the Forest Service was obligated to review

the Farm Bureau's specialists' reports, review the draft EA and post the final EA, and employ its

own decision maker prior to preparing the decision notice and FONSI.  *Id.*  Each of these steps in

the process would have provided the Forest Service with an independent opportunity to reevaluate

whether a FONSI was proper or whether an EIS was required instead.  *Cf. Davis v. Mineta*, 302

F.3d 1104, 1113 (10th Cir. 2002) (finding that agency "failed to conduct a sufficient independent

review of [the contractor's] work to insulate itself from the biases toward a FONSI reflected in

[the contractor's] draft EA").  Thus, without more, the Court does not find that this one line in the contract shows that the Forest Service "irreversibly and irretrievably" committed itself to issuing a FONSI instead of an EIS prior to completing the required NEPA analysis.

In addition to their predetermination claim, plaintiffs allege that the involvement of the Farm Bureau represented a conflict of interest that so compromised the NEPA process that the 2013 EA and FONSI should be invalidated.  Pls.' Mem. at 32; Pls.' Reply at 27–29.  Specifically, plaintiffs complain that "[t]he Farm Bureau has an inexorable conflict of interest relating to the outcome of the boundary modification (and the AML reduction), due to the grazing permits held by its members, who freely admit having vested financial interests adverse to wild horses in the WHT."  Pls.' Mem. at 32.

In assessing whether a conflict of interest should invalidate the results of a NEPA analysis, the ultimate question is whether the "objectivity and integrity of the NEPA process" has been compromised.  *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998), quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C. Cir. 1991).  Agency oversight of the contractor's work and independent review procedures can mitigate the potential influence that may arise from a conflict of interest.  *See id.* (finding that "the degree of supervision exercised by [the agency] protected the integrity and objectivity" of the NEPA process where the agency "independently and extensively reviewed all of the Contractor's analyses, commented on the Contractor's field data and written product, noted deficiencies in the data and analysis, gave direction to the Contractor's work, and frequently required the Contractor to gather more facts or perform supplemental analysis on aspects of the project").

For many of the same reasons discussed above, the Court finds that the "objectivity and integrity of the NEPA process" was not tainted by the involvement of the Farm Bureau in the

preparation of the draft and final EA.  As the parties' contract indicates, while the Farm Bureau was responsible for collecting, evaluating, and summarizing data, preparing specialist reports, providing a draft EA, submitting the draft EA for public comment, and finalizing the EA, *see* AR04713, the Forest Service employed its own specialist to review the Farm Bureau's specialists' reports, reviewed and commented on the draft EA, employed its own decision maker, and imposed "quality control" for "NEPA compliance" throughout this process.  AR04714.  As in the *Aurora* case, the "degree of supervision exercised" by the Forest Service here indicates that any conflict of interest posed by the Farm Bureau was properly minimized.  *See* 153 F.3d at 1129.

Other than general speculation about the motives the Farm Bureau's members based on their alleged "vested financial interests adverse to wild horses," Pls.' Mem. at 32, plaintiffs do not offer any evidence to show that the Forest Service's review of the Farm Bureau's specialists' reports and draft EA was in any way tainted, or that there was an "agreement, enforceable promise or guarantee of future work" that would give rise to a conflict of interest.  *Aurora*, 153 F.3d at 1128.  They have not "pointed to any inaccuracies" in the draft or final EA, but have "merely speculated" that the Farm Bureau's involvement was improper "due to the interests of the proponents."  *See Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990).  "Such a speculation, without more, is insufficient to undermine the [Forest Service's] independent determination" that a FONSI was the appropriate approach under NEPA.  *See id.* at 1485–86 (rejecting challenge to agency's reliance on data provided by an engineering firm with a purported conflict of interest, where the plaintiff "merely speculated" that the data was unreliable "due to the interests of the proponents of the evidence").  Moreover, all of plaintiffs' claim about the Bureau's vested interest in eliminating the Forest Service's management of the wild horses in the disputed

territory have little force, given the record evidence that the agency was not managing the horses there in the first place – especially on the privately-owned portions.

Thus, the Court finds that plaintiffs have not shown that the outcome of the NEPA process was predetermined or that a conflict of interest tainted the result.  And because the Court has determined that the Forest Service otherwise complied with NEPA in developing its 2013 EA and FONSI, it also finds that defendants are entitled to summary judgment on Count III.

## II.    The Forest Service's decision to adjust the AML range for the Devil's Garden WHT was not arbitrary and capricious.

In Counts IV, V, and VI, plaintiffs object to the Forest Service's decision to broaden the appropriate management level range for the Devil's Garden WHT from 275 to 335 animals to a new AML range of 206 to 402 animals.  Compl. ¶¶ 75–91.  The 2013 EA provides for a range of 105 to 183 horses in the Western portion of the territory and a range of 101 to 219 horses in the Eastern portion.  AR00124.

Plaintiffs contend that the removal of the disputed territory renders the low-end of the new AML range invalid *per se* under the Wild Horses Act.  *See* Pls.' Mem. at 39–40.  Plaintiffs also assert that the Forest Service's decision to move forward with the 2013 Management Plan, without formally amending the 1991 Forest Plan, and their failure to take a "hard look" at issues of genetic viability and livestock grazing violate the NFMA and NEPA, respectively.  *See id.* at 40–45.  But because the Court finds that the Forest Service reasonably determined that the disputed territory was never formally incorporated into the WHT, it finds that defendants are entitled to summary judgment on Count IV.  And because the Court further concludes that the Forest Service adequately analyzed the environmental issues associated with the new AML range and determined that they were not significant, defendants are also entitled to summary judgment on Counts V and VI.

A.     **The Forest Service complied with the Wild Horses Act in adjusting the AML for the Devil's Garden WHT.**

Plaintiffs contend that "the adoption of an AML of zero for the [disputed territory] was legally impermissible" because the AML evaluation "present[ed] no genuine analysis" of the disputed territory. Pls.' Mem. at 39–40. But as with Counts I, II, and III, this claim is entirely contingent upon a finding that the Forest Service acted improperly by removing the disputed territory from the Devil's Garden WHT, as plaintiffs appear to recognize in their memorandum. *See id.* at 39 ("*If the Court finds that the Forest Service's elimination of the [disputed territory] was unlawful*, then the new reduced AML is also defective because it is based on only those portions of the WHT that lie *outside* of the [disputed territory].") (first emphasis added). Thus, because the Court has already found that the Forest Service reasonably determined that the disputed territory was never formally incorporated into the Devil's Garden WHT, it similarly finds that the agency had no duty to consider the disputed territory in conducting its AML analysis or to establish a non-zero AML for that territory, and thus, this aspect of Count IV must fail.

Although they do not expand upon this argument in their summary judgment pleadings, plaintiffs also allege in the complaint that the Forest Service failed "to account for – much less analyze – the forage requirements of private livestock when taking the drastic action to reduce the low AML," and that its AML adjustment "violates the WHA's requirement that designated wild horse territories be devoted 'principally' to the welfare of wild horses." Compl. ¶ 76, quoting 16 U.S.C. § 1332. First, the Wild Horses Act makes clear that a wild horse range must be "devoted principally *but not necessarily exclusively*" to the welfare of wild free-roaming horses and burros. 16 U.S.C. § 1332(c) (emphasis added). Thus, as the D.C. Circuit has stated, "public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses." *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1317 (D.C. Cir. 1982). So the fact that there are "private cattle

and sheep grazing in the Devil's Garden WHT consuming much more forage than the relatively small number of wild horses," Compl. ¶ 76, is not on its own incompatible with the Act.

And in any event, the Forest Service did not fail "to account for – much less analyze – the forage requirements of private livestock," as plaintiffs contend. *See id.* The Forest Service explicitly compared livestock use of the territory to wild horse use, AR00228, and it conducted a thorough analysis of the "environmental consequences" of "livestock grazing" in the 2013 EA. *See* AR00223–30; *see also infra* section II.C.2. Therefore, to the extent that plaintiffs object to the adjustment of the AML range with respect to the rest of the Devil's Garden WHT beyond the disputed territory, based on the agency's purported failure to consider the impact of livestock grazing, the Court finds that the AML adjustment was not arbitrary and capricious or in violation of the Wild Horses Act, and that defendants are entitled to summary judgment on Count IV.

**B.     The Forest Service reasonably concluded that the AML range adjustment did not constitute a "significant" amendment under the NFMA.**

Plaintiffs also contend that that the Forest Service violated the NFMA because it did not analyze whether adjusting the AML range was a "significant" change to the 1991 Forest Plan. Compl. ¶¶ 80–84; *see also* Pls.' Mem. at 44–45; Pls.' Reply at 42–43. They argue that "the Forest Service was required either to formally amend/revise the 1991 Forest Plan when significantly reducing the wild horse AML, or set forth specific evidence establishing that 'such amendment would [not] result in a significant change in such plan.'" Pls.' Mem. at 45 (alteration in original), quoting 16 U.S.C. § 1604(f)(4).

The Court's review of the Forest Service's decision is "[h]ighly deferential," *AT&T Corp.*, 220 F.3d at 616, and the Court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Under that standard, the Court finds that the Forest Service reasonably concluded that the AML adjustment was not a significant change to the 1991 Forest Plan, and that

it provided sufficient justification for its decision.  In making its significance determination, the

Forest Service stated:

> The proposed amendments to remove establishment of the AML for wild
> horses from the Forest Plan and instead delineate a process by which AML
> would be established and revised as necessary in the [territory management
> plan] would allow for a more efficient and adaptable process to meet the
> stated Forest Plan goals and objectives. . . . The proposed changes would
> make it easier to achieve Forest Plan objectives and multiple-use goals and
> would not be NFMA significant.

AR00161–62.

The 2013 EA set forth specific evidence, based on "a site-specific and in-depth evaluation

of the available population inventory, resource monitoring data, and other information," AR00370,

that the proposed AML adjustment would not significantly alter the goals and objectives for the

Devil's Garden WHT.  For example, the Forest Service concluded that the expanded AML range

would provide a greater benefit to the wild horse population over time, as compared to the previous

range:

> The AML lower limit is set to allow the wild horse population to grow at
> the average annual population growth rate to the upper limit over an
> extended period of time (four or more years) without the need for interim
> gathers to remove excess animals.  This should lead to fewer gathers to
> maintain wild horse population size over time.  Fewer animals also would
> need to be removed during each gather.  Less frequent gathers would result
> in less stress to individual animals and the herd and fewer potential impacts
> to the herd's social structure as compared to the existing situation.

AR00553.

Plaintiffs point to nothing that would contradict the Forest Service's finding that the

adjusted AML range would benefit the wild horse population and would not alter the goals and

objectives of the 1991 Forest Plan, other than their own speculation that the new ALM range would

lead to "two isolated, inbred populations with serious genetic issues."  Pls.' Reply at 42.  Their

assessment is contradicted by the Forest Service's prediction that the average population of wild

horses under the new AML range is actually expected to be higher than the population would have been under the prior AML range. *Compare* AR00272 (noting that, with an AML range of 275 to 335 horses, "it is expected that animal numbers would range between 280 and 409 animals (with a median of 343 head) over the next 20 years") *with* AR00276 (noting that, with an AML range of 206 to 402 horses, "it is expected that animal numbers would range between 263 and 500 animals (with a median of 368 head) over the next 20 years"). Considering that a court must "show considerable deference . . . where the agency's decision rests on an evaluation of complex scientific data within the agency's technical expertise," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997), and in light of the lack of any contrary evidence in the record, the Court defers to the agency's expertise.

Plaintiffs also argue that the Forest Service failed to consider the impact of grazing livestock on the Devil's Garden WHT in evaluating whether the AML range should be adjusted for the wild horses. Compl. ¶ 82; *see also* Pls.' Mem. at 45 (stating that the Forest Service refused to address whether "a significant reduction of the wild horse AML is legally or scientifically warranted where far more of the rangeland damage and resource consumption derives from private livestock using this federally protected wild horse territory"). But as discussed, the 2013 EA demonstrates that the Forest Service did conduct an analysis of the impact of grazing livestock in determining that the AML adjustment was justified. *See* AR00223–30; *see also infra* section II.C.2. Thus, the Court finds that the Forest Service reasonably concluded that the AML adjustment was not significant and that formal amendment of the 1991 Forest Plan was not required, and defendants are entitled to summary judgment on Count V.

**C.      The Forest Service complied with NEPA in determining that the AML range adjustment was warranted.**

Finally, plaintiffs contend that the Forest Service violated NEPA because it failed to consider the impact of the AML adjustment on the genetic diversity of the Devil's Garden WHT horse population and failed to analyze the effects caused by livestock on the territory in setting the new AML range.  Compl. ¶¶ 85–91; *see also* Pls.' Mem. at 40–44.  The Court is not persuaded by either argument, and it finds that defendants are entitled to summary judgment on Count VI.

**1.      The Forest Service reasonably concluded that the adjusted AML range would provide for sufficient genetic diversity.**

Plaintiffs concede that "the Forest Service correctly identified genetic diversity as an environmental concern to be considered," Pls.' Mem. at 40, citing AR03911, the first step required in a NEPA analysis.  *See Sierra Club*, 753 F.2d at 127.  But they allege that the Forest Service "failed to take the necessary 'hard look' at the effect that the new AML will have" on genetic diversity in the Devil's Garden WHT, and that it also failed to conduct genetic testing of the herd prior to deciding to adjust the AML range.  Pls.' Mem. at 40–43; Pls.' Reply at 33–39.

**i.      The Forest Service took the required "hard look" at the impact of the AML adjustment on the diversity of the Devil's Garden wild horse population.**

In the 2013 EA, the Forest Service found that "[a] minimum population size of 50 effective breeding animals (i.e., a population size of about 150–200 animals) is currently recommended to maintain an acceptable level of genetic diversity within reproducing [wild horse and burro] populations."  AR00273.  The adjusted AML range for the Devil's Garden WHT, as set by the 2013 Management Plan, is 206 to 402 wild horses.  AR00124.  However, the AMLs for each portion of the territory – the Eastern and Western ranges – are set at 101 to 219 horses, and 105 to 183 horses, respectively.  *Id.*  Thus, plaintiffs contend that because "the WHT now consists of two

*isolated* units between which no genetic interchange will take place," the relevant AML is not the range for the entire Devil's Garden WHT, but the ranges for each of the two separate Eastern and Western portions of the territory.  Pls.' Mem. at 40–42.  Because those range-specific AMLs provide for less than the minimum population size of 50 effective breeding animals – or 150 to 200 total animals – for each range, and because the Forest Service failed to analyze the AML adjustment in this context, plaintiffs assert that the AML adjustment violated NEPA.  *Id.*

Under the APA, "we review scientific judgments of the agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'"  *Troy Corp.*, 120 F.3d at 283, quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976).  "[O]fficials receive significant discretion to choose the wild horse and burro populations the range can support," and this "discretion extends to choosing the target wild horse and burro populations."  *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 125 (D.D.C. 2013), citing *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006).

