UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BONNIE KOHLERITER, et al.,

    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

    Defendants.

No. 2:25-cv-02446-DJC-JDP

ORDER

    Plaintiffs have filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to prevent the scheduled gather of wild horses at the Devil's Garden Plateau Wild Horse Territory. Presently before the Court is the Motion for Temporary Restraining Order, which Defendants have opposed. The Court heard oral argument on the Motion on August 29, 2025, at the conclusion of which the matter was submitted.

    For the reasons stated below, the Court DENIES Plaintiffs' Motion for Temporary Restraining Order.

////

////

## BACKGROUND

The management of the Devil's Garden Plateau Wild Horse Territory by federal agencies has been a long running source of disputes spanning more than a decade. The Devil's Garden Plateau Wild Horse Territory is a portion of the Modoc National Forest in Northern California. (Mot. (ECF No. 4) at 10; Opp'n (ECF No. 10) at 4.)

In 1975 two portions of the Devil's Garden Plateau were designated as "Wild Horse Territory." (Mot. at 10–11; Opp'n at 5.) The United States Forest Service is responsible for management of most of that area today. (*See* Mot. at 7.) Designated wild horse territories are areas identified for protecting and maintaining wild free-roaming horses under the Wild and Free-Roaming Horses and Burros Act ("Wild Horse Act"). (Mot. at 20; Opp'n at 2.) The agencies in charge of these territories manage the population of the wild horses within the territory and seek to maintain a population in line with an Appropriate Management Level ("AML"). (*See* Mot. at 11; Opp'n at 3.) This allows for the wild horse populations to exist while still maintaining ecological balance and avoiding overpopulation. (Opp'n at 3.) As discussed below, what constitutes the current AML is a point of contention between the parties. Relying on a 2013 Wild Horse Territory Management Plan (the 2013 Plan), Defendants argue the upper limit of the AML is 402 horses, while the lower limit of the AML is 206. (Opp'n at 5 citing (ECF No. 10-6 at 6).) Plaintiffs for their part believe the operative AML is between 275 to 335 horses as set in the 1991 Modoc National Forest Land and Resource Management Plan. (Mot. at 11 citing (ECF No. 4-1, Ex. C).)

In 2024, Defendant United States Forest Service conducted a census showing a wild horse population of 723 horses. (Mot. at 15–16; Opp'n at 12–13.) Based on this census, Forest Service removed 407 wild horses in the of Fall 2024 to Winter 2025. (Mot. at 15–16.) On August 15, 2025, Forest Service announced plans to conduct a "gather" of wild horses in the Devil's Garden Plateau Wild Horse Territory with the helicopter portion of that gather occurring September 2, 2025, during which the Forest Service would gather 350 wild horses from the territory and ultimately remove

them from the area. (Mot. at 7; Opp'n at 8.) The Forest Service asserts that this gather is necessary to maintain the wild horse population in the Devil's Garden Plateau Wild Horse Territory at the AML. (Opp'n at 8.) The appropriate size for the gather was determined based on a "ground survey" that showed a wild horse population of 500 to 600 horses. (*Id.*) Plaintiffs are seeking to stop the planned September gather, arguing that Defendants have violated National Environmental Policy Act ("NEPA"), the Wild Horse Act, and the First Amendment.

## LEGAL STANDARD

The standards for issuing a temporary restraining order and a preliminary injunction are "substantially" similar. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain preliminary injunctive relief, Plaintiff must show (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Where a plaintiff can show that there are serious questions going to the merits, then a preliminary injunction may still be issued if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied. *Friends of the Wild Swan v. Weber,* 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

## DISCUSSION

**I. Likelihood of Success on the Merits**

Plaintiffs argue that they have a likelihood of success on the merits of all three of the causes of action in their Complaint. These are (1) the Forest Service violated NEPA when it failed to analyze the environmental impacts of removing horses from the Devil's Garden Plateau Wild Horse Territory; (2) the Forest Service violated the Wild Horse Act in making an inappropriate determination regarding the existence of excess wild horses determination and the necessity of removal; and (3) the Forest Service violated Plaintiffs' First Amendment rights by limiting observations of the

planned September gather. The Court finds that Plaintiff has established a likelihood of success on the NEPA claim but has failed to establish a likelihood of success on the merits of the WHA and First Amendment claims.

**A. NEPA**

Under NEPA, a federal agency must prepare an Environmental Impact Statement ("EIS") when it proposes to undertake "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998). To determine whether an EIS is needed, an agency will first prepare an Environmental Assessment ("EA") to assess whether the project will have a significant effect on the environment, thereby requiring an EIS. *Morongo Band of Mission Indians*, 161 F.3d at 575. Where "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor," an EIS is required. *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir.1988) (internal quotations and emphasis omitted). If the agency instead determines there will be no significant impact, the agency will issue a Finding of No Significant Impact ("FONSI") and is not required to issue an EIS. *Morongo Band of Mission Indians*, 161 F.3d at 575.