Especially in light of the substantial deference the Court must afford to the Forest Service's scientific evaluation of these issues, it finds that the agency took the required hard look at the AML adjustment and reasonably determined that it would not have a significant impact on the genetic diversity of the Devil's Garden herd.  As a threshold matter, the Court notes that plaintiffs offer only their own unsupported opinion on the effect of the AML range adjustment, and they do not

accurately characterize the plan.[10]  The Forest Service has not, as plaintiffs contend, "drastically and permanently reduce[d] the AMLs of the two isolated wild horse populations."  Pls.' Mem. at 41.  Rather, the AML adjustment *broadens* the acceptable range of wild horses that can permissibly reside within the Devil's Garden WHT.  Thus, as noted above, the Forest Service found that the wild horse population expected to result from management within the new AML range is higher than the expected population under the prior AML range.  *Compare* AR00272 *with* AR00276.

Further, plaintiffs provide no support for their assertion that there can or will be no interaction between the horses in the Eastern and Western portions of the Devil's Garden WHT, and that the two populations will be so isolated that the two AMLs must be viewed separately.  In fact, in support of their claim that the disputed territory had been incorporated into the Devil's Garden WHT at one point, plaintiffs specifically asserted that horses range freely across the disputed territory and into and out of the two separate, non-contiguous parcels.  *See, e.g.*, Pls.' Mem. at 10 ("[T]here are 'no geographical boundaries that would normally prohibit wild horses from using the [disputed territory]' for forage and water and to travel between the eastern and western portions of the WHT."), quoting AR04133.

Given these circumstances, the Court finds that the Forest Service took a sufficiently hard look at the impact of the AML adjustment across the two non-contiguous ranges, and it reasonably

---

10      Plaintiffs contend that the Forest Service stated in the 2013 Management Plan that it will implement gathers "to achieve the lower AML limit," meaning that the wild horse population will necessarily be reduced to 105 and 101 wild horses in the West and East portions, respectively.  Pls.' Mem. at 41, citing AR00123.  But that is not what the 2013 Management Plan states:  it provides that "a lower limit of 206 wild horses should be established to provide the population *range* necessary so AML maintenance gathers would be necessary only every 4–5 years."  AR00123 (emphasis added).  This does not indicate that the Devil's Garden WHT herd will automatically be managed to the lowest possible population, as plaintiffs claim; it merely establishes the absolute minimum number of horses required to maintain a thriving horse population within the territory, as part of the overall range of the acceptable wild horse population.

found that the effects would not be significant.  In discussing the adjusted AML range, it found

that "impacts to genetic diversity would be similar" to the impact of retaining the old AML.

AR00276.  Both alternatives were "expected to retain a sufficient number of individuals *in each*

*home range* and provide for adequate movement between the areas to maintain a healthy and

genetically diverse population of wild horses over the long-term."  AR00273 (emphasis added);

AR00276.  And in response to concerns that fencing within the Devil's Garden WHT would

"prevent horses from mingling (reducing gene flow)," the 2013 EA noted that the 2013

Management Plan "call[s] for the widening of gates that would provide even greater opportunity

for animal movement" than was previously possible.  AR00365.  Therefore, the Forest Service

specifically concluded that "[t]he proposed AML, coupled with known movement of animals

between each allotment and pasture, is expected to maintain an acceptable level of genetic

diversity."  AR00553.[11]

The Court finds that this determination was reasonable in light of the record evidence.  For

example, while the 2013 Management Plan does acknowledge that "[t]here have been no studies

---

[11]    For this and other reasons, plaintiffs' reliance on this Court's decision in *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014), *appeal docketed*, No. 14-5313 (D.C. Cir. Dec. 17, 2014), is misplaced.  In that case, the Court held that "it was unreasonable . . . for [the Fish and Wildlife Service] to determine that it was necessary for Wyoming to manage for more than ten breeding pairs and 100 wolves . . . but then accept a plan that did not commit to that" threshold.  *Id.* at 209.  The Court found the plan to be insufficient because the agency had relied on "nonbinding and unenforceable representations" made by Wyoming "when it concluded that the state's plan was adequate to ensure that the state will in fact maintain the necessary number of breeding pairs and individual wolves."  *Id.* at 207.  Here, in contrast, the Forest Service itself, and not a separate entity, will be managing the wild horse population within the adjusted AML range.  And it adopted a plan that it found would sustain that threshold across the Eastern and Western ranges, due to the "known movement of animals between each allotment and pasture," AR00553, and its plan to permit the introduction of horses from one home range to another "[i]f necessary to maintain genetic diversity."  AR00100.  Thus, it is not the case here that the Forest Service "accept[ed] a plan that did not commit" to the threshold it established as necessary to maintain the genetic diversity of the Devil's Garden wild horse population.

conducted to determine the genetic health of the animals in the area," it goes on to state that "[t]here is not . . . any indication that genetic diversity is a concern."  AR00128; *see also* AR00260 (2013 EA noting that, "[b]ased on observations of animals gathered and removed from the WHT, no problems have been identified that could be attributed to poor genetic health").  Further, the Forest Service has consistently found the wild horse population within the Devil's Garden WHT to be healthy and sufficiently genetically diverse in the past.  *See, e.g.*, AR02974 (1975 Management Plan noting that "[g]eneral health of the animals appears to be exceptionally good"); AR02847 (1982 Management Plan noting same); AR00641 (2012 Resource Monitoring Report noting that "[h]orse populations appear diverse and healthy"); AR00365 (2013 EA noting that "no potential impacts to genetic diversity (inbreeding) have been observed.").

And even if there turns out to be limited interaction between the two separate populations, the Court finds that it was reasonable for the Forest Service to determine that the adult breeding population of the Eastern and Western ranges – the number of "[w]ild horses within a population that are 1 years of age and older," AR02177 – will still be sufficient to maintain genetic diversity. The effective population size – the number of effective breeding animals required "for maintenance of genetic variation in endangered species or managed populations" – is 50 animals. AR01414.  Because "the effective population size is *generally* 1/4th to 1/3rd of the census population," "a census population size of 150 to 200 is required to achieve the minimum effective population size."  *Id.* (emphasis added).  In other words, for genetic diversity to be maintained, each of the two home ranges must have a census population generally within the range of 150 to 200 *total* horses.

Importantly, while the census population comprises all horses within the territory, the AML reflects only "[t]he number of adult horses" to be managed within a territory, AR02177, excluding

the current year's foals.  AR00177.  Thus, the AML ranges established in the 2013 Management

Plan – 101 to 219 horses in the Eastern range, and 105 to 183 horses in the Western range – reflect

only the adult horses in those ranges, and do not account for the foals present in the herd.

Plaintiffs speculate that *if* there is no crossover between the populations on the Eastern and

Western ranges, and *if* the Forest Service manages each range's adult population to the absolute

minimum of the AML range, and *if* the rate of foals born each year remains constant, then "the

total populations in both the West unit (140 horses) and the East unit (135 horses) would be *below*

the Forest Service's own 'absolute minimum' threshold" of 150 total horses.  Pls.' Reply at 33–

34.  But as discussed above, there is no indication in the record that the wild horse population will

in fact be managed to the lowest number allowed by the adjusted AML range, and in any event,

the Forest Service specifically concluded that the AML range is "expected to retain a sufficient

number of individuals *in each home range* . . . to maintain a healthy and genetically diverse

population of wild horses over the long-term."  AR00273 (emphasis added); AR00276.  "[T]he

'agency's evaluations of scientific data within its area of expertise'" are "entitled to a 'high level

of deference,'" *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998), quoting *A.L.*

*Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C. Cir. 1995), and the Court finds that deference

to be warranted here.

Thus, the Court concludes that the Forest Service has shown a rational connection between

the facts it found relating to the genetic health of the horse population within the Devil's Garden

WHT and its decision to expand the AML range to 206 to 402 wild horses.

> ### ii.    The Forest Service was not required to perform genetic testing prior to adjusting the AML range.

Plaintiffs also complain that the Forest Service "undertook no genetic study *before*

deciding to adopt" the new AML range, and they challenge the agency's decision "to conduct

genetic sampling '[d]uring the initial removal(s) to achieve [the new] AML'" instead.  Pls.' Mem. at 41, quoting AR00125.  They concede that "NEPA does not require an agency to conduct genetic testing prior to the issuance of an EA," but they assert that where, as here, "the AML range is being reduced to a level below the agency's *own* minimum safeguards, it is arbitrary and capricious to do so in the absence of genetic testing or other evidence indicating that the decision will *not* result in the types of harms predicted" from a lack of genetic diversity.  Pls.' Reply at 35.

Under NEPA, "[d]etailed analysis is required only where impacts are likely.  Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary."  *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981), citing *Carolina Envtl. Study Grp. v. United States*, 510 F.2d 796, 799 (D.C. Cir. 1875); *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012) ("NEPA does not require maximum detail.  Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information"), citing *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Here, the Court finds that the agency reasonably determined that no genetic study was required, based on the observed health of the horse population and the fact that adverse environmental impacts from the adjustment were unlikely.

As noted above, the Forest Service rationally concluded that the adjusted AML ranges for the Eastern and Western portions of the Devil's Garden WHT would maintain wild horse populations at or above the required census population to ensure the genetic diversity of the herd. And the Forest Service identified "other evidence" indicating that the adjusted AML poses little risk to the herd's genetic survival.  "Based on observations of animals gathered and removed from the WHT," the Forest Service found that "no problems have been identified that could be attributed to poor genetic health" among the Devil's Garden herd.  AR00260.  For that reason, it reasonably

determined that conducting a genetic test of the herd prior to implementing the adjusted AML range was unnecessary.  *See id.* ("Genetic diversity has not been sampled within the WHT").

Even with this observation, the Forest Service implemented safeguards to ensure that the genetic diversity of the Devil's Garden herd does not dip below acceptable levels.  The 2013 EA states that "[b]aseline genetic diversity would be determined by sampling a portion of the herd during the first gather cycle," and "[f]urther samples would be taken at a minimum of every other gather (e.g., 8–10 years) to detect any change in genetic diversity from the baseline."  AR00176.  As the expert relied upon by the Forest Service stated, it takes 1 or 2 generations – or about 10 to 20 years, *see* AR00176 – for a significant loss of diversity to occur.  AR01414.  Thus, if samples will be taken at the first gather and then every 8 to 10 years, then the diversity of the Devil's Garden herd will be assessed at a minimum of once every generation.

And if the genetic diversity value for the herd falls outside of acceptable ranges, the Forest Service will implement the following management actions:  "maximizing the number of breeding age wild horses (animals aged 6–10 years) within the herd, adjusting the sex ratio in favor of males to increase the number of harems and effective breeding males, and releasing 1–2 young mares from similar habitats every generation (about 10 years)."  AR00176.  Thus, this is not a situation where, as plaintiffs claim, "the agency's promise to conduct 'comprehensive' genetic testing every 8–10 years will likely be too little, too late [because] the irreversible damage to the population's gene pool will already have been inflicted."  *See* Pls.' Reply at 34–35, quoting Defs.' Reply at 38.

Plaintiffs point to no material from which the Court could conclude that the Forest Service's observations of a healthy and genetically diverse population were contrary to record evidence.  And they have not convinced the Court that the Forest Service acted unreasonably in determining that adverse impacts to the genetic diversity of the wild horse population were not

"likely," and that a genetic study was therefore not warranted. Thus, the Court finds that the Forest Service complied with NEPA in assessing the potential impacts the AML adjustment would have on the genetic diversity of the Devil's Garden wild horse population.

> **2.** **The Forest Service properly analyzed the cumulative impact of livestock on conditions in the Devil's Garden WHT.**

Under NEPA, "depending on the environmental concern at issue, the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust*, 290 F.3d at 342. Plaintiffs claim that the Forest Service "lowered the AML for wild horses . . . without undertaking *any* analysis of the contributory impacts of the substantial number of livestock that graze the WHT lands." Pls.' Mem. at 43; *see also* Pls.' Reply at 39–42. But the record shows that this allegation is unfounded. Instead, the Court finds that the 2013 EA shows that the Forest Service also took the required "hard look" at the cumulative impacts of wild horse and livestock grazing in reaching its decision to adjust the AML range.

The 2013 EA identified "livestock grazing" as one of "several ongoing and future activities . . . that are not specifically related to the management of the Devil's Garden Plateau wild horses but may contribute to cumulative effects." AR00199–200. It identifies "grazing" as one of the "desired conditions identified in the 1991 Forest Plan," and its summary of those desired grazing conditions appears to embrace balancing the interests of livestock and wild horses:

> Manage grazing use in a manner that achieves and maintains satisfactory ecological condition and protects soil, water, and streamside-dependent resources. Forage is made available for use by livestock, wild horses and wildlife. Actual grazing use by livestock, wild horses and wildlife remains in balance with the available capacity.

AR00168.

Further, the 2013 EA summarized historic and current livestock use of the Devil's Garden WHT and discussed the grazing allotments within the WHT affected by the proposed changes.

AR00223–28.   It also compared the permitted, authorized, and actual use of the territory by livestock with the allocated and actual use by wild horses.   AR00227; *see also* AR00259 (chart comparing actual and permitted livestock use to wild horse use for allotments within the Devil's Garden WHT from 2006 to 2012); AR00363–64 (observing that "actual use by livestock during 2006–2012 averaged 18,548 AUMs or 69% of that permitted," but that "[d]uring the same period, use by wild horses averaged 10,257 AUMs or 233% of the AUMs [animal unit months] allocated for wild horses").   And it analyzed the environmental impacts of each of the four proposed actions and examined the direct, indirect, and cumulative effects of each action, including how each would impact forage availability and livestock grazing.   AR00228–30.

Ultimately, the 2013 EA found that the proposed action – the boundary correction and the AML range adjustment – would result in "the reallocation of 1,390 AUMs from permitted livestock to wild horse forage if found necessary," and that "reduced competition between livestock and wild horses for the available forage and water would be expected."   AR00229; *see also* AR00195–96 (listing "livestock grazing" as a "potential impact to social and economic factors" and noting that, under the proposed action, "an estimated 1,390 AUMs of livestock forage could be lost due to the increase in authorized wild horse use (AML)").   Thus, the Court finds that the 2013 EA does not consist of "a mere listing of activities" that lacks "an analysis of the *impacts* of these activities," as plaintiffs allege.   *See* Pls.' Reply at 39, quoting *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 n.8 (D.D.C. 2001).   Rather, the effects of wild horse and livestock grazing were "considered together" in the 2013 EA so that the Forest Service "could determine the combined impact" of those animals on the territory.   *See Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998).

To the extent that plaintiffs contend that the Forest Service was required to consider modifying livestock grazing levels instead of, or in addition to, adjusting the AML range for the wild horse population in the 2013 EA, *see* Pls.' Mem. at 43–44; Pls.' Reply at 39 ("[T]he agency admits that it never asked the most obvious question:  are there too many cattle in the WHT?"), that is beyond the scope of what NEPA requires.  The cumulative impact analysis under NEPA is designed to identify "the incremental impact of *the action [at issue]* when added to other past, present, and reasonably foreseeable future actions."  *Dole*, 826 F.2d at 70 (emphasis added), quoting 40 C.F.R. § 1508.7.  Federal agencies have "broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities" and "need not solve every problem before [them] in the same proceeding."  *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230–231 (1991) (internal citations omitted).