Plaintiffs' NEPA claims are brough under the Administrative Procedures Act ("APA"). *See, e.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). Under the APA, a decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*; 5 U.S.C. § 706(2)(A). Such review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, a court may only set aside a decision if the agency:

> [H]as relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

4

> runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

Relevant to these issues is the history of the 2013 Devil's Garden Plateau Wild Horse Territory Management Plan and Forest Plan Amendments. Prior to the 2013 Plan, the Forest Service had treated the Devil's Garden Plateau Wild Horse Territory as a single connected territory for several decades. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 920–21 (D.C. Cir. 2017). The treatment of the Devil's Garden Plateau Wild Horse Territory as a single piece of land was potentially due to an "administrative error" where an additional approximately 23,000 acre "Middle Section" was included as part of the Territory, connecting the two divided areas that originally made up the Territory when it was first designated in 1975. *Id.* at 921–22. The 2013 Plan sought to alter this by eliminating the roughly 23,000 acre Middle Section from the Territory, effectively returning it to its original divided form.[1] *Id.* at 922–23. Ultimately, the D.C. Circuit Court found that the decision to remove the Middle Section was arbitrary and capricious as the Forest Service had failed to explain the change and adequately consider whether Environmental Impact Statement was necessary. *Id.* at 923. The Circuit Court directed the district court to "remand to the Service for further consideration consistent with this decision." *Id.* at 932. To date, no further plan has been adopted.[2] The parties disagree on the ongoing validity of the 2013 Plan in light of the D.C. Circuit's decision.

---

[1] The 2013 Plan concerned far more than this change. As noted by the D.C. Circuit in *American Wild Horse Preservation Campaign*, wild horse management generally was only "a factor of a factor of a factor that the Service considered when developing the [2013 Plan]." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 930.

[2] Plaintiff reports that in 2022, the Forest Service began the process of creating a new management plan which resulted in a finalized EA in 2024. (*See* Mot. at 15.) A draft Decision Notice and FONSI have allegedly been produced but have not been issued. (*See id.*) Thus, that plan has not yet been adopted and is not relevant here.

Plaintiffs have established a likelihood of success on the merits of their NEPA claim. While it is unclear exactly how far the D.C. Circuit's decision extends in vacating the 2013 Plan, it is clear that its effects extend well beyond that suggested by Defendants. The D.C. Circuit's determination that the Middle Section was improperly excluded from the 2013 analysis cannot be considered in a vacuum and the subsequent re-inclusion of the Middle Section necessarily has impacts on portions of the rest of the environmental analysis. In its order, the D.C. Circuit very specifically noted that "herd management levels" were affected by the inclusion and exclusion of the Middle Section:

> What the 1991 Forest Plan did do was formally document a single, contiguous, 258,000 acre Wild Horse Territory that could only exist through inclusion of the Middle Section, incorporate that status into the Plan through a notice-and-comment process, and set a herd management level within that territory of "275–335 animals to manage," J.A. 586. In addition, the Forest Plan's explicit description of the size and management levels for the Wild Horse Territory largely repudiates the Service's claims that the plan was "of no practical consequence for the management of the disputed area because the Forest Service never set appropriate management levels for horses on the [portions of allotments] within the disputed area.

*Am. Wild Horse Pres. Campaign*, 873 F.3d at 925. Thus, given that the Forest Service's exclusion of the Middle Section was vacated, decisions at least partially predicated on that conclusion – most importantly any AML established by the 2013 Plan – were also vacated by the Court's order.

Moreover, it does not appear that the Forest Service has yet complied with the remand order directed by the D.C. Circuit and issued by the district court. In its order the Circuit Court expressly "direct[ed] the district court to remand to the Service for further consideration consistent with this decision." *Id.* at 932. No subsequent NEPA document was ever issued by the Forest Service. Defendants have noted the existence of the "July 2018 Supplemental Information Report" but that document

6

focused on gathers scheduled to occur in 2018 and 2019. (*See* 2018 Supplemental Report (ECF No. 10-3) at 18.) As such, it is not relevant or applicable to the current gather because it was not intended to serve as an analysis of the sufficiency of the proposed September gather. *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 3:15-cv-0057-LRH-WGC, 2015 WL 555980, at *3–4 (D. Nev. Feb. 11, 2015). More importantly, as Counsel conceded at oral argument, the 2018 Supplemental Report is expressly <u>not</u> a NEPA document. (*See* 2018 Supplemental Report at 18 ("A [Supplemental Information Report] is not a NEPA document and cannot be used to fulfill the requirements for a supplemental EA.").) As such, the 2018 Supplemental Report does not satisfy D.C. Circuit's remand order.