Here, the action at issue was the management of the wild horses living within the Devil's Garden WHT, and not the modification of grazing permits for livestock, which is addressed through a separate process.  *See* AR00202 ("The Forest Service and the BLM will manage livestock grazing in compliance with the standards and guidelines in their land management plans and grazing permit terms and conditions.  These determine the timing, duration, and intensity of grazing.").  Thus, while the 2013 EA clearly contemplated some adjustment to the permitted grazing levels within the territory, *see* AR00248 ("Managing wild horse population size within the established AML, *coupled with some adjustments in the authorized livestock grazing use*, would be expected to meet Forest Plan utilization standards and achieve the desired conditions.") (emphasis added), because the 2013 EA "address[ed] population levels for wild horses only," the Forest Service stated that "[a]ny necessary adjustment to livestock management and/or use levels are outside the scope of this document and will be addressed . . . during the grazing permit renewal

process." AR00364.  This approach is consistent with NEPA.  *See, e.g.*, *Grunewald v. Jarvis*, 776 F.3d 893, 904–06 (D.C. Cir. 2015) (finding that agency did not violate NEPA when it declined to analyze an exotic plant management plan in the same EIS as a deer management plan and instead maintained them as "distinct actions addressed in two different planning efforts") (internal quotation marks omitted).

Plaintiffs complain that the Forest Service is guilty of a "bait-and-switch:  the agency assessed the impacts of a horse population at historically high levels in order to justify reducing the AML to a historically low range."  Pls.' Reply at 40–41.  But whatever the reason for the high wild horse population at the time the Forest Service decided to adopt the 2013 changes, agency "officials receive significant discretion to choose the wild horse and burro populations the range can support," and this "discretion extends to choosing the target wild horse and burro populations." *Cloud Found.*, 999 F. Supp. 2d at 125, citing *Fund for Animals*, 460 F.3d at 16.  The Court has found no reason to disturb that exercise of discretion here.

Plaintiffs may disagree with the Forest Service's decision to adjust the AML range instead of modifying grazing permits and livestock management plans, but "NEPA is 'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'"  *Grunewald*, 776 F.3d at 903, quoting *Lyng*, 817 F.2d at 886.  Based on the record before it, the Court finds that the Forest Service took a hard look at the relevant factors and articulated a rational connection between the facts it found and its decision to adjust the AML range for the Devil's Garden WHT.  Thus, defendants are entitled to summary judgment on Count VI.

## CONCLUSION

Because the Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT, and that any references to one contiguous territory were the result of administrative error, the Court finds that it was not arbitrary and capricious or in violation of the law for the Forest Service to act to correct the boundary in the 2013 EA and the 2013 Management Plan.  Thus, defendants are entitled to summary judgment on Counts I, II, and III.  And because the Forest Service articulated a rational basis for its decision to adjust the AML range for the Devil's Garden WHT that was not counter to record evidence or otherwise contrary to the law, the Court finds that defendants are also entitled to summary judgment on Counts IV, V, and VI.  Thus, plaintiffs' motion for summary judgment will be denied, defendants' cross-motion for summary judgment will be granted, and because they seek the same relief as defendants, the intervenor-defendants' cross-motion for summary judgment will be denied as moot.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2015

**EXHIBIT F**

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    EASTERN DISTRICT OF CALIFORNIA
10
11   DEVIL'S GARDEN PRESERVATION            No.  2:17-cv-02185-MCE-KJN
     GROUP, et al.,
12
                   Plaintiffs,
13                                          **ORDER OF DISMISSAL**
          v.
14
     U.S. FOREST SERVICE, et al.,
15
                   Defendants.
16
17
          The Court is in receipt of Plaintiffs' March 12, 2021 Notice of Partial Settlement of
18
     Action and Request for Dismissal of Complaint (ECF No. 112), in which Plaintiffs indicate
19
     that all claims between them and Defendants have been resolved.  The Court construes
20
     that request as a motion for dismissal under Federal Rule of Civil Procedure 41(a)(2).
21
          On March 24, 2021, the only other party to these proceedings, Intervenors and
22
     Cross-Claimants Animal Legal Defense Fund, American Wild Horse Campaign, and
23
     Carla Bowers (collectively "Intervenors") responded by indicating they do oppose the
24
     dismissal of Plaintiffs' claims in this matter, so long as Intervenors' Cross-Claim (ECF
25
     No. 87) against the Defendants is likewise dismissed without prejudice (ECF No. 113).
26
     Defendants did not object to that request.  (ECF No. 114).
27
          Accordingly, having examined the papers submitted, and good cause appearing,
28
                                            1

1   this entire action, including Intervenors' Cross-Claim, is hereby **DISMISSED**, without

2   prejudice.  The matter having now been concluded in its entirety, the Clerk of Court is

3   directed to close the file.

4           IT IS SO ORDERED.

5

6           Dated:  June 9, 2021

7

8                     MORRISON C. ENGLAND, JR.
                         SENIOR UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SETTLEMENT AGREEMENT

Plaintiffs Devil's Garden Preservation Group, *et al*., and Defendants, the U.S. Forest Service, *et al*. ("Forest Service"), by and through their undersigned counsel, enter into the following out-of-court Settlement Agreement ("Agreement") for the purpose of resolving *Devil's Garden Preservation Group, et al., v. U.S. Forest Service, et al*. 17-cv-02185-MCE-KJN (E.D. Cal.), and state as follows:

WHEREAS, On January 3, 2020, Plaintiffs filed their First Amended Complaint for Declaratory and Injunctive Relief. Plaintiffs' primary claim, among others, is that the Forest Service has "failed to act" under the APA, 5 U.S.C. § 706(1). More specifically, Plaintiffs assert that the Forest Service has failed to gather excess horses from the Modoc National Forest in compliance with the Wild Free-Roaming Horses and Burros Act.

WHEREAS, the Forest Service maintains that its delay in removing excess horses is reasonable and does not warrant Court involvement, while Plaintiffs disagree and therefore brought legal action.

WHEREAS, the Forest Service contends it has always been open to meaningful dialogue with Plaintiffs prior to issuance of any Annual Operating Instructions ("AOI"). The Forest Service intends to continue that practice, regardless of any Agreement, which may include joint field visits and will include consideration of any relevant data provided by Plaintiffs. The Forest Service will meet with each permittee at the earliest convenience to discuss range conditions and any relevant data provided by permittees prior to issuance of AOIs by April 1st of each year. These determinations will consider the Forest Service's multiple use responsibilities and the best scientific data available.

WHEREAS, the Forest Service intends to conduct annual post-gather meetings to discuss outcome, review any future implementation strategy to reach the appropriate management level, and discuss any needed changes with plaintiffs. These post-gather meetings will start in 2022 and be held by February 15 of each year. The Forest Service will take meeting minutes to document the discussion and any changes in strategy, which shall be made available to any permittee within five (5) days of such meeting.

WHEREAS, by April 1, 2021, the Forest Service intends to develop, and share with the public, a white paper describing the total cost of a wild horse and burro program to manage the agency's Devil's Garden Plateau Wild Horse Territory to the Appropriate Management Level.

WHEREAS, the Parties have discussed and negotiated the Agreement outlined below to resolve this matter.

WHEREAS, the Parties agree that settlement in the manner described below is in the public interest and is an appropriate way to resolve the disputes between them;

NOW THEREFORE, the Parties desire to compromise and settle Plaintiffs' case according to the terms set forth below, and thus agree to this Agreement:

1. Defendants agree to make good faith efforts to undertake the following actions:

    A. **Request sufficient funding for wild horse management**.

        1. Given the Forest Service budget formulation is controlled by the President's Budget process, Office of Management and Budget, and the Department of Agriculture, it is confidential and the Forest Service is not permitted to share funding levels being discussed or actually approved until they are made available through the President's Budget. Once publicly available, the Forest Service will inform Plaintiffs of the annual National Forest Vegetation and Watershed Management (the appropriate funding source for wild horse and burro management) funding level consistent with the details in the President's Budget once it is publicly available.

        2. The Forest Service will, in good faith and using its best efforts, seek to secure within the budget process sufficient funding to conduct, at a minimum, an annual census and an annual gather of not less than the number of horses necessary to ensure the Devil's Garden wild horse population does not increase.

        3. The Forest Service will, in good faith and using best efforts and no later than 14 days from the date of this settlement, request by letter that the Bureau of Land Management make a multi-year commitment to hold horses removed from the Modoc National Forest.

        4. Defendants will adhere to the Forest Service's contracting process as defined by Forest Service Manual 6300 Procurement Management and Federal Acquisitions Regulations.

    B. **Subject to available funding, the Forest Service will undertake an annual wild horse census before each gather of the Devil's Garden Plateau Wild Horse population**.

1. Regular censuses will be an annual effort.

   a. The census will encompass the area occupied by the Devil's Garden wild horse population.

   b. The census will be accomplished near the beginning of each calendar year during a time that allows for an accurate count – January or February, if possible.

   c. Census Methodology will continue to utilize the United States Geologic Survey double-count methodology to count and determine population numbers.

   d. In the event that the census does not meet the criteria above in 1(B)(1)(a)-(c), the gather will be informed by the most recent census that does, which at the time of signing this Agreement is the 2016 census.

   e. Notwithstanding the anticipated census protocol outlined above in subparagraphs (1)(B)(1)(a)-(d), nothing in this Agreement shall be construed to limit or modify the discretion accorded to the Forest Service by the Wild Horses and Free Roaming Burros Act as to the methodology used or the conduct of any census.

   f. If the Forest Service exercises its discretion to change the census protocol outlined in subparagraphs (1)(B)(1)(a)-(d) above, Plaintiffs, after following the dispute resolution procedure in paragraph 5 below, may terminate this Agreement and pursue legal action.

C. **Development of an Implementation Strategy to reach the Appropriate Management Level ("AML").**

   1. The Forest Service will consult with Plaintiffs, and seek input from all other interested parties, in the development of an AML Implementation Strategy.[1]

   2. The Forest Service will develop, in consultation with Plaintiffs and any other interested party, an AML Implementation Strategy by June 1, 2021. Development

---

[1] The AML Implementation Strategy is a staggered, multi-year strategy to achieve AML by using gathers, and any other appropriate management practices, within the authority of the Forest Service's Territory Management Plan.

3

of this Strategy will consider all management actions within the authority of the Forest Service's Territory Management Plan.

3. The Forest Service retains full discretion to collaborate with any interested party in the development of the AML Implementation Strategy in any manner it deems prudent and necessary.

4. The AML Implementation Strategy will be based on the best available science and data as determined by the Forest Service.

5. The Forest Service intends to use an annual wild horse net population increase of 20% in the development of its AML Implementation Strategy, unless better science indicates that another figure is more appropriate.

6. The AML Implementation Strategy will identify the number of horses that need to be gathered each year to reach low- to mid-range AML as specified in the 2013 Territory Management Plan or any subsequent revision or amendment(s).

7. After collaboratively analyzing the best available data, the AML Implementation Strategy will provide a path to reach AML by a date certain.[2]

8. Notwithstanding the details outlined in subparagraphs (1)(C)(1)-(7), nothing in this Agreement shall be construed to limit or modify any discretion accorded to the Forest Service by the Wild Horses and Free Roaming Burros Act and the direction of the Territory Management Plan as to the strategy and science used to develop the AML Implementation Strategy, including resolving any dispute involving any interested party submitting science, data, or opinion in the development of the Implementation Strategy.

9. If Plaintiffs are not satisfied with the Forest Service's AML Implementation Strategy, including the target date for AML, pursuant to the procedures outlined in paragraph 5 below, they may terminate this Agreement and pursue immediate legal action.

D. **Subject to available funding, the Forest Service will use best efforts to gather the number necessary to ensure the Devil's Garden wild horse population does not increase**.

---

[2] Pursuant to paragraph 5 below, if Plaintiffs are not satisfied with the target date for AML, Plaintiffs can terminate this agreement and pursue immediate legal action.

1. Annual gather numbers, starting with the 2021 gather, will be no less than a minimum of 500 horses or the number necessary to ensure that the Devil's Garden wild horse population does not increase, whichever is necessary to reach low to mid-range AML, at which time other management options become available, as outlined in the Territory Management Plan.

2. The Forest Service will meaningfully evaluate the use of all management tools available for holding and placing horses, including private pasture and holding facilities, for the purpose of maximizing placement.

3. If the Forest Service fails to gather, beginning in 2021, the number of horses necessary to ensure that the Devil's Garden wild horse population does not increase or 500 horses, whichever is greater, Plaintiffs may terminate this Agreement and pursue immediate legal action.

2. Plaintiffs agree to the following:

    A. **Support monitoring efforts**.

        1. Specifically, monitoring of range conditions, horse locations, and other attributes that will facilitate rangeland management.

    B. **Help place gathered horses through adoption and sale with limitations**.

    C. **Help identify short-term holding lease options**.

    D. **Help find other funding mechanisms**.

        1. Specifically, Plaintiffs will build networks and have discussions where Federal employees are prohibited from operating.

    E. **Dismissal without prejudice**.

        1. Plaintiffs agree to voluntarily dismiss its lawsuit without prejudice. Within five (5) days of executing this Agreement, Plaintiffs shall file a stipulation of voluntary dismissal of the above-captioned matter, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).

    F. **No future litigation**.

        1. Subject to paragraph 5 below, Plaintiffs agree that, while this Agreement is operative, Plaintiffs will not file any lawsuits challenging the Forest Service's wild horse management on the Devil's Garden Territory based on failure to achieve and maintain AML while this Agreement is in effect.

3. **Termination of this Agreement**: Defendants' commitments with respect to subparagraphs 1(A) through 1(D) above shall terminate when Defendants achieve the appropriate management level (i.e., low-to mid-range) in the Devil's Garden Wild Horse Territory or December 31, 2027, whichever is earlier. Plaintiffs' commitments with respect to 2(A)-(D) shall terminate upon termination of this Agreement or December 31, 2027, whichever is earlier.

4. **Future Modifications of this Agreement**: This Agreement may be modified by written agreement between Plaintiffs and the Forest Service. In the event that either Plaintiffs or the Forest Service seeks to modify the terms of this Agreement, it will confer at the earliest possible time with the other. In that event, or in the event that Plaintiffs or the Forest Service believes that the other has failed to comply with any term or condition of this Agreement, it shall use the dispute resolution procedures specified in paragraph 5 below.