The evidence submitted by both parties shows that the Forest Service is clearly relying on the 2013 Plan to assess and institute the planned September gather. (2025 Excess Wild Horse Determination (ECF No. 10-9) at 2 ("The 2013 TMP provides criteria for making or adjusting excess wild horse determinations[.]" and "At this time, and considering the 15-20% reproduction rate established by the 2013 TMP, wild horse populations have exceeded the designated appropriate management level and horses are permanently residing outside the Wild Horse Territory.").) Defendants, in relying the 2013 Plan, are acting based on a document that – at a bare minimum – remains partially vacated for portions of the environmental analysis that are intrinsically connected to the Forest Service's planned gather. The Forest Service's continued reliance on the 2013 Plan without completing the assessment that was ordered on remand almost certainly constitutes an arbitrary and capricious action. As such, Plaintiffs have established a likelihood of success on this claim.

**B. Wild Horse Act**

Plaintiffs have not shown a likelihood of success on their Wild Horse Act claim.[3] Even if the 2013 Plan is no longer valid, the current horse population assessed by the

---

[3] Alleged violations of the Wild Horse Act are also assessed under the APA's arbitrary and capricious standard. *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014).

Forest Service exceeds the AML limits set by the prior 1991 Forest Plan that Plaintiffs argue is the remaining valid analysis. While Plaintiffs contest the accuracy of the excess wild horse determination, Defendants have provided a valid description of how they reached their determination. Most of Plaintiffs' contentions regarding the accuracy of the number stems from the fact that the 2024 aerial survey resulted in a count of 651 to 998 horses and the subsequent gather resulted in a removal of 409 horses. (Mot. at 21-22; Opp'n at 12-13.) Based on this, Plaintiffs argue that applying a 15% growth rate would not be congruent with the ground count results of 500 to 600 horses. (Mot. at 22.) However, the Forest Service explains that the 2024 survey was conducted in late Winter/early Spring 2024. (Opp'n at 12; Levy Decl. (ECF No. 10-1) ¶ 13.) Thus, in the time between the 2024 aerial survey and the 2025 ground count, there were <u>two</u> birthing cycles. (*See* Levy Decl. ¶ 13-14.) Moreover, while the Forest Service agrees that aerial surveys are preferrable, it notes that the main issue with ground counts is the risk of undercounting the wild horse population. (Opp'n at 13.) Plaintiffs have thus not presented evidence that the Forest Service's excess population determination was arbitrary and capricious.[4]

Plaintiffs also challenge the determination whether removal is necessary. But based on the Forest Service's count, the current wild horse population exceeds the AML set by either the 2013 Plan and the 1991 Forest Plan. Defendants appear to have provided a reasonable basis for determination that removal of this excess population was necessary. To be sure, to the extent the Defendants are relying on invalid assessments in making that necessity determination, that determination would necessarily also be called into question. But based on the information presently

---

[4] The Court notes that it is also unconvinced that the 1991 Forest Plan is a viable alternative to the 2013 Plan. The 1991 Forest Plan states that it is intended to "guide[] the management of the Forest for the next 10-15 years[.]" (1991 Forest Plan (ECF No. 10-4) at 1-1.) Without the briefing of the parties on this issue, the Court makes no final determination here, but the Court has serious questions about whether a plan issued over three decades ago can be considered a valid NEPA document when it was only intended to cover a 10 to15 year period. *See Friends of Animals*, 2015 WL 555980, at *3-4. This issue is also ultimately irrelevant for purposes of this Order given the Court finds below that Plaintiffs have not met the irreparable injury requirement.

before the Court, the Court cannot find the Forest Service's necessity determination under the Wild Horse Act was arbitrary and capricious.

**C. First Amendment**

Plaintiffs have also not established a likelihood of success on the merits of the First Amendment claim. Both parties agree that the First Amendment provides "a qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012). A court determines whether a right of access attaches to a government activity by assessing "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter., Co. v. Sup. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 8 (1986). This qualified right has been understood to extend to the viewing of wild horse gather operations on public land, *see Leigh v. United States Dep't of Interior,* No. 2:22-cv-01200-MMD-BNW, 2024 WL 4279156, at *5 (D. Nev. Sept. 23, 2024) (collecting cases), and under certain circumstances to holding corrals on private land, *see id.* at *7. Where a qualified right of access exists, the government may only impose limitations where there is an "overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter., Co.,* 478 U.S. at 9.