5. **Dispute Resolution**: In the event that the Forest Service fails to complete an annual census pursuant to subparagraph 1(B) above by March 15th of any given year or complete its Implementation Strategy by June 1, 2021 (*see* subparagraph 1(C) above), Plaintiffs may terminate this agreement with no further obligation and may pursue immediate legal action (not to include seeking to enforce the terms of this out-of-court settlement agreement). In the event of a dispute arising out of or relating to any other provision of this Settlement Agreement (apart from the census and Implementation Strategy discussed in the preceding sentence), the party raising the dispute shall provide the other party written notice of the dispute and a request for negotiations. Plaintiffs and the Forest Service shall meet and confer (either telephonically or in-person) to attempt to resolve the dispute within 45 days of the written notice, or such time as is mutually agreed by them. If Plaintiffs and the Forest Service are unable to resolve the dispute within 30 days of such a meeting, or such time as is mutually agreed by them, the Forest Service, subject to available funding, will initiate a formal mediation process, and Plaintiffs agree to participate in good faith. If Plaintiffs and the Forest Service are unable to resolve the dispute informally or through a formal mediation process, Plaintiffs have no other remedy for any alleged failure of the Forest Service to meet the commitments set forth under subparagraphs 1(A) through 1(D) of this Agreement. In such an event, Plaintiffs may terminate this Agreement. Plaintiffs may also terminate this agreement and pursue legal action not directly related to enforcement of this Settlement

Agreement if they are not satisfied with any change in the census protocol as outlined in subparagraph (1)(B)(1)(a)-(f) or the AML Implementation Strategy, including its AML target date, as outlined in subparagraph (1)(C)(1)-(7).

6. **Attorneys' Fees and Costs**: Plaintiffs will not seek attorneys' fees or costs in this matter.

7. **Representative Authority**: The undersigned representatives of Plaintiffs and Defendants certify that they are fully authorized by the party or parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind those parties to it.

8. **Compliance with Other Laws**: Nothing in this Agreement shall be interpreted as, or shall constitute, a commitment or requirement that Defendants obligate or pay funds, or take any other actions in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable law. Nothing in this Agreement shall be construed to deprive a federal official of authority to revise, amend, or promulgate regulations, or to amend or revise land and resource management plans. Nothing in this Agreement is intended to, or shall be construed to, waive any obligation to exhaust administrative remedies; to constitute an independent waiver of the United States' sovereign immunity; to change the standard of judicial review of federal agency actions under the APA; or to otherwise extend or grant the Court jurisdiction to hear any matter, except as expressly provided in the Agreement.

9. **Mutual Drafting and Other Provisions**:

   a. It is hereby expressly understood and agreed that this Agreement was jointly drafted by Plaintiffs and Defendants. Accordingly, the Parties hereby agree that any rule of construction to the effect that ambiguity is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of the Agreement.

   b. This Agreement contains all of the agreements between Plaintiffs and Defendants, and is intended to be and is the final and sole agreement between Plaintiffs and Defendants concerning the complete and final resolution of Plaintiffs' claims. Plaintiffs and Defendants agree that any other prior or contemporaneous representations or understandings not explicitly contained in this Agreement, whether written or oral, are of no further legal or equitable force or effect. Any subsequent modifications to this Agreement must be in writing, and must be signed and executed by Plaintiffs and Defendants.

c. This Agreement is the result of compromise and settlement, and does not constitute an admission, implied or otherwise, by Plaintiffs or Defendants to any fact, claim, or defense on any issue in this litigation. This Agreement has no precedential value and shall not be used as evidence either by Plaintiffs or Defendants in any other litigation, except as necessary to enforce the terms of this Agreement.

10. **Force Majeure**: The Parties understand that, notwithstanding their efforts to comply with the commitments contained herein, events beyond their control may prevent or delay such compliance. Such events may include natural disasters or emergencies (*e.g.*, pandemics, etc.) as well as unavoidable legal barriers or restraints, including those arising from actions of persons or entities that are not party to this Agreement. At the time of formation of this agreement, the Parties are aware of the COVID-19 pandemic and at this time believe they can meet their mutual obligations under this Agreement.

11. **Effective Date**: The terms of this Agreement shall become effective upon execution of this Agreement, and shall remain in effect until the low- to mid-range AML is achieved or December 31, 2027, as set forth above in paragraph 3 of this Agreement. The Parties agree that this Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which, taken together, shall constitute the same instrument. Facsimile or scanned signatures submitted by electronic mail shall have the same effect as an original signature in binding the Parties.

IN WITNESS THEREOF, this Agreement among Plaintiffs and Federal Defendants has been duly executed by their authorized legal representatives.

Dated: January 18, 2021

Michael Byrne
_____
Michael Byrne
For the Plaintiffs

Dated: January 19, 2021

_____
Allen Rowley, Associate Deputy Chief
For the Federal Defendants

8

# EXHIBIT G

An official website of the United States government

Here's how you know ⌄

.gov



AWARD PROFILE
## Contract Summary





## Delivery Order (DO)

**PIID**  127EAY25F0016

**In Progress**

(2 months remain)

**Unlinked Award**

### Awarding Agency

**Department of Agriculture (USDA)**

### Recipient

**C D WARNER LIVESTOCK LLC**

1733 W 6400 S
SPANISH FORK, UT 84660-5005
UNITED STATES

Congressional District: UT-04  

**Related Awards** 

Parent Award Unique Key

CONT_IDV_127EAY22D0019_12C2

**Dates** 

**Today**

| | |
|---|---|
| Start Date | Jul 21, 2025 |
| Current End Date | Nov 15, 2025 |
| Potential End Date | Nov 15, 2025 |

**$ Award Amounts**



**$617,508**
Obligated Amount

**$617,508**
Current Award Amount

**$617,508**
Potential Award Amount

View Transaction History

| Outlayed Amount | $0.00 |
|---|---|
| Obligated Amount | $617,508.00 |
| Current Award Amount | $617,508.00 |
| Potential Award Amount | $617,508.00 |

 **Description**                                                                                      ⓘ

THE FY25 DEVIL'S GARDEN WILD HORSE GATHER IS TO REMOVE APPROXIMATELY 375 WILD HORSES OFF THE DEVIL'S GARDEN WILD HORSE TERRITORY AND SURROUNDING AREAS TO ACCOMPLISH MANAGEMENT GOALS. THIS WILL BE DONE USING A D...

read more

**North American Industry Classification System (NAICS) Code** 🗏

11 : Agriculture, Forestry, Fishing and Hunting

   1152: Support Activities for Animal Production

      **115210: Support Activities for Animal Production**

**Product or Service Code (PSC)** 🗏

SERVICES

   R: SUPPORT SVCS (PROF, ADMIN, MGMT)

      R4: PROFESSIONAL SERVICES

         **R416: SUPPORT- PROFESSIONAL: VETERINARY/ANIMAL CARE**

 **Contract Activity**                                                                                 ⓘ



## Federal Accounts

⚠ **This award has not been linked to any federal account.**

## Award History

| Transaction History 1 | Sub-Awards 0 | Federal Account Funding 0 |
| --- | --- | --- |

| Modification Number | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|
| 0 | 07/21/2025 | $617,508 | -- | THE FY25 DEVIL'S GARDEN WILD HO GATHER IS TO RE... read more |



1-1 of 1 results

---

ℹ️ **Additional Information**

Expand All



🔐  Unique Award Key                                                          ❯

🏛️  Agency Details                                                            ❯

🕸️  Parent Award Details                                                      ❯

📍  Place Of Performance                                                      ❯

📅  Period Of Performance                                                          ❯

🖊  Legislative Mandates                                                           ❯

🏢  Recipient Details                                                              ❯

🏷  Acquisition Details                                                            ❯

📊  Competition Details                                                            ❯

•••  Additional Details                                                            ❯

👤  Executive Compensation                                                         ❯

# Stay in touch

## Share your story

Love USASpending.gov? Join the "Your Data, Your Story" campaign to share how you use the data!

Share Now →

## Learn how to use USAspending

Access specialized training videos on how to use our tools and data.

Learn More →

## Sign up for release notes

Get release notes to your inbox to keep up with what's new on USASpending.gov.

Sign Up →



## Building a more transparent government.

Providing publicly accessible and searchable data on what the federal government spends each year.

| ABOUT | HELP | RELATED SITES |
|---|---|---|
| Mission | FAQs | Fiscal Data |
| | Community | Bureau of the Fiscal Service |

Email Us







Accessibility     |     Privacy Policy     |     Freedom of Information Act     |     D&B Information

© 2025 USAspending.gov

# EXHIBIT H

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 599 of 638

 An official website of the United States government    Here's how you know



**Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.

**Secure .gov websites use HTTPS**

A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

  **Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

# 2025 Wild Horse Gather set to begin September 2nd, 2025

## 2025 Wild Horse Gather

**Release Date:** August 15th, 2025

Alturas, Calif., August 15, 2025 - The USDA Forest Service plans to begin gathering 350 wild horses from the Devil's Garden Plateau Wild Horse Territory on September 2, 2025. The gather will continue movement toward the appropriate number of wild horses prescribed in the 2013 Devil's Garden Plateau Wild Horse Territory Management Plan.

The 2024 population census resulted in an estimate of more than 700 wild horses on and around the territory. The Modoc National Forest remains committed to managing wild free-roaming horses in a manner that is designed to achieve and maintain a thriving natural ecological balance and multiple-use condition on public lands.

The Modoc National Forest has contracted CD Warner Livestock, LLC. to conduct the gather. Gather contractors will utilize mechanized equipment and bait traps to gather horses. If you come across a livestock corral in the forest, please avoid the area.

Viewing of gather operations will be offered for up to 6 viewers on Mondays, Tuesdays, and Saturdays during the gather. Corral tours will also be offered on Saturdays. Some trap sites may not allow for viewing and/or multiple viewers. To make viewing reservations please email *sm.fs.modocwh_b@usda.gov* and include your name, phone number, requested viewing dates, and the number of viewers in your party. If you are unable to email reservation requests, please call **(530) 233-8738**. Reservations are first-come, first-served.

Viewers with reservations will be provided with the meeting location and time when their reservation is confirmed.

Viewers with reservations should be prepared to:

•Drive in rugged terrain

•Walk long distances across uneven and muddy ground

•Be exposed to possible inclement weather conditions such as rain, snow, wind, and intense sun

•Remain on site until gather operations have concluded for the day

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 600 of 638

- Bring food, water, folding chair, sunscreen, a wide-brimmed hat, sunglasses
- Wear neutral colored clothing (avoid brights and darks)


Please note: There are no restroom facilities at viewing locations and often no cell service. Viewers must not interfere with gather operations.

USDA is an equal opportunity provider, employer, and lender.

All gathered wild horses go to the local coral for adoption. Devil's Garden Plateau wild horse information and gather updates are available on the web at **fs.usda.gov/r05/modoc**. If you are interested in adopting a Devil's Garden wild horse, be sure to check out the Double Devil Corral Facebook page at **https://www.facebook.com/doubledevilwildhorsecorrals** .


*Last updated August 15th, 2025*


Return to top

# EXHIBIT I

**From:** **Bonnie Kohleriter** bkohlerite@yahoo.com 📎
**Subject:** Fw: [External Email]Gather of Devils Garden horses in September, 2025
**Date:** August 11, 2025 at 4:03 PM
**To:** jblome@greenfirelaw.com



----- Forwarded Message -----
**From:** Levy, Madeleine - FS, CA <madeleine.levy@usda.gov>
**To:** Bonnie Kohleriter <bkohlerite@yahoo.com>
**Cc:** Bielecki, Christopher - FS, CA <christopher.s.bielecki@usda.gov>
**Sent:** Tuesday, August 5, 2025 at 08:22:10 AM PDT
**Subject:** Re: [External Email]Gather of Devils Garden horses in September, 2025

Good morning Bonnie,

These statements are accurate, except AML on the Devil's Garden Wild Horse Herd is 206-402 and if we are below AML, stallions will be released on the territory, not geldings and mares will be fertility controlled with some form of fertility control (PZP or GonaCon, just depends on which EA we are working under at that given time).

Thanks,



**Madeleine Levy**
**Wild Horse and Burro Specialist**

**Forest Service**
**Modoc National Forest**

**p: 530-233-8856**
**c:530-708-7293**
madeleine.levy@usda.gov

225 West 8th Str.
Alturas, CA 96101
www.fs.fed.us

**Caring for the land and serving people**

---

**From:** Bonnie Kohleriter <bkohlerite@yahoo.com>
**Sent:** Sunday, August 3, 2025 1:34 PM
**To:** Levy, Madeleine - FS, CA <Madeleine.Levy@usda.gov>
**Subject:** [External Email]Gather of Devils Garden horses in September, 2025

[External Email]
If this message comes from an **unexpected sender** or references a **vague/unexpected topic**;
Use caution before clicking links or opening attachments.
Please send any concerns or suspicious messages to: Spam.Abuse@usda.gov

Madeleine,
Please confirm the information provided you in the attachment presented here. Please send your response to bkohlerite@yahoo.com.
Thank you.

Thank you.
Bonnie Kohleriter

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.



Dear Madeleine Levy                                          August 1, 2025

Thank you for continuing to communicate with advocacy for our Devils Garden wild horses. It is no secret I want a healthy herd of Devils Garden horses to continue to exist in perpetuity for my offspring to have, believing wildlife, including wild horses, give us a spiritual connectivity that grounds and enriches our humanity.

Please confirm the following:

1) In the 2024 spring census 723 DG wild horses in/around the DGWHT were documented by an aerial Simultaneous Double counting.
2) In fall 2024 and in winter 2025 407 DG wild horses were removed from the DGWHT.
3) The growth rate for the DG wild horses is estimated at 15% as presented in the pending 2025 EA.
4) For now, August 1, 2025, the USDA-FS managing the DGWHT is operating under the 2013 Environmental Assessment.
5) A Simultaneous Double Count of the DG wild horses was not done this spring, 2025, because of the lack of funding.
6) An unofficial ground count of DG wild horses was done this year showing 500-600 horses are currently in/around the DGWHT.
7) The USFS is now in the process of finalizing a roundup and removal of 350 Devils Garden horses in September, 2025, using FS funds.
8) A Simultaneous Double Count is being planned for the spring (Feb. to Apr.) in 2026.
9) If, at that time, the AML of the DG horses is below 206, stallions (likely gelded, sterilized) and mares (GonaConed ?) will be returned to the Garden to have the numbers within the AML of 206-408.

As stated, Madeleine, please confirm to me the correctness of the foregoing statements. Thank you.

Bonnie Kohleriter  bkohlerite@yahoo.com

# EXHIBIT J


GREENFIRE
LAW, PC

JESSICA L. BLOME
JENNIFER RAE LOVKO
2748 Adeline Street, Suite A
Berkeley, CA 94703
Phone: (510) 900-9502
Email:  jblome@greenfirelaw.com
          rlovko@greenfirelaw.com
www.greenfirelaw.com

August 18, 2025

Secretary Brooke Rollins
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250
Brooke.Rollins@usda.gov

Chief Tom Schultz
U.S. Forest Service
Tom.Schultz@usda.gov

Jason Kuiken
Acting Regional Forester
Pacific Southwest Region
U.S. Forest Service
Jason.Kuiken@USDA.gov

Christopher Bielecki
Forest Supervisor
Modoc National Forest
U.S. Forest Service
Christopher.Bielecki@USDA.gov

Madeleine Levy
Wild Horse and Burro Specialist
Modoc National Forest
Madeleine.Levy@usda.gov

**RE:    Request to Suspend Devil's Garden Plateau Wild Horse Territory Gather**

Dear Supervisor Bielecki:

On behalf of our clients, Bonnie Kohleriter, Mary Koncel, Laura Leigh, and Wild Horse
Education, we demand that the U.S. Forest Service (Forest Service or Service) suspend any
gather operations for the Devil's Garden Plateau Wild Horse Territory (Devil's Garden
WHT) until such time as the Service issues a Record of Decision for the Devil's Garden
Plateau Wild Horse Territory Management Plan - Project ID # 62741 (Proposed Plan).[1]

## I.    History of the Devil's Garden Plateau WHT

Wild horses have lived in the area now known as the Devil's Garden WHT since the late 1800s.
According to the Forest Service, an estimated 500 wild horses lived in the WHT in 1974.

---

[1] Please note that by this request, if the Forest Service agrees to this demand, my clients do not waive their right to
thereafter challenge any such Decision and FONSI for the Proposed Plan.

This land became officially designated as a WHT in 1975, initially being managed for 300 or 305 wild horses over two non-contiguous units covering approximately 236,000 acres. In the early 1980s, the WHT was expanded to approximately 258,000 acres and managed as one contiguous unit.

A management plan issued in 1985 identified a wild horse population objective of 275-335, which was reaffirmed by the 1991 Modoc National Forest Land and Resource Management Plan. Currently, this plan remains the operative management plan.

In 2011, the Forest Service issued a scoping letter for the purpose of addressing a new management plan for the Devil's Garden WHT. The Service subcontracted the development of the new plan to the Modoc County Farm Bureau in August of 2012. Farm bureaus are nonprofits whose mission is to represent the interests of farmers and ranchers, and not surprisingly, the board for the Modoc County Farm Bureau were comprised of farmers and ranchers. In keeping with the Farm Bureau's mission, the organization's work for the Devil's Garden WHT almost exclusively focused on the *impact* of wild horses *on livestock allotments*.

In October of 2012, the Modoc County Farm Bureau requested that the Forest Service change the WHT boundaries. In 2013, following preparation of an Environmental Assessment (EA), the Forest Service adopted the Devil's Garden Plateau Wild Horse Territory Management Plan and Forest Plan Amendments (2013 Plan) with a Decision Notice and Finding of No Significant Impact, or "FONSI." Through this plan, the Service eliminated 23,631 acres from the Middle Section of the WHT, thereby separating the territory into two isolated units. The proffered justification for removing this acreage from the WHT was the Forest Service's assertion that inclusion of this land in the WHT in the 1980s had been the result of "administrative error." With the 2013 Plan, the Forest Service also re-calculated the appropriate management level (AML) to 206-402 wild horses based upon the new constricted boundaries of the WHT.

In March of 2014, American Wild Horse Preservation Campaign, Carla Bowers, and Return to Freedom began litigation before the U.S. District Court for the District of Columbia to challenge the 2013 Plan. Through summary judgment, Plaintiffs asked the Court to set aside the Forest Service's Decision Notice, Environmental Assessment, and FONSI. In this motion, the Plaintiffs argued that the Forest Service had acted in an arbitrary and capricious manner by removing the Middle Section from the WHT in violation of provisions in the Wild Free-Roaming Horse and Burros Act (Wild Horse Act), the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA).[2] On September 30, 2015, the District Court denied Plaintiffs' summary judgment motion and granted the Service's cross-motion.

Plaintiffs appealed the decision, and the U.S. Court of Appeals for the D.C. Circuit reversed the lower court's order. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923, 932 (D.C. Cir. 2017). This conclusion was based on the Court's finding that the decision to remove

---

[2] Plaintiffs noted that if the Court were to find that the Forest Service's elimination of the Middle Section was unlawful, then the new reduced AML also is defective because it is based on only those portions of the WHT that lie outside of the Middle Section.

the middle section of the Devil's Garden WHT was arbitrary and capricious in two respects. *See id.* at 923.

> First, the Service failed to acknowledge and adequately explain its change in policy regarding the management of wild horses in the Middle Section as part of a single, contiguous protected Wild Horse Territory. Second, the Service failed to consider adequately whether an Environmental Impact Statement was required under NEPA.

*Id.* As regards the second point, the Court explained further:

> Here, the relevant environmental concern was the effect of the boundary modification on the wild horse population in the Devil's Garden area. The Service not only failed to address that concern, it denied its very existence. The Service insisted that the redrawn boundary lines would have "no effect" on the ground because it was only "correct[ing] a boundary established for administrative convenience." That is, the only sense in which the Service "identified" the effect of the boundary modification on wild horses was by insisting that there was "no effect" and that nothing had ever really changed. That head-in-the-sand approach to past agency practice is the antithesis of NEPA's requirement that an agency's environmental analysis candidly confront the relevant environmental concerns.
>
> More to the point, because the Service actually managed wild horses within portions of the Middle Section for two decades as though they were within the Wild Horse Territory, the 2013 boundary change entailed far more than scratching out a few lines in the 1991 Forest Plan. Yet the Service refused to even consider the possibility of that broader, real-world impact. Thus, while the Service "identifie[d]" some effects on wild horses as an environmental concern, the Service did not forthrightly and "accurately identif[y] the relevant environmental concern"—the actual effects of the boundary modification on wild horses in the Devil's Garden area.

*Id.* at 931. Thus, the Court "vacate[d] the Service's exclusion of the Middle Section territory and the related Finding of No Significant Impact, and direct[ed] the district court to remand to the Service for further consideration consistent with this decision." *Id.* at 932.

In October of 2017, a collective of ranchers filed suit against the Forest Service (*Devils Garden Preservation Group et al. v. U.S. Forest Service et. al*., U.S. District Court for the Eastern District of California, 2:17-cv-02185 ) to compel the immediate removal of excess horses in the Carr Allotment, Emigrant Springs Allotment, Pine Springs Allotment, Surveyors Valley Allotment, and Timbered Mountain Allotment.[3] In their motion for summary judgment in this case, the plaintiffs contended that the population of wild horses exceeded both the AML contained in the 1991 Modoc National Forest Land and Resource Management Plan and the

---

[3] All or a portion of each of these allotments is located within the Devil's Garden WHT; a portion of the Carr Allotment also falls within the middle section of the WHT.

AML as set in the 2013 Plan.[4] In response to this motion, intervenors in the case noted that the 2013 Plan's re-calculation of AML had been based on the assumption that more than 23,000 acres in the Middle Section of the WHT would no longer be available to wild horses, "an assumption which the U.S. Court of Appeals overturned." *Devil's Garden Preservation Group et al.*, Intervenors' Response to Plaintiffs' Statement of Facts.

Before any ruling on the merits of the case, the Forest Service and plaintiffs entered into a settlement agreement (Settlement Agreement). By its terms, the Forest Service agreed to the following:

- Subject to available funding, the Forest Service will undertake an annual wild horse census before each gather of the Devil's Garden Plateau Wild Horse population. In the event that a census does not occur, a gather will be informed by the most recent census.

- The Forest Service will develop an AML Implementation Strategy (a staggered, multi-year strategy to achieve AML by using gathers and other appropriate management strategies).[5] In developing this Strategy, the Service will consult with the plaintiff ranchers and seek input from other interested parties. The AML Implementation Strategy will identify the number of horses that need to be gathered each year to reach low- to mid-range AML as specified in the 2013 Plan or any subsequent revision or amendment(s).

- Subject to available funding, the Forest Service will use best efforts to gather the number necessary to ensure the Devil's Garden wild horse population does not increase. Annual gather numbers, starting with the 2021 gather, will be no less than a minimum of 500 horses or the number necessary to ensure that the Devil's Garden wild horse population does not increase, whichever is necessary to reach low to mid-range AML, at which time other management options become available, as outlined in the Territory Management Plan.

In 2022, the Forest Service began scoping for the Proposed Plan. (The Forest Service asserts that this Proposed Plan "will supersede" the 2013 Plan; however, as the 2013 Plan was vacated by the U.S. Court of Appeals, the Proposed Plan actually will supersede the 1991 Modoc National Forest Land and Resource Management Plan.) In 2024, the Service published a Final

---

[4]In their original complaint, the plaintiffs seemed uncertain as to what AML governed the WHT, acknowledging the Court in *Am. Wild Horse Pres. Campaign* had noted that when the Middle Section was included within the WHT under the 1991 Modoc National Forest Land and Resource Management Plan, the AML was 275-335 wild horses whereas the 2013 Plan had changed AML to 206-402. However, the plaintiffs stated that under either AML, an overpopulation of wild horses existed. Plaintiffs' first amended complaint removed reference to the *Am. Wild Horse Pres. Campaign* decision. In their motion for summary judgment, the Plaintiffs' mention the *Am. Wild Horse Pres. Campaign* decision, but characterize the decision as only holding that "the total geography of the [Devil's Garden WHT] was about 258,000 acres as stated in the 1991 Forest Plan, rather than a slightly smaller size that excluded an area of 23,631 acres under the 2013 [Plan] for wild horses."

[5] My clients are unaware of the Forest Service having developed an AML Implementation Strategy.

Environmental Assessment, as well as a draft Decision Notice and Finding of No Significant Impact. However, to date, no signed decision or FONSI have been issued.

## II.     Upcoming Gather

In the Spring of 2024, the Forest Service conducted a census of wild horses in the Devil's Garden WHT using an aerial survey with simultaneous, double-counting. This survey identified 723 wild horses in or around the WHT, and in the Fall of 2024, the Forest Service gathered and removed 407 wild horses. In 2025, the Forest Service conducted a ground count showing 500-600 horses in the Devil's Garden WHT. Ostensibly, an aerial survey was not conducted due to a lack of funding.

In July, my clients were informed by Wild Horse and Burro Specialist Madeleine Levy that the Forest Service intended to gather and remove approximately 350 horses from Devil's Garden WHT in early September. According to Ms. Levy, this number is based on the 2024 aerial survey and 2025 unofficial ground observation counts. The Forest Service signed a contract for $617,508.00 with C.D. Warner Livestock on July 21, 2025, to conduct the gather operations in the WHT. Notably, the contract description (as reported on the U.S. Department of the Treasury's USAspending.gov website) is for the removal of 375 wild horses.

On August 15, 2025, the Forest Service publicly announced that the agency plans to begin gathering 350 wild horses from the Devil's Garden WHT on September 2, 2025 (https://www.fs.usda.gov/r05/modoc/newsroom/releases/2025-wild-horse-gather-set-begin-september-2nd-2025). In this announcement, the Service references the 2024 census survey of "more than 700 horses." The announcement does not reference the removal of 407 wild horses in 2024.

As regards public observation of the gather, the Forest Service announcement provides:

> Viewing of gather operations will be offered for up to 6 viewers on Mondays, Tuesdays, and Saturdays during the gather. Corral tours will also be offered on Saturdays. Some trap sites may not allow for viewing and/or multiple viewers.

## III.     Basis for Demanding All Gathers Be Suspended

### A.     The Forest Service must consider the environmental impact of any gathers.

The National Environmental Policy Act (NEPA) requires federal agencies to consider the environmental impact of any major federal action. *See* 42 USCS § 4332. As gather operations are major federal actions, the Forest Service must conduct an environmental review to consider the proposed gather's impact before implementing the action. *See* 42 USCS § 4336e.

Here, no action has been environmentally reviewed and adopted pursuant to NEPA's requirements. Instead, the Forest Service intends to rely upon the EA for 2013 Plan. Such reliance is, frankly, indefensible, as the U.S. Court of Appeals specifically held the Plan's "environmental analysis" was "arbitrary and capricious," and the Court vacated the 2013 Plan and its related FONSI. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 931-932.
Once agency action has been vacated, it is invalidated. *See id.* at 928 (citing *Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687, 690 (9th Cir. 2007); *see also Action*

*on Smoking & Health v. Civil Aeronautics Bd*., 713 F.2d 795, 797 (D.C. Cir. 1983) ("'To vacate … means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside'") (citations omitted).

As such, the gather in the Devil's Garden WHT in September of 2025 must undergo NEPA review before any gather occurs.

> **B.      The Forest Service cannot remove wild horses without making a determination that an overpopulation exists *and* that removal is necessary to a thriving natural ecological balance.**

The Wild Horse Act provides for removal of wild horses only if the Forest Service determines an overpopulation exists *and* removal is necessary to is needed to restore and maintain a thriving ecological balance (TNEB). 16 U.S.C. § 1333(b)(2).

> **1.      The Forest Service has not adequately determined an overpopulation exists.**

The Wild Free-Roaming Horse and Burros Act mandates that the Forest Service determine appropriate management levels of horses within the Devil's Garden WHT to determine what number of horses should be removed during gather operations. *See* 16 U.S.C. § 1333(b)(1). Based upon the Forest Service's communication with my clients, it appears that the Service considers the current AML to be 206-402. Because this range is based on the invalidated 2013 Plan, the Service cannot rely upon it. *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 923, 928. The effect of setting aside the 2013 Plan was to re-establish the status quo, and the proper AML for the WHT reverted back to 206-402 wild horses as contained in the 1991 Modoc National Forest Land and Resource Management Plan. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 827 (N.D. Cal. 2025); *Action on Smoking & Health*, 713 F.2d at 797; *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 n.21 (D.C. Cir. 1999); *Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984).

To be clear, the Forest Service calculated the AML in the 2013 Plan based on an assumption that horses only had 232,521 acres upon which to forage, rather than the 258,000 acres under which the horses currently reside. Consequently, it is not only unlawful but also irrational to rely upon the 2013 Plan's AML designation. (For the same reason, it is my sincere hope the Forest Service will properly consider a new AML for the WHT prior to adopting the Proposed Plan).

The Forest Service may be relying upon the vacated AML because the Settlement Agreement is predicated upon it. However, a private settlement agreement[6] does not nullify the U.S. Court of Appeals decision in *Am. Wild Horse Pres. Campaign* nor revoke the Service's legal obligation under NEPA to establish AML based on consideration of accurately identified acreage.

---

[6] Prior to dismissal of the *Devils Garden Preservation Group*, the intervenors sought to have the Court address to address the Settlement Agreement, and the Forest Service responded that the Settlement Agreement was not a consent decree that requires either Court approval or continuing Court jurisdiction to enforce its terms.

Currently, the Forest Service is relying upon a ground count to estimate the wild horse population at 500-600. As you are aware, the Forest Service (and the Bureau of Land Management) generally uses aerial surveys *such as* simultaneous, double-counting to accurately assess wild horse populations. The Forest Service has consistently utilized simultaneous, double-counting prior to undertaking its last seven roundups. Ground counts are unreliable and typically only used for very small geographic locations. Also, the Forest Service's own internal guidance recognizes that more than population numbers need to be considered, noting that the current inventory of horses also should include information on "herd composition, reproduction rates, seasonal feeding habits, herd unit area, seasonal distribution or movement, external influences, and the effects of other animal species on behavior of wild horses and burros." FSM 2200, Section 2262.1.

After the 2024 gather, approximately 316 wild horses were left in the WHT.[7] Even assuming all of the remaining horses were adults and applying a 15% growth rate, the wild horse population would not be reaching 500 wild horses – let alone 600 wild horses.

For these reasons, the 500-600 estimate is highly suspect. And, even if the 500-count estimate is somehow correct, the removal of 350 (or 375) wild horses will reduce the population to below the lower range of AML under *either* the 1991 Modoc National Forest Land and Resource Management Plan or the 2013 Plan.[8]

Therefore, the Forest Service must cease its plan to gather wild horses in the Devil's Garden WHT. The Forest Service is relying upon a vacated AML that was based upon an incorrect assumption of acreage and an unreliable ground count to justify removing wild horses to a level that the agency itself recognizes to be inappropriate.

## 2.    The Forest Service has not shown removal is necessary.

Before gathering and removing horses, the Forest Service also must do more than simply rely upon population counts. The agency must make a determination that removal is necessary, too. *See* U.S.C. § 1333(b)(2); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1281 (D. Utah 2017). To date, the Forest Service has presented no evidence that rangeland conditions create such a necessity.

---

[7] This is based on the 2024 aerial survey reporting 723 horses in and around the WHT, and the Forest Service removing 407 horses.

[8] The Settlement Agreement provides "[t]he Forest Service will, in good faith and using best efforts and no later than 14 days from the date of this settlement, request by letter that the Bureau of Land Management make a multi-year commitment to hold horses removed from the Modoc National Forest." And, in communications with my clients, the Service has informally stated it would release any gathered horses back into the WHT if an aerial survey subsequently reveals the population is below low AML. First, my clients are unaware of the Forest Service making any request to the Bureau of Land Management, and based on past experience, are unaware of the Bureau ever agreeing to such a request. Second, neither the Settlement Agreement nor informal communication to my clients constitute a legal obligation enforceable by the public. Third, based upon the Forest Service's current fiscal constraints, it is unclear that the return of wild horses to the WHT could be done within any reasonable time period. This being the case, the holding and subsequent return of wild horses does not eliminate the harm caused to the wild horses or my clients.

Simply put, the proposed gather in September of 2025 is not based on a determination of overpopulation or necessity as mandated by the Wild Horse Act. Thus, the Forest Service does not have legal authority to remove wild horses from the Devil's Garden WHT.

### C.    The Forest Service cannot

The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. Amend. I. Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986). Access may only be limited where the government shows an overriding interest that is essential and narrowly tailored. *See id.* at 9.

The public's right of access to observe government activities extends to the public's right to observe and document gather operations. *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013).

Here, the Forest Service seeks to limit observation of gather operations to Mondays and Tuesdays. No overriding interest has been identified that would deem this limitation essential or narrowly tailored. Similarly, the Forest Service has not articulated any reason to explain why some trap sites may not allow for viewing.

## IV.    Temporary Restraining Order and Preliminary Injunction

In light of this, my clients request that the Forest Service postpone any gather of wild horses from the Devil's Garden WHT until it issues a Decision Notice and FONSI for the Proposed Plan.  Without such action, should the Forest Service seek to remove any horses, my clients will be forced to seek a temporary restraining order and preliminary injunction, unnecessarily incurring fees and costs for all parties.

The standard a moving party must meet to obtain injunctive relief in the form of a temporary restraining order (TRO) or a preliminary injunction is the same: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natl Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); *see also Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013).

As addressed above, based on the Forest Service's complete disregard of the ruling in *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017), violation of NEPA, and violation of the Wild Horse Act, there is more than a reasonable probability that my clients would succeed on the merits of their claims. And the harm here is great because a gather would decimate the herd and lower it to a population level far below any considered AML.

My clients' interest in observing the horse in the WHT necessarily involves keeping the herd viable. The balance of equities in this case strongly favors entry of an injunction because their interest in having the government legally manage and protect these wild horses is far outweighed by any interest the government has in rounding up the horses. Truly, I can think of

no legal justification for the Forest Service attempting to do an end-run around the provisions of either NEPA or the Wild Horse Act.

The Wild Horse Act recognizes that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. NEPA recognizes that government action must not be predetermined before agencies take a hard look at the impact of such action. *See Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000); *Forest Guardians v. United States Fish & Wildlife Serv.*, 611 F.3d 692 (10th Cir. 2010). To remove 375 horses in violation of these Acts is tragic not only for my clients but for everyone who cherishes these iconic and symbolic creatures. The public interest is in favor of managing these wild horses in a manner that ensures the Forest Service abides by the law. The public interest is in favor of ensuring that herds are not decimated and that the Forest Service make transparent removal determinations based on evidence (and not on unsupported, bare conclusions).

We would appreciate any response by you no later than August 22, 2025, so that we may proceed with any necessary legal action.


Sincerely,

Jessica L. Blome
Jennifer Rae Lovko
Greenfire Law, PC

# EXHIBIT K

**USDA**

United States Department of Agriculture
Forest Service

**Modoc National Forest**

225 W 8th Street
**Alturas, CA 96101**
**(530) 233-5811**
**TTY (530) 233-8708**

File Code: 2260

Date: August 22, 2025

Ms. Blome and Ms. Lovko,

I write in response to your letter dated August 18, 2025.  We appreciate your interest in ensuring the sustainable management of the Devil's Garden Wild Horse Territory (DGWHT).  The Modoc National Forest remains committed to managing wild horses in a manner that is designed to achieve and maintain a thriving natural ecological balance and multiple-use relationship on our public lands.

The Modoc National Forest currently manages the DGWHT in accordance with the 2013 Devil's Garden Wild Horse Territory Management Plan (2013 TMP), and consistent with the Wild Free-Roaming Horses and Burros Act (WFRHBA).  The 2013 TMP designates the Appropriate Management Level (AML) for the Territory as 206-402 wild horses.

On July 7, 2025, I determined that there continue to be excess wild horses in and around the DGWHT (see attached). That determination was based on the existence of animals found to be permanently residing outside the Territory and the conclusion that the DGWHT population exceeds the AML. I also determined that excess wild horses should be removed based on factors including rangeland conditions, ecosystem health, excess horse placement capability, workforce capacity, operational capacity, current and future year budget priorities, and other on-range management options.  Impacts of wild horse overpopulation include removal of vegetation from riparian areas, increased degradation of spring sites, and increased competition for resources with wildlife.  Thus, in order to maintain a thriving natural ecological balance on the land, I decided to remove excess wild horses and their foals from the DGPWHT and areas outside the Territory where wild horses now exist (including private and tribal lands, as requested). The WFRHBA instructs the Modoc National Forest to "immediately remove excess animals from the range." 16 U.S.C. § 1333(b)(2).

The first step in that removal process will be to gather wild horses in accordance with the 2013 TMP, as the Modoc National Forest has done in eight of the past nine years.  As stated in the August 15, 2025 press release titled "2025 Wild Horse Gather set to begin September 2nd, 2025," published on the Modoc National Forest's website, the Forest plans to gather 350 wild horses.  This number is based on the 2024 aerial survey of the DGWHT, the FY24 Devil's Garden wild horse gather, and 2025 ground observation counts.  Helicopter gather operations are anticipated to begin on September 2nd.  A contractor is anticipated to set bait traps this coming week in advance of the helicopter gather.  We intend to conduct an aerial survey in the new fiscal year and to continue managing the population according to the results, including releasing horses back to the range should it be determined that the on-range population is below the low end of the AML range. We have secured funds to support the aircraft contract in support of this census.

By continuing to manage the Devil's Garden wild horses as described above, the Forest Service is in compliance with the 2017 D.C. Circuit Court ruling and NEPA requirements.  The D.C. Circuit reversed the 2013 Forest Service decision to exclude the 23,000-acre middle section of the DGWHT but did not vacate the 2013 TMP.  As a



**Caring for the Land and Serving People**





**United States Department of Agriculture**
**Forest Service**
**Modoc National Forest**

225 W 8th Street
Alturas, CA 96101
(530) 233-5811
TTY (530) 233-8708

result, the Forest Service currently manages the DGWHT as a contiguous unit that includes the 23,000-acre middle section. [1] [2]

Starting September 2, 2025, the Forest Service will provide opportunities for interested parties to view gather operations on Mondays, Tuesdays, and Saturdays during the gather, and corral tours will be offered on Saturdays. A reduced Forest staff will be working overtime to accomplish the gather, including facilitating viewing opportunities. Our goal is to offer viewing opportunities while first providing for the safety of the public, agency personnel, and our Devil's Garden wild horses. Some trap sites may not allow for viewing and/or multiple viewers due to the location of the trap site, the presence of cover to shield viewers, and the probable path wild horses would travel to enter the trap.

Sincerely,

Digitally signed by
CHRISTOPHER BIELECKI
Date: 2025.08.22
17:00:27 -07'00'

Chris Bielecki
Forest Supervisor
Modoc National Forest

---

[1] As you are aware, the Modoc National Forest has prepared an Environmental Assessment (EA) that analyzes inclusion of the middle section to update the Devil's Garden Wild Horse Territory Management Plan, with a decision forthcoming.

[2] Even if the AML from the 1991 Modoc National Forest Land and Resource Management Plan were controlling (which it is not), its upper limit of 335 is *less* than the upper limit of 402 in the 2013 TMP. So that would not change the Forest's excess determination.



**Caring for the Land and Serving People**



# EXHIBIT L



**United States Department of Agriculture**
**Forest Service**
**Modoc National Forest**

225 W 8ᵗʰ Street
Alturas, CA 96101
(530) 233-5811

File Code: 2260
Route To: 1950

**Date:** July 7, 2025

Subject: Devil's Garden Wild Horse Territory Plan Implementation
To: Glenna Eckel, District Ranger

**Updated Excess Wild Horse Determination**

**Background**

With the passage of the Wild Free-Roaming Horses and Burros Act, the Forest Service is required to manage wild horses and burros in the areas where they were found in 1971 as an integral part of the national system of public lands. The Devil's Garden Plateau Wild Horse Territory (DGPWHT) was created because of the 1971 Wild Free-Roaming Horses and Burros Act (The Act) and is approximately 236,000 acres.

An aerial survey in 2024 found approximately 723 wild horses in and around the Wild Horse Territory. During the FY24 Devil's Garden wild horse gather, 409 wild horses were removed from the territory and surrounding areas. The Modoc National Forests' Devil's Garden Wild Horse Territory Management Plan (TMP) designates the Appropriate Management Level (AML) of 206-402 wild horses.

Impacts of wild horse overpopulation includes removal of vegetation from riparian areas, increased degradation of spring sites, and increased competition of resources with wildlife. Impacts to natural resources such as water and wildlife may be irreversible without significant investment.

**Territory Management Plan**

Excess population is being observed for both criteria listed as described in the Territory Management Plan (TMP). The highest priority is to gather and remove horses residing outside of the WHT and in areas where resource damage is occurring due to overpopulation. The second priority is to gather and remove wild horses as necessary to achieve AML.

Before the Forest Service can remove wild horses from the DGPWHT, the Act requires the responsible deciding official to use current information to make a two-part determination. First, it should be determined that an overpopulation exists within the area of public lands that the wild horses reside *(U.S.C. § 1333(b)(l))*. With that determination it should be decided that rather than using sterilization or natural population controls to decrease the overall population, that action, such as gathering, be necessary to remove excess animals (*U.S.C. § 1333(b)(l))*.

Once the responsible deciding officer makes these determinations, the Act provides clarity that the agency can remove excess animals from the range in order to achieve AML *(U.S.C. § 1333(b)(2))*. The Act establishes an order of priorities when removing excess horses but does not establish a specific statutory deadline for the completion of any particular removal action (*U.S.C. § 1333(b)(2))*).

Regulation 36 CFR § 222.61(a) also authorizes the Forest Service to determine when an over-population of wild horses exists and removal is required. Regulation 36 CFR § 222.6l(a) provides the steps required to make an "excess" determination.



**United States Department of Agriculture**
**Forest Service**
**Modoc National Forest**

225 W 8th Street
Alturas, CA 96101
(530) 233-5811

Based on previous experience with placement of excess horses from the 2016, 2018, 2019, 2020, 2021, 2022, 2023, and 2024 gathers, it is anticipated that placement of these excess animals may take 12 months or longer. Depending on gather success, multiple gathers may be necessary to remove excess animals.

Although there are no specific plans to return horses to the Wild Horse Territory, any adult mares that are returned will be treated with a fertility contraception vaccine before being released. Animals with pre-existing conditions or injuries may need to be humanely euthanized. The desired placement of all horses is through adoptions and sales with limitations to avoid putting horses in long-term holding.

**Updated Excess Determination**

The 2013 TMP provides criteria for making or adjusting excess wild horse determinations: 1) when animals are found to be permanently residing outside of the DGPWHT and 2) when the total population exceeds the AML. In making an excess determination, other considerations need to be included such as rangeland conditions, ecosystem health, excess horse placement capability, workforce capacity, operational capacity, current and future year budget priorities, and other on-range management options. At this time, and considering the 15-20% reproduction rate established by the 2013 TMP, wild horse populations have exceeded the designated appropriate management level and horses are permanently residing outside the Wild Horse Territory. Also, our intent is to conduct an aerial survey following the 2025 gather, and continue managing the population according to the results.

I have accounted for: 1) review of the TMP, 2) funding, 3) agreements to gather, hold, and place excess animals, and 4) other placement services through contracts and/or agreements. **Based on all these factors, I hereby determine that excess adult wild horses and their foals will be removed from the Devil's Garden Plateau Wild Horse Territory and areas outside the territory where wild horses now exist (including private and tribal lands, as requested).**

Digitally signed by
CHRISTOPHER BIELECKI
Date: 2025.07.07 12:31:38
-07'00'

Chris Bielecki
Forest Supervisor
Modoc National Forest

# EXHIBIT M

WO AMENDMENT 2200-2003-1
EFFECTIVE DATE: 01/24/2003
DURATION:  This amendment is effective until superseded or removed.

2260
Page 1 of 17

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## Table of Contents

2260.1 – Authority ............................................................................................................. 3
2260.2 – Objective ............................................................................................................. 3
2260.3 - Policy .................................................................................................................... 3
2260.4 – Responsibility ...................................................................................................... 4
    2260.41 - Regional Foresters .......................................................................................... 4
2260.5 - Definitions ............................................................................................................ 4
**2261 – COOPERATION ................................................................................................. 5**
2261.1 - Bureau of Land Management ............................................................................... 5
2261.2 - Other Federal Agencies ....................................................................................... 6
2261.3 - State and Local Governments ............................................................................. 6
    2261.31 - State Wildlife Agencies ................................................................................... 6
2261.4 - Private Individuals and Organizations ................................................................. 6
2261.5 - Agreement and Memorandums of Understanding ............................................... 6
**2262 - INVENTORY AND STUDIES ............................................................................... 7**
2262.1 – Inventory ............................................................................................................. 7
    2262.11 - Individual Animal Data ..................................................................................... 7
2262.2 – Habitat ................................................................................................................. 7
2262.3 – Wild Horse and Burro Ecology [Reserved] ........................................................ 7
**2263 - MANAGEMENT OF WILD FREE-ROAMING HORSES AND BURROS ............ 7**
2263.1 - Wild Horse and Burro Territory Plans ................................................................. 7
    2263.11 - Elements of Plan ............................................................................................. 8
**2264 - PROTECTION OF WILD FREE-ROAMING HORSES AND BURROS .............. 8**
2264.1 - Agency Responsibility .......................................................................................... 8
2264.2 - National Forest System ....................................................................................... 9
2264.3 - Private Lands ....................................................................................................... 9
**2265 - ANIMAL CONTROL ............................................................................................. 9**
2265.1 – Capture ............................................................................................................... 9
2265.2 - Removal of Animals at Landowner's Request ...................................................... 9
2265.3 - Removal of Excess Animals ............................................................................... 10
2265.4 - Relocation of Wild Horses and Burros ............................................................... 10
2265.5 - Maintenance and Care Agreement .................................................................... 10
    2265.51 - Identification of Animals Placed in Private Custody ........................................ 11
    2265.52 - Assignment of Number ................................................................................... 11
    2265.53 - Control of Numbers ........................................................................................ 12
    2265.54 - Adoption Fee Procedures ............................................................................... 12
    2265.55 – Violations ...................................................................................................... 13
    2265.56 - Conditions for Granting Title .......................................................................... 13
    2265.57 - Status of Animal After Title Has Been Granted ............................................. 13
2265.6 - Disposal of Animals on National Forest System Lands ...................................... 13
    2265.61 - Act of Mercy ................................................................................................... 13

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 623 of 638

WO AMENDMENT 2200-2003-1                                              2260
EFFECTIVE DATE:  01/24/2003                                          Page 2 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

2265.62 - Excess Unadoptable Animals ............................................................... 13

2265.7 – Carcasses ........................................................................................ 14

2265.71 - Carcasses That Retain Status as Wild Free-Roaming Horses and Burros............ 14

**2266 – CLAIMS** ........................................................................................ **14**

2266.1 - Handling Ownership Claims ................................................................. 14

2666.2 - Authorization to Gather Claimed Animals............................................... 14

**2267 - USE OF HELICOPTERS, FIXED-WING AIRCRAFT, AND MOTORIZED
VEHICLES**................................................................................................ **15**

2267.1 - Public Meetings ............................................................................... 15

2267.2 - Prohibition Against Use of Fixed-Wing Aircraft to Capture Wild Free-Roaming
Horses and Burros.............................................................................. 16

2267.3 - Use of Helicopters in Capture Operations ............................................... 16

2267.4 - Use of Motor Vehicles to Transport Excess Wild Horses and Burros ...................... 17

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## 2260.1 – Authority

The Wild Horses and Burros Protection Act of 1971, as amended by the Federal Land Policy and Management Act of 1976 and the Public Rangelands Improvement Act of 1978, establishes wild free-roaming horses and burros as a part of the natural system where they occur on National Forest System lands.  The acts require management, protection, and control of these horses and burros.  Four acts important in protection and control of wild free-roaming horses, and burros are the Multiple Use-Sustained Yield Act of 1960, the National Environmental Policy Act of 1969, and the Resource Planning Act as amended by the National Forest Management Act.  Legal citations for these acts are in FSM 2201.

## 2260.2 – Objective

To maintain wild free-roaming horse and burro populations in a thriving ecological balance in the areas they inhabit on National Forests.

## 2260.3 - Policy

1.  Confine wild free-roaming horses and burros to managed Horse and Burro Territories as established in 1971, to the extent possible.

2.  Determine population levels by considering the animals' forage and habitat requirements, wildlife, permitted livestock, and other uses recognized under the Multiple Use-Sustained Yield Act.

3.  Remove excess animals from the range at the earliest opportunity.

4.  Recognize wild free-roaming horses and burros as part of the natural system of National Forests.

5.  Recognize wild horse-burro territory boundaries in Forest land management plans.

6.  Relocate wild free-roaming horses and burros only to territories identified in 1971, and only where a receiving territory has sufficient suitable habitat to sustain planned population levels.

7.  Manage, protect, and control wild free-roaming horses and burros on National Forest land rather than issue leases or permits to private parties.

8.  Control uses of aircraft and motor vehicles in such a way that animals are disturbed as little as possible, and in a manner that ensures humane treatment of the animals at all times.

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 625 of 638

| WO AMENDMENT 2200-2003-1 | 2260 |
| EFFECTIVE DATE: 01/24/2003 | Page 4 of 17 |
| DURATION: This amendment is effective until superseded or removed. | |

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

9.  Grant title to individuals who have provided one year of private maintenance and care under humane conditions.

10.  The Forest Service may destroy excess wild horses and burros when there is no demand for adoption and it is not practical to capture or relocate the animals.  Excess animals may be destroyed when placement in private custody is not achieved within 45 days after capture.

11.  Charge adoption fees for all wild horses and burros placed through the Forest Service Adopt-A-Horse Program.

12.  Do not apply adoption fees or transportation charges to unweaned offspring, which are under the age of 6 months and accompany their mare or jenny.

## 2260.4 – Responsibility

Responsibilities for administering this program are included in FSM 2204 - 2204.3.

## 2260.41 - Regional Foresters

Regional Foresters are authorized to abolish territories or adjust territorial boundaries if justified in the Forest Land and Resource Management Plan.

Regional Foresters may enter into State level agreements with the Bureau of Land Management to ensure coordinated approaches to management.

## 2260.5 - Definitions

Adoption Fee.  A fee that partially recovers Forest Service costs incurred in removal of animals from territories, processing adoption applications, providing medical examinations and vaccinations, and feeding and handling the animals during the adoption procedure.

Excess Animals.  Wild free-roaming horses or burros that authorized personnel have removed or must remove, pursuant to law, to preserve and maintain ecological balance in coordination with other resources and activities.

Herd Unit.  An area of land within a Wild Horse and Burro Territory that is designated as a territorial habitat of one or more stallions/jacks, and their mares/jennies, and progeny, all ranging as one band of animals.  A herd unit identifies land area boundaries used by the herd under varying conditions necessary for survival and reproduction.

Territorial Plan.  An operational plan for managing one or more herd units of wild free-roaming horses and burros.  The plan describes desired population level, detailed management practices, interagency coordination, scheduling, and monitoring requirements for managing each herd unit, within the direction established in the Forest plan.

WO AMENDMENT 2200-2003-1
EFFECTIVE DATE: 01/24/2003
DURATION: This amendment is effective until superseded or removed.

2260
Page 5 of 17

**FSM 2200 - RANGE MANAGEMENT
CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

Transportation Costs. All costs incurred in moving animals beyond the Forest Service/Bureau of Land Management facility where they are prepared for adoption. See FSM 6531 for collection procedures.

Wild Free-Roaming Horses and Burros. All unbranded and unclaimed horses and burros and their progeny using National Forest System lands on or after December 15, 1971. This also includes all excess horses and burros removed from National Forest System lands by the Forest Service but which have not lost status (FSM 2264). Unbranded, claimed horses and burros found to be under an erroneous claim are also considered wild and free-roaming, if they meet the criteria above.

Does not include any horse or burro introduced onto National Forest System lands on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership. Such animals are unauthorized livestock. Animals that stray from other lands onto National Forest lands are not considered wild free-roaming horses and burros and are not under Forest Service protection, unless they stray from a Bureau of Land Management wild free-roaming horse or burro herd area.

Wild Horse and Burro Territory. National Forest land identified by the Chief as the territorial habitat of wild free-roaming horses and/or burros when the Wild Horses and Burros Protection Act was passed.

## 2261 – COOPERATION

Consult and cooperate with the organizations that may be affected or interested in providing for protection, management, determination of excess animals, and control of wild free-roaming horses and burros.

## 2261.1 - Bureau of Land Management

Coordinate all activities related to wild horses and burros with the Bureau of Land Management (BLM) to reflect similar management objectives.

When wild free-roaming horses and burros roam part of the year on National Forest lands and part of the year on lands administered by BLM, the authorized officers of the two agencies should develop and approve a single territory plan. The plan should include agreement on inventory, desired population level, determination of excess animals, planning, management, protection, control, capture methods, and responsibility for initiating action. The plan may designate a lead agency for management actions.

The Forest Service coordinates with BLM the Adopt-A-Horse Program through agreement (FSM 1531.11a).

| | |
|---|---|
| WO AMENDMENT 2200-2003-1 | 2260 |
| EFFECTIVE DATE: 01/24/2003 | Page 6 of 17 |
| DURATION: This amendment is effective until superseded or removed. | |

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## 2261.2 - Other Federal Agencies

Consult with the Fish and Wildlife Service, other affected land management agencies, and interested individuals in developing management levels for the protection, management, and control of wild free-roaming horses and burros, and in developing plans for removal of excess animals.

## 2261.3 - State and Local Governments

Develop a memorandum of understanding with the State agency responsible for enforcing State branding and estray laws. Preferably, the Bureau of Land Management (BLM) will be a party to the agreement. The memorandum of understanding should state clearly what is acceptable proof of ownership of claimed animals. In each State, the Forest Service and the BLM should develop identical criteria and procedures for establishing ownership of claimed animals. The courts have established that it is the responsibility of the Federal Government to determine whether or not the animals in questions are "wild and free-roaming." Once this determination has been made, the State agency responsible for enforcing brand and estray laws may handle ownership claims for those animals determined not to be wild free-roaming, in accordance with State law.

## 2261.31 - State Wildlife Agencies

Consult and cooperate with the State wildlife agency in management, protection, and control of wild free-roaming horses and burros. Such consultation and cooperation should include, but not be limited to:

1. Proposals to modify boundaries of established wild horse and burro territories.

2. Territory plans for wild free-roaming horses and burros, including plans for the achievement of appropriate population levels through removal and/or destruction of excess animals.

3. Determination of the effects of wild free-roaming horses and burros on other resource uses, especially wildlife and wildlife habitat, and coordination measures necessary to mitigate adverse impacts.

4. Proposals for predator control.

## 2261.4 - Private Individuals and Organizations

Participation of a well-informed public in management of wild horses and burros is desirable. Participation often can be achieved through public meetings, contacts with organized wild horse and burro protection groups, local livestock associations, or organizations with scientific expertise or special knowledge of wild horses and burros, or by individual contact.

## 2261.5 - Agreement and Memorandums of Understanding

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 628 of 638

| | |
|---|---|
| WO AMENDMENT 2200-2003-1 | 2260 |
| EFFECTIVE DATE: 01/24/2003 | Page 7 of 17 |
| DURATION: This amendment is effective until superseded or removed. | |

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

When necessary, enter into agreements or memorandums of understanding with other Federal agencies, State agencies, local governments, and private individuals and organizations in carrying out the responsibilities of management, protection, and control of wild free-roaming horses and burros.

## 2262 - INVENTORY AND STUDIES

## 2262.1 – Inventory

Maintain a current inventory of the number of wild free-roaming horses and burros on each territory.

In addition to population numbers, the census of wild free-roaming horses and burros shall include herd composition, reproduction rates, seasonal feeding habits, herd unit area, seasonal distribution or movement, external influences, and the effects of other animal species on behavior of wild horses and burros.

## 2262.11 - Individual Animal Data

It is important to identify some individual animals (marker animals) for management purposes and for processing private ownership claims. Obtain information about age, sex, reproduction, and color markings of individual wild horses and burros as needed.

## 2262.2 – Habitat

Range analyses and wildlife inventories are primary sources of information about habitat of wild free-roaming horses and burros. When information is not available, follow procedures described in FSM 2213 and FSM 2620 for gathering habitat information. In addition, use information available in other resource inventories in evaluating habitat. Baseline data must be established to determine long-term range condition and trend.

## 2262.3 – Wild Horse and Burro Ecology [Reserved]

## 2263 - MANAGEMENT OF WILD FREE-ROAMING HORSES AND BURROS

## 2263.1 - Wild Horse and Burro Territory Plans

Prepare a territory plan for each Wild Horse and Burro Territory. The plan shall ensure implementation of and compliance with the management direction identified in Regional Guides and Forest land and resource management plans (FSM 1921, 1922). Wild Horse and Burro Territory plans shall follow the outline for allotment management plans (FSM 2214). In addition, the plans shall include a section on management of the animals, addressing such items as population level, special consultation and coordination considerations, and plans for the removal or disposal of excess animals.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## 2263.11 - Elements of Plan

1. <u>Objectives</u>.  Clearly state the objectives of managing animal, vegetation, and soil resources.  In establishing objectives, note the importance of retaining wild free-roaming horses and burros in ecological balance.  Wild Horse and Burro Territory plans are to conform with the Forest land and resource management plans.  Consider existing livestock and wildlife needs and activities as well as the forage requirements of all animals.

Selective removal of excess animals or relocation of superior animals from other territories to improve gene pool is prohibited.  The intent of the Wild Horses and Burros Protection Act is to manage these animals as part of the natural ecosystem.

2. <u>Actions</u>.  Includes such direction as population level, protection requirements, and means for removal and/or disposal of excess animals.  Identify action needed to achieve management objectives.

Establish population levels by considering:

      a.  Number of animals.

      b.  Suitability of range.

      c.  Range condition and trend.

      d.  Other associated resources and resource use activities.

The plan must include range improvements in order to ensure desired management.  Range improvements may be constructed from appropriated funds or deposits.

3. <u>Evaluation</u>.  Describe the system to be used to determine progress in meeting management objectives.

4. <u>Annual Operating Plan</u>.  List the actions for the current year to implement management direction.  Include plans for removal of excess animals.

## 2264 - PROTECTION OF WILD FREE-ROAMING HORSES AND BURROS

## 2264.1 - Agency Responsibility

Wild free-roaming horses and burros remain under protection of the Forest Service and/or the Bureau of Land Management even though they stray from National Forest lands to lands under other Federal jurisdiction such as National Parks, monuments, and military reservations.  The Forest Service shall maintain surveillance of and provide protection for wild free-roaming horses and burros at all times.  Utilize agreements, memorandums of understanding, or other

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 630 of 638

WO AMENDMENT 2200-2003-1                                    2260
EFFECTIVE DATE: 01/24/2003                                Page 9 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

instruments authorized by law to protect these animals.  Forest Service personnel are not authorized, in the absence of agreements with landowners or court orders to enter lands of other ownership for the surveillance and protection of wild horses and burros.  When there is reason to suspect violation of the protective measures of the Wild Horses and Burros Protection Act and regulations, initiate appropriate administrative and/or criminal and civil judicial procedures.

## 2264.2 - National Forest System

Do not issue permits to individuals or organizations for management of animals on National Forest System lands.  Consider entering into agreements whereby individuals or organizations may provide funds for management purposes, improvement of water supply, fencing, or other habitat needs.

## 2264.3 - Private Lands

Agency officials may permit owners of private land who wish to maintain wild free-roaming horses and burros to do so when excess animals are available, and when the owners agree to provide management, protection, and control of the animals, and as a condition of such agreement, to provide an annual report of the welfare and condition of the animals.  When wild horses and burros stray or migrate seasonally from National Forest lands onto private lands and the owner does not object to their intermittent presence, the authorized officer should formulate agreements that establish a mutual understanding about the animals' management.

## 2265 - ANIMAL CONTROL

## 2265.1 – Capture

Capture wild free-roaming horses and burros as necessary for management, protection, and control.  Corral captured animals and hold them in a humane manner pending release, relocation, or disposal.  All actions affecting the capture of wild free-roaming horses and burros shall be under the direction of a Forest officer with delegated authority (FSM 2204.3).

## 2265.2 - Removal of Animals at Landowner's Request

Upon request of a landowner, Forest Service personnel shall remove wild free-roaming horses and burros that have strayed from National Forest lands onto private lands. When fences on boundaries between private lands and National Forest do not exist or are not adequate, advise the landowners of their responsibilities, what the Forest Service position is, and come to an agreement about who will construct, improve, or maintain such fences.

Adhere to applicable State laws governing movement of live-stock when moving wild free-roaming horses and burros from private lands.  Return all wild free-roaming horses and burros from private lands to their normal herd territories with minimum physical damage or stress to the animals.  Use helicopters and motor vehicles within limits established in FSM 2267.

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 631 of 638

WO AMENDMENT 2200-2003-1                                                    2260
EFFECTIVE DATE: 01/24/2003                                          Page 10 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

When strayed animals pose an imminent threat to the safety of persons or are likely to cause excessive damage to private property if not removed immediately, they may be destroyed in the most humane and cost-efficient manner possible.

## 2265.3 - Removal of Excess Animals

Remove excess animals in the following order and priority:

1. Old, sick, or lame animals.  They should be destroyed in the most humane manner possible.

2. Those animals determined to be "excess" to the maintenance of a natural ecological balance.  The remaining number is that acceptable population range identified in the management plans.

## 2265.4 - Relocation of Wild Horses and Burros

Relocate wild horses and burros if they are excess or if it is necessary to prevent their repeated return to private land from which their removal has been requested.  Relocation must be to one or more of the following:

1. Some other area designated as a Wild Horse and Burro Territory, if suitable habitat and grazing capacity is available.

2. Lands administered by the Bureau of Land Management.

3. Custody of other parties, under agreement.

## 2265.5 - Maintenance and Care Agreement

Authorized Forest officers may place excess animals with qualified individuals, Government agencies, or other entities.  Written agreement must accompany such relocation.  Animals may remain in private custody for an indefinite period.

Allow an individual to adopt No more than four animals per year, unless the applicant is found capable of caring for more than four animals.  Document evidence of the individual's ability to care for additional animals.  Each Region shall establish procedures, including public awareness, for adoption programs.  Coordinate programs with local Bureau of Land Management efforts (FSM 2261.1).

The maintenance and care agreement will provide for:

1. Humane treatment and care of animals.

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 632 of 638

WO AMENDMENT 2200-2003-1                                        2260
EFFECTIVE DATE: 01/24/2003                                     Page 11 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

2.  Prevention of sale of the animals.

3.  Prevention of transfer or assignment of the animal to a third party without approval of the Forest Service.

4.  Domestication, including riding, packing, and other recognized uses of domesticated horses and burros.

5.  Possible gelding of stallions.

6.  Ownership of foals born during the time animals are in custody of private parties.

7.  Submission of periodic reports to the Forest Service.

8.  Prohibiting financial remuneration from carcasses of animals.

9.  Notification, within at least 7 days, of the death of adopted animal.

10.  Transfer of ownership (granting of title) at the end of one year of humane care and maintenance (FSM 2265.56).

## 2265.51 - Identification of Animals Placed in Private Custody

All animals placed in private custody must receive a number for identification purposes.  Use the Alpha Angle marking and numbering system where sizable numbers are processed or where animals are processed in cooperation with the Bureau of Land Management.  Use freeze brand methods to place markings under the mane on the left side of the neck.

## 2265.52 - Assignment of Number

Numbers are assigned as follows:

| State | Numbers to be Assigned | Total Number Available |
|---|---|---|
| Arizona | 975,001 - 975,500 | 500 |
| California | 975,501 - 985,500 | 10,000 |

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 633 of 638

WO AMENDMENT 2200-2003-1                                    2260
EFFECTIVE DATE:  01/24/2003                                 Page 12 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

| State | Numbers to be Assigned | Total Number Available |
|-------|------------------------|------------------------|
| Colorado | 985,501 - 986,000 | 500 |
| Idaho | 986,001 - 986,500 | 500 |
| Montana | 986,501 - 987,000 | 500 |
| New Mexico | 987,001 - 990,000 | 3,000 |
| Nevada | 990,001 - 997,000 | 7,000 |
| Oregon | 997,001 - 998,500 | 1,500 |
| Utah | 998,501 - 999,500 | 1,000 |
| Wyoming | 999,501 - 999,999 | 499 |
|  |  | 24,499 |

Numbers are assigned through the Bureau of Land Management.  It is suggested that Regions make allocations by territories or Forest.

## 2265.53 - Control of Numbers

Do not reuse numbers for 20 years following the granting of title or 5 years following the known death of a horse or burro placed in private custody.

Report any horses or burros marked by numbers to the Bureau of Land Management, Denver Service Center.  It is not necessary to report assigned numbers not yet marked on animals to BLM.

## 2265.54 - Adoption Fee Procedures

Charge adoption fees and transportation costs used in the Adopt-A-Horse Program.  Where advance applications for adoptions are required, the adopting individual must make a non-refundable $25 advance payment with the application.  Such advance payment is applicable to the total fee.

Mark Forest Service animals to be moved through BLM adoption centers to the eastern states with BLM Alpha Code numbers and process them as BLM animals.  When animals are processed through BLM facilities, come to agreement about charges for transportation costs.  See FSM 6531 for collection and billing procedures.

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 634 of 638

WO AMENDMENT 2200-2003-1                                        2260
EFFECTIVE DATE: 01/24/2003                                  Page 13 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## 2265.55 – Violations

Handle violations of maintenance and care agreements, including unlocatable cooperators, as set forth in FSM 5320.3, FSM 5303.12, and FSM 5321.4.

## 2265.56 - Conditions for Granting Title

Grant title to wild free-roaming horses and burros applicant when:

    1.  Applicant has provided the animal maintenance and care under humane conditions for at least 1 year.

    2.  Unless waived in writing, the application for title includes a written statement by a licensed veterinarian attesting to the present condition and treatment of the animal.

    3.  Applicant is of legal age in the State in which the applicant resides.

Grant title to no more than four animals per year to any individual, organization, or government agency unless they have an agreement, which covers more than four animals.  The maintenance and care agreement may include the application for title.  The title can then be issued when 1 year of humane maintenance and care has been provided.

## 2265.57 - Status of Animal After Title Has Been Granted

After title has been granted, the horse or burro loses its wild free-roaming status, the United States has no further jurisdiction, and the owner has full freedom to manage, protect, use, and control the animal.

## 2265.6 - Disposal of Animals on National Forest System Lands

## 2265.61 - Act of Mercy

Immediately destroy severely injured or seriously ill animals on National Forest System lands in the most humane manner possible under the supervision of a Forest officer delegated such authority.  Destruction as an act of mercy is acceptable regardless of other population considerations.  Destruction of an animal as an act of mercy should be documented fully by the person who destroys the animal.  Documentation should describe the health of the animal, reason for its destruction, and cause of injury or circumstances leading to the animal's condition.

## 2265.62 - Excess Unadoptable Animals

Animals not placed under care and maintenance agreements to qualified individuals within 45 days following capture may be destroyed in the most humane and cost-efficient manner possible. Make a reasonable attempt to establish demand for these animals before destroying them.

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 635 of 638

WO AMENDMENT 2200-2003-1                                      2260
EFFECTIVE DATE: 01/24/2003                                    Page 14 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

Dispose of carcasses in accordance with FSM 2265.7.  Adhere to State and local laws in destroying excess animals and consult local veterinarians for advice.

## 2265.7 – Carcasses

Carcasses of animals that were wild free-roaming lose their status and no longer fall under the jurisdiction of the United States when:

1.  Animals have been destroyed as an act of mercy.  This includes carcasses of animals under private maintenance and care agreement.

2.  Excess animals have been destroyed or their disposal approved of by an authorized Forest officer in carrying out provisions of the territory management plan.

3.  Animals have died of natural causes on National Forest lands or on private land where they were being maintained under agreement.

Follow State and local laws in the disposal of these carcasses.

## 2265.71 - Carcasses That Retain Status as Wild Free-Roaming Horses and Burros

Retain the status of wild free-roaming horses and burros that are deliberately destroyed by others for malicious or capricious reasons.  Do not process these carcasses through a rendering plant or into a commercial product.  When State sanitary codes do not prescribe techniques for disposal, consider burying or burning the carcasses in accordance with State fire laws.

## 2266 – CLAIMS

Privately-owned branded or unbranded horses and burros might roam into areas established as Wild Horse and Burro Territories and become intermingled with wild free-roaming horses and burros.  Pursuant to 36 CFR 222.22(a), individuals claiming ownership of these animals must make their claim to the District Ranger, who then decides whether or not to recommend a roundup to determine the validity of the claim.  The Forest Supervisor makes the decision whether to authorize a roundup in writing (FSM 2266.2).

## 2266.1 - Handling Ownership Claims

Settle claims as soon as possible after capturing the claimed animals.  The District Ranger shall verify or reject the claim and shall obtain a written release from the claimant for animals verified.

## 2666.2 - Authorization to Gather Claimed Animals

Case 2:25-cv-02446-DJC-JDP    Document 4-1    Filed 08/27/25    Page 636 of 638

WO AMENDMENT 2200-2003-1                                          2260
EFFECTIVE DATE:  01/24/2003                                       Page 15 of 17
DURATION:  This amendment is effective until superseded or removed.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

Authorization to gather privately claimed horses and burros located on Wild Horse and Burro Territories, whether or not they have become intermingled with wild free-roaming horses and/or burros, must be in writing by the Forest Supervisor.  The written authorization must as a minimum:

    1.  Be consistent with the provisions of 36 CFR 222.22.

    2.  Establish a specific, reasonable period of time to allow the gathering of claimed animals.

    3.  Stipulate that Forest Officers make periodic observations of roundup operations.

    4.  Stipulate measures for the roundup that ensure humane treatment of wild free-roaming horses and burros.

    5.  Outline criteria for achieving compliance with agreements with the State agency administering the State estray laws.  In the absence of an agreement, the authorization shall outline measures required by the Forest Service to comply with State law.

    6.  In the event that helicopter use is authorized for the roundup, the authorization shall specify how such helicopters shall be used to ensure humane treatment of all horses and burros involved (FSM 2204.3).

    7.  Provide for inspection of captured animals by authorized Forest officer to verify ownership.  Use State brand inspectors whenever possible.

## 2267 - USE OF HELICOPTERS, FIXED-WING AIRCRAFT, AND MOTORIZED VEHICLES

The Wild Horse and Burro Protection Act limits use of helicopters, fixed-wing aircraft, and motor vehicles.  There are no limitations when such vehicles are used in carrying out management programs, such as inventory, observation, movement, relocation, and surveillance purpose, except that use must be in a manner that ensures humane treatment of the animals.  There are strict limitations concerning use of aircraft and ground motor vehicles in connection with the capture or transport of wild horses and burros.

### 2267.1 - Public Meetings

Hold public meetings before initiating capture operations that include use of helicopters with subsequent use of motor vehicles to transport captured animals.

Hold public meetings close to the territory where the capture operations are to take place.  Plan the meetings far enough in advance of capture operations to allow for changes in plans that result from public input.

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

The Forest Supervisor or a representative authorized by the Forest Supervisor shall preside over the meeting.  Federal Register notice of a meeting is desirable when there is considerable public interest in the operation or it has generated controversy.

Verbatim documentation of these meetings is not necessary.  Keep minutes that identify the date and place of meeting, the number in attendance, and the names of those offering comments, as well as a summary of comments made.  Minutes of the meeting shall be filed in the Forest Supervisor's office, as well as in the affected Ranger's office.

## 2267.2 - Prohibition Against Use of Fixed-Wing Aircraft to Capture Wild Free-Roaming Horses and Burros

The Wild Horse Protection Act of September 8, 1959, as amended (18 U.S.C. 21 et seq.), prohibits use of fixed-wing aircraft in capturing wild horses and burros.  Use such aircraft as support vehicles to transport personnel and equipment, but not in actual capture operations.

## 2267.3 - Use of Helicopters in Capture Operations

Helicopter use in the capture of wild free-roaming horses and burros is acceptable, subject to compliance with public meeting requirements (FSM 2267.1) and to the following stipulations:

1.  Helicopters must be used in a manner that ensures humane treatment of wild free-roaming horses and burros.  They may be used to locate animals, to assist ground crews in moving and turning animals to encourage movement, to immobilize animals with tranquilizers, and for related purposes such as transporting personnel and equipment.

2.  Use helicopters in roundups in such a manner that bands or herds will tend to remain together.

3.  Do not move horses or burros at a rate that exceeds the limitations set by the authorized officer who shall consider terrain, weather, distance to be traveled, and condition of animals in setting the limitations.

4.  Use helicopters to observe the presence of dangerous areas and to move animals away from hazards during capture operations.

5.  During capture operations, move animals in such a way as to limit stress or injury.

6.  The authorized Forest officer supervising helicopter use shall:

   a.  Have means to communicate with the pilot and direct the helicopter's use.

   b.  Be able to observe the effects of the helicopter on the animals.

WO AMENDMENT 2200-2003-1
EFFECTIVE DATE: 01/24/2003
DURATION:  This amendment is effective until superseded or removed.

2260
Page 17 of 17

**FSM 2200 - RANGE MANAGEMENT**
**CHAPTER 2260 - WILD FREE-ROAMING HORSES AND BURROS**

## 2267.4 - Use of Motor Vehicles to Transport Excess Wild Horses and Burros

Use of motor vehicles to transport excess wild horses or burros is acceptable, subject to compliance with public meeting requirements (FSM 2267.1).  Do not use motor vehicles for rounding up, driving, or chasing wild free-roaming horses or burros.  Transport excess animals in a humane manner to minimize injury.  The following guidelines apply:

1.  Such transportation shall comply with appropriate State and Federal laws and regulations on humane transportation of horses and burros.

2.  Inspect vehicles before use to ensure they are in good repair and of adequate rated capacity.  Do not use "possum belly" cattle trucks to transport wild free-roaming horses and burros.

3.  Unless otherwise approved by the authorized officer, limit the transportation of wild free-roaming horses and burros, in sequence, to a maximum of 24 hours in transit followed by a minimum of 5 hours of on-the-ground rest with adequate feed and water.

4.  Operate vehicles carefully to ensure that excess animals are transported without undue risk or injury.

5.  Where necessary and practical, sort animals by age, temperament, sex, size, and condition to limit injuries from fighting and trampling to the extent possible.

6.  Consider the condition of the animals, weather conditions, type of vehicle, and distance to be traveled when planning for transportation of captured animals.