Defendants have asserted that their restrictions are tailored to serve two important overriding interests: (1) "the effective and efficient gather of the horses" and (2) "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves." (Opp'n at 14 (citing *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013) [hereinafter *Salazar II*].) These are interests that courts have upheld as constituting appropriate overriding interests justifying the limitations placed on the availability of public viewing of the proposed September gather. *See Salazar II*, 954 F. Supp. 2d at 1101. While Plaintiffs note that they have on other occasions been able to attend gathers without the same degree of

restrictions, Defendants note that the Forest Service has been forced to limit that access compared to prior gathers to ensure safety as a result of substantially reduced staffing. (Opp'n at 14–15.) Defendants explain the many potential dangers to observers, horses, and staff during the gather and argue that their ability to conduct the gather in an efficient, effective, and safe manner is an overriding interest that justifies limited access. At this point, the restrictions appear to be narrowly tailored, as viewing opportunities exist subject to Forest Service's ability to ensure safe and efficacious gatherings. *See Leigh v. Raby,* No. 3:22-cv-00034-MMD-CLB, 2022 WL 267353, at *9–10 (D. Nev. Jan. 28, 2022) (finding that restrictions allowing some viewing opportunity based on ensuring safe and efficacious gatherings were narrowly tailored for purposes of preliminary injunctive relief but dismissing the First Amendment claim without prejudice so the plaintiff could potentially re-challenge narrow tailoring). As such, the Forest Service has at this stage met their burden at this stage to show that the limitations placed on access are narrowly tailored to serve important overriding interests.

**II. Irreparable Harm**

While the Court above finds that Plaintiffs have established a likelihood of success on their NEPA claim, they have not satisfied the irreparable harm requirement for preliminary injunctive relief. Importantly, the horses from the proposed September gather will be held by the Forest Service and are subject to release only if the Forest Service determines after conducting the October aerial survey that the wild horse population in the Territory has fallen below the minimum AML threshold. (Levy Decl. ¶ 19.) This obviates any irreparable harm that might be suffered based on the Forest Service conducting the planned September gather. Given the lack of irreparable injury for the claim where Plaintiffs have a likelihood of success, the Court will deny Plaintiffs' Motion for Temporary Restraining Order.

The Court notes that while there is no irreparable harm in the Forest Service conducting the gather, it does not mean that there is no irreparable injury for the

ultimate <u>removal</u> of gathered horses. It is difficult to assess at this time the scope of the harm that would result from the removal of the horses given the factual dispute between the parties regarding the current number of horses. If Plaintiffs are correct that as a result of the removal of horses "the population will dip significantly below AML, and the horses will essentially be eradicated" (Mot. at 22–23), that would almost certainly constitute irreparable injury. *See Friends of Animals* 2015 WL 555980, at *4. If Defendants are correct and the removal of horses is required to return to herd to AML, that may not constitute irreparable harm. *See In Def. of Animals v. U.S. Dept. of Interior*, 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010). In light of the representations that the gathered horses will not be removed and can be released after the October aerial survey, however, these concerns can be addressed on briefing for Plaintiffs' Motion for Preliminary Injunction and do not establish irreparable harm for purposes of Plaintiffs' Motion for Temporary Restraining Order.

### III. Balance of Equities and Public Interest

Where a party seeks preliminary injunctive relief against the Government, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009). The balance of equities here tips in Defendants favor. As noted, Plaintiffs have not established that they will suffer irreparable harm if the gather is conducted. Defendants and the public have a strong interest in maintaining control of the wild horse population. While there is a sharp dispute between the parties as to the actual herd size in the Devil's Garden Plateau Wild Horse Territory, this dispute will likely be resolved by conducting the October aerial survey. At oral argument, Defendants represented that if the gather does not occur now, it may not happen and that, due to budget constraints, they will be unlikely to conduct a subsequent gather for the remainder of the year. Nevertheless, it is important to note that as discussed above, Defendants may not ultimately be able to permanently remove horses from the Territory if they have, in fact, failed to comply with their obligations under NEPA.

However, given the facts presently before the Court, the balance of equities tips in Defendants favor.

## CONCLUSION

In light of the above, Plaintiffs have not met their burden to show that issuance of a Temporary Restraining Order is warranted.  *See Winter,* 555 U.S. at 20.  Accordingly, Plaintiff's Motion for Temporary Restraining Order (ECF No. 4) is DENIED.

Defendants' Opposition to Plaintiffs' pending Motion for Preliminary Injunction shall be filed on or before September 11, 2025.  Plaintiffs Reply shall be filed on or before September 18, 2025.  Oral Argument for the Motion for Preliminary Injunction will be held on September 25, 2025 at 1:30 p.m. via Zoom before District Judge Daniel J. Calabretta.  Additionally, the parties are ORDERED to meet and confer prior to September 11, 2025 in an attempt to narrow the disputed issues, including the parties' best estimate of the number of horses currently in the Territory.

IT IS SO ORDERED.

Dated:    **August 30, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE